SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
DAVID A. SCHWARZ, Cal. Bar No. 159376
dschwarz@sheppardmullin.com
BARBARA E. TAYLOR, Cal. Bar No. 166374
btaylor@sheppardmullin.com
ZACHARY J. GOLDA, Cal. Bar No. 327532
zgolda@sheppardmullin.com
JAMES V. FAZIO, Cal. Bar No. 183353
jfazio@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:  310.228.3701

*Attorneys for Plaintiff*
Southern California Healthcare System,
Inc., a California Corporation, d/b/a
Southern California Hospital at Culver City

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Southern California Healthcare System, Inc., a California Corporation, d/b/a Southern California Hospital at Culver City. | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF:** |
| v. | **(1) National Labor Relations Act (29 U.S.C. § 141, *et seq.*) Preemption;** |
| City of Culver City, a charter municipality; Mayor Alex Fisch, in his official capacity; Vice Mayor Daniel Lee, in his official capacity; Council Member Yasmine-Imani McMorrin, in her official capacity; Council Member Göran Eriksson, in his official capacity; and Council Member Albert Vera, in his official capacity, | **(2) Violation of Equal Protection (U.S. Const., amend XIV, § 1); (3) Violation of Equal Protection Clause (Cal. Const., Art. I, § 7); (4) Violation of Contracts Clause (U.S. Const., Art. 1, § 10); (5) Violation of Contracts Clause (Cal. Const., Art. I, § 9); (6) Violation of Ban on Bills of Attainder (U.S. Const., Art 1, § 10); (7) Violation of Ban on Bills of Attainder (Cal. Const., Art. I, § 9); (8) Violation of Ban on Special Legislation (Cal. Const., Art. IV, § 16(b); (9) Violation of Due Process (U.S. Const., amend XIV, § 1); (10) Violation of Due Process (Cal. Const., Art. I, § 7); and (11) Violation of 42 U.S.C. § 1983** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................... 1

II.    PARTIES .................................................................................... 6

III.   JURISDICTION AND VENUE ................................................... 7

IV.    FACTUAL ALLEGATIONS ....................................................... 8

    A.   Southern California Hospital at Culver City ........................ 8

    B.   SCHCC's Response To the COVID-19 Pandemic ............... 10

    C.   Financial Impact of COVID-19 ........................................ 16

    D.   The Medical Economic Realities of Safety Net Hospitals. ........ 18

    E.   Collective Bargaining Agreements ................................... 20

    F.   Contract Renewal Negotiations Between SCHCC and SEIU ........... 21

    G.   The Ordinance ................................................................ 24

        1.   February 22, 2021:  The City Council Initiates Discussions Concerning the Ordinance ........... 24

        2.   April 12, 2021: First Agendized Discussion of "Hero Pay" ...... 27

        3.   May 10, 2021: The Proposed SCHCC Ordinance Is Introduced ........... 30

        4.   May 24, 2021: The Revised Proposed Ordinance is Introduced ........... 31

        5.   June 14, 2021: The SCHCC Ordinance Is Adopted ........... 34

    H.   The Targeted and Arbitrary Nature of the Ordinance ........... 37

    I.   The Financial Impact of the Ordinance on SCHCC and its Employees ........... 39

    J.   The Irreparable Harm That Would Be Caused By Enforcement of the Ordinance ........... 41

FIRST CAUSE OF ACTION
NLRA PREEMPTION (29 U.S.C. § 141, *et seq.*) ........... 43

SECOND CAUSE OF ACTION
VIOLATION OF EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT (U.S. Const., amend. XIV, § 1) ........... 45

THIRD CAUSE OF ACTION
    VIOLATION OF EQUAL PROTECTION CLAUSE (Cal. Const., Art.
    I, § 7) ........................................................................................................ 50

FOURTH CAUSE OF ACTION
    VIOLATION OF CONTRACTS CLAUSE (U.S. Const., Art. 1, sec.
    10, cl. 1) ................................................................................................... 50

FIFTH CAUSE OF ACTION
    VIOLATION OF CONTRACTS CLAUSE (Cal. Const., Art I, § 9) ............ 54

SIXTH CAUSE OF ACTION
    VIOLATION OF BAN ON BILLS OF ATTAINDER (U.S. Const.,
    Art. I, § 10) .............................................................................................. 55

SEVENTH CAUSE OF ACTION
    VIOLATION OF BAN ON BILLS OF ATTAINDER (Cal. Const., Art.
    I, § 9) ........................................................................................................ 56

EIGHTH CAUSE OF ACTION
    VIOLATION OF BAN ON SPECIAL LEGISLATION (Cal. Const.,
    Art. IV, § 16(b)) ....................................................................................... 57

NINTH CAUSE OF ACTION
    VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH
    AMENDMENT (U.S. Const., amend. XIV, § 1) ............................................ 57

TENTH CAUSE OF ACTION
    VIOLATION OF DUE PROCESS CLAUSE (Cal. Const., Art. I, § 7) ......... 59

ELEVENTH CAUSE OF ACTION
    42 U.S.C. § 1983 (Against Defendant City of Culver City) ........................... 60

PRAYER FOR RELIEF ........................................................................................ 60

JURY DEMAND .................................................................................................. 62

1    Plaintiff Southern California Healthcare System, Inc., d/b/a Southern

2 California Hospital at Culver City, alleges as follows for its Complaint for

3 Declaratory, Injunctive, and Monetary relief:

4 **I.    INTRODUCTION**

5    1.    This is a statutory and constitutional challenge to the intentional and

6 arbitrary legislative targeting of one employer, Southern California Hospital at

7 Culver City ("SCHCC"), for discriminatory treatment via a "Premium Hazard Pay"

8 Ordinance (the "Ordinance"), adopted by a 3-2 vote of the Culver City Council on

9 June 14, 2021.  The ostensible purpose of the Ordinance is to require SCHCC to

10 "compensate" employees through an extra $5.00 for each hour worked for 120 days,

11 regardless of any bonuses, incentives, or benefits SCHCC already provided.  The

12 Ordinance goes into effect on July 14, 2021.  To date, no other California

13 municipality has enacted "hero pay" for hospitals.  To our knowledge, this is the

14 first "hero pay" ordinance of any kind intended to target only one employer.

15    2.    There is no dispute that employees at every general acute care hospital,

16 including SCHCC, were on the frontlines in the fight against COVID-19.  So too

17 were healthcare workers at skilled nursing, assisted living, and long-term care

18 facilities, where COVID-19 positivity and mortality rates were higher than virtually

19 anywhere else.  Culver City's own first responder employees, including police, fire,

20 and paramedic personnel were just as much at risk from the virus.  No one would

21 question that these workers also put their lives on the line.  Yet, the Ordinance

22 excludes these frontline workers, including the City's own employees, from

23 receiving "Premium Hazard Pay."  In fact, the Ordinance excludes every healthcare

24 provider in the City—except SCHCC.

25    3.    *The targeting is intentional.*  As initially introduced, the Ordinance

26 specifically named SCHCC and no other healthcare facility.  It was impermissibly

27 motivated by a desire to target SCHCC at the behest (or demand of) the Service

28 Employees International Union – United Healthcare Workers West ("SEIU"), a

1  politically influential special interest which represents a majority of SCHCC's

2  employees.  It was conceived and orchestrated by the union in furtherance of a

3  campaign to demonize SCHCC by, among other things, portraying the hospital as

4  indifferent to its employees during the pandemic and as a puppet of private equity

5  interests seeking to siphon cash from hospital operations.  SEIU's plan was put into

6  motion behind the scenes while it was negotiating a new collective bargaining

7  agreement ("CBA") with SCHCC.  The Ordinance, in effect, would give SEIU a

8  windfall in circumvention of the bargaining process over demands which it never

9  once raised at the bargaining table.

10       4.     *The targeting is arbitrary.*  There is no rational basis that could justify

11  excluding similarly-situated frontline health care employees, including the City's

12  own first responders, from the Ordinance.  But even within the "class of one"

13  defined by the City, the Ordinance applies only to a "general acute care hospital"

14  licensed under Health & Safety Code section 1250(a).  This excludes a significant

15  portion of SCHCC's employees – approximately 237 – in the subacute (skilled

16  nursing facility) unit for long-term care ("SNF") and behavioral health unit, which

17  provides psychiatric, substance rehabilitation, and detoxification services

18  ("Psych/Detox").  Employees in the SNF and Psych/Detox units provide direct

19  patient care and some are SCHCC's most at-risk staff members.  While COVID-19

20  positivity rates were generally higher in all healthcare professions with direct

21  exposure to COVID-19 patients, SNFs had among the highest positivity rates and

22  reported COVID-19 related deaths in the nation.  As such, the Ordinance is

23  underinclusive.

24       5.     The Ordinance is also overinclusive.  Of the approximately 756

25  SCHCC employees in the general acute and acute rehabilitation units covered by the

26  Ordinance, approximately 121 (16%) work in positions SCHCC has determined are

27  low risk for COVID-19  transmission, such as activity coordinators, discharge

28  planners, case managers, insurance verifiers, social workers, health information

technicians, and sterile processing technicians.  By contrast, of the approximately 85 employees in the general acute and acute rehabilitation units excluded under the Ordinance, approximately 55 (64%) work in supervisory and managerial positions SCHCC has determined are high-risk for COVID-19 exposure, such as nursing managers, patient access supervisors, and pharmacy managers.

6.     *The targeting serves no discernible, legitimate government interest.* The Ordinance was patterned after a grocery and retail drug store "hero pay" ordinance without any acknowledgement of fundamental distinctions between these businesses and a hospital.  Unlike Ralphs or Kroger, which can raise the price of a gallon of milk or a pound of coffee to offset the costs of such legislation, hospitals in general, and in particular "safety net" hospitals like SCHCC which take a disproportionate share of low-income patients and are heavily dependent on relatively low Medi-Cal and Medicare reimbursement rates for revenue, cannot increase patient charges to account for the increased costs imposed by the Ordinance.  Even with respect to commercial insurance, which accounts for only a fraction of SCHCC's revenue, rates are locked for a number of years and SCHCC has no contractual right to seek an increase.

7.     The Ordinance disserves the public interest by diverting finite resources from SCHCC's planned expansions of patient services, including obtaining primary stroke center certification, upgrading the cardiac catheterization laboratory for heart attack patients, and building a new emergency room.  The Ordinance interferes with the delicate balance of revenues and expenses necessary to ensure that SCHCC has the ability to deliver high quality, comprehensive care to uninsured patients and patients covered by Medi-Cal and Medicare, who typically have few options for healthcare.

8.     The City justifies the Ordinance as an employee retention tool without any intelligible nexus between the need for a long-term retention strategy and a short-term, $5.00 per hour bonus.  The City made no findings whatsoever regarding

how SCHCC dealt with staff retention during the height of the pandemic, SCHCC's current needs or availability of acute care medical staff in Southern California, or how the hospital might re-apply the contingency planning protocols it developed during the crisis should the need for additional personnel arise in the future.

9.     SCHCC (unlike a majority of hospitals) spent millions of dollars to provide monetary bonuses and incentives and other employee benefits during the height of the pandemic.  It invested additional resources to redeploy its staffing resources to assure that all employees were seriously following the hospital's rigorous COVID-19 safety precautions, which (not surprisingly) do more to assure retention than a 120-day bonus now that COVID-19 is past its peak.  The Ordinance expressly forbids SCHCC any offsetting credit for bonuses and incentives already paid.  Less than two months ago, SEIU and SCHCC agreed to a three year contract that would provide workers a substantial pay increase over three years.  If there was one, appropriate moment for SEIU to address "retention" concerns, it was through contract renewal negotiations, rather than bargaining by legislative fiat.

10.    *SEIU orchestrated the legislative targeting of SCHCC.*  Beginning as early as February 2021, SEIU began coordinating its campaign against SCHCC with Vice Mayor Daniel Lee's (unsuccessful) political campaign for State Senate.  In addition to drafting the proposed ordinance which Vice Mayor Lee introduced, SEIU ghost wrote an "if elected" campaign op-ed in which he accused SCHCC of becoming a "profit generator that endangers our most vulnerable populations."  In return, Vice Mayor Lee strategized with SEIU's political operatives as to what it would take to pass the Ordinance.

11.    In private messages texted to Mayor Alex Fisch, Council Member Yasmine-Imani McMorrin, and Vice Mayor Lee **during** the April 12, 2021 City Council discussion of a "Potential Hero Pay Ordinance" targeting grocery stores, retail drugstores, and "Front-Line Workers at Southern California Hospital," SEIU's Regional Political Director Maky Peters told the elected officials that the union will

"have your back" in the event of a legal challenge to the Ordinance. Ms. Peters urged them to move quickly to agendize the combined Grocery/SCHCC "Hero Pay" ordinance for a vote: "It's actually the only way you're gonna have [the union's] pro bono support," concluding: "There are only so many ways I legally can say that." When the City Council decided to proceed first with the grocery/drugstore ordinance, Ms. Peters questioned the decision to separate out SCHCC: "Why make it 2?" Vice Mayor Lee replied: "The mayor wants to handle healthcare differently."

12.     The following month, on May 21, 2021, SEIU's Lead Political Organizer, Shelbi Augustus, reported to Vice Mayor Lee that "the mayor is wavering on his decision again," and asked what SEIU "could do externally and internally to help move him." Vice Mayor Lee told Augustus that the union needed to "get[] explicit about how your legal team would help or participate should the city get sued." Augustus replied that SEIU's legal and research team met with the Mayor and told him that SEIU "agreed to take on all legal responsibility." At the next City Council meeting, Mayor Fisch cast the deciding vote to put the Ordinance up for adoption at the June 14, 2021 meeting, where he again cast the deciding vote.

13.     There can be no doubt that retroactive wage increases go to the very heart of the bargaining relationship with the union because wages are a mandatory subject of negotiation. No right is more central to the contract's inducement and reasonable reliance than what employees shall be paid. Because "'[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected,'"[1] the City must demonstrate why these wage increases are necessary to advance a significant and legitimate public purpose, as opposed to providing a benefit to special interests. It must also show that there is some connection between the social good to be protected and the means to achieve that purpose, including

---

[1] *Cal. Grocers Ass'n v. City of Long Beach*. Case No. 2:21-cv-00524-ODW (ASx). 2021 WL 736627 at *6 (C.D. Cal. Feb. 25. 2021) (quoting *Energy Reserves Group v. Kansas Power Light*, 459 U.S. 400, 411 (1983)).

whether the conditions imposed are reasonable.  The Ordinance fails each of these requirements under the Contracts Clauses of the U.S. and California Constitutions.

14.     Because the Ordinance materially modifies SCHCC's agreements with its workers after SEIU ratified the renewed collective bargaining agreement for a three year term, the union has no legal obligation or motive to surrender bargained-for contractual wage increases to help SCHCC offset the financial impact of the Ordinance. While a contract is in force, section 8(d) of the National Labor Relations Act ("NLRA") permits the union to refuse, even unreasonably, an employer's proposal to modify the terms established by collective bargaining.  As such, the Ordinance's collective bargaining "exemption" is nothing more than a misguided attempt to paper over the fact that the City did not "set the stage for bargaining" so much as it brought down the curtain on SCHCC's ability to bargain by dictating the substantive terms of one collective bargaining agreement.

15.     In this respect, the Ordinance works two, related impairments.  First, by retroactively rewriting the core term in the parties' CBA.  Second, by "violat[ing] the fundamental premise on which the [NLRA] is based – private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H.K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 108 (1970).

16.     Culver City "may not draw lines for the purpose of arbitrarily excluding individuals." *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016).  By doing so, the Ordinance offends two fundamental constitutional safeguards.  First, to protect individuals from legislative caprice or the demands of powerful special interests.  Second, to safeguard against the retroactive application of laws that "alter the legal consequences of their past acts so as to take away their lives, their liberty, or their property." *City of El Paso v. Simmons*, 379 U.S. 497, 522 (1965) (Black, J., dissenting).

## II.     PARTIES

17.     Plaintiff Southern California Healthcare System, Inc. ("Plaintiff") is a corporation organized under the laws of the State of California with its principal place of business in Los Angeles, California.  Plaintiff owns and operates Southern California Hospital at Culver City ("SCHCC"), a general acute care hospital, as that term is defined under California Health and Safety Code section 1250(a), located at 3828 Delmas Terrace, Culver City, California.

18.     Defendant City of Culver City ("City") is and at all relevant times has been a public entity duly organized and existing under and by virtue of the laws of the State of California as a charter municipality.  It is a public entity under 42 U.S.C. § 1983.

19.     Defendant Alex Fisch, in his official capacity, is the Mayor of Culver City, California.  He is one of five members of the Culver City Council.

20.     Defendant Daniel Lee, in his official capacity, is the Vice Mayor of Culver City, California.  He is one of five members of the Culver City Council.

21.     Defendants Göran Eriksson, Yasmine-Imani McMorrin, and Albert Vera, in their official capacities, are members of the Culver City Council.

22.     The relief requested in this action is sought against each Defendant in his or her official capacity as agents and members of the Culver City Council in connection with the adoption of Ordinance No. 2021-___, "An Ordinance of the City of Culver City, State of California, Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals" (June 14, 2021).  (Exh. A, p. 65).

III.   **JURISDICTION AND VENUE**

23.     This case arises under the Constitution of the United States, the National Labor Relations Act, 29 U.S.C. § 141, *et seq*. ("NLRA"), and 42 U.S.C. § 1983.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiff's claims arising under the California Constitution.  These

1   claims are so related to claims in the action within such original jurisdiction of the

2   Court that they form part of the same case or controversy under Article III of the

3   United States Constitution.

4       25.     Venue is proper in the Central District of California pursuant to 28

5   U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in

6   this District.

7   **IV.    FACTUAL ALLEGATIONS**

8       **A.    Southern California Hospital at Culver City**

9       26.     SCHCC is the only general acute care hospital, as that term is defined

10  under California Health & Safety Code section 1250(a), in the City. Formerly

11  known as the Brotman Medical Center, SCHCC was founded in 1925.  In 2005,

12  Prospect Medical Holdings, Inc. ("PMH") acquired its initial 33% ownership

13  interest in SCHCC.  As of June 1, 2021, PMH is majority-owned and managed by

14  its co-founders, Samuel Lee and David Topper.  Prior to PMH's initial investment

15  and continuing thereafter, SCHCC (then operated as Brotman Medical Center)

16  experienced significant financial difficulties and went through a Chapter 11

17  Bankruptcy in 2009.  PMH provided additional financing to help SCHCC emerge

18  from the bankruptcy and thereby increased its ownership to 72%.  In 2012, PMH

19  purchased the ownership interests of the remaining minority shareholders and

20  became the 100% owner of SCHCC.

21      27.     SCHCC is one of 17 hospitals and other health care facilities owned

22  and operated by PMH in California, Connecticut, New Jersey, Pennsylvania, and

23  Rhode Island.  This includes five general acute care hospitals in Southern

24  California:  Foothill Regional Medical Center in Orange County; Southern

25  California Hospital at Hollywood; Los Angeles Community Hospital in Los

26  Angeles; Norwalk Community Hospital in Norwalk; and SCHCC.  All 17 of PMH's

27  hospitals, including SCHCC, are "Disproportionate Share Hospitals" ("DSH"), as

28  that term is defined in 42 U.S.C. section 1886(d)(1)(B).

28.     To qualify as a DSH, or "safety net" hospital, a hospital must serve a disproportionate number of low-income individuals who are uninsured, or who are Medicaid or Medicare beneficiaries.

29.     During a typical year, SCHCC has about 13,000 patient admissions. Most patients admitted to SCHCC are not residents of the City.  In a typical year, only 13% (191) of SCHCC's COVID-19 patients were residents of Culver City.

30.     Two unions represent different categories of SCHCC's non-management employees.  California Nurses Association ("CNA") represents registered nurses.  Service Employees International Union – United Healthcare Workers West, i.e., SEIU, represents service, maintenance, technical, and clerical employees, such as licensed vocational nurses, groundskeepers, transport/couriers, technicians, clerks (file, mail room and warehouse), social workers, secretaries, patient access representatives, and pharmacists.

31.     In addition to employees, two other categories of workers are on-site at SCHCC:  (1) services contractors, who are under contracts between SCHCC and vendors, perform functions such as food services and environmental services ("EVS") (i.e., housekeeping); and (2) independent practitioners who are physicians with hospital privileges.  SCHCC does not pay these physicians. They directly bill patients and insurers for their services.

32.     SCHCC's campus consists of two buildings that house four distinct units providing different health care services: (1) the General Acute unit, including SCHCC's intensive care unit ("ICU"), perinatal care, coronary care, pharmacy, radiology, and other general medical treatment; (2) Acute Rehabilitation unit, which provides physical therapy services to patients; (3) the subacute unit, which operates a skilled nursing facility for long-term care ("SNF"); and (4) the behavioral health unit, which provides psychiatric services and substance rehabilitation and detoxification services ("Psych/Detox").

33.     All units on SCHCC's campus are sublicensed under Plaintiff's general acute care hospital license.  That license also covers all units at Southern California Hospital at Hollywood and Southern California Hospital at Van Nuys (which is not a general acute care hospital, but only provides behavioral health services).  Only the general acute unit and the acute rehabilitation unit at SCHCC provide services that meet the definition of a "general acute care hospital" under Health & Safety Code § 1250(a)—"organized medical staff that provides 24-hour inpatient care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services."  Thus, only the workers in the general acute unit and the acute rehabilitation unit would be covered by the Ordinance's definition of a Covered Hospital as "any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the geographical borders of the City."  (Exh. A, p. 70.)

34.     Most workers at SCHCC are assigned to a home unit, meaning they are dedicated workers in their home unit and do not provide services in the other three units of SCHCC.  SCHCC also uses some "floaters," who could be assigned to work shifts in varying units depending upon SCHCC's staffing requirements.

35.     The general acute unit and acute rehabilitation unit have a combined 311 beds available for patient care.  Of the unionized employees who have these two units as their home units, 287 are represented by CNA, and 420 are represented by SEIU. The SNF has 21 beds available for patient care. Of the unionized employees who have the SNF as their home unit, CNA represents 9, and SEIU represents 24. Psych/Detox has 121 beds available for patient care. Of the unionized employees who have Psych/Detox as their home units, CNA represents 63, and SEIU represents 132.

**B.     SCHCC's Response To the COVID-19 Pandemic**

36.     As of June 20, 2021: (1) there have been 3,702,882 cumulative reported cases of COVID-19 in California with 62,689 reported deaths;[2] (2) 1,205,602 of those cases were reported in the greater Los Angeles County area with 24,454 reported deaths;[3] (3) 2,238 of those cases were reported among Culver City residents with 110 reported deaths.[4]

37.     From January 1, 2020 through June 9, 2021, SCHCC treated 1,467 COVID-19 patients.  The peak was the period from December 2020 through January 2021, when 595 patients were treated.

38.     The 1,467 patients treated at SCHCC, comprise 0.12% of total reported COVID-19 cases in Los Angeles County.  SCHCC accounted for 7.4% of all COVID-19 hospital admissions in Los Angeles County.  Of all COVID-19 deaths in hospitals in Los Angeles County, SCHCC accounted for 1.95%—a total of 179 patients.

39.     Not one SCHCC employee died as a result of COVID-19 exposure in the workplace.  From March 2020 to the present, SCHCC has received 138 workers compensation claims based on COVID-19, of which only seven resulted in hospitalizations.  As of June 17, 2021, 63 percent of SCHCC's workforce has been vaccinated.

40.     All PMH hospitals, including SCHCC, proactively planned and prepared in the event that the spread of COVID-19 would, in fact, take on pandemic

_____

[2] California for All, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-dashboard/ [as of June 20, 2021].

[3] California for All, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-dashboard/#location-los_angeles [as of June 20, 2021].

[4] Los Angeles Department of Public Health, *COVID-19 Dashboard: Cases and Deaths by City/Community*, http://dashboard.publichealth.lacounty.gov/covid19_surveillance_dashboard/ [as of June 20, 2021] (reported location data is based on patients' addresses, not location of treatment).

Case No.

proportions.  Compared to other healthcare organizations, PMH was significantly ahead of the curve.  For example, in January 2020, PMH placed orders for one million N-95 respirators.  These respirators were ordered and arrived before Governor Newsom declared a state of emergency on March 4, 2020, and were distributed to all PMH hospitals.  As a result, PMH hospitals, including SCHCC, did not face shortages of N-95 respirators, unlike many other hospitals and healthcare facilities. This early action helped to protect hospital staff and avoided the impact of personal protective equipment ("PPE") shortages.

41.     PMH developed system-wide comprehensive strategies to mitigate healthcare personnel shortages.  To maintain a constant state of readiness, PMH hospitals identified alternative staffing resources within facilities, i.e., those who were not presently working in critical care, but who either had prior critical care experience or could provide support under the guidance and expertise of a critical care nurse.  Where facilities elected to cancel non-essential procedures, PMH encouraged system hospitals to shift healthcare personnel to support areas of highest need.  For example, rather than lay off support staff who were underutilized as a result of the decrease in patient admissions due to the pandemic, support staff were tasked with educating co-workers regarding COVID-19 exposure, proper use and disposal of PPE (including how to properly wear N-95 respirators), proactive infectious disease control protocols (including CDC-consistent practices to sanitize equipment), and acting as monitors throughout the facility to ensure strict compliance by staff, third-party contractors, patients, and visitors, with health and safety protocols.

42.     By redeploying (rather than laying off) underutilized personnel, SCHCC advanced two strategies to maintain critical care staffing at levels sufficient to support COVID-19 functions.  First, the constant presence (and vigilance) of dozens of health and safety monitors gave staff comfort that SCHCC was doing everything practicable to protect them from the risk of COVID-19 transmission.

From the onset of the pandemic, it was clear to front-line supervisors and human resources managers that critical care personnel were willing to make personal sacrifices to save patient lives so long as they perceived that the hospital was equally committed to protecting the lives of its staff.  Second, by redeploying personnel instead of reducing headcount, SCHCC communicated to all staff that, notwithstanding the loss of patient volume and decline in revenues as a result of the temporary cessation of elective procedures and surgeries, SCHCC had made a decision to put staff and patient safety ahead of cost savings.  This was important not only to sustain morale, but to retain critical care specialists, such as respiratory therapists and registered nurses, with the highest levels of interaction with COVID-19 patients.

43.     To further boost morale and employee retention, SCHCC voluntarily provided monetary bonuses and incentives and other benefits to employees—none mandated by federal, state, or local law.  Nor were these benefits provided in response to union demands.  In fact, at no point until late March 2021 did SEIU even raise the possibility of "Hero Pay."  And when that subject was raised, SEIU went no further than to demand two weeks of "Hero severance pay" per year of service in lieu of the severance benefits provided in the parties' CBA and continuing health care insurance through the end of 2021.  This proposal would have affected fewer than five employees.

44.     Beginning one month after the Governor's state of emergency declaration on March 4, 2020, SCHCC voluntarily initiated the following COVID-19 bonuses, incentives, and benefits:

a)  Child care subsidies of $50 per day per child, up to $250 per day available to all employees from April 9, 2020 through February 28, 2021.

b) Hourly wage increases beginning April 9 through July 4, 2020,[5] ranging from $1.50/hour to $5/hour.  The amount of the increase depended on the COVID-19 exposure risk associated with the job.  These increases did not just apply to critical care medical professionals, such as registered nurses and respiratory therapists, but also technicians cleaning equipment in a COVID-19 patient's room and administrative employees, such as registration clerks, who interacted directly with patients.

c) Two separate bonuses intended as a retention tool, ranging in amounts up to $1,250.  Eligibility for the first bonus was based on daily attendance and employees working 90 percent of their scheduled shifts between April 10 and June 15, 2020.  The second bonus, intended to address the winter surge in COVID-19 cases, was based on employees working 95 percent of their scheduled shifts between December 13, 2020 and March 14, 2021.

d) Paid time off ("PTO") grants were available to employees who: (1) did not have PTO, sick leave, or workers compensation or State short-term disability (if applicable); and (2) faced hardship due to personal or family illness related to COVID-19, or were flexed or furloughed as a result of disruptions caused by COVID-19.  Under this program,  employees could donate up to half of their reserved PTO to a pool for qualifying employees to use.  This program began on April 9, 2020 and remains in effect.

e) Free cafeteria meals to all employees from April 1, 2020 through February 28, 2021.  SCHCC also turned its cafeterias into food pantries, so that employees could buy essential foodstuffs and household products, such as toilet paper, paper towels, and other basics without the need to take time away from work or family to seek out scarce items on grocery shelves.

---

[5] The hourly wage increases were originally planned to expire on June 15, 2021 but were extended by management through the July 4th holiday.

f) Employees who treated COVID-19 patients or had access to COVID-19 patients were allowed to continue to accrue PTO hours in excess of what was provided under CBAs.

g) Mental health resources were provided to all employees.

h) Arrears were forgiven for medical, dental and other benefit premiums that accumulated for employees who had been recently flexed or furloughed due to COVID-19.

i) Requirements for 401K plan hardship withdrawals were relaxed to permit employees to withdraw up to $100,000 (increased from $50,000) and the 10% tax penalty for hardship withdrawals by plan beneficiaries under the age of 59 ½ was temporarily suspended.

j) Hotel room subsidies were provided to employees who treated COVID-19 patients or had access to COVID-19 patients and did not want to risk exposing their families. This program initiated on April 9, 2020 and ran through August 18, 2020. After August 18, SCHCC used a State program to provide this benefit.

45. These bonuses, incentives, and benefits were provided to employees who fall under the Ordinance's definition of "Hospital Worker." As should be clear, these programs were designed to maximize employee retention, improve morale, and reduce stress associated with fears of exposing loved ones to the virus. Moreover, they were calibrated to fit the risk of the specific job. SCHCC was not only an early adopter – it was in the minority of hospitals in California to provide COVID-19 benefits to employees.

46. According to a January 29, 2021 study which reviewed COVID-19 benefits and incentives offered by 73 California healthcare organizations representing 172 hospitals, only 21 percent (including SCHCC) provided hazard pay to their employees. The survey defined hazard pay as "additional pay offered to employees who are working during the pandemic." (Exh. B, p. 79.) The survey

1  found that only one respondent offered temporary hourly increases to RNs working

2  in a COVID-19 unit -- which SCHCC had done. (*Id.* at 98.)  Eighteen respondents

3  representing 54 hospitals (including SCHCC), provided fixed bonuses  to

4  incentivize employees to work additional shifts to meet staffing needs.  (*Id.* at 90.)

5  Seventeen respondents representing 71 hospitals (including SCHCC), changed PTO

6  policies, retirement benefits, and insurance benefits.  (*Id.* at 92.)  Twenty four

7  respondents representing 61 hospitals (including SCHCC), provided additional pay

8  or benefits to employees who were quarantined due to a suspected COVID-19

9  exposure or positive COVID-19 test.  (*Id.* at 103.)

10       47.    SCHCC obtained and provided to the City's first responders in

11  December 2020 among the first available doses of COVID-19 vaccines in the State.

12  This was at least one month before vaccines became generally available to

13  "essential" healthcare workers and first responders.

14       48.    SCHCC's efforts present a stark contrast with how the City

15  incentivized and rewarded its own front-line workers.  On information and belief,

16  the City did not provide COVID-19 "Premium Hazard Pay" for any of its own

17  employees, including fire, police, public safety, and EMT personnel.

18  **C.**    **Financial and Operational Impact of COVID-19 on SCHCC**

19       49.    Total losses from COVID-19 for the nation's healthcare system,

20  including hospitals, exceeded $323.1 billion in 2020.[6]  Compared to baseline levels

21  from 2019, there were reported average declines of 19.5% in inpatient volume and

22  34.5% in outpatient volume.  (*Id.*)  In other words, as hospitals were bearing

23  significant pandemic costs, they were receiving less revenue from fewer patients.

24  SCHCC was no exception.

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  [6] Chicago: American Hospital Association, *New AHA report: "Losses deepen for hospitals & health systems — catastrophic financial impact of COVID-19 expected*

27  *to top $323 billion in 2020* (June 30, 2020) https://www.aha.org/press-releases/2020-06-30-new-aha-report-losses-deepen-hospitals-health-systems [as of

28  June 20, 2021].

50.     SCHCC's trailing twelve month total operating revenue for the period ending in March 2021 declined by 6 percent ($13.1 million) compared to the same period in 2020.  SCHCC's year-to-date total operating revenue for the period ending May 2021 declined by 5% ($7.5 million) compared to the same period in 2020.  This decline in revenue is primarily due to two factors: (1) suspension of elective surgeries and procedures due to the COVID-19 pandemic; and (2) patient reluctance to come to hospital facilities because of fear of COVID-19 infection.

51.     On or about the onset of the pandemic, SCHCC (along with most other hospitals in major metropolitan areas) began to experience staffing shortages of critical health care personnel, particularly registered nurses.  As the shortages increased, SCHCC was required to operate under crisis ratios, meaning the hospital was unable to comply with state-mandated ratios of registered nurses to patients.  SCHCC stopped performing elective surgeries, in part because SCHCC leadership felt it could not in good conscience divert skilled nursing staff to elective surgeries at a time when the hospital was not adequately staffed.  While State public health authorities issued guidance recommending that general acute care hospitals suspend non-essential medical procedures for the duration of the pandemic, they did not mandate this.  SCHCC took this step voluntarily.

52.     SCHCC also lost approximately half of its ICU staff because registered nurses left to work in nurse registry positions.  A nurse registry is a list of nurses licensed by the California Board of Registered Nurses.  Due to high demand and the exponential growth in demand for temporary nurses, salary and other benefits (including housing stipends) for registry positions more than doubled by mid-March 2020.  According to one source, rates at the top of the market reached $5,000 per week, though most were in the $3,000-$4,000 per week range.[7]  As the pandemic

_____

[7] Deena Beasley, "Coronavirus drives up demand – and pay - for temporary U.S. nurses," Reuters (March 21, 2020), available at http://www.reuters.com/article/us-health-coronavirus-usa-nurses/coronavirus-drives-up-demand-and-pay-for-temporary-u-s-nurses-idUSKBN2180HF [as of June 21, 2021].

1  lengthened and grew worse, registry positions in some instances offered nurses as
2  much as $250 per hour.

3       53.     Safety net hospitals such as SCHCC could not match these salaries, or
4  even come close.  Given this environment, PMH senior management knew that
5  retention of its nursing staff would not turn on whether its hospitals offered a
6  $5/hour temporary increase in pay – registered nurses were more likely to remain
7  based on the hospital's investment of resources (financial and human) directed to
8  preventing, mitigating, and containing workplace spread of COVID-19.

9       54.     During the period from March, 2020 to March, 2021, and in addition to
10 $5.9 million in lost revenues from March through December, 2020, SCHCC
11 incurred extraordinary expenses related to COVID-19 totaling $4.9 million,
12 including: (1) $1.323 million in incentives and bonuses paid to employees; (2) $1
13 million in PPE and other supplies; (3) $930,000 in COVID-19 testing kits; (4)
14 $547,000 in equipment, e.g., negative air pressure machines; (5) $516,000 in repairs
15 and capital purchases; (6) $479,000 for free meals for employees; and (7) $74,000 in
16 childcare and hotel subsidies to employees.

17      55.     According to the Centers for Disease Control ("CDC"), SCHCC
18 received a total of $8,600,000 in federal COVID-19 relief. In comparison, Cedars-
19 Sinai Medical Center in Los Angeles, a non-profit hospital with considerable
20 endowment and charitable support, received $42,337,164.19 in federal COVID-19
21 relief.  Los Angeles County and USC Medical Center in Los Angeles, one of the
22 largest non-profit, quasi-governmental hospitals and medical training centers in Los
23 Angeles County, received $45,226,627.77.[8]

24      **D.     The Medical Economic Realities of Safety Net Hospitals**

25

---

26 [8] *See* Center for Disease Control and Prevention, *"Provider Relief Fund – COVID-
27 19 High-Impact Payments* (Metadata last updated January 25, 2021), available at
28 https://data.cdc.gov/Administrative/Provider-Relief-Fund-COVID-19-High-Impact-
   Payments/b58h-s9zx [as of June 20, 2021].

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

56.     In general, there are four financial models for general acute care hospitals in California:  (1) non-profit hospitals with relatively large endowments, benefactors and foundations supporting them, such as Cedars-Sinai; (2) non-profit, quasi-governmental hospitals that also serve as academic centers, such as UCLA Medical Center, which receive significant funding from the State; (3) community-based hospitals that derive most of their revenues from treating patients with commercial (or private) insurance, such as Torrance Medical Center and St. John's Health Center in Los Angeles; and (4) safety-net, i.e., disproportionate share hospitals. *See* Paragraphs 27-28, *supra*.

57.     For the fiscal year ending May 2020, approximately 93% of SCHCC's patients were uninsured, Medi-Cal beneficiaries, or Medicare beneficiaries.  For the fiscal year ending May 2021, approximately 91% of SCHCC's patients were uninsured, Medi-Cal beneficiaries, or Medicare beneficiaries.  The balance of SCHCC patients had commercial insurance.  Because over 90% of SCHCC's patients do not have commercial insurance, SCHCC depends on Medi-Cal and Medicare for most of its revenues.

58.     There are two types of Medi-Cal and Medicare:  (1) fee-for-service or "straight"; and (2) managed care.  Fee-for-service rates are set by the federal Centers for Medicaid and Medicare Services ("CMS") and California Department of Health Care Services ("CDHCS").  Fee-for service rates are fixed and non-negotiable.  Under the managed care model, health plans contract with CMS and CDHCS to receive a fixed or "capitated" amount of money to provide for the care of each member, which results in an incentive to keep costs down.  SCHCC in turn contracts with plans, and although reimbursement rates are negotiable when contracts are renewed, as a practical matter SCHCC has minimal ability to increase rates.

59.     Medicare and Medi-Cal reimbursement rates are approximately twenty to forty percent lower than commercial insurance reimbursement rates.  Medicare

1  and Medi-Cal reimbursement typically falls below the cost of care provided.  DSH

2  payments for qualifying hospitals are designed to offset cost of care shortfalls with

3  respect to uninsured, Medicaid, and low-income Medicare patients.

4       60.    The methodologies used to develop reimbursement rates do not account

5  for the impact of local ordinances.  A local ordinance that raises costs for a single

6  hospital could place that hospital at a competitive disadvantage to surrounding

7  hospitals because fewer resources would be available for patient care, maintenance

8  and repairs, and capital improvements.

9       61.    The increased cost imposed by the Ordinance, in the context of

10  SCHCC's decline in revenue and increased expenses due to COVID-19, could place

11  SCHCC at a competitive disadvantage with respect to other general acute care

12  hospitals in the region (twenty-eight within a ten-mile radius of SCHCC).  Although

13  these hospitals likely lost revenue and incurred COVID-19 related expenses as well,

14  none of them have had premium hazard pay imposed on them by a municipality or

15  Los Angeles County

16       62.    SCHCC cannot mitigate the financial impact of the Ordinance's

17  $5.00/hour Premium Hazard Pay by raising prices.  Unlike a grocery store, which

18  can pass along to consumers the cost of "Hero Pay" by raising the price of a gallon

19  of milk or a pound of sugar, SCHCC cannot pass along to its patients or government

20  (or even commercial) payors the cost of Premium Hazard Pay expenses imposed by

21  the City.  As a practical matter, because staffing ratios for registered nurses are

22  mandated by the State, SCHCC cannot cut costs by reducing staffing unless it also

23  reduces patient services.

24     **E.**    **SCHCC's Collective Bargaining Relationships with SEIU and CNA**

25       63.    As already noted, the majority of SCHCC's non-managerial employees

26  are represented by two unions.  CNA represents 359 non-supervisory registered

27  nurses in the general acute care, acute rehabilitation, SNF, and Psych/Detox units.

28

64.     SEIU represents 576 non-managerial employees (full-time, regular part-time and per diem) service, maintenance, technical, and clerical.

65.     The labor-management relationships between SCHCC and these two unions are governed by two CBAs.  Both CBAs have three year terms.  The CBA with CNA expires on March 31, 2023.  The CBA with SEIU expired on February 22, 2021.  On April 29, 2021, SCHCC and SEIU completed CBA renewal negotiations.  The terms of the new CBA were ratified by a vote of SEIU's members on or about May 10, 2021.

66.     The terms of the new SEIU CBA have been ratified and documented through a tentative agreement signed on April 29, 2021.  This tentative agreement reflects various changes and amendments to the expired CBA generally related to work schedules, floating conditions, severance pay, a 401(k) matching program, and significant wage increases.

**F.     Contract Renewal Negotiations Between SCHCC and SEIU**

67.     Contract renewal negotiations with SEIU began in or about November 2020.  SEIU's lead negotiator was John Aho.  Seventeen separate formal bargaining sessions were conducted, including seven sessions conducted over the 45-day period leading up to the MOU.  In total, the parties spent on average six hours per day in negotiations during these seventeen sessions.  Much of the time was spent with the parties in caucus.  Due to COVID-19, these sessions were held via video conference.  The April 29, 2021 negotiation began at approximately 9 a.m. and did not conclude until approximately 9 p.m.

68.     As is typical in CBA renewal negotiations, the parties began by addressing non-economic issues.  SEIU proposed (or, in the parlance of labor-management negotiations, "passed") its first economic proposal on January 28, 2021.  SCHCC did not pass an economic proposal until March 4, 2021, due to the fact that the parties had not resolved most of the non-economic issues until that date.  The economic negotiations centered on compensation terms, including annual

1  raises, wage structure (movement from wage ranges to wage grids), and health care

2  and benefits proposals.

3      69.    On several occasions during the negotiations over economic terms, the

4  SEIU's lead bargaining representative, John Aho, claimed that the union was

5  dissatisfied with the pace of negotiations and was expecting to complete an

6  agreement prior to contract expiration.  In one of its flyers, SEIU claimed that "even

7  with 250 of us picketing, news stories, and pressure from the city council, [SCHCC]

8  management is still rejecting our proposals to improve patient care and fix the

9  hospital."  On information and belief, however, fewer than 30 picketers participated

10  in each picket.  SEIU claimed that it would "not accept management's bare

11  minimum" and threatened a strike as "our last resort."  SEIU further claimed that

12  they would "not accept management's bare minimum" and threatened a strike as

13  "our last resort."  *Id*.  In fact, SEIU made a public display of scheduling a strike vote

14  on April 5 and 6, 2021.  This was very unusual.  More typically, a union would not

15  publicly reveal an intent to strike.

16      70.    On February 12, 2021, SEIU filed an unfair labor practice charge

17  ("ULP") with the National Labor Relations Board ("NLRB") alleging that SCHCC

18  was engaging in unfair labor practices during the negotiations for contract renewal.

19  In particular, SEIU alleged that SCHCC engaged in bad faith by allegedly

20  cancelling bargaining in December 2020, refusing to discuss proposals in one

21  bargaining session and instead bargaining via e-mail, walking out of a bargaining

22  session only ten minutes after the session started and refusing to return to the

23  bargaining session, and conditioning further bargaining on SEIU's agreement to

24  participate in mediation.  However, SEIU withdrew the charge less than a month

25  later on March 9, 2021, before any action was taken by the NLRB.

26      71.    The first and only time the SEIU put a "Hero Pay" proposal on the

27  table was on March 25, 2021.  Two specific terms were proposed, both "in

28  recognition of service shown by hospital employees during the pandemic."  First,

SEIU proposed a provision for "Hero Severance," which would provide two weeks' severance pay per year of service in lieu of existing benefits under the CBA for all employees terminated as a result of the reduction in force announced on March 19, 2021. Second, SEIU proposed "Hero Health Benefits," which would provide for continued payment of health insurance benefits through the end of 2021 for those employees affected by the reduction in force. (Exh. S.) Fewer than five employees were ultimately subject to the reduction in force, and only one was an SEIU union member.

72.   SCHCC rejected these "Hero Pay" proposals at the next bargaining session on March 31, 2021. At that time, SCHCC's lead negotiator, Luis Padilla, explained to SEIU that SCHCC management was not interested in providing this benefit. Instead, Mr. Padilla invited the union to amend SEIU's proposal or to make a counterproposal. The next mention of these Hero Pay proposals was on April 29, 2021, when SEIU withdrew them from negotiations. On that same day, the parties reached agreement on the terms for the renewal of the CBA. At no time did SEIU propose "hazard premium pay," such as bonuses in the form of an across-the-board increase in hourly wages. In particular, at no time during the negotiations did SEIU propose terms set forth in the Ordinance, including a $5 per hour raise for all non-managerial employees for 120 days.

73.   In contrast to SEIU's bargaining with SCHCC, another SEIU local representing workers at the Prospect Waterbury Hospital in Connecticut entered into three different memoranda of agreement ("MOAs"), one dated June 3, 2020, and two dated January 5, 2021, which included specific provisions providing "hero pay" and other benefits to staff at these facilities.

74.   Under the renewed SCHCC-SEIU CBA, base hourly wages for all job positions will increase at least 3% year over year for the life of the contract and in some cases, raises will be as high as 42%. The bargaining concessions by SCHCC – in particular the substantial wage increase over the three year term of the new CBA

– were significant.  SEIU viewed these concessions as material improvements as well.

75.    Indeed, to gain support for ratification of the CBA, SEIU broadcast to its members and the public:  "WE WON A GREAT CONTRACT!  After months of difficult bargaining with management, we finally agreed on a three-year contract that includes wage scale increases "with raises between 1.5% and 42% (yes, 42%!) in year one, 1.5%-8.5% raises in year two and year three, [and] increased differentials between $1.50-$8 an hour."

**G.    The Ordinance**

**1.    February 22, 2021:  The City Council Initiates Discussions Concerning the Ordinance**

76.    The idea of a "Premium Hazard Pay" ordinance targeting SCHCC was first raised at a February 22, 2021 City Council meeting.  At that meeting, representatives of the United Food and Commercial Workers ("UFCW") asked the City Council to consider adopting an ordinance that would require grocery stores and other "essential" retailers to pay "hero pay" bonuses to employees for their services during the  COVID-19 pandemic.

77.    During a discussion whether to agendize further consideration of an ordinance covering grocery stores and essential retail employers, Vice Mayor Daniel Lee proposed that the City Council "focus on not only just the grocery workers and the retail workers, but the workers who are actually on the front line," specifically referring to SCHCC.  At the time, Vice Mayor Lee was running to fill a vacancy in the 30th State Senate District in a March 2, 2021 special election.  His campaign materials included attacks on SCHCC (its facilities, emergency room services) and PMH, which he accused of putting "profits before people."  Among other things, Vice Mayor Lee used his twitter feed to raise the false charge that workers at SCHCC "were exposed to COVID and not even notified until days, sometimes weeks, later."

78.     While Vice Mayor Lee was the first City Council Member to advocate for a SCHCC "hero pay" ordinance, it appears he did not conceive of the idea.  In a February 11, 2021 email, Maky Peters, SEIU Regional Political Director, "floated" the idea of targeting SCHCC and gave Vice Mayor Lee a draft urgency ordinance prepared by SEIU's "research team" entitled "Hospital Heroes Hazard Pay Ordinance."  (Exh. C, p. 112.)  Ms. Peters also provided Vice Mayor Lee with an op-ed she drafted that "has finally been cleared [by SEIU] to share with you."  (*Id.*)  This ghostwritten attack piece, which (per Ms. Peters) "tried to capture [Vice Mayor Lee's] voice," described SCHCC as a "profit generator that endangers our most vulnerable population" and insinuated that people would die "as a result of Prospect Medical Holdings' predatory business model."  (*Id.* at 118.)

79.     On February 19, 2021, Vice Mayor Lee reported to Ms. Peters that his campaign "press guy" was "getting no bites on the Op-ed" and instead wanted to "pitch this" as a news story.  He asked Ms. Peters whether the unnamed SEIU members quoted in the draft op-ed "would be open to talking to reporters anonymously."  This plan apparently did not materialize, and the op-ed was never published.  A week after losing the March 3, 2021 election, Vice Mayor Lee published the op-ed drafted, "approved" and "cleared" by SEIU as a March 10, 2021 letter to the editor of the Culver City *Crossroads*.[9]

80.     Text messages and emails reveal a consistent theme in the communications between Vice Mayor Lee and SEIU's political operations

---

[9] Culver City Crossroads, *Dear Editor: Vice Mayor Lee Amplifies Staff Calls for Help at Southern California Hospital*, https://culvercitycrossroads.com/2021/03/10/dear-editor-Vice Mayor-lee-amplifies-staff-calls-for-help-at-southern-california-hospital/?fbclid=IwAR3Il3yIRZMtH8cwjlJA30D9QvwJDWuUpqOyTGP_yIABzE E8ZnauKfs_KIo [as of June 20, 2021].

Case No.
COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

department.[10]  He wanted SEIU's assistance in advancing his senate candidacy; so much so that he provided SEIU with photographs of him standing side-by-side with SEIU picketers in front of SCHCC, asked Ms. Peters whether he could pitch the op-ed as co-authored with unnamed SEIU union members, and, of course, carried forward SEIU's legislation.  (Exh. E, pp. 169-171, 178; Exh. T, pp.351-353 .)  For its part, the union wanted Vice Mayor Lee to carry its "Hero Pay for Hospital Workers Ordinance"; so much so that it would ghostwrite his op-ed and a letter to SCHCC's CEO demanding immediate attention to COVID-19 and other alleged safety issues at SCHCC.

81.     Text messages also reveal that Ms. Peters and Vice Mayor Lee coordinated to demand a site visit by the California Department of Public Health ("CDPH").  (Exh. E, p. 171.)  On February 19, 2021, the same day that Ms. Peters and Vice Mayor Lee exchanged text messages discussing joint authorship of the draft op-ed, Ms. Peters told Vice Mayor Lee that she "got a call from CDPH, possibly from the letter you sent them?  In any case that is good, what it will amount to remains to be seen but they plan to survey site again next week."  Vice Mayor Lee responded with a "thumbs up" sign.  (*Id.*)

82.     The following week, on February 24, 2021, the CDPH conducted a regulatory site visit to investigate an "Anonymous Complaint" alleging, among other things, that "ICU intubations were dirty causing patients to inhale mold," and "patients requiring assistance with feeding are not assisted and left without eating for days."  The CDPH found "No deficiencies" and closed its investigative file.

83.     Ms. Peters did not limit her ghostwriting efforts to the Vice Mayor.  On February 3, 2021, she sent Council Member Yasmine-Imani McMorrin a draft letter, addressed to SCHCC's CEO, regarding the "unacceptable" conditions at SCHCC.

---

[10] On June 15 and 16, 2021, the City produced the communications in Exhibits D and E, respectively, in response to SCHCC's Public Records Act Request.  Exhibit T shows images of certain messages also contained in Exhibit E to capture photos.

(Exh. C, p. 119.)  The letter "call[s] upon [SCHCC] to enter into [its] ongoing [contract renewal] negotiations in good faith."  (*Id.* at 120.)  Council Member McMorrin notified Ms. Peters that she had sent the letter to SCHCC's CEO on February 23, 2021.  (*Id.* at 121.)  A near identical letter was also provided by Ms. Peters to Mayor Fisch.  (*Id.* at 129, 135.)

## 2. March 22, 2021: Agendized Discussion of Combined Hero Pay Ordinance Deferred

84.   A combined resolution to consider an ordinance that would target grocery and retail stores along with SCHCC was first made public in advance of the March 22, 2021 City Council meeting.  The City Council did not discuss the combined ordinance on March 22, as scheduled.  Instead, the discussion was deferred until the City Council's April 12, 2021 meeting.

85.   Notwithstanding the scheduled discussion of a combined ordinance, on March 22, 2021, Ms. Peters sent a draft hero pay ordinance targeting SCHCC to Mayor Fisch, Vice Mayor Lee, and Council Member McMorrin.  Her cover email stated, "Our research team drafted an updated version of the ordinance and I was wondering if you might be able to take a look at it before the council meeting this evening."  (Exh. C, p. 123-28.)  On, April 7, 2021 Ms. Peters wrote a follow up email to Mayor Fisch which stated, "Following up on my text and phone call on Monday.  Would be great if we could all get on a call to chat about Hero Pay with our [SEIU's] legal and research team. . . . I have some background for you that I think can help instill the confidence to do the right thing here."  (*Id.* at 136.)

86.   Mayor Fisch accepted Ms. Peters' offer, and scheduled a meeting with SEIU's lawyers for April 9, 2021 at 12:00 p.m. via video-conference.  (Exh. C, p. 136.)  At 1:40 p.m., Erik Dimitruk (Lead Research Analyst for SEIU) sent an email to Mayor Fisch thanking him "for the opportunity to meet and discuss the importance of 'Heroes' Pay for the essential workers of Culver City."  (*Id.* at 138.)

## 3. April 12, 2021: First Agendized Discussion of "Hero Pay"

87.    On April 12, 2021, the City Council agenda included a "Discussion of a Potential Hero Pay Ordinance to Provide Additional Compensation to Grocery Workers, Retail Workers and Front-Line Workers at Southern California Hospital." (Exh. H, p. 234.)  The agenda's explicit reference to SCHCC leaves no doubt as to the entity targeted.

88.    Three days before that meeting, SEIU's "legal team" and Ms. Peters met with Mayor Fisch.  Ms. Peters reported to Vice Mayor Lee, who helped facilitate the meeting with Mayor Fisch, that she was "cautiously optimistic" that the Mayor would support SEIU's ordinance.  (Exh. E, p. 186.)

89.    At the April 12, 2021 City Council meeting, Shelley Wolfberg, Assistant to the City Manager, advised council members that: (1) "COVID-19 cases in Los Angeles continue to decline as vaccine availability increases;" and (2) "healthcare workers were among the first tier eligible to receive the COVID-19 vaccine."  Ms. Wolfberg also noted:  "There is a sentence in the staff report relating to bonus structures similar to those adopted by Kaiser Permanente and the Mayo Clinic."  The staff report does not contain such a statement or any citation to data or sources regarding healthcare bonus structures.  (Exh. I.)  The staff report merely states: "At this time, no other municipality has adopted an ordinance relative to providing healthcare worker hazard pay."  Instead, the staff report focuses on grocery and retail, and the extensive report by the City of Los Angeles Chief Legislative Analyst discussing the Los Angeles ordinance providing hazard pay for grocery and retail workers is attached.

90.    Vice Mayor Lee responded to comments made by SCHCC CEO Michael Klepin during public comment.  After stating that SCHCC's safety efforts "really didn't materialize," Vice Mayor Lee attacked Mr. Klepin's statements as "lies":

> On one hand, some of them [benefits offered by SCHCC] just didn't happen. Those are lies. Others materialized after employees complained for months, they weren't a

1
2
3
4

benevolent thing that the CEO in the company gave to the employees out of the kindness of their heart. They're things that they were forced to do, because the employees were talking to the LA County Department of Public Health, or Cal OSHA, or other places that really try to mediate between employers, and employees to make sure that the working environment is as safe as possible.

5   91.   Vice Mayor Lee later stated that he believed it was right to focus on

6   companies which profited during the pandemic: "By taking some of the record

7   profits of some of the most, some of the companies that have made the most within

8   the last 12 months and dictating that some of that should be shared with some of

9   their workers for a limited amount of time.  That's not overreach.  That's

10   humanity."

11   92.   Other Council Members took issue with Vice Mayor Lee's

12   characterization of the facts as well as the legality of the City stepping in to

13   negotiate on behalf of a union.  Council Member Göran Eriksson stated, "a city

14   shouldn't interfere with the private sector.  If there is issues there are unions to

15   clearly hear, so they should, they should then deal with this with management that

16   works in a private sector market."

17   93.   Council Member Eriksson went on to comment:

18
19
20
21
22

I think that the issue is really between the employees and the owners of the business. And in this aspect, we know that some of the employers has compensated their employees well, and some has compensated less. But it's really not for us to step in. And here is the whole issue is that, it's so easy to spend other people's money, right. It's not our money. It's not coming out of our general fund, that would have been a little more honest, that we actually took and compensated the people with our money, with our tax money. That would be a more honest discussion.

23   94.   Following discussion, the City Council voted (3-2) to agendize a

24   proposed ordinance targeting SCHCC for discussion and vote after a first reading at

25   the next meeting.

26   95.   At 9:50 p.m., while the meeting was still in progress, Ms. Peters

27   opened a group chat with Mayor Fisch, Vice Mayor Lee, and Councilmember

28

McMorrin.  Apparently frustrated by the decision to defer immediate action on ordinance targeting SCHCC, Ms. Peters sought to assure Mayor Fisch, Vice Mayor Lee, and Council Member McMorrin: "We're ready to fight court case"; "Literally you guys have the support"; "That's not something you should worry [about]"; "It's actually the only way you're going to have this pro bono support." When she asked: "Why make it 2?"—an apparent reference to the decision by the City Council to agendize the grocery/retailer "hero pay" ordinance first—Vice Mayor Lee responded to the entire group in the text chat: "The mayor wants to handle healthcare differently"; and "Still work to do on this."  (Exh. D, pp. 146-47.)

96.     Viewed in context, the only plausible interpretation is that SEIU's representative was telling three City Council members that the union was prepared to defend a SEIU-sponsored ordinance by providing legal support, while at the same time suggesting that the "only way you're going to have the union's "pro bono support" would be by the Council taking up the "Hospital ordinance" and the "grocery" ordinance as one combined bill.  Ms. Peters' final texts, directed at the Mayor in particular, remove all doubt as to the quid pro quo offered: "pro bono support" from SEIU in exchange for three members' support: "Mr. Mayor"  "We have your back"  "There are only so many ways I can legally say that."  (Exh. D, p. 147.)

**4.     May 10, 2021: The Proposed SCHCC Ordinance Is Introduced**

97.     On May 10, 2021, Action Item A-1 on the City Council's agenda was "Introduction of an Ordinance Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals."  (Exh. J, p. 279.)  The staff report accompanying Action Item A-1 named the proposal:  "Premium Hazard Pay for Southern California Hospital Workers."  (Exh. K, p. 283.)  The original draft of the proposed ordinance did not reference employee retention as a justification.  (Exh.

L.)  This justification was added later when the proposed ordinance was revised and was re-introduced on May 24, 2021.

98.    During the meeting, Mayor Fisch stated:  "[W]e received some new information that we have not had a chance to be advised by staff on Item A-1.  So we will continue that item until the next council meeting."  The new information Mayor Fisch referenced was a letter sent by SCHCC's counsel which, among other things, advised the City Council of "recently concluded negotiations with SEIU with respect to a new collective bargaining agreement" and that the agreement was ratified by SEIU members as of May 10, 2021.  The letter further noted that, as a result, SEIU would have no legal obligation or economic motivation to engage in mid-term negotiations, let alone agree to concessions as to windfall payments never requested by the union during bargaining, and that because the proposed ordinance would dictate a substantive economic term of the CBA without permitting bargaining, it would be preempted under the National Labor Relations Act ("NLRA").

### 5.    May 24, 2021: The Revised Proposed Ordinance is Introduced

99.    The City Council introduced a revised version of the ordinance on May 24, 2021.  (Exh. M.)  Amended in an attempt to address the preemption issue raised by SCHCC, the revised proposed ordinance purported to cure this defect by adding a new section that would permit the parties to waive the legal effect of the ordinance, provided its provisions are "expressly waived in a collective bargaining agreement, . . . in clear and unambiguous terms."  (Exh. O.)

100.    Presumably this amendment was added to create the illusion that the proposed ordinance would do nothing more than "set the stage for labor-management engagement" without "alter[ing] the process of collective bargaining."  *Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 964 (9th Cir. 2016).  But because the proposed ordinance would dictate economic terms ***after*** negotiations

had closed and SCHCC had renewed its CBA with SEIU, the union would have no obligation to agree to bargain, let alone surrender bargained-for concessions, such as pay raises, once bargaining ended and the agreement was ratified.

101.   While a contract is in force, section 8(d) of the National Labor Relations Act ("NLRA") permits the union to refuse, even unreasonably, an employer's proposal to modify the terms established by the CBA.  SCHCC may neither reopen bargaining without SEIU's consent nor unilaterally change any term of the agreement for the direct purpose of offsetting the economic impact of the mandated bonus pay.  *See Connecticut Power Co.,* 271 NLRB 766, 766-67 (1984).  Under the NLRA, the union has no duty to bargain until 60 days before the contract expires in March 2024 – more than two years after the Ordinance would by its own terms expire.

102.   To the extent any confusion may linger over the parties' absolute right to decline mid-term negotiations, the integration clauses in both the SEIU and CNA CBA's put that issue to rest.  Article 27 of the CNA CBA, entitled "Entire Agreement," states:

> The parties agree that this Agreement (including the results of any local bargaining as provided herein constitutes the entire contract between them governing wages, hours and conditions of employment of bargaining unit Registered Nurses covered during the term hereof, and settles all demands and issues on all matters subject to collective bargaining.  Accordingly, except as the Agreement expressly provides for a local bargaining process, the Association and the Facility expressly waive their rights during the term of the Agreement to demand negotiations upon any subject matter, whether or not such subject matter is specifically contained in this Agreement or whether such subject matter has or has not been raised or discussed by either party during the negotiations leading up to the execution of this Agreement.

103.   Article 27 of the SEIU CBA, entitled "Entire Agreement," states:

> The parties agree that this Agreement constitutes the entire contract between them governing wages, hours and conditions of employment of bargaining unit Employees covered during the term hereof, and settles all demands and

issues on all matters subject to the Collective Bargaining Agreement.

Accordingly, except for statutory rights to bargain over the impact or effects of events that arise during the term of the Agreement, and except for the bargaining process for a successor agreement, the Union and the Facility will not demand to re-negotiate any subject matter contained in this Agreement or to negotiate whether new subject matter should be included in this Agreement during its term.

Additionally, nothing in this Article prevents the parties from mutually agreeing to meet and discuss issues, and to enter into mutual agreements on significant matters.

104.   At the May 24, 2021, City Council meeting, one speaker objected to the proposed ordinance because the City Council had wanted to "take up the cause of [SCHCC] for some time now," stating that SEIU had contributed to the campaigns of the Council Members pushing to pass the proposed ordinance.  When the Council's deliberations began, Vice Mayor Lee denied any contributions from SEIU.  Lee also responded to comments that the proposed ordinance was unfair because it singled out SCHCC without providing increased compensation for City employees who were required to continue working during the pandemic:

In regards to our city employees. Those are separate negotiations. And I would ask the administration of Southern California Hospital at Culver City, as they have asked us to stay out of those negotiations. Those are between the city and our separate employee groups. And you better believe some of the same questions have come up about our public facing employees and the danger that they have been in for the last year as a result of COVID-19. We acknowledged that danger. And it is within the City's jurisdiction to do something about it. I think we should compensate our employees for that.

105.   Council Member Albert Vera specifically questioned why the City Council should intercede after the parties had already come to an agreement. Council Member Eriksson also opposed the proposed ordinance, stating:

[I]t's outside our purview really, to pick one company or one specific group in our City and provide them with this compensation, that is not money out of our pocket or the officers pocket. I think we have to realize that the Brotman

Case No.
COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

> Hospital was losing money, when the time that when this new operator came in, and they have slowly worked on improving and, and turning the hospital around, and I think we as a community should be very, very grateful for those efforts.

106. The City Council then voted (3-2) to proceed to a second reading of the proposed ordinance at a future City Council meeting, with Mayor Fisch, Vice Mayor Lee, and Council Member McMorrin voting in favor.

### 6.   June 14, 2021: The SCHCC Ordinance Is Adopted

107. The Ordinance was agendized for a second reading on June 14, 2021. (Exh. P, p. 338.)

108. One email exchange between Vice Mayor Lee and another SEIU senior official was remarkably consistent with Maky Peters' April 12, 2021 promises of "pro bono support" and "we've got your back" should the Mayor proceed to a vote.[11]

109. In her May 21, 2021 email to Vice Mayor Lee, SEIU's "Lead Organizer" Shelbi Augustus states: "We had a meeting with the Mayor and our legal and research team. He still seems to have very cold feet. ***We have agreed to take on all legal responsibility***, have shot down all legal arguments, and have agreed to formally rebuttal [sic] the arguments made." (Exh. C, p. 140 (emphasis added).)  As this email thread indicates, the Vice Mayor was fully engaged in coaching SEIU on how to persuade the Mayor.  He recommended to SEIU that a ***"strong legal footing is what need to be communicated and getting explicit about how [SEIU's] legal team would help or participate should the city get sued."***  (*Id.* at 141 (emphasis added).)

110. As SCHCC explained in a June 10,  2021 letter to the City Council, these communications by a second SEIU official reinforce the concern that SEIU

---

[11] One week prior to that meeting, on June 7, 2021, the City produced the communications in Exhibit A and other communications in response to SCHCC's Public Records Act Request.

was offering an illegal quid pro quo: to obtain the Mayor's support, the union was prepared to make payments, underwrite a legal defense, and assume responsibility for the legal consequences of adoption of the Ordinance, which was prepared at the union's behest for the purposes of serving the special interests of the SEIU. (Exh. Q.)

111. As SCHCC explained, SEIU's offer appeared to be a behested contribution which, under California's Political Reform Act, applies to any gift, donation or contribution "made at the behest" of an elected official if it is made under the control or at the direction of, in cooperation, consultation, coordination, or concert with, at the request or suggestion of, or with prior consent of an elected official. Second, SEIU's provision of legal services of any kind would also be deemed a gift. Under Government Code section 82028, anything of value given to a public official without cost, including legal services, may be a reportable gift. SCHCC is aware of no exemption that would permit SEIU to "take legal responsibility" for the Ordinance without complying with disclosure and contribution limitations. Third, supplying legal support constitutes a "contribution." A contribution is a payment made for political purposes, meaning it was received by a candidate, unless it is clear from surrounding services that the payment was received for personal purposes unrelated to candidacy or status as an office holder. Finally, given SEIU's interest and role in coordinating the legislative and public relations strategy for the Ordinance, the union's entwinement could be so pervasive as to constitute "state action" by a private union. *See, e.g.*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

112. On June 15, 2021, Senior Deputy City Attorney Lisa Vidra responded to SCHCC's June 10 letter. Ms. Vidra stated that no gift or quid pro quo exchange occurred because "[w]hen there is no personal benefit there is not a gift and not a quid pro quo for official action." (Exh. R, p. 346.) Ms. Vidra also stated that there not "anything extraordinary about [SEIU's] offer of support, as it is common for

unions and other organizations to become involved in litigation challenging an ordinance they support." (*Id.* at 345.)  Further, Ms. Vidra stated that "[d]rafting assistance is not a campaign contribution because the intent is to influence the passage of an ordinance, or influence the hospital's actions toward its employees, and not the outcome of an election." (*Id.* at 346.)

113. In an editorial published on Sunday, June 9, 2021, the editorial board of the Orange County *Register* asked the following question:

> The union drafted the ordinance, drafted an op-ed for Lee promoting it and agreed to take legal responsibility for defending it in court. After reading the string of emails, obtained through a public records request by the hospital's attorney, we're left with this troubling question: Is the Culver City council or an outside union running the government?

114. During debate over the Ordinance on June 14, 2021, Vice Mayor Lee offered the following defense:

> Yeah, I spoke with SEIU on a regular basis about the potential to bring a hazard pay ordinance to Culver City. But no, I have never worked for SEIU, not SEIU-UHW, not any of the other variants.  I applied maybe seven years ago, but I had intended to run for City Council in a couple months, so the job wasn't really going to work out.

115. Vice Mayor Lee articulated that the purpose of the Ordinance is to compensate employees for the stresses faced during the COVID-19 pandemic:

> What we are talking about right now is ***not*** compensating people for what they will go through in the next three months. If things go well, we will open back up, we won't see another surge – though in the past we have seen repeated surges – but we are compensating people for the mental, physical, and emotional stress that both them, their families, and their friends had to go through during the COVID-19 pandemic.

116. Council Member Eriksson, during discussion and in response to claims from Vice Mayor Lee that members voting against the Ordinance were intimidated

1 by business interests, stated: "I am not intimidated Mr. Lee, you know you throw
2 these words around, but that's another lie from your end."

3    **H.    The Targeted and Arbitrary Nature of the Ordinance**

4    117.  The Ordinance defines "Covered Hospital" as any and all hospitals
5 meeting the definition contained in California Health and Safety Code section
6 1250(a) operating within the geographical borders of the City.  (Exh. A, p. 70.)
7 SCHCC is the only facility meeting that definition within the City.

8    118.  The Ordinance provides that "Hospital Workers shall be entitled to no
9 less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked
10 on-site at a Covered Hospital in the City for an Employer."  (Exh. A, p. 71.)  The
11 Ordinance purports to credit premium pay provided as of the effective date, but
12 offers no credit for compensation provided by SCHCC before the effective date.
13 (*Id.* at 71-72.)

14   119.  The Ordinance gives a private right of action to any hospital worker
15 aggrieved by a violation.  (Exh. A, p. 72.)

16   120.  The Ordinance purports to be waivable in a collective bargaining
17 agreement.  (Exh. A, p. 73.)  However, because negotiations between SCHCC and
18 SEIU have already been completed, SEIU has no obligation to negotiate with
19 SCHCC in good faith.

20   121.  The Ordinance prohibits SCHCC from claiming offsetting credits for
21 incentive pay or bonuses paid prior to the effective date.  (Exh. A, p. 71-72.)

22   122.  The Ordinance contains a sunset provision stating it "shall expire 120
23 days after the effective date of this Ordinance.  The City will continue to monitor
24 COVID-19 indicators to assess the impact of the disease and may rescind this
25 ordinance before the full 120 days elapses if evolving conditions render it advisable
26 to do so."  (Exh. A, p. 74.)

27   123.  The Ordinance is underinclusive because it arbitrarily applies only to
28 workers at general acute care hospitals.  Culver City is home to other licensed

healthcare facilities:  Skilled Nursing Facility (3); Intermediate Care Facility/Developmentally Disabled (3); Community Clinic (6); Ambulatory Surgery Center (2); Acute Psychiatric Hospital (1); Chemical Dependency Recovery Hospital (1); Chronic Dialysis Clinic (2); Hospice (4); Home Health Agency (8).

124.   Hospitals are not the only, nor even the primary, hot spots for COVID-19 exposure for healthcare employees.  Rather, employees in SNFs have been identified by the CDC as at even more severe risk of contracting COVID-19 at work because of the communal nature of such facilities.[12]

125.   COVID-19 spreads more easily in communal settings like SNFs and assisted living facilities.[13]  Although less than one percent of the nation's population resides in nursing homes, assisted living facilities and other long-term care facilities, deaths among this fraction of the population accounted for more than 34% of *all* deaths related to COVID-19 in the United States.  (*Id.*)  One out of twelve residents of long-term care facilities died of COVID-19, while nearly one out of ten residents in SNFs died of COVID-19.[14]  In 18 states, COVID-19 deaths in long-term care facilities account for at least half of all deaths.  (*Id.*)  SNFs had an adjusted COVID-19 mortality rate of 5.9%.  (*Id.*)

126.   Long-term care facility staff were at a heightened risk of COVID-19 exposure, even when compared with other front-line workers such as hospital staff. Increased risk of exposure came from the often "close physical contact with

---

[12] CDC, *People Who Live in a Nursing Home or Long-Term Care Facility* (Sep. 11, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-in-nursing-homes.html [as of June 20, 2021].

[13] Holland B., USC Annenberg, *Center for Health Journalism, Coronavirus 'spread extremely easily' in skilled-nursing facilities, with deadly consequences* (May 31, 2021) https://centerforhealthjournalism.org/fellowships/projects/coronavirus-spread-extremely-easily-skilled-nursing-facilities-deadly [as of June 20, 2021].

[14] Covidtracking.com, https://covidtracking.com/data/state/california/long-term-care#-119.09993188523151,35.03083840927995,6.830760504682747 [as of June 20, 2021].

patients" and "extended shifts due to a workforce shortage," as well as the fact that long term care facility employees "may not be familiar with robust infection prevention programs."[15] "In addition to their own increased risk of exposure, long term care facility staff present an increased transmission risk.  The relatively high proportion of staff working in more than one facility and the ability of the virus to be transmitted by asymptomatic and pre-symptomatic persons are two factors that facilitate the introduction and transmission of the virus within and among LTC facilities."  (*Id.*)

**I.     The Financial Impact of the Ordinance on SCHCC and its Employees**

127.   The Ordinance, by providing a $5.00/hour wage increase, would affect the employees represented by CNA and SEIU differently in terms of percentage pay increase.

128.   For employees represented by SEIU, the increase would range from a low of 5.15% for certain pharmacists, to over 30% for other employees based upon their job class and seniority.  These percentage differentials have no correlation with the level of patient interaction or risk of COVID-19 transmission at work.  The average percentage pay increase would be 19.21%.  A total of 333 SEIU-represented employees would receive the $5.00 per hour pay increase should the proposed ordinance pass.  This would be in addition to a substantial wage increase over the next three years under the CBA ratified less than 60 days ago.

129.   As just one example, as of April 29, 2021, under the old CBA a lab technician would earn between $25.25 and $33.92 per hour, depending on seniority.  Under the new CBA, this technician would receive over the first 12 months of the

---

[15] TRACIE, *COVID-19 Considerations for Long-Term Care Facilities* (Sep. 2020) https://files.asprtracie.hhs.gov/documents/aspr-tracie-covid-19-long-term-care-considerations-toolkit-final.pdf.

1  CBA $1.25 in step increases, equivalent to a 5 percent pay increase.  The Ordinance

2  would provide this technician a 20 percent pay bump for four months.

3      130.  For employees represented by CNA, the increase would range from a

4  low of 7.36% for certain registered nurses, to a high of 13.65% for other registered

5  nurses.  The average percentage pay increase would be 10.91%.  A total of 575

6  CNA-represented employees would receive the $5.00 per hour pay increase under

7  the Ordinance.

8      131.  SCHCC also employs approximately 149 non-union employees,

9  including charge nurses, security officers, infection control coordinators, front office

10  supervisors, and skilled maintenance workers.  Eighty-one of those employees are

11  managers or supervisors excluded from the proposed ordinance's definition of

12  "Hospital Worker."  Additionally, 659 physicians, most of whom have privileges to

13  practice at SCHCC as independent practitioners, are excluded from the Ordinance.

14      132.  A number of employees voluntarily left or were terminated from

15  SCHCC during the COVID-19 pandemic.  From the end of March, 2020 to the

16  beginning of February, 2021, SCHCC had 451 new hires and 455 departures.  Thus,

17  the Ordinance does not necessarily reward the people who worked at SCHCC during

18  the most difficult parts of the COVID-19 pandemic.

19      133.  The Ordinance is underinclusive because, of the approximately 756

20  SCHCC employees in the general acute and acute rehabilitation facilities covered by

21  the Ordinance, approximately 121 (16%) work in positions SCHCC has determined

22  are low risk for COVID-19  transmission, such as activity coordinators, discharge

23  planners, case managers, insurance verifiers, social workers, health information

24  technicians, and sterile processing technicians.  By contrast, of the approximately 85

25  employees in the general acute and acute rehabilitation facilities excluded under the

26  Ordinance, approximately 55 (64%) work in supervisory and managerial positions

27  SCHCC has determined are high-risk for COVID-19 exposure, such as nursing

28  managers, patient access supervisors, and pharmacy managers.  Similarly, by only

including general acute care and acute rehabilitation services within its ambit under section 1250(a), the Ordinance excludes a significant portion of SCHCC's employees in the subacute (skilled nursing facility) and acute psychiatric and detoxification units – approximately 237 employees.

134.   No other municipality in California has enacted an ordinance targeting general acute care hospitals.  On information and belief, no governing state or local legislative body anywhere in the United States has done what the City has done. The effect of the Ordinance is to make SCHCC the only hospital in the United States required by law to provide additional compensation to employees.

135.   Additionally, SCHCC has, for the past 2 years, been in the planning stage of establishing itself as a primary stroke center.  A primary stroke center has the skilled staff and resources necessary to treat patients within the first ninety minutes of experiencing a stroke.  Obtaining primary stroke center certification is a very expensive and time-consuming process.  SCHCC has, for the past 2.5 years, been in the process of upgrading its cardiac catheterization laboratory for heart attack patients.  SCHCC has, for the past 9 months, been in the process of building a new emergency room, scheduled to be completed in 2022.  The Ordinance jeopardizes all of these enhanced services and improvements and could result in the time, effort, and resources expended on them being wasted.

**J.     The Irreparable Harm That Would Be Caused By Enforcement of the Ordinance**

136.   SCHCC will suffer irreparable harm from having to comply with the Ordinance.

137.   As a general matter, costs of compliance with an unconstitutional ordinance are not recoverable.  *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in judgment) ("[C]omplying with a

1   regulation later held invalid almost always produces the irreparable harm of

2   nonrecoverable compliance costs.").

3       138.   Provisional relief is particularly appropriate when a law's targeting of a

4   single person raises substantial constitutional issues, as here, under the Equal

5   Protection Clause and prohibitions on Bills of Attainder and Special Legislation.

6   (*See, e.g., Caudell v. City of Toccoa*, 153 F.Supp.2d 1371 (N.D. Ga. 2001) (granting

7   preliminary injunction to enjoin enforcement of municipal charter amendment that

8   would force plaintiffs to either resign from Hospital Authority or forego re-election

9   to City Commission).

10      139.   The Ordinance will irreparably harm SCHCC's reputation by creating

11  the impression that it is the only healthcare facility in the City—in fact in Los

12  Angeles County and even the State—that had to be forced by law to address the

13  well-being of its employees due to COVID-19.  *See N and N Catering Company v.*

14  *City of Chicago*, 26 F.Supp.2d 1067, 1079 (N.D. Ill. 1998) (granting preliminary

15  injunction to enjoin referendum that would prevent a single business from selling

16  alcohol where plaintiff claimed that "enactment of the referendum will irreparably

17  tarnish its business reputation and goodwill.").

18      140.   The Ordinance will irreparably harm employee relations and morale,

19  particularly morale of workers who ***did*** work at SCHCC throughout the peak of the

20  panic and who actually treated COVID-19 patients, by arbitrarily: (1) treating

21  workers in the same building in the same job classifications differently – one group

22  gets Premium Hazard Pay and the other does not; (2) providing Premium Hazard

23  Pay to new hires who were not working at SCHCC during the peak of the pandemic;

24  (3) providing Premium Hazard Pay to workers regardless of whether they provided

25  care to COVID-19 patients or the level of exposure to COVID-19.

26      141.   The Ordinance is contrary to the public's interest.  To decide whether

27  to grant an injunction, courts consider harm to the general public, i.e., economic

28  harm, inconvenience, and loss of available resources as a result of interruptions to

critical industries.  *Long Island R. R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir. 1989) (enjoining strike as general public would sustain irreparable harm from cessation of railroad services); *Hornbeck Offshore Services, L.L.C. v. Salazar*, 696 F.Supp.2d 627, 639 (E.D. La. 2010) (enjoining drilling moratorium because "effect on employment, jobs, loss of domestic energy supplies" "will clearly ripple throughout the economy").  The Ordinance, by diverting resources, will impair SCHCC's ability, as a "safety net" hospital to continue with planned capital improvements and expansions of services (e.g., certification as a comprehensive stroke center) to benefit the patients it serves, a population that has limited healthcare alternatives.

## SECOND CAUSE OF ACTION

### NLRA PREEMPTION

### (29 U.S.C. § 141, *et seq.*)

142.   Plaintiff incorporates by reference and realleges each allegation set forth above.

143.   The National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.*, creates a uniform federal body of law governing union organizing, collective bargaining, and labor-management relations applicable to employers engaged in interstate commerce.  It established various rules concerning collective bargaining and defined a series of banned unfair labor practices, including bans on interference with the formation or organization of labor unions by employers.  The NLRA does not apply to certain workers, including supervisors and managerial employees – categories specifically excluded from the Ordinance.

144.   The NLRA prohibits state and local regulation of conduct that Congress intended to be left to be controlled by the free-play of economic forces. Legislation that interferes with the "balanced state of collective bargaining" is preempted by the NLRA.  *See Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976).

145.   In particular, the NLRA preempts any and all state and local enactments that, by design or consequence, regulate or interfere with the then-existing balance of economic power between labor and management with respect to zones of activity that, under federal labor law, are intended to be left to the free play of economic forces.  Laws subject to NLRA preemption include laws that interfere with or attempt to regulate the economic tools available to labor or management during the course of collective bargaining or that otherwise interfere with the collective bargaining process, such as those that alter the parties' rights and economic alternatives during collective bargaining, or the processes and procedures utilized for union organizing.

146.   Application of the Ordinance to SCHCC unequivocally intrudes upon zones of activity in the areas of labor relations, union organizing, and collective bargaining that is reserved under federal labor law and policy to the free play of economic forces.  The Ordinance dictates a substantive term of one employer's CBA and establishes Premium Hazard Pay that, by design or consequence, empowers SEIU in particular to secure a wage rate it could not otherwise obtain from SCHCC, or (in this case) failed to even offer to propose during bargaining.  Because midterm negotiations are not permitted as to any subject matter reflected in the terms and conditions of the CBA, a union is under no obligation to reopen negotiations or to agree to concessions that would alter the terms agreed upon in the CBA.  The Ordinance by its own terms expired 120 days after its effective date.

147.   There is no practical ability or legal right to demand bargaining over the Ordinance, since both the SEIU and CNA agreements remain in effect for 34 months and 15 months, respectively.  Thus, the Ordinance imposed a substantive economic term  as to only one collective bargaining agreement which substantially adjusts the bargained-for consideration upon which the one party to a CBA justifiably relied.  This undermines the collective bargaining process and disrupts the process of union organizing.

148.   While the City has the ability to enact ordinances of general applicability to further the health and safety of its citizens, the Ordinance bears no relation to those goals.  Local minimum wage laws, for example, seek to lessen the burden on public welfare services.  Not only do almost all of the Hospital Workers covered by the Ordinance reside outside the City's jurisdiction, but the Ordinance is not a minimum labor standard.  It is a mandatory hourly bonus for a specific group of workers employed by one hospital, regardless of the wage negotiated in current collective bargaining agreements or other employment agreements.

149.   The Ordinance contains "Section 5:  Exemption for Collective Bargaining Agreement."  This provision permits parties to a CBA to waive the $5 per hour bonus, provided that both parties agree, in writing, to expressly amend their CBAs.  As explained, the "waiver" provision does not alter the parties' legal rights and obligations under the NLRA concerning midterm bargaining.

150.   The Ordinance is preempted by the NLRA because it regulates zones of activity that Congress intentionally left to be controlled by the free play of economic forces.

151.   SCHCC is entitled to judgment declaring the Ordinance to be void and unenforceable under the Supremacy Clause of the U.S. Constitution and equitable and injunctive relief to prevent the City or any private enforcer from attempting to enforce or give effect to the Ordinance.

## THIRD CAUSE OF ACTION

**VIOLATION OF EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

**(U.S. Const., amend. XIV, § 1)**

152.   Plaintiff incorporates by reference and realleges each allegation set forth above.

Case No.

153.   The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., amend. XIV, § 1.)

154.   The Equal Protection Clause requires that persons who are similarly situated receive like treatment under the law.

155.   The elements of a "class of one" claim under the Equal Protection Clause of the Fourteenth Amendment are that a state or local government: (1)"intentionally" (2) treated the plaintiff "differently than other similarly situated" persons, (3) "without a rational basis." *Gerhart v. Lake County, Montana*, 637 F.3d 1013, 1022 (9th Cir. 2011), citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, (2000); *North Pacifica LLC v. City of Pacifica,* 526 F.3d 478, 486 (9th Cir.2008).

156.   "For purposes of the equal protection clause, the question whether two groups on either side of a governmental classification are similarly situated is not decided in the abstract.  Rather, courts must determine whether the two groups are similarly situated "*with respect to the purpose of the law challenged.*" *Avelar v. Cruz*, 6 F.Supp.2d 744, 757 (1998) (emphasis in original), *rev'd on other grounds LaGuerre v. Reno*, 164 F.3d 1035 (7th Cir. 1998).

157.   "A reasonable classification is one which includes all persons who are similarly situated with respect to the purpose of the [law]."  Gerald Gunther & Kathleen M. Sullivan, *Constitutional Law* 636—37 (13th ed.1997) (quoting Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341, 346 (1949)).

158.   While the Equal Protection Clause "does not require that every classification be drawn with precise mathematical nicety," legislatures do not have unfettered discretion to pass discriminatory legislation no matter how feeble the purported justification. *See U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 538 (1973) (quotations omitted); *Silveira v. Lockyer*, 312 F.3d 1052, 1088-89 (9th Cir.

1   2002) ("Deference is not abdication and 'rational-basis scrutiny' is still scrutiny.")

2   (quotation and citation omitted).

3   159.   Statutes that are both "over inclusive" and "underinclusive raise grave

4   constitutional concerns even where they otherwise might further a legitimate

5   interest.  *See Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974).

6   160.   The Supreme Court has rejected laws serving even legitimate state

7   interest because they sweep either too broadly or not broadly enough.  *See*, *e.g.*,

8   *Quinn v. Millsap*, 491 U.S. 95, 107 (1989) (property owners' representation on local

9   governing boards); *Williams v. Vermont*, 472 U.S. 14, 23-24 (1985) (prevention of

10  double taxation of state residents); *United States Dept. of Agriculture v. Moreno*,

11  413 U.S. 528, 538 (1973) (prevention of hunger).

12  161.   The Ordinance improperly singles out one healthcare facility in the

13  City for disparate treatment while not requiring the same treatment of similarly

14  situated healthcare facilities.

15  162.   The Ordinance does not have a rational relationship to any of its four

16  stated purposes:  (1) to protect the health and welfare of [the City's] essential

17  Hospital Workers, their families, and the community; (2) to recognize and

18  compensate Hospital Workers for the risks and burdens they face every day and will

19  continue to face in the coming months; (3) support stable incomes among Hospital

20  Workers; and (4) promote job retention by ensuring Hospital Workers are

21  adequately compensated for the substantial risks, efforts, and expense they are

22  undertaking to provide essential services in a safe and reliable manner.

23  163.   The Ordinance is both overinclusive and underinclusive.  It is

24  overinclusive by including in the definition of Hospital Workers categories of

25  workers who may never have directly cared for COVID-19 patients or have been

26  exposed to COVID-19 patients due to their job duties, as well as new hires that did

27  not work at SCHCC during the height of the pandemic.

28

164.   It is underinclusive by not including similarly situated healthcare facilities in the City and excluding workers in the same buildings as covered Hospital Workers regardless of whether they provide "direct patient care and services supporting patient care."  Many of these excluded workers are in the same job classifications as covered Hospital Workers, such as registered nurses, licensed vocational nurses, and therapists.  This differential treatment is bound to foment resentment and is thus at odds with promoting job retention.

165.   The Ordinance also excludes Hospital Workers who worked during the height of the pandemic but have since left employment at SCHCC.  The Ordinance also ignores the fact that most of SCHCC's patients and employees do not even reside in the City and ignores the effect of imposing Premium Hazard Pay on SCHCC when the other general acute care hospitals in SCHCC's proximity are not subject to government-mandated hazard pay.

166.   The Ordinance is arbitrary because it was patterned after a hazard pay ordinance applicable to grocery and retail workers without any analysis of the materially different economics of healthcare organizations in general and SCHCC in particular as a "safety net" hospital that is heavily dependent on relatively low Medi-Cal and Medicare reimbursement for its revenue and that is unable to increase charges to offset or otherwise account for the increased costs imposed by the Ordinance.

167.   The Ordinance does not serve the purpose of job retention because it ignores that SCHCC has already expended millions of dollars to provide monetary bonuses and incentives and other benefits to its employees to address the impact of COVID-19 and that the employees represented by SEIU recently ratified a new collective bargaining agreement under which they are entitled to a substantial pay increase over three years.

168.   The Ordinance is arbitrary because of its 120-day duration and because it was adopted after the COVID-19 emergency was well past its peak.

169.   The rational basis of the Ordinance is further belied because it was adopted to placate a political constituent of the City – SEIU.

170.   The City "intentionally" targeted SCHCC by enacting the Ordinance. The Ordinance was impermissibly motivated by a desire to target SCHCC at the behest (or demand) of SEIU.  The Ordinance was conceived and orchestrated by SEIU in furtherance of a campaign to demonize SCHCC by, among other things, portraying it as indifferent to the burdens on and sacrifices made by its employees due to COVID-19 and a puppet of private equity interests seeking to siphon cash from hospital operations.  SEIU's plan was put into motion behind the scenes while it was negotiating a new collective bargaining agreement with SCHCC.  The Ordinance, in effect, would give SEIU a windfall in circumvention of the bargaining process.

171.   When legislation is motivated by animus or antipathy toward a particular group or individual, that is a factor relevant to rational basis scrutiny.  *See*, *e.g.*, *Romer v. Evans*, 517 U.S. 620, 635 (1996); *Cleburne*, 473 U.S. at 448; *Moreno*, 413 U.S. at 534.  Additional scrutiny is warranted where there is "some reason to infer antipathy" on the part of the legislature.  *See FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 314 (1993) (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

172.   Under "equal protection analysis, the history of the legislation in question may affect whether the government's action may survive rational basis scrutiny." *Merrifield v. Lockyer*, 547 F.3d 978, 986, n.11 (9th Cir. 2008).  In other words, courts are not required to accept "after-the-fact rationalizations" for legislative classifications without question.  *See Cleveland Bd. of Educ. V. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring).  Hypothetical justifications do not render an illegitimate classification reasonable.

173.   "Under [the rational basis] test, a plaintiff may demonstrate that the government action lacks a rational basis … either by negativing every conceivable basis which might support the government action, or by demonstrating that the

challenged government action was motivated by animus or ill-will." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (emphasis added) (internal quotations omitted); *see also Brown v. N. Carolina Div. of Motor Vehicles*, 166 F.3d 698, 706-07 (4th Cir. 1999) ("Irrational classifications or laws motivated by the desire to harm an unpopular group fail rational basis scrutiny.") (emphasis added).

174.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, or any private enforcer, from depriving it of the protections afforded to it under the Equal Protection Clause of the U.S. Constitution.  This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

## FOURTH CAUSE OF ACTION

### VIOLATION OF EQUAL PROTECTION CLAUSE

### (Cal. Const., Art. I, § 7)

175.   Plaintiff incorporates by reference and realleges each allegation set forth above.

176.   The California Constitution provides that "[a] person may not be denied equal protection of the laws."  (Cal. Const., Art. I, § 7.)

177.   For the same reasons set forth in Paragraphs 153 through 174 above, the Ordinance violates the Equal Protection Clause of the California Constitution.

178.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Equal Protection Clause of the California Constitution.

## FIFTH CAUSE OF ACTION

### VIOLATION OF CONTRACTS CLAUSE

### (U.S. Const., Art. 1, sec. 10, cl. 1)

179.   Plaintiff incorporates by reference and realleges each allegation set forth above.

180.   The U.S. Constitution states:  "No State shall . . . make any . . . law impairing the obligation of contracts[.]"  (U.S. Const. art. I, § 10, cl. 1.) This is exactly what the Ordinance does.

181.   SCHCC has contractual relationships with two labor unions, CNA and SEIU.  The contracts are collective bargaining agreements, i.e., CBAs.  Both CBAs have a three year term.  The SCHCC/CNA agreement expires on March 31, 2023.  The SCHCC/SEIU agreement expired on February 22, 2021.

182.   SCHCC has also entered into services contracts with third-parties for the provision of a variety of services, including food services and housekeeping/janitorial services.  The workers providing food services and housekeeping/janitorial services are covered by the Ordinance; however the services contracts do not provide for offsetting the additional costs of the Ordinance's $5.00 per hour increase.

183.   On April 29, 2021, SCHCC and SEIU signed a Memorandum of Understanding, i.e., MOU, which fixed the terms of the parties' agreement for three years.  The parties are acting on the basis of that MOU, which reflects various changes and amendments to the expired CBA, including significant bargained-for wage increases and benefits.  Under the renewed agreement, base hourly wages will increase at least three percent year over year for the life of the contract.  The bargaining concessions obtained by SEIU amount to substantial pay increases over the three-year term of the CBA.  On the basis of these concessions, as well as SEIU's representations concerning the materiality of the benefits obtained in negotiations, a majority of the SEIU bargaining unit's members voted to ratify the contract on or about May 10, 2021.

184.   The Supreme Court has established a three-step test for determining whether the Contracts Clause has been violated by an otherwise valid exercise of police power. *First*, "[t]he threshold inquiry is 'whether the [city] law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy*

*Rsrvs. Grp., Inc. v. Kan. Power & Light Co*., 450 U.S. 400, 411 (1983) (cleaned up). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Id*. **Second**, "[i]f the [city] regulation constitutes a substantial impairment, the [city], in justification, must have a *significant and legitimate public* purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Id*. (internal citations omitted). "The principle underlying this step is to 'guarantee[] that the [city] is exercising its police power, rather than providing a benefit to special interests.'" *Cal. Grocers Ass'n*, 2021 WL 736627 at *6 (quoting *Energy Reserves Group v. Kansas Power Light*, 459 U.S. 400, 411 (1983). **Third**, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon *reasonable conditions* and is of a *character appropriate to the public purpose* justifying the legislation's adoption." *Energy Rsrvs. Grp*., 459 U.S. at 411 (cleaned up; emphasis added).

185.   As part of the bargaining process, SCHCC made concessions to demands by SEIU and CNA, just as these unions made concessions themselves in order to reach an agreement. "In the employment context, there likely is no right both more central to the contract's inducement and on the existence of which the parties more especially rely, than the right to compensation at the contractually specified level." *Baltimore Teachers Union v. Mayor & City Council of Baltimore,* 6 F.3d 1012, 1018 (4th Cir. 1993). For example, the compromises reached in order to renew the SCHCC-SEIU CBA, including terms relating to wage increases, health and retirement benefits, severance pay, and work schedules. These go to the "very heart" of the employment agreements between SCHCC, the SEIU, and hospital employees that are beneficiaries under the CBA. *Sonoma Cty. Org. of Pub. Employees v. Cty. of Sonoma,* 23 Cal.3d 296, 309 (1979).

186.   The Ordinance substantially impairs SCHCC's contractual relationships in two, distinct ways. **First**, the Ordinance impairs SCHCC's right to

compensation terms at a contractually-specified level.  As to both CBAs, the impairment is not ancillary or inconsequential.  Apart from dictating wealth transfers in excess of two million dollars over 120 days, the Ordinance would unilaterally impose wage increases ranging up to over 30 percent.  Apart from the materiality of these increases, the impairment strikes at the "very heart" of the bargain struck in any collective bargaining agreement – wages and benefits.

187.  ***Second***, although wages are at the core of the bargain struck in virtually every CBA, the impairment as to these terms may not be viewed in isolation.  "'The [CBA] states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The [CBA] covers the whole employment relationship.'" *Inlandboatmens Union of Pacific v. Dutra Group* 279 F.3d 1075, 1079 (9th Cir. 2002), quoting *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 578-579 (1960).

188.  The Ordinance retroactively impairs SCHCC's bargained-for right as to wages.  It upends the essential premise of collective bargaining, which is to allow the parties to obtain finality as to how they will govern their future relationships.  A key bulwark against the impairment of settled contractual rights is the NLRA's guarantee of finality by prohibiting one party to demand to reopen negotiations or to threaten to unilaterally change the terms or conditions of the agreement.  Here, the timing of the Ordinance, as well as its duration, all but guarantees that SCHCC has no contractual or statutory recourse to mitigate against the consequences of the impairment.

189.  No public need justifies the imposition of retroactive upward adjustment of bargained-for contractual wages. No emergency would justify such a "severe disruption of contractual expectation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978).  In fact, there is no articulated necessity, urgent or otherwise, that could justify the Ordinance's retroactive interference with bargained-for compromises, the basis upon which labor peace is based.  Allowing

the City Council to unilaterally rewrite the central terms of one contract affecting only one employer does not advance any significant or legitimate public purpose. Had it been tailored appropriately to its stated purpose, the City Council could not have excluded its own, similarly-situated employees. Indeed, the wage increases are wholly arbitrary.  Given the troubling indication of a quid pro quo, it would appear that certain members of the City Council were acting as much in their own self-interest as in the interest of the SEIU.

190.   By enforcing this fundamentally unfair and discriminatory Ordinance, which substantially impairs only one employer's contracts, the City, acting under color of state law, has acted on behalf of a special interest to the detriment of the public interest, thereby unconstitutionally impairing the obligation of SCHCC's contracts.

191.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Contracts Clause of the U.S. Constitution.  This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

### SIXTH CAUSE OF ACTION
### VIOLATION OF CONTRACTS CLAUSE
### (Cal. Const., Art I, § 9)

192.   Plaintiff incorporates by reference and realleges each allegation set forth above.

193.   The California Constitution provides that a "law impairing the obligation of contracts may not be passed."  (Cal. Const., Art. I, § 9.)

194.   The Contract Clause analysis under the California Constitution is "substantially the same" as under the U.S. Constitution. *See*, *e.g.*, *Hall v. Butte Home Health, Inc.*, 60 Cal.App.4th 308, 319 (1997).

195.   For the reasons set forth in Paragraphs 180 through 191 above, the Ordinance violates the Contracts Clause of the California Constitution.

196.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it by the Contracts Clause of the California Constitution.

**SEVENTH CAUSE OF ACTION**

**VIOLATION OF BAN ON BILLS OF ATTAINDER**

**(U.S. Const., Art. I, § 10)**

197.   Plaintiff incorporates by reference and realleges each allegation set forth above.

198.   The U.S. Constitution provides that "'[n]o State shall … pass any Bill of Attainder." (U.S. Const., Art. I, § 10.)

199.   To determine whether a law inflicts punishment forbidden by the Bill of Attainder Clause, the Supreme Court evaluates whether "(1) the challenged statute falls within the historical meaning of legislative punishment; (2) ... the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) ... the legislative record evinces a congressional intent to punish. " *Selective Serv. Sys. v. Minn. Pub. Interest Research Group,* 468 U.S. 841, 852  (1984) (quotation omitted).

200.   The Ordinance violates the prohibition against Bills of Attainder because it applies with specificity and constitutes legislative punishment.

201.   The Ordinance is targeted specifically at SCHCC.

202.   The Ordinance constitutes punishment because it marks SCHCC with the badge of infamy.  By making SCHCC the only healthcare facility in the City subject to Premium Hazard Pay legislation, the City is creating the false impression that SCHCC is a "bad actor" and that the Ordinance had to be passed to ensure that SCHCC took steps to mitigate the effects of COVID-19 on employee morale, well-being, and retention, when in fact SCHCC voluntarily provided employees with the bonuses, incentives, and other benefits described herein, none of which were

1  required by federal, state or local law, and without any demand or request by any
2  union.

3      203.   The Ordinance constitutes punishment because of the severity of the
4  burdens it imposes on SCHCC and cannot be said to further any non-punitive
5  legislative purpose.  The Ordinance impedes rather than furthers its stated purpose,
6  serves no legitimate government interest, and is intended to punish SCHCC.

7      204.   The Ordinance constitutes punishment because the context, timing,
8  structure, and legislative history of the Ordinance evinces a legislative motivation to
9  punish SCHCC at the behest of SEIU.  The Ordinance was drafted to target one
10  employer, as tribute to a politically influential union.

11      205.   SCHCC thus seeks declaratory, equitable and injunctive relief to
12  prevent the City, and any private enforcer, from depriving it of the protections
13  afforded to it by the U.S. Constitution's prohibition on Bills of Attainder.  This
14  claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

### EIGHTH CAUSE OF ACTION
### VIOLATION OF BAN ON BILLS OF ATTAINDER
### (Cal. Const., Art. I, § 9)

18      206.   Plaintiff incorporates by reference and realleges each allegation set
19  forth above.

20      207.   The California Constitution prohibits Bills of Attainder.  (Cal. Const.,
21  Art. I, § 9.)

22      208.   For the reasons set forth in Paragraphs 199 through 205 above, the
23  Ordinance violates the prohibition against Bills of Attainder because it applies with
24  specificity and constitutes legislative punishment.

25      209.   SCHCC thus seeks declaratory, equitable and injunctive relief to
26  prevent the City, and any private enforcer, from depriving it of the protections
27  afforded to it by the California Constitution's prohibition on Bills of Attainder.
28

## NINTH CAUSE OF ACTION

## VIOLATION OF BAN ON SPECIAL LEGISLATION

### (Cal. Const., Art. IV, § 16(b))

210.   Plaintiff incorporates by reference and realleges each allegation set forth above.

211.   The California Constitution provides that "[a] local or special statute is invalid in any case if a general statute can be made applicable."  "The test of validity under either the special legislation or the equal protection challenge is the same, namely, whether there is a rational relationship between the purpose of the enactment … and the singling out" of the person "affected by the statute."  *City of Los Angeles v. City of Artesia*, 73 Cal.App.3d 450, 455 (1977).

212.   The Ordinance is special legislation because it singles out and only applies to SCHCC.

213.   For the reasons set forth in Paragraphs 159 through 173 above, there is no rational relationship between the purpose of the Ordinance and the singling out of SCHCC.  The Ordinance is therefore invalid special legislation.

214.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it against special legislation under the California Constitution.

## TENTH CAUSE OF ACTION

## VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

### (U.S. Const., amend. XIV, § 1)

215.   Plaintiff incorporates by reference and realleges each allegation set forth above.

216.   Under the Due Process Clause of the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law." (U.S. Const., amend. IV, § 1.)

217.   The Ordinance imposes a substantial economic deprivation on SCHCC without providing any mechanism that secures the hospital's ability to obtain "a just and reasonable return" on its property or that provides some ex ante means to avoid the potential for confiscation based on the terms imposed retroactively.  *See Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 820 ("The risk that the rate set by [Proposition 103] is confiscatory as to some insurers from its inception is high enough to require an adequate method for obtaining individualized relief."); *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 165 ("a regulation may be invalid on its face when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties"); *Fed. Power Comm'n v. Hope Natural Gas*, 320 U.S. 591 (1944) (discussing invalidity of regulation where rates "unjust and unreasonable"); *Guar. Nat. Ins. Co. v. Gates*, 916 F.2d 508, 513-515 (9th Cir. 1990) (striking down Nevada's version of Proposition 103 because it did not provide insurers with a means for relief from potentially confiscatory rates).

218.   SCHCC, as a highly-regulated healthcare facility, cannot mitigate the financial impact of compliance with the Ordinance by raising prices or reducing staff.

219.   Approximately 90% of SCHCC's payors are government – Medi-Cal (approximately 50%) and Medicare (approximately 40%).  The payments SCHCC receives from Medi-Cal and Medicare are either set by law under non-negotiable fee schedules or, in the case of managed Medi-Cal and Medicare, set by contracts with managed care plans that may only be renegotiated when the contract terms are up. As a practical matter, the payments under managed Medi-Cal and Medicare are non-negotiable, i.e., take it or leave it.  In comparison to commercial insurance and health maintenance organizations, Medi-Cal provides the lowest reimbursement, with Medicare the next lowest.

SMRH:4846-7193-7263.3
Case No.
COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

220. SCHCC cannot reduce registered nursing staff because the CDPH sets mandatory staffing ratios. As a practical matter, SCHCC cannot reduce other staff without risking compromising patient care.

221. SCHCC provides essential services as a DSH, also referred to as a "safety net" hospital. Safety net hospitals treat a disproportionate share of low-income patients who are either uninsured or are Medi-Cal or Medicare beneficiaries. As a practical matter, other hospitals in the region are not willing to take these patients because of the low reimbursement rates. Thus, compliance with the Ordinance has the potential not just to harm SCHCC, but also patients who have no other alternative for their critical healthcare needs.

222. SCHCC has no practical ability to mitigate the financial impacts of the Ordinance, whether through the collective bargaining process or through (as an example) hardship exceptions provided in living wage ordinances upheld by courts. *See Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 962 (9th Cir. 2016) (upholding minimum wage ordinance which contained an opt-out provision allowing employer covered by a CBA to waive the requirements of the ordinance, and a hardship waiver that allows employers to postpone implementation for one year).

223. SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Due Process Clause of the U.S. Constitution. This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

## ELEVENTH CAUSE OF ACTION
## VIOLATION OF DUE PROCESS CLAUSE
### (Cal. Const., Art. I, § 7)

224. Plaintiff incorporates by reference and realleges each allegation set forth above.

225.   Under the Due Process Clause of the California Constitution, "[a] person may not be deprived of life, liberty, or property without due process of law." Cal. Const., Art. I, § 7.

226.   For the same reasons set forth in Paragraphs 217 through 232 above, the Ordinance violates the Due Process Clause of the California Constitution.

227.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Due Process Clause of the California Constitution.

## TWELFTH CAUSE OF ACTION

### (42 U.S.C. § 1983)

### (Against Defendant City of Culver City)

228.   Plaintiff incorporates by reference and realleges each allegation set forth above.

229.   "Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 690 (1978).

230.   Because the Ordinance is unconstitutional and was officially adopted by the City Council, the City violated 42 U.S.C. § 1983.

231.   SCHCC is entitled to monetary damages, in an amount to be proven at trial, to compensate it for any costs incurred to comply with the Ordinance and for the reputational harm to SCHCC caused by the City's actions in introducing and adopting the Ordinance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.      On the First Cause of Action, a judgment declaring that the Ordinance, as well as any action taken in further of the Ordinance by any person, is preempted

by the National Labor Relations Act, and its implementing regulations and guidance, and is therefore void and unenforceable, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

2.      On the Second and Third Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the equal protection guarantees of the California and U.S. Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

3.      On the Fourth and Fifth Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the Contracts Clauses of the California and U.S. Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

4.      On the Sixth and Seventh Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the prohibition against Bills of Attainder of the U.S. and California Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

5.      On the Eighth Cause of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the prohibition against special legislation of the California Constitution, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

6.     On the Ninth and Tenth Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the due process guarantees of the California and U.S. Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

7.     On the Eleventh Cause of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates 42 U.S.C. § 1983 because the Ordinance is unconstitutional, and is therefore void and invalid, a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance, and monetary damages in an amount to be proven at trial;

8.     For an award of attorneys' fees and costs of suit herein pursuant to California Code of Civil Procedure § 1021.5, 42 U.S.C. § 1988(b), and any other applicable law; and

9.     For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

10.     Plaintiffs respectfully demand a trial by jury of all issues for which they have a right to demand a trial by jury.

1 | Dated:  June 21, 2021

2

3  SHEPPARD, MULLIN, RICHTER & HAMPTON
   LLP

4

5  By

6  DAVID A. SCHWARZ

7  Attorneys for Plaintiffs/Petitioners
   Southern California Healthcare System, Inc.,
8  dba Southern California Hospital at Culver
   City, a California Corporation
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4846-7193-7263.3

Case No.

COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF