1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2    Including Professional Corporations
    DAVID A. SCHWARZ, Cal. Bar No. 159376
3   dschwarz@sheppardmullin.com
    BARBARA E. TAYLOR, Cal. Bar No. 166374
4   btaylor@sheppardmullin.com
    ZACHARY J. GOLDA, Cal. Bar No. 327532
5   zgolda@sheppardmullin.com
    JAMES V. FAZIO, Cal. Bar. No. 183353
6   jfazio@sheppardmullin.com
    1901 Avenue of the Stars, Suite 1600
7   Los Angeles, California 90067-6055
    Telephone:  310.228.3700
8   Facsimile:   310.228.3701

9   Attorneys for Plaintiff Southern California Healthcare System, Inc.,
    d/b/a Southern California Hospital at Culver City

10

11

12                  UNITED STATES DISTRICT COURT

13        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14

15   SOUTHERN CALIFORNIA                Case No. 2:21-cv-05052-MCS-RAO
     HEALTHCARE SYSTEM, INC., d/b/a     Hon. Mark C. Scarsi
16   SOUTHERN CALIFORNIA
     HOSPITAL AT CULVER CITY,
17                                      **NOTICE OF MOTION AND
                 Plaintiff,             MOTION FOR PRELIMINARY
18                                      INJUNCTION; MEMORANDUM
            v.                          OF POINTS AND AUTHORITIES**
19
     CITY OF CULVER CITY; MAYOR         [Filed concurrently with Declarations of
20   ALEX FISCH, in his official capacity;   Von Crockett, Michael Klepin, Rosanne
     VICE MAYOR DANIEL LEE, in his      Dickerson, Janine Yoshida, Luis
21   official capacity; COUNCIL MEMBER  Padilla, Rebecca Levy, Michelle F.
     YASMINE-IMANI MCMORRIN, in         Allan, and Zachary Golda; Request for
22   her official capacity; COUNCIL     Judicial Notice]
     MEMBER ALBERT VERA, in his
23   official capacity; COUNCIL MEMBER  Hearing
     GORAN ERIKSSON, in his official    Date:    July 26, 2021
24   capacity,                          Time:    9:00 a.m.
                                        Courtroom:  7C, 350 W. 1st Street
25               Defendants.
                                        Complaint filed:    June 22, 2021
26                                      Trial Date:         Not Set

27

28
                                        Case No. 2:21-cv-05052-MCS-RAO

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 26, 2021 at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 7C of the United States District Court, Central District of California, located at 350 W. 1st Street, Los Angeles, California, Plaintiff Southern California Healthcare System, Inc., d/b/a Southern California Hospital at Culver City ("SCHCC") will and hereby does move, pursuant to Federal Rule of Civil Procedure 65, for issuance of a preliminary injunction enjoining defendant City of Culver City, and any private enforcer, from enforcing Ordinance No. 2021-_____, entitled "An Ordinance of the City of Culver City, State of California, Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals," adopted on June 14, 2021 and effective on July 14, 2021.

This Motion is made on the grounds that, as alleged in the Complaint for Declaratory, Injunctive, and Monetary Relief [DKT. No. 1], the Ordinance violates and is preempted by the National Labor Relations Act, 29 U.S.C. §151, *et seq.*. The Ordinance also violates the Equal Protection Clause, the Contracts Clause, the prohibition against Bills of Attainder, and the Due Process Clause of the U.S. and California Constitutions, and the ban on special legislation under the California Constitution. As set forth in the Complaint, in this Motion and the attached Memorandum of Points and Authorities, each of SCHCC's statutory and constitutional claims relate to the selective, retroactive, and unlawful targeting of one entity for arbitrary and discriminatory treatment, or for punishment by legislative act, without legitimate public purpose and reasonable public need, and without due process of law. (Compl. ¶¶ 152-231.) Because SCHCC is likely to succeed on the merits of its claims (or, at the very least, has raised serious questions going to the merits of its Complaint), and because, once in force, the Ordinance would cause SCHCC irreparable harm, the balance of equities and the public interests all tip decisively in favor of granting the relief requested.

SCHCC respectfully seeks relief, in the form of an preliminary injunction order**, to be issued on or before July 26, 2021** for the following reasons:

Absent injunctive relief, the Ordinance shall require SCHCC to provide "five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer."  The effective date of the Ordinance is July 14, 2021.  SCHCC has bi-weekly pay periods. The first applicable pay period after July 14, 2021 falls within the pay period beginning July 11 and ending July 24, 2021.  Consistent with SCHCC's payroll practices, checks will be issued or direct deposited on July 30, 2021 for this pay period.  *See* Declaration of Michelle F. Allan ("Allan Decl."), ¶3.  SCHCC is already beginning the process to program payroll to account for the Premium Hazard Pay, in the event the relief sought by this Motion is not granted, or is not granted on or before July 26, 2021.  (*Id.*, ¶4.)  The Premium Hazard Pay may be deleted from the check processing system as late as July 26, 2021; however, as of July 27, 2021, that pay increase cannot be undone and checks will be issued and direct deposits made, including the Premium Hazard Pay**.** (*Id.*, ¶¶4-6.)

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, concurrently filed Declarations and Request for Judicial Notice, the pleadings and papers on file in this action, and any further evidence or argument that may be presented at or before the hearing on this Motion.

This Motion is made following the conference of counsel pursuant to L.R.7-3 which took place on June 16, 17, 21, and 24, 2021.

Dated:  June 25, 2021

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

DAVID A. SCHWARZ
Attorneys for Plaintiff Southern California
Healthcare System, Inc., d/b/a Southern
California Hospital at Culver City

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     FACTUAL BACKGROUND. .............................................................. 3

A.      SCHCC's Response to the COVID-19 Pandemic ............................ 3

B.      The "Premium Hazard Pay" Ordinance ........................................... 4

C.      The SEIU's Entanglement In the Legislative Process ...................... 5

III.    LEGAL STANDARD .......................................................................... 7

IV.     SCHCC IS LIKELY TO PREVAIL ON THE MERITS; AT THE VERY
        LEAST, SERIOUS QUESTIONS GO TO THE MERITS ....................... 7

A.      The Ordinance Is Preempted By The NLRA ................................. 8

1.      The City May Not Dictate Substantive Terms of SCHCC's
        Collective Bargaining Agreements ...................................... 8

2.      The Ordinance Impermissibly Intrudes Upon The Collective
        Bargaining Process ............................................................. 9

B.      The Ordinance Violates The Equal Protection Clause ................... 11

1.      The Ordinance Intentionally Treats SCHCC Differently From
        Similarly Situated Persons ................................................ 11

2.      The Ordinance Lacks A Rational Basis .............................. 14

3.      The City Impermissibly Targeted One Employer To
        Respond To The Demands Of A Political Constituent ...................... 16

C.      The Ordinance Violates The Contracts Clause of The U.S. and
        California Constitutions .................................................................. 17

1.      The Ordinance Retroactively And Substantially Impairs The
        Existing CBA By Effecting A Naked Wealth Transfer .................... 18

2.      The Ordinance Extends Well Beyond The City's Significant
        And Legitimate Public Purpose .......................................... 20

3.      The Ordinance Is Tailored To Fit The Demands Of One
        Special  Interest Rather Than Being A Reasonable Or
        Necessary Means  To Address A Public Emergency ........................ 22

V.      SCHCC IS LIKELY TO BE IRREPARABLY HARMED ABSENT A
        PRELIMINARY INJUNCTION ............................................................... 23

VI.     THE BALANCE OF HARDSHIPS TIPS SHARPLY IN SCHCC's  FAVOR ....... 24

VII.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST ......................... 24

-i-

VIII.   CONCLUSION ......................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SMRH:4814-4196-5040.3

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*520 S. Mich. Ave. Assocs., Ltd. v. Shannon*
 549 F.3d 1119 (7th Cir. 2008)..................................................................... 10, 18

*Alliance for the Wild Rockies v. Cottrell*
 632 F.3d 1127 (9th Cir. 2011)............................................................................. 7

*Allied Structural Steel Co. v. Spannaus*
 438 U.S. 234 (1978)................................................................... 17, 18, 20, 21

*Am. Hotel and Lodging Assn. v. City of Los Angeles*
 834 F.3d 958 (9th Cir. 2016)............................................................................. 9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
 559 F.3d 1046 (9th Cir. 2009)......................................................................... 23

*Ariz. Dream Act Coalition v. Brewer*
 757 F.3d 1053 (9th Cir. 2014)......................................................................... 24

*Auciello Iron Works, Inc. v. NLRB*
 517 U.S. 781 (1996) ........................................................................................ 20

*Baltimore Teachers Union v. Mayor & City Council of Baltimore*
 6 F.3d 1012 (4th Cir. 1993)............................................................................ 19

*Brown v. N. Carolina Div. of Motor Vehicles*
 166 F.3d 698 (4th Cir. 1999)........................................................................... 17

*Caudell v. City of Toccoa*
 153 F.Supp.2d 1371 (N.D. Ga. 2001) ............................................................. 23

*Chamber of Commerce of U.S. v. Bragdon*
 64 F.3d 497 (9th Cir. 1995)................................................................... 9, 10, 18

*City of El Paso v. Simmons*
 379 U.S. 497 (1965)......................................................................................... 17

*Cleveland Bd. of Educ. v. LaFleur*
 414 U.S. 632 (1974) ........................................................................................ 17

*Connecticut Power Co.*
 271 NLRB 766 (1984) ..................................................................................... 10

-iii-

SMRH:4814-4196-5040.3

Case No. 2:21-cv-05052-MCS-RAO
NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES

*Craigmiles v. Giles*
   312 F.3d 220 (6th Cir. 2002)........................................................................ 12

*Davis v. Prison Health Servs.*
   679 F.3d 433 (6th Cir. 2012)........................................................................ 16

*Energy Reserves Group, Inc. v. Kansas Power Light Co.*
   459 U.S. 400 (1983)........................................................................ 12, 18, 21

*F.C.C. v. Beach Comm'ns, Inc.*
   508 U.S. 307 (1993)............................................................................. 12, 17

*Fortuna Enters. L.P. v. City of Los Angeles*
   673 F.Supp.2d 1000 (C.D. Cal. 2008) ........................................................ 10

*Fowler Packing Co. v. Lanier*
   844 F.3d 809 (9th Cir. 2016)................................................................. 12, 16

*Gerhart v. Lake County, Montana*
   637 F.3d 1013 (9th Cir. 2011)..................................................................... 11

*H. K. Porter Co. v. Nat'l Labor Relations Bd.*
   397 U.S. 99 (1970).................................................................................... 8, 9

*Jimenez v. Weinberger*
   417 U.S. 628 (1974)................................................................................... 13

*Leiva-Perez v. Holder*
   640 F.3d 962 (9th Cir. 2011)......................................................................... 7

*Machinists v. Wisconsin Employment Relationships Comm'n*
   427 U.S. 132 (1976) ........................................................................... 8, 9, 10

*Melendres v. Arpaio*
   695 F.3d 990 (9th Cir. 2012)....................................................................... 25

*Merrifield v. Lockyer*
   547 F.3d 978 (9th Cir. 2008)................................................................. 16, 17

*Metropolitan Life Ins. Co. v. Massachusetts*
   471 U.S. 724 (1985) ..................................................................................... 9

*Metropolitan Life Ins. Co. v. Ward*
   470 U.S. 869 (1985)................................................................................... 14

*Mountaire Farms, Inc.*
   370 NLRB 110 (2021) ............................................................................... 20

*N and N Catering Company v. City of Chicago*
   26 F.Supp.2d 1067 (N.D. Ill. 1998) ............................................................. 23

*NLRB v. American Nat'l Ins. Co.*
   343 U.S. 395 (1952) ...................................................................................... 8

*Nordlinger v. Hahn*
   505 U.S. 1 (1992) ........................................................................................ 14

*Republic of the Philippines v. Marcos*
   862 F.2d 1355 (9th Cir. 1988) ...................................................................... 7

*Sonoma Cty. Org. of Pub. Employees v. Cty. of Sonoma*
   23 Cal.3d 296 (1979) ................................................................. 19, 20, 21, 23

*Standard Fittings Co. v. NLRB*
   845 F.2d 1311 (5th Cir. 1988) .................................................................... 11

*Stormans, Inc. v. Selecky*
   586 F.3d 1109 (9th Cir. 2009) .................................................................... 24

*Sveen v. Melin*
   138 S. Ct. 1815 (2018) ................................................................................ 17

*Thunder Basin Coal Co. v. Reich*
   510 U.S. 200 (1994) .................................................................................... 24

*U.S. Philips Corp. v. KBC Bank N.V.*
   590 F.3d 1091 (9th Cir. 2010) ...................................................................... 7

*United Auto., Aerospace, Agr. v. Fortuño*
   633 F.3d 37 (1st Cir. 2011) ......................................................................... 18

*United States Trust Co. of New York v. New Jersey*
   431 U.S. 1 (1977) ........................................................................................ 22

*Village of Willowbrook v. Olech*
   528 U.S. 562 (2000) .................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .......................................................................... 7, 23, 24

<u>Statutes</u>

29 U.S.C. § 158(d) ............................................................................ 8, 10, 20

California Government Code § 54952.2(b)(1) ................................................ 6

SMRH:4814-4196-5040.3

1

California Health & Safety Code § 1250(a) ...................................................... 3, 13

2

California Health & Safety Code § 1250(b) ....................................................... 13

3

California Health & Safety Code § 1250(c) ....................................................... 13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

At 10: 45 p.m. on June 14, 2021 – 75 minutes before Governor Newsom lifted all COVID-19 related restrictions for vaccinated Californians – the Culver City Council pushed through a "Premium Hazard Pay" Ordinance mandating that "On-Site Hospital Workers" at "Covered Hospitals" receive a $5/hour bonus for 120 days. The only "Covered Hospital" in the City is Southern California Hospital at Culver City ("SCHCC"). The Ordinance goes into effect July 14, 2021. It is the first time a California city has enacted a "hero pay" ordinance targeting hospitals. To our knowledge, it is the first such law in the state targeting only one employer.[1]

SCHCC has not had a single COVID-19 ICU patient in four weeks. Yet, the Ordinance mandates millions of dollars in additional bonus payments on top of staff incentive pay, retention bonuses, and other benefits SCHCC voluntarily provided at the height of the pandemic. Declaration of Michael Klepin ("Klepin Decl."), ¶24; Declaration of Rosanne Dickerson ("Dickerson Decl."), ¶¶ 18-19.  Less than two months ago, SCHCC renewed its collective bargaining agreement ("CBA") with the Service Employees International Union ("SEIU"), which represents a majority of all SCHCC employees. The Ordinance would increase by 26% the total wage increases under new 3-year CBA. *Id.*, ¶14.

The Ordinance is arbitrary in two respects: *first*, by creating a "class of one" which excludes all other City healthcare workers and first responders; *second*, by excluding within that class some of SCHCC's employees most at risk during the pandemic. If its purpose is to "recognize and compensate" those most at risk , the City would have mandated "hero pay" for all first responders, including its own police and

---

[1] Initially styled as a "Hero Pay Ordinance to Provide Additional Compensation to … Front-Line Workers at **Southern California Hospital**," (Request for Judicial Notice ("RJN"), Ex. F, p. 343), there is no dispute that SCHCC is the only "Covered Hospital" in the City.

fire departments. If it intended to "support stable incomes" and "promote job retention" among SCHCC's employees, it would not have carved out nursing supervisors, pharmacy managers and physicians, or unionized and non-unionized staff in SCHCC's skilled nursing facility who faced the greatest risk of COVID-19 exposure. Compl., ¶¶ 132-33.

Given the lack of any legitimate justification for such arbitrary line-drawing, the only plausible explanation is an illegitimate one: To single out SCHCC at the behest of a politically influential union. Beginning in February 2021, and in parallel with contract renewal negotiations, SEIU "floated" the idea of the Ordinance as part of a coordinated campaign with Vice Mayor Daniel Lee to portray SCHCC as indifferent to its employees during the pandemic and as a puppet of private equity interests seeking to siphon cash from hospital operations.

Documents produced by the City in response to Public Records Act requests reveal an unusual and possibly illegal degree of quid pro quo entanglement. SEIU assisted Lee's failed campaign to fill a vacant Senate seat by ghostwriting letters and an op-ed critical of SCHCC, and by publicizing his attacks against the hospital.  Lee "authored" the Ordinance, even though it was drafted by SEIU.  RJN, Exs. B, D; Compl. ¶¶ 78-82, 95-96, 108-111. When SEIU told Lee that Mayor Fisch still had "very cold feet" and was "wavering" in his support, Lee advised SEIU to "get[] explicit about how your legal team would help or participate should the city get sued." RJN, Ex. B, p. 212. SEIU later reported to Lee it met with Mayor Fisch and told him that SEIU "agreed to take on all legal responsibility." Three days later, the Mayor voted to put the Ordinance up for adoption at the June 14, 2021 meeting, where he again cast the deciding vote.

The Ordinance's retroactive impairment of SCHCC's CBAs with SEIU and the California Nurses Association ("CNA") offends two, related constitutional safeguards. First, to protect individuals from legislative caprice or overreach by powerful special interests. Second, to protect against retroactive laws which upend

the right of individuals to rely on bargained-for contractual obligations. This case illustrates these dangers: The City Council imposed via fiat terms never demanded by SEIU during contract negotiations, and did so only *after* SEIU members ratified what the union termed a "GREAT CONTRACT." SCHCC would not have bargained-away significant concessions to get a deal done had it known that the City would later do the "bargaining" for SEIU. SCHCC now faces severe and unanticipated financial burdens and contractual impairments which it cannot offset by increasing charges for patient care or by demanding midterm renegotiation of its CBAs.

Compliance with an unconstitutional or unlawful law is *per se* irreparable harm. Once payments are made, there is no legal recourse to claw back the bonuses. The Ordinance would also inflict reputational harm.  By singling out SCHCC, the Ordinance carries an official imprimatur, and conveys to SCHCC's employees, its patients and the public that special legislation was required to compel SCHCC to fulfill its legal and moral obligations to its employees. Because it arbitrarily discriminates between covered "Hospital Workers" and those not entitled to bonuses, the Ordinance will sow discord and resentment while diverting resources allocated to critical patient services. Compl., ¶135. These risks are immediate and cannot remedied by law. Given Defendants' decision (unlike other cities with "hero pay" ordinances) to *not* enact the Ordinance as urgency legislation, the balance of equities favors a preliminary injunction until a trial on the merits.

## II.    FACTUAL BACKGROUND.

### A.    SCHCC's Response to the COVID-19 Pandemic

SCHCC is the only general acute care hospital in the City as that term is defined under Health & Safety Code section 1250(a).  It is a qualified Disproportionate Share Hospital ("DSH"), sometimes called a "safety net" hospital. Klepin Decl., ¶¶ 15-16. On average, over 90% of its patients are uninsured, Medi-Cal beneficiaries, or Medicare beneficiaries. *Id.*, ¶¶ 16-17.  Medicare and Medi-Cal reimbursement rates are approximately 20% to 40% lower than commercial insurance reimbursement

1  rates. *Id.*, ¶19. Qualified hospitals receive DSH payments designed to offset cost of
2  care shortfalls. *Id.* The methodologies used to develop reimbursement rates do not
3  account for the impact of local ordinances. *Id.*, ¶18; Compl., ¶¶ 58-60.

4        Like all California hospitals, SCHCC incurred serious staffing, operational, and
5  financial burdens due to the pandemic. Compl., ¶¶ 36-46, 49-55; Klepin Decl., ¶¶ 21-
6  24. Unlike most California hospitals, SCHCC anticipated the need for PPE before the
7  onset of the pandemic (Compl., ¶40; Declaration of Von Crockett ("Crockett Decl."),
8  ¶5), and provided bonuses and other benefits to help offset the financial and day-to-
9  day burdens on its staff. Compl., ¶¶ 43-46; Dickerson Decl., ¶¶ 18-19. It was clear to
10 SCHCC frontline supervisors that employees were willing to make sacrifices to save
11 patient lives so long as they perceived that the hospital was equally committed to
12 protecting the lives of its staff. Compl., ¶¶ 41-42; Klepin Decl., ¶ 30. Even so, due
13 to the demand for critical care personnel, SCHCC could not compete with "registries"
14 offering up to $250 per hour to registered nurses to take temporary positions in
15 hospitals across the nation. Compl., ¶¶ 52-53; Klepin Decl., ¶23. Rather than lay off
16 non-essential personnel, SCHCC redeployed employees to maintain critical care
17 staffing levels, or to monitor strict compliance with SCHCC's COVID-19 safety
18 protocols. Compl., ¶51. Not one SCHCC employee died due to COVID-19 exposure
19 in the workplace. Klepin Decl., ¶12.

20      **B.**    **The "Premium Hazard Pay" Ordinance**

21       The Ordinance provides that "Hospital Workers shall be entitled to no less than
22 five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at
23 a Covered Hospital in the City for an Employer." RJN, Ex. A, p. 11. It purports to
24 credit premium pay provided as of the effective date, but offers no credit for
25 compensation provided by SCHCC before the effective date. *Id.*, at 11-12. The
26 Ordinance gives a private right of action to any hospital worker aggrieved by a
27 violation. *Id.* at 12.

28

SMRH:4814-4196-5040.3

While the Ordinance contains an "Exemption," such that its provisions may be waived by a collective bargaining agreement (RJN, Ex. A, p. 13), this is illusory.  As discussed below (Part IV.A.2. *infra*), SCHCC and SEIU agreed to a renewed, three-year CBA on April 29, 2021.  SEIU members ratified the CBA on or about May 10, 2021.  SCHCC is also a party to a three-year CBA with CNA.  Neither union has any obligation to agree to reopen negotiations of their CBAs, and no motivation to agree to offsetting concessions to help relieve SCHCC of the unanticipated financial costs of the bonuses imposed by the Ordinance. Declaration of Luis Padilla ("Padilla Decl."), ¶¶ 18-23.  SCHCC estimates that the total cost of the bonuses dictated by the Ordinance would be approximately $2.1 million.  Declaration of Rebecca Levy, ¶8; Dickerson Decl., ¶14.[2]

## C.   The SEIU's Entanglement In the Legislative Process

February 11, 2021, 10 days before the SEIU CBA expired (but while renewal negotiations were ongoing), SEIU began a campaign of legislative targeting to exert pressure on SCHCC. Compl., ¶¶ 76-83, 85-86, 95-96, 108-111.  SEIU's Regional Political Director, Maky Peters, "floated" the idea to Vice Mayor Lee of sponsoring a "hero pay" urgency ordinance specifically targeting SCHCC. *Id.*, ¶78; RJN Ex. B, p. 22. Along with providing a draft of its "Hospital Heroes Hazard Pay Ordinance" (*id.*), Peters also provided an op-ed she drafted that "has finally been cleared [by SEIU] to share with you [Lee]." *Id.* This ghostwritten attack piece which (per Peters) "tried to capture [Lee's] voice," described SCHCC as a "profit generator that endangers our most vulnerable population" and insinuated that people would die "as a result of Prospect Medical Holdings' predatory business model." *Id.* at 28.[3]

---

[2] The Ordinance does not mention that SEIU members ratified the new CBA 35 days **before** the Ordinance was adopted.  At that time, the union told its members:  "WE WON A GREAT CONTRACT."  Padilla Decl., ¶16; Dickerson Decl., ¶14.

[3] Lee published the Op-Ed as a  March 10, 2021 "Letter to the Editor" in the Culver City Catalyst. https://culvercitycatalyst.co/letter-to-editor-daniel-lee-repair-southern-california-hospital-culver-city/.

Text messages and emails reveal a quid pro quo between Vice Mayor Lee and SEIU.  He wanted SEIU's assistance in advancing his senate candidacy; the union wanted him to carry its "Hero Pay for Hospital Workers Ordinance."  RJN, Ex. D, pp. 269-78.  The level of cooperation was extensive, and continued even after Lee lost his bid for a senate seat. *Id.* at 279-82. But other documents produced pursuant to Public Record Act requests reveal that SEIU's coordination included extensive, undisclosed communications with Mayor Fisch and Council Member McMorrin, as well.  RJN, Exs. C & E.  From these communications, another quid pro quo emerged:  In exchange for Mayor Fisch's vote, SEIU promised him (as well as Lee and McMorrin) that the union "had his back," and would "provide pro bono support" and "accept all legal responsibility" in the event the Ordinance was challenged in court. RJN, Ex. C, pp. 245-47; Ex. D, pp. 301-02.

In one "group chat" which took place ***during*** the City Council's April 12, 2021 discussion of the targeted "Hero Pay" ordinance, Peters assured Fisch, Lee, and McMorrin that the union is "ready to fight court case"; "Literally you guys have the support"; "That's not something you should worry [about]"; "It's actually the only way you're going to have this pro bono support;" and "There are only so many ways I can legally say that." RJN, Ex. C, pp. 245-47.[4]  In separate text messages that same evening to McMorrin, Peters said "we're gonna be there if anything gets hairy! We told the mayor that"; "You know we will support if anything happens."  RJN, Ex. E, pp. 319-20. After telling McMorrin "This is not our first rodeo," Peters said: "I am taking a risk by being this open [about what] I put I words." *Id*. McMorrin responded to some of these texts with ▌ and ♡ emojis. *Id*.

---

[4] These communications violate Cal. Gov't Code § 54952.2(b)(1), which prohibits the private gathering of "any congregation of a majority of the members of a legislative body at the same time and location . . . to hear, discuss, deliberate, or take action on any item that is within the subject matter jurisdiction of the legislative body."

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure: Rule 65 provides courts with the authority to issue preliminary injunctions.  The purpose is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered.  *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).  A plaintiff is entitled to a preliminary injunction by showing (1) "that he is likely to succeed on the merits;" (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in his favor;" and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale in which "serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of the irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011).

## IV.   SCHCC IS LIKELY TO PREVAIL ON THE MERITS; AT THE VERY LEAST, SERIOUS QUESTIONS GO TO THE MERITS

While it is likely to succeed on the merits, SCHCC need only identify serious questions going to the merits to obtain injunctive relief. The *Alliance* standard recognizes that the "district court at the preliminary injunction stage is in a much better position to predict the likelihood of harm than the likelihood of success." *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011) (quoting *Alliance*, 632 F.3d at 1139).  As the Ninth Circuit explained in a pre-*Alliance* case, "'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362

SMRH:4814-4196-5040.3

(9th Cir. 1988). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.*

## A.   The Ordinance Is Preempted By The NLRA

The NLRA preempts the Ordinance in two, related ways. First, by expressly forbidding the City from dictating substantive terms of a CBA between one employer and a union. Second, under "*Machinists* preemption." *Machinists v. Wisconsin Employment Relationships Comm'n,* 427 U.S. 132, 153 (1976).

### 1.   The City May Not Dictate Substantive Terms of SCHCC's Collective Bargaining Agreements

In *NLRB v. Jones & Laughlin Steel Corp.*, the Supreme Court upheld the NLRA against a constitutional due process challenge specifically because "[t]he Act does not compel agreements between employers and employees. It does not compel any agreement whatever." 301 U.S. 1, 45 (1937). As subsequently codified, the mutual obligation of good faith bargaining "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d). The Supreme Court has invariably held that neither the NLRB nor a state may order an employer or union to agree to a substantive term of a CBA. *See, e.g., H. K. Porter Co. v. Nat'l Labor Relations Bd.*, 397 U.S. 99, 106 (1970); *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 404 (1952) (NLRB "may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.").

In *Machinists*, the Supreme Court held that "state attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB: Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State." 427 U.S. at 153 (cleaned up). *Machinists* preemption is consistent with "the fundamental premise on which the [NLRA] is based – private bargaining under governmental

supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H.K. Porter Co.*, 397 U.S. at 108.

Imposing "Premium Hazard Pay" on one employer directly violates this "fundamental premise." Unlike a law of general applicability, such as minimum wage or labor standards, the Ordinance does not merely "set the stage for labor-management engagement, " (*Am. Hotel and Lodging Assn. v. City of Los Angeles*, 834 F.3d 958, 964 (9th Cir. 2016)), or impose "minimal substantive requirements on contract terms negotiated between parties to labor agreements." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 754-55 (1985). By definition, a one-off, temporary bonus specific to one employer is not a wage or labor "standard." It is special legislation. It supplants bargaining entirely by dictating a key term of the parties' CBA: what the hospital must pay its employees.[5]

## 2. The Ordinance Impermissibly Intrudes Upon The Collective Bargaining Process

In *Cal. Grocers Ass'n v. City of Long Beach*, a case involving a different "hero pay" ordinance broadly applicable to grocery stores, Judge Wright observed: "If the Ordinance really does prohibit any collective bargaining by grocers to mitigate increased labor costs that result from the Ordinance, then CGA's position [that it is subject to *Machinists* preemption] is fairly compelling." Case No. 2:21-cv-00524-ODW (ASx), 2021 U.S. Dist. LEXIS 35622, at *10 (C.D. Cal. Feb. 25, 2021). Here, there is no ability to bargain, at all.

The Ordinance is an even more extreme intrusion into the bargaining process than that rejected in *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995). In *Bragdon*, the Ninth Circuit held that an ordinance which required "that employers pay 'prevailing wages' to their employees on wholly private construction projects,"

---

[5] By altering contract terms negotiated through arms length bargaining, the City directly interfered with SCHCC's rights and obligations to impose financial concessions never demanded except via legislative fiat. Even though illusory, the Ordinance expressly links the CBA with a waiver of the Ordinance's provisions.

-9-

with "prevailing wages" set by the State based on third-party collective bargaining agreements, was "much more invasive and detailed" than a typical "minimum wage law, applicable to all employees" because it did not simply set a floor. *Id.* at 502. Rather, it effectively dictated "specific minimum wages and benefits to be paid" to a limited group of workers "engaged in [] specific construction projects." *Id.*

The Ordinance explicitly dictates wages and benefits to be paid as to one employer and then as to only a subset of its employees, nearly all of whom are subject to a CBA. Dickerson Decl., ¶¶ 11-17. These temporary wage increases are significant, averaging 19% for SEIU members and 10% for CNA members. *Id.*, ¶¶ 12-13. Rather than "fix the floor" or "set the stage" for bargaining, the Ordinance is a state-imposed straitjacket, with nothing "left to be controlled by the free play of economic forces." *Machinists*, 427 U.S. at 140. The Ordinance is not a minimal labor standard, or any standard whatsoever, since it applies only to one employer and two CBAs governing two bargaining units at the same hospital.[6]

While a CBA is in force, section 158(d) of the NLRA permits a union to refuse, even unreasonably, an employer's proposal to modify the terms established by a CBA. SCHCC may not reopen bargaining without SEIU's consent, (*Connecticut Power Co.*, 271 NLRB 766, 766-67 (1984) (union under no obligation to bargain over issues covered by the contract during the life of the CBA)), or require SEIU to renegotiate the CBA until 60 days before the contract expires in March, 2024 – more than two years after the Ordinance's 120-day's sunset. *See* Compl., ¶146; Padilla Decl., ¶18. Regardless of whether terms or conditions of employment are explicitly covered by contract provisions, a mid-term, ***unilateral alteration*** by either the union or the

---

[6] *See, e.g., 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1136 (7th Cir. 2008) ("The more stringent a state labor substantive standard, the more likely . . . interferes with the bargaining process [and] at a certain point, effectively substitutes itself as the bargaining representative."); *Fortuna Enters. L.P. v. City of Los Angeles*, 673 F.Supp.2d 1000, 1010 (C.D. Cal. 2008) (distinguishing *Bragdon* because it stripped employers of choice, whereas with minimum wage ordinances, "an employer can choose to pay the living wage or it can enter into a [CBA].").

employer breaches the agreement and gives rise to a civil action. *Standard Fittings Co. v. NLRB,* 845 F.2d 1311, 1315 (5th Cir. 1988) ("The result may be harsh, but the law is clear that a party may not escape its obligations under a [CBA] because of financial difficulties.").

In this case, the union never bothered to bargain for anything remotely resembling the bonuses imposed by the Ordinance. Padilla Decl., ¶¶ 13-14. Defendant Fisch knew this because SEIU told him. RJN, Ex. B,  pp. 175-76; Ex. C, p. 248-49. SEIU skipped the process altogether, choosing instead to have the City effectively substitute itself for SEIU as the bargaining representative.

## B.    The Ordinance Violates The Equal Protection Clause

To succeed on a "class of one" claim under the Fourteenth Amendment's Equal Protection Clause, a plaintiff must demonstrate that a state or local government: (1) "intentionally" (2) treated the plaintiff "differently than other similarly situated" persons (3) "without a rational basis." *Gerhart v. Lake Cty., Montana*, 637 F.3d 1013, 1022 (9th Cir. 2011) (citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000); *North Pacifica LLC v. City of Pacifica,* 526 F.3d 478, 486 (9th Cir.2008)). Here, all elements are satisfied.

### 1.    The Ordinance Intentionally Treats SCHCC Differently From Similarly Situated Persons

There can be no doubt that the City intended to create a class of one:  from the first day the City Council agendized discussion of a "Potential Hero Pay Ordinance" it specifically referenced "Front-Line Workers at Southern California Hospital." Compl. ¶87.[7]   Over the next four months, a majority of City Council members, whether separately or as a group, in both off-the-record communications with the SEIU and in public sessions of the City Council, referenced only one critical care health provider in connection with the proposed legislation.  Although SCHCC "need

---

[7] Substituting the term "Covered Hospitals" for "Southern California Hospital" merely relabels the class of one. This name change itself, like the stated rationales for the law, further suggests pretext.

not show" that the targeting was motivated by "subjective ill will" or improper motive (*Willowbrook*, 528 U.S. at 565), such evidence exists here.

Regulatory line-drawing "does not violate equal protection simply because it is not made with mathematical nicety or because in practice it results in some inequality." *F.C.C. v. Beach Comm'ns, Inc.*, 508 U.S. 307, 317 n.7 (1993) (internal quotations and citation omitted). Legislatures may approach a perceived problem incrementally. *Id.* And while courts "defer to legislatures in the necessary process of regulatory line-drawing, legislatures may not draw lines for the purpose of arbitrarily excluding individuals" or "to procure the support of [a union]" (*Fowler Packing Co. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016)), to "protect[] a discrete interest group from economic competition" (*Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002)), or to "provid[e] a benefit to special interests." *Energy Reserves Group, Inc. v. Kansas Power Light Co.*, 459 U.S. 400, 412 (1983). Given the irrationality of the Ordinance's line-drawing with respect to its purpose, the only justifications that could explain targeting SCHCC are illegitimate ones.

The Ordinance not only treats similarly situated employers differently from SCHCC – it irrationally discriminates **among** SCHCC employees. The Ordinance itself acknowledges that those at risk are not limited to "Hospital Workers." RJN, Ex. A, pp. 6, 9.[8] Yet, it arbitrarily applies only to workers at a single general acute care hospital, and then only to those currently employed. If the purpose was to recognize and compensate frontline workers, the City would not exclude "Hospital Workers" who worked during the height of the pandemic but have since left employment at SCHCC. The City's own first responders, including police, fire, and paramedic personnel, are excluded from the Ordinance, even though they were as much at risk

---

[8] The Ordinance is replete with misimpressions, *e.g.*, "hospitals continue to report the highest proportion of overall employee infection among all healthcare worker and first responder settings" RJN, Ex. A, p. 6. This ignores the lack of cases at the targeted hospital. Klepin Decl., ¶9. The statement that "nurses continue to face the highest risk of infection" is not limited to hospital settings, much less SCHCC.

from the virus.  Compl., ¶48.[9]  COVID-19 risk is not limited to, or even predominant at, general acute care hospitals. There are over two dozen licensed health care facilities in the City, including skilled nursing facilities. *Id*., ¶123. The CDC has concluded employees in skilled nursing facilities are at heightened risk of infection at work because of the communal nature of such facilities, even when compared with other frontline workers such as hospital staff.  *Id*., ¶¶ 124-126.

The Ordinance is overinclusive. Of the approximately 756 SCHCC employees in the general acute and acute rehabilitation units covered by the Ordinance, approximately 121 (16%) work in positions SCHCC has determined are low risk for COVID-19 transmission, i.e.,  case managers, insurance verifiers, social workers, and sterile processing technicians. Klepin Decl. ¶29. By contrast, of the approximately 85 employees in the general acute and acute rehabilitation units excluded under the Ordinance, roughly two-thirds work in supervisory and managerial positions which SCHCC has determined are high-risk for COVID-19 exposure, such as nursing managers, patient access supervisors, and pharmacy managers. *Id*. Similarly, by only including general acute care and acute rehabilitation units falling under section 1250(a), the Ordinance excludes a significant portion of SCHCC's employees in the subacute (skilled nursing facility) and behavioral health units – approximately 237.[10] The employees in these units were equally at risk. *Id*.

Statutes that are both "overinclusive" and "underinclusive" raise grave constitutional concerns even where they might otherwise further a legitimate interest. *E.g., Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974). Given the lack of any plausible legitimate, rational basis for the Ordinance's classifications, the only conceivable explanation is that the City deliberately tailored the Ordinance to exclude all employers (including itself) except SCHCC.

---

[9] When this was pointed out in public comment Lee warned SCHCC to "stay out of those negotiations." Compl. ¶104; Decl. of Zachary Golda ("Golda Decl."), ¶12.

[10] These units are subject to Health & Safety Code sections 1250(b) and (c), not (a).

## 2.     The Ordinance Lacks A Rational Basis

The core function of the rational basis test is to ensure that classifications rest on something other than preference for or antipathy toward one person or group. Otherwise, "*any* discrimination subject to the rational relation level of scrutiny could be justified simply on the ground that it favored one group at the expense of another." *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 882 n.10 (1985) (italics original). Whatever deference may be accorded the plausible reasons for the City's action, "deference is not abdication and rational-basis scrutiny is still scrutiny." *Nordlinger v. Hahn*, 505 U.S. 1, 31 (1992). The City must have a "legitimate state purpose." *Ward*, 470 U.S. at 876.  Given the jerry-rigged nature of the Ordinance's line-drawing, none of its stated purposes survives even the most deferential judicial review.

For example, "promot[ing] job retention" may be a legitimate basis to enact a general wage standard applicable to *all* "healthcare workers and first responders" who face COVID-19 exposure "in a healthcare setting." *See* RJN, Ex. A, pp. 6, 9.  If "the vast majority of known COVID-19 exposures" among that group "occurred in a healthcare setting" (*id.*, p. 6), there is no plausible basis to justify why the only "healthcare setting" to be regulated is SCHCC's general acute care hospital, while SCHCC's behavioral health unit and skilled nursing facility ("SNF") are carved out. For that matter, why any other "healthcare setting" in the City is excluded, such as a phlebotomy lab, an urgent care clinic, or a long-term care facility where the risk of COVID-19 exposure has been especially high.

The Ordinance states that "nurses continue to face the highest risk of infection among healthcare workers and first responders." RJN, Ex. A p. 6. That description also applies to SCHCC nurses and staff who work in the SNF on SCHCC's campus. The Los Angeles County Department of Public Health ("LACDPH") reported only a 1% difference in infection rates between hospitals and skilled nursing facilities – 26% vs. 25%, respectively. RJN, Ex. G, p. 380. Yet, the SNF is excluded from the

1   Ordinance. For comparison, SCHCC, across its entire facility, had a significantly

2   lower infection rate – 11.2%.  Klepin Decl., ¶12.[11]

3       While no one would deny that it is in the public interest "to protect the health

4   and welfare of essential Hospital Workers, their families, and the community," it does

5   not rationally follow why some of SCHCC's essential workers should fall on the

6   wrong side of the government's classification. The Ordinance makes repeated

7   reference to "first responders" as among the most at risk of all frontline workers (the

8   vast majority of whom are employed by the City), yet excludes them from receiving

9   "Premium Hazard Pay."

10      Whatever is meant by the phrase "support stable incomes among Hospital

11  Workers" (RJN, Ex. A, p. 9), SCHCC is not the only employer of low wage workers

12  in essential healthcare positions. Among the lowest paid, highest at risk health care

13  workers are those who provide home care and hospice services, custodial support and

14  housekeeping at assisted living and long-term care facilities, and services at

15  psychiatric and substance abuse/detoxification facilities. RJN, Ex. G, p. 380. They

16  "put themselves and their families at increased risk every day to care for patients with

17  COVID-19," and are among those most likely to "service as family surrogates for

18  very ill or dying patients."  RJN,  Ex. A, p. 7.  They are just as susceptible to COVID-

19  19 variants, particularly those working in skilled nursing facilities, which Senator

20  Elizabeth Warren called the "epicenter of the crisis," and who continue to face the

21  greatest risk from COVID-19.[12]

22      Not one of the proffered rationales justifies the Ordinance's class of one, let

23  alone the arbitrary line-drawing within that class of one.  But even if the Court were

24  to accept at face value a rational relationship between a $5.00 per hour, 120-day pay

25

26  _____

27  [11] Only 13% of SCHCC's COVID-19 patients were City residents.  Klepin Decl., ¶8.
    [12] *See* Healthcare Financial Management Association, *With 40% of COVID deaths,*
    *post-acute care sites get funding, scrutiny* (May 26, 2020)

28  <https://www.hfma.org/topics/news/2020/05/with-40--of-covid-deaths--post-acute-
    care-sites-get-funding--scr.html> [as of June 24, 2021].

raise and job retention, the Court need not turn a blind eye to the actual realities faced by SCHCC, the putative beneficiary of this employee retention initiative. Klepin Decl., ¶¶ 21-25. If there is another COVID-19 surge, a $5.00 hourly temporary pay increase, particularly with respect to registered nurses, will do nothing to "promote job retention." *Id.*, ¶23. In this respect, it is the City who turns a blind eye to SCHCC's on-the-ground experience with personnel retention strategies during the peak of the pandemic. Dickerson Decl., ¶¶ 18-21.[13]

### 3. The City Impermissibly Targeted One Employer To Respond To The Demands Of A Political Constituent

Once these proffered justifications are set aside, the most plausible—and only—justification for the City's line-drawing is an illegitimate one. As observed in *Fowler Packing*, "courts rarely inquire into the sausage-making of political compromise." 844 F.3d at 815 n.3. This case presents one of these rare instances. While the Court is not asked to decide whether SEIU's "got your back" offer of "pro bono support" amounts to an illegal quid pro quo, the Court may consider whether the only (or only plausible) explanation for the lines drawn between SCHCC and other essential, frontline healthcare employers, or the perplexing demarcations within this class of one, is an illegitimate one.

The Ninth Circuit has looked past the government's purported rationales for legislation to conclude that they were merely smokescreens for intentional discrimination. *See Merrifield v. Lockyer*, 547 F.3d 978, 992, n.15 (9th Cir. 2008) (statute motivated by economic protectionism rather legitimate governmental interest); *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (lack of rational basis shown "by demonstrating that the challenged government action was

---

[13] The City's "legislative analysis" is missing the only exhibit it references, which purportedly identifies comparable bonuses provided by the Mayo Clinic and Kaiser. Golda Decl., ¶4. The only other document referenced is an analysis by the City of Los Angeles regarding grocery store revenues and profits. But unlike a supermarket, SCHCC cannot pass on unanticipated costs of hero pay bonuses to government payors or private insurers. Crockett Decl., ¶4; Klepin Decl., ¶¶ 14-20, 26.

motivated by animus or ill-will"); *Brown v. N. Carolina Div. of Motor Vehicles*, 166 F.3d 698, 706-07 (4th Cir. 1999) ("Irrational classifications or laws motivated by the desire to harm an unpopular group fail rational basis scrutiny.").

Even where statutes are upheld under rational basis analysis, additional scrutiny is warranted where there is "some reason to infer antipathy" on the part of the legislature. *Beach Comm'ns, Inc.*, 508 U.S. at 314. "[Under] equal protection analysis, the history of the legislation in question may affect whether a government's action may survive rational basis scrutiny." *Merrifield*, 547 F.3d at 986, n.11. In other words, courts are not required to accept "after-the-fact rationalizations" without question. *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring). Hypothetical justifications do not render an illegitimate classification "reasonable."

## C.     The Ordinance Violates The Contracts Clause of The U.S. and California Constitutions

The Contracts Clause of the U.S. Constitution states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1. As with the Constitution's prohibition against bills of attainder or *ex post facto* laws, the Contracts Clause "reflect[s] the strong belief of the Framers of the Constitution that men should not have to act at their peril, fearing always that the State might change its mind and alter the legal consequences of their past acts so as to take away their lives, their liberty, or their property."  *City of El Paso v. Simmons*, 379 U.S. 497, 522 (1965) (Black, J., dissenting).

The Supreme Court has established a three-step test to determine whether a law "impair[s] the Obligation of Contracts." ***First***, "'whether the law has operated as a substantial impairment of a contractual relationship.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018) (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id*.

at 1822.  "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Reserves*, 459 U.S. at 411. "Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Spannaus*, 438 U.S. at 245. **Second**, "[i]f the [city] regulation constitutes a substantial impairment, the [city], in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem," as opposed to "providing a benefit to special interests." *Energy Reserves*, 459 U.S. at 412.[14] **Third**, "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id*. (cleaned up).  The Ordinance fails to meet these constitutional minima.  And, as case law makes clear, this Court need not accept the proffered legislative blandishments at face value.[15]

### 1.  The Ordinance Retroactively And Substantially Impairs The Existing CBA By Effecting A Naked Wealth Transfer

The Ordinance severely and substantially impairs SCHCC's CBA by imposing unanticipated and significant financial burdens.  As explained in *Spannaus*:

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular

---

[14] While SEIU's rent-seeking overreach is on full display in this case, the Ninth Circuit believed that a similar game was afoot in *Bragdon*, which characterized the prevailing wage ordinance at issue as an example of "an interest group deal in public-interest clothing." 64 F.3d at 503 (cleaned up); *see also Shannon*, 549 F.3d at 1132 ("[B]y passing a statute with such a narrow focus (one occupation, in one industry, in one county), there seems to be a disincentive to collective bargaining and instead encouragement for employers or unions to focus on lobbying at the state capital instead of negotiating at the bargaining table.").

[15] Unlike the search for a rational basis, a court need not take at face value any conceivable or post hoc rationalization for the impairment. "For example, if a state purports to impair a contract to address a budgetary crisis, a plaintiff could allege facts showing that the impairment did not save the state much money, the budget issues were not as severe as alleged by the state, or that other cost-cutting or revenue-increasing measures were reasonable alternatives to the contractual impairment at issue." *United Auto., Aerospace, Agr. v. Fortuño*, 633 F.3d 37, 45 (1st Cir. 2011).

needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

438 U.S. at 245.

"In the employment context, there likely is no right both more central to the contract's inducement and on the existence of which the parties more especially rely, than the right to compensation at the contractually specified level." *Baltimore Teachers Union v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1018 (4th Cir. 1993). The negotiation over wages goes to the "very heart" of the collective bargaining relationship. *Sonoma Cty. Org. of Pub. Employees v. Cty. of Sonoma*, 23 Cal.3d 296, 309 (1979) (upholding Contracts Clause challenge).

SCHCC renewed its CBA with SEIU based on its bargained-for expectation that the agreement fixed wage increases over a three-year term. Padilla Decl., ¶17; Dickerson Decl., ¶14. The hospital's investment-backed reliance in exchange for agreeing to these concessions could not be more apparent. When it agreed to the contractual wage increases, the hospital budgeted out the anticipated expenses over the life of the CBA. Padilla Decl., ¶17; Dickerson Decl., ¶14. The total amount of the "Premium Hazard Pay" bonuses to be paid to SEIU members is approximately 26% of the entire amount of wage increases over the life of the CBA. Dickerson Decl., ¶14. Unlike the CBA, which spreads wage increases over a three-year period, the Ordinance forces SCHCC to comply with these retroactive changes to its contractual obligations over 120 days. The hospital cannot simply offset these unanticipated expenses by unilaterally raising what it charges patients or government or commercial payors. Crockett Decl., ¶4; Klepin Decl., ¶¶ 16-19.

Standing alone, these impairments, both in financial terms and in expectational interests, are substantial and severe. At no point during the six months of contract renewal negotiations did SEIU once demand an across-the-board pay increase such as imposed by the Ordinance or anything remotely close to it. Padilla Decl., ¶¶ 13-14. It is unlikely that SCHCC would have agreed to such bonuses (had SEIU ever

proposed them during bargaining), without demanding offsetting concessions from the union, including almost certainly adjustments to the wage increases offered by the hospital. *Id.*, ¶17. It is virtually certain that, had the union demanded bonuses in the amount mandated by the Ordinance **and** three years' worth of wage increases obtained from SCHCC, the parties might still be bargaining or at impasse. *Id.*

The consequences of the Ordinance's impairment of SCHCC's rights involve more than one specific contractual term. A central objective of the NLRA is to foster industry and stability through collective bargaining relationships. Once the parties enter into a CBA, legal consequences attach above and beyond payment of wages and benefits. For example, an employer may not disavow a CBA because of a good-faith doubt as to the union's majority status "when the doubt arises from facts known to the employer before its contract offer had been accepted by the union." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 783 (1996). Under the NLRB's "contract-bar" doctrine, employees covered by a valid CBA are prohibited from petitioning to oust an existing union for three years or the duration of the agreement – whichever is shorter. *See Mountaire Farms, Inc*., 370 NLRB 110, at *1 (2021). As already noted, section 158(d) of the NLRA does not require either a union or an employer "to discuss or agree on any modification of the terms and conditions contained in the contract for a fixed period." These are a few of the myriad obligations, independent of the terms of the CBA, which are statutory consequences of the parties' voluntary agreement.

Here, the Ordinance would cause a "'severe, permanent, and immediate change'" in SCHCC's rights under the contract (*Sonoma Cty.*, 23 Cal.3d at 309 (quoting *Spannaus*, 438 U.S. at 250)), that is neither "a mild one [or] hardly burdensome" to SCHCC. *Id.* at 308 n.11 (quoting *City of El Paso*, 379 U.S. at 526).

### 2. The Ordinance Extends Well Beyond The City's Significant And Legitimate Public Purpose

"The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special

interests." *Energy Reserves*, 459 U.S. at 412.  Given the class of one created by the Ordinance and its dubious justifications (essentially retrospective in purpose and effect), "this law can hardly be characterized as one enacted to protect a broad societal interest rather than a narrow class." *Spannaus*, 438 U.S. at 248-249 (cleaned up). Given its factual similarities, *Spannaus* should guide the Court's analysis.  As here, the statute invalidated in *Spannaus* not only had "an extremely narrow aim, but also its effective life was extremely short," like the 120-day Ordinance, and it intruded into an area never before subject to regulation by the State.  *Id*. at 248, n.21.

Then there is the unavoidable fact that the Ordinance is, in its crudest form, special interest legislation.  In *Spannaus*, there was evidence to support the contention that the Minnesota law was designed to benefit a few, while at the same time targeting a small number of employers singled out from a larger group.  Unlike in *Energy Reserves*, there are obvious indications that the political process had broken down, such that the "selection of a public purpose and determinations of necessity and appropriateness should be left to [the legislature]." 459 U.S. at 418 n.25 (cleaned up).

No public need justifies the retroactive upward adjustment of contractual wages.  No emergency could warrant such a "severe disruption of contractual expectation." *Spannaus*, 438 U.S. at 247. Nor is there any showing that these unilateral wage increases are "necessary to meet an important general social problem." *Id*.  The City cannot, for obvious reasons, invoke an emergency (even if one existed) to justify this intrusion into one employer's contractual relations.  *Cf. Sonoma Cty.*, 23 Cal.3d at 310 ("Here respondents rely upon the existence of a fiscal crisis as justification for the impairment, but they have not met their burden of establishing that such a crisis existed.") (footnote omitted).  And while Defendants assert the power to "recognize," "protect" or "compensate" Hospital Workers for the "substantial risks" "they face and will continue to face in the coming months," speculation about future events is not a constitutionally sufficient basis to disrupt the

careful balance, both in terms of labor relations and healthcare economics, which safety net hospitals such as SCHCC must carefully manage.

Second, even if Defendants could show that COVID-19 is a continuing crisis, they cannot justify the arbitrary scope and duration. There appears to be no other explanation specifying 120 days other than the same time duration was used in ordinances requiring "hero pay" for grocery workers, as was the case with the equally arbitrary amount of the bonus.  Importantly, there is no discernible nexus with the stated purposes of the Ordinance.  While one stated purpose is to "promote job retention," it is not plausible to suggest that a salary increase of such limited duration would do anything to retain workers once the 120-day period expires. The Ordinance is both overinclusive and underinclusive, highlighting the disconnect between the ostensible purpose of the law and how it would work. The City had several other "more moderate courses" to satisfy its interests other than this overinclusive and underinclusive "remedy," which leaves no recourse for SCHCC.  *See United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 31 (1977).

### 3. The Ordinance Is Tailored To Fit The Demands Of One Special Interest Rather Than Being A Reasonable Or Necessary Means To Address A Public Emergency

Apart from the arbitrary nature of the Ordinance's line-drawing, duration, and $5.00 per hour increase, the Ordinance trips over essential safeguards against unlawful impairment of private contracts.  No one would doubt that frontline workers are owed a debt of gratitude; this, however, does not empower the City to compel one employer to pay that debt, particularly when SCHCC provided monetary and other benefits during the pandemic when most needed, while refusing to do the same for its own employees.  And while the Vice Mayor ironically proclaimed that requiring SCHCC to pay is the City's way of "putting its money where its mouth is," the City has yet to abide by the same mandate for its own employees.  Golda Decl., ¶13.

If the City Council believed it was essential to provide bonuses to reward, recognize, compensate, or retain all frontline healthcare workers and first responders,

then "Premium Hazard Pay" would be the subject of general legislation. Instead, the Ordinance's unilateral, ex post facto burdens were enacted "for the advantage of particular individuals," namely SEIU (and incidentally CNA), not for a greater social good. *Sonoma Cty.,* 23 Cal.3d at 306. It cannot be said that "labor stability" or "industrial peace" is promoted by arbitrarily depriving similarly situated frontline workers the same windfall awarded to others.  In fact, the more likely consequence is to impede the hospital's ability to recruit, retain, or rehire.

## V.    SCHCC IS LIKELY TO BE IRREPARABLY HARMED ABSENT A PRELIMINARY INJUNCTION

A plaintiff seeking preliminary relief must show a likelihood of irreparable harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Where constitutional claims are alleged, courts "presume irreparable harm." *Id.; see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). Here, Plaintiff has alleged nine meritorious constitutional claims. Compl. ¶¶ 142-231. Provisional relief is particularly appropriate when a law's targeting of a single person raises substantial constitutional issues, as here, under the Equal Protection Clause and state and federal prohibitions of Bills of Attainder and Special Legislation. *See, e.g., Caudell v. City of Toccoa*, 153 F.Supp.2d 1371, 1381 (N.D. Ga. 2001).  Even absent a presumption of irreparable harm, the evidence establishes such harm is likely.

The Ordinance will irreparably harm SCHCC's reputation by creating the impression that it is the only healthcare facility in the City—in fact in Los Angeles County and the State—that had to be forced by law to address the well-being of its employees due to COVID-19. *See N and N Catering Company v. City of Chicago*, 26 F.Supp.2d 1067, 1079 (N.D. Ill. 1998) (enjoining referendum that "will irreparably tarnish its business reputation and goodwill.").

It will also irreparably damage employee relations and morale, particularly morale of workers who *did* work at SCHCC throughout the peak of the pandemic and actually treated COVID-19 patients, by arbitrarily: (1) treating workers in the same

building in the same job classifications differently – one group gets Premium Hazard Pay and the other does not; (2) providing bonuses to new hires who were not working at SCHCC during the peak; (3) providing Premium Hazard Pay to workers regardless of whether they provided care to COVID-19 patients or level of exposure to COVID-19. *See* Part IV.B., *supra*. Finally, should SCHCC comply and the Ordinance later be declared invalid or preempted, SCHCC will as a legal and/or practical matter be unable to claw back monies paid to hospital workers. *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in judgment) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.") (italics in original).

## VI.   THE BALANCE OF HARDSHIPS TIPS SHARPLY IN SCHCC's FAVOR

A plaintiff seeking preliminary relief must show that "the balance of equities tips in his favor." *Winter, supra*, 555 U.S. at 20. Courts "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). The balance of hardships favors a preliminary injunction where there is a likelihood that a law is unconstitutional. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Because SCHCC raises meritorious claims, the balance of hardships tips sharply in its favor. Moreover, Defendants would not be damaged by a preliminary injunction. The only consequence of a preliminary injunction would be to delay briefly imposition of Premium Hazard Pay. An undertaking will ensure that there are sufficient funds to pay bonuses, with interest from the effective date of the Ordinance, should it be later upheld.

## VII.  INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

A motion for preliminary injunction must show "that an injunction is in the public interest." *Winter, supra*, 555 U.S. at 20. It is never "in the public's interest to allow the state to violate the requirements of federal law." *Brewer, supra*, 757 F.3d at 1069 (likelihood of success on equal protection and preemption challenges also

satisfied balance of hardships factor). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal citation omitted).

The Ordinance disserves the public interest by diverting finite resources from SCHCC's planned expansions of patient services, including obtaining primary stroke center certification, upgrading the cardiac catheterization laboratory for heart attack patients, and building a new emergency room. Klepin Decl., ¶¶ 27-28. It interferes with the delicate balance of revenues and expenses necessary to ensure that SCHCC has the ability to deliver high quality, comprehensive care to uninsured patients and patients covered by Medi-Cal and Medicare, who typically have few options for healthcare. *Id.*, ¶¶ 17, 19-20. The public interest favors an injunction.

## VIII. CONCLUSION

Plaintiff respectfully requests that a preliminary injunction be granted enjoining enforcement of the Ordinance.

Dated:  June 25, 2021

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

DAVID A. SCHWARZ
Attorneys for Plaintiff SCHCC

-25-

SMRH:4814-4196-5040.3

Case No. 2:21-cv-05052-MCS-RAO
NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES