JEFFREY V. DUNN, Bar No. 131926
jeffrey.dunn@bbklaw.com
CHRISTOPHER M. PISANO, Bar No. 192831
christopher.pisano@bbklaw.com
DANIEL L. RICHARDS, Bar No. 315552
daniel.richards@bbklaw.com
BEST BEST & KRIEGER LLP
300 South Grand Avenue
25th Floor
Los Angeles, California 90071
Telephone: (213) 617-8100
Facsimile: (213) 617-7480

Attorneys for Defendants
City Of Culver City, Mayor Alex Fisch, Vice
Mayor Daniel Lee, Council Member Yasmine-
Imani McMorrin, Council Member Göran
Eriksson, Council Member Albert Vera

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SOUTHERN CALIFORNIA HEALTHCARE SYSTEM, INC., a California Corporation, d/b/a SOUTHERN CALIFORNIA HOSPITAL AT CULVER CITY,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CULVER CITY, a charter municipality MAYOR ALEX FISCH, in his official capacity, VICE MAYOR DANIEL LEE, in his official capacity, COUNCIL MEMBER YASMINE-IMANI McMORRIN, in her official capacity, COUNCIL MEMBER GÖRAN ERIKSSON, in his official capacity, and COUNCIL MEMBER ALBERT VERA, in his official capacity,<br><br>Defendants. | Case No. 2:21-cv-05052-MCS-RAO<br>Hon. Mark C. Scarsi<br><br>**DEFENDANTS CITY OF CULVER CITY, MAYOR ALEX FISCH, VICE MAYOR DANIEL LEE, COUNCIL MEMBER YASMINE-IMANI MCMORRIN, COUNCIL MEMBER GÖRAN ERIKSSON, COUNCIL MEMBER ALBERT VERA'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Request for Judicial Notice, Declarations of Daniel Richards, Dr. Joshua Luke, Lisa Vidra, LaRhonda Smith, Jane Steinberg, Arturo Espinoza, Marne Vervan, John Aho, Jacques Maia, Objection to Request for Judicial Notice; and [Proposed] Order Filed Concurrently Herewith]<br><br>Hearing Date: July 26, 2021<br>Time: 9:00 a.m.<br>Courtroom: 7C<br><br>Action Filed: June 22, 2021 |

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

CASE NO. 2:21-CV-05052-MCS-RAO
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................ 1

II.     FACTUAL BACKGROUND .............................................................. 1

        A.    BACKGROUND ON PMH ........................................................ 2

        B.    MEDICAL WORKER "BURNOUT" AND RETENTION .................. 2

        C.    ENACTMENT OF THE PREMIUM PAY ORDINANCES ............... 3

III.    LEGAL ARGUMENT ........................................................................ 5

        A.    STANDARD FOR PRELIMINARY INJUNCTION ......................... 5

        B.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS ........ 6

              1.    THE POLICE POWER INCLUDES THE POWER TO
                    REGULATE WAGES ........................................................ 6

              2.    THE NLRA DOES NOT PREEMPT THE ORDINANCE ........ 6

                    a.    *There is a Strong Presumption Against Preemption* ......... 7

                    b.    *The Ordinance is not Preempted* ...................................... 7

                    c.    *Bragdon* .......................................................................... 9

              3.    THE ORDINANCE DOES NOT VIOLATE THE EQUAL
                    PROTECTION CLAUSE .................................................... 11

                    a.    *No HealthCare Facility is Similarly Situated* ................ 12

                    b.    *The Ordinance is Supported by a Rational Basis* .......... 14

              4.    THE ORDINANCE DOES NOT VIOLATE THE
                    CONTRACTS CLAUSE ...................................................... 18

        C.    SCHCC FAILS TO SHOW IRREPARABLE HARM ...................... 22

        D.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST ....... 24

IV.     CONCLUSION .............................................................................. 25

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

CASE NO. 2:21-CV-05052-MCS-RAO
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

## <u>TABLE OF AUTHORITIES</u>

PAGE

**Federal Cases**

*Allied Structural Steel Co. v. Spannaus*
    438 U.S. 234 (1978) ................................................................................ 19, 21

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*
    119 F.Supp.3d 1177 (C.D. Cal. 2015) .................................................... 8, 11

*American Hotel and Lodging Association v. City of Los Angeles*
    834 F.3d 958 (9th Cir. 2016) ................................................................... 9, 11

*Andy's BP, Inc. v. City of San Jose*
    605 F. App'x 617 (9th Cir. 2015) ................................................................. 12

*Animal Legal Def. Fund v. Wasden*
    878 F.3d 1184 (9th Cir. 2018) ..................................................................... 18

*Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*
    940 F.2d 766 (2d Cir. 1991) ........................................................................ 20

*Assoc. Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*
    231 F. Supp. 3d 810 (C.D. Cal. 2017) ......................................................... 9

*Associated Builders & Contractors of S. California, Inc. v. Nunn*
    356 F.3d 979 (9th Cir. 2004) .............................................................. 7, 9, 10

*Babler Brother v. Roberts*
    995 F.2d 911 (9th Cir. 1993) ......................................................................... 7

*Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of Baltimore*
    6 F.3d 1012 (4th Cir. 1993) ......................................................................... 20

*California Grocers Ass'n v. City of Long Beach*
    2021 WL 736627 (C.D. Cal. Feb. 25, 2021) ................................................ 8

*Calop Bus. Sys., Inc. v. City of Los Angeles*
    984 F. Supp. 2d 981 (C.D. Cal. 2013) ......................................................... 9

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE**

*Chamber of Commerce of U.S. v. Bragdon*
  64 F.3d 497 (9th Cir. 1995) ...................................................................... 9, 10, 11

*Chicago Bd. of Realtors, Inc. v. Chicago*
  819 F.2d 732 (7th Cir. 1987) ............................................................................ 21

*Citizens United v. Fed. Election Comm'n*
  558 U.S. 310 (2010) ......................................................................................... 18

*City of Los Angeles v. Lyons*
  461 U.S. 95 (1983) ............................................................................................. 6

*Crossley v. California*
  2020 WL 4747723 (S.D. Cal. Aug. 17, 2020)................................................... 18

*Dallas v. Stanglin*
  490 U.S. 19 (1989) ........................................................................................... 14

*Drakes Bay Oyster Co. v. Jewell*
  747 F.3d 1073 (9th Cir. 2014).......................................................................... 24

*Eilenberg v. City of Colton*
  2020 WL (C.D. Cal. May 14, 2020).................................................................. 23

*Elizondo v. City of Junction City*
  669 F. App'x 855 (9th Cir. 2016) ..................................................................... 12

*Energy Reserves Group, Inc. v. Kan. Power and Light Co*.
  459 U.S. 400 (1983) .............................................................................. 19, 20, 21

*F.C.C. v. Beach Communications, Inc.*
  508 U.S. 307 (1993) .............................................................................. 3, 14, 15, 17

*Fort Halifax Packing Co. v. Coyne*
  482 U.S. 1 (1987) .................................................................................... 1, 7, 8, 9

*Fortuna Enters., L.P. v. City of Los Angeles*
  673 F.Supp.2d 1000 (C.D. Cal. 2008).................................................................. 8

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE**

*Freeman v. City of Santa Ana*
  68 F.3d 1180 (9th Cir. 1995) ............................................................. 12

*Gallinger v. Becerra*
  898 F.3d 1012 (9th Cir. 2018) ..................................................... 17, 18

*Gen. Offshore Corp. v. Farrelly*
  743 F. Supp. 1177 (D.V.I. 1990) ....................................................... 19

*Gerhart v. Lake Cty., Mont.*
  637 F.3d 1013 (9th Cir. 2011) ........................................................... 12

*Golden Estate Transit Corp. v. City of Los Angeles*
  475 U.S. 608 (1986) ............................................................................ 6

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*
  512 F.3d 1112 (9th Cir. 2008) ........................................................... 25

*Great N. Res., Inc. v. Coba*
  2020 WL 6820793 (D. Or. Nov. 20, 2020) ....................................... 22

*Hawaiian Airlines, Inc. v. Norris*
  512 U.S. 246 (1994) ............................................................................ 7

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*
  736 F.3d 1239 (9th Cir. 2013) ........................................................... 22

*Hill St. Health Servs. LLC v. Cty. of Los Angeles*
  2016 WL 9453998 (C.D. Cal. Nov. 16, 2016) .................................. 12

*Home Bldg. & Loan Ass'n v. Blaisdell*
  290 U.S. 398 (1934) .......................................................................... 18

*Hudson Water Co. v. McCarter*
  209 U.S. 349 (1908) .......................................................................... 18

*Hunters Cap. LLC v. Seattle*
  499 F. Supp. 3d 888 (W.D. Wash. 2020) .......................................... 18

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE**

*Interpipe Contracting, Inc. v. Becerra*
898 F.3d 879 (9th Cir. 2018) ............................................................... 7

*Kadrmas v. Dickinson Pub. Schs.*
487 U.S. 450 (1988) ........................................................................... 14

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*
634 F.2d 1197 (9th Cir. 1980) ........................................................... 24

*Lewis v. Casey*
518 U.S. 343 (1996) ............................................................................. 6

*Lusnak v. Bank of Am., N.A.*
883 F.3d 1185 (9th Cir. 2018) ............................................................. 7

*Maryland v. King*
567 U.S. 1301 (2012) ......................................................................... 25

*Medtronic, Inc. v. Lohr*
518 U.S. 470 (1996) ............................................................................. 7

*Metro. Life Ins. Co. v. Massachusetts*
471 U.S. 724 (1985) ......................................................................... 6, 9

*National Broadcasting Co., Inc. v. Bradshaw*
70 F.3d 69 (9th Cir. 1995) ................................................................... 8

*Nw. Grocery Ass'n v. City of Seattle*
2021 WL 1055994 (W.D. Wash. Mar. 18, 2021) ................................. 7

*Pentecostal Church of God v. Douglas Cty.*
798 F. App'x 995 (9th Cir. 2020) ...................................................... 12

*Ramos v. Bank of Am., N.A.*
2012 WL 12550456 (C.D. Cal. Jan. 31, 2012) ................................... 13

*Rendish v. City of Tacoma*
123 F.3d 1216 (9th Cir. 1997) ........................................................... 22

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGE**

*Ross v. Moffitt*
    417 U.S. 600 (1974) ................................................................. 12

*RUI One Corp. v. City of Berkeley*
    371 F.3d 1137 (9th Cir. 2004) ........................................ 1,6,12,15,21

*Sampson v. Murray*
    415 U.S. 61 (1974) ................................................................. 23

*Strange v. Searcy*
    574 U.S. 1145 (2015) .............................................................. 25

*Thornton v. City of St. Helens*
    425 F.3d 1158 (9th Cir. 2005) .................................................. 12

*U.S. Dept. of Agr. v. Moreno*
    413 U.S. 528 (1973) ............................................................... 18

*Vance v. Bradley*
    440 U.S. 93 (1979) ................................................................. 14

*Viceroy Gold Corp. v. Aubry*
    75 F.3d 482 (9th Cir. 1996) .................................................... 7, 8

*West Coast Hotel Co. v. Parrish*
    300 U.S. 379 (1937) .................................................................. 6

*Williamson v. Lee Optical of Oklahoma, Inc.*
    348 U.S. 483 (1955) ............................................................... 14

*Winter v. National Resources Defense Council, Inc.*
    555 U.S. 7 ......................................................................... 1, 5, 22

**State Cases**

*Sonoma Cty. Org. of Pub. Emps. v. Cty. of Sonoma*
    23 Cal. 3d 296 (1979) ............................................................. 20

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE**

**Constitutional Provisions**

First Amendment .............................................................................. 17, 22

Cal. Const., Article I, § 9 .......................................................................... 18

U.S. Const., Article I, § 10 ........................................................................ 18

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1

## I.    **INTRODUCTION**

Plaintiff Southern California Healthcare Systems, Inc., d/b/a Southern California Hospital at Culver City's ("SCHCC" or "Plaintiff") motion for a preliminary injunction (Mot., ECF No. 11) should be denied. Plaintiff has no chance of success on the merits, and satisfies none of the other factors under *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7 (the "*Winter* factors.")

The Ordinance is not preempted by the NLRA. The Supreme Court and the Ninth Circuit have held that substantive state labor standards are not preempted. *See*, *e.g.*, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20–22 (1987).

The Ordinance does not violate equal protection guarantees. It is subject to rational basis review, and it is rationally related to legitimate governmental purposes that include staff retention at the City's only hospital and compensating hospital workers for the burdens they continue to face in light of the COVID-19 pandemic. *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004).

The Ordinance does not violate the Contracts Clause of the United States or California Constitutions. It is a valid exercise of the constitutional police power authority, it imposes obligations independent of any contractual rights and so burdens no contract, and it furthers significant and legitimate public purposes.

## II.   **FACTUAL BACKGROUND**

The City of Culver City ("City"), like the rest of the state, has been in the midst of a public health emergency of almost unprecedented magnitude. While significant progress has been made in combating the pandemic, in particular the rollout of vaccines to prevent infection and serious symptoms, the pandemic is not over, and dangerous virus variants continue to spread in this county and elsewhere. (Richards Decl. Exs. X–Z.) Community transmission of COVID-19 continues, and acute infections require treatment in hospitals with emergency departments, like SCHCC. (Declaration of Joshua D. Luke ("Luke Decl.") ¶¶ 37–38.) Recognizing

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

CASE NO. 2:21-CV-05052-MCS-RAO
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

this fact, the CDC still recommends the wearing of face masks in hospital settings. Just days ago, the World Health Organization urged all people to continue to wear masks and observe social distancing in light of the continued spread of variants such as the Delta-variant. (Declaration of Daniel L. Richards ("Richards Decl.") Ex. U.) More recently, Los Angeles County issued guidance recommending that masks be worn indoors. (Richards Decl. Ex. V; *see also* Richards Decl. Ex. W.)

## A.   Background on PMH

SCHCC is owned by Prospect Medical Holdings, Inc. ("PMH," *see* Compl. ¶ 26, ECF No. 1). According to investigations by the Wall Street Journal, Bloomberg, ProPublica, and others, PMH paid out hundreds of millions in shareholder dividends, including a $457,000,000 dividend in 2018 alone. PMH has also received hundreds of millions of dollars in taxpayer funded grants and loans to battle the pandemic. (Richards Decl. Ex. N at p. 7; Ex. O at pp. 1, 21–22, Ex. Q at pp. 6–7; Ex. R; Ex. T; Luke Decl. ¶ 41; *see also* Luke Decl. ¶ 40.)

## B.   Medical Worker "Burnout" and Retention

According to a March, 2021 report prepared by the Washington Post and KFF Survey Project, the COVID-19 Pandemic has exacted a heavy toll on health care workers. (Richards Decl. Ex. L.) A full *seven in ten* younger frontline workers report that they are experiencing "burn out." (*id.* at p. 11.) Thirty percent of healthcare workers say that they are considering leaving the healthcare profession. (*Id.* at p. 16.) Among healthcare workers who worked in a facility that ran out of PPE at least at times (like the City heard testimony that SCHCC did, Richards Decl. Ex. 4 at p. 37, 41-42; *see also* Richards Decl. Ex. O at p. 21), 48 percent report that they are considering leaving the healthcare field. (Richards Decl. Ex. L at p. 16.)

As Plaintiff recognizes, SCHCC has had a substantial problem with employee attrition. Out of a total of 1,082 employees, SCHCC lost 455 employees in less than one year, an attrition rate approaching fifty percent. (Decl. of Rosanne Dickerson ("Dickerson Decl."), ¶¶ 3, 6, ECF No. 11-6.) While Plaintiff states it

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

knows best how to retain hospital workers (Mot. at 16:3–7),[1] it seems it may be unwilling to take necessary steps, or that the steps it has taken are insufficient.

According to a recent report and survey released by the United States Chamber of Commerce, the single best way to convince workers who have left the workforce to return is a one-time bonus, which is analogous to the short term pay required by the Ordinance. (Richards Decl. Ex. T; see also Luke Decl. ¶¶ 13–19.) As Plaintiff notes, financial considerations, and in particular competition with the pay offered by nurse registries, seems to be driving at least some of the serious issues Plaintiff faces with employee retention. (Mot. at 16:3–5.)

## C.   **Enactment of the Premium Pay Ordinances**

Before passage of the Ordinance, the City enacted an ordinance requiring premium pay for grocery and drugstore workers, addressing compensating and promoting retention among frontline workers incrementally. (Richards Decl. Ex. AA); *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993).

In advance of enacting the Ordinance here, the City received many public comments. While some hospitals submitted (largely identical) opposition comments (Richards Decl. Ex. K), the City received a substantial number of comments supporting the Ordinance. (Richards Decl. Exs. H, I, J.)

Perhaps most notably, the City received a petition signed by *four hundred and thirty-five* hospitals workers urging the City to enact the Ordinance:

> Fighting on the frontlines of the COVID-19 pandemic has been anything but easy for healthcare workers. We have been pushed to the brink trying to keep up with an overwhelming number of critical patients. We constantly struggle with stress, exhaustion, and burnout. We've sacrificed time with our families, our personal lives, and even our own safety in order to take care of our community.
>
> No amount of money can compensate for the trauma we experienced watching countless patients die while we were exposed to the same virus that was killing them. Nothing can bring back the co-workers we

---

[1] It is notable that many of the "benefits" Plaintiff provided during the pandemic were either effectively mandated, extremely temporary, of minimal value, or provided by the federal government (e.g., the 401k tax related "incentive"). (Luke Decl. ¶¶ 20–30.)

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

lost to COVID-19. But hazard pay will help us support our families while we continue serving out patients and community. . . . All we ask is that the City Council recognize our dedication and sacrifice the same way you recognized grocery workers. (Richards Decl. Ex. I.)

On June 14, 2021, the City received a letter signed by more than forty employees of the Hospital urging the City to enact the Ordinance:

I speak for myself and my colleagues when I say that this historic legislation means more than you could know. Receiving hazard pay will help us support the families we had to sacrifice time with so we could care for the community. But this is more than just money – it is value and respect, the likes of which we haven't seen from our own employer in many ways. (Richards Decl. Ex. J.)

In addition to written comments, hospital workers and other members of the public appeared at City Council meetings, discussing conditions at the Hospital (Richards Decl. Ex. A at 4:4–7:15, Ex. B at 4:18–9:12, Ex. C at 4:17–6:9) and providing heartfelt testimony urging enactment of the Ordinance, and explaining why passage of the Ordinance was so important to them, their co-workers, and their families. (Richards Decl. Ex. C at 6:24–8:16; Ex. D at 20:4–28:1; Ex. E at 6:9–11:16, 25:20–42:22, 45:18–46:23; Ex. F at pp. 10:15–12:25, 15:10–25, 25:1–30:8, 33:9–34:19.) After considering extensive public comment and a lengthy debate (Richards Decl. Ex. E at 51:21–70:4; Ex. F at 37:19–50:4), the City Council voted to enacted the Ordinance. (Richards Decl. Ex. F at 49:11–25, Ex. G.)

The Ordinance provides for an increase of $5 per hour to existing wages. It does not prevent an employer from taking any action (e.g., reduction in hours or benefits), it includes the ability to "opt-out" in a collective bargaining agreement ("CBA"), and it does not preclude bargaining (or unilateral action, as to non-unionized employees) on any other term of employment. (Richards Decl. Ex. G at 7:20–8:8; 9:1–7; Declaration of John Aho ("Aho Decl.") ¶ 7.)

The Ordinance is a modest, temporary measure, and expires 120 days after its effective date. (*Id.* at 10:7–13.) In enacting this Ordinance, the City Council legislatively determined that, among other things, (1) hospital workers have faced

and will face serious risk from COVID-19, (2) the COVID-19 threat remains, especially in light of the spread of variants and the slowing pace of vaccinations, (3) hospital workers face this threat in order to provide critical, lifesaving care to the community, and (4) in addition to physical risk hospital employees have and will continue to face a heavy emotional and psychological toll. (*Id.* at 1:5–5:27; *see also* Declaration of Jane Steinberg ("Steinberg Decl.") ¶¶ 10–12.) In light of this:

> [T]he City seeks to compensate essential Hospital Workers for their daily sacrifices and the ongoing risks and burdens they and their families face while providing vital services to the community during the pandemic and in the coming weeks and months; and
> [T]he City aims (1) to protect the health and welfare of its essential Hospital Workers, their families, and the community; (2) to recognize and compensate Hospital Workers for the risks and burdens they face every day and will continue to face in the coming months; (3) support stable incomes among Hospital Workers; and (4) promote job retention by ensuring Hospital Workers are adequately compensated for the substantial risks, efforts, and expenses they are undertaking to provide essential services . . . (Richards Decl. Ex. G at 6:1–14.)

## III.    LEGAL ARGUMENT

### A.    Standard for Preliminary Injunction

Because it is an extraordinary remedy, a plaintiff seeking a preliminary injunction "must establish" that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 21. Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Even under this test, Plaintiff must meet all four *Winter* factors. *Id.* at 1132, 1135. Where an injunction is sought against a government, a higher showing is required of imminent harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Lewis v. Casey*, 518 U.S. 343, 349–50 (1996).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

**B.**     **Plaintiff is Unlikely to Succeed on the Merits**

1.     **The Police Power Includes the Power to Regulate Wages**

Regulation of wages and the conditions of employment is squarely within the police power of local government. As the Supreme Court determined more than 80 years ago, local regulation of wages is not constitutionally infirm, and employers do not have a right based in an employment contract to avoid such regulation. In *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), the Court rejected a constitutional challenge to Washington State's minimum wage laws, noting the broad power of government to exercise the police power to protect workers. *Id.* at 392–93, 400.

"The power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." *RUI One Corp.*, 371 F.3d at 1150. The Ordinance regulates wages and employment conditions. *See also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985).

2.     **The NLRA Does not Preempt the Ordinance**

The NLRA does not preempt local wage or other labor regulations; it preempts only laws that interfere with "economic weapons of self-help, such as strikes and lockouts." *Golden Estate Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 614–15 (1986). The Ordinance does not interfere with any such weapons.

The NLRA is "concerned primarily with establishing an equitable process for determining terms and conditions of employment." *Metro. Life Ins. Co.*, 471 U.S. at 753. Pursuant to this principle, the Supreme Court has established two narrow doctrines of preemption by federal labor law: *Garmon* and *Machinists*. In its motion, Plaintiff acknowledges that *Machinists* preemption is the only relevant preemption question. (Mot. at pp. 8:21–9:2.) *Machinists* preemption does not apply.

As with the Seattle hazard pay law at issue in *Nw. Grocery Ass'n v. City of Seattle*, 2021 WL 1055994 (W.D. Wash. Mar. 18, 2021), the Ordinance provides a wage premium to all covered workers "engaged in specifically delimited types of hazardous work who have been disproportionately impacted by COVID-19;" that

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

premium is applied regardless of the covered workers' current pay rate; and the Ordinance does not seek to regulate benefits, workplace conditions, or hours. The Ordinance is thus a classic minimum labor standard of general applicability that "does not interfere with the mechanics of the collective bargaining process" and therefore is not preempted by the NLRA. *Id.* at \*4; *see also Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004).

### a.   *There is a Strong Presumption Against Preemption*

Federal preemption cases are guided by two key principles: (1) "the purpose of Congress is the ultimate touchstone in every pre-emption case" and (2) "the assumption that the State's historic police powers are not preempted" absent Congress' "clear and manifest purpose" to preempt the exercise of those powers. *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018) (citations and internal quotation marks omitted). "Pre-emption of employment standards within the traditional police power of the State should not be lightly inferred." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). This "approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

*Fort Halifax*, is clear that "pre-emption should not be lightly inferred... [because] the establishment of labor standards falls within the traditional police power of the State." *Fort Halifax*, 482 U.S. at 21; *see also Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 888, 891 (9th Cir. 2018).

### b.   *The Ordinance is not Preempted*

The Supreme Court and the Ninth Circuit have repeatedly held that substantive state labor standards are not preempted by the NLRA. *See*, *e.g.*, *Fort Halifax*, 482 U.S. at 20–22; *National Broadcasting Co., Inc. v. Bradshaw*, 70 F.3d 69 (9th Cir. 1995); *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996); *Babler Brother v. Roberts*, 995 F.2d 911 (9th Cir. 1993). The Ordinance is a substantive labor standard benefitting union and non-union hospital workers, and

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

does not conflict with the NLRA, which regulates the collective bargaining *process*. Applying this logic, Courts in this district have rejected similar challenges to City of Los Angeles' living wage ordinances, *see Am. Hotel & Lodging Ass'n v. City of Los Angeles* 119 F.Supp.3d 1177, 1179 (C.D. Cal. 2015), *aff'd*, 834 F.3d 958 (9th Cir. 2016); *Fortuna Enters., L.P. v. City of Los Angeles*, 673 F.Supp.2d 1000 (C.D. Cal. 2008), and similar challenges to "Hero Pay" ordinances. *California Grocers Ass'n v. City of Long Beach*, 2021 WL 736627, at *5 (C.D. Cal. Feb. 25, 2021).

In *Fort Halifax*, 482 U.S. 1, the Supreme Court held that a Maine statute requiring employers, in the event of a plant closing, to provide a one-time severance payment in the absence of a collective bargaining agreement on the subject, was not preempted. The company in *Fort Halifax* argued that the statute was preempted under *Machinists* because it undercut the employer's ability to withstand a union's demand for severance pay. *Id*. at 20. The Supreme Court rejected this argument, finding that Maine's law was a valid and unexceptional exercise of its police power. *Id*. at 22. The Court reasoned that such a substantive labor standard provides protections to union and nonunion workers alike, and thus neither encourages nor discourages bargaining processes. *Id*. at 21–22. The *Fort Halifax* Court held that the mere fact that a state statute regulates matters over which the parties may bargain cannot support a claim of preemption. *Id*. at 21–22.

In *Viceroy Gold Corp*, 75 F.3d 482, the Ninth Circuit held that a California labor standard prohibiting more than eight hour work days in the absence of a CBA was not subject to *Machinists* preemption. The Ninth Circuit rejected the company's claim that the law was preempted. *Id*. at 489–90. The Court reasoned that it "undoubtedly" qualified as a minimum labor standard. *Id*.

More recently, in *American Hotel and Lodging Association v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016), the Ninth Circuit held that a Los Angeles living wage ordinance was not preempted by the NLRA, explaining:

Under *Machinists* preemption, at issue here, the NLRA prohibits states

Best Best & Krieger LLP
Attorneys at Law
1800 K Street NW, Suite 725
Washington, District of Columbia 20006

from restricting a "weapon of self-help," such as a strike or lock-out. . . . [M]inimum labor standards affect union and nonunion employees equally, neither encouraging nor discouraging [] collective bargaining processes. . . . **[T]hese standards are not preempted, because they do not "regulate the mechanics of labor dispute resolution."** . . Such standards are a valid exercise of states' police power to protect workers. . . . It is no surprise, then, that "state minimum benefit protections have repeatedly survived *Machinists* preemption challenges," . . . .

*Id.* at 963–65 (emphasis added). Both the Supreme Court and Ninth Circuit have held that standards other than minimum wage laws, or laws that set "floors," are not preempted. *See, e.g., Fort Halifax*, 482 U.S. at 21 (lump sum severance payments); *Metro Life Ins. Co.*, 471 U.S. at 758 (mental health benefits).

In *Nunn*, 356 F.3d 979, the Ninth Circuit rejected Plaintiff's apparent argument that preemption is more likely to be found when a labor standard applies only to a small group of employers or employees:

> While *Bragdon* emphasized that the Contra Costa County ordinance "targets particular workers in a particular industry," we have since explained on several occasions that the NLRA does not authorize us to pre-empt minimum labor standards simply because they are applicable only to particular workers in a particular industry. (citations) [S]tate substantive labor standards . . . are not invalid simply because they apply to particular trades, professions, or job classifications . . . .

*Id*. at 990 (internal citations and quotations omitted).

c.     *Bragdon is Inapplicable*

Plaintiff relies on *Chamber of Commerce of U.S. v. Bragdon*, 64 F.3d 497 (9th Cir. 1995) for the proposition that the Ordinance is so "invasive and detailed" that it is preempted by the NLRA. Plaintiff's reliance on *Bragdon* is misplaced. In *Bragdon*, the Ninth Circuit held that an ordinance requiring construction employers to pay "prevailing wages" determined solely by reference to established CBAs was preempted. *Id*. at 502. "This manner of setting wages, . . gave employers what amounted to a Hobson's choice—they had either to accept the results of third parties' collective bargaining processes or enter into a [CBA] themselves." *Calop Bus. Sys.,*

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

*Inc. v. City of Los Angeles*, 984 F. Supp. 2d 981, 1011 (C.D. Cal. 2013).

The Ninth Circuit subsequently cabined *Bragdon*'s holding to its particular facts—an ordinance mandating wages based exclusively on third-party collectively bargained rates. *Nunn*, 356 F.3d at 990; *id.* at 991, fn. 8 ("In invalidating Contra Costa County's prevailing wage ordinance, we carefully distinguished, for purposes of preemption, state-established minimum wage regulations, which we acknowledged to be lawful."); *Assoc. Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*, 231 F. Supp. 3d 810, 823–24 (C.D. Cal. 2017) ("Plaintiffs ignore that the Ninth Circuit has retreated from its holding in *Bragdon*."). The pay required here is not tied to any CBA, and is not preempted.

The Ordinance here has none of the characteristics of the law the *Bragdon* court held was preempted. The ordinance in *Bragdon* wholesale imported terms from negotiated collective bargaining agreements: "[T]he prevailing wage . . . is not a fixed statutory or regulatory minimum wage, but one derived from the combined collective bargaining of third parties in a particular locality. . . . The manner in which the Ordinance operates affects not only the total of the wages and benefits to be paid, but also the division of the total package that is paid in hourly wages directly to the worker and the amount paid by the employer in health, pension, and welfare benefits for the worker." *Bragdon*, 64 F.3d at 502. Here, the Ordinance provides for a fixed regulatory premium, and in no way derives its requirements from "the collective bargaining of third parties." The Ordinance does not regulate the "total of the wages and benefits paid," it simply requires that *whatever* wages and benefits are paid are supplemented by a $5 premium. The Ordinance is unconcerned with "the division of the total package that is paid in hourly wages directly to the worker and the amount paid by the employer in health, pension, and welfare benefits for the worker." *Id.* at 502.

Finally, even to the extent that dicta in *Bragdon* can be read to endorse an essentially new strand of NLRA preemption, through which sufficiently "onerous"

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

minimum labor standard can be preempted, a $5 wage supplement is a far cry from the extreme regulation that could fall into such a novel preemption. In *Am. Hotel & Lodging Ass'n*, 119 F. Supp. 3d 1177, the court reasoned that a wage standard would have to be extreme beyond reason to even potentially face such preemption:

> Plaintiffs cannot identify a single case where any court held that a minimum labor standard was so onerous that it rendered the statute preempted. This makes sense. Establishing preemption in this context is hard . . . .The Court ventures to guess a minimum wage standard would need to have a degree of outrageousness—an amount that is completely arbitrary and has no rational basis with respect to its intended purpose—for it to be considered an extreme case that compels preemption.

*Id*. at 1191–92. On appeal in the *American Hotel & Lodging Association* matter, the Ninth Circuit had no need to even address the alleged onerousness of the ordinance at issue. *Am. Hotel & Lodging Ass'n*, 834 F.3d 958. Instead, the Ninth Circuit recognized that, based on its own and Supreme Court precedent, the inquiry was whether the ordinance was a "minimum labor standard" or whether the challenged ordinance attempted to "regulate the mechanics of collective bargaining" – an inquiry that is agnostic as to the alleged onerousness of a labor standard. *Id.* at 963–65

Finally, Plaintiff's repeated note that a CBA is currently in force which does not require any further bargaining dooms Plaintiff's preemption claim. The NLRA is "concerned primarily with establishing an equitable process" for bargaining, and prevents a state from restricting "weapons of self-help," such as a strike or lockout. *Id*. at 963. If all bargaining has concluded for a CBA that will survive the life of the Ordinance, there is no bargaining process the City could interfere with. The Ordinance facially and as a matter of fact does not restrict or limit *any* economic weapon of self-help. Finally, as Plaintiff acknowledges, the Ordinance simply does not restrict any voluntary bargaining the parties may choose to engage in.[2]

3.  **The Ordinance does not Violate the Equal Protection Clause**

In a "class of one" challenge, Plaintiff must show the City "(1) intentionally

---

[2] The Union and Plaintiff are not *required* to bargain further, but they not precluded from doing so. (Mot. at 10:15–11:4.) SCHCC has not, to the City's knowledge, even attempted to contact the Union to discuss waiving the Ordinance's requirement in exchange for other terms or conditions. (*See* Declaration of John Aho ¶ 7.)

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

(2) treated [Plaintiff] differently than other similarly situated [persons], (3) without a rational basis." *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011). Classifications are scrutinized more carefully the "smaller and more vulnerable" the affected entity. *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1156 (9th Cir. 2004). Plaintiff and its parent company, PMH, can "hardly be considered vulnerable." *Id.*; (*see also* Luke Decl. ¶¶ 39–41, 44; Richards Decl. Exs N–S).

### a.   *No HealthCare Facility is Similarly Situated*

Once a plaintiff establishes a governmental classification, it is necessary to identify a "similarly situated" class against which the plaintiff can be compared. *See Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). "Equal protection is intended to prevent disparate treatment of those 'whose situations are *arguably indistinguishable*.' " *Hill St. Health Servs. LLC v. Cty. of Los Angeles*, 2016 WL 9453998, at *8 (C.D. Cal. Nov. 16, 2016) (quoting *Ross v. Moffitt*, 417 U.S. 600, 609 (1974) (emphasis added).

A failure to identify a sufficiently similar group is fatal to an equal protection claim. *See, e.g., Andy's BP, Inc. v. City of San Jose*, 605 F. App'x 617, 618–19 (9th Cir. 2015) ("Plaintiff cannot state an equal protection claim . . . because the two gas stations are not similarly situated."); *Elizondo v. City of Junction City*, 669 F. App'x 855 (9th Cir. 2016) ("The district court also did not abuse its discretion in denying preliminary injunction . . . . [T]he situations of other property owners cited by the Elizondos were not sufficiently similar because they did not present all of the unique issues posed by the maple tree . . . ."); *Pentecostal Church of God v. Douglas Cty.*, 798 F. App'x 995, 997 (9th Cir. 2020) ("We hold that the Church has not met the second prong. The record does not show that other churches in the County are in fact similarly situated to the Church."); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) ("There are no other auto wreckers in St. Helens and, therefore, the City is not imposing a burden on the Thorntons that it

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

does not also impose on other wreckers within its jurisdiction.[3] . . . Evidence of different treatment of unlike groups does not support an equal protection claim.").

Plaintiff fails to identify any similarly situated entity. Plaintiff *argues* that there are "over two dozen licensed health care facilities in the City, including skilled nursing facilities." (Mot. at 13:1–6.) Plaintiff provides no analysis as to why these other health care facilities are similarly situated, and provides no evidence in support of even this threadbare allegation of similarity, citing instead only to its complaint. *Id.*[4] The only evidence Plaintiff submitted germane to this question is the declaration of Michael Klebin, in which he states the Hospital is the only hospital in the City. (Klebin Decl., ¶ 3, ECF No. 11-3.)

Hospitals (especially hospitals with emergency departments, like SCHCC) are meaningfully distinct from skilled nursing facilities and other "licensed health care facilities". (Mot. at p. 23:2–3.) Only hospitals have emergency departments and ICUs to accept and treat the most serious acute injuries and diseases. Only hospitals have the licensure, staff, training, and equipment to treat the full panoply of serious illness and injury, *including* acute COVID-19 cases. Only hospitals bare the full brunt of treating the most acute patients infected with COVID-19, including struggling to treat cases that prove fatal. Only hospitals are required by law to accept and treat all patients presenting with a medical emergency. (*See* Luke Decl. ¶¶ 37–38.) In short, hospitals stand alone, and are *not* similarly situated to skilled nursing facilities or any other healthcare facility.

Plaintiff's argument that the City treated SCHCC's similarly situated *employees* different is nonsensical, and is not relevant to Plaintiff's claim. Plaintiff brings an equal protection claim alleging that *its* equal protection rights were violated because *it* was treated differently than similarly situated entities. Plaintiff

---

[3] Compare with Compl. ¶ 26 ("SCHCC is the only general acute care hospital . . . in the City.")
[4] Plaintiff's allegations in its unverified complaint are not evidence. *See, e.g.*, *Ramos v. Bank of Am., N.A.*, 2012 WL 12550456, at *4 (C.D. Cal. Jan. 31, 2012) ("Plaintiff's first amended complaint—which is not verified and not signed under penalty of perjury—is not evidence. . . . In light of the foregoing, Plaintiff's ex parte application for TRO is DENIED.").

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

cannot stand in the shoes of non-party employees. None of these employees have joined, and none have submitted declarations in support of Plaintiff.[5]

        b.    *The Ordinance is Supported by a Rational Basis*

Choices about the scope of economic regulations are fundamentally political choices. Courts therefore review laws challenged as violating equal protection under the deferential "rational basis" test. This test is the "most relaxed and tolerant form of judicial scrutiny," *Dallas v. Stanglin*, 490 U.S. 19, 26 (1989), reflecting a strong preference for resolution of policy differences at "the polls not [in] the courts." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488 (1955). A law will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications, Inc.*, 508 U.S. at 313. Any plausible basis suffices, even if it did not underlie the legislative action, *id.*, and even if no party raised it. *Kadrmas v. Dickinson Pub. Schs.,* 487 U.S. 450, 463 (1988). Because it is "entirely irrelevant for constitutional purpose" whether the rational basis was the actual motivation for a law, "the absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis." *Beach Commc'ns, Inc.*, 508 U.S. at 315. Legislative decisions may be based on rational speculation, and may go unsupported by data. *See Vance v. Bradley*, 440 U.S. 93, 111 (1979). Plaintiffs "attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." *Beach Commc'ns, Inc.*, 508 U.S. at 315.

Controlling Ninth Circuit authority renders Plaintiff's claim meritless. In *RUI One Corp.,* 371 F.3d 1137, the Ninth Circuit rejected an equal protection challenge to a living wage ordinance that targeted only employers of a certain size within a certain zone of the City of Berkeley. *Id.* at 1156. The Berkeley ordinance required large employers located in the Berkeley Marina to pay employees a "living wage."

---

[5] Notably, a group that could speak to the interests of these non-parties (who would directly feel the effects of the sought injunction), SEIU-UHW is attempting to intervene, but Plaintiff has apparently declined to stipulate to this intervention. (Mot. to Intervene at p. 2:8–13.)

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

*Id.* at 1145. The Ninth Circuit considered plaintiff's argument that the purported reasons for the law were not the real reasons motivating the enactment of the Berkeley ordinance, but rather it was a ploy to help unionize hotels in the Marina. *Id*. at 1155. The Ninth Circuit refused to conduct a more searching review of the legislative motivations, however, finding that it was "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* The plaintiff also argued that the Berkeley ordinance was unconstitutional because it imposed the living wage only on Marina businesses, and not on other businesses in the city. *Id*. The Ninth Circuit rejected this argument noting that "[s]uch legislative decisions are 'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.' " *Id.* (quoting *Beach Commc'ns, Inc*., 508 U.S. at 316.) Thus, the Ninth Circuit concluded that it was "certainly rational ... for the City to treat Marina businesses differently from their competitors outside the Marina." *Id*. at 1156.

Here, it was rational for the City to legislatively draw the lines that it did, and require premium pay for hospital workers and not, at this time, other classifications of workers working for other healthcare facilities. Unlike other healthcare facilities, a hospital *must* accept acute COVID-19 case, while skilled nursing facilities and other health care facilities can (and do) redirect patients elsewhere – specifically, to hospitals. (Luke Decl. ¶¶ 37–38.) Further, hospitals are the *only* type of facility licensed, trained, and equipped to treat those with acute COVID-19 (and individuals with a host of other diseases and emergency injuries). No other facility in the City is *legally permitted* to treat individuals with acute COVID-19 symptoms. (Luke Decl. ¶ 37.) If an individual with acute COVID-19 symptoms sought treatment at a skilled nursing facility, or other facility, they would not be permitted entry, and would instead be isolated and transferred to the Hospital – where they would be treated by the hospital workers who are the beneficiaries of the Ordinance. (*Id.*)

It was also rational for the City to conclude that the need for "hero pay" was

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

most acute for hospital workers based on public input. Several hospital workers wrote in or appeared at City Council meetings expressing the need for hero pay, and the City received a petition signed by *hundreds* of hospital workers expressing the stress, burnout and other effects of the pandemic. (Richards Decl. Exs. I, J, Ex. C at 6:24–8:16; Ex. D at 20:4–28:1; Ex. E at 6:9–11:16, 25:20–42:22, 45:18–46:23; Ex. F at pp. 10:15–12:25, 15:10–25, 25:1–30:8, 33:9–34:19.) The City received no such input from workers at other healthcare facilities.

Moreover, even absent COVID-19, requiring heightened pay for hospital workers would be rationally related to the legitimate interest of ensuring adequate staffing at the City's *only* hospital with the City's *only* emergency room and intensive care unit. It was rational for the City to draw a distinction between the acute lifesaving care provided by a hospital and the care provided by other healthcare facilities in the City.

Plaintiff's argument that the City violated Plaintiff's equal protection rights by only requiring premium pay for some of its employees is bizarre, and meritless. If the City had irrationally treated certain *employees* differently, this would implicate those employees' equal protection rights, not Plaintiff's. None of the employees have joined as plaintiffs. On the contrary, SEIU-UHW has moved to intervene in this matter to defend the Ordinance. (Mot. to Intervene, ECF No. 13.)

Even assuming Plaintiff's ill-explained reading of whom the Ordinance applies to (Mot. at 13:7–19) is correct[6] and relevant to Plaintiff's equal protection challenge, it was rational for the City to target hero pay at those working in the emergency room and the other portions of the Hospital in-taking and treating the most acute cases of COVID-19. (Luke Decl. ¶¶ 37–38.)

Further, SCHCC remains free to voluntarily pay these other employees premium pay, and the City Council remains free to enact subsequent legislation,

---

[6] The City understands the entire Hospital is licensed under General Acute Care Hospital License No. 930000066, and thus all defined categories of healthcare providers workers at the Hospital are Hospital Workers entitled to premium pay, regardless of where in the Hospital they work.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

addressing the task of properly compensating front-line workers and promoting retention "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Beach Commc'ns, Inc.*, 508 U.S. at 316. A legislature may "select one phase of one field and apply a remedy there, neglecting the others" without running afoul of the equal protection clause. *Id.*

Plaintiff's protestation that the Ordinance irrationally failed to include employees who have "left employment at SCHCC" is meritless, and almost certainly disingenuous. Requiring retroactive payment to non-employees would do little to further key aims of the Ordinance: worker retention and recognizing ongoing burdens faced by hospital workers.[7] (Richards Decl. Ex. G at 6:1–14.)

Finally, Plaintiff's allegation that the Ordinance was passed as a result of union lobbying is meritless, and does not show that the Ordinance is irrational. First, despite Plaintiff's venomous and reckless accusation of corruption, its evidence does not establish or even support this serious charge. SEIU-UHW indicated it would be "ready to fight the court case". It is far from improper for an interested group to intervene to attempt to defend legislation it supports, precisely as SEIU-UHW has done here. (Mot. to Intervene.) Nor is there anything improper about petitioning the government to support the passage of legislation.[8]

In any event, Plaintiff's unsupported allegations do not demonstrate that the Ordinance lacked a rational basis. The Ninth Circuit has held that a plaintiff cannot prove invidious discrimination by showing that legislators responded to lobbying efforts. *Gallinger v. Becerra*, 898 F.3d 1012, 1020–21 (9th Cir. 2018) (finding no impermissible animus in statute's exemption for retired police officers after "political pressure" resulting from "potent lobbying efforts by the law enforcement community."). The right to lobby and petition the government is "constitutionally

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

---

[7] SCHCC would presumably challenge a retroactive obligation to pay former employees.
[8] While as irrelevant as Plaintiff's accusations, it bears noting that Plaintiff "entangled" itself in the legislative process, lobbying the City Council against the Ordinance. (Declaration of Lisa A. Vidra ¶¶ 5–7 & Exs. A, B.)

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

protected," and indeed a core part of the First Amendment. *Id.* at 1021; *see generally Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). There is no evidence the City acted out of a desire to do anything but *help* hospital workers (and the broader community they serve and protect), not a desire to *harm* SCHCC. *Id.* at 1020–21 ("Accommodating one interest group is not equivalent to intentionally harming another."); *Crossley v. California*, 2020 WL 4747723 (S.D. Cal. Aug. 17, 2020) ("Accommodating one interest group is not equivalent to intentionally harming another."); *Hunters Cap. LLC v. Seattle*, 499 F. Supp. 3d 888, 905 (W.D. Wash. 2020) ("[A]n allegation that the government favors a certain class or viewpoint, standing alone, is insufficient to show that the government necessarily disfavors the plaintiff's alleged class . . . .")

A legislative act motivated in part by the lobbying efforts of a group is not unconstitutional; rather, if the *only* motivation of legislation is to *harm* an unpopular group, that bare desire to harm is not a legitimate government interest. *U.S. Dept. of Agr. v. Moreno*, 413 U.S. 528, 534 (1973) ("[B]are [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.") "[A] court may strike down [a] statute under the Equal Protection Clause if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment." *Gallinger*, 898 F.3d at 1021 (quoting *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018)) (emphasis in original). Neither prong of this test is met here.

### 4. <u>The Ordinance Does not Violate the Contracts Clause</u>

Plaintiff alleges that its agreements regarding working conditions with its employees supersedes public laws enacted to protect the safety, health and welfare of the people in Culver City. This argument has no merit. Both the state and federal constitutions prohibit impairment of contracts. U.S. Const., art. I, § 10; Cal. Const., art. I, § 9. However, it has long been recognized that "the prohibition against any impairment of contracts is 'not an absolute one and is not to be read with literal

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

exactness.'" *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934).

The contract clause "prohibition must be accommodated to the inherent police power of the State," *Energy Reserves Group, Inc. v. Kan. Power and Light Co*., 459 U.S. 400, 410 (1983), safeguarding the interests of the people, because such police powers are "paramount to any rights under contracts between individuals." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978). Under these principles, the first question is whether the challenged law constitutes a "substantial impairment" of contracts. *Energy Reserves*, 459 U.S. at 411. Critically, this threshold condition is not met when the law is a valid exercise of the police powers. *Id.* at 411 (quoting *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908)) ("'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them'").

Additionally, given the broad authority of the City to regulate working conditions and the highly regulated nature of healthcare, Plaintiff is "operating in a heavily regulated industry" and so additional workplace laws cannot be said to substantially impair their contracts. *Energy Reserves*, 459 U.S. at 413 (natural gas producers did not have contracts impaired where state regulated the intra-state prices they could charge because "State authority to regulate natural gas prices is well established" even though Kansas had never before regulated prices); *Gen. Offshore Corp. v. Farrelly*, 743 F. Supp. 1177, 1198 (D.V.I. 1990) (working conditions are heavily regulated under *Energy Reserves*, because "[o]ccupational safety, collective bargaining, minimum wages, worker's compensation, and other areas of legislation have left few aspects of the workplace unregulated").

As a factual matter, the Ordinance does not substantially impair Plaintiff's contracts. Any CBA or employment contracts remain in full force and effect, and are fully enforceable. The Ordinance imposes a separate legal requirement, independent of the terms of a CBA, employment contract, or at-will employment agreement. If Plaintiff fails to pay any particular worker the premium pay required

by the Ordinance, the employee would have the right to bring a civil action against Plaintiff to enforce the employee's rights under the Ordinance, but the right to bring that action is independent of the existence and terms of the employment contract.

Plaintiff's (misleading) reliance on *Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1014 (4th Cir. 1993) and *Sonoma Cty. Org. of Pub. Emps. v. Cty. of Sonoma*, 23 Cal. 3d 296, 297 (1979) is misplaced. In both cases, the challenged governmental action was legislation modifying the government's *own* contractual obligations. And in both of those cases a contract was in fact impaired – essentially, a governmental body contracted to pay a certain amount for labor, and by legislative fiat decided to pay less. Not so here.

If there were a "substantial impairment" of Plaintiff's contracts, Plaintiff would still need to show that the challenged law does not have a "significant and legitimate" public purpose under a rational basis standard. *Energy Reserves*, 459 U.S. at 411-412. "Unless the State itself is a contracting party . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412–13; *see RUI One Corp.*, 371 F.3d at 1150; *Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*, 940 F.2d 766, 771 (2d Cir. 1991) ("[L]egislation which impairs the obligations of *private* contracts is tested under the contract clause by reference to a rational-basis test[.]"); *Chicago Bd. of Realtors, Inc. v. Chicago*, 819 F.2d 732, 737 (7th Cir. 1987) (courts assess whether the government adopted law it "rationally could have believed would lead to improved public health and welfare").

The Ordinance is supported by a more than rational basis. The express "aim" of the Ordinance to "promote job retention" provides a rational basis to uphold the Ordinance. Ensuring adequate staffing at the City's *only* hospital is a legitimate (and important and compelling) interest, especially in light of the continued community transmission of COVID-19 and the worrying rise in variants.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

An ordinance requiring heightened payment to hospital workers is rationally related to the governmental interest of promoting job retention. Plaintiff cannot demonstrate, or even reasonably argue, that higher wages are wholly unrelated to an employee's desire to remain working. Indeed, as Plaintiff admits, wage related issues are a major part of Plaintiff's issues with employee retention. (Mot. at p. 4:12–15; *see also* Luke Decl. ¶¶ 18–19; Richards Decl. Ex. T.)

Even if there are "better" or more narrowly tailored means to ensure medical staff retention at the City's only hospital, as Plaintiff vaguely alleges (Mot. at 16:5–7) this is not the test for an economic ordinance that burdens no fundamental right and targets no suspect class. The Ordinance need only be rationally related to a legitimate governmental interest, which it is. It was rational for the City to conclude that hospital workers face extreme difficulties in light of the pandemic, and that they deserved recognition and compensation. (*See, e.g.*, Declaration of Arturo Espinoza ("Espinoza Decl.") ¶¶ 4–9; Declaration of LaRhonda M. Smith ("Smith Decl.") ¶¶ 5–9; Declaration of Marne Vervan ("Vervan Decl.") ¶¶ 5–8;  Declaration of Jacques Maia ¶¶ 5–8; Steinberg Decl. ¶¶ 10–12; Richards Decl. Ex. C at 6:24–8:16; Ex. D at 20:4–28:1; Ex. E at 6:9–11:16, 25:20–42:22, 45:18–46:23; Ex. F at pp. 10:15–12:25, 15:10–25, 25:1–30:8, 33:9–34:19, Exs. H, I, J, M.)

Plaintiff's contention that *Spannaus*, 438 U.S. 234 is "factual[ly] similar" to this matter is meritless. In *Spannaus*, Minnesota enacted a statute requiring a decade of *retroactive* pension contributions: "The result was that, although the company's past contributions were adequate when made, they were not adequate when computed under the 10-year statutory vesting requirement. . . . Not only did the state law thus retroactively modify the compensation that the company had agreed to pay its employees from 1963 to 1974, but also it did so by changing the company's obligations in an area where the element of reliance was vital—the funding of a pension plan." *Id.* at 246. The Court noted:

This Minnesota law simply does not possess the attributes of those

state laws that in the past have survived challenge . . . The law was not even purportedly enacted to deal with a broad, generalized economic or social problem. (citation) It did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State. (citation) It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships—irrevocably and retroactively.

*Id.* at 250. The opposite is true here. The Ordinance was enacted as a response to the ongoing pandemic, and in recognition of the dangers faced by and extraordinary contribution of hospital workers, *and* in recognition of the substantial probability of worker "burnout" and further employee attrition. The Ordinance operates in an area already subject to extensive state regulation at the time employment contracts were entered into.[9] Finally, the Ordinance affects only a temporary alteration of any contractual relations – it requires only a discrete amount of premium pay for a limited period of 120 days. Further, the Ordinance is not retroactive.

### C.      SCHCC Fails to Show Irreparable Harm

Plaintiff bears a heavy burden to show that "irreparable injury [was] likely in the absence of an injunction." *Winter*, 555 U.S. at 21–22. To establish a likelihood of irreparable harm, conclusory or speculative allegations are not enough. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

Plaintiff's argument that when constitutional claims are *alleged* courts *presume* irreparable harm is incorrect.[10] *See, e.g., Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) ("In this circuit, no presumption of irreparable harm arises in a First Amendment retaliation claim ."); *Great N. Res., Inc. v. Coba*, 2020 WL 6820793, at *2 (D. Or. Nov. 20, 2020) ("In the past decade or so, the Ninth Circuit has required more than a constitutional claim to find irreparable harm.

---

[9] Plaintiff's argument that regulation of wages is an area "never before subject to regulation" is baffling. (Mot. at 21:7–8.)

[10] Notably, the quoted the phrase "presume irreparable harm" appears *nowhere* in the two decisions following this "quote" in Plaintiff's motion.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

. . . This Court agrees with the other district courts in this Circuit that have rejected arguments of *per se* irreparable injury for constitutional claims and required something more.") (collecting Ninth Circuit and district court decisions).

The actual harms Plaintiff points to are either monetary, or pure, unsupported speculation. First, Plaintiff alleges, based on nothing but supposition, that the Ordinance *going into effect* will somehow create reputational harm.[11] Next, Plaintiff alleges that morale will suffer because some workers will not receive the premium pay. This, again, is pure speculation, and Plaintiff did not submit a declaration of any employee whose 'morale would suffer' as a result of the Ordinance going into effect. Nor did Plaintiff provide documentary evidence, expert analysis, or even reasoned argument to support this argument. The hundreds of signatures the City received on the petition urging enactment of the Ordinance, and the Union's efforts to intervene to defend the Ordinance, suggest otherwise.

Plaintiff's protestation that it will be unable to "claw back monies paid to hospital workers" is a monetary harm insufficient to justify injunctive relief. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("[M]onetary injury is not normally considered irreparable."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough.").

Finally, Plaintiff's protestation that its various harms are not remediable by money is belied by Plaintiff's own twelfth cause of action, which seeks monetary damages to "compensate it for any costs incurred to comply with the Ordinance and for reputational harm. . . ." (Compl. ¶ 231.) Plaintiff cannot have it both ways.

---

[11] While the argument that being "forced by law" to provide premium pay created reputational harm is entirely speculative, if any "reputational harm" was inflicted, it was inflicted by the enactment of the ordinance, not its implementation, and a preliminary injunction would not remedy this (non-existent) harm. *See Eilenberg v. City of Colton*, 2020 WL at *4 (C.D. Cal. May 14, 2020) (" 'A plaintiff may be irreparably harmed by all sorts of things, but the irreparable harm considered by the court must be caused by the conduct in dispute and remedied by the relief sought.' ")

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006

### D.   The Balance of Hardships and Public Interest

When an injunction is sought against the government, the balance of equities and public interest in part merge. *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014). The extent of Plaintiff's analysis as to the balance of harms is that it is going to win, and therefore the balance tilts in its favor. But the public interest and balance of harms tilt *sharply* against an injunction. The public interest and equities are undeniably served by allowing an ordinance to protected the health, safety and welfare and ensure fair payment to go into effect.

First, Plaintiff is far from likely to prevail on the merits. Second, Plaintiff would suffer no or minimal harm, and the alleged harms Plaintiff identifies are speculative, or monetary, which are not appropriate bases for injunctive relief.

Notably, while Plaintiff alludes to "high quality" patient care issues, and risk to SCHCC's plans to obtain a primary stroke center certification and upgrade its cardiac laboratory, Plaintiff carefully avoids saying it will be unable or unwilling to move forward with these upgrades, and does not allege that patient care will in fact suffer. Plaintiff certainly submits no evidence that could substantiate either implication, and all evidence points to the contrary. (*See* Luke Decl. ¶¶ 46–53.)

Further, the substantial dividend payments Plaintiff's parent company has made, the extraordinary sums of taxpayer funded aid received, and Plaintiff's ability to raise the rates it charges (and history of doing so) suggest that Plaintiff can weather the financial burden imposed by the Ordinance with minimal hardship. (Richards Decl. Ex. R; Luke Decl. ¶¶ 39–45 & Ex. C.)

Even assuming the Ordinance would delay or stop Plaintiff's plan to become a stroke center, the need for such a certification is unclear. There are at least seven stroke centers within eight miles of Plaintiff, many associated with world-class health care providers. There is hardly a gap in the availability of stroke centers near Culver City, and little reason to believe access to care requires an additional center. In fact, the likely explanation for SCHCC's desire to become a primary stroke

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

center is not to fill a community healthcare gap or serve the public good, but to obtain another, more profitable product line. (Luke Decl. ¶¶ 49–52 & Ex. D.)

Prevention of the Ordinance from going into effect would harm the public, and the non-parties to this litigation who are the beneficiaries of the Ordinance.[12] While Plaintiff speculates that the Ordinance going into *effect* would somehow harm employee morale, it is far more likely that prevention of additional pay (caused by their own employer) would harm employee morale and exacerbate Plaintiff's issue with employee retention. (*See* Smith Decl. ¶¶ 5–9; Espinoza Decl. ¶¶ 4–9; Vervan Decl. ¶¶ 5–8; Steinberg Decl. ¶¶ 10, 12; Richards Decl. Ex. I.)

The public interest is generally served by allowing duly enacted legislation to go into effect, absent clear unconstitutionality or preemption. *See, e.g., Golden Gate Rest. Ass'n v. City & Cty. of San Francisco,* 512 F.3d 1112, 1126–27 (9th Cir. 2008) ("[O]ur consideration of the public interest is constrained in this case, for the responsible public officials in San Francisco have already considered that interest. Their conclusion is manifested in the Ordinance that is the subject of this appeal."); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012); *Strange v. Searcy*, 574 U.S. 1145 (2015) ("The equities and public interest likewise generally weigh in favor of enforcing duly enacted state laws.") (Thomas, J. and Scalia, J., dissenting).

## IV.    CONCLUSION

For all of the aforementioned reasons, the motion should be denied.

Dated July 2, 2021                            BEST BEST & KRIEGER LLP

By: :*Christopher M. Pisano*
     JEFFREY V. DUNN
     CHRISTOPHER M. PISANO
     DANIEL L. RICHARDS
     Attorneys for Defendants City Of Culver City, City Of Culver City, Mayor Alex Fisch, Vice Mayor Daniel Lee, Council Member Yasmine-Imani McMorrin, Council Member Göran Eriksson, Council Member Albert Vera

---

[12] Public interest is not limited to the parties. *Golden Gate Restaurant Ass'n*, 512 F.3d at 1126.

CASE NO. 2:21-CV-05052-MCS-RAO
DEFS' OPP. TO MOT FOR PI

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1800 K STREET NW, SUITE 725
WASHINGTON, DISTRICT OF COLUMBIA 20006