SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
DAVID A. SCHWARZ, Cal. Bar No. 159376
dschwarz@sheppardmullin.com
BARBARA E. TAYLOR, Cal. Bar No. 166374
btaylor@sheppardmullin.com
ZACHARY J. GOLDA, Cal. Bar No. 327532
zgolda@sheppardmullin.com
JAMES V. FAZIO, Cal. Bar No. 183353
jfazio@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:   310.228.3700
Facsimile:   310.228.3701

*Attorneys for Plaintiff*
Southern California Healthcare System, Inc.,
d/b/a Southern California Hospital at Culver City

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Southern California Healthcare System, Inc., a California Corporation, d/b/a Southern California Hospital at Culver City. <br><br> Plaintiff, <br><br> v. <br><br> City of Culver City, a charter municipality; Mayor Alex Fisch, in his official capacity; Vice Mayor Daniel Lee, in his official capacity; Council Member Yasmine-Imani McMorrin, in her official capacity; Council Member Göran Eriksson, in his official capacity; and Council Member Albert Vera, in his official capacity, <br><br> Defendants. | Case No. 2:21-cv-05052-MCS-RAO <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF:** <br><br> **(1) National Labor Relations Act (29 U.S.C. § 141, *et seq.*) Preemption;** <br> **(2) Violation of Equal Protection (U.S. Const., amend XIV, § 1);** <br> **(3) Violation of Equal Protection Clause (Cal. Const., Art. I, § 7);** <br> **(4) Violation of Contracts Clause (U.S. Const., Art. 1, § 10);** <br> **(5) Violation of Contracts Clause (Cal. Const., Art. I, § 9);** <br> **(6) Violation of Ban on Bills of Attainder (U.S. Const., Art 1, § 10);** <br> **(7) Violation of Ban on Bills of Attainder (Cal. Const., Art. I, § 9);** <br> **(8) Violation of Ban on Special Legislation (Cal. Const., Art. IV, § 16(b);** <br> **(9) Violation of Due Process (U.S. Const., amend XIV, § 1);** <br> **(10) Violation of Due Process (Cal. Const., Art. I, § 7); and** <br> **(11) Violation of 42 U.S.C. § 1983** <br><br> **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................. 1

II.     PARTIES ............................................................................................. 7

III.    JURISDICTION AND VENUE............................................................ 7

IV.     FACTUAL ALLEGATIONS ................................................................ 8

        A.      Southern California Hospital at Culver City............................. 8

        B.      SCHCC's Response To the COVID-19 Pandemic ................... 12

        C.      Financial and Operational Impact of COVID-19 on SCHCC ............. 17

        D.      The Medical Economic Realities of Safety Net Hospitals .................. 20

        E.      SCHCC's Collective Bargaining Relationships with SEIU and
                CNA ...................................................................................... 22

        F.      Contract Renewal Negotiations Between SCHCC and SEIU ............. 22

        G.      The Ordinance ....................................................................... 25

                1.      February 22, 2021:  The City Council Initiates Discussions
                        Concerning the Ordinance ...........................................25

                2.      March 22, 2021: Agendized Discussion of Combined Hero
                        Pay Ordinance Deferred ............................................... 28

                3.      April 12, 2021: First Agendized Discussion of "Hero Pay" ...... 29

                4.      May 10, 2021: The Proposed SCHCC Ordinance Is
                        Introduced .................................................................. 31

                5.      May 24, 2021: The Revised Proposed Ordinance is
                        Introduced .................................................................. 32

                6.      June 14, 2021: The SCHCC Ordinance Is Adopted .................. 35

        H.      The Targeted and Arbitrary Nature of the Ordinance........................... 38

        I.      The Financial Impact of the Ordinance on SCHCC and its
                Employees ............................................................................. 45

        J.      The Irreparable Harm That Would Be Caused By Enforcement
                of the Ordinance.................................................................... 48

FIRST CAUSE OF ACTION NLRA PREEMPTION  (29 U.S.C. § 141, *et
seq.*) ........................................................................................... 49

SECOND CAUSE OF ACTION VIOLATION OF EQUAL PROTECTION
    CLAUSE OF THE FOURTEENTH AMENDMENT (U.S. Const.,
    amend. XIV, § 1)............................................................................53

THIRD CAUSE OF ACTION VIOLATION OF EQUAL PROTECTION
    CLAUSE (Cal. Const., Art. I, § 7)..................................................59

FOURTH CAUSE OF ACTION VIOLATION OF CONTRACTS CLAUSE
    (U.S. Const., Art. 1, sec. 10, cl. 1) ................................................59

FIFTH CAUSE OF ACTION VIOLATION OF CONTRACTS CLAUSE
    (Cal. Const., Art I, § 9)..................................................................65

SIXTH CAUSE OF ACTION VIOLATION OF BAN ON BILLS OF
    ATTAINDER (U.S. Const., Art. I, § 10) ........................................66

SEVENTH CAUSE OF ACTION VIOLATION OF BAN ON BILLS OF
    ATTAINDER (Cal. Const., Art. I, § 9)...........................................67

EIGHTH CAUSE OF ACTION VIOLATION OF BAN ON SPECIAL
    LEGISLATION (Cal. Const., Art. IV, § 16(b))..............................67

NINTH CAUSE OF ACTION VIOLATION OF DUE PROCESS CLAUSE
    OF THE FOURTEENTH AMENDMENT (U.S. Const., amend. XIV, §
    1)....................................................................................................68

TENTH CAUSE OF ACTION VIOLATION OF DUE PROCESS CLAUSE
    (Cal. Const., Art. I, § 7).................................................................70

ELEVENTH CAUSE OF ACTION (42 U.S.C. § 1983) (Against Defendant
    City of Culver City)........................................................................71

PRAYER FOR RELIEF ..............................................................................71

JURY DEMAND ..........................................................................................73

1    Plaintiff Southern California Healthcare System, Inc., d/b/a Southern

2  California Hospital at Culver City, alleges as follows for its Complaint for

3  Declaratory, Injunctive, and Monetary relief:

4  **I.    INTRODUCTION**

5    1.    This is a statutory and constitutional challenge to the intentional and

6  arbitrary legislative targeting of one employer, Southern California Hospital at

7  Culver City ("SCHCC"), for discriminatory treatment via a "Premium Hazard Pay"

8  Ordinance (the "Ordinance"), adopted by a 3-2 vote of the Culver City Council on

9  June 14, 2021.  The ostensible purpose of the Ordinance is to require SCHCC to

10  "compensate" employees through an extra $5.00 for each hour worked for 120 days,

11  regardless of any bonuses, incentives, or benefits SCHCC already provided.  The

12  Ordinance goes into effect on July 14, 2021.  To date, no other California

13  municipality has enacted "hero pay" for hospitals.  To our knowledge, this is the

14  first "hero pay" ordinance of any kind intended to target only one employer.

15    2.    There is no dispute that employees at every general acute care hospital,

16  including SCHCC, were on the frontlines in the fight against COVID-19.  So too

17  were healthcare workers at skilled nursing, assisted living, and long-term care

18  facilities, where COVID-19 positivity and mortality rates were higher than virtually

19  anywhere else.  Culver City's own first responder employees, including police, fire,

20  and paramedic personnel were just as much at risk from the virus.  No one would

21  question that these workers also put their lives on the line.  Yet, the Ordinance

22  excludes these frontline workers, including the City's own employees, from

23  receiving "Premium Hazard Pay."  In fact, the Ordinance excludes every healthcare

24  provider in the City—except SCHCC.

25    3.    *The targeting is intentional.*  As initially introduced, the Ordinance

26  specifically named SCHCC and no other healthcare facility.  It was impermissibly

27  motivated by a desire to target SCHCC at the behest (or demand of) the Service

28  Employees International Union – United Healthcare Workers West ("SEIU"), a

politically influential special interest which represents a majority of SCHCC's employees. It was conceived and orchestrated by the union in furtherance of a campaign to demonize SCHCC by, among other things, portraying the hospital as indifferent to its employees during the pandemic and as a puppet of private equity interests seeking to siphon cash from hospital operations. SEIU's plan was put into motion behind the scenes while it was negotiating a new collective bargaining agreement ("CBA") with SCHCC. The Ordinance, in effect, would give SEIU a windfall in circumvention of the bargaining process over demands which it never once raised at the bargaining table.

4. *The targeting is arbitrary.* There is no rational basis that could justify excluding similarly-situated frontline health care employees, including the City's own first responders, from the Ordinance. In fact, the City now requires its first responders to be vaccinated in recognition of the risks they face. But even within the "class of one" defined by the City, the Ordinance applies only to a "general acute care hospital" licensed under Health & Safety Code section 1250(a). This excludes a significant portion of SCHCC's employees – approximately 237 – in the subacute (skilled nursing facility) unit for long-term care ("SNF") and behavioral health unit, which provides psychiatric, substance rehabilitation, and detoxification services ("Psych/Detox"). Employees in the SNF and Psych/Detox units provide direct patient care and some are SCHCC's most at-risk staff members. While COVID-19 positivity rates were generally higher in all healthcare professions with direct exposure to COVID-19 patients, SNFs had among the highest positivity rates and reported COVID-19 related deaths in the nation. As such, the Ordinance is underinclusive.

5. The Ordinance is also overinclusive. Of the approximately 756 SCHCC employees in the general acute and acute rehabilitation units covered by the Ordinance, approximately 121 (16%) work in positions SCHCC has determined are low risk for COVID-19 transmission, such as activity coordinators, discharge

planners, case managers, insurance verifiers, social workers, health information technicians, and sterile processing technicians.  By contrast, of the approximately 85 employees in the general acute and acute rehabilitation units excluded under the Ordinance, approximately 55 (64%) work in supervisory and managerial positions SCHCC has determined are high-risk for COVID-19 exposure, such as nursing managers, patient access supervisors, and pharmacy managers.

6. *The targeting serves no discernible, legitimate government interest.* The Ordinance was patterned after a grocery and retail drug store "hero pay" ordinance without any acknowledgement of fundamental distinctions between these businesses and a hospital.  Unlike Ralphs or Kroger, which can raise the price of a gallon of milk or a pound of coffee to offset the costs of such legislation, hospitals in general, and in particular "safety net" hospitals like SCHCC which take a disproportionate share of low-income patients and are heavily dependent on relatively low Medi-Cal and Medicare reimbursement rates for revenue, cannot increase patient charges to account for the increased costs imposed by the Ordinance.  Even with respect to commercial insurance, which accounts for only a fraction of SCHCC's revenue, rates are locked for a number of years and SCHCC has no contractual right to seek an increase.

7. The Ordinance disserves the public interest by diverting finite resources from SCHCC's planned expansions of patient services, including obtaining primary stroke center certification, upgrading the cardiac catheterization laboratory for heart attack patients, and building a new emergency room.  The Ordinance interferes with the delicate balance of revenues and expenses necessary to ensure that SCHCC has the ability to deliver high quality, comprehensive care to uninsured patients and patients covered by Medi-Cal and Medicare, who typically have few options for healthcare.

8. The City justifies the Ordinance as an employee retention tool without any intelligible nexus between the need for a long-term retention strategy and a

1  short-term, $5.00 per hour bonus.  The City made no findings whatsoever regarding
2  how SCHCC dealt with staff retention during the height of the pandemic, SCHCC's
3  current needs or availability of acute care medical staff in Southern California, or
4  how the hospital might re-apply the contingency planning protocols it developed
5  during the crisis should the need for additional personnel arise in the future.

6         9.     SCHCC (unlike a majority of hospitals) spent millions of dollars to
7  provide monetary bonuses and incentives and other employee benefits during the
8  height of the pandemic.  It invested additional resources to redeploy its staffing
9  resources to assure that all employees were seriously following the hospital's
10  rigorous COVID-19 safety precautions, which (not surprisingly) do more to assure
11  retention than a 120-day bonus now that COVID-19 is past its peak.  The Ordinance
12  expressly forbids SCHCC any offsetting credit for bonuses and incentives already
13  paid.  Less than two months ago, SEIU and SCHCC agreed to a three year contract
14  that would provide workers a substantial pay increase over three years.  If there was
15  one, appropriate moment for SEIU to address "retention" concerns, it was through
16  contract renewal negotiations, rather than bargaining by legislative fiat.

17         10.    *SEIU orchestrated the legislative targeting of SCHCC.*  Beginning as
18  early as February 2021, SEIU began coordinating its campaign against SCHCC with
19  Vice Mayor Daniel Lee's (unsuccessful) political campaign for State Senate.  In
20  addition to drafting the proposed ordinance which Vice Mayor Lee introduced,
21  SEIU ghost wrote an "if elected" campaign op-ed in which he accused SCHCC of
22  becoming a "profit generator that endangers our most vulnerable populations."  In
23  return, Vice Mayor Lee strategized with SEIU's political operatives as to what it
24  would take to pass the Ordinance.

25         11.    In private messages texted to Mayor Alex Fisch, Council Member
26  Yasmine-Imani McMorrin, and Vice Mayor Lee *during* the April 12, 2021 City
27  Council discussion of a "Potential Hero Pay Ordinance" targeting grocery stores,
28  retail drugstores, and "Front-Line Workers at Southern California Hospital," SEIU's

Regional Political Director Maky Peters told the elected officials that the union will "have your back" in the event of a legal challenge to the Ordinance. Ms. Peters urged them to move quickly to agendize the combined Grocery/SCHCC "Hero Pay" ordinance for a vote: "It's actually the only way you're gonna have [the union's] pro bono support," concluding: "There are only so many ways I legally can say that." When the City Council decided to proceed first with the grocery/drugstore ordinance, Ms. Peters questioned the decision to separate out SCHCC: "Why make it 2?" Vice Mayor Lee replied: "The mayor wants to handle healthcare differently."

12.   The following month, on May 21, 2021, SEIU's Lead Political Organizer, Shelbi Augustus, reported to Vice Mayor Lee that "the mayor is wavering on his decision again," and asked what SEIU "could do externally and internally to help move him." Vice Mayor Lee told Augustus that the union needed to "get[] explicit about how your legal team would help or participate should the city get sued." Augustus replied that SEIU's legal and research team met with the Mayor and told him that SEIU "agreed to take on all legal responsibility." At the next City Council meeting, Mayor Fisch cast the deciding vote to put the Ordinance up for adoption at the June 14, 2021 meeting, where he again cast the deciding vote.

13.   There can be no doubt that retroactive wage increases go to the very heart of the bargaining relationship with the union because wages are a mandatory subject of negotiation. No right is more central to the contract's inducement and reasonable reliance than what employees shall be paid. Because "'[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected,'" [1] the City must demonstrate why these wage increases are necessary to advance a significant and legitimate public purpose, as opposed to providing a benefit to special interests. It must also show that there is some connection between

---

[1] *Cal. Grocers Ass'n v. City of Long Beach*. Case No. 2:21-cv-00524-ODW (ASx). 2021 WL 736627 at *6 (C.D. Cal. Feb. 25, 2021) (quoting *Energy Reserves Group v. Kansas Power Light*, 459 U.S. 400, 411 (1983)).

the social good to be protected and the means to achieve that purpose, including whether the conditions imposed are reasonable. The Ordinance fails each of these requirements under the Contracts Clauses of the U.S. and California Constitutions.

14. Because the Ordinance materially modifies SCHCC's agreements with its workers after SEIU ratified the renewed collective bargaining agreement for a three year term, the union has no legal obligation or motive to surrender bargained-for contractual wage increases to help SCHCC offset the financial impact of the Ordinance. While a contract is in force, section 8(d) of the National Labor Relations Act ("NLRA") permits the union to refuse, even unreasonably, an employer's proposal to modify the terms established by collective bargaining. As such, the Ordinance's collective bargaining "exemption" is nothing more than a misguided attempt to paper over the fact that the City did not "set the stage for bargaining" so much as it brought down the curtain on SCHCC's ability to bargain by dictating the substantive terms of one collective bargaining agreement.

15. In this respect, the Ordinance works two, related impairments. First, by retroactively rewriting the core term in the parties' CBA. Second, by "violat[ing] the fundamental premise on which the [NLRA] is based – private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H.K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 108 (1970).

16. Culver City "may not draw lines for the purpose of arbitrarily excluding individuals." *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016). By doing so, the Ordinance offends two fundamental constitutional safeguards. First, to protect individuals from legislative caprice or the demands of powerful special interests. Second, to safeguard against the retroactive application of laws that "alter the legal consequences of their past acts so as to take away their lives, their liberty, or their property." *City of El Paso v. Simmons*, 379 U.S. 497, 522 (1965) (Black, J., dissenting).

## II.     PARTIES

17.     Plaintiff Southern California Healthcare System, Inc. ("Plaintiff") is a corporation organized under the laws of the State of California with its principal place of business in Los Angeles, California.  Plaintiff owns and operates Southern California Hospital at Culver City ("SCHCC"), a general acute care hospital, as that term is defined under California Health and Safety Code section 1250(a), located at 3828 Delmas Terrace, Culver City, California.

18.     Defendant City of Culver City ("City") is and at all relevant times has been a public entity duly organized and existing under and by virtue of the laws of the State of California as a charter municipality.  It is a public entity under 42 U.S.C. § 1983.

19.     Defendant Alex Fisch, in his official capacity, is the Mayor of Culver City, California.  He is one of five members of the Culver City Council.

20.     Defendant Daniel Lee, in his official capacity, is the Vice Mayor of Culver City, California.  He is one of five members of the Culver City Council.

21.     Defendants Göran Eriksson, Yasmine-Imani McMorrin, and Albert Vera, in their official capacities, are members of the Culver City Council.

22.     The relief requested in this action is sought against each Defendant in his or her official capacity as agents and members of the Culver City Council in connection with the adoption of Ordinance No. 2021-___, "An Ordinance of the City of Culver City, State of California, Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals" (June 14, 2021).  (Exh. A, p. 75).

## III.     JURISDICTION AND VENUE

23.     This case arises under the Constitution of the United States, the National Labor Relations Act, 29 U.S.C. § 141, *et seq*. ("NLRA"), and 42 U.S.C. § 1983.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiff's claims arising under the California Constitution.  These claims are so related to claims in the action within such original jurisdiction of the Court that they form part of the same case or controversy under Article III of the United States Constitution.

25.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Southern California Hospital at Culver City

26.     SCHCC is the only general acute care hospital, as that term is defined under California Health & Safety Code section 1250(a), in the City. Formerly known as the Brotman Medical Center, SCHCC was founded in 1925.  In 2005, Prospect Medical Holdings, Inc. ("PMH") acquired its initial 33% ownership interest in SCHCC.  As of June 1, 2021, PMH is majority-owned and managed by its co-founders, Samuel Lee and David Topper.  Prior to PMH's initial investment and continuing thereafter, SCHCC (then operated as Brotman Medical Center) experienced significant financial difficulties and went through a Chapter 11 Bankruptcy in 2009.  PMH provided additional financing to help SCHCC emerge from the bankruptcy and thereby increased its ownership to 72%.  In 2012, PMH purchased the ownership interests of the remaining minority shareholders and became the 100% owner of SCHCC.

27.     SCHCC is one of 17 hospitals and other health care facilities owned and operated by PMH in California, Connecticut, New Jersey, Pennsylvania, and Rhode Island.  This includes five general acute care hospitals in Southern California:  Foothill Regional Medical Center in Orange County; Southern California Hospital at Hollywood; Los Angeles Community Hospital in Los Angeles; Norwalk Community Hospital in Norwalk; and SCHCC.  All 17 of PMH's

hospitals, including SCHCC, are "Disproportionate Share Hospitals" ("DSH"), as that term is defined in 42 U.S.C. section 1886(d)(1)(B).

28.     To qualify as a DSH, or "safety net" hospital, a hospital must serve a disproportionate number of low-income individuals who are uninsured, or who are Medicaid or Medicare beneficiaries.

29.     During a typical year, SCHCC has about 13,000 patient admissions. Most patients admitted to SCHCC are not residents of the City.  In a typical year, only 13% (191) of SCHCC's COVID-19 patients were residents of Culver City.

30.     Two unions represent different categories of SCHCC's non-management employees.  California Nurses Association ("CNA") represents registered nurses.  Service Employees International Union – United Healthcare Workers West, i.e., SEIU, represents service, maintenance, technical, and clerical employees, such as licensed vocational nurses, groundskeepers, transport/couriers, technicians, clerks (file, mail room and warehouse), social workers, secretaries, patient access representatives, and pharmacists.

31.     In addition to employees, two other categories of workers are on-site at SCHCC:  (1) services contractors, who are under contracts between SCHCC and vendors, perform functions such as food services and housekeeping; and (2) independent practitioners who are physicians with hospital privileges.  SCHCC does not pay these physicians. They directly bill patients and insurers for their services.

32.     SCHCC's campus primarily consists of two buildings (Tower and Pavilion) that house four distinct units providing different health care services: (1) the General Acute unit, including SCHCC's intensive care unit ("ICU"), perinatal care, coronary care, pharmacy, radiology, and other general medical treatment; (2) Acute Rehabilitation unit, which provides physical therapy services to patients; (3) the subacute unit, which operates a skilled nursing facility for long-term care, i.e., SNF; and (4) the behavioral health unit, which provides psychiatric services and substance rehabilitation and detoxification services.  The SNF unit is a segregated

area in the Tower Building.  The behavioral health unit is further divided into "detox" services provided in a segregated area of the Tower building and psychiatric services provided in a segregated area of the Pavilion building.

33.     All units on SCHCC's campus are sublicensed under Plaintiff's general acute care hospital license.  That license also covers all units at Southern California Hospital at Hollywood and Southern California Hospital at Van Nuys (which is not a general acute care hospital, but only provides behavioral health services).  The general acute unit and the acute rehabilitation unit at SCHCC provide services that meet the definition of a "general acute care hospital" under Health & Safety Code § 1250(a).  Per subsection (a) of section 1250, a general acute care hospital must have an "organized medical staff that provides 24-hour inpatient care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services" and may provide "acute medical rehabilitation center services, including at least physical therapy, occupational therapy, and speech therapy."

34.     The Ordinance does not define "Covered Hospital" in reference to SCHCC's licensure or all services provided by SCHCC.  Instead, the Ordinance defines a "Covered Hospital" as "any and all hospitals as *defined* in California Health and Safety Code section 1250(a) that operate within the geographical borders of the City."  (emphasis added).  Thus, the scope of the Ordinance is limited to healthcare facilities which satisfy the definition of general acute care hospital under Health and Safety Code section 1250, subsection (a), and does not extend to other types of healthcare facilities.  Thus, only the workers in the general acute unit and the acute rehabilitation unit are covered by the Ordinance's definition of a Covered Hospital as "any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the geographical borders of the City."  (Exh. A, p. 80.)

35.     The workers in the subacute unit (i.e., SNF), and Psych/Detox unit are not covered by the Ordinance's definition of a Covered Hospital because these units do not provide services meeting the definition of a "Covered Hospital" under the Ordinance.  The SNF is defined under subsection (c)(1) of section 1250 of the Health & Safety Code ("a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis").  In fact, the California Department of Public Health ("CDPH") identifies the SNF on SCHCC's campus as a "skilled nursing facility." The Psych/Detox unit is defined under subsection (b) of section 1250 ("a health facility having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care for persons with mental health disorders") and subsection (a) of section 1250.3 ("a health facility that provides 24-hour inpatient care for persons who have a dependency on alcohol or other drugs, or both alcohol and other drugs") of the Health & Safety Code.  In fact, the CDPH identifies an "acute psychiatric hospital" and "chemical dependency and recovery hospital" operating at SCHCC's address.[2]

36.     Most workers at SCHCC are assigned to a home unit, meaning they are dedicated workers in their home unit and do not provide services in the other three units of SCHCC.  SCHCC also uses some "floaters," who could be assigned to work shifts in varying units depending upon SCHCC's staffing requirements.

37.     The general acute unit and acute rehabilitation unit have a combined 311 beds available for patient care.  Of the unionized employees who have these two units as their home units, 287 are represented by CNA, and 420 are represented by SEIU. The SNF has 21 beds available for patient care. Of the unionized employees

---

[2] This can be verified by using the search function on CDPH's website. https://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/Pages/SearchResult.aspx.

1  who have the SNF as their home unit, CNA represents 9, and SEIU represents 24.

2  Psych/Detox has 121 beds available for patient care. Of the unionized employees

3  who have Psych/Detox as their home units, CNA represents 63, and SEIU represents

4  132.

5       **B.**     **SCHCC's Response To the COVID-19 Pandemic**

6       38.     As of June 20, 2021: (1) there have been 3,702,882 cumulative reported

7  cases of COVID-19 in California with 62,689 reported deaths; [3] (2) 1,205,602 of

8  those cases were reported in the greater Los Angeles County area with 24,454

9  reported deaths;[4] (3) 2,238 of those cases were reported among Culver City

10  residents with 110 reported deaths.[5]

11       39.     From January 1, 2020 through June 9, 2021, SCHCC treated 1,467

12  COVID-19 patients.  The peak was the period from December 2020 through January

13  2021, when 595 patients were treated.

14       40.     The 1,467 patients treated at SCHCC, comprise 0.12% of total reported

15  COVID-19 cases in Los Angeles County.  SCHCC accounted for 7.4% of all

16  COVID-19 hospital admissions in Los Angeles County.  Of all COVID-19 deaths in

17  hospitals in Los Angeles County, SCHCC accounted for 1.95%—a total of 179

18  patients.

19       41.     Not one SCHCC employee died as a result of COVID-19 exposure in

20  the workplace.  From March 2020 to June 20, 2021, SCHCC received 138 workers

21

22       ———————————

23  [3] California for All, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-dashboard/ [as of June 20, 2021].

24  [4] California for All, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-

25  dashboard/#location-los_angeles [as of June 20, 2021].

26  [5] Los Angeles Department of Public Health, *COVID-19 Dashboard: Cases and Deaths by City/Community*,

27  http://dashboard.publichealth.lacounty.gov/covid19_surveillance_dashboard/ [as of

28  June 20, 2021] (reported location data is based on patients' addresses, not location of treatment).

1  compensation claims based on COVID-19, of which only seven resulted in

2  hospitalizations.  As of June 17, 2021, 63 percent of SCHCC's workforce has been

3  vaccinated.

4      42.    All PMH hospitals, including SCHCC, proactively planned and

5  prepared in the event that the spread of COVID-19 would, in fact, take on pandemic

6  proportions.  Compared to other healthcare organizations, PMH was significantly

7  ahead of the curve.  For example, in January 2020, PMH placed orders for one

8  million N-95 respirators.  These respirators were ordered and arrived before

9  Governor Newsom declared a state of emergency on March 4, 2020, and were

10  distributed to all PMH hospitals.  As a result, PMH hospitals, including SCHCC, did

11  not face shortages of N-95 respirators, unlike many other hospitals and healthcare

12  facilities. This early action helped to protect hospital staff and avoided the impact of

13  personal protective equipment ("PPE") shortages.

14      43.    PMH developed system-wide comprehensive strategies to mitigate

15  healthcare personnel shortages.  To maintain a constant state of readiness, PMH

16  hospitals identified alternative staffing resources within facilities, i.e., those who

17  were not presently working in critical care, but who either had prior critical care

18  experience or could provide support under the guidance and expertise of a critical

19  care nurse.  Where facilities elected to cancel non-essential procedures, PMH

20  encouraged system hospitals to shift healthcare personnel to support areas of highest

21  need.  For example, rather than lay off support staff who were underutilized as a

22  result of the decrease in patient admissions due to the pandemic, support staff were

23  tasked with educating co-workers regarding COVID-19 exposure, proper use and

24  disposal of PPE (including how to properly wear N-95 respirators), proactive

25  infectious disease control protocols (including CDC-consistent practices to sanitize

26  equipment), and acting as monitors throughout the facility to ensure strict

27  compliance by staff, third-party contractors, patients, and visitors, with health and

28  safety protocols.

44.     By redeploying (rather than laying off) underutilized personnel, SCHCC advanced two strategies to maintain critical care staffing at levels sufficient to support COVID-19 functions.  First, the constant presence (and vigilance) of dozens of health and safety monitors gave staff comfort that SCHCC was doing everything practicable to protect them from the risk of COVID-19 transmission. From the onset of the pandemic, it was clear to front-line supervisors and human resources managers that critical care personnel were willing to make personal sacrifices to save patient lives so long as they perceived that the hospital was equally committed to protecting the lives of its staff.  Second, by redeploying personnel instead of reducing headcount, SCHCC communicated to all staff that, notwithstanding the loss of patient volume and decline in revenues as a result of the temporary cessation of elective procedures and surgeries, SCHCC had made a decision to put staff and patient safety ahead of cost savings.  This was important not only to sustain morale, but to retain critical care specialists, such as respiratory therapists and registered nurses, with the highest levels of interaction with COVID-19 patients.

45.     To further boost morale and employee retention, SCHCC voluntarily provided monetary bonuses and incentives and other benefits to employees—none mandated by federal, state, or local law.  Nor were these benefits provided in response to union demands.  In fact, at no point until late March 2021 did SEIU even raise the possibility of "Hero Pay."  And when that subject was raised, SEIU went no further than to demand two weeks of "Hero severance pay" per year of service in lieu of the severance benefits provided in the parties' CBA and continuing health care insurance through the end of 2021.  This proposal would have affected fewer than five employees.

46.     Beginning one month after the Governor's state of emergency declaration on March 4, 2020, SCHCC voluntarily initiated the following COVID-19 bonuses, incentives, and benefits:

a) Child care subsidies of $50 per day per child, up to $250 per day available to all employees from April 9, 2020 through February 28, 2021.

b) Hourly wage increases beginning April 9 through July 4, 2020,[6] ranging from $1.50/hour to $5/hour.  The amount of the increase depended on the COVID-19 exposure risk associated with the job.  These increases did not just apply to critical care medical professionals, such as registered nurses and respiratory therapists, but also technicians cleaning equipment in a COVID-19 patient's room and administrative employees, such as registration clerks, who interacted directly with patients.

c) Two separate bonuses intended as a retention tool, ranging in amounts up to $1,250.  Eligibility for the first bonus was based on daily attendance and employees working 90 percent of their scheduled shifts between April 10 and June 15, 2020.  The second bonus, intended to address the winter surge in COVID-19 cases, was based on employees working 95 percent of their scheduled shifts between December 13, 2020 and March 14, 2021.

d) Paid time off ("PTO") grants were available to employees who: (1) did not have PTO, sick leave, or workers compensation or State short-term disability (if applicable); and (2) faced hardship due to personal or family illness related to COVID-19, or were flexed or furloughed as a result of disruptions caused by COVID-19.  Under this program, employees could donate up to half of their reserved PTO to a pool for qualifying employees to use.  This program began on April 9, 2020 and remains in effect.

e) Free cafeteria meals to all employees from April 1, 2020 through February 28, 2021.  SCHCC also turned its cafeterias into food pantries, so that employees could buy essential foodstuffs and household products, such as

---

[6] The hourly wage increases were originally planned to expire on June 15, 2021 but were extended by management through the July 4th holiday.

toilet paper, paper towels, and other basics without the need to take time away from work or family to seek out scarce items on grocery shelves.

f) Employees who treated COVID-19 patients or had access to COVID-19 patients were allowed to continue to accrue PTO hours in excess of what was provided under CBAs.

g) Mental health resources were provided to all employees.

h) Arrears were forgiven for medical, dental and other benefit premiums that accumulated for employees who had been recently flexed or furloughed due to COVID-19.

i) Requirements for 401K plan hardship withdrawals were relaxed to permit employees to withdraw up to $100,000 (increased from $50,000) and the 10% tax penalty for hardship withdrawals by plan beneficiaries under the age of 59 ½ was temporarily suspended.

j) Hotel room subsidies were provided to employees who treated COVID-19 patients or had access to COVID-19 patients and did not want to risk exposing their families.  This program initiated on April 9, 2020 and ran through August 18, 2020.  After August 18, SCHCC used a State program to provide this benefit.

47.    These bonuses, incentives, and benefits were provided to employees who fall under the Ordinance's definition of "Hospital Worker." As should be clear, these programs were designed to maximize employee retention, improve morale, and reduce stress associated with fears of exposing loved ones to the virus. Moreover, they were calibrated to fit the risk of the specific job.  SCHCC was not only an early adopter – it was in the minority of hospitals in California to provide COVID-19 benefits to employees.

48.    According to a January 29, 2021 study which reviewed COVID-19 benefits and incentives offered by 73 California healthcare organizations representing 172 hospitals, only 21 percent (including SCHCC) provided hazard pay

to their employees.  The survey defined hazard pay as "additional pay offered to employees who are working during the pandemic."  (Exh. B, p. 89.)  The survey found that only one respondent offered temporary hourly increases to RNs working in a COVID-19 unit—which SCHCC had done. (*Id.* at 108.)  Eighteen respondents representing 54 hospitals (including SCHCC), provided fixed bonuses  to incentivize employees to work additional shifts to meet staffing needs.  (*Id.* at 100.)  Seventeen respondents representing 71 hospitals (including SCHCC), changed PTO policies, retirement benefits, and insurance benefits.  (*Id.* at 102.)  Twenty four respondents representing 61 hospitals (including SCHCC), provided additional pay or benefits to employees who were quarantined due to a suspected COVID-19 exposure or positive COVID-19 test.  (*Id.* at 113.)

49.     SCHCC obtained and provided to the City's first responders in December 2020 among the first available doses of COVID-19 vaccines in the State.  This was at least one month before vaccines became generally available to "essential" healthcare workers and first responders.

50.     SCHCC's efforts present a stark contrast with how the City incentivized and rewarded its own front-line workers.  On information and belief, the City did not provide COVID-19 "Premium Hazard Pay" for any of its own employees, including fire, police, public safety, and EMT personnel.

### C.     Financial and Operational Impact of COVID-19 on SCHCC

51.     Total losses from COVID-19 for the nation's healthcare system, including hospitals, exceeded $323.1 billion in 2020.[7]  Compared to baseline levels from 2019, there were reported average declines of 19.5% in inpatient volume and 34.5% in outpatient volume.  (*Id.*)  In other words, as hospitals were bearing

---

[7] Chicago: American Hospital Association, *New AHA report: "Losses deepen for hospitals & health systems — catastrophic financial impact of COVID-19 expected to top $323 billion in 2020* (June 30, 2020) https://www.aha.org/press-releases/2020-06-30-new-aha-report-losses-deepen-hospitals-health-systems [as of June 20, 2021].

significant pandemic costs, they were receiving less revenue from fewer patients. SCHCC was no exception.

52.     SCHCC's trailing twelve month total operating revenue for the period ending in March 2021 declined by 6 percent ($13.1 million) compared to the same period in 2020.  SCHCC's year-to-date total operating revenue for the period ending May 2021 declined by 5% ($7.5 million) compared to the same period in 2020. This decline in revenue is primarily due to two factors: (1) suspension of elective surgeries and procedures due to the COVID-19 pandemic; and (2) patient reluctance to come to hospital facilities because of fear of COVID-19 infection.

53.     On or about the onset of the pandemic, SCHCC (along with most other hospitals in major metropolitan areas) began to experience staffing shortages of critical health care personnel, particularly registered nurses.  As the shortages increased, SCHCC was required to operate under crisis ratios, meaning the hospital was unable to comply with state-mandated ratios of registered nurses to patients. SCHCC stopped performing elective surgeries, in part because SCHCC leadership felt it could not in good conscience divert skilled nursing staff to elective surgeries at a time when the hospital was not adequately staffed.  While State public health authorities issued guidance recommending that general acute care hospitals suspend non-essential medical procedures for the duration of the pandemic, they did not mandate this.  SCHCC took this step voluntarily.

54.     SCHCC also lost approximately half of its ICU staff because registered nurses left to work in nurse registry positions.  A nurse registry is a list of nurses licensed by the California Board of Registered Nurses.  Due to high demand and the exponential growth in demand for temporary nurses, salary and other benefits (including housing stipends) for registry positions more than doubled by mid-March 2020.  According to one source, rates at the top of the market reached $5,000 per

week, though most were in the $3,000-$4,000 per week range.[8]  As the pandemic lengthened and grew worse, registry positions in some instances offered nurses as much as $250 per hour.

55.     Safety net hospitals such as SCHCC could not match these salaries, or even come close.  Given this environment, PMH senior management knew that retention of its nursing staff would not turn on whether its hospitals offered a $5/hour temporary increase in pay – registered nurses were more likely to remain based on the hospital's investment of resources (financial and human) directed to preventing, mitigating, and containing workplace spread of COVID-19.

56.     During the period from March, 2020 to March, 2021, and in addition to $5.9 million in lost revenues from March through December, 2020, SCHCC incurred extraordinary expenses related to COVID-19 totaling $4.9 million, including: (1) $1.323 million in incentives and bonuses paid to employees; (2) $1 million in PPE and other supplies; (3) $930,000 in COVID-19 testing kits; (4) $547,000 in equipment, e.g., negative air pressure machines; (5) $516,000 in repairs and capital purchases; (6) $479,000 for free meals for employees; and (7) $74,000 in childcare and hotel subsidies to employees.

57.     According to the Centers for Disease Control ("CDC"), SCHCC received a total of $8,600,000 in federal COVID-19 relief. In comparison, Cedars-Sinai Medical Center in Los Angeles, a non-profit hospital with considerable endowment and charitable support, received $42,337,164.19 in federal COVID-19 relief.  Los Angeles County and USC Medical Center in Los Angeles, one of the

---

[8] Deena Beasley, "Coronavirus drives up demand – and pay - for temporary U.S. nurses," Reuters (March 21, 2020), available at http://www.reuters.com/article/us-health-coronavirus-usa-nurses/coronavirus-drives-up-demand-and-pay-for-temporary-u-s-nurses-idUSKBN2180HF [as of June 21, 2021].

largest non-profit, quasi-governmental hospitals and medical training centers in Los Angeles County, received $45,226,627.77.[9]

**D.    The Medical Economic Realities of Safety Net Hospitals**

58.    In general, there are four financial models for general acute care hospitals in California:  (1) non-profit hospitals with relatively large endowments, benefactors and foundations supporting them, such as Cedars-Sinai; (2) non-profit, quasi-governmental hospitals that also serve as academic centers, such as UCLA Medical Center, which receive significant funding from the State; (3) community-based hospitals that derive most of their revenues from treating patients with commercial (or private) insurance, such as Torrance Medical Center and St. John's Health Center in Los Angeles; and (4) safety-net, i.e., disproportionate share hospitals. *See* Paragraphs 27-28, *supra*.

59.    For the fiscal year ending May 2020, approximately 93% of SCHCC's patients were uninsured, Medi-Cal beneficiaries, or Medicare beneficiaries.  For the fiscal year ending May 2021, approximately 91% of SCHCC's patients were uninsured, Medi-Cal beneficiaries, or Medicare beneficiaries.  The balance of SCHCC patients had commercial insurance.  Because over 90% of SCHCC's patients do not have commercial insurance, SCHCC depends on Medi-Cal and Medicare for most of its revenues.

60.    There are two types of Medi-Cal and Medicare:  (1) fee-for-service or "straight"; and (2) managed care.  Fee-for-service rates are set by the federal Centers for Medicaid and Medicare Services ("CMS") and California Department of Health Care Services ("CDHCS").  Fee-for service rates are fixed and non-negotiable.  Under the managed care model, health plans contract with CMS and

---

[9] *See* Center for Disease Control and Prevention, *"Provider Relief Fund – COVID-19 High-Impact Payments* (Metadata last updated January 25, 2021), available at https://data.cdc.gov/Administrative/Provider-Relief-Fund-COVID-19-High-Impact-Payments/b58h-s9zx [as of June 20, 2021].

CDHCS to receive a fixed or "capitated" amount of money to provide for the care of each member, which results in an incentive to keep costs down.  SCHCC in turn contracts with plans, and although reimbursement rates are negotiable when contracts are renewed, as a practical matter SCHCC has minimal ability to increase rates.

61.     Medicare and Medi-Cal reimbursement rates are approximately twenty to forty percent lower than commercial insurance reimbursement rates.  Medicare and Medi-Cal reimbursement typically falls below the cost of care provided.  DSH payments for qualifying hospitals are designed to offset cost of care shortfalls with respect to uninsured, Medicaid, and low-income Medicare patients.

62.     The methodologies used to develop reimbursement rates do not account for the impact of local ordinances.  A local ordinance that raises costs for a single hospital could place that hospital at a competitive disadvantage to surrounding hospitals because fewer resources would be available for patient care, maintenance and repairs, and capital improvements.

63.     The increased cost imposed by the Ordinance, in the context of SCHCC's decline in revenue and increased expenses due to COVID-19, could place SCHCC at a competitive disadvantage with respect to other general acute care hospitals in the region (twenty-eight within a ten-mile radius of SCHCC).  Although these hospitals likely lost revenue and incurred COVID-19 related expenses as well, none of them have had premium hazard pay imposed on them by a municipality or Los Angeles County

64.     SCHCC cannot mitigate the financial impact of the Ordinance's $5.00/hour Premium Hazard Pay by raising prices.  Unlike a grocery store, which can pass along to consumers the cost of "Hero Pay" by raising the price of a gallon of milk or a pound of sugar, SCHCC cannot pass along to its patients or government (or even commercial) payors the cost of Premium Hazard Pay expenses imposed by the City.  As a practical matter, because staffing ratios for registered nurses are

mandated by the State, SCHCC cannot cut costs by reducing staffing unless it also reduces patient services.

### E.   SCHCC's Collective Bargaining Relationships with SEIU and CNA

65.   As already noted, the majority of SCHCC's non-managerial employees are represented by two unions.  CNA represents 359 non-supervisory registered nurses in the general acute care, acute rehabilitation, SNF, and Psych/Detox units.

66.   SEIU represents 576 non-managerial employees (full-time, regular part-time and per diem) service, maintenance, technical, and clerical.

67.   The labor-management relationships between SCHCC and these two unions are governed by two CBAs.  Both CBAs have three year terms.  The CBA with CNA expires on March 31, 2023.  The CBA with SEIU expired on February 22, 2021.  On April 29, 2021, SCHCC and SEIU completed CBA renewal negotiations.  The terms of the new CBA were ratified by a vote of SEIU's members on or about May 10, 2021.

68.   The terms of the new SEIU CBA have been ratified and documented through a tentative agreement signed on April 29, 2021.  This tentative agreement reflects various changes and amendments to the expired CBA generally related to work schedules, floating conditions, severance pay, a 401(k) matching program, and significant wage increases.

### F.   Contract Renewal Negotiations Between SCHCC and SEIU

69.   Contract renewal negotiations with SEIU began in or about November 2020.  SEIU's lead negotiator was John Aho.  Seventeen separate formal bargaining sessions were conducted, including seven sessions conducted over the 45-day period leading up to the MOU.  In total, the parties spent on average six hours per day in negotiations during these seventeen sessions.  Much of the time was spent with the parties in caucus.  Due to COVID-19, these sessions were held via video conference. The April 29, 2021 negotiation began at approximately 9 a.m. and did not conclude until approximately 9 p.m.

70.     As is typical in CBA renewal negotiations, the parties began by addressing non-economic issues.  SEIU proposed (or, in the parlance of labor-management negotiations, "passed") its first economic proposal on January 28, 2021.  SCHCC did not pass an economic proposal until March 4, 2021, due to the fact that the parties had not resolved most of the non-economic issues until that date.  The economic negotiations centered on compensation terms, including annual raises, wage structure (movement from wage ranges to wage grids), and health care and benefits proposals.

71.     On several occasions during the negotiations over economic terms, the SEIU's lead bargaining representative, John Aho, claimed that the union was dissatisfied with the pace of negotiations and was expecting to complete an agreement prior to contract expiration.  In one of its flyers, SEIU claimed that "even with 250 of us picketing, news stories, and pressure from the city council, [SCHCC] management is still rejecting our proposals to improve patient care and fix the hospital."  On information and belief, however, fewer than 30 picketers participated in each picket.  SEIU claimed that it would "not accept management's bare minimum" and threatened a strike as "our last resort." SEIU further claimed that they would "not accept management's bare minimum" and threatened a strike as "our last resort."  *Id*.  In fact, SEIU made a public display of scheduling a strike vote on April 5 and 6, 2021.  This was very unusual.  More typically, a union would not publicly reveal an intent to strike.

72.     On February 12, 2021, SEIU filed an unfair labor practice charge ("ULP") with the National Labor Relations Board ("NLRB") alleging that SCHCC was engaging in unfair labor practices during the negotiations for contract renewal.  In particular, SEIU alleged that SCHCC engaged in bad faith by allegedly cancelling bargaining in December 2020, refusing to discuss proposals in one bargaining session and instead bargaining via e-mail, walking out of a bargaining session only ten minutes after the session started and refusing to return to the

bargaining session, and conditioning further bargaining on SEIU's agreement to participate in mediation.  However, SEIU withdrew the charge less than a month later on March 9, 2021, before any action was taken by the NLRB.

73.     The first and only time the SEIU put a "Hero Pay" proposal on the table was on March 25, 2021.  Two specific terms were proposed, both "in recognition of service shown by hospital employees during the pandemic."  First, SEIU proposed a provision for "Hero Severance," which would provide two weeks' severance pay per year of service in lieu of existing benefits under the CBA for all employees terminated as a result of the reduction in force announced on March 19, 2021.  Second, SEIU proposed "Hero Health Benefits," which would provide for continued payment of health insurance benefits through the end of 2021 for those employees affected by the reduction in force.  (Exh. S.)  Fewer than five employees were ultimately subject to the reduction in force, and only one was an SEIU union member.

74.     SCHCC rejected these "Hero Pay" proposals at the next bargaining session on March 31, 2021.  At that time, SCHCC's lead negotiator, Luis Padilla, explained to SEIU that SCHCC management was not interested in providing this benefit.  Instead, Mr. Padilla invited the union to amend SEIU's proposal or to make a counterproposal.  The next mention of these Hero Pay proposals was on April 29, 2021, when SEIU withdrew them from negotiations.  On that same day, the parties reached agreement on the terms for the renewal of the CBA.  At no time did SEIU propose "hazard premium pay," such as bonuses in the form of an across-the-board increase in hourly wages.  In particular, at no time during the negotiations did SEIU propose terms set forth in the Ordinance, including a $5 per hour raise for all non-managerial employees for 120 days.

75.     In contrast to SEIU's bargaining with SCHCC, another SEIU local representing workers at the Prospect Waterbury Hospital in Connecticut entered into three different memoranda of agreement ("MOAs"), one dated June 3, 2020, and

two dated January 5, 2021, which included specific provisions providing "hero pay" and other benefits to staff at these facilities.

76.     Under the renewed SCHCC-SEIU CBA, base hourly wages for all job positions will increase at least 3% year over year for the life of the contract and in some cases, raises will be as high as 42%.  The bargaining concessions by SCHCC – in particular the substantial wage increase over the three year term of the new CBA – were significant.  SEIU viewed these concessions as material improvements as well.

77.     Indeed, to gain support for ratification of the CBA, SEIU broadcast to its members and the public:  "WE WON A GREAT CONTRACT!  After months of difficult bargaining with management, we finally agreed on a three-year contract that includes wage scale increases "with raises between 1.5% and 42% (yes, 42%!) in year one, 1.5%-8.5% raises in year two and year three, [and] increased differentials between $1.50-$8 an hour."

**G.     The Ordinance**

       **1.     February 22, 2021:  The City Council Initiates Discussions Concerning the Ordinance**

78.     The idea of a "Premium Hazard Pay" ordinance targeting SCHCC was first raised at a February 22, 2021 City Council meeting.  At that meeting, representatives of the United Food and Commercial Workers ("UFCW") asked the City Council to consider adopting an ordinance that would require grocery stores and other "essential" retailers to pay "hero pay" bonuses to employees for their services during the  COVID-19 pandemic.

79.     During a discussion whether to agendize further consideration of an ordinance covering grocery stores and essential retail employers, Vice Mayor Daniel Lee proposed that the City Council "focus on not only just the grocery workers and the retail workers, but the workers who are actually on the front line," specifically referring to SCHCC.  At the time, Vice Mayor Lee was running to fill a vacancy in

the 30th State Senate District in a March 2, 2021 special election.  His campaign materials included attacks on SCHCC (its facilities, emergency room services) and PMH, which he accused of putting "profits before people."  Among other things, Vice Mayor Lee used his twitter feed to raise the false charge that workers at SCHCC "were exposed to COVID and not even notified until days, sometimes weeks, later."

80.     While Vice Mayor Lee was the first City Council Member to advocate for a SCHCC "hero pay" ordinance, it appears he did not conceive of the idea.  In a February 11, 2021 email, Maky Peters, SEIU Regional Political Director, "floated" the idea of targeting SCHCC and gave Vice Mayor Lee a draft urgency ordinance prepared by SEIU's "research team" entitled "Hospital Heroes Hazard Pay Ordinance."  (Exh. C, p. 122.)  Ms. Peters also provided Vice Mayor Lee with an op-ed she drafted that "has finally been cleared [by SEIU] to share with you."  (*Id.*)  This ghostwritten attack piece, which (per Ms. Peters) "tried to capture [Vice Mayor Lee's] voice," described SCHCC as a "profit generator that endangers our most vulnerable population" and insinuated that people would die "as a result of Prospect Medical Holdings' predatory business model."  (*Id.* at 128.)

81.     On February 19, 2021, Vice Mayor Lee reported to Ms. Peters that his campaign "press guy" was "getting no bites on the Op-ed" and instead wanted to "pitch this" as a news story.  (Exh. E, p. 180.)  He asked Ms. Peters whether the unnamed SEIU members quoted in the draft op-ed "would be open to talking to reporters anonymously."  (*Id.* at 181.)  This plan apparently did not materialize, and the op-ed was never published.  A week after losing the March 3, 2021 election, Vice Mayor Lee published the op-ed drafted, "approved" and "cleared" by SEIU as a March 10, 2021 letter to the editor of the Culver City *Crossroads*.[10]

---

[10] Culver City Crossroads, *Dear Editor: Vice Mayor Lee Amplifies Staff Calls for Help at Southern California Hospital*,

82.    Text messages and emails reveal a consistent theme in the communications between Vice Mayor Lee and SEIU's political operations department.[11]  He wanted SEIU's assistance in advancing his senate candidacy; so much so that he provided SEIU with photographs of him standing side-by-side with SEIU picketers in front of SCHCC, asked Ms. Peters whether he could pitch the op-ed as co-authored with unnamed SEIU union members, and, of course, carried forward SEIU's legislation.  (Exh. E, pp. 179-181, 178; Exh. T, pp. 361-363.)  For its part, the union wanted Vice Mayor Lee to carry its "Hero Pay for Hospital Workers Ordinance"; so much so that it would ghostwrite his op-ed and a letter to SCHCC's CEO demanding immediate attention to COVID-19 and other alleged safety issues at SCHCC.

83.    Text messages also reveal that Ms. Peters and Vice Mayor Lee coordinated to demand a site visit by the CDPH.  (Exh. E, p. 181.)  On February 19, 2021, the same day that Ms. Peters and Vice Mayor Lee exchanged text messages discussing joint authorship of the draft op-ed, Ms. Peters told Vice Mayor Lee that she "got a call from CDPH, possibly from the letter you sent them?  In any case that is good, what it will amount to remains to be seen but they plan to survey site again next week."  Vice Mayor Lee responded with a "thumbs up" sign.  (*Id.*)

84.    The following week, on February 24, 2021, the CDPH conducted a regulatory site visit to investigate an "Anonymous Complaint" alleging, among other things, that "ICU intubations were dirty causing patients to inhale mold," and

---

https://culvercitycrossroads.com/2021/03/10/dear-editor-Vice Mayor-lee-amplifies-staff-calls-for-help-at-southern-california-hospital/?fbclid=IwAR3Il3yIRZMtH8cwjlJA30D9QvwJDWuUpqOyTGP_yIABzE8ZnauKfs_KIo [as of June 20, 2021].

[11] On June 15 and 16, 2021, the City produced the communications in Exhibits D and E, respectively, in response to SCHCC's Public Records Act Request.  Exhibit T shows images of certain messages also contained in Exhibit E to capture photos.

"patients requiring assistance with feeding are not assisted and left without eating for days."  The CDPH found "No deficiencies" and closed its investigative file.

85.     Ms. Peters did not limit her ghostwriting efforts to the Vice Mayor.  On February 3, 2021, she sent Council Member Yasmine-Imani McMorrin a draft letter, addressed to SCHCC's CEO, regarding the "unacceptable" conditions at SCHCC.  (Exh. C, p. 129.)  The letter "call[s] upon [SCHCC] to enter into [its] ongoing [contract renewal] negotiations in good faith."  (*Id.* at 130.)  Council Member McMorrin notified Ms. Peters that she had sent the letter to SCHCC's CEO on February 23, 2021.  (*Id.* at 131.)  A near identical letter was also provided by Ms. Peters to Mayor Fisch.  (*Id.* at 139, 145.)

## 2.     March 22, 2021: Agendized Discussion of Combined Hero Pay Ordinance Deferred

86.     A combined resolution to consider an ordinance that would target grocery and retail stores along with SCHCC was first made public in advance of the March 22, 2021 City Council meeting.  The City Council did not discuss the combined ordinance on March 22, as scheduled.  Instead, the discussion was deferred until the City Council's April 12, 2021 meeting.

87.     Notwithstanding the scheduled discussion of a combined ordinance, on March 22, 2021, Ms. Peters sent a draft hero pay ordinance targeting SCHCC to Mayor Fisch, Vice Mayor Lee, and Council Member McMorrin.  Her cover email stated, "Our research team drafted an updated version of the ordinance and I was wondering if you might be able to take a look at it before the council meeting this evening."  (Exh. C, p. 133-38.)  On, April 7, 2021 Ms. Peters wrote a follow up email to Mayor Fisch which stated, "Following up on my text and phone call on Monday.  Would be great if we could all get on a call to chat about Hero Pay with our [SEIU's] legal and research team. . . . I have some background for you that I think can help instill the confidence to do the right thing here."  (*Id.* at 146.)

88.     Mayor Fisch accepted Ms. Peters' offer, and scheduled a meeting with SEIU's lawyers for April 9, 2021 at 12:00 p.m. via video-conference.  (Exh. C, p. 146.)  At 1:40 p.m., Erik Dimitruk (Lead Research Analyst for SEIU) sent an email to Mayor Fisch thanking him "for the opportunity to meet and discuss the importance of 'Heroes' Pay for the essential workers of Culver City."  (*Id.* at 148.)

### 3.     April 12, 2021: First Agendized Discussion of "Hero Pay"

89.     On April 12, 2021, the City Council agenda included a "Discussion of a Potential Hero Pay Ordinance to Provide Additional Compensation to Grocery Workers, Retail Workers and Front-Line Workers at Southern California Hospital." (Exh. H, p. 244.)  The agenda's explicit reference to SCHCC leaves no doubt as to the entity targeted.

90.     Three days before that meeting, SEIU's "legal team" and Ms. Peters met with Mayor Fisch.  Ms. Peters reported to Vice Mayor Lee, who helped facilitate the meeting with Mayor Fisch, that she was "cautiously optimistic" that the Mayor would support SEIU's ordinance.  (Exh. E, p. 196.)

91.     At the April 12, 2021 City Council meeting, Shelley Wolfberg, Assistant to the City Manager, advised council members that: (1) "COVID-19 cases in Los Angeles continue to decline as vaccine availability increases;" and (2) "healthcare workers were among the first tier eligible to receive the COVID-19 vaccine."  Ms. Wolfberg also noted:  "There is a sentence in the staff report relating to bonus structures similar to those adopted by Kaiser Permanente and the Mayo Clinic."  The staff report does not contain such a statement or any citation to data or sources regarding healthcare bonus structures.  (Exh. I.)  The staff report merely states: "At this time, no other municipality has adopted an ordinance relative to providing healthcare worker hazard pay."  Instead, the staff report focuses on grocery and retail, and the extensive report by the City of Los Angeles Chief Legislative Analyst discussing the Los Angeles ordinance providing hazard pay for grocery and retail workers is attached.

92.     Vice Mayor Lee responded to comments made by SCHCC CEO Michael Klepin during public comment.  After stating that SCHCC's safety efforts "really didn't materialize," Vice Mayor Lee attacked Mr. Klepin's statements as "lies":

> On one hand, some of them [benefits offered by SCHCC] just didn't happen. Those are lies. Others materialized after employees complained for months, they weren't a benevolent thing that the CEO in the company gave to the employees out of the kindness of their heart. They're things that they were forced to do, because the employees were talking to the LA County Department of Public Health, or Cal OSHA, or other places that really try to mediate between employers, and employees to make sure that the working environment is as safe as possible.

93.     Vice Mayor Lee later stated that he believed it was right to focus on companies which profited during the pandemic: "By taking some of the record profits of some of the most, some of the companies that have made the most within the last 12 months and dictating that some of that should be shared with some of their workers for a limited amount of time.  That's not overreach.  That's humanity."

94.     Other Council Members took issue with Vice Mayor Lee's characterization of the facts as well as the legality of the City stepping in to negotiate on behalf of a union.  Council Member Göran Eriksson stated, "a city shouldn't interfere with the private sector.  If there is issues there are unions to clearly hear, so they should, they should then deal with this with management that works in a private sector market."

95.     Council Member Eriksson went on to comment:

> I think that the issue is really between the employees and the owners of the business. And in this aspect, we know that some of the employers has compensated their employees well, and some has compensated less. But it's really not for us to step in. And here is the whole issue is that, it's so easy to spend other people's money, right. It's not our money. It's not coming out of our general fund, that would have been a little more honest, that we actually took and compensated the people with our money, with our tax money. That would be a more honest discussion.

96.     Following discussion, the City Council voted (3-2) to agendize a proposed ordinance targeting SCHCC for discussion and vote after a first reading at the next meeting.

97.     At 9:50 p.m., while the meeting was still in progress, Ms. Peters opened a group chat with Mayor Fisch, Vice Mayor Lee, and Councilmember McMorrin.  Apparently frustrated by the decision to defer immediate action on ordinance targeting SCHCC, Ms. Peters sought to assure Mayor Fisch, Vice Mayor Lee, and Council Member McMorrin: "We're ready to fight court case"; "Literally you guys have the support"; "That's not something you should worry [about]"; "It's actually the only way you're going to have this pro bono support." When she asked: "Why make it 2?"—an apparent reference to the decision by the City Council to agendize the grocery/retailer "hero pay" ordinance first—Vice Mayor Lee responded to the entire group in the text chat: "The mayor wants to handle healthcare differently"; and "Still work to do on this."  (Exh. D, pp. 156-57.)

98.     Viewed in context, the only plausible interpretation is that SEIU's representative was telling three City Council members that the union was prepared to defend a SEIU-sponsored ordinance by providing legal support, while at the same time suggesting that the "only way you're going to have the union's "pro bono support" would be by the Council taking up the "Hospital ordinance" and the "grocery" ordinance as one combined bill.  Ms. Peters' final texts, directed at the Mayor in particular, remove all doubt as to the quid pro quo offered: "pro bono support" from SEIU in exchange for three members' support: "Mr. Mayor"  "We have your back"  "There are only so many ways I can legally say that."  (Exh. D, p. 157.)

#### 4.     May 10, 2021: The Proposed SCHCC Ordinance Is Introduced

99.     On May 10, 2021, Action Item A-1 on the City Council's agenda was "Introduction of an Ordinance Establishing Premium Hazard Pay for On-Site

Hospital Workers at Covered Hospitals." (Exh. J, p. 289.)  The staff report accompanying Action Item A-1 named the proposal:  "Premium Hazard Pay for Southern California Hospital Workers." (Exh. K, p. 293.)  The original draft of the proposed ordinance did not reference employee retention as a justification. (Exh. L.)  This justification was added later when the proposed ordinance was revised and was re-introduced on May 24, 2021.

100.   During the meeting, Mayor Fisch stated:  "[W]e received some new information that we have not had a chance to be advised by staff on Item A-1. So we will continue that item until the next council meeting."  The new information Mayor Fisch referenced was a letter sent by SCHCC's counsel which, among other things, advised the City Council of "recently concluded negotiations with SEIU with respect to a new collective bargaining agreement" and that the agreement was ratified by SEIU members as of May 10, 2021.  The letter further noted that, as a result, SEIU would have no legal obligation or economic motivation to engage in mid-term negotiations, let alone agree to concessions as to windfall payments never requested by the union during bargaining, and that because the proposed ordinance would dictate a substantive economic term of the CBA without permitting bargaining, it would be preempted under the National Labor Relations Act ("NLRA").

### 5.    May 24, 2021: The Revised Proposed Ordinance is Introduced

101.   The City Council introduced a revised version of the ordinance on May 24, 2021. (Exh. M.)  Amended in an attempt to address the preemption issue raised by SCHCC, the revised proposed ordinance purported to cure this defect by adding a new section that would permit the parties to waive the legal effect of the ordinance, provided its provisions are "expressly waived in a collective bargaining agreement, . . . in clear and unambiguous terms." (Exh. O.)

102.   Presumably this amendment was added to create the illusion that the proposed ordinance would do nothing more than "set the stage for labor-management engagement" without "alter[ing] the process of collective bargaining." *Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 964 (9th Cir. 2016).  But because the proposed ordinance would dictate economic terms *after* negotiations had closed and SCHCC had renewed its CBA with SEIU, the union would have no obligation to agree to bargain, let alone surrender bargained-for concessions, such as pay raises, once bargaining ended and the agreement was ratified.

103.   While a contract is in force, section 8(d) of the National Labor Relations Act ("NLRA") permits the union to refuse, even unreasonably, an employer's proposal to modify the terms established by the CBA.  SCHCC may neither reopen bargaining without SEIU's consent nor unilaterally change any term of the agreement for the direct purpose of offsetting the economic impact of the mandated bonus pay.  *See Connecticut Power Co.*, 271 NLRB 766, 766-67 (1984).  Under the NLRA, the union has no duty to bargain until 60 days before the contract expires in March 2024 – more than two years after the Ordinance would by its own terms expire.

104.   To the extent any confusion may linger over the parties' absolute right to decline mid-term negotiations, the integration clauses in both the SEIU and CNA CBA's put that issue to rest.  Article 27 of the CNA CBA, entitled "Entire Agreement," states:

> The parties agree that this Agreement (including the results of any local bargaining as provided herein constitutes the entire contract between them governing wages, hours and conditions of employment of bargaining unit Registered Nurses covered during the term hereof, and settles all demands and issues on all matters subject to collective bargaining.  Accordingly, except as the Agreement expressly provides for a local bargaining process, the Association and the Facility expressly waive their rights during the term of the Agreement to demand negotiations upon any subject matter, whether or not such subject matter is specifically contained in this Agreement or whether such subject matter has or has not been raised or discussed by

either party during the negotiations leading up to the execution of this Agreement.

105.   Article 27 of the SEIU CBA, entitled "Entire Agreement," states:

The parties agree that this Agreement constitutes the entire contract between them governing wages, hours and conditions of employment of bargaining unit Employees covered during the term hereof, and settles all demands and issues on all matters subject to the Collective Bargaining Agreement.

Accordingly, except for statutory rights to bargain over the impact or effects of events that arise during the term of the Agreement, and except for the bargaining process for a successor agreement, the Union and the Facility will not demand to re-negotiate any subject matter contained in this Agreement or to negotiate whether new subject matter should be included in this Agreement during its term.

Additionally, nothing in this Article prevents the parties from mutually agreeing to meet and discuss issues, and to enter into mutual agreements on significant matters.

106.   At the May 24, 2021, City Council meeting, one speaker objected to the proposed ordinance because the City Council had wanted to "take up the cause of [SCHCC] for some time now," stating that SEIU had contributed to the campaigns of the Council Members pushing to pass the proposed ordinance.  When the Council's deliberations began, Vice Mayor Lee denied any contributions from SEIU.  Lee also responded to comments that the proposed ordinance was unfair because it singled out SCHCC without providing increased compensation for City employees who were required to continue working during the pandemic:

In regards to our city employees. Those are separate negotiations. And I would ask the administration of Southern California Hospital at Culver City, as they have asked us to stay out of those negotiations. Those are between the city and our separate employee groups. And you better believe some of the same questions have come up about our public facing employees and the danger that they have been in for the last year as a result of COVID-19. We acknowledged that danger. And it is within the City's jurisdiction to do something about it. I think we should compensate our employees for that.

107.   Council Member Albert Vera specifically questioned why the City Council should intercede after the parties had already come to an agreement. Council Member Eriksson also opposed the proposed ordinance, stating:

> [I]t's outside our purview really, to pick one company or one specific group in our City and provide them with this compensation, that is not money out of our pocket or the officers pocket. I think we have to realize that the Brotman Hospital was losing money, when the time that when this new operator came in, and they have slowly worked on improving and, and turning the hospital around, and I think we as a community should be very, very grateful for those efforts.

108.   The City Council then voted (3-2) to proceed to a second reading of the proposed ordinance at a future City Council meeting, with Mayor Fisch, Vice Mayor Lee, and Council Member McMorrin voting in favor.

### 6.   June 14, 2021: The SCHCC Ordinance Is Adopted

109.   The Ordinance was agendized for a second reading on June 14, 2021. (Exh. P, p. 348.)

110.   One email exchange between Vice Mayor Lee and another SEIU senior official was remarkably consistent with Maky Peters' April 12, 2021 promises of "pro bono support" and "we've got your back" should the Mayor proceed to a vote.[12]

111.   In her May 21, 2021 email to Vice Mayor Lee, SEIU's "Lead Organizer" Shelbi Augustus states: "We had a meeting with the Mayor and our legal and research team. He still seems to have very cold feet. ***We have agreed to take on all legal responsibility***, have shot down all legal arguments, and have agreed to formally rebuttal [sic] the arguments made." (Exh. C, p. 150 (emphasis added).)  As this email thread indicates, the Vice Mayor was fully engaged in coaching SEIU on how to persuade the Mayor.  He recommended to SEIU that a

---

[12] One week prior to that meeting, on June 7, 2021, the City produced the communications in Exhibit A and other communications in response to SCHCC's Public Records Act Request.

*"strong legal footing is what need to be communicated and getting explicit about how [SEIU's] legal team would help or participate should the city get sued."* (*Id.* at 141 (emphasis added).)

112.   As SCHCC explained in a June 10,  2021 letter to the City Council, these communications by a second SEIU official reinforce the concern that SEIU was offering an illegal quid pro quo: to obtain the Mayor's support, the union was prepared to make payments, underwrite a legal defense, and assume responsibility for the legal consequences of adoption of the Ordinance, which was prepared at the union's behest for the purposes of serving the special interests of the SEIU.  (Exh. Q.)

113.   As SCHCC explained, SEIU's offer appeared to be a behested contribution which, under California's Political Reform Act, applies to any gift, donation or contribution "made at the behest" of an elected official if it is made under the control or at the direction of, in cooperation, consultation, coordination, or concert with, at the request or suggestion of, or with prior consent of an elected official.  Second, SEIU's provision of legal services of any kind would also be deemed a gift.  Under Government Code section 82028, anything of value given to a public official without cost, including legal services, may be a reportable gift. SCHCC is aware of no exemption that would permit SEIU to "take legal responsibility" for the Ordinance without complying with disclosure and contribution limitations.  Third, supplying legal support constitutes a "contribution."  A contribution is a payment made for political purposes, meaning it was received by a candidate, unless it is clear from surrounding services that the payment was received for personal purposes unrelated to candidacy or status as an office holder.  Finally, given SEIU's interest and role in coordinating the legislative and public relations strategy for the Ordinance, the union's entwinement could be so pervasive as to constitute "state action" by a private union.  *See, e.g.*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

114.   On June 15, 2021, Senior Deputy City Attorney Lisa Vidra responded to SCHCC's June 10 letter.  Ms. Vidra stated that no gift or quid pro quo exchange occurred because "[w]hen there is no personal benefit there is not a gift and not a quid pro quo for official action."  (Exh. R, p. 356.)  Ms. Vidra also stated that there not "anything extraordinary about [SEIU's] offer of support, as it is common for unions and other organizations to become involved in litigation challenging an ordinance they support."  (*Id.* at 355.)  Further, Ms. Vidra stated that "[d]rafting assistance is not a campaign contribution because the intent is to influence the passage of an ordinance, or influence the hospital's actions toward its employees, and not the outcome of an election."  (*Id.* at 356.)

115.   In an editorial published on Sunday, June 9, 2021, the editorial board of the Orange County *Register* asked the following question:

> The union drafted the ordinance, drafted an op-ed for Lee promoting it and agreed to take legal responsibility for defending it in court. After reading the string of emails, obtained through a public records request by the hospital's attorney, we're left with this troubling question: Is the Culver City council or an outside union running the government?

116.   During debate over the Ordinance on June 14, 2021, Vice Mayor Lee offered the following defense:

> Yeah, I spoke with SEIU on a regular basis about the potential to bring a hazard pay ordinance to Culver City. But no, I have never worked for SEIU, not SEIU-UHW, not any of the other variants.  I applied maybe seven years ago, but I had intended to run for City Council in a couple months, so the job wasn't really going to work out.

117.   Vice Mayor Lee articulated that the purpose of the Ordinance is to compensate employees for the stresses faced during the COVID-19 pandemic:

> What we are talking about right now is **not** compensating people for what they will go through in the next three months. If things go well, we will open back up, we won't see another

> surge – though in the past we have seen repeated surges – but we are compensating people for the mental, physical, and emotional stress that both them, their families, and their friends had to go through during the COVID-19 pandemic.

118.    Council Member Eriksson, during discussion and in response to claims from Vice Mayor Lee that members voting against the Ordinance were intimidated by business interests, stated: "I am not intimidated Mr. Lee, you know you throw these words around, but that's another lie from your end."

**H.    The Targeted and Arbitrary Nature of the Ordinance**

119.    The Ordinance defines "Covered Hospital" as any and all hospitals meeting the definition contained in California Health and Safety Code section 1250(a) operating within the geographical borders of the City.  (Exh. A, p. 80.) SCHCC is the only facility meeting that definition within the City.

120.    The Ordinance provides that "Hospital Workers shall be entitled to no less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer."  (Exh. A, p. 81.)  The Ordinance purports to credit premium pay provided as of the effective date, but offers no credit for compensation provided by SCHCC before the effective date. (*Id.* at 81-82.)

121.    The Ordinance gives a private right of action to any hospital worker aggrieved by a violation.  (Exh. A, p. 82.)

122.    The Ordinance purports to be waivable in a collective bargaining agreement.  (Exh. A, p. 83.)  However, because negotiations between SCHCC and SEIU have already been completed, SEIU has no obligation to negotiate with SCHCC in good faith.

123.    The Ordinance prohibits SCHCC from claiming offsetting credits for incentive pay or bonuses paid prior to the effective date.  (Exh. A, p. 81-82.)

124.   The Ordinance contains a sunset provision stating it "shall expire 120 days after the effective date of this Ordinance.  The City will continue to monitor COVID-19 indicators to assess the impact of the disease and may rescind this ordinance before the full 120 days elapses if evolving conditions render it advisable to do so."  (Exh. A, p. 84.)

125.   The Ordinance is underinclusive because it arbitrarily applies only to workers at one general acute care hospital.  Yet, as the Ordinance states, "nurses continue to face the highest risk of infection among all healthcare workers and first responders in Los Angeles County," that "the vast majority of known exposures among COVID-19 positive healthcare workers and first responders occurred in a healthcare setting," that "examples of workers in the Very High Exposure Risk category include healthcare workers such as nurses and emergency medical technicians," that "healthcare delivery and support staff" are identified by OSHA as "High Exposure Risk" worker classifications," and that "some individuals with COVID-19 experience symptoms and require healthcare services for an extended period of time."  These healthcare workers and first responders are not limited to those who work in hospitals, just as COVID-19 is not limited to hospital settings, just as hospitals are not the only healthcare providers whose workers have been exposed disproportionately to risk of infection, stress, and on-the-job burnout due to long hours, and the day-to-day burden of caring for, or being exposed to, persons with COVID-19.

126.   SCHCC is not the only licensed healthcare facility in Culver City. There are numerous other CDPH licensed and license exempt healthcare facilities: Skilled Nursing Facility (3); Intermediate Care Facility/Developmentally Disabled-Habilitative (3); Community Clinic (6); Ambulatory Surgical Center (2); Acute Psychiatric Hospital (1); Chemical Dependency Recovery Hospital (1); Chronic

Dialysis Clinic (2); Hospice (4); Home Health Agency (8).[13]  These facilities are identified by using the search function on the CDPH website: https://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/pages/searchresult.aspx. The vast majority of these facilities are designated "essential" services per the CDPH.

127.   Skilled Nursing Facilities provide skilled nursing care and supportive care to patients whose primary need is for skilled nursing care on an extended basis. (*See* Health and Safety Code §1250(c).)  The SNFs in the City are:  (1) the subacute unit operating on SCHCC's campus with 21 beds; (2) Mary Crest Manor (https://marycrestculvercity.com/) with 57 beds; and (3) Marina Pointe Healthcare & Subacute (https://www.marinacare.com/) with 116 beds.[14]

128.   Intermediate Care Facility/Developmentally Disabled-Habilitative facilities provide 24-hour personal care, habilitation, developmental, and supportive health services to developmentally disabled clients whose primary need is for developmental services and who have a recurring but intermittent need for skilled nursing care.  (*See* Health and Safety Code §1250(e).) The Intermediate Care Facility/Developmentally Disabled-Habilitative facilities in the City are:  (1) Fairbanks House; (2) Berryman House; and (3) Barman House.  Each has six beds.

129.   Community Clinics are outpatient health facilities operated by a tax-exempt nonprofit corporation that provide direct medical, surgical, dental, optometric, or podiatric advice, services, or treatment to patients who remain for less than twenty-four hours, and "any charges to the patient shall be based on the patient's ability to pay, utilizing a sliding scale."  (*See* Health & Safety Code § 1204

---

[13] The Acute Psychiatric Hospital and Chemical Dependency Recovery Hospital refer to SCHCC's facilities in Culver City, Van Nuys, and Hollywood.

[14] Bed counts can be found using the search function on the CDPH website, https://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/Pages/SearchResult.aspx.

(a)(1)(A).)  The Community Clinics in the City are:  (1) Complete Care Community Health Center (https://ccchclinic.com/), which provides comprehensive medical care; (2) The Achievable Clinic (https://achievable.org/), which provides integrated health care to individuals with intellectual and developmental disabilities, their families, and other vulnerable populations; (3) The Center for the Partially Sighted (https://doctor.webmd.com/practice/the-center-for-the-partially-sighted-a76808b1-2a2d-495b-a450-6b508bd8f813-overview); (4) Venice Family Clinic (https://venicefamilyclinic.org/programs-and-services/comprehensive-health-care/sandy-segal-youth-health-center/), which provides physical and mental health services to middle and high school students (closed for in-person consultation during the pandemic); (5) Venice Family Clinic-Colen Family Health Center (https://venicefamilyclinic.org/), which provides comprehensive medical care; and (6) Westside Family Health Center (http://www.wfhcenter.org/), which provides comprehensive medical care.

130.   Ambulatory Surgical Centers are variously defined and accredited surgical centers who provide services on an outpatient basis.  (*See* Health and Safety Code § 1248.1.)  The Ambulatory Surgical Centers in the City are:  (1) Aalpha Medical Group; and  (2) Culver City Surgical Specialists (https://www.alignable.com/los-angeles-ca/culver-city-surgical-specialists).

131.   Chronic Dialysis Clinics provide less than 24-hour care for treatment of end-stage renal disease, including renal dialysis services.  (*See* Health and Safety Code §1204(b)(2).) The Chronic Dialysis Clinics in the City are:  (1) FMCNA of Culver City (https://carelistings.com/dialysis-facilities/culver-city-ca/fmcna-of-culver-city/5ace87ca93efd2372f975f34), with twenty-five beds; and (2) U.S. Renal Care Culver City Dialysis (https://www.usrenalcare.com/locations/points/culver-city.html), with eighteen beds.

132.   The Hospices in the City are:  (1) Affinity Hospice LLC (https://hospice.io/care/affinity-hospice-llc-culver-city-ca/), which provides home

1  health aides, counseling, medical social services, medical supply services, nursing

2  services, occupational therapy, physician services, physical therapy, short term

3  inpatient care, and speech pathology services; (2) Companion Hospice and

4  Palliative Care (https://www.companionhealthgroup.com/), which provides

5  hospice, home health, and palliative care services; (3) Quality Healthcare Hospice

6  (https://healthcarecomps.com/hospice/ca/A01533/); and (4) Roze Room Hospice

7  (https://www.rozeroomhospice.org/privacy-policy/), which provides hospice and

8  palliative care.  These facilities provide services identified in Health and Safety

9  Code section 1746(d).

10        133.   Home Health Agencies provide or arrange for the provision of skilled

11  nursing services to persons in their temporary or permanent place of residence,

12  pursuant to Health and Safety Code section 1727(a). The Home Health Agencies in

13  the City are: (1) Accord Home Health Care, Inc.; (2) Affinity Home Health, Inc.; (3)

14  All Supreme Home Care, Inc.; (4) At Home Nursing Care, Inc.; (5) Aveanna Health

15  Care; (6) Caring Hands Home Health Agency, Inc.; (7) Optimum Home Health,

16  Inc.; and (8) Partners for Care, Inc.

17        134.   The City is also home to large-scale assisted living facilities for seniors,

18  including: (1) Sunrise Villa Culver City; (2) Studio Royale; and (3) Terraza Court

19  Senior Living.  The City also has multiple adult residential facilities, including

20  Holistic Care Adult Residential Facility, Bay Area House, and Ecf, Eras House 2.

21  https://www.assistedseniorliving.net/facilities/california/culver-city/36958/holistic-

22  care-adult-residential-facility/;

23  https://www.assistedseniorliving.net/facilities/california/culver-city/36500/bay-area-

24  house/; https://www.assistedseniorliving.net/facilities/california/culver-

25  city/36749/ecf-eras-house-2/.

26        135.   The populations which these facilities care for are among the most at-

27  risk and vulnerable to COVID-19.  The risks of COVID-19 transmission, as well as

28  the morbidity and mortality rates associated with COVID-19 cases among those

1   patients with chronic health problems, those who require frequent or continuous

2   medical care, or those who are 65 years and older, present challenges no less

3   daunting than those faced by healthcare workers at a hospital.

4        136.   In this regard, the three SNFs in the City, the subacute unit operating on

5   SCHCC's campus, Mary Crest Manor, and Marina Pointe Healthcare & Subacute—

6   all excluded from the Ordinance—are most significant in terms of COVID-19 cases

7   and risk of death.

8        137.   SCHCC's SNF provides a level of care for individuals who no longer

9   require acute hospitalization but remain medically fragile and require special

10  services, including "inhalation therapy, tracheotomy care, intravenous tube feeding,

11  or complex wound management care."  (See https://www.sch-

12  culvercity.com/news/2020/subacute-unit-upholds-strict-infection-control-guidelines-

13  remains-covid-free/.) SCHCC staff recognize that the "combination of underlying

14  medical conditions and a group setting means that residents of long-term care

15  facilities are particularly vulnerable to COVID-19" and therefore undergo invasive

16  COVID-19 testing on a weekly basis.  (Id.)

17       138.   The *Los Angeles Times* has reported that:  "Deaths attributed to

18  COVID-19 have skewed heavily toward the elderly, making nursing homes a tragic

19  focal point of the pandemic."  (*See* https://www.latimes.com/projects/california-

20  coronavirus-cases-tracking-outbreak/nursing-homes/.)  Based on statistics from the

21  CDPH, the *Los Angeles Times* has reported that "[n]ursing homes have accounted

22  for 4% the state's coronavirus cases, but 20% of its deaths," characterized as an

23  "outsized share."  (*Id.*)

24       139.   Workers in SNFs are at equal or greater risk from COVID-19 as

25  workers in general acute care hospitals.  On June 9, 2021, the Los Angeles County

26  Department of Public Health ("LACDPH") reported only a 1% difference in

27  infection rates between hospitals and SNFs – 26% vs. 25%, respectively. (Exh. Y, p.

28  578.)

140.   Workers in SNFs are also subjected to the "emotional toll" of "serv[ing] as family surrogates for very ill or dying patients" identified in the Ordinance as justifying Premium Hazard Pay.  (*See* Exh. A, p. 77.)

141.   According to the *Los Angeles Times*, assisted living facilities (adult and senior care) monitored by the California Department of Social Services, have experienced COVID-19 cases and deaths among residents and staff.  This includes facilities in the City with cases and deaths among residents and cases among staff: (1) Sunrise Villa Culver City; (2) Studio Royale; and (3) Terraza Court Senior Living.

142.   To manage risk of transmission, these facilities—including the SNF operated by SCHCC—prohibited visitors for fear of transmission, locking out family members who could not visit elderly, infirm, or disabled loved ones in these facilities.  These factors bring different, though no less painful, stresses and trauma on those who care for these patients.

143.   Hospitals are not the only, nor even the primary, hot spots for COVID-19 exposure for healthcare employees.  Rather, employees in SNFs have been identified by the CDC as at even more severe risk of contracting COVID-19 at work because of the communal nature of such facilities.[15]

144.   COVID-19 spreads more easily in communal settings like SNFs and assisted living facilities.[16]  Although less than one percent of the nation's population resides in nursing homes, assisted living facilities and other long-term care facilities, deaths among this fraction of the population accounted for more than 34% of ***all***

---

[15] CDC, *People Who Live in a Nursing Home or Long-Term Care Facility* (Sep. 11, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-in-nursing-homes.html [as of June 20, 2021].

[16] Holland B., USC Annenberg, *Center for Health Journalism, Coronavirus 'spread extremely easily' in skilled-nursing facilities, with deadly consequences* (May 31, 2021) https://centerforhealthjournalism.org/fellowships/projects/coronavirus-spread-extremely-easily-skilled-nursing-facilities-deadly [as of June 20, 2021].

deaths related to COVID-19 in the United States.  (*Id.*)  One out of twelve residents of long-term care facilities died of COVID-19, while nearly one out of ten residents in SNFs died of COVID-19.[17]  In 18 states, COVID-19 deaths in long-term care facilities account for at least half of all deaths.  (*Id.*)  SNFs had an adjusted COVID-19 mortality rate of 5.9%.  (*Id.*)

145.   The Culver City Observer reported that as of September 16, 2020: "Deaths related to coronavirus totaled 29 in Culver City. ***More than half of the deaths occurred in nursing homes and assisted living facilities.***"  (*See* https://www.culvercityobserver.com/story/2020/09/17/covid-19/covid-19-cases-declining-in-culver-city/9301.html (emphasis added).)

146.   Long-term care facility staff have been at a heightened risk of COVID-19 exposure, even when compared with other front-line workers such as hospital staff.   Increased risk of exposure has come from the often "close physical contact with patients" and "extended shifts due to a workforce shortage," as well as the fact that long term care facility employees "may not be familiar with robust infection prevention programs."[18] "In addition to their own increased risk of exposure, long term care facility staff present an increased transmission risk.  The relatively high proportion of staff working in more than one facility and the ability of the virus to be transmitted by asymptomatic and pre-symptomatic persons are two factors that facilitate the introduction and transmission of the virus within and among LTC facilities."  (*Id.*)

I.      **The Financial Impact of the Ordinance on SCHCC and its Employees**

---

[17] Covidtracking.com, https://covidtracking.com/data/state/california/long-term-care#-119.09993188523151,35.03083840927995,6.830760504682747 [as of June 20, 2021].

[18] TRACIE, *COVID-19 Considerations for Long-Term Care Facilities* (Sep. 2020) https://files.asprtracie.hhs.gov/documents/aspr-tracie-covid-19-long-term-care-considerations-toolkit-final.pdf.

147.   The Ordinance, by providing a $5.00/hour wage increase, would affect the employees represented by CNA and SEIU differently in terms of percentage pay increase.

148.   For employees represented by SEIU, the increase would range from a low of 5.15% for certain pharmacists, to over 30% for other employees based upon their job class and seniority.  These percentage differentials have no correlation with the level of patient interaction or risk of COVID-19 transmission at work.  The average percentage pay increase would be 19.21%.  A total of 333 SEIU-represented employees would receive the $5.00 per hour pay increase should the proposed ordinance pass.  This would be in addition to a substantial wage increase over the next three years under the CBA ratified less than 60 days ago.

149.   As just one example, as of April 29, 2021, under the old CBA a lab technician would earn between $25.25 and $33.92 per hour, depending on seniority.  Under the new CBA, this technician would receive over the first 12 months of the CBA $1.25 in step increases, equivalent to a 5 percent pay increase.  The Ordinance would provide this technician a 20 percent pay bump for four months.

150.   For employees represented by CNA, the increase would range from a low of 7.36% for certain registered nurses, to a high of 13.65% for other registered nurses.  The average percentage pay increase would be 10.91%.  A total of 575 CNA-represented employees would receive the $5.00 per hour pay increase under the Ordinance.

151.   SCHCC also employs approximately 149 non-union employees, including charge nurses, security officers, infection control coordinators, front office supervisors, and skilled maintenance workers.  Eighty-one of those employees are managers or supervisors excluded from the proposed ordinance's definition of "Hospital Worker."  Additionally, 659 physicians, most of whom have privileges to practice at SCHCC as independent practitioners, are excluded from the Ordinance.

152.   A number of employees voluntarily left or were terminated from SCHCC during the COVID-19 pandemic.  From the end of March, 2020 to the beginning of February, 2021, SCHCC had 451 new hires and 455 departures.  Thus, the Ordinance does not necessarily reward the people who worked at SCHCC during the most difficult parts of the COVID-19 pandemic.

153.   The Ordinance is underinclusive because, of the approximately 756 SCHCC employees in the general acute and acute rehabilitation facilities covered by the Ordinance, approximately 121 (16%) work in positions SCHCC has determined are low risk for COVID-19  transmission, such as activity coordinators, discharge planners, case managers, insurance verifiers, social workers, health information technicians, and sterile processing technicians.  By contrast, of the approximately 85 employees in the general acute and acute rehabilitation facilities excluded under the Ordinance, approximately 55 (64%) work in supervisory and managerial positions SCHCC has determined are high-risk for COVID-19 exposure, such as nursing managers, patient access supervisors, and pharmacy managers.  Similarly, by only including general acute care and acute rehabilitation services within its ambit under section 1250(a), the Ordinance excludes a significant portion of SCHCC's employees in the subacute (skilled nursing facility) and acute psychiatric and detoxification units – approximately 237 employees.

154.   No other municipality in California has enacted an ordinance targeting general acute care hospitals.  On information and belief, no governing state or local legislative body anywhere in the United States has done what the City has done.  The effect of the Ordinance is to make SCHCC the only hospital in the United States required by law to provide additional compensation to employees.

155.   Additionally, SCHCC has, for the past 2 years, been in the planning stage of establishing itself as a primary stroke center.  A primary stroke center has the skilled staff and resources necessary to treat patients within the first ninety minutes of experiencing a stroke.  Obtaining primary stroke center certification is a

very expensive and time-consuming process.  SCHCC has, for the past 2.5 years, been in the process of upgrading its cardiac catheterization laboratory for heart attack patients.  SCHCC has, for the past 9 months, been in the process of building a new emergency room, scheduled to be completed in 2022.  The Ordinance jeopardizes all of these enhanced services and improvements and could result in the time, effort, and resources expended on them being wasted.

### J.     The Irreparable Harm That Would Be Caused By Enforcement of the Ordinance

156.    SCHCC will suffer irreparable harm from having to comply with the Ordinance.

157.    As a general matter, costs of compliance with an unconstitutional ordinance are not recoverable.  *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in judgment) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.").

158.    Provisional relief is particularly appropriate when a law's targeting of a single person raises substantial constitutional issues, as here, under the Equal Protection Clause and prohibitions on Bills of Attainder and Special Legislation. (*See, e.g., Caudell v. City of Toccoa*, 153 F.Supp.2d 1371 (N.D. Ga. 2001) (granting preliminary injunction to enjoin enforcement of municipal charter amendment that would force plaintiffs to either resign from Hospital Authority or forego re-election to City Commission).

159.    The Ordinance will irreparably harm SCHCC's reputation by creating the impression that it is the only healthcare facility in the City—in fact in Los Angeles County and even the State—that had to be forced by law to address the well-being of its employees due to COVID-19.  *See N and N Catering Company v. City of Chicago*, 26 F.Supp.2d 1067, 1079 (N.D. Ill. 1998) (granting preliminary injunction to enjoin referendum that would prevent a single business from selling

alcohol where plaintiff claimed that "enactment of the referendum will irreparably tarnish its business reputation and goodwill.").

160.   The Ordinance will irreparably harm employee relations and morale, particularly morale of workers who **did** work at SCHCC throughout the peak of the panic and who actually treated COVID-19 patients, by arbitrarily: (1) treating workers in the same building in the same job classifications differently – one group gets Premium Hazard Pay and the other does not; (2) providing Premium Hazard Pay to new hires who were not working at SCHCC during the peak of the pandemic; (3) providing Premium Hazard Pay to workers regardless of whether they provided care to COVID-19 patients or the level of exposure to COVID-19.

161.   The Ordinance is contrary to the public's interest.  To decide whether to grant an injunction, courts consider harm to the general public, i.e., economic harm, inconvenience, and loss of available resources as a result of interruptions to critical industries.  *Long Island R. R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir. 1989) (enjoining strike as general public would sustain irreparable harm from cessation of railroad services); *Hornbeck Offshore Services, L.L.C. v. Salazar*, 696 F.Supp.2d 627, 639 (E.D. La. 2010) (enjoining drilling moratorium because "effect on employment, jobs, loss of domestic energy supplies" "will clearly ripple throughout the economy").  The Ordinance, by diverting resources, will impair SCHCC's ability, as a "safety net" hospital to continue with planned capital improvements and expansions of services (e.g., certification as a comprehensive stroke center) to benefit the patients it serves, a population that has limited healthcare alternatives.

## FIRST CAUSE OF ACTION

### NLRA PREEMPTION

### (29 U.S.C. § 141, *et seq.*)

162.   Plaintiff incorporates by reference and realleges each allegation set forth above.

163.   The National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.*, creates a uniform federal body of law governing union organizing, collective bargaining, and labor-management relations applicable to employers engaged in interstate commerce.  It established various rules concerning collective bargaining and defined a series of banned unfair labor practices, including bans on interference with the formation or organization of labor unions by employers.  The NLRA does not apply to certain workers, including supervisors and managerial employees – categories specifically excluded from the Ordinance.

164.   The Ordinance expressly violates NLRA section 8(d), which states that the mutual obligation of good faith bargaining "does not compel either party to agree to a proposal or require the making of a concession."  This is "the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970).  Section 8(d) is a "per se rule applied in the regulation of the bargaining process." *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 145 (1976).

165.   The NLRA, under the *Machinists* doctrine, also prohibits state and local regulation of conduct that Congress intended to be left to be controlled by the free-play of economic forces. Legislation that interferes with the "balanced state of collective bargaining" is preempted by the NLRA.  *Machinists,* 427 U.S. at 132.

166.   In particular, the NLRA preempts any and all state and local enactments that, by design or consequence, regulate or interfere with the then-existing balance of economic power between labor and management with respect to zones of activity that, under federal labor law, are intended to be left to the free play of economic forces.  Laws subject to NLRA preemption include laws that interfere with or attempt to regulate the economic tools available to labor or management during the course of collective bargaining or that otherwise interfere with the collective bargaining process, such as those that alter the parties' rights and

economic alternatives during collective bargaining, or the processes and procedures utilized for union organizing.

167.   Application of the Ordinance to SCHCC unequivocally intrudes upon zones of activity in the areas of labor relations, union organizing, and collective bargaining that is reserved under federal labor law and policy to the free play of economic forces.  The Ordinance dictates a substantive term of one employer's CBAs, for at least the 120-day duration of the Ordinance, and establishes Premium Hazard Pay that, by design or consequence, empowers SEIU in particular to secure a wage rate it could not otherwise obtain from SCHCC, or (in this case) failed to even offer to propose during bargaining.

168.   There is no practical ability or legal right to demand bargaining over the Ordinance, since both the SEIU and CNA agreements remain in effect for 34 months and 15 months, respectively.  (*See* Exhs. U, V & W.)  Because midterm negotiations are not permitted as to any subject matter reflected in the terms and conditions of a CBA, a union is under no obligation to reopen negotiations or to agree to concessions that would alter the agreed-upon terms.

169.   The Ordinance substantially impairs and interferes with the most substantive economic terms of both the CNA CBA and SEIU CBA.  Specifically, Article 13 – Compensation of the SEIU CBA (Exh. U, p. 398-406 & Exh. V, p. 439-42.) and Article 13 – Compensation of the CNA CBA (Exh. W, p. 439-42.  Both CBAs provide for substantial wage increases.  The CNA CBA expressly states: "Except as mutually agreed to by the parties, no other increases shall be required except to the extent provided for in a subsequent agreement."  (Exh. W, p. 472-78.)

170.   SCHCC cannot offset the costs of compliance with the Ordinance by reducing hours, wages and/or benefits.  SCHCC is prohibited from making unilateral changes to terms and conditions of employment except under expressly limited circumstances that would not be satisfied here given the language of the Management Rights clauses in the CBAs.  That the Ordinance itself does not

explicitly prohibit reduction of hours, wages and/or benefits to offset the costs it imposes on SCHCC is irrelevant.  Given the timing, the unions would accuse SCHCC of acting in bad faith by seeking to offset compliance costs by making cuts negatively affecting their members.  Moreover, the CBAs' integration clauses prohibit changing already bargained for hours, wages and/or benefits.  (Exh. U, Art. 27, p. 421 & Exh. W, Art. 27, p. 499.)

171.   Thus, the Ordinance imposed a substantive economic term as to only two collective bargaining agreements which substantially adjusts the bargained-for consideration upon which the one employer who is party to the CBAs justifiably relied.  This undermines the collective bargaining process and disrupts the process of union organizing.

172.   While the City has the ability to enact ordinances of general applicability to further the health and safety of its citizens, the Ordinance bears no relation to those goals.  Local minimum wage laws, for example, seek to lessen the burden on public welfare services.  Not only do almost all of the Hospital Workers covered by the Ordinance reside outside the City's jurisdiction, but the Ordinance is not a minimum labor standard.  It is a mandatory hourly bonus for a specific group of workers employed by one hospital, regardless of the wage negotiated in current collective bargaining agreements or other employment agreements.

173.   The Ordinance contains "Section 5:  Exemption for Collective Bargaining Agreement."  This provision permits parties to a CBA to waive the $5 per hour bonus, provided that both parties agree, in writing, to expressly amend their CBAs.  As explained, the "waiver" provision does not alter the parties' legal rights and obligations under the NLRA concerning midterm bargaining.

174.   The Ordinance is preempted by the NLRA because it regulates zones of activity that Congress intentionally left to be controlled by the free play of economic forces.

175.   SCHCC is entitled to judgment declaring the Ordinance to be void and unenforceable under the Supremacy Clause of the U.S. Constitution and equitable and injunctive relief to prevent the City or any private enforcer from attempting to enforce or give effect to the Ordinance.

## SECOND CAUSE OF ACTION

## VIOLATION OF EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

## (U.S. Const., amend. XIV, § 1)

176.   Plaintiff incorporates by reference and realleges each allegation set forth above.

177.   The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  (U.S. Const., amend. XIV, § 1.)

178.   The Equal Protection Clause requires that persons who are similarly situated receive like treatment under the law.

179.   The elements of a "class of one" claim under the Equal Protection Clause of the Fourteenth Amendment are that a state or local government: (1)"intentionally" (2) treated the plaintiff "differently than other similarly situated" persons, (3) "without a rational basis."  *Gerhart v. Lake County, Montana*, 637 F.3d 1013, 1022 (9th Cir. 2011), citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, (2000); *North Pacifica LLC v. City of Pacifica,* 526 F.3d 478, 486 (9th Cir.2008).

180.   "For purposes of the equal protection clause, the question whether two groups on either side of a governmental classification are similarly situated is not decided in the abstract.  Rather, courts must determine whether the two groups are similarly situated *with respect to the purpose of the law challenged.*"  *Avelar v. Cruz*, 6 F.Supp.2d 744, 757 (1998) (emphasis in original), *rev'd on other grounds LaGuerre v. Reno*, 164 F.3d 1035 (7th Cir. 1998).

181.   "A reasonable classification is one which includes all persons who are similarly situated with respect to the purpose of the [law]."  Gerald Gunther & Kathleen M. Sullivan, *Constitutional Law* 636—37 (13th ed.1997) (quoting Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341, 346 (1949)).

182.   While the Equal Protection Clause "does not require that every classification be drawn with precise mathematical nicety," legislatures do not have unfettered discretion to pass discriminatory legislation no matter how feeble the purported justification.  *See U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 538 (1973) (quotations omitted); *Silveira v. Lockyer*, 312 F.3d 1052, 1088-89 (9th Cir. 2002) ("Deference is not abdication and 'rational-basis scrutiny' is still scrutiny.") (quotation and citation omitted).

183.   Statutes that are both "over inclusive" and "underinclusive raise grave constitutional concerns even where they otherwise might further a legitimate interest.  *See Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974). The Supreme Court has rejected laws serving even legitimate state interest because they sweep either too broadly or not broadly enough.  *See*, *e.g.*, *Quinn v. Millsap*, 491 U.S. 95, 107 (1989) (property owners' representation on local governing boards); *Williams v. Vermont*, 472 U.S. 14, 23-24 (1985) (prevention of double taxation of state residents); *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 538 (1973) (prevention of hunger).

184.   The Ordinance improperly singles out one healthcare facility in the City for disparate treatment while not requiring the same treatment of similarly situated healthcare facilities.  The test is not whether these healthcare facilities are "arguably indistinguishable"—if it were, then virtually any classification could survive scrutiny.  The test is whether Culver City "treats differently persons who are in all relevant respects alike," where "relevant respects" are only those respects that

1    relate to the goals of the challenged law.  *Nordlinger v. Hahn*, 505 U.S. 1, 10

2    (1992).

3        185.   The Ordinance does not have a rational relationship to any of its four

4    stated purposes:  (1) to protect the health and welfare of [the City's] essential

5    Hospital Workers, their families, and the community; (2) to recognize and

6    compensate Hospital Workers for the risks and burdens they face every day and will

7    continue to face in the coming months; (3) support stable incomes among Hospital

8    Workers; and (4) promote job retention by ensuring Hospital Workers are

9    adequately compensated for the substantial risks, efforts, and expense they are

10   undertaking to provide essential services in a safe and reliable manner.

11       186.   The Ordinance is both overinclusive and underinclusive.  It is

12   overinclusive by including in the definition of Hospital Workers categories of

13   workers who may never have directly cared for COVID-19 patients or have been

14   exposed to COVID-19 patients due to their job duties, as well as new hires that did

15   not work at SCHCC during the height of the pandemic.

16       187.   It is underinclusive by not including similarly situated healthcare

17   facilities in the City and excluding workers in the same buildings as covered

18   Hospital Workers regardless of whether they provide "direct patient care and

19   services supporting patient care."  Many of these excluded workers are in the same

20   job classifications as covered Hospital Workers, such as registered nurses, licensed

21   vocational nurses, and therapists.  This differential treatment is bound to foment

22   resentment and is thus at odds with promoting job retention.

23       188.   Although the City may try to rationalize singling out SCHCC's general

24   acute care hospital as the only facility in the City with an emergency room and ICU,

25   the Ordinance's WHEREAS clauses nowhere mention this as a basis to do so, but

26   instead expressly call out "healthcare workers such as nurses and emergency

27   medical technicians" (i.e., EMTs) and "healthcare or laboratory personnel"

28   regardless of whether they work in a hospital setting.  (*See* Exh. A p. 79.)

189.   The City's own COVID-19 website recognizes that "healthcare workers" are not just those who work in general acute care hospitals:

> Healthcare workers have been among the County's highest-risk populations for COVID-19 infections since the beginning of the pandemic. …
>
> Los Angeles County will issue a Health Officer Order to align with State Orders that mandate vaccinations for healthcare workers by September 30. The County Order will also include three additional groups of healthcare workers: ***emergency medical technicians and paramedics, home healthcare workers, and dental practice employees.*** Over the coming weeks, the County will work collaboratively and closely with healthcare and labor partners to develop an effective education and implementation strategy.

(*See* https://content.govdelivery.com/accounts/CACULVER/bulletins/2ec5628?reqfrom=share (emphasis added).)  The LACDPH has recognized that:

> ***Health care facilities and home health care settings*** identified by this Order***, are particularly high-risk settings*** where COVID-19 outbreaks can have severe consequences for vulnerable populations, including hospitalizations, severe illness, and death. ***Workers, patients, and residents providing or receiving care at these facilities or in their homes are all at increased risk for infection in these settings*** which share the following features: frequent exposure to staff and highly vulnerable patients, including elderly, chronically ill, critically ill, medically fragile, and disabled patients.

(*See* http://publichealth.lacounty.gov/media/coronavirus/docs/HOO/FAQ-HealthCareWorkerVaccination.pdf (emphasis added).)  Thus, the full list of "healthcare workers" required to be vaccinated comprises:

> all paid and unpaid employees, contractors, students, and volunteers who work in indoor or other settings where (1) care is provided to patients, (2) patients have access for any purpose, leading to direct patient contact, or (3) home care or daily living assistance is provided to residents. This includes, but is not limited to, nurses, nursing assistants, medical assistants, physicians, dental assistants, dentists, technicians, therapists, phlebotomists, pharmacists, emergency medical technicians (EMTs), EMT—paramedics, prehospital care personnel, affiliated home care aides, registered home care aides, independent home care aides, home health aides, students and trainees, contractual staff not employed by the health care facility, and persons not directly involved in patient care, but who could be exposed to germs that can be spread in the health care setting (e.g., clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, and volunteer personnel). The requirements apply to anyone listed above, including those with a remote or hybrid

work agreement, since employees who work remotely may need to visit a facility location from time to time, and universal vaccination helps ensure a safer environment for everyone. Facilities and employers need to be confident that all employees can more safely enter the workplace when needed.

(*Id.*)  LACDPH, unlike the City, did not single out general acute care hospitals.

190.   The Ordinance also excludes Hospital Workers who worked during the height of the pandemic but have since left employment at SCHCC.  The Ordinance also ignores the fact that most of SCHCC's patients and employees do not even reside in the City and ignores the effect of imposing Premium Hazard Pay on SCHCC when the other general acute care hospitals in SCHCC's proximity are not subject to government-mandated hazard pay.

191.   The Ordinance is arbitrary because it was patterned after a hazard pay ordinance applicable to grocery and retail workers without any analysis of the materially different economics of healthcare organizations in general and SCHCC in particular as a "safety net" hospital that is heavily dependent on relatively low Medi-Cal and Medicare reimbursement for its revenue and that is unable to increase charges to offset or otherwise account for the increased costs imposed by the Ordinance.

192.   The Ordinance does not serve the purpose of job retention because it ignores that SCHCC has already expended millions of dollars to provide monetary bonuses and incentives and other benefits to its employees to address the impact of COVID-19 and that the employees represented by SEIU recently ratified a new collective bargaining agreement under which they are entitled to a substantial pay increase over three years.

193.   The Ordinance is arbitrary because of its 120-day duration and because it was adopted at a time when the COVID-19 emergency was well past its peak.

194.   The rational basis of the Ordinance is further belied because it was adopted to placate a political constituent of the City – SEIU.  In fact, what

distinguishes SCHCC from other healthcare providers in the City is that it is the only healthcare employer with employees represented by SEIU.

195.   The City "intentionally" targeted SCHCC by enacting the Ordinance. The Ordinance was impermissibly motivated by a desire to target SCHCC at the behest (or demand) of SEIU.  The Ordinance was conceived and orchestrated by SEIU in furtherance of a campaign to demonize SCHCC by, among other things, portraying it as indifferent to the burdens on and sacrifices made by its employees due to COVID-19 and a puppet of private equity interests seeking to siphon cash from hospital operations.  SEIU's plan was put into motion behind the scenes while it was negotiating a new collective bargaining agreement with SCHCC.  The Ordinance, in effect, would give SEIU a windfall in circumvention of the bargaining process.

196.   When legislation is motivated by animus or antipathy toward a particular group or individual, that is a factor relevant to rational basis scrutiny.  *See*, *e.g.*, *Romer v. Evans*, 517 U.S. 620, 635 (1996); *Cleburne*, 473 U.S. at 448; *Moreno*, 413 U.S. at 534.  Additional scrutiny is warranted where there is "some reason to infer antipathy" on the part of the legislature.  *See FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 314 (1993) (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

197.   Under "equal protection analysis, the history of the legislation in question may affect whether the government's action may survive rational basis scrutiny." *Merrifield v. Lockyer*, 547 F.3d 978, 986, n.11 (9th Cir. 2008).  In other words, courts are not required to accept "after-the-fact rationalizations" for legislative classifications without question.  *See Cleveland Bd. of Educ. V. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring).  Hypothetical justifications do not render an illegitimate classification reasonable.

198.   "Under [the rational basis] test, a plaintiff may demonstrate that the government action lacks a rational basis … either by negating every conceivable basis which might support the government action, or by demonstrating that the

challenged government action was motivated by animus or ill-will." *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (emphasis added) (internal quotations omitted); *see also Brown v. N. Carolina Div. of Motor Vehicles*, 166 F.3d 698, 706-07 (4th Cir. 1999) ("Irrational classifications or laws motivated by the desire to harm an unpopular group fail rational basis scrutiny.") (emphasis added).

199.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, or any private enforcer, from depriving it of the protections afforded to it under the Equal Protection Clause of the U.S. Constitution.  This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

<u>**THIRD CAUSE OF ACTION**</u>

**VIOLATION OF EQUAL PROTECTION CLAUSE**

**(Cal. Const., Art. I, § 7)**

200.   Plaintiff incorporates by reference and realleges each allegation set forth above.

201.   The California Constitution provides that "[a] person may not be denied equal protection of the laws."  (Cal. Const., Art. I, § 7.)

202.   For the same reasons set forth in Paragraphs 153 through 174 above, the Ordinance violates the Equal Protection Clause of the California Constitution.

203.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Equal Protection Clause of the California Constitution.

<u>**FOURTH CAUSE OF ACTION**</u>

**VIOLATION OF CONTRACTS CLAUSE**

**(U.S. Const., Art. 1, sec. 10, cl. 1)**

204.   Plaintiff incorporates by reference and realleges each allegation set forth above.

205.   The U.S. Constitution states:  "No State shall . . . make any . . . law impairing the obligation of contracts[.]"  (U.S. Const. art. I, § 10, cl. 1.) This is exactly what the Ordinance does.

206.   SCHCC has contractual relationships with two labor unions, CNA and SEIU.  The contracts are collective bargaining agreements, i.e., CBAs.  Both CBAs have a three year term.  The SCHCC/CNA agreement expires on March 31, 2023. The SCHCC/SEIU agreement expired on February 22, 2021.

207.   On April 29, 2021, SCHCC and SEIU signed a Memorandum of Understanding, i.e., MOU, which fixed the terms of the parties' agreement for three years.  The parties are acting on the basis of that MOU, which reflects various changes and amendments to the expired CBA, including significant bargained-for wage increases and benefits.  Under the renewed agreement, base hourly wages will increase at least three percent year over year for the life of the contract.  The bargaining concessions obtained by SEIU amount to substantial pay increases over the three-year term of the CBA.  On the basis of these concessions, as well as SEIU's representations concerning the materiality of the benefits obtained in negotiations, a majority of the SEIU bargaining unit's members voted to ratify the contract on or about May 10, 2021.

208.   The impact of the Ordinance on these CBAs is substantial:  (1) an average percentage pay increase of 10.91% over 120 days for employees represented by CNA; and (2) an average percentage pay increase of 19.21% over 120 days for employees represented by SEIU.

209.   The Ordinance supplants the carefully balanced step increases negotiated under the CBAs.

210.   For SEIU members:

Effective on the first day of the second full pay period following the date on which the Agreement is ratified, all full-time and part time employees shall move [sic] **receive a wage increase based on being moved to the**

1  **appropriate step on the wage scale.  Employees above the appropriate**

2  **step on the wage scale shall receive a 1.5% increase to their base rate of**

3  **pay**.

4  Effective on the first day of the first full pay period **after the one year**

5  **anniversary of the ratification of this agreement, the wage scale shall be**

6  **increased by 3%.  All employees shall receive a wage increase based on**

7  **movement to the appropriate step on the wage scale.  Employees above**

8  **the appropriate step on the wage scale shall receive a 1.5% increase to**

9  **their base rate of pay**.

10  Effective on the first day of the first full pay period **after the two year**

11  **anniversary of the ratification of this agreement, the wage scale shall be**

12  **increased by 3%.  All employees shall receive a wage increase based on**

13  **movement to the appropriate step on the wage scale.  Employees above**

14  **the appropriate step on the wage scale shall receive a 1.5% increase to**

15  **their base rate of pay**.

16  (Exh. V, p. 440.)

17      211.   For CNA members:

18  Effective March 24, 2020, each registered nurse will receive a minimum

19  increase of 4.5% as follows:  2.5% effective the first pay period of April

20  2020, and an additional 2% effective October 4, 2020 to her/his base rate of

21  pay or receive an increase to their appropriate step based on the RN's years of

22  nursing experience, whichever is greater.

23  Effective April 2021, each Registered Nurse will receive a minimum increase

24  of three percent (3%) as follows:  1.5% effective April 4, 2021, and an

25  additional 1.5% effective October 3, 2021 to his/her base rate of pay or

26  receive an increase to their appropriate step based on the RN's years of

27  nursing experience, whichever is greater.

28

Effective April 2022, each Registered Nurse will receive a minimum increase of three percent (3%) as follows:  1.5% effective April 3, 2022, and an additional 1.5% effective October 2, 2022 to his/her base rate of pay or receive an increase to their appropriate step based on the RN's years of nursing experience, whichever is greater.

(Exh. W, pp. 472-73.)

212.   SCHCC has also entered into services contracts with third-party vendors for the provision of a variety of services, including food services and housekeeping/janitorial services.  The workers providing food services and housekeeping/janitorial services are covered by the Ordinance; however the services contracts do not allow SCHCC to offset the additional costs of the Ordinance's $5.00 per hour increase.  On the contrary, these services contracts allow the vendors to raise their rates should local legislation increase labor costs.  For example, the food services contract, which runs through July 31, 2024, provides that the vendor can increase its rates should "new" "costs" be incurred arising out of "changes" to "local legislation" relating to its employees. (*See* Exh. X, pp. 564-65 [Section 5. & Section 4.d.ii].)

213.   The impact of the Ordinance on these vendor contracts is substantial: an additional $321,000 in costs for the 120-day duration of the Ordinance.  A $5.00 per hour raise for workers covered by these services contracts

214.   The Supreme Court has established a three-step test for determining whether the Contracts Clause has been violated by an otherwise valid exercise of police power. ***First***, "[t]he threshold inquiry is 'whether the [city] law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 450 U.S. 400, 411 (1983) (cleaned up). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Id.* ***Second***, "[i]f the [city] regulation constitutes a substantial impairment, the [city], in justification, must have a *significant and*

*legitimate public* purpose behind the regulation, such as the remedying of a broad
and general social or economic problem." *Id.* (internal citations omitted). "The
principle underlying this step is to 'guarantee[] that the [city] is exercising its police
power, rather than providing a benefit to special interests.'" *Cal. Grocers Ass'n*,
2021 WL 736627 at *6 (quoting *Energy Reserves Group v. Kansas Power Light*,
459 U.S. 400, 411 (1983). **Third**, "[o]nce a legitimate public purpose has been
identified, the next inquiry is whether the adjustment of the rights and
responsibilities of contracting parties is based upon *reasonable conditions* and is of
a *character appropriate to the public purpose* justifying the legislation's
adoption." *Energy Rsrvs. Grp.*, 459 U.S. at 411 (cleaned up; emphasis added).

215.  As part of the bargaining process, SCHCC made concessions to
demands by SEIU and CNA, just as these unions made concessions themselves in
order to reach an agreement. "In the employment context, there likely is no right
both more central to the contract's inducement and on the existence of which the
parties more especially rely, than the right to compensation at the contractually
specified level." *Baltimore Teachers Union v. Mayor & City Council of Baltimore,*
6 F.3d 1012, 1018 (4th Cir. 1993). For example, the compromises reached in order
to renew the SCHCC-SEIU CBA, including terms relating to wage increases, health
and retirement benefits, severance pay, and work schedules. These go to the "very
heart" of the employment agreements between SCHCC, the SEIU, and hospital
employees that are beneficiaries under the CBA. *Sonoma Cty. Org. of Pub.
Employees v. Cty. of Sonoma,* 23 Cal.3d 296, 309 (1979).

216.  The Ordinance substantially impairs SCHCC's contractual
relationships in two, distinct ways. **First**, the Ordinance impairs SCHCC's right to
compensation terms at a contractually-specified level. As to both CBAs, the
impairment is not ancillary or inconsequential. Apart from dictating wealth
transfers in excess of two million dollars over 120 days, the Ordinance would
unilaterally impose wage increases ranging up to over 30 percent. Apart from the

materiality of these increases, the impairment strikes at the "very heart" of the bargain struck in any collective bargaining agreement – wages and benefits.

217. **Second**, although wages are at the core of the bargain struck in virtually every CBA, the impairment as to these terms may not be viewed in isolation.  "'The [CBA] states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The [CBA] covers the whole employment relationship.'" *Inlandboatmens Union of Pacific v. Dutra Group* 279 F.3d 1075, 1079 (9th Cir. 2002), quoting *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 578-579 (1960).

218.  The Ordinance retroactively impairs SCHCC's bargained-for right as to wages.  It upends the essential premise of collective bargaining, which is to allow the parties to obtain finality as to how they will govern their future relationships.  A key bulwark against the impairment of settled contractual rights is the NLRA's guarantee of finality by prohibiting one party to demand to reopen negotiations or to threaten to unilaterally change the terms or conditions of the agreement.  Here, the timing of the Ordinance, as well as its duration, all but guarantees that SCHCC has no contractual or statutory recourse to mitigate against the consequences of the impairment.

219.  No public need justifies the imposition of retroactive upward adjustment of bargained-for contractual wages. No emergency would justify such a "severe disruption of contractual expectation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978).  In fact, there is no articulated necessity, urgent or otherwise, that could justify the Ordinance's retroactive interference with bargained-for compromises, the basis upon which labor peace is based.  Allowing the City Council to unilaterally rewrite the central terms of one contract affecting only one employer does not advance any significant or legitimate public purpose.  Had it been tailored appropriately to its stated purpose, the City Council could not have excluded its own, similarly-situated employees. Indeed, the wage increases are

wholly arbitrary.  Given the troubling indication of a quid pro quo, it would appear that certain members of the City Council were acting as much in their own self-interest as in the interest of the SEIU.

220.   By enforcing this fundamentally unfair and discriminatory Ordinance, which substantially impairs only one employer's contracts, the City, acting under color of state law, has acted on behalf of a special interest to the detriment of the public interest, thereby unconstitutionally impairing the obligation of SCHCC's contracts.

221.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Contracts Clause of the U.S. Constitution.  This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

### FIFTH CAUSE OF ACTION

### VIOLATION OF CONTRACTS CLAUSE

### (Cal. Const., Art I, § 9)

222.   Plaintiff incorporates by reference and realleges each allegation set forth above.

223.   The California Constitution provides that a "law impairing the obligation of contracts may not be passed."  (Cal. Const., Art. I, § 9.)

224.   The Contract Clause analysis under the California Constitution is "substantially the same" as under the U.S. Constitution. *See*, *e.g.*, *Hall v. Butte Home Health, Inc.*, 60 Cal.App.4th 308, 319 (1997).

225.   For the reasons set forth in Paragraphs 180 through 191 above, the Ordinance violates the Contracts Clause of the California Constitution.

226.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it by the Contracts Clause of the California Constitution.

# SIXTH CAUSE OF ACTION

## VIOLATION OF BAN ON BILLS OF ATTAINDER

### (U.S. Const., Art. I, § 10)

227.   Plaintiff incorporates by reference and realleges each allegation set forth above.

228.   The U.S. Constitution provides that "'[n]o State shall … pass any Bill of Attainder." (U.S. Const., Art. I, § 10.)

229.   To determine whether a law inflicts punishment forbidden by the Bill of Attainder Clause, the Supreme Court evaluates whether "(1) the challenged statute falls within the historical meaning of legislative punishment; (2) ... the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) ... the legislative record evinces a congressional intent to punish. " *Selective Serv. Sys. v. Minn. Pub. Interest Research Group,* 468 U.S. 841, 852  (1984) (quotation omitted).

230.   The Ordinance violates the prohibition against Bills of Attainder because it applies with specificity and constitutes legislative punishment.

231.   The Ordinance is targeted specifically at SCHCC.

232.   The Ordinance constitutes punishment because it marks SCHCC with the badge of infamy.  By making SCHCC the only healthcare facility in the City subject to Premium Hazard Pay legislation, the City is creating the false impression that SCHCC is a "bad actor" and that the Ordinance had to be passed to ensure that SCHCC took steps to mitigate the effects of COVID-19 on employee morale, well-being, and retention, when in fact SCHCC voluntarily provided employees with the bonuses, incentives, and other benefits described herein, none of which were required by federal, state or local law, and without any demand or request by any union.

233.   The Ordinance constitutes punishment because of the severity of the burdens it imposes on SCHCC and cannot be said to further any non-punitive

legislative purpose.  The Ordinance impedes rather than furthers its stated purpose, serves no legitimate government interest, and is intended to punish SCHCC.

234.   The Ordinance constitutes punishment because the context, timing, structure, and legislative history of the Ordinance evinces a legislative motivation to punish SCHCC at the behest of SEIU.  The Ordinance was drafted to target one employer, as tribute to a politically influential union.

235.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it by the U.S. Constitution's prohibition on Bills of Attainder.  This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

## SEVENTH CAUSE OF ACTION

## VIOLATION OF BAN ON BILLS OF ATTAINDER

## (Cal. Const., Art. I, § 9)

236.   Plaintiff incorporates by reference and realleges each allegation set forth above.

237.   The California Constitution prohibits Bills of Attainder.  (Cal. Const., Art. I, § 9.)

238.   For the reasons set forth in Paragraphs 199 through 205 above, the Ordinance violates the prohibition against Bills of Attainder because it applies with specificity and constitutes legislative punishment.

239.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it by the California Constitution's prohibition on Bills of Attainder.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF BAN ON SPECIAL LEGISLATION

## (Cal. Const., Art. IV, § 16(b))

240.   Plaintiff incorporates by reference and realleges each allegation set forth above.

241.   The California Constitution provides that "[a] local or special statute is invalid in any case if a general statute can be made applicable."  "The test of validity under either the special legislation or the equal protection challenge is the same, namely, whether there is a rational relationship between the purpose of the enactment … and the singling out" of the person "affected by the statute." *City of Los Angeles v. City of Artesia*, 73 Cal.App.3d 450, 455 (1977).

242.   The Ordinance is special legislation because it singles out and only applies to SCHCC.

243.   For the reasons set forth in Paragraphs 159 through 173 above, there is no rational relationship between the purpose of the Ordinance and the singling out of SCHCC.  The Ordinance is therefore invalid special legislation.

244.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it against special legislation under the California Constitution.

### NINTH CAUSE OF ACTION

### VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

### (U.S. Const., amend. XIV, § 1)

245.   Plaintiff incorporates by reference and realleges each allegation set forth above.

246.   Under the Due Process Clause of the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law." (U.S. Const., amend. IV, § 1.)

247.   The Ordinance imposes a substantial economic deprivation on SCHCC without providing any mechanism that secures the hospital's ability to obtain "a just and reasonable return" on its property or that provides some ex ante means to avoid the potential for confiscation based on the terms imposed retroactively. *See Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 820 ("The risk that the rate set by

[Proposition 103] is confiscatory as to some insurers from its inception is high enough to require an adequate method for obtaining individualized relief."); *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 165 ("a regulation may be invalid on its face when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties"); *Fed. Power Comm'n v. Hope Natural Gas*, 320 U.S. 591 (1944) (discussing invalidity of regulation where rates "unjust and unreasonable"); *Guar. Nat. Ins. Co. v. Gates*, 916 F.2d 508, 513-515 (9th Cir. 1990) (striking down Nevada's version of Proposition 103 because it did not provide insurers with a means for relief from potentially confiscatory rates).

248. SCHCC, as a highly-regulated healthcare facility, cannot mitigate the financial impact of compliance with the Ordinance by raising prices or reducing staff.

249. Approximately 90% of SCHCC's payors are government – Medi-Cal (approximately 50%) and Medicare (approximately 40%). The payments SCHCC receives from Medi-Cal and Medicare are either set by law under non-negotiable fee schedules or, in the case of managed Medi-Cal and Medicare, set by contracts with managed care plans that may only be renegotiated when the contract terms are up. As a practical matter, the payments under managed Medi-Cal and Medicare are non-negotiable, i.e., take it or leave it. In comparison to commercial insurance and health maintenance organizations, Medi-Cal provides the lowest reimbursement, with Medicare the next lowest.

250. SCHCC cannot reduce registered nursing staff because the CDPH sets mandatory staffing ratios. As a practical matter, SCHCC cannot reduce other staff without risking compromising patient care.

251. SCHCC provides essential services as a DSH, also referred to as a "safety net" hospital. Safety net hospitals treat a disproportionate share of low-income patients who are either uninsured or are Medi-Cal or Medicare beneficiaries.

As a practical matter, other hospitals in the region are not willing to take these patients because of the low reimbursement rates.  Thus, compliance with the Ordinance has the potential not just to harm SCHCC, but also patients who have no other alternative for their critical healthcare needs.

252.   SCHCC has no practical ability to mitigate the financial impacts of the Ordinance, whether through the collective bargaining process or through (as an example) hardship exceptions provided in living wage ordinances upheld by courts. *See Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 962 (9th Cir. 2016) (upholding minimum wage ordinance which contained an opt-out provision allowing employer covered by a CBA to waive the requirements of the ordinance, and a hardship waiver that allows employers to postpone implementation for one year).

253.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Due Process Clause of the U.S. Constitution.  This claim is also brought pursuant to 42 U.S.C. § 1983 and § 1988(b).

### TENTH CAUSE OF ACTION

### VIOLATION OF DUE PROCESS CLAUSE

### (Cal. Const., Art. I, § 7)

254.   Plaintiff incorporates by reference and realleges each allegation set forth above.

255.   Under the Due Process Clause of the California Constitution, "[a] person may not be deprived of life, liberty, or property without due process of law." Cal. Const., Art. I, § 7.

256.   For the same reasons set forth in Paragraphs 217 through 232 above, the Ordinance violates the Due Process Clause of the California Constitution.

257.   SCHCC thus seeks declaratory, equitable and injunctive relief to prevent the City, and any private enforcer, from depriving it of the protections afforded to it under the Due Process Clause of the California Constitution.

## ELEVENTH CAUSE OF ACTION

### (42 U.S.C. § 1983)

### (Against Defendant City of Culver City)

258.   Plaintiff incorporates by reference and realleges each allegation set forth above.

259.   "Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Services of New York*, 436 U.S. 658, 690 (1978).

260.   Because the Ordinance is unconstitutional and was officially adopted by the City Council, the City violated 42 U.S.C. § 1983.

261.   SCHCC is entitled to monetary damages, in an amount to be proven at trial, to compensate it for any costs incurred to comply with the Ordinance and for the reputational harm to SCHCC caused by the City's actions in introducing and adopting the Ordinance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.     On the First Cause of Action, a judgment declaring that the Ordinance, as well as any action taken in further of the Ordinance by any person, is preempted by the National Labor Relations Act, and its implementing regulations and guidance, and is therefore void and unenforceable, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

2.     On the Second and Third Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the equal protection guarantees of the California and U.S. Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

3.     On the Fourth and Fifth Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the Contracts Clauses of the California and U.S. Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

4.     On the Sixth and Seventh Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the prohibition against Bills of Attainder of the U.S. and California Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

5.     On the Eighth Cause of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the prohibition against special legislation of the California Constitution, and therefore is void and invalid, and a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

6.     On the Ninth and Tenth Causes of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates the due process guarantees of the California and U.S. Constitutions, and therefore is void and invalid, and a preliminary and permanent injunction

enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance;

7.      On the Eleventh Cause of Action, a judgment declaring that the Ordinance, as well as any action taken in furtherance of the Ordinance by any person, violates 42 U.S.C. § 1983 because the Ordinance is unconstitutional, and is therefore void and invalid, a preliminary and permanent injunction enjoining the City, and any private enforcer, from enforcing or taking any action under the Ordinance, and monetary damages in an amount to be proven at trial;

8.      For an award of attorneys' fees and costs of suit herein pursuant to California Code of Civil Procedure § 1021.5, 42 U.S.C. § 1988(b), and any other applicable law; and

9.      For such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

10.      Plaintiff respectfully demands a trial by jury of all issues for which it has a right to demand a trial by jury.

Dated:  September 8, 2021

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By      _____

DAVID A. SCHWARZ

Attorneys for Plaintiff
Southern California Healthcare System, Inc.,
dba Southern California Hospital at Culver City

# EXHIBIT "A"

# EXHIBIT "A"

**ORDINANCE NO. 2021-_____**

**AN ORDINANCE OF THE CITY OF CULVER CITY, STATE OF CALIFORNIA, ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE HOSPITAL WORKERS AT COVERED HOSPITALS**

**WHEREAS,** the novel coronavirus ("COVID-19") disease is caused by a virus that spreads easily from person to person and may result in serious illness or death, and is classified by the World Health Organization (WHO) as a worldwide pandemic; and

**WHEREAS**, on March 14, 2020, the City Manager, as the Director of Emergency Services, issued a Proclamation of Local Emergency due to the COVID-19 pandemic, which was ratified by the City Council on March 18, 2020 by Resolution No. 2020-R015.  Such action followed the Los Angeles County Department of Public Health's (LACDPH) and the Chair of the Board of Supervisor's declarations of a local health emergency, the State of California's declaration of a State of Emergency on March 4, 2020, and the declaration of a National Emergency on March 13, 2020; and

**WHEREAS**, after issuing local health emergency declarations, the County of Los Angeles, with guidance from the State of California, issued public health orders requiring the closure or modified operations of numerous business sectors, and ordered the general public to stay 'safer at home', except to provide essential services and to engage in essential activities, to mitigate the spread and the effects of COVID-19; and

**WHEREAS**, hospital operations were determined to be part of the essential infrastructure, and hospital workers were identified to be essential workers who continued to report to work throughout the pandemic and work long hours to serve their communities, despite the ongoing health hazard of being exposed to COVID-19; and

-1-

**WHEREAS**, on May 14, 2021, the LACDPH issued an amended order with modified restrictions, based on, among other things, the following determinations: evidence of continued community transmission of COVID-19 within the County; asymptomatic transmission has been documented; evidence that a significant portion of the County population continues to be at risk for infection with serious health complications, including hospitalizations and death from COVID-19, due to age or pre-existing health conditions; and further evidence that other County residents, including younger and otherwise healthy people, are also at risk for serious negative health outcomes and for transmitting the virus to others. The City Council acknowledges that these conditions exist; and

**WHEREAS**, according to the LACDPH, as of May 6, 2021 over 10,000 Hospital Workers have been infected with COVID-19. As of May 6, 2021 hospitals continue to report the highest proportion of overall employee infection among all healthcare worker and first responder settings, and nurses continue to face the highest risk of infection among all healthcare workers and first responders in Los Angeles County, totaling approximately five times as many reported cases as the next occupation with the highest number of reported cases; and

**WHEREAS,** according to the LACDPH, the vast majority of known exposures among COVID-19 positive healthcare workers and first responders occurred in a healthcare setting, reflecting the continued dangers and risks faced by Hospital Workers; and

**WHEREAS,** while existing community transmission of COVID-19 is at a lower level, it continues to present a substantial and significant risk of harm to the health of County residents and workforce. Only 43.5% of people over the age of 16 in Los

-2-

Angeles County are fully vaccinated against COVID-19, leaving the majority of the population susceptible to infections. Further, according to the LACDPH, as of May 14, 2021 there remains a strong likelihood that increased interactions among members of the public who are not fully vaccinated against COVID-19 may result in an increased number of cases of community transmission. Making the community transmission problem worse, some individuals who contract the virus causing COVID-19 have no symptoms or only mild symptoms, and so are unaware that they carry the virus and are transmitting it to others. As the LACDPH concluded, as of May 14, 2021, the public health emergency and attendant risks to public health associated with COVID-19 still predominate despite the availability of the vaccine; and

WHEREAS, Hospital Workers in Culver City put themselves and their families at increased risk every day to care for patients with COVID-19 and are facing now and will face substantial risk and burden over the coming weeks and months; and

WHEREAS, caring for COVID-19 patients may also take an emotional toll on Hospital Workers, who often serve as family surrogates for very ill or dying patients and must bear the stress of record hospitalizations, declining caregiver-to-patient ratios, longer work shifts and deferred time off; and

WHEREAS, in 2021 the Centers for Disease Control and Infection (CDC) has reported that multiple COVID-19 variants are circulating globally that appear to spread more quickly and easily than other variants. Variants are present in Los Angeles County, and the efficacy of vaccines against these new variants remains under investigation. While the impact of these variants is not fully known, other nearby states including Oregon, Nevada, Utah, and Arizona are experiencing a recent increase in case and hospitalization rates. As COVID-19 cases continue to spread throughout the region,

-3-

Hospital Workers continue to face health threats, including the threat from the potentially more contagious variants of the coronavirus that have been detected in California; and

**WHEREAS,** despite the availability of vaccines, the existence of vaccine hesitancy individuals, vaccine refusal, and age and health conditions that prevent vaccination mean that Hospital Workers will still be required to interface with and treat individuals who have not been vaccinated over the coming weeks and months; and

**WHEREAS,** according to a study by the Urban Institute, a nonprofit health policy center, more than one-third of adults between the ages of 18 and 64 have forgone or delayed medical care because of COVID-19. Even as community transmission of COVID-19 declines, this pent-up demand for healthcare will place a substantial burden on Hospital Workers; and

**WHEREAS,** even with growing percentages of the public becoming vaccinated against COVID-19, Hospitals Workers still face increased risks and burdens due to the fact that their employment requires them to work directly and over longer periods of time with those with symptomatic COVID-19, as well as asymptomatic carriers and those at higher risk of being asymptomatic carriers, including individuals who have not or cannot take the vaccine; and

**WHEREAS**, as the CDC has recognized, some individuals with COVID-19 experience symptoms and require healthcare services for an extended period of time, a phenomenon termed "Long Haul COVID;" "Long Haul COVID" may continue to place a strain on the healthcare system and Hospital Workers for a substantial period of time; and

**WHEREAS,** as the CDC has recognized, there is limited data on vaccine protection in people who are immunocompromised. Hospital Workers'

-4-

employment requires them to treat and interface with people with immunocompromising conditions; and

        **WHEREAS,** in recognition of the heightened risks facing Hospital Workers and those they treat, the recently relaxed masking guidelines released by the CDC still call for wearing masks in, among other places, hospitals; and

        **WHEREAS,** according to the U.S. Occupational Safety and Health Administration (OSHA), worker classifications which have a "Very High Exposure Risk" to COVID-19 includes jobs with a very high potential for exposure to known or suspected sources of COVID-19 during specific medical, postmortem, or laboratory procedures; and

        **WHEREAS,** examples of workers in the Very High Exposure Risk category include healthcare workers such as nurses and emergency medical technicians performing aerosol-generating procedures (e.g., intubation, cough induction procedures, bronchoscopies, or invasive specimen collection) on known or suspected COVID-19 patients; and healthcare or laboratory personnel collecting or handling specimens from known or suspected COVID-19 patients (e.g., manipulating cultures from known or suspected COVID-19 patients); and

        **WHEREAS,** OSHA further identifies "High Exposure Risk" worker classifications as those with jobs with a high potential for exposure to known or suspected sources of COVID-19, and this classification includes healthcare delivery and support staff (including hospital staff who must enter patients' rooms) exposed to known or suspected COVID-19 patients, and those persons who have frequent or sustained contact with coworkers, including under close working conditions indoors or in poorly ventilated spaces; and

**WHEREAS**, through this Ordinance, the City seeks to compensate essential Hospital Workers for their daily sacrifices and the ongoing risks and burdens they and their families face while providing vital services to the community during the pandemic and in the coming weeks and months; and

**WHEREAS**, by requiring premium hazard pay for their work during the COVID-19 pandemic, the City aims (1) to protect the health and welfare of its essential Hospital Workers, their families, and the community; (2) to recognize and compensate Hospital Workers for the risks and burdens they face every day and will continue to face in the coming months; (3) support stable incomes among Hospital Workers; and (4) promote job retention by ensuring Hospital Workers are adequately compensated for the substantial risks, efforts, and expenses they are undertaking to provide essential services in a safe and reliable manner.

**NOW THEREFORE**, the City Council of the City of Culver City, California, **DOES HEREBY ORDAIN** as follows:

**SECTION 1: DEFINITIONS.**

The following  definitions shall apply to this Ordinance:

A.    "**City**" means the City of Culver City.

B.    "**Covered Hospital**" means any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the geographical borders of the City.

C.    "**Employer**" means any person, as defined in Section 18 of the California Labor Code, including any person, who directly or indirectly or through an agent or any other person, including through the services of a

-6-

temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Hospital Worker.

D.      "**Hospital Worker**" means any individual  providing direct patient care and services supporting patient care at a Covered Hospital, including, but not limited to, clinicians, nurses, aides, technicians, janitorial and housekeeping staff, security guards, food services workers, laundry workers, pharmacists, and nonmanagerial administrative staff, but does not include any exempt manager or an individual performing exclusively managerial or supervisory functions, or any physician or surgeon licensed by the State of California pursuant to Chapter 5 of Division 2 of the Business and Professions Code.

E.      "**Premium Hazard Pay**" means additional compensation owed to an Employee in addition to the Employee's other compensation, including, but not limited to, salaries, wages, tips, overtime, commissions, piece rate, bonuses rest breaks, paid leave, and reimbursement for expenses.

**SECTION 2.  PREMIUM HAZARD PAY FOR HOSPITAL WORKERS.**

A.      Hospital Workers shall be entitled to no less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer.  If an Employer already provides hourly Premium Hazard Pay as of the effective date of this Ordinance, such compensation may be credited as part of the additional five dollars per hour required by this section.

-7-

In no event shall any Premium Hazard Pay provided prior to the effective date of this Ordinance be credited as part of the compensation due under this section.

B.      Hospital Workers entitled to Premium Hazard Pay include Hospital Workers employed directly by a Covered Hospital and Hospital Workers who are contracted to work at the Covered Hospital through another Employer.

C.      A Covered Hospital shall reimburse any contracted Employer for Premium Hazard Pay pursuant to this Ordinance.

**SECTION 3:  RETALIATORY ACTION PROHIBITED.**

No Covered Hospital or Employer shall discharge, reduce in compensation, or otherwise discriminate against any Hospital Worker for opposing any practice proscribed by this Ordinance, for requesting the additional compensation owed under this Ordinance, for participating in proceedings  related to this Ordinance, for seeking to enforce his or her rights under this Ordinance by any lawful means, or for otherwise asserting rights under this Ordinance.

**SECTION 4:  ENFORCEMENT.**

Any Hospital Worker aggrieved by a violation of this Ordinance may bring a civil action in a court of competent jurisdiction against the Employer violating this Ordinance. An Employee, upon prevailing, shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation, including, without limitation, the payment  of any wages unlawfully withheld and/or injunctive relief, and shall be awarded  attorney's fees and costs.

-8-

**SECTION 5: EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT**

All of the provisions of this Ordinance, or any part thereof, may be expressly waived in a collective bargaining agreement, but only if the waiver is explicitly set forth in the agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute a waiver of all or any of the provision of this Ordinance.

**SECTION 6:  NO WAIVER OF RIGHTS.**

Except for a collective bargaining agreement provision made pursuant to Section 5, any waiver by an Employee of any or all of the provisions of this Ordinance shall be deemed contrary to public policy and shall be void and unenforceable.

**SECTION 7:  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR DEPRIVATIONS OF PROTECTED RIGHTS.**

The provisions of this Ordinance are in addition to or independent of any other rights remedies, or procedures  available under any other law and do not diminish, alter, or negate any other legal rights, remedies, or procedures  available to an Employee.

**SECTION 8:  CONFLICTS**

Nothing in this Ordinance shall be interpreted or applied to create any power or duty in conflict with any federal or state law.

*///*

-9-

**SECTION 9:  RULES AND REGULATIONS.**

The City Manager or their designee shall promulgate Rules and Regulations that will be updated when necessary consistent with this Ordinance for further clarification of the provisions of this Ordinance if warranted.  The Rules and Regulations shall be posted on the City's website.

**SECTION 10:  SUNSET**

This Ordinance shall expire 120 days after the effective date of this Ordinance. The City will continue to monitor COVID-19 indicators to assess the impact of the disease and may rescind this Ordinance before the full 120 days elapses if evolving conditions render it advisable to do so.

**SECTION 11.  ENVIRONMENTAL DETERMINATION.**   The City Council finds that this Ordinance is not subject to the California Environmental Quality Act ("CEQA") pursuant to CEQA guidelines, California Code of Regulations, Title 14, Chapter 3, §15060(c)(2) [the activity will not result in a direct or reasonably foreseeable indirect physical change in the environment] and §15060(c)(3) [the activity is not a project as defined in §15378] because it has no potential for resulting in physical change to the environment, directly or indirectly.

**SECTION 12.   EFFECTIVE DATE.** Pursuant to Section 619 of the City Charter, this Ordinance shall take effect thirty (30) days after its adoption.

-10-

**SECTION 13.   SEVERABILITY.**   The provisions of this Ordinance are declared to be separate and severable. The City Council hereby declares that, if any provision, section, subsection, paragraph, sentence, phrase, or word of this Ordinance, or the application thereof to any covered hospital, employer, hospital worker, person, or circumstance, is rendered or declared invalid or unconstitutional by any final action in a court of competent jurisdiction or by reason of any preemptive legislation, then the City Council would have independently adopted the remaining provisions, sections, subsections, paragraphs, sentences, phrases, words or applications of this Ordinance and as such they shall remain in full force and effect.

**SECTION 14.  PUBLICATION.**  Pursuant to Sections 616 and 621 of the City Charter, prior to the expiration of fifteen (15) days after the adoption, the City Clerk shall cause this Ordinance, or a summary thereof, to be published in the Culver City News and shall post this Ordinance or a summary thereof in at least three places within the City.

APPROVED and ADOPTED this _____day of _____ 2021.

_____
ALEX FISCH, MAYOR
City of Culver City, California

ATTEST:                                     APPROVED AS TO FORM:

_____        _____
JEREMY GREEN            ,           CAROL A. SCHWAB
City Clerk                                    City Attorney

-11-

Exhibit A, Page 85

# EXHIBIT "B"

# EXHIBIT "B"





# 2021 COVID-19 Pay Practices & Policies Pulse Survey



FUTURESENSE®

Prepared by FutureSense, LLC

01/29/2021

# COVID-19 Pay Practices & Policies Pulse Survey

## INTRODUCTION

This COVID-19 Pay Practices & Policies Pulse Survey has been run again to get a sense of how pay practices, policies and strategies have evolved and been affected by the current pandemic, and what organizations are doing to address any concerns that may be arising or on-going as a direct result. The Hospital Association of Southern California ("HASC") and FutureSense, LLC ("FutureSense") sponsored this survey. All participants were provided with the survey results. **Data effective date is 1/1/21** unless noted otherwise

Thank you to those who participated, and we hope everyone stays safe and healthy!

**Important Notice:** Nothing in this survey constitutes legal advice and Allied for Health sponsors and project managers assume no responsibility, legal or otherwise, for the outcome of decisions, contracts, commitments, or other obligations or outcomes made on the basis of this survey. Allied for Health sponsors and project managers also assume no responsibility for the use or misuse of this survey by anyone, including survey participants or other parties or individuals who obtain information from this survey. Any analysis should be considered more in terms of trends and general direction rather than absolute reliance on exact amounts.

**Distribution Policy:** These reports are confidential and proprietary. They are only distributed to members of the California Hospital Association. As a condition to receiving these reports, members agree that they will not reproduce or copy any portion of these reports in any manner and will not distribute, provide, or publish in any manner these reports to any other person or entity without the express written permission of the association.

FUTURESENSE®

Exhibit B, Page 88

# COVID-19 Pay Practices & Policies Pulse Survey

## Summary of Survey Results

➢ **73 California healthcare organizations**, representing **172 individual facilities**, participated in the survey.

➢ **58** out of **73** respondents (**79%**) stated that they **are not offering "Hazard Incentive Pay"** (additional pay offered to employees who are working during the pandemic) to their employees because of the pandemic. This represents **125 individual facilities**.



FUTURESENSE®

P a g e **3 | 34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

- Of those **15** respondents (representing **47 facilities**) who indicated that they **are offering "Hazard Pay"**, some types of pay include the following:

  o Must work on a COVID unit floor or directly with a COVID positive patient.

  o Restricted to direct patient care employees in COVID units which include RNs, Respiratory Therapists, LVNs and CNA's.

  o $5.00 per hour differential for working on a COVID unit, up to a $225 bonus to work an extra shift after you have completed your scheduled shifts for the week.

  o All employees received a one-time COVID Hazard Pay bonus based on hours worked during the pandemic.

FUTURESENSE®

# COVID-19 Pay Practices & Policies Pulse Survey



- Of those **15** respondents (representing **47 facilities**) who indicated that they **are offering "Hazard Pay";**

  o **7 respondents (7 facilities)** are offering **a flat dollar amount added to the base rate,** with an average amount of **$7.00/hr.**

  o **1 respondent (1 facility)** is offering **a percentage of the base hourly rate,** which is **50%.**

  o **7 respondents (32 facilities)** are offering **other types of incentive pay,** which include:

    ▪ $2.00 per hour worked

    ▪ 1.5 times regular rate of pay for a declared emergency

    ▪ 2x the hourly rate

    ▪ $110/hour COVID rate as an incentive to pick up vacant shifts, instead of using Registry/Travelers

    ▪ OT rate

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

- Of the **58** respondents who are **not offering "Hazard Pay"**, **54 (151 facilities)** or **93%**, said they are **not considering offering it in the future.**



FUTURESENSE®

Page **6 | 34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **42** respondents, representing **122 individual facilities**, indicated that they have **changed their current pay practices and/or policies, or have developed some new pay practices, or polices (other than Hazard Pay)**, to address the pandemic.



FUTURESENSE®

Page **7** | **34**

www.futuresense.com

Exhibit B, Page 93

# COVID-19 Pay Practices & Policies Pulse Survey

- Of the **42** respondents who indicated they **have changed current pay practices and/or policies, 9 (21%)** respondents (**13 facilities**) indicated that **all employees are eligible** for these new pay practices and policies.
- **33 (79%)** respondents (**109 facilities**) indicated that these **new practices and/or policies are restricted to a particular group.**
  - o Those groups typically include CNAs, Housekeeping, LVNs, Respiratory Therapists, RNs, Support Personnel, or anyone who works in a COVID-19 unit.



FUTURESENSE®

P a g e  **8 | 34**

www.futuresense.com

Exhibit B, Page 94

# COVID-19 Pay Practices & Policies Pulse Survey

- Of the **32** respondents (**50 facilities**) who **have not changed their pay policy to address the COVID-19 pandemic, 4** respondents (**5 facilities) are considering implementing changes and/or developing new pay practices or policies to address the COVID-19 pandemic in the future.**
  - o Some of those potential pay practices and polices include:
    - ▪ Supplemental Sick Leave after December 31st, 2020
    - ▪ Creating a policy that allows the hospital to implement crisis pay when specific variables are met (i.e., pandemic, natural disaster, etc.)
    - ▪ Adding an ICU retention bonus

FUTURESENSE®

P a g e **9 | 34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

- When asked if their organization has **temporarily modified their current annual compensation planning process** (i.e., market, merit, budgeting) because of the COVID-19 pandemic, **18 (25%)** respondents (**62 facilities**) said they have; **55 (75%)** respondents (**113 facilities**) have not.



FUTURESENSE®

Page **10 | 34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

- Of those **55** respondents who indicated that they **have not made any changes to practices and/or policies, 3 (6%)** respondents (**5 facilities**) **will modify** their planning process in the next fiscal year.



FUTURESENSE®

www.futuresense.com

P a g e **11 | 34**

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **None of the respondents** have created and offered **new weekend bonuses,** because of the pandemic, **to incentivize staff to sign up or pick up weekend shifts.**

➢ **4 (5%)** respondents **(6 facilities)** said that they have created and offered **new shift differentials,** because of the pandemic, **to incentivize staff to sign up or pick up weekend shifts.**

　　o Some common positions that received these new differentials are:

　　　　▪ LVNs, Nursing Practitioners, Occupational Therapists, Pharmacists, Pharmacy Technicians, Radiologic Technologists, Respiratory Care Practitioners, and RN's both Staff and in Specialties.

FUTURE**SENSE**®

P a g e **12 | 34**

Exhibit B, Page 98

# COVID-19 Pay Practices & Policies Pulse Survey

⚔ **0** respondents indicated that they **have developed a new weekend shift program for nursing staff**, directly because of the COVID-19 pandemic, to address staffing shortfalls during weekend shifts.



FUTURESENSE®

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➤ **18** respondents (**54 facilities**) indicated that they **have started providing a flat bonus amount as an incentive for employees to work extra shifts to meet staffing needs caused by the COVID-19 pandemic.**

- Some of the most common positions that are being offered this flat bonus include;
  - o CNAs, LVNs, Pharmacy Techs, Respiratory Care/Therapists, and RNs.

- Some of the average flat bonus amounts offered range from $90 to $500.

FUTURESENSE®

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

⟩ **14** respondents (**42 facilities**) indicated that they **have started providing an extra shift differential as an incentive for employees to work extra shifts to meet staffing needs caused by the COVID-19 pandemic.**

- Some of the most common positions that are being offered this flat bonus include;
  - ○ CNAs, LVNs, Patient Care Techs, Pharmacists, Respiratory Care/Therapists, and RNs.

- The average shift differential amounts offered range from as low as $5.00 to as high as $80.32.

FUTURESENSE®

P a g e **15** | **34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **17** respondents (**23%**) (**71 facilities**) **have made changes to their employee benefits program** directly because of the COVID-19 pandemic.

• The main components of the benefits programs that have been changed include: (multiple responses were accepted)





P a g e **16 | 34**

www.futuresense.com

Exhibit B, Page 102

# COVID-19 Pay Practices & Policies Pulse Survey

- Some of the "other" responses include the following:
  - o Additional or more robust Employee Assistance Program.
  - o Up to 80 hours Emergency Paid Administrative Leave.
  - o Removed access restrictions.
  - o Extended days available, increased maximum accrual amount.
  - o Added virtual mental health support option.
  - o A supplemental admin leave due to COVID has been provided to all staff, up to 128 hours.
  - o Added a Staff Day Care on-site facility. Provide childcare reimbursement due to childcare difficulties in many communities.
  - o Supplemental +80 hours PTO if associates go below 0. +80 hours sick leave for COVID.
  - o Offered enhanced sick leave for COVID related care.
  - o Allowed employees to go into the negative for vacation balances.



FUTURESENSE®

P a g e **17** | **34**

www.futuresense.com

Exhibit B, Page 103

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **40** respondents (**121 facilities**) **will continue** to offer **Supplemental COVID-19 Sick Pay** after the December 31st, 2020 expiration date.

➢ **33** respondents (**51 facilities**) will **not continue** to offer **Supplemental COVID-19 Sick Pay** after the December 31st, 2020 expiration date.





FUTURESENSE®

P a g e **18 | 34**

www.futuresense.com

Exhibit B, Page 104

# COVID-19 Pay Practices & Policies Pulse Survey

- Of those **40** respondents who **will continue** to offer **Supplemental COVID-19 Sick Pay, 17** respondents (**43%**) (**35 facilities**) have a set end date for this form of pay.



FUTURESENSE®

P a g e **19 | 34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ To determine **eligibility for COVID-19 related Supplemental Paid Sick Leave payments,** respondents selected from these four categories:

- Respondents were able to select multiple responses.





# COVID-19 Pay Practices & Policies Pulse Survey

- Some of the "other" responses include the following:
  - o Employee Heath determines eligibility.
  - o As outlined by the Labor Commissioner.
  - o Employee expresses symptoms or informs their supervisor that they are ill.
  - o Follow state guidelines.
  - o No documentation requires/Use the honor system.
  - o Through Reasonable Accommodations process.
  - o We have not required for Protected Health Information reasons; they only need to designate. If it is an actual leave, they will follow the regular leave process and provide documentation as needed.

FUTURESENSE®

P a g e **21** | **34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ Only **1** respondent (**1 facility**) has offered temporary hourly increases to **Registered Nurses** for working in a "COVID-19 unit".



FUTURESENSE®

P a g e  **22** | **34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **39 respondents (97 facilities)** have turned to a **third-party staffing agency** specifically to address their COVID-19 staffing needs for Registered Nurses, Patient Care Technicians, Respiratory Therapists, and other positions.



FUTURESENSE®

P a g e **23 | 34**

www.futuresense.com

Exhibit B, Page 109

# COVID-19 Pay Practices & Policies Pulse Survey



- For organizations using **third-party staffing agencies** to address COVID-19 staffing needs, the number of respondents, the average base hourly rates (where displayable) and the average percentage increases (where displayable) in hourly rates from 9/1/2020 to 1/1/2021 are provided below:

| Position | Yes | | No | | Avg base hourly rate | Avg % increase from 9/1/20 to 1/1/21 |
| --- | --- | --- | --- | --- | --- | --- |
| | # | % | # | % | | |
| Patient Care Technicians | 4 | 17% | 20 | 83% | $35.33 | 55% |
| Registered Nurses | 37 | 88% | 2 | 13% | $124.24 | 54% |
| Respiratory Therapists | 9 | 38% | 15 | 63% | $100.89 | 52% |
| Other Positions | 4 | 17% | 20 | 83% | $74.00 | 39% |

- The **"Other Positions"** reported include: CNA's, Dietitians, Environmental Services Associates, Housekeeping Aides, Laboratory, LVN's, Pharmacy, and Radiology.

FUTURESENSE®

Exhibit B, Page 110

# COVID-19 Pay Practices & Policies Pulse Survey

- **20** respondents (**48 facilities**) are **hiring inexperienced nurses or nurse interns** to address the **shortage of nurses** who may be taking jobs as **traveling nurses** to locations that are **offering higher pay.**



FUTURESENSE®

P a g e **25** | **34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **22** respondents (**53 facilities**) are **supplementing their employees' Short-Term Disability Insurance payments** when they are removed from work due to suspicion of contracting COVID-19 at work, and **if they are already on Short Term Disability Insurance.**





P a g e **26** | **34**

www.futuresense.com

Exhibit B, Page 112

# COVID-19 Pay Practices & Policies Pulse Survey

➢ Similarly, **24 (18%)** respondents (**61 facilities**) are **providing additional pay or benefits to employees** who are quarantined due to a family member being suspected of having COVID-19 or testing positive for COVID-19.

● Common responses include: Supplemental COVID Pay, Supplemental Sick Pay, up to 80 hours Emergency Paid Administration, and PTO or COVID time off bank hours.



FUTURESENSE®

P a g e **27 | 34**

www.futuresense.com

Exhibit B, Page 113

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **36** respondents (**49%**) (**88 respondents**) offer **COVID-19 Quarantine Leave Pay.**

➢ **37** respondents (**51%**) (**84 respondents**) do not offer **COVID-19 Quarantine Leave Pay.**

- (That is when an employee, following screening by Employee Health, is deemed to require home quarantine, up to 80 hours of COVID-19 Quarantine Leave Pay can be used within the first 14 days. If the EE tests positive during the home quarantine, the pay code switches to Extended Sick Leave because there is now a bona-fide sickness.)





Page **28** | **34**

www.futuresense.com

Exhibit B, Page 114

# COVID-19 Pay Practices & Policies Pulse Survey

⋏ **12** respondents (**42 facilities**) **do offer** childcare subsidies to their employees.

⋏ **61** respondents (**130 facilities**) **do not offer** childcare subsidies to their employees.



FUTURESENSE®

P a g e **29** | **34**

www.futuresense.com

# COVID-19 Pay Practices & Policies Pulse Survey

➢ The respondents indicated that the following positions/roles are the ones **taking temperatures or screening visitors** coming into their facilities (multiple responses per facility were accepted).



FUTURESENSE®

www.futuresense.com

P a g e  **30 | 34**

# COVID-19 Pay Practices & Policies Pulse Survey

➢ **11** respondents (**35 facilities**) indicated that they are in **dire need of hiring** or **looking to hire staff to administer the COVID-19 vaccine.**

● The most common positions that are actively being sought out are LVNs, Medical Assistants, and RNs.



FUTURESENSE®

P a g e **31 | 34**

www.futuresense.com

Exhibit B, Page 117

# COVID-19 Pay Practices & Policies Pulse Survey

The Hospital Association of Southern California is a not-for-profit 501(c)(6) regional trade association. HASC is dedicated to effectively advancing the interests of hospitals in Los Angeles, Orange, Riverside, San Bernardino, Santa Barbara, and Ventura counties.

Contact Teri Hollingsworth at thollingsworth@hasc.org with any questions pertaining to this survey.

FutureSense is a management consulting and professional services firm. We specialize in people strategies and organizational solutions that drive performance.

Contact Ben Teichman at ben@futuresense.com with any questions pertaining to this survey or any compensation related matters.

FUTURESENSE®

www.futuresense.com

Page **32** | **34**

# COVID-19 Pay Practices & Policies Pulse Survey



FUTURESENSE®

## PARTICIPANT LIST

- Adventist Health
- AHMC Healthcare Inc.
- Alhambra Hospital Medical Center
- Arrowhead Regional Medical Center
- Avanti Hospitals
- Bakersfield Heart Hospital
- Barton Health
- Beverly Hospital
- California Rehabilitation Institute
- Casa Colina Hospital
- Catalina Island Medical Center
- Cedars-Sinai Medical Center
- Children's Hospital Los Angeles
- Children's Hospital Orange County
- College Hospital Cerritos
- College Hospital Costa Mesa
- College Medical Center
- Community Medical Centers
- Cottage Health

- Eastern Plumas Health Care
- El Camino Hospital
- Emanate Health System
- Enloe Medical Center
- Fairchild Medical Center
- Good Samaritan Hospital
- Henry Mayo Newhall Hospital
- Hoag Hospital
- Huntington Hospital
- John Muir Health
- Kaiser Permanente Southern California
- Keck Medicine of USC
- Kern County Hospital Authority
- Lompoc Valley Medical Center
- Madera Community Hospital
- Mammoth Hospital
- Marin Health Medical Center
- Marshall Medical Center
- Martin Luther King, Jr. Community Hospital

Exhibit B, Page 119

# COVID-19 Pay Practices & Policies Pulse Survey


FUTURESENSE®

- Mayer's Memorial Hospital District
- MemorialCare Health System
- Montage Health
- Mountain Communities Healthcare District
- Natividad Medical Center
- Orange County Global Medical Center
- Pacifica Hospital of the Valley
- Palomar Health
- PIH Health
- Pioneers Memorial Healthcare District
- Pomona Valley Hospital Medical Center
- Prospect Medical Holdings
- Rady Children's Hospital
- Riverside University Health System- Medical Center
- Salinas Valley Memorial Healthcare System
- San Antonio Regional Hospital
- San Bernardino Mountains Community Hospital
- San Gorgonio Memorial Hospital
- Seneca Healthcare District
- Sharp HealthCare

- Shriners Hospitals for Children Northern California
- Sierra View Medical Center
- Sonoma Valley Hospital
- St. Agnes Medical Center
- Surprise Valley Health Care District
- Tahoe Forest Hospital
- Tri-City Healthcare District
- UC Davis Health
- UCSF Benioff Children's Hospital Oakland
- Universal Health Services, Southern California
- University of California, San Diego, Health
- Valley Children's Healthcare
- Ventura County Medical Center/Santa Paula Hospital
- Vibra Healthcare
- Washington Hospital Healthcare System

Exhibit B, Page 120

# EXHIBIT "C"

# EXHIBIT "C"

| | |
|---|---|
| **From:** | Maky Peters <mpeters@seiu-uhw.org> |
| **Sent:** | Thursday, February 11, 2021 3:43 PM |
| **To:** | Lee, Daniel |
| **Subject:** | Op-Ed Draft |
| **Attachments:** | SCHCC Op-Ed - shortened.docx; 02-10-2021 Culver City Hero Pay Ordinance Draft.docx |
| | |
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Flagged |

Vice Mayor Lee,

Thanks so much for your patience, our Op-Ed had to go through several hands before getting approved but it has finally been cleared to share with you. I fully expect you will have your own edits. My original draft was about 1400 words and I was informed that most outlets won't run an Op-Ed longer than around 600-800 words so, not everything we discussed was included in here. Feel free to change this in whatever way you see fit. Tried to capture your voice but of course, you will have to be the final judge of that! I look forward to your feedback on this and happy to continue to work on it if need be.

I wanted to float another idea, that is passing an ordinance around Heroes Pay. Curious to get your thoughts on this and likelihood of support from other councilmembers. Long Beach recently passed a similar ordinance for grocery workers and LA City council has recently moved to pass a version of this as well. Our research team put together a draft of what this might look like, using language that reflects the way ordinances out of Culver City typically look.

Let me know if you might have some time to chat about this tonight or tomorrow!

Hope to hear from you soon.

Best,

Maky Peters
Regional Political Organizer
SEIU – United Healthcare Workers West
(323) ██████ | mpeters@seiu-uhw.org

# DRAFT

### ORDINANCE NO. 2021____

AN <mark>URGENCY ORDINANCE</mark> OF THE CITY OF CULVER CITY, CALIFORNIA ADDING CHAPTER 8.24 TO THE CITY OF CULVER CITY MUNICIPAL CODE TO REQUIRE COVERED HOSPITALS TO PAY ESSENTIAL HOSPITAL WORKERS AN ADDITIONAL FOUR DOLLARS <mark>($4.00)</mark> PER HOUR IN HAZARD PAY DURING THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC.

**NOW THEREFORE,** the City Council of the City of Culver City, California, **DOES HEREBY ORDAIN** as follows:

**SECTION 1.    FINDINGS.**    The City Council of the City of Culver City hereby determines and declares that:

A.  Since February 2020, the City of Culver City has been part of a coordinated response to the novel coronavirus (COVID-19) pandemic, including working with and supporting the efforts of the federal Centers for Disease Control and Prevention, the California Department of Public Health, and the Los Angeles County Department of Public Health to take appropriate measures to protect the health and safety of the people of Culver City;

B.  Pursuant to the authority granted by Culver City Municipal Code Section 3.09.020, on March 14, 2020, the City Manager, as the Director of Emergency Services, issued a Proclamation of Local Emergency due to the outbreak and spread of COVID-19, which was ratified by the City Council on March 18, 2020. Such action followed the Los Angeles County Department of Public Health's and the Chair of the Board of Supervisors' declaration of a local health emergency and the State of California's declaration of a State of Emergency on March 4, 2020, and the President's declaration of a National Emergency on March 13, 2020;

C.  Essential Hospital Workers in Culver City put themselves and their families at increased risk every day to care for patients with COVID-19. Essential Hospital Workers in California have suffered over 80,000 documented infections and over 300 deaths from COVID-19, totals that increase daily;

1

# DRAFT

E.  Caring for COVID-19 patients may also take an emotional toll on Essential Hospital Workers, who often serve as family surrogates for very ill or dying patients and must bear the stress of record hospitalizations, declining caregiver-to-patient ratios, longer work shifts and deferred time off; and

H.  A hazard pay premium for Essential Hospital Workers in Culver City justly compensates for the unique burdens and risks borne by these professionals during the COVID-19 pandemic and helps to retain an essential and overextended workforce.

**SECTION 2.**      **URGENCY MEASURE.**  Based on the findings set forth in Section 1, the City Council finds and declares that requiring Covered Hospitals to issue Hazard Pay to Essential Hospital Workers is necessary for the immediate preservation of the public health, safety, and welfare, and upon that basis has determined that an urgency measure, pursuant to Government Code Section 36937(b) and Culver City Charter Section 614, is warranted and shall take effect immediately upon adoption by a four-fifths vote of the City Council.

**SECTION 3.**      **EMERGENENCY ESSENTIAL HOSPITAL WORKER HAZARD PAY.**      A new Chapter 8.24 is added to the City of Culver City Municipal Code as follows:

**8.24.010.**      **Title.**

This Chapter shall be known as the "Hospital Heroes Hazard Pay Ordinance."

**8.24.020.**      **Authority.**

This Chapter is adopted pursuant to the powers vested in the City of Culver City under the laws of the State of California, including but not limited to, the police powers vested in the City pursuant to Article XI, Section 5 of the California Constitution, California Labor Code section 1205(b), and the Charter of the City of Culver City.

**8.24.030.**      **Definitions.**

2

DRAFT

The definitions set forth in this Section shall govern the construction and meaning of the terms used in this Chapter:

A.  "Base Wage" means the hourly wage paid to Essential Hospital Workers as of the effective date of this Chapter less Hazard Pay owed under this Ordinance.

B.  "Covered Hospital" means any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the borders of the City.

C.  "City" means the City of Culver City.

D.  "Employer" means any person, as defined in Section 18 of the California Labor Code, including any Person, who directly or indirectly or through an agent or any other person, including through the services of a temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Essential Hospital Worker.

E.  "Essential Hospital Worker" means any individual performing work at a Covered Hospital, but does not include any individual performing exclusively managerial or supervisory functions, or any individual earning regular pay in an amount greater than $_____ annually, or any physician or surgeon licensed by the state pursuant to Chapter 5 of Division 2 of the Business and Professions Code.

**8.24.040.    Payment of Hazard Pay to Essential Hospital Workers**

A.  In addition to all other compensation due, Employers shall pay Essential Hospital Workers hazard premium pay in the amount of $4.00 per hour for each hour worked at the Covered Hospital.

B.  Hazard Pay shall not be considered part of the Essential Hospital Worker's regular rate of pay or compensation.

C.  It shall be a violation of this Chapter for any Covered Hospital or other Employer to reduce an Essential Hospital Worker's compensation or hours so as to prevent, in whole or in part, a worker from receiving hazard premium pay at a rate of $4.00 per hour for each hour worked at a Covered Hospital.

3

# DRAFT

**D.** The hazard premium pay mandates imposed by this Chapter shall expire with the expiration of the Governor's Declaration of the State of Emergency related to the threat of COVID-19.

**8.24.050.**      **Prohibitions**

A. It shall be unlawful for a Covered Hospital or any other Employer to interfere with, restrain, or deny the existence of, or the attempt to exercise any rights protected under this Chapter.

B. Covered Hospitals and other Employers shall not take retaliatory action or discriminate against any Essential Hospital Worker or former Essential Hospital Worker because the individual has exercised rights protected under this Chapter. Such rights include, but are not limited to, the right to request hazard pay pursuant to this Chapter; the right to file a complaint with the City or inform any person about a Covered Hospital's alleged violation of this Chapter; the right to participate in an investigation, hearing or proceeding or cooperate with or assist the City in its investigations of alleged violations of this Chapter; and the right to inform any person of their rights under this Chapter. Protections of this Chapter shall apply to any Essential Hospital Worker who mistakenly, but in good faith, alleges noncompliance with this Chapter. Taking adverse action against an Essential Hospital Worker, including lowering Essential Hospital Worker's Base Wage or reducing an Essential Hospital Worker's scheduled hours, within 90 days of the Essential Hospital Worker's exercise of rights protected under this Chapter, shall raise a rebuttable presumption of having done so in retaliation for the exercise of such rights.

**8.24.060**      **Enforcement**

A violation of this Chapter may be enforced under the Culver City Municipal Code.

**8.24.070**      **Other Laws**

4

DRAFT

All rights and remedies provided by this Chapter shall be in addition to and apply notwithstanding any other provision of local, state, or federal law.

**8.24.080.**     **Conflicts**

Nothing in this Chapter shall be interpreted or applied so as to create any power or duty in conflict with any federal or state law.

**8.24.090.**     **Severability**

If any provision in this Chapter or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this Chapter that can be given effect without the invalid provision or application, and to this end the provisions of this Chapter are severable.

5

We all know that we are in the worst healthcare crisis of our lifetimes. What you may not know, however, is that the management of our local community hospital – Southern California Hospital at Culver City (SCHCC) – is making it worse. In my capacity as Vice Mayor of Culver City, I recently met with SCHCC workers, who came to me afraid for their patients' safety and their own. What they described horrified me.

They spoke of broken and missing portions of ceilings. Whenever it rains in LA, it rains in the hospital too, despite the makeshift system of plastic tubes and buckets in front of patient rooms that staff have put in place to control the leaks.

They spoke of mold blooming through the walls at a nursing station. This level of mold would be grounds to terminate a lease in a residential apartment.  To see it in any hospital – let alone one treating hundreds of COVID patients with respiratory issues – is unconscionable.

They spoke of a lobby elevator (one of only two) that has been defunct for over a year. With so many critically ill patients, waiting for the only working elevator could be a matter of life and death.

The slow decline of the formerly prestigious Brotman Hospital to SCHCC's current condition is a sad story, but unfortunately a common one. As a recent ProPublica article exposed, our community hospital's erosion fits a pattern. Across the country, private equity firms – like SCHCC's owner, Prospect Medical Holdings – have bought up local community hospitals and used their skills to extract their value while reinvesting little and saddling the facilities with ruinous debt. The firms usually sell off the crippled facilities in about five years. The fate of such hospitals is dire, if not fatal.

**Commented [TP1]:** Is it kosher to reference another publication's article in an OpEd?

Even worse, SCHCC is like many hospitals targeted by private equity firms in that it sees an overwhelming number of Medi-Cal and Medicare patients. What began as a laudable mission to treat the most underserved members of our community has been twisted into a profit generator that endangers our most vulnerable population.

But ultimately, the current sorry state of Culver City's hospital is not just dangerous for one portion of our community. It's dangerous for all of us. I am the Vice Mayor of Culver City, but I am a member of this community first. And as someone who is immunocompromised, I campaigned on the belief that every one of us has a right to quality, accessible healthcare. From what I've heard of SCHCC, it doesn't meet that standard.

My heart breaks for the SCHCC workers who have spent months caring for their patients amid this uncertainty and chaos. These healthcare heroes have risked their own lives, and those of their families. And now, they have risked their jobs to sound the alarm before someone dies as a result of Prospect Medical Holdings' predatory business model.

I call on Prospect Medical Holdings to take bold and immediate steps to repair the state of the facility at SCHCC. Our community has suffered enough losses in this healthcare crisis.

| | |
|---|---|
| **From:** | Maky Peters <mpeters@seiu-uhw.org> |
| **Sent:** | Thursday, February 11, 2021 3:29 PM |
| **To:** | McMorrin, Yasmine |
| **Subject:** | RE: Culver City Hospital - Letter to CEO |

Hi again Councilmember, wanted to circle back to see if you have had a chance to review this letter and might consider sending a version of it as well. The letters from Vice Mayor Lee and Asm. Kamlager have been sent out. We would really appreciate your support to continue to add to the list of folks pressuring the hospital to take action.

Thanks so much again,

Maky Peters
Regional Political Organizer
SEIU – United Healthcare Workers West
(323) ██████ | mpeters@seiu-uhw.org

---

**From:** Maky Peters
**Sent:** Wednesday, February 3, 2021 11:01 AM
**To:** 'yasmine-imani.mcmorrin@culvercity.org' <yasmine-imani.mcmorrin@culvercity.org>
**Subject:** Culver City Hospital - Letter to CEO

Hi Councilmember McMorrin,

Thank you for taking the time to hear about the ongoing issues at SCHCC. I have attached the letter I mentioned a few weeks back, it is the same draft that both Vice Mayor Lee and Asm. Kamlager will be sending out. The main addressee is the CEO of the hospital. Of course if you need, or want, to change any of the verbiage feel free to do that.

Looking forward to hearing your thoughts and really appreciate your bold leadership on this issue.

Best,

Maky Peters
Regional Political Organizer
SEIU – United Healthcare Workers West
(323) ██████ | mpeters@seiu-uhw.org

1

Exhibit C, Page 129

Mr. Michael Klepin
CEO, Southern California Hospital at Culver City
3828 Delmas Terrace
Culver City, CA 90232


It was recently brought to my attention by the healthcare workers in your facility that substandard working conditions have become an urgent matter of issue. After hearing the testimonies of healthcare workers at Southern California Hospital at Culver City, I felt compelled to reach out to you directly. We are living in the age of COVID-19. As an elected representative of Culver City, it behooves me to ensure our residents have access to trusted and reliable care. The fact that mold broke through the walls at a nursing station, that buckets in hallways have become normalized as a result of faulty pipes or broken ceilings is frankly, unacceptable.

Furthermore, healthcare workers have been on the frontline of this pandemic for nearly a year. They, and their families, have put their own health and safety on the line to serve this community. I am a firm believer in the rights of workers, and I feel strongly that workers deserve fair pay and safe working conditions. Essential workers have not been afforded the luxury of staying safe at home. We must do better by them, and this is all the more true during a pandemic.

During a recent meeting, workers from your facility shared with us the state of disrepair at SCHCC. To hear of a main lobby elevator that has been defunct for well over a year reflects a lack of urgency around how these conditions can impact patient care. I understand that the ongoing conversations you are having with union representatives present an opportunity to address some of these issues. It is my hope that you also recognize how healthcare workers have shown tremendous bravery in the face of overwhelming challenges. As an unequivocal supporter of labor, I call upon you to enter into your ongoing negotiations in good faith.


Respectfully,

| | |
|---|---|
| **From:** | McMorrin, Yasmine |
| **Sent:** | Tuesday, February 23, 2021 7:40 PM |
| **To:** | Maky Peters |
| **Subject:** | Fw: SCHCC |
| **Attachments:** | SCHCC Letter.pdf |

Hi Maky!

Please see below.

I hope I can make the picket tomorrow. But please direct me to social media language to support, just in case.

Warmly,
YM

---

**From:** McMorrin, Yasmine
**Sent:** Tuesday, February 23, 2021 7:28 PM
**To:** michael.klepin@altahospitals.com <michael.klepin@altahospitals.com>
**Subject:** SCHCC

Dear Mr. Klepin:

I hope this email finds you well.

Please see my letter re Southern CA Hospital Culver City attached.

Best regards,
YM

Mr. Michael Klepin
CEO, Southern California Hospital at Culver City
3828 Delmas Terrace
Culver City, CA 90232

February 23, 2021

Dear Mr. Klepin:

I am a Culver City Councilmember and it was recently brought to my attention by the healthcare workers in your facility that substandard working conditions have become an urgent matter of issue. After hearing the testimonies of healthcare workers at Southern California Hospital at Culver City, I felt compelled to reach out to you directly. We are living in the age of COVID-19. As an elected representative of Culver City, it behooves me to ensure our residents have access to trusted and reliable care. The fact that mold broke through the walls at a nursing station, that buckets in hallways have become normalized as a result of faulty pipes or broken ceilings is frankly, unacceptable.

Furthermore, healthcare workers have been on the frontline of this pandemic for nearly a year. They, and their families, have put their own health and safety on the line to serve this community. I am a firm believer in the rights of workers, and I feel strongly that workers deserve fair pay and safe working conditions. Essential workers have not been afforded the luxury of staying safe at home. We must do better by them, and this is all the more true during a pandemic.

During a recent meeting, workers from your facility shared with us the state of disrepair at SCHCC. To hear of a main lobby elevator that has been defunct for well over a year reflects a lack of urgency around how these conditions can impact patient care. I understand that the ongoing conversations you are having with union representatives present an opportunity to address some of these issues. It is my hope that you also recognize how healthcare workers have shown tremendous bravery in the face of overwhelming challenges. As an unequivocal supporter of labor, I call upon you to enter into your ongoing negotiations in good faith.

Respectfully,

Yasmine-Imani McMorrin
Yasmine-imani.mcmorrin@culvercity.org

Exhibit C, Page 132

| | |
|---|---|
| **From:** | Maky Peters <mpeters@seiu-uhw.org> |
| **Sent:** | Monday, March 22, 2021 1:47 PM |
| **To:** | McMorrin, Yasmine;Lee, Daniel;Fisch, Alex |
| **Subject:** | Culver City Hero Pay Ordinance Changes |
| **Attachments:** | 03-2021 Draft Culver City Hero Pay Ordinance_Updated.docx |

Hello All,

I heard that the Hero Pay item would be taken up this evening – that is great news! Our research team drafted an updated version of the ordinance and I was wondering if you might be able to take a look at it before the council meeting this evening. There are just a few minor changes, summarized below.

1- **Removed the pay cap on the ordinance** (to accommodate more healthcare workers)
2- The ordinance **now only covers healthcare workers** at the hospitals (doctors and management are carved out.) But note if there are any **contracted** <u>healthcare</u> workers at the hospital, they would still be covered (that is, it's not limited to employees of the hospital). The hospital would be required to reimburse the workers' actual employers for the hazard pay.

Attached is an updated copy. Looking forward to hearing feedback on what folks think about these changes. Thank you so much for moving quickly on this important issue!

Best,

Maky Peters
Regional Political Organizer
SEIU – United Healthcare Workers West
(323) ████████ | mpeters@seiu-uhw.org

ORDINANCE NO. 2021____

**AN ORDINANCE OF THE CITY OF CULVER CITY, CALIFORNIA ADDING CHAPTER 8.24 TO THE CITY OF CULVER CITY MUNICIPAL CODE TO REQUIRE COVERED HOSPITALS TO PAY HOSPITAL WORKERS AN ADDITIONAL FOUR DOLLARS ($4.00) PER HOUR IN HAZARD PAY DURING THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC.**

**NOW THEREFORE,** the City Council of the City of Culver City, California, **DOES HEREBY ORDAIN** as follows:

**SECTION 1.    FINDINGS.**    The City Council of the City of Culver City hereby determines and declares that:

A.  Since February 2020, the City of Culver City has been part of a coordinated response to the novel coronavirus (COVID-19) pandemic, including working with and supporting the efforts of the federal Centers for Disease Control and Prevention, the California Department of Public Health, and the Los Angeles County Department of Public Health to take appropriate measures to protect the health and safety of the people of Culver City;

B.  Pursuant to the authority granted by Culver City Municipal Code Section 3.09.020, on March 14, 2020, the City Manager, as the Director of Emergency Services, issued a Proclamation of Local Emergency due to the outbreak and spread of COVID-19, which was ratified by the City Council on March 18, 2020. Such action followed the Los Angeles County Department of Public Health's and the Chair of the Board of Supervisors' declaration of a local health emergency and the State of California's declaration of a State of Emergency on March 4, 2020, and the President's declaration of a National Emergency on March 13, 2020;

C.  Hospital Workers in Culver City put themselves and their families at increased risk every day to care for patients with COVID-19. Hospital Workers in California have suffered over 80,000 documented infections and over 300 deaths from COVID-19, totals that increase daily;

1

Exhibit C, Page 134

E.  Caring for COVID-19 patients may also take an emotional toll on Hospital Workers, who often serve as family surrogates for very ill or dying patients and must bear the stress of record hospitalizations, declining caregiver-to-patient ratios, longer work shifts and deferred time off; and

F.  A hazard pay premium for Hospital Workers in Culver City justly compensates for the unique burdens and risks borne by these professionals during the COVID-19 pandemic and helps to retain an essential and overextended workforce.

G. Paying hazard pay to Hospital Workers will help foster the public health by helping Hospital Workers care for themselves and their families, resulting in retaining a more experienced, well-trained health care workforce.

**SECTION 2.     HOSPITAL WORKER HAZARD PAY.**   A new Chapter 8.24 is added to the City of Culver City Municipal Code as follows:

**8.24.010.      Title.**

This Chapter shall be known as the "Hospital Heroes Hazard Pay Ordinance."

**8.24.020.       Authority.**

This Chapter is adopted pursuant to the powers vested in the City of Culver City under the laws of the State of California, including but not limited to, the police powers vested in the City pursuant to Article XI, Section 5 of the California Constitution, California Labor Code section 1205(b), and the Charter of the City of Culver City.

**8.24.030.      Definitions.**

The definitions set forth in this Section shall govern the construction and meaning of the terms used in this Chapter:

A.   "Base Wage" means the hourly wage paid to Hospital Workers as of the effective date of this Chapter not including the Hazard Pay owed under this Ordinance.

2

B. "Covered Hospital" means any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the borders of the City.

C. "City" means the City of Culver City.

D. "Employer" means any person, as defined in Section 18 of the California Labor Code, including any Person, who directly or indirectly or through an agent or any other person, including through the services of a temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Hospital Worker.

E. "Hospital Worker" means any individual  providing direct patient care and services supporting patient care at a Covered Hospital, including, but not limited to, clinicians, nurses, aides, technicians, janitorial and housekeeping staff, security guards, food services workers, laundry workers, pharmacists, and nonmanagerial administrative staff,  but does not include any individual performing exclusively managerial or supervisory functions, or any physician or surgeon licensed by the state pursuant to Chapter 5 of Division 2 of the Business and Professions Code.

**8.24.040.      Payment of Hazard Pay to Hospital Workers**

A. In addition to all other compensation due, Employers shall pay Hospital Workers hazard premium pay in the amount of $4.00 per hour for each hour worked at the Covered Hospital.

B. Hospital Workers entitled to hazard premium pay include Hospital Workers employed directly by a Covered Hospital and Hospital Workers who are contracted to work at the Covered Hospital through another Employer.

C. A Covered Hospital shall reimburse any contracted Employer for hazard premium pay pursuant to this Chapter.

D. Hazard premium pay shall not be considered part of the Hospital Worker's regular rate of pay or compensation.

E. It shall be a violation of this Chapter for any Covered Hospital or other Employer to discharge, lay off, or reduce a Hospital Worker's compensation or hours so as to

3

prevent, in whole or in part, a worker from receiving hazard premium pay at a rate of $4.00 per hour for each hour worked at a Covered Hospital.

**F.** The hazard premium pay mandates imposed by this Chapter shall expire when the state of emergency relating to the COVID-19 pandemic terminates pursuant to Section 8629 of the Government Code.

**8.24.050.        Prohibitions**

A. It shall be unlawful for a Covered Hospital or any other Employer to interfere with, restrain, or deny the existence of, or the attempt to exercise any rights protected under this Chapter.

B. Covered Hospitals and other Employers shall not take retaliatory action or discriminate against any Hospital Worker or former Hospital Worker because the individual has exercised rights protected under this Chapter. Such rights include, but are not limited to, the right to request hazard pay pursuant to this Chapter; the right to file a complaint with the City or inform any person about a Covered Hospital's alleged violation of this Chapter; the right to participate in an investigation, hearing or proceeding or cooperate with or assist the City in its investigations of alleged violations of this Chapter; and the right to inform any person of their rights under this Chapter. Protections of this Chapter shall apply to any Hospital Worker who mistakenly, but in good faith, alleges noncompliance with this Chapter. Taking adverse action against an Essential Hospital Worker, including lowering a Hospital Worker's Base Wage or reducing a Hospital Worker's scheduled hours, within 90 days of the Hospital Worker's exercise of rights protected under this Chapter, shall raise a rebuttable presumption of having done so in retaliation for the exercise of such rights.

**8.24.060        Enforcement**

A violation of this Chapter may be enforced under the Culver City Municipal Code.

**8.24.070        Other Laws**

4

All rights and remedies provided by this Chapter shall be in addition to and apply notwithstanding any other provision of local, state, or federal law.

### 8.24.080.        Conflicts

Nothing in this Chapter shall be interpreted or applied so as to create any power or duty in conflict with any federal or state law.

### 8.24.090.        Severability

If any provision in this Chapter or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this Chapter that can be given effect without the invalid provision or application, and to this end the provisions of this Chapter are severable.

5

| **From:** | Maky Peters <mpeters@seiu-uhw.org> |
|---|---|
| **Sent:** | Tuesday, March 9, 2021 7:13 PM |
| **To:** | Fisch, Alex |
| **Subject:** | Letter and Ordinance Draft |
| **Attachments:** | SCHCC Letter Draft 02-01.docx; 02-10-2021 Culver City Hero Pay Ordinance Draft.docx |

Hi Mayor Fisch,

Please see attached draft letter and Hero Pay ordinance.
Let me know if you have any questions and thank you for your willingness to speak up in support of healthcare workers.

Best,
Maky Peters
Regional Political Organizer
SEIU – United Healthcare Workers West
(323) ████████ | mpeters@seiu-uhw.org

1

# DRAFT

### ORDINANCE NO. 2021____

**AN <mark>URGENCY ORDINANCE</mark> OF THE CITY OF CULVER CITY, CALIFORNIA ADDING CHAPTER 8.24 TO THE CITY OF CULVER CITY MUNICIPAL CODE TO REQUIRE COVERED HOSPITALS TO PAY ESSENTIAL HOSPITAL WORKERS AN ADDITIONAL FOUR DOLLARS <mark>($4.00)</mark> PER HOUR IN HAZARD PAY DURING THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC.**

    **NOW THEREFORE,** the City Council of the City of Culver City, California, **DOES HEREBY ORDAIN** as follows:

    **SECTION 1.**    **FINDINGS.**    The City Council of the City of Culver City hereby determines and declares that:

A.  Since February 2020, the City of Culver City has been part of a coordinated response to the novel coronavirus (COVID-19) pandemic, including working with and supporting the efforts of the federal Centers for Disease Control and Prevention, the California Department of Public Health, and the Los Angeles County Department of Public Health to take appropriate measures to protect the health and safety of the people of Culver City;

B.  Pursuant to the authority granted by Culver City Municipal Code Section 3.09.020, on March 14, 2020, the City Manager, as the Director of Emergency Services, issued a Proclamation of Local Emergency due to the outbreak and spread of COVID-19, which was ratified by the City Council on March 18, 2020. Such action followed the Los Angeles County Department of Public Health's and the Chair of the Board of Supervisors' declaration of a local health emergency and the State of California's declaration of a State of Emergency on March 4, 2020, and the President's declaration of a National Emergency on March 13, 2020;

C.  Essential Hospital Workers in Culver City put themselves and their families at increased risk every day to care for patients with COVID-19. Essential Hospital Workers in California have suffered over 80,000 documented infections and over 300 deaths from COVID-19, totals that increase daily;

1

# DRAFT

E.  Caring for COVID-19 patients may also take an emotional toll on Essential Hospital Workers, who often serve as family surrogates for very ill or dying patients and must bear the stress of record hospitalizations, declining caregiver-to-patient ratios, longer work shifts and deferred time off; and

H.  A hazard pay premium for Essential Hospital Workers in Culver City justly compensates for the unique burdens and risks borne by these professionals during the COVID-19 pandemic and helps to retain an essential and overextended workforce.

**SECTION 2.**    <mark>URGENCY MEASURE</mark>**.**  Based on the findings set forth in Section 1, the City Council finds and declares that requiring Covered Hospitals to issue Hazard Pay to Essential Hospital Workers is necessary for the immediate preservation of the public health, safety, and welfare, and upon that basis has determined that an urgency measure, pursuant to Government Code Section 36937(b) and Culver City Charter Section 614, is warranted and shall take effect immediately upon adoption by a four-fifths vote of the City Council.

**SECTION 3.        EMERGENENCY ESSENTIAL HOSPITAL WORKER HAZARD PAY.**      A new Chapter 8.24 is added to the City of Culver City Municipal Code as follows:

**8.24.010.        Title.**
This Chapter shall be known as the "Hospital Heroes Hazard Pay Ordinance."

**8.24.020.        Authority.**
This Chapter is adopted pursuant to the powers vested in the City of Culver City under the laws of the State of California, including but not limited to, the police powers vested in the City pursuant to Article XI, Section 5 of the California Constitution, California Labor Code section 1205(b), and the Charter of the City of Culver City.

**8.24.030.        Definitions.**

2

# DRAFT

The definitions set forth in this Section shall govern the construction and meaning of the terms used in this Chapter:

    A.  "Base Wage" means the hourly wage paid to Essential Hospital Workers as of the effective date of this Chapter less Hazard Pay owed under this Ordinance.

    B. "Covered Hospital" means any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the borders of the City.

    C. "City" means the City of Culver City.

    D. "Employer" means any person, as defined in Section 18 of the California Labor Code, including any Person, who directly or indirectly or through an agent or any other person, including through the services of a temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Essential Hospital Worker.

    E. "Essential Hospital Worker" means any individual performing work at a Covered Hospital, but does not include any individual performing exclusively managerial or supervisory functions, or any individual earning regular pay in an amount greater than $_____$ annually, or any physician or surgeon licensed by the state pursuant to Chapter 5 of Division 2 of the Business and Professions Code.

## 8.24.040.    Payment of Hazard Pay to Essential Hospital Workers

    A. In addition to all other compensation due, Employers shall pay Essential Hospital Workers hazard premium pay in the amount of $4.00 per hour for each hour worked at the Covered Hospital.

    B. Hazard Pay shall not be considered part of the Essential Hospital Worker's regular rate of pay or compensation.

    C. It shall be a violation of this Chapter for any Covered Hospital or other Employer to reduce an Essential Hospital Worker's compensation or hours so as to prevent, in whole or in part, a worker from receiving hazard premium pay at a rate of $4.00 per hour for each hour worked at a Covered Hospital.

3

# DRAFT

**D.** The hazard premium pay mandates imposed by this Chapter shall expire with the expiration of the Governor's Declaration of the State of Emergency related to the threat of COVID-19.

### 8.24.050.        Prohibitions

A. It shall be unlawful for a Covered Hospital or any other Employer to interfere with, restrain, or deny the existence of, or the attempt to exercise any rights protected under this Chapter.

B. Covered Hospitals and other Employers shall not take retaliatory action or discriminate against any Essential Hospital Worker or former Essential Hospital Worker because the individual has exercised rights protected under this Chapter. Such rights include, but are not limited to, the right to request hazard pay pursuant to this Chapter; the right to file a complaint with the City or inform any person about a Covered Hospital's alleged violation of this Chapter; the right to participate in an investigation, hearing or proceeding or cooperate with or assist the City in its investigations of alleged violations of this Chapter; and the right to inform any person of their rights under this Chapter. Protections of this Chapter shall apply to any Essential Hospital Worker who mistakenly, but in good faith, alleges noncompliance with this Chapter. Taking adverse action against an Essential Hospital Worker, including lowering Essential Hospital Worker's Base Wage or reducing an Essential Hospital Worker's scheduled hours, within 90 days of the Essential Hospital Worker's exercise of rights protected under this Chapter, shall raise a rebuttable presumption of having done so in retaliation for the exercise of such rights.

### 8.24.060        Enforcement

A violation of this Chapter may be enforced under the Culver City Municipal Code.

### 8.24.070        Other Laws

4

DRAFT

All rights and remedies provided by this Chapter shall be in addition to and apply notwithstanding any other provision of local, state, or federal law.

**8.24.080.      Conflicts**

Nothing in this Chapter shall be interpreted or applied so as to create any power or duty in conflict with any federal or state law.

**8.24.090.      Severability**

If any provision in this Chapter or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this Chapter that can be given effect without the invalid provision or application, and to this end the provisions of this Chapter are severable.

5

Mr. Michael Klepin
CEO, Southern California Hospital at Culver City
3828 Delmas Terrace
Culver City, CA 90232

It was recently brought to my attention by the healthcare workers in your facility that substandard working conditions have become an urgent matter of issue. After hearing the testimonies of healthcare workers at Southern California Hospital at Culver City, I felt compelled to reach out to you directly. We are living in the age of COVID-19. As an elected representative of Culver City, it behooves me to ensure our residents have access to trusted and reliable care. The fact that mold broke through the walls at a nursing station, that buckets in hallways have become normalized as a result of faulty pipes or broken ceilings is frankly, unacceptable.

Furthermore, healthcare workers have been on the frontline of this pandemic for nearly a year. They, and their families, have put their own health and safety on the line to serve this community. I am a firm believer in the rights of workers, and I feel strongly that workers deserve fair pay and safe working conditions. Essential workers have not been afforded the luxury of staying safe at home. We must do better by them, and this is all the more true during a pandemic.

During a recent meeting, workers from your facility shared with us the state of disrepair at SCHCC. To hear of a main lobby elevator that has been defunct for well over a year reflects a lack of urgency around how these conditions can impact patient care. I understand that the ongoing conversations you are having with union representatives present an opportunity to address some of these issues. It is my hope that you also recognize how healthcare workers have shown tremendous bravery in the face of overwhelming challenges. As an unequivocal supporter of labor, I call upon you to enter into your ongoing negotiations in good faith.

Respectfully,

| | |
|---|---|
| **From:** | Maky Peters <mpeters@seiu-uhw.org> |
| **Sent:** | Thursday, April 8, 2021 12:21 PM |
| **To:** | Fisch, Alex |
| **Subject:** | RE: Meet this week/weekend |

Absolutely! That'd be great. Just confirming the lawyers can join at that time.

Will forward a zoom link once confirmed.

Maky

---

**From:** Fisch, Alex <Alex.Fisch@culvercity.org>
**Sent:** Wednesday, April 7, 2021 8:04 PM
**To:** Maky Peters <mpeters@seiu-uhw.org>
**Subject:** Re: Meet this week/weekend

Yes! Thanks for your patience, Maky. Would Friday at noon work?

Alex
(424) 253-4724

---

**From:** Maky Peters <mpeters@seiu-uhw.org>
**Sent:** Wednesday, April 7, 2021 7:58:56 PM
**To:** Fisch, Alex <Alex.Fisch@culvercity.org>
**Subject:** Meet this week/weekend

Hi Mayor Fisch,

Following up on my text and phone call on Monday. Would be great if we could all get on a call to chat about Hero Pay
with our legal and research team. I think there is exciting potential to make this happen in Culver City. The workers
certainly deserve it. I have some background for you that I think can help instill the confidence to do the right thing here.

Hope to hear from you soon!

Best,

Maky Peters
Regional Political Organizer
SEIU – United Healthcare Workers West
(323) ▓▓▓▓▓▓ | mpeters@seiu-uhw.org

Exhibit C, Page 146

*The City of Culver City keeps a copy of all E-mails sent and received for a minimum of 2 years. All retained E-mails will be treated as a Public Record per the California Public Records Act, and may be subject to disclosure pursuant to the terms, and subject to the exemptions, of that Act.*

| From: | Erik Dimitruk <edimitruk@seiu-uhw.org> |
|---|---|
| Sent: | Sunday, April 11, 2021 1:40 PM |
| To: | Fisch, Alex |
| Cc: | Maky Peters;Catha Worthman;Genevieve Casey |
| Subject: | SEIU-UHW Follow Up from 4-9-21 |
| Attachments: | Memo re City of Long Beach Hazard Pay Arguments (Updated).docx |

Dear Mayor Fisch,

Thank you for the opportunity to meet and discuss the importance of "Heroes" Pay for the essential workers of Culver City. Attached is memorandum drafted by our legal team summarizing the issues discussed. Also, please see the note below which includes additional citations. If you have any questions about legal issues, please feel free to contact Catha (cc'd here and contact info is below).

Best,


Erik Dimitruk
Lead Research Analyst
SEIU United Healthcare Workers – West
(323) ███████


**From:** Catha Worthman <catha@feinbergjackson.com>
**Sent:** Friday, April 9, 2021 6:51 PM
**To:** Erik Dimitruk <edimitruk@seiu-uhw.org>; Maky Peters <mpeters@seiu-uhw.org>
**Cc:** Genevieve Casey <genevieve@feinbergjackson.com>; Leticia Chavez <leticia@feinbergjackson.com>
**Subject:** Memo & Cases re: Hazard Pay Legal Challenges

Erik & Maky – Here is the updated memo from us with some additional case citations to provide to Mayor Fisch. I've also cut and paste below some of the most on point cases upholding substantive minimum labor standards, including living wage and prevailing wage laws. Please feel free to forward to the Mayor and copy us to make follow up communication easier.

Best,
Catha

--
Cases upholding minimum substantive labor standards over NLRA preemption, contract clause, equal protection, and related challenges:

- *Am. Hotel & Lodg. Ass'n v. City of L.A.*, 834 F.3d 958, 963–65 (9th Cir. 2016) (upholding city law requiring payment of higher living wages for employees of large hotels);
- *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1146 (9th Cir. 2004) (upholding city living wage ordinance applicable to workers in City of Berkeley marina over contracts clause challenge);
- *Northwest Grocery Ass'n v. City of Seattle*, No. 21-cv-00142-JCC, 2021 WL 1055994 (W.D. Wash. Mar. 18, 2021) (upholding Seattle grocery worker hero pay ordinance);
- *California Grocers Ass'n v. City of Long Beach*, 2021 WL 736627, *3 (C.D. Cal. Feb. 25, 2021) (denying preliminary injunction over Long Beach grocery worker hero pay ordinance);

Exhibit C, Page 148

- *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 83 (2d Cir. 2015) (upholding prevailing wage applicable to home care workers);

- *California Grocers Assn. v. City of Los Angeles*, 52 Cal.4th 177 (2011) (ordinance protecting large grocery stores' non-supervisory employees not preempted);

- *Fortuna Enterprises, L.P. v. City of Los Angeles*, 673 F. Supp. 2d 1000, 1006-12 (C.D. Cal. 2008) (upholding a living wage ordinance for hotel workers);

- *Woodfin Suite Hotels, LLC v. City of Emeryville*, 2006 WL 2739309, *12-*14 (N.D. Cal. Aug. 23, 2006) (upholding a living wage ordinance for hotel workers);

- *National Broadcasting Co., Inc. v. Bradshaw*, 70 F.3d 69, 72 (9th Cir. 1995), *opinion amended on denial of reh'g* (9th Cir., Dec. 4, 1995, No. 92-56178) 1995 WL 70816 (upholding law requiring double-rate overtime in broadcast industry).

**Feinberg
Jackson
Worthman
& Wasow LLP**

CATHA WORTHMAN
2030 Addison, Suite 500
Berkeley, CA 94704
Tel. 510/269.7998 (main)
Tel. 510/269.2084 (direct)
feinbergjackson.com

PRIVILEGE AND CONFIDENTIALITY NOTICE
This electronic mail message, and any documents, files, or previous e-mail transmissions attached to or forwarded with it, may contain information that is privileged, confidential, and/or otherwise legally protected and exempt from disclosure. Unless this message is addressed to you or you are authorized to receive it for the person to whom it is addressed, any disclosure, copying, distribution, or other use of the information contained herein is strictly prohibited. If you have received this electronic mail message in error, please destroy the message and any attachments immediately and notify the sender by reply e-mail to catha@feinbergjackson.com.

| **From:** | Shelbi Augustus <saugustus@seiu-uhw.org> |
|---|---|
| **Sent:** | Friday, May 21, 2021 4:27 PM |
| **To:** | Lee, Daniel |
| **Cc:** | Erik Dimitruk |
| **Subject:** | RE: Culver City Heroes Pay Support Petition |

Looks like I missed this email before sending my last one. I and my team are very clear on who we need to convince. The previous email was sent with intent of updating you as the proposer to communicate updates .

In addition,  I'd like to ensure we have proponents and arguments ready when presenting this item to support you. Maky is out sick and will not be returning before Monday, myself or Erik cc'ed here can communicate with you on next steps.

**Shelbi N. Augustus**
SEIU United Healthcare Workers West
Political Department
Lead Organizer
Cell ▇▇▇▇▇▇▇▇
Office (323)888-8276

---

**From:** Lee, Daniel <Daniel.Lee@culvercity.org>
**Sent:** Friday, May 21, 2021 3:34 PM
**To:** Shelbi Augustus <saugustus@seiu-uhw.org>
**Subject:** Re: Culver City Heroes Pay Support Petition

As I said it was already on the agenda before and will be so again Monday night. I don't need any convincing. Spoken to Maky extensively about this. Pretty much hinges on Alex and I can't speak to him for Brown Act reasons.

Get Outlook for Android

---

**From:** Shelbi Augustus <saugustus@seiu-uhw.org>
**Sent:** Friday, May 21, 2021 3:16:13 PM
**To:** Lee, Daniel <Daniel.Lee@culvercity.org>
**Subject:** RE: Culver City Heroes Pay Support Petition

Yes, Maky did update me on this. We had a meeting with the Mayor and our legal and research team. He still seems to have very cold feet. We have agreed to take on all legal responsibility, have shot down all legal arguments, and have agreed to formally rebuttal the arguments being made.

I think our main concern is ensuring this is put on the agenda and is put to a proper vote. I'm available to speak all weekend as well on additional strategies.

**Shelbi N. Augustus**
SEIU United Healthcare Workers West
Political Department
Lead Organizer

1

Exhibit C, Page 150

Cell
Office (323)888-8276

---

**From:** Lee, Daniel <Daniel.Lee@culvercity.org>
**Sent:** Friday, May 21, 2021 2:51 PM
**To:** Shelbi Augustus <saugustus@seiu-uhw.org>
**Subject:** Re: Culver City Heroes Pay Support Petition

Hi Shelbi,

Booked schedule wise today buti told Maky it's all about the legal arguments. I can't disclose whati heard in closed session buta strin strong legal footing is what needs to be communicated from the union and getting explicit about how your legal team would help or participate should the city get sued.

Daniel

Get Outlook for Android

---

**From:** Shelbi Augustus <saugustus@seiu-uhw.org>
**Sent:** Friday, May 21, 2021 2:06:51 PM
**To:** Lee, Daniel <Daniel.Lee@culvercity.org>
**Subject:** RE: Culver City Heroes Pay Support Petition

Hi Daniel,

You've been working directly with Maky who is one of my staffers. Do you have a moment to chat? It seems like the mayor is wavering on his decision again. Wanted to know what we could do externally and internally to help move him.

**Shelbi N. Augustus**
SEIU United Healthcare Workers West
Political Department
Lead Organizer
Cell
Office (323)888-8276

---

**From:** Lee, Daniel <Daniel.Lee@culvercity.org>
**Sent:** Friday, May 21, 2021 1:58 PM
**To:** Shelbi Augustus <saugustus@seiu-uhw.org>
**Subject:** Re: Culver City Heroes Pay Support Petition

Hi Shelbi,

I introduced this a few months ago and it is coming back before us in Monday.

Daniel

Get Outlook for Android

---

**From:** Shelbi Augustus <saugustus@seiu-uhw.org>
**Sent:** Friday, May 21, 2021 11:44:15 AM
**To:** Shelbi Augustus <saugustus@seiu-uhw.org>

**Cc:** Clerk, City <city.clerk@culvercity.org>
**Subject:** Culver City Heroes Pay Support Petition

Mayor Fisch and Councilmembers,

Below is a petition signed by 435 hospital workers from Southern California Hospital at Culver City urging you to agendize and pass the Heroes Pay Ordinance for Healthcare Workers in Culver City. I am cc'ing the City Clerks office to ensure this petition is added to the official record for the upcoming council meeting.

Petition: https://drive.google.com/file/d/1cxQbExvd5uQXBUNNTEgNzxa3UEMpmZee/view

If you have any questions, my contact information can be found below.

**Shelbi N. Augustus**
SEIU United Healthcare Workers West
Political Department
Lead Organizer
Cell ████████████
Office (323)888-8276

---

*The City of Culver City keeps a copy of all E-mails sent and received for a minimum of 2 years. All retained E-mails will be treated as a Public Record per the California Public Records Act, and may be subject to disclosure pursuant to the terms, and subject to the exemptions, of that Act.*

---

*The City of Culver City keeps a copy of all E-mails sent and received for a minimum of 2 years. All retained E-mails will be treated as a Public Record per the California Public Records Act, and may be subject to disclosure pursuant to the terms, and subject to the exemptions, of that Act.*

---

*The City of Culver City keeps a copy of all E-mails sent and received for a minimum of 2 years. All retained E-mails will be treated as a Public Record per the California Public Records Act, and may be subject to disclosure pursuant to the terms, and subject to the exemptions, of that Act.*

# EXHIBIT "D"

# EXHIBIT "D"



**OFFICE OF THE CITY ATTORNEY**

# CITY OF CULVER CITY

9770 CULVER BOULEVARD, CULVER CITY, CALIFORNIA 90232-0507

(310) 253-5660
•
FAX  (310) 253-5664

CAROL A. SCHWAB
City Attorney

June 16, 2021

***Via Email Only*** **DSchwarz@sheppardmullin.com**

David A. Schwarz, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA  90067-6055

Re:  Additional Documents/Public Records Request of May 26, 2021

Dear Mr. Schwarz:

As a follow up to my letter dated June 15, 2021, attached are text messages and calendar entries/acceptances for Mayor Alex Fisch, in response to your May 26th public records request. The documents were redacted to protect privacy rights of third parties (Government Code section 6255); however, you will note upon reading the screen shots of the text string I left the last 4 digits of the cell phone numbers unredacted so that you are able to identify the various individuals on the text messages.

We appear to be having a misunderstanding about whether you requested "notes" in your *May 26, 2021* public records request sent to City Council and City Clerk. While I agree that "notes" are encompassed in the word "documents", and are specifically requested in your *June 10th* letter, your May 26th letter asks for "communications" between SEIU representatives and the City Councilmembers, not the Councilmembers' own notes.  I am clear now however, that notes are requested, and as stated in my June 15th letter, the City will respond to that request, and the request for communications between City Council and City personnel, within the statutory response period.

Sincerely,

CAROL A. SCHWAB, CITY ATTORNEY

*Lisa A. Vidra*

By:    Lisa A. Vidra
        Senior Deputy City Attorney

Attachments

cc:    City Clerk

Exhibit D, Page 154

# Daniel Lee, +2

Hey bye – when these hospitals were lobbying for federal money, they were literally saying we need this money for hazard pay

And then they never did it!

Sorry, no one has to text me back here

*hey btw

Btw klepin lied abt the tracking and testing

That never happened

I can get people here to vouch for it

Not urgency!

We gotta do normal!!!

Don't need to duplicate e

Don't need to duplicate e

We're ready to fight court Cade

Even if it looks different

*case

Literally you guys have the support

That's not something you should worry abt

It's actually the only way you're gonna have this pro bono support



Why make it 2?

⬛⬛⬛-6753 · Apr 12, 10:28 PM



The mayor wants to handle healthcare differently

Daniel Lee · Apr 12, 10:29 PM

Mr. mayor

Mr. mayor

Literally your Trader Joe's could should be the issue before the hospital would be the issue

We have your back

There are only so many ways I legally can say that

*literally your Trader Joe's would be the issue

 ████████ -6753 · Apr 12, 10:31 PM

 Still work to do on this.

Daniel Lee · Apr 12, 10:32 PM

Hi Mayor, thanks for letting me know, there is no good faith confusion. I am looking at the TA right now, I'll send it to you, it's probably the same thing you are loooking.

This mention of "hero pay" was about the fact that a small group of workers that were being laid off were going to recieve enhanced severance benefits.

I can forward you the language of the proposal that was withdrawn, this has nothing to do with the ordinance. Which was never discussed between the union or the employer.

Just sent

 -6753 • May 10, 6:41 PM

Just confirmed there was no agreement or MOU around heroes pay

Anyone who says otherwise is fabricating information, I would ask them to produce proof of it, if you have the time. Would honestly be kind of interested to see what that would even look like!



Thanks again for your time!

6753 · May 10, 1:05 PM

I saw the MOU and I think it was good faith confusion. We got a last minute letter from their council that we need to analyze. We have to kick A-1 to the next meeting. Sorry, and I welcome another meeting in the meantime.

May 10, 6:06 PM



‑6753



Hi Mayor Fisch do you have some time to talk before the council meeting tomorrow?

‑6753 • May 9, 2:07 PM

Hi Maky—Sorry for the delay. Mothers Day and all. Are you free this afternoon?

May 10, 12:17 PM

No problem, I understand! Yes would be great to connect this afternoon



What time works best for you?

‑6753 • May 10, 12:19 PM

Are you free in about 15 minutes?

May 10, 12:25 PM

Yes that works

Just confirmed there was no agreement or MOU around heroes pay

 

**4829**

Hi Mayor Fisch - is it possible to set up a very brief meeting sometime before Monday's meeting. We are interested in making sure the ordinance is on the consent calendar and gets voted on. Thanks for standing with the healthcare workers and we look forward to your support. I'm available in the days and evenings. Thanks! Erik Dimitruk SEIU-UHW



4829 · Jun 7, 1:30 PM

Hi Erik—Sorry to be difficult to reach. I can join you for a call at 9:30, 11, or 1:30 tomorrow. Would any of those work?

Thu 2:06 PM

It's no problem at all. I know you're swamped. How about 11?



-4829 · Thu 2:12 PM

Sounds great!

Thu 2:14 PM



**Subject:**          Meeting w/ SEIU-UHW on SCHCC
**Location:**         https://seiu-uhw.zoom.us/j███████████

**Start:**            Tue 3/9/2021 12:00 PM
**End:**              Tue 3/9/2021 12:30 PM
**Show Time As:**     Tentative

**Recurrence:**       (none)

**Organizer:**        Maky Peters

Hi there,

Maky Peters is inviting you to a scheduled Zoom meeting.

## Join Zoom Meeting

Password: ████████
Phone one-tap:    US: ████████████████████████████
Meeting URL:      https://seiu-
                  ████████████████████████████████████████

### Join by Telephone

For higher quality, dial a number based on your current location.
Dial:
                  US: ████████████████████████████
                  ████████████████████████████

Meeting ID ████████████

Password:  ████████

International numbers

Exhibit D, Page 163

**Join from an H.323/SIP room system**

Dial IP: ██████████

Enter Meeting ID: ████████

Password: ████

SIP: ███████████████ ▬

Password: ████

| | |
|---|---|
| **Subject:** | UHW Zoom Meeting |
| **Location:** | https://seiu-uhw.zoom.us███████████ |
| **Start:** | Fri 5/21/2021 10:00 AM |
| **End:** | Fri 5/21/2021 11:00 AM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Organizer:** | Erik Dimitruk |

Hi there,

Erik Dimitruk is inviting you to a scheduled Zoom meeting.

# Join Zoom Meeting

Password ███████

Phone one-tap: US: ████████████████████████

Meeting URL: https://seiu-uhw.zoom.us ████████████████████

## Join by Telephone

For higher quality, dial a number based on your current location.

Dial:

US: ████████████████████████
████████████████████

Meeting ID: ████████

Password ███████

International numbers

Exhibit D, Page 165

**Join from an H.323/SIP room system**

Dial IP: ██████████

Enter
Meeting
ID: ████████

Password ██████

SIP: ████████████████████

Password ██████

**From:** Fisch, Alex
**Sent:** Monday, March 8, 2021 7:45 PM
**To:** Maky Peters
**Subject:** Accepted: Meeting w/ SEIU-UHW on SCHCC

**From:** Fisch, Alex
**Sent:** Wednesday, May 19, 2021 8:21 PM
**To:** Erik Dimitruk
**Subject:** Accepted: UHW Zoom Meeting

# EXHIBIT "E"

# EXHIBIT "E"



**OFFICE OF THE CITY ATTORNEY**

# CITY OF CULVER CITY

(310) 253-5660
•
FAX  (310) 253-5664

9770 CULVER BOULEVARD, CULVER CITY, CALIFORNIA 90232-0507

CAROL A. SCHWAB
City Attorney

June 17, 2021

***Via Email Only*** **DSchwarz@sheppardmullin.com**

David A. Schwarz, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA  90067-6055

Re:  Document Transmittal/Public Records Request of May 26, 2021

Dear Mr. Schwarz:

As I mentioned yesterday, attached are additional responsive documents representing text messages from Vice Mayor Daniel Lee. Please be aware that the documents have been redacted to withhold personal information. Public disclosure of the personal information would constitute an unwarranted invasion of personal privacy and would not provide any benefit to the public. Therefore, the public interest served by withholding the personal information clearly outweighs any public interest served by disclosure. (Gov. Code § 6255.)  Additionally, a portion of the personal information redacted is exempt under the PRA as personal health information protected by the Confidentiality of Medical Information Act and the Health Insurance Portability and Accountability Act. (Gov. Code § 6254(k).)

In the spirit of cooperation, and similar to the explanation/guide I provided to you this evening via separate letter regarding the text message production from the Mayor, I would like to provide the following information to assist you in reviewing the attached:

The document labeled "Lee Text String 1" is one continuous text string between Vice Mayor Lee and Maky Peters from SEIU, who identifies herself at the top of the first page. "Screen shots photos" 1, 2, and 3 are photographs referenced and contained in the text string.

The documents labeled "Lee Text 2" and "Lee Text 3" are one continuous string and are a duplicate of those sent to you yesterday labeled "Fisch 1", "Fisch 2", and "Fisch 3."  At the top of Lee Text 2, the persons in the text string are identified where it states: "Maky Peters created this group MMS with you, Yasmine-Imani McMorrin, and (424) 253-

David A. Schwarz
June 17, 2021
Page 2

4724."  The phone number (424) 253-4724 can be cross-referenced with the previously produced emails from Mayor Fisch to confirm that it is the phone number of Mayor Fisch. This may also be verified by comparing Fisch 1, 2, and 3 with Lee Text 2 and Lee Text 3, showing the same text string, from the different phones of Mayor Fisch and Vice Mayor Lee.

Sincerely,

CAROL A. SCHWAB, CITY ATTORNEY

*Lisa A. Vidra*

By:   Lisa A. Vidra
        Senior Deputy City Attorney

Enclosures

cc:   City Clerk

Hi Vice Mayor Lee, this is Maky I got your email! Let me know if you have some time to chat in next hour, I have a couple things this afternoon but can connect in the evening, or tomorrow works too! Thank you so much again for your time yesterday!

Saturday, Jan 9 · 3:06 PM

This evening would be good. Let me know what time works.

Great, can you do 5:30 or 6?

6pm works for me.

Perfect, looking forward to speaking with you then!

Monday, Jan 11 · 7:21 PM

Floyd is unfortunately not doing well today, came down with a stomach issue. If I can get someone else in the meeting can they speak in place of him? If not no worries.

They can email the clerk and just get on to speak jeremy.green@culvercity.org and clerk@culvercity.org and see if they can speak prior to you in Floyd's place.

Jeremy Green

Ambitious problem solver with a passion for online businesses who would like to join a team of like-minded developers.
jeremy.green

Got it ok thank you!

Unfortunately couldn't get someone else in time, but thank you will let you know if anything changes before time is up.
Got it.

Will follow up ASAP with an answer to that question Albert just asked as well

So the issues have all been reported to either the County and/or CDPH - they've sent folks out to survey the situation and have given SCHCC a plan of action (essentially an understanding that x, y, z needs to be done to remedy the issue) but as evidenced most notably by the elevator that has been nonfunctional for over a year, they fail to follow through. Would it be beneficial to send the photo evidence to the city clerk email ahead of the discussion? Or should I wait on that. I'll text them to you for now.

Yes, I believe sending images and as much information as possible would be great.

Ok great. The photos don't seem to be sending via text so will email you and the city clerk 👍

Thank you so much again, really appreciate your advocacy on this issue!

You can also email the whole city council at   city.council.d@culvercity.org
we just can't reply. If you'd like reflections then email us individually.

Got it ok thank you!

Monday, Jan 11 · 10:53 PM

Thank you so much for your efforts. Goran! 

But looking forward to moving ahead with whatever steps we can. Perhaps we could get a letter signed by the 4 supportive members. We can talk more about your thoughts on this tomorrow.

Totally understand why you were mentioning that we should've just pitched it as a public health issue and not bring in the fact that the negotiations are our opportunity to actually fix it. But again, so appreciate your effort in helping us bring these issues to light.

It means a lot, thank you.

Yeah, I know Goran's proclivities. Alex was better than I thought.

Yes, glad everyone else was supportive. In any case really grateful that you understand the gravity and importance of this issue. 🎧

Tuesday, Jan 12 · 1:04 PM

Still time to touch base now?

Tuesday, Jan 19 · 10:24 AM

Good morning! Hope you're doing well and have enjoyed the weekend

Wanted to see if you think we can get the agreeable councilmembers to sign on to a letter

Does that need to go through a process vis a vis the city attorney? Or would it be easy enough to just move forward?

Tuesday, Jan 19 · 3:11 PM

The process with the council will be slower if you have a letter you can ask us to sign separately. Also, let me know about the oped. If you need something sooner I would ask us separately to sign.

Liked "The process with the council will be slower if you have a letter you can ask us to sign separately. Also, let me know about the oped. If you need something sooner I would ask us separately to sign."

Exhibit E, Page 175

Ok will draft and send something over

And yes op ed is def something we should do soon

I may be able to get an oped to get some traction regionally. But, definitely in Culver.

Thank you so much again for your willingness

I can also do some work on my end to to try and get the media to cover it

Let me know how you would like it outlined it send any talking points.

Wednesday, Jan 27 · 3:52 PM

Hi councilmember Lee just wanted to circle back and let you know that I am just being held up by not having yet spoken with Mayor Fisch abt signing on to a letter. Obviously we need to move urgently but we don't want to send these letters out at different times and would prefer to send them all out at once.

I think we should also talk about moving forward with the op-ed / media coverage side of this since that will take some time. Bargaining continues to go nowhere and the hospital is unwilling to really consider any of our demands around repairs in the hospital, so we would definitely get the public's eyes on this.

I spoke to one of Sydney's staffers this week. I get the feeling she is going to be tough to sway into action without a little additional pressure. Also planning to meet with some of holly's staff soon. So those are kind of the

updates.

Just wanted to keep you in the loop, maybe if you have some time for a quick chat this evening we could talk abt next steps regarding the possibilities of getting to work on that op-ed

Wednesday, Jan 27 · 5:07 PM

Hi Maky. We have a special city council meeting tonight but I might have time to speak tomorrow night.

Got it, no problem. Thank you! Also, would really just like to get this letter out ASAP so perhaps may need you and Yasmine to send yours out first. Can I send you the draft I have once it has been cleared through our legal team?

Thursday, Jan 28 · 6:12 PM

Does 8p work for you? Received your draft but in a meeting at the moment and then need to make an appearance at a neighborhood council. Could possibly do a little earlier.

8pm works!

Whenever you are available works for me

Thank you so much for your help

Tuesday, Feb 2 · 6:03 PM

Hi Vice Mayor Lee just wanted to check in to see if you have sent out the letter(s) yet! I am doing some final edits on the Op-Ed tonight and sharing with a few others internally before sending over your way. Thank you!

Hi Maky, I have not sent my letter out I think we weren't on the same page about the process. But, I have contacts for the elected officials I have mentioned to email and mail but I don't for the hospital owners. If you can send me the best place where you think that might be effective I can send letters out in the mail and through email tomorrow.

Oh my gosh that's right I totally forgot about the email, I will get you that ASAP

Thursday, Feb 4 · 12:51 PM

Hi Vice Mayor Lee, just checking in to see if there are any updates on the letter, would love to get it out by tomorrow at the latest!

Thursday, Feb 4 · 4:46 PM

I can send this out today. Just wrapped a board meeting for the a Clean Power Alliance.

Loved "I can send this out today. Just wrapped a board meeting for the a Clean Power Alliance."

Amazing thank you so much again

Friday, Feb 12 · 7:40 PM

Good evening Mr. Vice Mayor! Happy Friday hope you have some plans for rest this weekend. Just wanted to circle back on the email I sent over yesterday. Let me know if you have some time to chat this evening. Curious to get your thoughts on the Op-Ed, good or bad I can handle it! Thanks again for all that you do.

Friday, Feb 12 · 10:52 PM

Hi Maky, sorry to get back to you late but I had a class and then a campaign event and then a campaign meeting but will get back to you this weekend.

No worries! I am still up working 😊 Sounds like you've also had a very long day. Praying you have some rest time scheduled for the weekend. I look forward to connecting whenever you can!

Tuesday, Feb 16 · 9:41 AM

Good morning Vice Mayor Lee, do you have some time to connect today?

Tuesday, Feb 16 · 2:26 PM

Not much time today, unfortunately. I read over the op-ed and there are some small changes I would make. I sent it as is to the person working press on my campaign to see if he thinks other contacts might be interested.

Thursday, Feb 18 · 2:13 PM

Any time to connect this evening?

Thursday, Feb 18 · 3:33 PM

I could touch base around 6 or 8pm

Ok 8 is best for me

But I can do 6 just lmk

Thank you!

I can do 8 but it might be more like 805.

Totally that works, no problem!

Thursday, Feb 18 · 8:11 PM

Wrapping a candidate forum.

No worries also on a call

Wanna aim for 830?

Perfect

Still on this call sorry should be wrapping up in abt ten min

Call when you are available. Working on emails.

Friday, Feb 19 · 12:16 PM

My press guy wonders of it will be alright if he pitches the oped as the vice

mayor along with SEIU union members.

Is that a common thing?

It could be that I just haven't seen it anywhere

I would have to run it by the members to see if I can use their names, they may be hesitant to put their names in print for fear of retaliation

It is not something that I have heard of before. But, I think it would just be vague and not mention their names just the name of the union.

Should be fine! Just running this by the reps for due diligence

Make sure there is no one we need permission from but I'm pretty sure there'd be no issue!

Friday, Feb 19 · 5:27 PM

Josh wants to pitch this as a story and was getting no bites on the Op-ed. Do you think folks would be open to talking to reporters anonymously if he was successful and it moved forward as a story?

I think yes

Shouldn't be an issue

Also got a call from CDPH, possibly from the letter you sent them? In any case that is good, what it will amount to remains to be seen but they plan to survey site again next week



Friday, Feb 19 · 8:24 PM

So did the local Culver City outlets also seem uninterested? Or haven't explored that yet

Was waiting to see how the regional stuff pans out but I know two outlets will run it no matter what and a third is a strong possible.

Monday, Feb 22 · 8:00 AM

Got it! Yes I think if it looks like the regional outlets are not likely to run the Op/Ed we should move forward with the two local outlets. Do you think you'll have time today to send to them?

Monday, Feb 22 · 2:15 PM

After 12pm tomorrow? Or today? Sorry if you sent this earlier but looks like your text just came in at 2pm

I'll get right on it, any specific time in mind?

In addition to Larhonda and Floyd whom you'be   met

This is really so great, thank you so much for your work in making this

happen

One more question -- the workers' contract expired today so they are planning a picket on Wednesday morning 11am -- I don't know if you are doing in public appearances or if you are even available but would love it if you could stop by to show solidarity with the workers. If not, I totally understand, even just posting a tweet (or perhaps the series of tweets like what we spoke abt the other day) would be immensely helpful!

I could possibly drop in but I have a ▮▮▮▮▮ appointment in the morning and I'm not sure how long it will be. If we get the story going I still plan to publish the oped locally. We also thought we'd tweet out the oped as well.

That is fantastic, I think the more coverage the better, absolutely.

So I just found out the picket goes from 11am-1pm and from 5pm-8pm so there are some options

Also spoke to Councilmember McMorrin she is going to try and attend as well but I know she said after 1pm would be better for her

Also just an FYI she is on board with hero pay, we would just need a third person in order to pass it as an emergency ordinance

I think around 11 might be good but I have a candidate forum at 1230. In the evening I have class and then a fundraiser so the earlier slot is more likely.

Ok got it, yeah whatever you can do would be immensely helpful!

Let me know as soon as you can about tomorrow we'll be heading into closed session at 530p

Got it, yes none of the members have responded to me yet

Will do my best!

Monday, Feb 22 · 7:14 PM

Weird. Myself and two members: Larhonda Smith and Jacob Manesh were all signed up for public comment on non agenda items

We were going to provide an update

And thank you and Yasmine for sending letters while asking the other members to send letters as well

Any idea why we might not be on the list? We signed up within the last hour

I'm going to ask about hero pay at the end of the meeting. I think one or two people may organically be on public comment to request it. Send a message to Mimi Ferrell from the clerk's office to get on and send a public message.

Thank you for mentioning the hospital workers

Mimi has not responded to my chat 😦

Can you try sending a public chat? I can remind her if we all see it. Mention that you submitted before.

Ok just sent to "all panelists"

Are LaRhonda and Jacob down to be interviewed tomorrow at noon or 3? Be good to get back to the reporter soon.

LaRhonda said she can do 3pm

Jacob should be able to do 3pm as well

Trying to see if Two others can also join

Ok, I'll try to set it up.

Great thank you so much again

Omg this guy is a piece of work

Also thank you for your clarifying comments

No prob. So, we are on for 3pm tomorrow. Thinking it will be a zoom link but might just be a conference call will let you know as soon as I get info. As many people as possible contributing would be great. I can play whatever role but I think this writer is really interested in hearing from the workers and lifting up their story.

Tuesday, Feb 23 · 7:25 AM

Amazing! Idk how I missed this text last night. Thank you so much again for your help on all of this, it is really great.

Tuesday, Feb 23 · 12:28 PM

Here is the link for the interview at 3p. Still looking good?

<u>https://us02web.zoom.us</u> ████████

Join our Cloud HD Video Meeting
Zoom is the leader in modern enterprise video communications, with an easy, reliable cloud platform for video and audio conferencing, chat, and webinars across mobile, desktop, and room systems. Zoom Rooms is the original software-based conference room solution used around the world in board, conference, huddle, and training rooms, as well as executive offices and classrooms. Founded in 2011, Zoom helps businesses and organizations bring their teams together in a frictionless environment to get more done. Zoom is a publicly traded company headquartered in San Jose, CA.
us02web.zoom.us

Thank you!

Yes we'll have LaRhonda and Jacob (same folks from last night) on the call

Tuesday, Feb 23 · 4:17 PM

Thanks so much again for setting that up and taking the time
Sure. Might not be necessary if we could do more on the city level.
Wednesday, Feb 24 · 9:30 AM

Good morning, please feel free to reach out if you need info/have any questions re the picket today
Wednesday, Feb 24 · 12:21 PM

Unfortunately it doesn't look like I'll be able to make it. But, if you have pictures we can share on social media and ask people to join at 5

Wednesday, Feb 24 · 1:27 PM

I might be able to drop by at 5pm for a very little. I just gave Cerise your number so she can be in touch if need be.

Wednesday, Feb 24 · 2:45 PM

Awesome thank you!

Also sorry just waiting for some photos from this AM

Wednesday, Feb 24 · 6:18 PM



Finally got hands on some images

Thanks. I also dropped by for a bit at 5 and got a picture with a few folks.

Oh amazing! Do you mind sharing?

Like send the photo to me? Thank you so much

Wonderful love it!

Wednesday, Mar 3 · 3:32 PM

Vice Mayor Lee, wanted to congratulate you on a campaign well run. It was a tough fight, so many of us appreciate that you stand by your values and fight for what is right. I know you probably have a lot going on post-election but please let me know when you have some time to connect again. I know the hero pay topic had been agendized but any update on a set date?

Wednesday, Mar 3 · 9:50 PM

Just wrapped a council budget meeting. No update yet unfortunately. But, you can check with the city clerk.   city.clerk@culvercity.org   I'm also waiting for an update from the writer about the story. Hope it can still run.

Monday, Mar 8 · 7:16 PM

Has Cerise reached out? Been following up with my contact to try to get the article out. But, I can send the op-ed to local papers tomorrow.

Last I heard from her was I think Thursday, she said they were waiting for comment from Prospect and we're giving them until 5pm. She said she'd tell me as soon as they publish it but I'm not sure what is happening with it.

It would be great to have the op-Ed go out tomorrow!

Can you send me a reminder midday? Just to make sure I get it out?

Yes of course! Thanks again, so appreciate your continued support on this

Tuesday, Mar 9 · 2:40 PM

Good afternoon, sending the reminder re the Op-Ed!

Tuesday, Mar 9 · 4:11 PM

Sent to 3 media outlets here in Culver. Will let you know.

That's great, thank you!

Should be published on Culver City Catalyst tonight and Culver City Crossroads tomorrow. Waiting to hear from Culver City News.

Fantastic news! I'll keep an eye out

Thanks so much again

Wednesday, Mar 10 · 12:17 PM

https://culvercitycatalyst.co/letter-to-editor-daniel-lee-repair-southern-california-hospital-culver-city/?fbclid=IwAR1i6lMu73-RBGDENdp7LWVz77TBJqyKBpK59UXTUekC1VcmgVbJgorUWu4

Daniel Lee, Letter to the Editor: Repair Southern California Hospital at Culver City | Culver City Catalyst
culvercitycatalyst.co

https://culvercitycrossroads.com/2021/03/10/dear-editor-vice-mayor-lee-amplifies-staff-calls-for-help-at-southern-california-hospital/

Dear Editor – Vice Mayor Lee Amplifies Staff Calls for Help at Southern

California Hospital – Culver City Crossroads
culvercitycrossroads.com

Wednesday, Mar 10 · 2:32 PM

Fantastic thank you so much!

Sunday, Mar 21 · 7:27 PM

Hi Maky, I hope you are well. We are considering hero pay tomorrow. Didn't hear from you so I'm not sure if the clerk reached out.

Monday, Mar 22 · 10:21 AM

Good morning Vice Mayor Lee! I didn't know you'd be taking it up tonight, that is great to hear! Did have a meeting with the Mayor and sent over all the examples of similar ordinances to him, he asked for specific examples to share with the clerk.

Is there any chance you'd have a moment to chat before the meeting tonight?

Monday, Mar 22 · 4:55 PM

Sorry was slammed today. Going into closed session now. If Alex is on board I think it should go through

Thanks no worries

I hope he is, Yasmine seemed to think there would be three votes, if not do you have the ability to pull it off agenda? Give us more time to get a confirmed vote of support from him? I don't want to lose momentum but wouldn't want it to fail and then have no recourse

I think if it was taken off the agenda it would never be put back on.

Ok yeah that makes sense. My supervisors were trying to say let's pull it but I agree w you. Let's keep moving forward thank you!

I'll have members on the call again, appreciate all your help

Monday, Mar 22 · 7:25 PM

Do people making comment on agenda items, comment when that agenda item comes up?

Yes, when the item come up. People who signed up to speak will be called.

Got it

Thank you!

Monday, Mar 22 · 9:53 PM

Seems like the hero pay might get bumped. With the number of speakers for A-4 I think this will definitely take an hour or more. I'll try to ask at 11p so

we know for sure and people can go to sleep if we won't get to it today.

Yeah seemed like it might be the case once he went out of order. I told the members to take a break and I'd keep them posted. Thank you

Monday, Mar 22 · 11:06 PM

Thank you for asking about it, going to hop off now

More time to talk to Alex without it being outright rejected and time for us to talk in between.

Totally, and we can organize more speakers in support on our end

Monday, Mar 29 · 1:09 PM

FYI the grocers association is reaching out to council members for a discussion on hero pay and other experts have been saying that hospital workers hero pay hasn't been successful in LA County. If you can share more examples with the council from other areas that would be good.

Thanks for the heads up. So our research and legal team has put a lot of thought into crafting the draft ordinance in a way that would ensure only the healthcare workers are included -- and in a way that is safe from litigation etc. I think it would be great if we could have a meeting with our legal team, research, and yourself. I know the meetings need to be individual so ideally we would also do the same w McMorrin and the Mayor, respectively.

I think it does complicate things for the grocery and retail workers to be included even though there is precedence for that. I actually connected with the UFCW local and they are not pushing for this in Culver City -- the person who made the comment about hero pay for grocery workers a few weeks ago was totally random and not a union member and actually pinged UFCW after the fact.

It seemed like the grocery portion is less controversial. That was just for information. A meeting around the medical pay would be good. I'd aim for Alex

I don't need convincing

Got it ok yeah will gather as much info as I can get to share w you as well

Thank you so much for the info!

Thursday, Apr 1 · 5:11 PM

Hi Vice mayor lee do you have some time to connect this evening?

I could talk at 7.

Ok great will call you then! Thanks so much

Thursday, Apr 1 · 7:28 PM

https://pestakeholder.org/update-leonard-green-led-ownership-collected-65

8-million-from-safety-net-hospital-company-despite-challenges-commitment
-to-regulators-to-forgo-dividends/

UPDATE: Leonard Green-led ownership collected $658 million from
safety-net hospital company despite challenges, commitment to regulators
to forgo dividends – Private Equity Stakeholder Project

pestakeholder.org

Thursday, Apr 8 · 6:16 PM

Did you have a chance to speak with the rep from the stakeholder project?
Anything come of it?

Yeah she was great

Connected me w someone from PBS

Prob too late to get into the doc

But we can still share info w her which is good

Maybe they can do some type of story outside of the doc. But, probably
good connections long term anyway.

Thursday, Apr 8 · 9:48 PM

Oh definitely, good productive conversation

Glad we had it

Thank you again for making the connection!

You're welcome!

Loved "You're welcome!"

Monday, Apr 12 · 1:49 PM

Spoke to the mayor on Friday

Got our legal team there, they actually all kind of vibed abt case law

I think/hope it made a positive impact. He did state that he thought it was really good we all got this meeting together. Just wanted to instill some confidence and I think that happened.

Cautiously optimistic?

Yeah basically

Lol

I'll connect w Yasmine today too

We'll have some members on tonight so that will be good

Maybe not good for you guys who are trying to go to sleep at a reasonable hour, but 😫 gotta make sure their voices are heard

Thanks again for everything

We have a lot tonight. It's one of those days. Mine started at 8am and will probably end at 2a I am guessing.

No problem. We'll see how it goes.

Oof I hope that is not the case, you need a vacation

And yes, will see what happens

Monday, Apr 12 · 8:05 PM

Idk why my computer thinks I'm Katrice Frierson - maybe it's just remembering my IP address

Just don't want that to be an issue when it comes time for comment

I registered a bunch of people

For the meeting

But I clicked on one of the TWO   emails I sent for myself! 

That's probably it. Just send a message to the host clarifying who you are prior to speaking

Ok will do

TY

Monday, Apr 12 · 9:13 PM

Did Socal Hospital hire any additional staff for covid?

I honestly don't know abt that

Definitely didn't seem like it.

Yeah I would bet no

Hahaha! Michael Klepin showed up! Ridiculous

He's abt to make an argument that starts w being "relatable"

Lemme tell your rn

A good sign in a way. They are paying attention. Did they recently agree to a contract?

Sorry I'll stop texting you but

No they haven't

So stupid! Meals?! That's what you're bringing up?! Why is there such a culture around shaming healthcare workers for asking for anything

They did a huge insane thing

You're up

They just called your name but didn't see you listed so moved on

Yeah I know sorry that happened, I communicated to the host that I'm here

But I'm under a diff name

Is it possible the ceo scared people away by speaking?

No I don't think it was that

I think ppl just get tired

I can't tell you how many people I spoke to today are like

I have never done this, I also have to work at 4 in the morning

If you can say Katrice would like to speak

I'll speak

But yeah I'm like, telling them, you guys deserve this!

Don't be ashamed to ask! It's doable

Literally so doable

I get that. I'm at 14.5 hours so far today. I sent a message. But I'll speak up at the end if they don't call you.

Liked "I get that. I'm at 14.5 hours so far today. I sent a message. But I'll speak up at the end if they don't call you."

Thank you

Lol this is so wild

Actually not funny at all but

Idk how Katrice is on here and they unmuted her and I'm also listed as Katrice

Yeah. I see two Katrice's. Did the clerk get back to you?

No she never said anything

I literally am on here

Trying to speak

Lol I got super passionate, was that bad?

No it translated.

I just was rearin to go, was that bad?

Ok cool

Haha I repeated myself to you

Yeah I'm just texting a million people at the same time rn

Thanks again for everything

Also

This argument is such bullshit lol

Oof you are doing an incredible job

Yup!

Yup!! Thank you for saying this!!

This is so powerful

You're spelling it out for everyone

I appreciate it so much

Thank you for that

Tuesday, Apr 20 · 11:10 AM

Also do you have the city attorney's email? I just want to connect them with our attorneys

Make sure they have all the info we've gathered and to alleviate any concerns they may have

Elaine works for the city. She can also connect you to the attorney. But it should be carol.schwab

Got it, I googled her and it wasn't clear what her role was or like how she was relevant to the conversation

Thank you!

Saturday, Apr 24 · 6:24 PM

Hi Vice Mayor Lee - just checking in, the hero pay ordinance will not be taken up this Monday will it? Have been trying to get the city attorney in a meeting with our attorneys and they seem to want to meet early this coming week -- want to make sure we aren't catching them too late. Hope you are enjoying your weekend! ☼

Saturday, Apr 24 · 8:38 PM

It is on the agenda monday. Since we got initial approval we wanted to bring it back ASAP

Monday, Apr 26 · 10:16 AM

So it's just the hazard pay for grocery and drug retail workers, correct? In looking at the agenda item, it looks like the hero pay for healthcare workers is not being taken up tonight, would be better if that's the case really would prefer that the city attorney have an opportunity to connect with our attorneys and get their hands on all the resources they've compiled for them 😊

Monday, Apr 26 · 12:41 PM

Best to check in with the clerk to see when it will come up

Monday, Apr 26 · 1:49 PM

Thanks!

Thursday, May 6 · 12:25 PM

Hi Vice Mayor Lee just got notice that the ordinance is on the agenda for Monday so wanted to connect with you when you have the chance, thank you so much!

Thursday, May 6 · 3:38 PM

I could connect tomorrow afternoon.

Thursday, May 6 · 7:37 PM

Ok that sounds good! How is like 3:30? Or later in the evening?

Friday, May 7 · 11:20 AM

Could you do like 5 or 6

Friday, May 7 · 1:36 PM

Yes of course will try you then!

Thank you!

Monday, May 10 · 1:09 PM

Spoke to the Mayor, he is in support. He brought up that he thought we had signed an MOU to not move forward with hero pay if we got the contract, which 100% did not happen. I also went back to our negotiator to confirm this did not happen.

He said the only reason why he would not support is if that MOU was real but it is not, which I communicated to him, so hopefully this is an example of how cavalier employers can be in making bold-faces lies.

Since you only told me about the mayor it's fine but the brown act limits our discussion about colleague's positions outside of public meetings since Culver is small that's only one other council member total

Oh no sorry

I didn't know that was not intentional at all

Will stay mum from here on out

Monday, May 10 · 5:17 PM

Can't share specifics but hope your folks still show up tonight due to developments...

Do you have a second to chat

Don't need to go into this particular thing if it's an issue

No, in closed session. Looks like item Mary be delayed so if people could get on public comment to underlie the importance of this that would help. But, been in the council meeting since 5.

Ah just heard you're already in closed session

Got it, ok thank you so much

Monday, May 10 · 7:34 PM

Hey I have a favor to ask -- can you back me up when I ask the host to allow us to speak on non agenda item public comment? Going to put in the chat

We signed up to speak on the agenda item but now that it's moved, want to still make comment

Can do. Probably won't be able to get to you realistically.

Yeah seems like it

Here's the list of people trying to speak if somehow it is possible

Cass Gualvez
Greg Maron

Jane Steinberg
Jon Barton
Triana Silton
And myself

Thanks so much either way 

At least three of those are residents. Seems unlikely but definitely next time.
I'll reach out to the clerk.

Oh yeah these are all residents besides me

Oh also! Sorry Kurt Scott

Thank you 👷

One more -- Erik Dimitruk

I know we prob won't get in, but just in case, that's the last one
Sent a message to the clerk. Mayor might be limiting.

Agh ok

Will hang in, time is prob coming up soon
Hopefully they can email us again she show up when it comes back

Yeah my team was just talking about sending emails now so look out for that lol

Thanks again

Thursday, May 13 · 6:26 PM

Hey just wanted to check in and see if you have heard anything

Friday, May 14 · 1:03 PM

No, check in with the clerk but should be in the agenda for the next regular meeting.

Monday, May 17 · 4:30 PM

Liked "No, check in with the clerk but should be in the agenda for the next regular meeting."

Hope you got my voicemail. The mayor has agreed to meet w our team of attorneys etc so hopefully they get that on the books soon. I'll unfortunately have to be away for a while dealing with some health stuff but I hope to hear good news about all of this after that upcoming meeting.

I really, personally, appreciate everything you are doing on this and everything else in the city. Hopefully once I am well (and everything in this world is Covid safe) maybe we can find some time to connect over coffee

or lunch if you are willing. I really would love to get to meet you face to face and connect over this crazy messed up political world we work in! This has been my work phone which, for now, I'm going to try and avoid as I'm on sick leave. Personal number is attached in case you need anything in the meantime c: ██████████

Thanks again for everything

In our first budget session at the moment. Received your voicemail. Sorry to hear about your health issues. I deal with quite a bit myself and I know how it can bring things to a halt. Down to meet in person when you are well. Good that Alex has agreed to meet with the legal team. Hope it happens.

Yeah I know you have shared some of that with me, it can be so tough. I should be out for probably 3 weeks max maybe slightly longer. I'm glad you're willing to meet sometime! I think that'd be awesome. And yes hoping he meets and we succeed in getting this done! I know we would've never gotten this far without you pushing it along the whole way.

I am sure I will come out of all this okay, looking forward to being on the

other side of this!

Thanks again, talk soon.

Monday, May 24 · 10:21 PM

THANK YOU  for everything

Still paranoid about random stuff coming up on the second reading. But, glad to finally be moving forward.

Yes, certainly more work ahead but so grateful to have gotten this far

And incredibly grateful for you, especially

Wish I was able to be more present during this final leg but will be back soon

Hope you're feeling better.

Thank you so much, I appreciate it

May 24, 10:48 PM





Yasmine-Imani, Maky, (424) 253-4724

Monday, Apr 12 · 9:50 PM

Maky Peters created this group MMS with you, Yasmine-Imani McMorrin, and (424) 253-4724

Maky Peters

Hey bye - when these hospitals were lobbying for federal money, they were literally saying we need this money for hazard pay

And then they never did it!

Sorry, no one has to text me back here

*hey btw

Btw klepin lied abt the tracking and testing

That never happened

I can get people here to vouch for it

Not urgency!

We gotta do normal!!!

Don't need to duplicate e

We're ready to fight court Cade

Even if it looks different

*case

Yasmine-Imani, Maky, (424) 253-4724
Even if it looks different
*case
Literally you guys have the support
That's not something you should worry abt
It's actually the only way you're gonna have this pro bono support
Why make it 2?
M
The mayor wants to handle healthcare differently
Maky Peters
Mr. mayor
Literally your Trader Joe's could should be the issue before the hospital would be the issue
We have your back
There are only so many ways I legally can say that
*literally your Trader Joe's would be the issue
M
Still work to do on this.
Apr 12, 10:32 PM · MMS

# EXHIBIT "F"

# EXHIBIT "F"





Mayor Alex Fisch
Vice Mayor Daniel Lee
Member Göran Eriksson
Member Yasmine-Imani McMorrin
Member Albert Vera

### City Council Meeting Agenda

**REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**



Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

| 7:00 PM | Monday, March 22, 2021 |
|---------|------------------------|

**MEETING INFORMATION AND ACCOMMODATION:**

To combat the spread of the coronavirus respiratory disease (COVID-19), the City proclaimed a local emergency on March 14, 2020 and issued subsequent public orders beginning March 16, 2020.  In accordance with such orders City Hall has been closed to the public and in-person meetings have been discontinued until further notice.

City Council meetings can be viewed live in Culver City on Channel 35 by Time Warner subscribers, on Channel 37 by Frontier FIOS subscribers and, for AT&T Uverse subscribers, by going to Channel 99. Additionally, you may access   http://www22.verizon.com/residential/fiostv/channels.htm   and enter your zip code to see the channel listing.

Meetings can also be viewed live online at 1) http://www.culvercity.org/meetings and clicking on the "In Progress" meeting, 2) the Culver City youtube channel:   Youtube.com/CityofCulverCityGov  or 3) Via the Webex App, which requires registration at culvercity.org/agendas.

Any person needing reasonable accommodation related to disabilities, including assisted listening devices, is welcome to contact the City Clerk's Office at 310-253-5851 or via email at city.clerk@culvercity.org.

*For complete information on how to attend and participate in a City Council meeting and provide public comment, please visit www.culvercity.org/agendas.

**PUBLIC COMMENT:**

For those who wish to speak and provide oral public comment during a meeting, please register to attend the meeting via Webex at culvercity.org/agendas and indicate the agenda item(s) for which you wish to

Exhibit F, Page 214

**City Council Meeting Agenda**
**Closed Session 5:00pm**
**Regular Session 7:00pm**

**REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

**March 22, 2021**

make a comment. This will serve as a virtual speaker card. Speakers will be called in chronological order, based on when they registered to attend.   A tutorial on Webex Registration is available at Culver City's YouTube page (https://youtube.com/watch?v=q3NX-9lhSoU.)

Members of the public may submit written comments in advance on the City's website via eComment. To submit, go to www.culvercity.org/meetings, locate the appropriate meeting and click on the highlighted eComment link. As a new user you may need to register once. There is a new user tutorial at the City of Culver City's YouTube page (https://youtu.be/ckjtduK9B9s). Written comments may also be sent via public.comment@culvercity.org, or mail. Written comments, received by 3:00 PM on the day of the City Council meeting, will be compiled and provided to Council Members to ensure sufficient time for Council Member review. These comments will become part of the official record through a motion to receive and file correspondence.   Please be advised, written comments WILL NOT be read aloud during the City Council Meeting.

The City Council will receive comments from the public on any item of interest to the public (not listed on the agenda) that is within the subject matter jurisdiction of the City Council. The City Council cannot legally take action on any item not appearing on the agenda.   Such items may be referred for administrative action or scheduled on a future agenda.

Each speaker may address the City Council for up to three minutes.   Public comments on items on the agenda are taken at the time that particular agenda item is considered by the City Council.

**AUTHORITY OF PRESIDING OFFICER:**

Section 611 of the City Charter provides that during any public meeting, all persons shall have the right to address the City Council, and any City commission, board or committee, subject to reasonable rules of decorum and time limits established by ordinance or the presiding officer.   Therefore, the presiding officer may, from time to time, establish different time limits than those listed in this Agenda in order to effectively conduct City business.   The presiding officer may also, from time to time, re-order the items on the agenda in order to effectively conduct the City Council meeting.

Exhibit F, Page 215

| | | |
|---|---|---|
| **City Council Meeting Agenda** | **REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board** | **March 22, 2021** |
| **Closed Session 5:00pm** | | |
| **Regular Session 7:00pm** | | |

## AVAILABILITY OF AGENDA PACKETS AND CONSERVATION OF RESOURCES:

The Agenda, staff reports and attachments are available online at www.culvercity.org/agendas. Members of the public may inspect (at no cost) and/or obtain copies (upon payment of the City's current copying fee) of any regular session item by contacting the City Clerk's Office at City Hall via phone at (310) 253-58591 or email at city.clerk@culvercity.org.

**NOTE: AT OR ABOUT 11:00 P.M., MEMBERS MAY DETERMINE WHETHER TO CONTINUE WITH DISCUSSION OF REMAINING ITEMS ON THE AGENDA OR TO CARRY SOME/ALL OF THE ITEMS OVER TO A FUTURE MEETING DATE.**

Exhibit F, Page 216

**City Council Meeting Agenda**
**Closed Session 5:00pm**
**Regular Session 7:00pm**

**REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

March 22, 2021

---

**CALL TO ORDER & ROLL CALL:**

**CLOSED SESSION - 5:00 PM**

Public requests to discuss Closed Session Items must be filed with the Clerk before Closed Session convenes.

The City Council shall convene in closed session to consider the following matters:

**CS-1.**   21-766   **CC - CONFERENCE WITH REAL PROPERTY NEGOTIATORS RE: UNDERGROUND OIL PIPELINE THROUGH CITY**
**CITY NEGOTIATORS: JOHN NACHBAR, CITY MANAGER; JESSE MAYS, ASSISTANT TO THE CITY MANAGER**
**OTHER PARTIES NEGOTIATORS: REPRESENTATIVES OF TORRANCE VALLEY PIPELINE COMPANY**
**UNDER NEGOTIATION: BOTH TERMS AND PRICE PURSUANT TO GOVERNMENT CODE SECTION 54956.8**

**CS-2.**   21-800   **CC - CONFERENCE WITH LEGAL COUNSEL – ANTICIPATED LITIGATION**
**RE:  INITIATION OF LITIGATION – ONE ITEM**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(4)**

**CS-3.**   21-801   **CC - CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION**
**RE: SIGNIFICANT EXPOSURE TO LITIGATION—TWO ITEMS**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(2)**

**REGULAR SESSION - 7:00 PM**

**PLEDGE OF ALLEGIANCE**

**REPORT ON ACTION TAKEN IN CLOSED SESSION**

---

Exhibit F, Page 217

**City Council Meeting Agenda**
Closed Session 5:00pm
Regular Session 7:00pm

REVISION #1 - Regular Meeting of
the City Council, Successor Agency
to the Culver City Redevelopment
Agency Board, and Culver City
Housing Authority Board

March 22, 2021

## COMMUNITY ANNOUNCEMENTS BY MEMBERS/INFORMATION ITEMS FROM STAFF

Note: Council Members will have up to two minutes each to provide announcements (not including requests to "adjourn in memory".) Any additional announcements and/or requests to place items on a future agenda may be held to the end of the City Council Meeting, after all other business appearing on the agenda has been completed.

**I-1.**    21-585    **CC - COVID-19 UPDATE**

## PRESENTATIONS TO CITY COUNCIL

**P-1.**    21-760    **GREETING AND VISIT BY LOS ANGELES COUNTY DISTRICT NUMBER 2 SUPERVISOR HOLLY MITCHELL**

## JOINT PUBLIC COMMENT - Items NOT on the Agenda (Limit 20 Minutes)

Note: All requests to address the City Council (and all other bodies in session) on items of interest to the public that are within the subject matter jurisdiction of the City Council (and all other bodies in session) and NOT on the agenda must be submitted to the City Clerk prior to the calling of this item by the presiding officer.  This public comment period shall have an aggregate duration of up to 20 minutes for all bodies in session.  Each comment may be up to three minutes in length.

## RECEIPT AND FILING OF CORRESPONDENCE

Note: The City Council shall consider a motion to receive and file all written correspondence related to agenda items appearing on this evening's agenda and for all other written documents (including e-mails sent to city.clerk@culvercity.org) on subjects not appearing on the agenda that were received by the City Clerk's Office. Comments received in writing by 3:00 PM on the meeting date will be distributed to the City Council Members and become part of the official record of the meeting.

## ORDER OF THE AGENDA

Note: The presiding officer or City Council may consider reordering the sequence in which items appearing on this evening's agenda will be considered by the City Council.

| | | |
|---|---|---|
| **City Council Meeting Agenda**<br>**Closed Session 5:00pm**<br>**Regular Session 7:00pm** | **REVISION #1 - Regular Meeting of**<br>**the City Council, Successor Agency**<br>**to the Culver City Redevelopment**<br>**Agency Board, and Culver City**<br>**Housing Authority Board** | **March 22, 2021** |

## CONSENT CALENDAR

Note: Joint Consent and Consent Calendar items are considered to be routine in nature and may be approved by one motion. All requests to address the City Council under these items must be filed with the City Clerk before the Consent Calendar and Joint Consent Calendar are called by the presiding officer. Any Consent Calendar item that is pulled for discussion by a Council Member (not including brief questions, points of clarification and the like, which can be handled quickly), or because a public comment card(s) has been filed with the City Clerk, may be pulled from the Consent Calendar and considered later in the agenda, at the discretion of the presiding officer or City Council.

**C-1.**   21-797   **CC:HA:SA - APPROVAL OF CASH DISBURSEMENTS FOR FEBRUARY 27, 2021 TO MARCH 12, 2021**

*Attachments:*   Final Cash Disbursements for City Council - 210322.pdf

**C-2.**   21-798   **CC:HA:SA - APPROVAL OF MINUTES FOR THE REGULAR CONSOLIDATED CITY COUNCIL MEETINGS OF MARCH 1, 2021,   MARCH 3, 2021 AND MARCH 8, 2021**

*Attachments:*   CCCC 03012021 Minutes for Approval.pdf
CCCC 03032021 Minutes for Approval.pdf
CCCC 03082021 Minutes for Approval.pdf

Exhibit F, Page 219

**City Council Meeting Agenda**
Closed Session 5:00pm
Regular Session 7:00pm

REVISION #1 - Regular Meeting of
the City Council, Successor Agency
to the Culver City Redevelopment
Agency Board, and Culver City
Housing Authority Board

March 22, 2021

**C-3.**   21-399   CC - (1) AWARD OF CONSTRUCTION CONTRACT IN THE AMOUNT OF $315,000.00 TO ONYX PAVING COMPANY INC., AS THE LOWEST RESPONSIVE AND RESPONSIBLE BIDDER FOR THE CONSTRUCTION OF THE RANCHO HIGUERA NEIGHBORHOOD TRAFFIC MANAGEMENT PROGRAM (NTMP); (2) AUTHORIZATION TO THE PUBLIC WORKS DIRECTOR/CITY ENGINEER TO APPROVE CHANGE ORDERS IN A TOTAL AMOUNT NOT-TO-EXCEED $47,250.00 (15%); (3) AUTHORIZATION OF MATERIAL TESTING FROM AN ON-CALL CONSULTANT IN AN AMOUNT NOT-TO-EXCEED $10,000; AND (4) FOUR-FIFTHS VOTE REQUIREMENT: APPROVAL OF A BUDGET AMENDMENT TO ALLOCATE THE UNUSED REMAINING AMOUNT FROM PO-008 TO PF-025, BICYCLE/PEDESTRIAN ACTION PLAN IMPLEMENTATION.

**C-4.**   21-719   CC - ADOPTION OF A RESOLUTION APPOINTING THE CITY'S DIRECTOR AND ALTERNATE DIRECTORS TO THE CALIFORNIA TRANSIT SYSTEMS JOINT POWERS AUTHORITY (CALTIP)

*Attachments:*   21-03-22 TRANS Reso - CalTIP Directors.pdf

**C-5.**   21-730   HA - APPROVAL OF AN AMENDMENT TO THE EXISTING PROFESSIONAL SERVICE AGREEMENT WITH SAINT JOSEPH CENTER TO CONTINUE EXPANDED HOMELESS OUTREACH SERVICES DURING WEEKDAYS, EVENINGS, AND SATURDAYS IN AN AMOUNT NOT-TO-EXCEED $699,659.

*Attachments:*   2021-03-22 ATT No. 1 SJC Proposed Budget (1).pdf
2021-03-22 ATT 2 SJC Renewal Housing Matrix.pdf
2021-03-22 ATT No. 3 SJC July 2020 - February 2021 Report FY2021 2.pdf

Exhibit F, Page 220

**City Council Meeting Agenda**
Closed Session 5:00pm
Regular Session 7:00pm

**REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

March 22, 2021

**C-6.**  21-734   **CC - (1) APPROVAL OF A MEMORANDUM OF UNDERSTANDING WITH THE COUNTY OF LOS ANGELES REGISTRAR-RECORDER/COUNTY CLERK FOR REAL PROPERTY TRANSFER TAX COLLECTION; AND (2) ADOPTION OF A RESOLUTION ESTABLISHING RULES AND PROCEDURES NECESSARY FOR THE IMPLEMENTATION OF THE REAL PROPERTY TRANSFER TAX IN ACCORDANCE WITH CULVER CITY MUNICIPAL CODE SECTION 3.08.400.D.**

*Attachments:*  21-03-22_ATT_RESOLUTION RPTT.pdf

**C-7.**  21-774   **CC - CONTINUATION OF PUBLIC HEARING TO APRIL 12, 2021: ADOPTION OF A RESOLUTION APPROVING AN EXCEPTION TO THE CITY'S SUBDIVISION DESIGN STANDARD TO ALLOW THE DEVELOPMENT OF THREE DETACHED TOWNHOME STYLE RESIDENTIAL UNITS LOCATED AT 4044 MADISON AVENUE.**

**C-8.**  21-775   **CC - FOUR-FIFTHS VOTE REQUIREMENT: APPROVAL OF A BUDGET AMENDMENT IN THE AMOUNT OF $ 509,097.73 FROM THE LOS ANGELES COUNTY MEASURE W SAFE CLEAN WATER PARCEL TAX.**

**C-9.**  21-790   **CC - RECEIPT AND FILING OF THE FINAL INTERNAL CONTROLS AUDIT REPORT OF ENTERPRISE RISK ASSESSMENT**

*Attachments:*  2021_03_22_ATT_Culver City - Enterprise Risk Assessment Report.pdf

Exhibit F, Page 221

**City Council Meeting Agenda**
Closed Session 5:00pm
Regular Session 7:00pm

**REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

March 22, 2021

**C-10.** [21-793](#) CC - (1) APPROVAL OF THE 90% COMPLETED PLANS AND SPECIFICATIONS FOR THE MOVE CULVER CITY - DOWNTOWN CORRIDOR PROJECT PS017 (PROJECT) AND AUTHORIZATION TO PUBLISH A NOTICE INVITING BIDS; AND, (2) ADOPTION OF A RESOLUTION CERTIFYING THE PROJECT WILL BE COMPLETED BY A SKILLED AND TRAINED WORKFORCE AND GRANTING EXEMPTIONS FROM THE CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA).

*Attachments:* [2021-03-22_ATT_Resolution Certifying Workforce and Granting CEQA Exemptions.pdf](#)

**C-11.** [21-799](#) CC - ADOPTION OF A RESOLUTION APPROVING THE CLASSIFICATION AND SALARY PLAN FOR CITY EMPLOYEES EFFECTIVE MARCH 22, 2021.

*Attachments:* [Misc Salary Schedule - MidYear Budget Amendment March 2021.pdf](#)

**C-12** [21-792](#) CC - (1) APPROVAL OF AN AMENDMENT TO THE PROFESSIONAL SERVICES AGREEMENT WITH SAM SCHWARTZ FOR THE MOVE CULVER CITY PROJECT IN AN AMOUNT NOT-TO-EXCEED $673,167.66; (2) AUTHORIZATION TO THE CITY MANAGER TO NEGOTIATE AND APPROVE THE FINAL TERMS OF THE AMENDMENT; (3) AUTHORIZATION TO THE CITY MANAGER TO APPROVE AMENDMENTS TO THE AGREEMENT FOR CONTINGENCY COSTS OF 18% NOT-TO-EXCEED $122,000.00; AND (4) (FOUR-FIFTHS VOTE REQUIREMENT): APPROVE A BUDGET AMENDMENT IN THE AMOUNT OF $662,682.82 TO BRIDGE THE GAP IN PROJECT FUNDING FOR THE PROFESSIONAL SERVICES.

**PUBLIC HEARINGS AND ACTION ITEMS**

Note: The Public Hearing or Action Item with the most public comment cards on file with the City Clerk may be considered by the City Council as the first item,

Exhibit F, Page 222

**City Council Meeting Agenda**

**Closed Session 5:00pm**
**Regular Session 7:00pm**

REVISION #1 - Regular Meeting of
the City Council, Successor Agency
to the Culver City Redevelopment
Agency Board, and Culver City
Housing Authority Board

March 22, 2021

at the discretion of the presiding officer or City Council. The remaining Public Hearing and Action items shall be considered in the order they appear on the agenda, unless re-ordered by the presiding officer or City Council.

## ACTION ITEMS

**A-1.**   21-789   **CC - ADOPTION OF A RESOLUTION ADOPTING AN UPDATED CITY COUNCIL POLICY NO. 4210 ENTITLED FRAUD, WASTE AND ABUSE OF CITY RESOURCES, INCLUDING THE RELATED INTERNAL AUDIT FRAMEWORK, WHICH SHALL SUPERSEDE CURRENT CITY COUNCIL POLICY 4210 FRAUD PREVENTION.**

*Attachments:*   2021-03-21_ATT 1_Resolution Adopting Fraud Waste and Abuse of City Resources Policy.pdf
2021-03-21_ATT 2_Existing Council Policy 4210 Fraud Prevention.pdf

**A-2.**   21-729   **CC/HA - 1) DISCUSSION OF AFFORDABLE HOUSING PROGRAMS, INCLUDING CREATION OF AFFORDABLE MODULAR HOUSING UNITS OR DEVELOPMENT OF A HOMELESS SHELTER ON IDENTIFIED SITES; 2) DISCUSSION OF FINDINGS AND RECOMMENDATIONS OF THE MOTEL REUSE FEASIBILITY STUDY TO PROVIDE SHELTER BEDS OR PERMANENT SUPPORTIVE HOUSING; 3) UPDATE ON THE COVID-19 EMERGENCY RENTAL ASSISTANCE PROGRAM AND PROVIDE DIRECTION FOR EXTENDING THE PROGRAM; AND (4) DIRECTION TO THE CITY MANAGER ON THE FOREGOING ITEMS AS DEEMED APPROPRIATE.**

*Attachments:*   2021-03-22 ATT 1 Housing Programs Matrix Demo Info.pdf
2021-03-22 ATT No 2 COVID 19 ERAP Status Update Chart final.pdf
2021-03-22 ATT No. 3 COVID 19 ERAP Guidelines.pdf
2021-03-22 ATT No. 4 Housing Programs 2010 200821 Step 1 Screening Criteria Summary.pdf

Exhibit F, Page 223

**City Council Meeting Agenda**
Closed Session 5:00pm
Regular Session 7:00pm

**REVISION #1 - Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

March 22, 2021

A-3.   21-794   CC - (1) DISCUSSION OF A POTENTIAL HERO PAY ORDINANCE TO PROVIDE ADDITIONAL COMPENSATION TO GROCERY WORKERS, RETAIL WORKERS AND FRONT-LINE WORKERS AT SOUTHERN CALIFORNIA HOSPITAL; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.

*Attachments:*   2021-03-22__ATT__City of LA Report on Hero Pay.pdf

2021-03-22__ATT__City of LA Ordinance 186940.pdf

A-4.   21-695   CC - (1) CONSIDERATION OF ADOPTION OF ALTERNATE PROPOSED RESOLUTIONS ESTABLISHING GUIDING PRINCIPLES FOR CULVER CITY'S 2021-2029 HOUSING ELEMENT UPDATE; AND (2) (IF DESIRED) ADOPTION OF THE PROPOSED RESOLUTION OF CHOICE.

*Attachments:*   2021-03-22_ATT_1_Proposed Model Resolution.pdf

2021-03-22_ATT_2_Draft WSCCOG REAP Development Constraints Scope

2021-03-22_ATT_3_Proposed Modified Model Resolution.pdf

2021-03-22_ATT_4_Housing Element Existing Approach and Schedule

2021-03-22_ATT_5_Raimi + Associates Existing Agreement

2021-03-22_ATT_6_HCD Existing Agreement

**PUBLIC COMMENT - ITEMS NOT ON THE AGENDA (CONTINUED)**

**ITEMS FROM MEMBERS (CONTINUED)**

**MEMBER REQUESTS TO AGENDIZE FUTURE ITEMS**

**ADJOURN (INCLUDING ADJOURNMENT IN MEMORY)**

Exhibit F, Page 224

# EXHIBIT "G"

# EXHIBIT "G"



# City of Culver City

Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

## Staff Report Details (With Text)

| | | | | |
|---|---|---|---|---|
| **File #:** | 21-794 | **Version:** 1 | **Name:** | Potential Hero Pay Ordinance |
| **Type:** | Resolution | | **Status:** | Agenda Ready |
| **File created:** | 3/11/2021 | | **In control:** | City Council Meeting Agenda |
| **On agenda:** | 3/22/2021 | | **Final action:** | |
| **Title:** | CC - (1) Discussion of a Potential Hero Pay Ordinance to Provide Additional Compensation to Grocery Workers, Retail Workers and Front-Line Workers at Southern California Hospital; and (2) Direction to the City Manager as Deemed Appropriate. | | | |
| **Sponsors:** | | | | |
| **Indexes:** | | | | |
| **Code sections:** | | | | |
| **Attachments:** | 1. 2021-03-22__ATT__City of LA Report on Hero Pay.pdf, 2. 2021-03-22__ATT__City of LA Ordinance 186940.pdf | | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| | | | | |

## CC - (1) Discussion of a Potential Hero Pay Ordinance to Provide Additional Compensation to Grocery Workers, Retail Workers and Front-Line Workers at Southern California Hospital; and (2) Direction to the City Manager as Deemed Appropriate.

**Meeting Date:** March 22, 2021

**Contact Person/Dept:**   Shelly Wolfberg/City Manager's Office
**Phone Number:**   (310) 253-6000

**Fiscal Impact:** Yes [] No [X]   **General Fund:** Yes [] No [X]

**Public Hearing:** []   **Action Item:** [X]   **Attachments:** [X]

**Commission Action Required:**   Yes [] No [X]   **Date:**

**Public Notification:**   (E-Mail) Southern California Hospital, Culver City Chamber of Commerce, Downtown Business Association, and Meetings and Agendas - City Council (03/18/2021) and **Department Approval:** John M. Nachbar (03/18/2021)

_____

## RECOMMENDATION

Staff recommends the City Council (1) discuss a potential Hero Pay Ordinance to provide additional compensation to grocery workers, retail workers and front-line workers at Southern California Hospital; and (2) provide direction to the City Manager as deemed appropriate.

Exhibit G, Page 226

File #: 21-794, **Version:** 1

## BACKGROUND

At the February 22, 2021 City Council Meeting, there was consensus by City Council to agendize consideration of a "Hero Pay" ordinance to provide additional compensation to grocery workers, retail workers and front-line workers at Southern California Hospital (SCH).   Several other Southern California municipalities, including the County of Los Angeles, City of Los Angeles, West Hollywood, Long Beach, and Montebello as well as San Leandro, Oakland and San Jose in northern California, have adopted hero pay ordinances to require employers in the grocery, drug, and retail industries to provide additional compensation to their essential and public-facing employees during the COVID-19 crisis. Hero pay compensates employees for the risks and hazards encountered in providing access to food/medicine and maintaining functionality of key economic sectors during the COVID-19 pandemic.

A report from the City of Los Angeles Chief Legislative Analyst ("the Report"), dated February 19, 2021, provides a comprehensive overview of pertinent issues such as grocery industry economics, potential economic impacts, potential legal challenges, and a summary of similar programs ordinances enacted throughout California (Attachment 1).    Subsequently, on March 4, 2021, the Los Angeles City Council adopted an addition to the Los Angeles Municipal Code to provide additional pay to grocery and drug retail workers on the frontlines of COVID-19.   The Ordinance became effective on March 8, 2021 (Attachment 2).

Generally, most municipalities in Southern California have adopted ordinances that provide/require:

**Additional Hourly compensation for a Specific Duration**:
- Provide employees an additional $4/hour - $5/hour pay increase for a period of 120 days.

**Business Type and Number of employees**:
- Require grocery stores, drug stores and retail stores that are publicly traded or have at least 300 employees nationwide and more that 10-15 employees on site to comply.

Variations exist between other cities' adopted and draft ordinances relative to:

**Employee Eligibility:**
- Only hourly, non-managerial employees affected; **or**
- All workers included.

**Floor Area/Percent for food/retail threshold:**
- Stores with 85,000 or more that dedicate 10% of floor to grocery/drug retail **and/or**
- 70% of business activity involves selling groceries; **or**
- No specific space requirement (if business type and number of employees threshold is met)

In Northern California, there are differences relative to the required timeframe to provide hero pay in conjunction with current state infection tiers (Widespread, Substantial and Moderate) and/or the duration of the public emergency.   There are also lower square footage requirements for store compliance.

Exhibit G, Page 227

**File #:** 21-794, **Version:** 1

## DISCUSSION

While COVID-19 cases in Los Angeles continue to decline, and vaccine availability increases, there is a continued risk of coronavirus infection in certain essential job sectors.  Until potential variants are subdued, and "herd immunity" is achieved, frontline workers in grocery, drug retail and healthcare industries are potentially placed in a hazardous environment until they are fully vaccinated. Healthcare workers were among the first tier eligible to receive the COVID-19 vaccine and as of March 1st, food service workers became eligible to receive the vaccine based on availability.

In considering a potential "hero pay" ordinance, it is also important to consider potential economic impacts to businesses required to comply with the law as well as legal challenges.

*Potential Economic Impacts*

There are a number of potential economic impacts to private businesses in providing hazard pay for their employees.  The Report notes that while these industries generated significant profit in the first quarter of 2020 as customers stocked up on essential food and home items, net profit margin for Kroger returned to the first quarter of the 2019 level, and Albertsons saw a slight increase over the same period. Additionally, stores are required to provide personal protective equipment, increased sanitation, cleaning protocols, installation of protective equipment, and COVID-19 testing costs, increasing overall expenses.  Additionally, several of the large national grocery, retail and drug companies have already provided bonuses and other benefits to their employees related to COVID-19, also affecting profit margins related to ongoing operation.  Requiring these businesses to provide hazard pay could potentially create the following economic impacts:

- Increased labor costs, which could require businesses to reduce costs or increase revenues.
- Potentially higher prices for consumers.
- Store closures, and/or
- Reduced hours, wages, or jobs.

Increased benefits to employees, however, could help spur the economy with the purchase of food and goods, payment of debt, or additional service support for family and childcare.

*Potential Impacts to Culver City Business*

Based on similar guidelines instituted in neighboring cities, numerous businesses in Culver City could be potentially affected if an ordinance comparable to other cities was enacted.

To date, two Kroger stores have been closed in response to similar hero pay ordinances adopted in Long Beach, though as noted in the Report, these stores were classified as "underperforming," and other factors may have contributed to  their closures.

*Healthcare Workers*

At this time, no other municipality has adopted an ordinance relative to providing healthcare worker hazard pay.  If the City Council wishes to require hazard pay for frontline health care employees at Southern California Hospital, it could potentially include all public-facing staff including reception, janitorial, laboratory, nursing and medical personnel in a comparable bonus structure similar to those adopted directly by Kaiser Permanente and the Mayo Clinic (Attachment 3).  The number of employees in these categories could prove significant and may encompass both hourly and salaried employees.

*Potential Legal Challenges*

As detailed in the Report, a number of federal lawsuits have been filed by the California Grocers Association (CGA), the trade association for approximately 300 grocery retailers and 150 grocery supply companies in California. In the Long Beach case, the CGA alleges that the Long Beach ordinance violates the National Labor Relations Act (NLRA) by regulating activity that Congress intended to be left to economic forces; violates the Equal Protection Clause of the United States and California Constitutions for singling out certain workers but ignoring those in other industries; violates the Contract Clause of the United States and California Constitutions, by interfering with collective bargaining. Similar suits were filed against Montebello and West Hollywood, as well as the northern California cities.

The United Food and Commercial Workers Local 770, a union representing grocery and drugstore workers, filed a motion in federal court to intervene in the Montebello case, so their interests could be better represented.  In the Long Beach matter, the federal court denied the CGA's motion for a temporary restraining order (TRO) and preliminary injunction against the City; the motion had requested that the court halt the implementation of the ordinance. The Court denied the motion for a preliminary injunction on the basis that CGA failed to establish a "likelihood of success on the merits." The CGA has filed an appeal to the Ninth Circuit Court of Appeals.

The City Attorney's office and City staff will be monitoring these cases as they progress through the courts.

## FISCAL ANALYSIS

There is no fiscal impact relative to the discussion of a potential hazard "hero" pay ordinance.  If directed to proceed with an urgency ordinance, there is the potential for exposure to litigation and related legal fees for enactment.

## ATTACHMENTS

1. 2021-03-22__ATT__City of Los Angeles Report of the Chief Legislative Analyst - February 19, 2021

2. 2021-03-22__ATT__City of Los Angeles Ordinance No. 186940 Premium Hazard Pay for On-Site Grocery and Drug Retail Workers

## MOTION

That the City Council:

1. Discuss a potential Hero Pay Ordinance to provide hazard pay for certain grocery, drug, retail, and healthcare workers; and

2. Provide direction to the City Manager as deemed appropriate.

# EXHIBIT "H"

# EXHIBIT "H"





Mayor Alex Fisch
Vice Mayor Daniel Lee
Member Göran Eriksson
Member Yasmine-Imani McMorrin
Member Albert Vera

## City Council Meeting Agenda

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**



Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

| | |
|---|---|
| **7:00 PM** | **Monday, April 12, 2021** |

**MEETING INFORMATION AND ACCOMMODATION:**

To combat the spread of the coronavirus respiratory disease (COVID-19), the City proclaimed a local emergency on March 14, 2020 and issued subsequent public orders beginning March 16, 2020. In accordance with such orders City Hall has been closed to the public and in-person meetings have been discontinued until further notice.

City Council meetings can be viewed live in Culver City on Channel 35 by Time Warner subscribers, on Channel 37 by Frontier FIOS subscribers and, for AT&T Uverse subscribers, by going to Channel 99. Additionally, you may access http://www22.verizon.com/residential/fiostv/channels.htm and enter your zip code to see the channel listing.

Meetings can also be viewed live online at 1) http://www.culvercity.org/meetings and clicking on the "In Progress" meeting, 2) the Culver City youtube channel: www.CulverCity.org/youtube or 3) Via the Webex App, which requires registration at culvercity.org/agendas.

Any person needing reasonable accommodation related to disabilities, including assisted listening devices, is welcome to contact the City Clerk's Office at 310-253-5851 or via email at city.clerk@culvercity.org.

*For complete information on how to attend and participate in a City Council meeting and provide public comment, please visit www.culvercity.org/agendas.

Exhibit H, Page 232

| | | |
|---|---|---|
| **City Council Meeting Agenda** | **Regular Meeting of the City Council,** | **April 12, 2021** |
| Closed Session 5:00pm | **Successor Agency to the Culver City** | |
| Recognitions 6:45pm | **Redevelopment Agency Board, and** | |
| Regular Session 7:00pm | **Culver City Housing Authority Board** | |

**PUBLIC COMMENT:**

For those who wish to speak and provide oral public comment during a meeting, please register to attend the meeting via Webex at culvercity.org/agendas and indicate the agenda item(s) for which you wish to make a comment. This will serve as a virtual speaker card. Speakers will be called in chronological order, based on when they registered to attend. A tutorial on Webex Registration is available at Culver City's YouTube page (https://youtube.com/watch?v=q3NX-9lhSoU.)

Members of the public may submit written comments in advance on the City's website via eComment. To submit, go to www.culvercity.org/meetings, locate the appropriate meeting and click on the highlighted eComment link. As a new user you may need to register once. There is a new user tutorial at the City of Culver City's YouTube page (https://youtu.be/ckjtduK9B9s). Written comments may also be sent via public.comment@culvercity.org, or mail. Written comments, received by 3:00 PM on the day of the City Council meeting, will be compiled and provided to Council Members to ensure sufficient time for Council Member review. These comments will become part of the official record through a motion to receive and file correspondence. Please be advised, written comments WILL NOT be read aloud during the City Council Meeting.

The City Council will receive comments from the public on any item of interest to the public (not listed on the agenda) that is within the subject matter jurisdiction of the City Council. The City Council cannot legally take action on any item not appearing on the agenda. Such items may be referred for administrative action or scheduled on a future agenda.

Each speaker may address the City Council for up to three minutes. Public comments on items on the agenda are taken at the time that particular agenda item is considered by the City Council.

Exhibit H, Page 233

**City Council Meeting Agenda**
**Closed Session 5:00pm**
**Recognitions 6:45pm**
**Regular Session 7:00pm**

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

**April 12, 2021**

**AUTHORITY OF PRESIDING OFFICER:**

Section 611 of the City Charter provides that during any public meeting, all persons shall have the right to address the City Council, and any City commission, board or committee, subject to reasonable rules of decorum and time limits established by ordinance or the presiding officer. Therefore, the presiding officer may, from time to time, establish different time limits than those listed in this Agenda in order to effectively conduct City business. The presiding officer may also, from time to time, re-order the items on the agenda in order to effectively conduct the City Council meeting.

**AVAILABILITY OF AGENDA PACKETS AND CONSERVATION OF RESOURCES:**

The Agenda, staff reports and attachments are available online at www.culvercity.org/agendas. Members of the public may inspect (at no cost) and/or obtain copies (upon payment of the City's current copying fee) of any regular session item by contacting the City Clerk's Office at City Hall via phone at (310) 253-58591 or email at city.clerk@culvercity.org.

**NOTE:   AT OR ABOUT 11:00 P.M., MEMBERS MAY DETERMINE WHETHER TO CONTINUE WITH DISCUSSION OF REMAINING ITEMS ON THE AGENDA OR TO CARRY SOME/ALL OF THE ITEMS OVER TO A FUTURE MEETING DATE.**

Exhibit H, Page 234

**City Council Meeting Agenda**
Closed Session 5:00pm
Recognitions 6:45pm
Regular Session 7:00pm

**Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board, and
Culver City Housing Authority Board**

April 12, 2021

---

**CALL TO ORDER & ROLL CALL:**

**CLOSED SESSION - 5:00 PM**

Public requests to discuss Closed Session Items must be filed with the Clerk before Closed Session convenes.

The City Council shall convene in closed session to consider the following matters:

**CS-1.**   21-855   **CC - CONFERENCE WITH LABOR NEGOTIATORS**
**CITY DESIGNATED REPRESENTATIVES: CITY MANAGER JOHN NACHBAR; ASSISTANT CITY MANAGER SERENA WRIGHT**
**EMPLOYEE ORGANIZATION: CULVER CITY EMPLOYEES ASSOCIATION; CULVER CITY MANAGEMENT GROUP; CULVER CITY POLICE OFFICERS ASSOCIATION;**
**CULVER CITY FIRE FIGHTERS ASSOCIATION; CULVER CITY POLICE MANAGEMENT GROUP; CULVER CITY FIRE MANAGEMENT ASSOCIATION; EXECUTIVE MANAGEMENT EMPLOYEES**
**PURSUANT TO GOVERNMENT CODE SECTION 54957.6**

**CS-2.**   21-873   **CC – CONFERENCE WITH REAL PROPERTY NEGOTIATORS**
**RE: 10858 CULVER BOULEVARD**
**CITY NEGOTIATORS: JOHN NACHBAR, CITY MANAGER, SOL BLUMENFELD, COMMUNITY DEVELOPMENT DIRECTOR, TODD MOONEY, CITY SPECIAL COUNSEL**
**OTHER PARTIES NEGOTIATORS: WENDE MUSEUM**
**UNDER NEGOTIATION: PRICE, TERMS OF PAYMENT OR BOTH, INCLUDING USE RESTRICTIONS, DEVELOPMENT OBLIGATIONS AND OTHER MONETARY RELATED CONSIDERATIONS.**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.8**

---

Exhibit H, Page 235

**City Council Meeting Agenda**
Closed Session 5:00pm
Recognitions 6:45pm
Regular Session 7:00pm

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

April 12, 2021

---

**CS-3.**   21-875   **CC - CONFERENCE WITH LEGAL COUNSEL – ANTICIPATED LITIGATION**
**RE: INITIATION OF LITIGATION – ONE ITEM**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(4)**

**CS-4.**   21-876   **CC - CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION**
**RE: SIGNIFICANT EXPOSURE TO LITIGATION—TWO ITEMS**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(2)**

**RECOGNITION PRESENTATIONS - 6:45 PM**

**R-1.**   21-860   **CC - PRESENTATION OF A PROCLAMATION DESIGNATING APRIL 30, 2021 AS "ARBOR DAY"**

**R-2.**   21-859   **CC - PRESENTATION OF A COMMENDATION TO NO LIMITS FOR DEAF CHILDREN IN RECOGNITION OF ITS 25TH ANNIVERSARY**

**REGULAR SESSION - 7:00 PM**

**PLEDGE OF ALLEGIANCE**

**REPORT ON ACTION TAKEN IN CLOSED SESSION**

**COMMUNITY ANNOUNCEMENTS BY MEMBERS/INFORMATION ITEMS FROM STAFF**

Note: Council Members will have up to two minutes each to provide announcements (not including requests to "adjourn in memory".) Any additional announcements and/or requests to place items on a future agenda may be held to the end of the City Council Meeting, after all other business appearing on the agenda has been completed.

**I-1.**   21-877   **CC - COVID-19 UPDATE**

---

Exhibit H, Page 236

**City Council Meeting Agenda**

Closed Session 5:00pm
Recognitions 6:45pm
Regular Session 7:00pm

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

April 12, 2021

**PRESENTATIONS TO CITY COUNCIL**

**P-1.**   21-856   **CC - PRESENTATION TO THE CITY COUNCIL BY STREETS FOR ALL REGARDING THE "VENICE BLVD FOR ALL" INITIATIVE.**

**JOINT PUBLIC COMMENT - Items NOT on the Agenda (Limit 20 Minutes)**

Note: All requests to address the City Council (and all other bodies in session) on items of interest to the public that are within the subject matter jurisdiction of the City Council (and all other bodies in session) and NOT on the agenda must be submitted to the City Clerk prior to the calling of this item by the presiding officer.  This public comment period shall have an aggregate duration of up to 20 minutes for all bodies in session.  Each comment may be up to three minutes in length.

**RECEIPT AND FILING OF CORRESPONDENCE**

Note: The City Council shall consider a motion to receive and file all written correspondence related to agenda items appearing on this evening's agenda and for all other written documents (including e-mails sent to city.clerk@culvercity.org) on subjects not appearing on the agenda that were received by the City Clerk's Office. Comments received in writing by 3:00 PM on the meeting date will be distributed to the City Council Members and become part of the official record of the meeting.

**ORDER OF THE AGENDA**

Note: The presiding officer or City Council may consider reordering the sequence in which items appearing on this evening's agenda will be considered by the City Council.

Exhibit H, Page 237

| City Council Meeting Agenda | Regular Meeting of the City Council, | April 12, 2021 |
|---|---|---|
| Closed Session 5:00pm | Successor Agency to the Culver City | |
| Recognitions 6:45pm | Redevelopment Agency Board, and | |
| Regular Session 7:00pm | Culver City Housing Authority Board | |

## CONSENT CALENDAR

Note: Joint Consent and Consent Calendar items are considered to be routine in nature and may be approved by one motion.  All requests to address the City Council under these items must be filed with the City Clerk before the Consent Calendar and Joint Consent Calendar are called by the presiding officer. Any Consent Calendar item that is pulled for discussion by a Council Member (not including brief questions, points of clarification and the like, which can be handled quickly), or because a public comment card(s) has been filed with the City Clerk, may be pulled from the Consent Calendar and considered later in the agenda, at the discretion of the presiding officer or City Council.

**C-1.**   21-857   **CC:HA:SA - APPROVAL OF CASH DISBURSEMENTS FOR MARCH 13, 2021 TO  APRIL 2, 2021**

*Attachments:*   Final Cash Disbursements for City Council - 210412.pdf

**C-2.**   21-858   **CC:HA:SA - APPROVAL OF MINUTES FOR THE SPECIAL CITY COUNCIL MEETING OF MARCH 15, 2021 AND THE REGULAR CONSOLIDATED CITY COUNCIL MEETING OF MARCH 22, 2021**

*Attachments:*   CCCC 03152021 Minutes for Approval.pdf
CCCC 03222021 Minutes for Approval.pdf

Exhibit H, Page 238

**City Council Meeting Agenda**
Closed Session 5:00pm
Recognitions 6:45pm
Regular Session 7:00pm

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

April 12, 2021

---

**C-3.**   21-861   CC - ADOPTION OF A RESOLUTION CONFIRMING THE MARCH 25, 2021 THIRTY-FIFTH SUPPLEMENT TO PUBLIC ORDER ((1) CONTINUED ALIGNMENT WITH THE LOS ANGELES COUNTY PUBLIC HEALTH ORDER: REOPENING SAFER AT WORK AND IN THE COMMUNITY - BLUEPRINT FOR A SAFER ECONOMY; (2) FURTHER EXTENSION OF WAIVER OF OUTDOOR DINING LICENSE FEES AND VALET PARKING LICENSE FEES TO JUNE 30, 2021; AND (3) EXTENSION OF THE LIMIT ON THIRD PARTY FOOD DELIVERY SERVICE FEES TO THE END OF THE LOCAL EMERGENCY) ISSUED BY THE CITY MANAGER, AS DIRECTOR OF EMERGENCY SERVICES, UNDER CITY OF CULVER CITY EMERGENCY AUTHORITY, DUE TO THE CORONAVIRUS RESPIRATORY DISEASE (COVID-19) PANDEMIC.

_Attachments:_   2021-04-12_ATT Resolution_35th Supplement.pdf

**C-4.**   21-862   CC - (1) SIXTH REVIEW OF THE NEED FOR CONTINUING THE LOCAL EMERGENCY DECLARED ON MARCH 14, 2020 BY THE CITY MANAGER, AS DIRECTOR OF EMERGENCY SERVICES, UNDER CITY OF CULVER CITY EMERGENCY AUTHORITY, DUE TO THE CORONAVIRUS RESPIRATORY DISEASE (COVID-19) PANDEMIC, IN ACCORDANCE WITH THE REQUIREMENTS OF GOVERNMENT CODE SECTION 8630; AND (2) DIRECTION TO CITY MANAGER AS DEEMED APPROPRIATE.

_Attachments:_   2021-04-12_ATT_Proclamation of Local Emergency.pdf

---

Exhibit H, Page 239

**City Council Meeting Agenda**          **Regular Meeting of the City Council,**          April 12, 2021
Closed Session 5:00pm                         **Successor Agency to the Culver City**
Recognitions 6:45pm                            **Redevelopment Agency Board, and**
Regular Session 7:00pm                        **Culver City Housing Authority Board**

---

**C-5.**   21-768   **CC - ADOPTION OF A RESOLUTION INITIATING PROCEEDINGS FOR THE LEVY AND COLLECTION OF ANNUAL ASSESSMENTS FOR THE HIGUERA STREET LANDSCAPING AND LIGHTING MAINTENANCE DISTRICT AND ORDERING THE PREPARATION OF THE ENGINEER'S REPORT THEREON FOR FISCAL YEAR 2021/2022.**

*Attachments:*   Resolution of Initiation - Higuera.pdf

**C-6.**   21-770   **CC - ADOPTION OF A RESOLUTION INITIATING PROCEEDINGS FOR THE LEVY AND COLLECTION OF ANNUAL ASSESSMENTS FOR THE SEWER USER'S SERVICE CHARGE AND ORDERING THE PREPARATION OF THE ENGINEER'S REPORT, THEREON FOR FISCAL YEAR 2021/2022.**

*Attachments:*   Resolution of Initiation - SUSC.pdf

**C-7.**   21-802   **CC - ADOPTION OF AN ORDINANCE REPEALING AND REPLACING CHAPTER 15.03, CONSTRUCTION IN FLOOD PRONE AREAS, OF THE CULVER CITY MUNICIPAL CODE, INCORPORATING CHANGES REQUIRED BY THE FEDERAL EMERGENCY MANAGEMENT AGENCY FOR CONTINUED PARTICIPATION IN THE NATIONAL FLOOD INSURANCE PROGRAM**

*Attachments:*   2021-04-12_ATT 1_Proposed Ordinance Amending Chapter 15.03.pdf

**C-8.**   21-820   **CC - CONSIDERATION OF A SUPPORT POSITION ON AB 854 - RESIDENTIAL REAL PROPERTY: WITHDRAWAL OF ACCOMMODATIONS.**

*Attachments:*   2021-04-12__ATT__AB 854 As Amended on 2021-03-18.pdf
2021-04-12__ATT__AB 854 Fact Sheet.pdf

---

Exhibit H, Page 240

**City Council Meeting Agenda**
Closed Session 5:00pm
Recognitions 6:45pm
Regular Session 7:00pm

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

April 12, 2021

---

**C-9.**   21-825   CC - ADOPTION OF A RESOLUTION INITIATING PROCEEDINGS TO LEVY AND COLLECT ANNUAL ASSESSMENTS FOR THE WEST WASHINGTON BENEFIT ASSESSMENT DISTRICT NO. 1 AND ORDER THE PREPARATION OF THE ENGINEER'S REPORT THEREON FOR FISCAL YEAR 2021/2022.

*Attachments:*   2021-22 Washington Boulevard No. 1 - Initiation Reso.pdf

**C-10.**   21-826   CC - ADOPTION OF A RESOLUTION INITIATING PROCEEDINGS TO LEVY AND COLLECT ANNUAL ASSESSMENTS FOR THE WEST WASHINGTON BENEFIT ASSESSMENT DISTRICT NO. 2 AND TO ORDER THE PREPARATION OF AN ENGINEER'S REPORT THEREON FOR FISCAL YEAR 2021/2022.

*Attachments:*   2021-22 Washington Boulevard No. 2 - Initiation Reso.pdf

**C-11.**   21-827   CC - ADOPTION OF A RESOLUTION INITIATING PROCEEDINGS TO LEVY AND COLLECT ANNUAL ASSESSMENTS FOR THE WEST WASHINGTON BENEFIT ASSESSMENT DISTRICT NO. 3 AND TO ORDER THE PREPARATION OF AN ENGINEER'S REPORT THEREON FOR FISCAL YEAR 2021/2022.

*Attachments:*   2021-22 Washington Boulevard No. 3 - Initiation Reso.pdf

**C-12.**   21-831   CC - APPROVAL OF AN AMENDMENT TO EXISTING PROFESSIONAL SERVICES AGREEMENT WITH MELANIE DORAN TRAXLER, DBA PLANNING PLUS/P+ FOR CONTINUED PLANNING AND PROJECT MANAGEMENT SERVICES FOR INGLEWOOD OIL FIELD-RELATED MATTERS IN AN AMOUNT NOT-TO-EXCEED $36,400.

---

Exhibit H, Page 241

**City Council Meeting Agenda**
Closed Session 5:00pm
Recognitions 6:45pm
Regular Session 7:00pm

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

April 12, 2021

---

**C-13.**  21-833  **CC - 1) ADOPTION OF A RESOLUTION ACCEPTING $9,571.00 IN STATE HOMELAND SECURITY PROGRAM GRANT FUNDS FOR THE PURCHASE OF DUODOTES, AND PROVIDING PROOF OF AUTHORITY OF THE GOVERNING BODY AS REQUIRED BY THE CALIFORNIA OFFICE OF EMERGENCY SERVICES; AND 2) APPROVE A BUDGET AMENDMENT APPROPRIATING THE FUNDS (REQUIRES A FOUR-FIFTHS VOTE).**

_Attachments:_  2021-04-12_ATT_Resolution SHSP Grant Authorization.pdf

**C-14.**  21-835  **CC - CONSIDERATION AND, IF DESIRED, ADOPTION OF A RESOLUTION SUPPORTING THE GOAL OF 100% ZERO EMISSION VEHICLE SALES IN CALIFORNIA BY 2030.**

_Attachments:_  2021-04-12__ATT__Gov Newsom - CA Phase Out of Gasoline-Powered Cars.pdf
2021-04-12_ATT_Resolution Supporting Zero Emission Vehicle Goal.pdf

**C-15.**  21-846  **CC - APPROVAL OF AN AMENDMENT TO THE EXISTING SOFTWARE CONTRACT WITH ACCELA, INC. FOR ADDITIONAL SERVICES TO ENHANCE THE ACCELA CITIZENS ACCESS (ACA) IMPLEMENTATION, FOR AN AMOUNT NOT-TO-EXCEED $58,050.00**

**PUBLIC HEARINGS AND ACTION ITEMS**

Note: The Public Hearing or Action Item with the most public comment cards on file with the City Clerk may be considered by the City Council as the first item, at the discretion of the presiding officer or City Council. The remaining Public Hearing and Action items shall be considered in the order they appear on the agenda, unless re-ordered by the presiding officer or City Council.

**PUBLIC HEARINGS**

---

Exhibit H, Page 242

**City Council Meeting Agenda**      Regular Meeting of the City Council,     April 12, 2021
Closed Session 5:00pm           Successor Agency to the Culver City
Recognitions 6:45pm            Redevelopment Agency Board, and
Regular Session 7:00pm         Culver City Housing Authority Board

---

**PH-1.**    21-779    **CC - PUBLIC HEARING CONTINUED FROM MARCH 22, 2021: ADOPTION OF A RESOLUTION APPROVING AN EXCEPTION TO THE CITY'S SUBDIVISION DESIGN STANDARD TO ALLOW THE DEVELOPMENT OF THREE DETACHED TOWNHOME STYLE RESIDENTIAL UNITS LOCATED AT 4044 MADISON AVENUE.**

       *Attachments:*    2021-04-12_ATT - Proposed City Council Resolution.pdf
                         2021-04-12_ATT - Planning Commission Resolution No. 2021-P002 with Exhibit A - Conditions of Approval.pdf
                         2021-04-12_ATT - February 10, 2021, Planning Commission Staff Report (without attachments).pdf
                         2021-04-12_ATT - Development Plans Dated January 22, 2021.pdf
                         2021-04-12_ATT - Tentative Parcel Map No. 83372.pdf
                         2021-04-12_ATT - February 10, 2021, Planning Commission Minutes.pdf

**PH-2.**    21-828    **CC - PUBLIC HEARING - ADOPTION OF A RESOLUTION ORDERING THE VACATION OF THE ALLEY LOCATED EAST OF ELENDA STREET, AND BETWEEN LINDBLADE STREET AND BARMAN AVENUE PURSUANT TO DIVISION 9, PART 3, CHAPTER 3 OF THE STREETS AND HIGHWAY CODE**

       *Attachments:*    2021-04-12_ATT_Resolution Ordering Vacation of Portion of Elenda Alley between Lindblade and Barman.pdf
                         2021-4-12 - VICINITY MAP Alley Vacation-Elenda_Lindblade_Barman.pdf
                         2021-04-12_ATT_Alley Easement Agreement.pdf
                         2021-4-12 Public Notice of PH to Vacate Alley_Elenda_Barman_Lindblade.docx

**ACTION ITEMS**

---

Exhibit H, Page 243

**City Council Meeting Agenda**
**Closed Session 5:00pm**
**Recognitions 6:45pm**
**Regular Session 7:00pm**

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, and**
**Culver City Housing Authority Board**

**April 12, 2021**

---

**A-1.**   21-818   **CC - (1) DISCUSSION OF A POTENTIAL HERO PAY ORDINANCE TO PROVIDE ADDITIONAL COMPENSATION TO GROCERY WORKERS, RETAIL WORKERS AND FRONT-LINE WORKERS AT SOUTHERN CALIFORNIA HOSPITAL; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.**

*Attachments:*   2021-04-12__ATT__City of LA Report on Hero Pay.pdf
2021-04-12__ATT__City of LA Ordinance 186940.pdf

**A-2.**   21-830   **CC - ADOPTION OF A RESOLUTION ESTABLISHING GUIDING PRINCIPLES FOR CULVER CITY'S 2021-2029 HOUSING ELEMENT UPDATE.**

*Attachments:*   2021-04-12_ATT_1_Proposed Resolution Establishing HE Guiding Principles.pdf
2021-04-12_ATT_2_Realistic Capacity Chart

**A-3.**   21-844   **CC - (1) DISCUSSION OF A POTENTIAL RESOLUTION TO SUPPORT STATE LEGISLATION TO END CHILD MARRIAGE; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.**

*Attachments:*   2021-04-12__ATT__CA Coalition to End Child Marriage Sample Resolution.pdf

**A-4.**   21-824   **CC - (1) DISCUSSION OF A RESOLUTION REQUESTING A STATE AUDIT OF ALLEGED SEXUAL HARASSMENT, DISCRIMINATION, BULLYING AND RETALIATION AT THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.**

*Attachments:*   2021-04-12__ATT__LA Times Editorial-Sexual misconduct at MWD.pdf
2021-04-12__ATT__LADWP letter to MWD.pdf
2021-04-12__ATT__MWD Motion-LA County BOS.pdf
2021-04-12__ATT__City of Los Angeles MWD Resolution.pdf

---

Exhibit H, Page 244

| City Council Meeting Agenda | Regular Meeting of the City Council, | April 12, 2021 |
|---|---|---|
| Closed Session 5:00pm | Successor Agency to the Culver City | |
| Recognitions 6:45pm | Redevelopment Agency Board, and | |
| Regular Session 7:00pm | Culver City Housing Authority Board | |

**PUBLIC COMMENT - ITEMS NOT ON THE AGENDA (CONTINUED)**

**ITEMS FROM MEMBERS (CONTINUED)**

**MEMBER REQUESTS TO AGENDIZE FUTURE ITEMS**

**ADJOURN (INCLUDING ADJOURNMENT IN MEMORY)**

Exhibit H, Page 245

# EXHIBIT "I"

# EXHIBIT "I"



# City of Culver City

Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

## Staff Report Details (With Text)

| | | | | |
|---|---|---|---|---|
| **File #:** | 21-818 | **Version:** 1 | **Name:** | Potential Hero Pay Ordinance |
| **Type:** | Resolution | | **Status:** | Action Item |
| **File created:** | 3/23/2021 | | **In control:** | City Council Meeting Agenda |
| **On agenda:** | 4/12/2021 | | **Final action:** | |

**Title:** CC - (1) Discussion of a Potential Hero Pay Ordinance to Provide Additional Compensation to Grocery Workers, Retail Workers and Front-Line Workers at Southern California Hospital; and (2) Direction to the City Manager as Deemed Appropriate.

**Sponsors:**

**Indexes:**

**Code sections:**

**Attachments:** 1. 2021-04-12__ATT__City of LA Report on Hero Pay.pdf, 2. 2021-04-12__ATT__City of LA Ordinance 186940.pdf

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 4/12/2021 | 1 | City Council Meeting Agenda | | |

**CC - (1) Discussion of a Potential Hero Pay Ordinance to Provide Additional Compensation to Grocery Workers, Retail Workers and Front-Line Workers at Southern California Hospital; and (2) Direction to the City Manager as Deemed Appropriate.**

**Meeting Date:** April 12, 2021

**Contact Person/Dept:**    Shelly Wolfberg/City Manager's Office
**Phone Number:**        (310) 253-6000

**Fiscal Impact**: Yes []   No [X]        **General Fund:** Yes []    No [X]

**Public Hearing:** []      **Action Item:**   [X]    **Attachments:** [X]

**Commission Action Required:**    Yes []    No [X]   **Date:**

**Public Notification:**    (E-Mail) Southern California Hospital, Culver City Chamber of Commerce, Downtown Business Association, and Meetings and Agendas - City Council (04/07/2021).

**Department Approval:** John M. Nachbar (04/07/2021)

_____

## **RECOMMENDATION**

Staff recommends the City Council (1) discuss a potential Hero Pay Ordinance to provide additional compensation to grocery workers, retail workers and front-line workers at Southern California Hospital; and (2) provide direction to the City Manager as deemed appropriate.

Exhibit I, Page 247

BACKGROUND

At the February 22, 2021 City Council Meeting, there was consensus by City Council to agendize consideration of a "Hero Pay" ordinance to provide additional compensation to grocery workers, retail workers and front-line workers at Southern California Hospital (SCH).  This item was originally on the City Council March 22, 2021 agenda, and was continued to April 12th due to the length of the March 22 meeting.

A number of Southern California municipalities, including the County of Los Angeles, City of Los Angeles, West Hollywood, Long Beach, and Montebello, as well as San Leandro, Oakland and San Jose in northern California, have adopted hero pay ordinances to require employers in the grocery, drug, and retail industries to provide additional compensation to their essential and public-facing employees during the COVID-19 crisis. Hero pay compensates employees for the risks and hazards encountered in providing access to food/medicine and maintaining functionality of key economic sectors during the COVID-19 pandemic.

A report from the City of Los Angeles Chief Legislative Analyst ("the Report"), dated February 19, 2021, provides a comprehensive overview of pertinent issues such as grocery industry economics, potential economic impacts, potential legal challenges, and a summary of similar programs ordinances enacted throughout California (Attachment 1).   Subsequently, on March 4, 2021, the Los Angeles City Council adopted an addition to the Los Angeles Municipal Code to provide additional pay to grocery and drug retail workers on the frontlines of COVID-19.  The Ordinance became effective on March 8, 2021 (Attachment 2).

Generally, most municipalities in Southern California have adopted ordinances that provide/require:

**Additional Hourly compensation for a Specific Duration**:
- Provide employees an additional $4/hour - $5/hour pay increase for a period of 120 days.

**Business Type and Number of employees**:
- Require grocery stores, drug stores and retail stores that are publicly traded or have at least 300 employees nationwide and more that 10-15 employees on site to comply.

Variations exist between other cities' adopted and draft ordinances relative to:

**Employee Eligibility:**
- Only hourly, non-managerial employees affected; **or**
- All workers included.

**Floor Area/Percent for food/retail threshold:**
- Stores with 85,000 or more that dedicate 10% of floor to grocery/drug retail **and/or**
- 70% of business activity involves selling groceries; **or**
- No specific space requirement (if business type and number of employees threshold is met)

In Northern California, there are differences relative to the required timeframe to provide hero pay in

Exhibit I, Page 248

conjunction with current state infection tiers (Widespread, Substantial and Moderate) and/or the duration of the public emergency.  There are also lower square footage requirements for store compliance.

## DISCUSSION

While COVID-19 cases in Los Angeles continue to decline, and vaccine availability increases, there is a continued risk of coronavirus infection in certain essential job sectors.  Until potential variants are subdued, and "herd immunity" is achieved, frontline workers in grocery, drug retail and healthcare industries are potentially placed in a hazardous environment until they are fully vaccinated. Healthcare workers were among the first tier eligible to receive the COVID-19 vaccine and as of March 1st, food service workers became eligible to receive the vaccine based on availability.

In considering a potential "hero pay" ordinance, it is also important to consider potential economic impacts to businesses required to comply with the law as well as legal challenges.

*Potential Economic Impacts*

There are a number of potential economic impacts to private businesses in providing hazard pay for their employees.  The Report notes that while these industries generated significant profit in the first quarter of 2020 as customers stocked up on essential food and home items, net profit margin for Kroger returned to the first quarter of the 2019 level, and Albertsons saw a slight increase over the same period. Additionally, stores are required to provide personal protective equipment, increased sanitation, cleaning protocols, installation of protective equipment, and COVID-19 testing costs, increasing overall expenses.  Additionally, several of the large national grocery, retail and drug companies have already provided bonuses and other benefits to their employees related to COVID-19, also affecting profit margins related to ongoing operation.  Requiring these businesses to provide hazard pay could potentially create the following economic impacts:

- Increased labor costs, which could require businesses to reduce costs or increase revenues.
- Potentially higher prices for consumers.
- Store closures, and/or
- Reduced hours, wages, or jobs.

Increased benefits to employees, however, could help spur the economy with the purchase of food and goods, payment of debt, or additional service support for family and childcare.

*Potential Impacts to Culver City Business*

Based on similar guidelines instituted in neighboring cities, numerous businesses in Culver City could be potentially affected if an ordinance comparable to other cities was enacted.

To date, two Kroger stores have been closed in response to similar hero pay ordinances adopted in Long Beach, though as noted in the Report, these stores were classified as "underperforming," and other factors may have contributed to  their closures.

*Healthcare Workers*

At this time, no other municipality has adopted an ordinance relative to providing healthcare worker hazard pay.  If the City Council wishes to require hazard pay for frontline health care employees at Southern California Hospital, it could potentially include all public-facing staff including reception, janitorial, laboratory, nursing and medical personnel in a comparable bonus structure similar to those adopted directly by Kaiser Permanente and the Mayo Clinic (Attachment 3).  The number of employees in these categories could prove significant and may encompass both hourly and salaried employees.

*Potential Legal Challenges*

As detailed in the Report, a number of federal lawsuits have been filed by the California Grocers Association (CGA), the trade association for approximately 300 grocery retailers and 150 grocery supply companies in California. In the Long Beach case, the CGA alleges that the Long Beach ordinance violates the National Labor Relations Act (NLRA) by regulating activity that Congress intended to be left to economic forces; violates the Equal Protection Clause of the United States and California Constitutions for singling out certain workers but ignoring those in other industries; violates the Contract Clause of the United States and California Constitutions, by interfering with collective bargaining. Similar suits were filed against Montebello and West Hollywood, as well as the northern California cities.

The United Food and Commercial Workers Local 770, a union representing grocery and drugstore workers, filed a motion in federal court to intervene in the Montebello case, so their interests could be better represented.  In the Long Beach matter, the federal court denied the CGA's motion for a temporary restraining order (TRO) and preliminary injunction against the City; the motion had requested that the court halt the implementation of the ordinance. The Court denied the motion for a preliminary injunction on the basis that CGA failed to establish a "likelihood of success on the merits." The CGA has filed an appeal to the Ninth Circuit Court of Appeals.

The City Attorney's office and City staff will be monitoring these cases as they progress through the courts.

## FISCAL ANALYSIS

There is no fiscal impact relative to the discussion of a potential hazard "hero" pay ordinance.  If directed to proceed with an urgency ordinance, there is the potential for exposure to litigation and related legal fees for enactment.

## ATTACHMENTS

1. 2021-04-12__ATT__City of Los Angeles Report of the Chief Legislative Analyst - February 19, 2021

2. 2021-04-12__ATT__City of Los Angeles Ordinance No. 186940 Premium Hazard Pay for On-Site Grocery and Drug Retail Workers

powered by Legistar™

Exhibit I, Page 250

**File #:** 21-818, **Version:** 1

## MOTION

That the City Council:

1. Discuss a potential Hero Pay Ordinance to provide hazard pay for certain grocery, drug, retail, and healthcare workers; and

2. Provide direction to the City Manager as deemed appropriate.

Exhibit I, Page 251

# REPORT OF THE
## CHIEF LEGISLATIVE ANALYST

DATE:   February 19, 2021

TO:   Honorable Members of the City Council

FROM:   Sharon M. Tso                Council File No. 20-1609
          Chief Legislative Analyst     Assignment No. 21-02-0086

### Grocery, Drug, and Retail Store COVID-19 Hazard Pay Economic Impact

**SUMMARY**

On February 2, 2021, the City Council requested that the City Attorney draft an ordinance that will provide all hourly, non-managerial employees at grocery, drug, and retail stores (with a grocery or drug component) in the City with 300 or more employees nationally and 10 or more employees on-site, with a total of five dollars per hour premium hazard pay in addition to their base wage for the next 120 days. The Council further directed the Office of Wage Standards (Bureau of Contract Administration), with assistance of the City Attorney, to promulgate rules and regulations for implementing the ordinance. Additionally, the Chief Legislative Analyst (CLA) was instructed to report on the ordinance's economic impact, potential legal challenges, strategies to counter such challenges, and the impact on disadvantaged communities. Subsequent to Council action, the City Attorney transmitted the draft ordinance to the Council on February 5, 2021.

To prepare this report, our Office reviewed the actions of other cities, interviewed stakeholders, and analyzed research papers on the matter. This report includes a discussion of the draft ordinance, grocery industry economics, potential economic impacts (including on underserved communities), and potential legal challenges.

**RECOMMENDATION**

That the City Council note and file this report as it is for informational purposes only.

**FISCAL IMPACT**

There is no impact to the General Fund. Any costs associated with the enforcement of the ordinance by the Bureau of Contract Administration will be absorbed by the department.

**DISCUSSION**

As a result of the outbreak of the COVID-19 virus, on March 4, 2020, Governor Newsom declared a State of Emergency in California and Mayor Garcetti declared a State of Emergency in the City of Los Angeles. The COVID-19 pandemic has forced the closure of schools and

1

many businesses, including, but not limited to, movie theaters, bars, restaurants and event venues. On March 19, 2020, Mayor Garcetti issued a "Safer at Home" emergency order, requiring all residents to stay inside their homes and immediately limit all movement outside their homes beyond what is necessary to take care of essential needs. On March 19, 2020, Governor Newsom issued an executive order that required all residents to stay home, except as needed to maintain continuity of operations of essential sectors as critical to protect the health and well-being of all Californians. In accordance with this order, the State Public Health Officer designated a list of Essential Critical Infrastructure Workers. Among this list were workers supporting groceries, pharmacies, convenience stores, and other retail stores that sell food or beverage products.

From the beginning of the COVID-19 pandemic, grocery and drug store employees have continued to be essential workers, who face health and safety risks as they support the community's access to food, medicine, and other indispensable services. With restaurants either forced to close or opened for outdoor dining at limited capacity, grocery and drug stores have increasingly been the source of America's meals. The Census Bureau reported that the grocery sector has seen an 11.2 percent increase in sales from 2019 while other types of retail stores have seen less pronounced sales increases or declines. Grocery and drug store employees work in environments where they come into close contact with large numbers of customers over the course of the workday, and these working conditions have resulted in localized outbreaks of COVID-19 across the City's grocery and drug stores.

A Harvard study of over 100 employees at one grocery store in Boston, Massachusetts found that employees in customer-facing roles are five times as likely to test positive for COVID-19 as their colleagues in other positions. In another study, researchers at the University of California, San Francisco analyzed death records and estimated excess mortality among Californians 18–65 years of age by occupational sector and occupation, including race and ethnicity. They found that for the period March-October 2020, working age adults experienced a 22 percent increase in mortality compared to historical periods. Excess mortality was highest in food/agriculture workers (39 percent increase), transportation/logistics workers (28 percent increase), facilities (27 percent increase) and manufacturing workers (23 percent increase). Latino Californians experienced a 36 percent increase in mortality, with a 59 percent increase among Latino food/agriculture workers. Black Californians experienced a 28 percent increase in mortality, with a 36 percent increase for Black retail workers. The researchers conclude that in-person essential work is a likely venue of transmission and must be addressed through strict enforcement of health orders and the protections of in-person workers. They add that vaccination programs prioritizing food/agriculture workers are likely to have disproportionately large benefits for reducing COVID-19 mortality.

In April 2020, the City Council adopted Ordinance #186591, which provided grocery, drug, and food delivery workers with a series of protections:

- Right to schedule changes;
- Additional work hours offered to current employees before hiring new employees;
- The option of a "no-contact" delivery method; and
- Retaliatory actions prohibited.

2

The ordinance has a sunset date upon the later of either the Governor or the Mayor lifting the COVID-19 emergency order. Grocery, drug, and retail store employees do not currently have a right to hazard pay, a type of additional compensation for workers performing hazardous duty or involving physical hardship. Due to the essential nature of work provided by these workers and due to the risk these workers face due to higher potential for exposure to COVID-19, the Council seeks to ensure that these workers receive hazard pay commensurate to their risk.

1.    **Draft Ordinance**

On February 5, 2021, the City Attorney released a draft hazard pay ordinance (C.F. 20-1609) that would require grocers, drug, and retail stores meeting certain criteria to provide hazard pay as a result of the COVID-19 pandemic. The ordinance mandates that all non-managerial employees at grocery, drug, and retail stores in the City be paid five dollars per hour premium hazard pay in addition to their base wage for the next 120 days. According to the California Grocers Association, it is common for store managers and assistant managers to be paid on a salaried (non-hourly) basis. Should the Council wish to include managers and supervisors that are paid on an hourly basis in the hazard pay proposal, the City Attorney should be requested to amend the ordinance.

As proposed, the following grocery, drug, and retail employers would be required to provide the premium hazard pay:

- A **grocery retail store** with more than 300 employees nationwide, and more than 10 employees on-site in the City, that primarily sells food or household goods, including the sale of produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, baked foods, and/or prepared foods; or

- A **drug retail store** with more than 300 employees nationwide, and more than 10 employees on-site in the City, that sells a variety of prescription and nonprescription medicines and miscellaneous items, including, but not limited to, drugs, pharmaceuticals, sundries, produce, meats, poultry, fish, deli products, dairy products, canned foods dry foods, beverages, prepared foods, and other merchandise; or

- A **retail store** with more than 300 employees nationwide, and more than 10 employees on-site in the City, that is over 85,000 square feet and:
  - Dedicates 10 percent or more of its sales floor to groceries, including, but not limited to, produce, meats, poultry, fish deli products, dairy products, canned foods, dry foods, beverages, baked foods, and/or prepared foods; or
  - Dedicates 10 percent or more of its sales floor to drug retail, including, but not limited to, drugs, pharmaceuticals, sundries, produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, prepared foods, and other merchandise.

The ordinance also includes a private right of action (which allows a private citizen to bring a judicial action) and an urgency clause, in which case the ordinance would go into effect

3

immediately upon publication. The Office of Wage Standards, under the Bureau of Contract Administration, would be responsible for promulgating the rules, regulations, and enforcement of the ordinance.

## 2.    Hazard Pay Efforts by Other Cities and Existing Hazard Pay for City of Los Angeles Employees

Besides Seattle, the majority of cities contemplating hazard pay for grocery and other retail employees are located in California. Five cities have adopted ordinances that provide a range of hazard pay from $3-$5 per hour. They are Long Beach ($4), Seattle ($4), San Jose ($3), Montebello ($4), and Oakland ($5). Nearly all of the cities and counties that have adopted or are drafting ordinances have an employee threshold of 300 and sunset after 120 days. For a detailed chart of each city's ordinance, see Attachment A. While some of the cities listed here provided a staff report on their respective proposal, those reports did not provide a robust level of economic analysis.

The City provides its employees with numerous types of hazard pay when the working environment has been determined to be hazardous. For example, employees performing the following work are entitled to 5.5 percent hazard pay above the base salary rate:

- Working on a ladder, scaffolding, hydraulic lift platform, etc.
- Spraying asphalt, chemicals, paint, etc.
- Working in a deep sewer
- Cleaning a homeless encampment or illegal dump site

Other hazard pay examples include Airport Security Officers that work to direct traffic (11.5 percent hazard pay) and Canine Police Officers (16 percent hazard pay).

## 3.    Grocery Industry Economics and Response to COVID-19

In response to the COVID-19 pandemic, major grocery, drug, and retail chains have provided some form of extra COVID-19 related compensation. Research by the Brookings Institution (Brookings) found that Target, Amazon, Kroger, Albertsons, and Costco provided $2 per hour in hazard pay and some provided additional bonuses. Walgreens and CVS only provided bonuses. By July 2020, all of these companies had canceled their hourly hazard pay, while some continued to provide bonuses. Rather than continue its hourly hazard pay, Target moved up a planned increase of its nationwide starting salary to $15 in July 2020 (it had committed to the increase by the end of 2020 in 2017). Target also continues to provide bonuses. Since the beginning of the pandemic, Trader Joe's has provided employees with $2 per hour hazard pay and recently increased the hazard pay to $4 per hour.

As a result of COVID-19, the grocery, drug, and retail industry has faced a number of additional infrastructure and labor costs, including:

- Providing employees with personal protective equipment
- Increased sanitation and cleaning protocols

4

- Installation of protective equipment, including plastic barriers, and social distancing markers
- Supplemental paid leave
- Hiring and training workers or paying overtime wages to existing workers who fill in for those out on paid leave
- Biweekly or weekly COVID-19 testing costs
- E-commerce staffing and capital costs

Labor costs are discussed further in the economic impact section.

Additional details concerning hazard pay, bonuses and other benefits provided by retail companies to their employees is described in Attachment B.

Industry Overview

According to Sageworks (a financial information company), the grocery industry is a low profit margin industry. Companies in this sector achieve success through the substantial volume of goods they sell. According to the United Food and Commercial Workers International Union, there are approximately 26,000 grocery workers in the City, of which 35 percent belong to a union. According to ZipRecruiter, the average pay for a grocery store worker in Los Angeles is $17.51 per hour.

In their research paper on hazard pay, Brookings reported on the performance of large retailers in 2019 compared to 2020. The table below shows the change in the net income after taxes (after subtracting all costs) of select companies:

Figure 1. Net income after taxes (profit) of large grocery, drug, and retail companies in $ millions (first three financial quarters).

| Company | 2019 Profit | 2020 Profit | $ Change | % Change |
|---|---|---|---|---|
| Albertsons | $399 | $995 | $596 | 149% |
| Kroger | $1,332 | $2,662 | $1,330 | 100% |
| Amazon | $8,320 | $14,109 | $5,789 | 70% |
| Costco (only two quarters) | $2,003 | $2,227 | $224 | 11% |
| Target | $2,447 | $2,988 | $541 | 22% |
| Walmart | $10,740 | $15,601 | $4,861 | 45% |
| CVS | $4,887 | $6,206 | $1,319 | 27% |
| Walgreens (only two quarters) | $1,695 | $885 | -$810 | -48% |

Source: Brookings Institution Report and company quarterly reports.

Brookings reported that the size, scale, and e-commerce capabilities of these large companies enabled many of them to vastly outperform their 2019 profit, with the exception of Walgreens.

5

In order to compare the performance of grocery companies pre-COVID and post-COVID, a more appropriate measurement is the net profit margin, which defines how much profit is generated as a percentage of revenue. Put another way, it illustrates how much of each dollar in revenue collected by a company translates into profit. Sageworks reported that the 2017 average net profit margin for the Grocery Stores NAICS code (4451) was 2.2 percent, which is among the lowest among American industries[1]. Taken separately, the net income (profit) of these large retailers is impressive, but it is the net profit margin figure that allows comparison between companies and the industry average to determine the performance of the companies. Net profit margin for 2020 is discussed further below.

<u>Publicly Traded Grocers</u>

For the publicly traded grocers, we focus on the performance of Kroger (Ralphs and Food 4 Less) and Albertsons (including Vons and Pavilions). These companies are the first and third largest grocery chains in the United States respectively and have a combined 100 stores in the City. These chains have full service stores that are on average 50,000 square feet and have between 100 and 175 employees per store. In 2019, the net profit margin of Kroger and Albertsons was near or below the industry average. The chart below shows the change in net profit margin for both companies from 2019 to 2020 and compares it to the 2017 average net profit margin for grocery stores, supermarkets, and convenience stores (Kroger divided 2020 into three unequal quarters, so they did not have a fourth quarter result for 2020.):



Figure 2. Kroger and Albertsons 2019 vs. 2020 Net Profit Margin After Taxes

Source: Company quarterly earnings as reported to the U.S. Securities and Exchange Commission.

At the beginning of the pandemic, net profit margins spiked in the first quarter of 2020 as customers stocked up on essential food and home items. In the most recent financial report for

---

[1] NAICS codes are used to categorize industries. NAICS code 4451 includes grocery stores, supermarkets, and convenience stores. Convenience stores are not included in the draft ordinance.

6

the 3rd Quarter 2020, the net profit margin for Kroger returned to the first quarter of 2019 level, with Albertsons seeing a slight increase over the same period in 2019.

While the 2017 average net profit margin of 2.2 percent does contain convenience stores, we use this average as the best available benchmark to grade the performance of Kroger and Albertsons during the last two years. Both companies did not earn above average profits until the first quarter of 2020 during the COVID-19 shopping spike and by the third quarter had dropped below the average.

For additional historical context of the economic performance of both Kroger and Albertsons, the following chart shows the fiscal year net profit margin after taxes for both companies between 2015-2019. Only Kroger produced above industry average results during this timeframe (in 2018). Albertsons had a negative net profit margin in 2015 and 2016.



Figure 3. Kroger and Albertsons Fiscal Year Net Profit Margin After Taxes

Source: Company fiscal earnings as reported to the U.S. Securities and Exchange Commission

Independent Grocers

For privately held grocers, we use the 2020 Independent Grocers Financial Survey for information on this industry segment, which provides data on the nation's privately held grocery stores. Independent stores are smaller in footprint at an average of 27,000 square feet. Independent stores have an average of 72 employees per store. Labor and benefit costs are 18.42 percent of sales in the western region, meaning that grocers must spend $18.42 in labor and benefit costs in order to receive $100 in sales. The Independent Grocers Financial Survey provides net profit margin *before* taxes versus the Kroger and Albertsons data above which provides *after* tax performance. The following chart shows the western region independent grocers net profit before taxes from 2015 to 2019:

7



**Figure 4. Western Region Independent Grocers Net Profit Margin Before Taxes 2015-2019**

The average net profit before taxes was 1.85 percent for independent grocers for the five years before the pandemic. The data also shows that while the western region grocers experienced a net profit of 2.44 percent in 2019, during that year 25 percent of companies had a negative net profit.

Much like the publicly traded grocers, COVID-19 resulted in independent grocers experiencing two of the biggest weeks in the history of food retailing in terms of trips, sales, and basket size (the quantity of goods purchased in a single trip). After the March 2020 surge, the number of trips to stores fell well below 2019 levels as shoppers quarantined at home. The Independent Grocers Financial Survey reports that overall sales were up 13.3 percent for the first six months of 2020 vs. the same period in 2019. No net profit margin data is available for 2020.

**4.   Potential Economic Impacts**

Businesses that will be required to provide hazard pay

To provide the Council with context of the impact of the hazard pay draft ordinance, our Office prepared a list of the potential grocery, drug, and retail chains that could be affected (Attachment C). For the major local and nationwide chains, there is no question these companies have over 300 employees and thus would be subject to providing hazard pay. For the smaller chains, we assume these chains are privately owned and thus their average employee count per store is 72 (based on the Independent Grocers Survey discussed above). To determine how many smaller chains would be included, we must make an educated assumption on the average number of employees for the independent grocery chains located in Los Angeles with more than one location. We also must add employees to account for the corporate or other support (back office) employees who do not work in the store (but who are counted toward the nationwide 300

8

employee threshold). We inferred that 80 employees per store is a more likely average for the purposes of this analysis. We multiplied the nationwide number of stores by 80 to arrive at an estimated total nationwide employee count for each chain.

We note that Attachment C includes drug stores and retail chains. In these industries, there is less of a middle market, with the majority of the stores being either a nationwide chain or small mom and pop establishments (which would not be covered by the ordinance).

We reiterate that this list is simply a projection to gauge the degree of how many chains could be included in the hazard pay requirement, and is not the final list of companies that will be required to comply. For the retail chains, we did not analyze which chains have 10 percent or more of their sales floor dedicated to grocery or drug retail.

Large Retailers

Large retailers like Walmart and Target would be subject to the draft ordinance, however, as written, the ordinance requires hazard pay on a store by store basis. Target, for example, would be required to include hazard pay for its employees that work at stores larger than 85,000 square feet that dedicate at least 10 percent of the sales floor to grocery or drug retail. Target has several stores that operate in a smaller footprint, including:

- 59,000 square foot store at 415 S. La Brea Ave. (CD 4)
- 25,000 square foot store at 8900 Sepulveda Blvd. (CD 11)
- 39,600 square-foot (future) location at 7021 Hollywood Blvd. (CD 13)
- 49,000 square-foot (future) location at 17401 Ventura Blvd. (CD 5)
- 24,000 square-foot (future) location at 330 Westlake Ave. (CD 13)

Because these stores are under 85,000 square feet, Target would not be required to provide hazard pay to the employees working in these stores. Should the Council wish to include smaller footprint stores of major retailers, the City Attorney would need to amend the draft ordinance to include a provision that if a retailer has one store located in the City that meets the hazard pay ordinance, all stores located in the City would be required to provide hazard pay, regardless of store size.

Economic Impacts

Implementing the proposed ordinance could have several economic impacts. In order to determine these impacts, we have prepared projections based on certain factors, including the reaction to the City of Long Beach ordinance (which requires hazard pay of $4 for grocery employees), research of the wages of impacted employees, and the number of companies located in the City that could be required to implement hazard pay under the proposed ordinance. Below are the potential economic impacts:

- **Higher wages for grocery, drug, and retail store workers**. According to ZipRecruiter, the average pay for grocery store workers in Los Angeles is $17.51 per hour. A $5 per hour hazard pay would increase the average salary to $22.51 per hour, an increase of 29 percent from the base wage. Employees would have a temporary earnings boost and more spending power, which could trigger a temporary increase in the demand for goods. This

9

extra demand for goods could result in more business activity in the City, benefiting other City businesses. Employees could also use the higher wages to pay down debt or increase their savings rate. The pay increase will be temporary, lasting for 120 days, unless the ordinance is extended.

- **Temporarily increases labor costs as a percentage of sales**. As discussed above, labor and benefit costs are 18.42 percent of sales in the western region for independent grocers, meaning that grocers must spend $18.42 in labor and benefit costs in order to receive $100 in sales. For the national grocery industry as a whole, including the publicly traded companies, labor expenses account for 13.2 percent of sales, according to a 2019 study conducted by Baker-Tilly, a tax consulting firm. An increase of the base wage rate by $5 will increase the labor costs as a percentage of sales 4-5 percent to between 17 percent of sales for publicly traded companies and 24 percent of sales for independent companies. Companies would be required to take action to reduce costs or increase revenue as the labor increase will eliminate all current profit margin. The increase will be temporary, lasting for 120 days, unless the ordinance is extended.

- **Potentially higher prices for consumers**. Affected companies could raise prices to counteract the additional wage cost. Economic analysis from the California Grocers Association (which analyzed data from the Bureau of Labor) shows that if grocers pass on the entirety of the hazard pay labor cost to consumers, a typical family of four could see grocery prices increase by $33 per month, for a total of $132 in extra costs over the 120 days the ordinance would be in effect. Based on our limited discussions with grocers, there is a lower likelihood that grocers would pass on 100 percent of the labor costs to consumers. Shoppers are extremely price conscious, particularly in chains that serve low-income communities. However, prices could increase on average to a lesser degree.

  According to a December 2020 survey conducted by the Public Policy Institute of California, 39 percent of Los Angeles County households making under $40,000 reported reducing the number of meals or cutting back on food as a result of the turmoil caused by COVID-19. Increased food costs may cause further negative impact on these lower income households.

- **Potentially delayed store openings, renovations, and wage increases/promotions.** It is more likely that grocery chains will put a temporary hold on expansion plans and reduce or eliminate wage increases/promotions (this is more likely with non-union stores).

- **More pressure on struggling stores (especially independent grocers), which could lead to store closures**. The Independent Grocers Financial Survey reported that in 2019, 25 percent of western region companies reported a negative net profit. According to the California Grocers Association, between one-sixth to one-third of association stores reported negative earnings. More profitable stores often subsidize unprofitable stores within the same chain. Smaller chains with fewer stores will have less capacity to rely on their profitable stores to make up the increase in labor costs. This will be especially acute

10

in smaller chains with a majority of stores located in jurisdictions that have passed hazard pay mandates. The publicly traded grocers have stores throughout the country and have more capacity to rely on the profits of stores throughout the nation to subsidize the local labor cost increase.

To contain costs, companies may close stores. In response to the City of Long Beach ordinance that provides $4 per hour in hazard pay, Kroger, the parent company of Ralphs and Food 4 Less, announced it was permanently closing two stores located there. It has been reported that both of these stores have historically underperformed for some time before the City Long Beach hazard pay was enacted. Kroger also closed two stores in Seattle in response to the city's $4 hazard pay policy. Closures of stores affect three groups:

- Employees – experience a reduction in earnings and could slow or stop certain spending, negatively impacting the local economy. According to the Los Angeles Times, the Long Beach closures will affect 200 workers.

- Product Vendors/3rd Party Service Providers – vendors that support the store, for example food vendors, custodial, and security, will see reduced demand for their services. Vendors might lay off or reduce hours of their employees as a result.

- Customers – will have to find new grocery locations. The closures of stores could lead to an increase in "food deserts" that lack access to fresh groceries. The California Healthy Places Index (HPI) is a new tool developed by the Public Health Alliance of Southern California that combines economic, education, housing, health care access, neighborhood, environment, transportation, and social factors into an index score at the census tract level. While the Long Beach Ralphs location set for closure is in a tract with a HPI score of 85.5 (meaning the area has healthier community conditions than 85.5 percent of other California census tracts), the Food 4 Less set for closure has an HPI score of 29.2 (and adjacent to an area with a score of 9.9) signifying that this location is located in a disadvantaged neighborhood.

  We are researching the number of affected stores that are located in or near a food desert and will provide that information in a separate report.

- **Reduced hours, wages, or jobs**. To offset higher labor costs, companies might reduce working hours, benefits, wage rates, or lay-off employees.

## 5.   Potential Legal Challenges

As requested by the Council, we are providing an overview of current legal challenges to similar ordinances. The California Grocers Association (CGA), the trade association for the state's

11

approximately 300 grocery retailers and 150 grocery supply companies, recently filed suit against the City of Long Beach in opposition to the city's adopted $4 per hour grocery hazard pay ordinance. In its lawsuit, the CGA asserts that the Long Beach ordinance is invalid on several grounds:

- Violates the National Labor Relations Act (NLRA) by regulating zones of activity that Congress intentionally left to be controlled by the free play of economic forces.

- Violates the Equal Protection Clause of the United States and California Constitution by improperly singling out certain grocery businesses for disparate treatment while ignoring employers or essential frontline workers outside the industry.

- No significant and legitimate public purpose exists for the ordinance. The stated purpose for the ordinance (to protect public health, address economic insecurity, and promote job retention) is not rationally related to the discriminatory treatment of CDA's members.

- While the city has the ability to enact ordinances to further the health and safety of its citizens, including minimum wage laws, this ordinance is not a minimum labor standard, rather a mandatory hourly bonus, regardless of the wage negotiated during collective bargaining or other agreements.

- Violates the Contracts Clause of the United States and California Constitution. Interferes with collective bargaining.

The CGA filed a request for a temporary restraining order, which was rejected by the Court. The case is scheduled for a Court hearing on February 23rd for a hearing on a preliminary injunction, which would stop the law while the case is pending. The CGA has also sued the cities of Oakland and Montebello, who have adopted similar actions.

At your request we conferred with the City Attorney to discuss the legal strategies that could be used to lessen the likelihood of legal action against the City in relation to this proposal. If the Council wishes to discuss the legal strategies related to the proposed ordinance, we recommend that the City Attorney be requested to address these issues in closed session.

*Clay McCarter – rg*

Clay McCarter
Analyst

Attachments:   A. Other Jurisdictions Hazard Pay Actions
B. Bonuses and other benefits provided by retail companies
C. Projected Companies That Will Be Required to Include Hazard Pay Under the Draft Ordinance

12

Attachment A

**Other Jurisdictions Hazard Pay Actions**

| Jurisdiction | Status | Hazard Pay | Impacted Businesses | Eligible Employees | Ordinance Sunset Date |
|---|---|---|---|---|---|
| *City of Los Angeles (Proposed)* | *Draft ordinance submitted to Council* | *$5.00* | *Grocery or drug retail, including retail stores with 85,000 square feet or more that dedicate 10 percent of the sales floor to grocery or drug retail. Must employ over 300 employees nationally and 10 or more employees on-site.* | *all hourly, non-managerial employees* | *120 days* |
| Long Beach | Adopted | $4.00 | 70% or more of the business activity involves the selling of groceries, and the company employs over 300 covered employees nationally, and has more than 15 employees per site. | Employed at a grocery store, except managers, supervisors, and confidential employees. | 120 days |
| Los Angeles County | Ordinance in the process of being drafted | $5.00 | Grocery stores, convenience stores, liquor stores and other retail locations that sell food or beverage products located in unincorporated Los Angeles County and are publicly traded or have at least 300 employees nationwide and more than 10 employees per store. | All workers | 120 days |
| West Hollywood | Ordinance in the process of being drafted | $5.00 | Grocery store chains that are publicly traded or have at least 300 employees nationwide and more than 10 employees per store. | Frontline workers | 120 days or until the city declares the coronavirus local emergency to be over, whichever is longer. |

13

| Jurisdiction | Status | Hazard Pay | Impacted Businesses | Eligible Employees | Ordinance Sunset Date |
|---|---|---|---|---|---|
| Santa Monica | Adopted an action to prepare an order or ordinance consistent with any such measures imposed in unincorporated areas of Los Angeles County. | $5.00 | Grocery stores, convenience stores, liquor stores and other retail locations that sell food or beverage products located in unincorporated Los Angeles County and are publicly traded or have at least 300 employees nationwide and more than 10 employees per store. | All workers | 120 days |
| Montebello | Adopted | $4.00 | Grocery and drug stores that are publicly traded or have at least 300 employees nationwide and more than 15 employees per store | Employees not including managers, supervisors or confidential employees | 180 days |

14

| Jurisdiction | Status | Hazard Pay | Impacted Businesses | Eligible Employees | Ordinance Sunset Date |
|---|---|---|---|---|---|
| Irvine | Ordinance in the process of being drafted | $4.00 | Retail establishment that employs at least 15 employees on site and employs 300 or more employees nationally and<br><br>a. (i) devotes 70% or more of its sales floor area to retailing a general range of food products, which may be fresh or packaged, or (ii) receives 70% or more revenue from retailing a general range of food products;<br>b. is more than 85,000 square feet and devotes 10% or more of its sales floor area to the sale of merchandise that is non-taxable pursuant to Section 6359 of the Revenue and Taxation Code; or<br>c. is retail pharmacy that sells a variety of prescription and nonprescription medicines | Individual who performs at least two hours of work in a calendar week but does not include managerial, supervisory, or confidential employees of a covered employer. | 120 days |

15

| Jurisdiction | Status | Hazard Pay | Impacted Businesses | Eligible Employees | Ordinance Sunset Date |
|---|---|---|---|---|---|
| Oakland | Adopted | $5.00 | Grocery stores with 500 or more employees nationwide and a retail/wholesale store over 15,000 square feet. | Any individual working in a qualified grocery store who qualifies as an employee entitled to payment of a minimum wage. | Hazard Pay is required during a Widespread (purple), Substantial (red) or Moderate (orange) Risk Level, and until such time as Risk Levels return to Minimal (yellow). |
| Berkeley | Ordinance in the process of being drafted | $5.00 | Grocery stores (defined by NAICS Code 445110 – Supermarkets and Other Grocery Stores, except Convenience Stores, with a total floor area over 25,000 square feet, and publicly traded entities or businesses with over 300 employees. | All employees | Ordinance is valid from the period of the effective date through and until such time as the County returns to the Yellow-Tier 4 designation of COVID-19 or 120 days from the effective date of the ordinance |

16

Exhibit I, Page 267

| Jurisdiction | Status | Hazard Pay | Impacted Businesses | Eligible Employees | Ordinance Sunset Date |
|---|---|---|---|---|---|
| San Jose | Adopted | $3.00 | Retail establishments that sell meats, poultry, dairy products, fresh fruits and vegetables and have at least 300 employees nationwide. Includes a credit for retail establishments that currently provide pay increases related to the COVID-19 pandemic. | | Until the Santa Clara County Health Officer has lifted mandatory directives for implementing the State's Regional Stay at Home Order related to the COVID-19 pandemic. |
| Seattle | Adopted | $4.00 | Grocery business with more than 500 employees worldwide. "Grocery business" would include a retail store that is either: 1. Over 10,000 square feet in size and that is primarily engaged in retailing groceries for offsite consumption; or 2. Over 85,000 square feet and with 30 percent or more of its sales floor area dedicated to the sale of groceries. | All employees except executive, administrative, or professional roles. | Valid for as long as the city's coronavirus civil emergency remains in effect. |

17

Exhibit I, Page 268

Attachment B

**Bonuses and Other Benefits Provided by Retail Companies to Their Employees**

- Target (an increase by $1 billion from 2019 employee benefits)[2]
  - Bonus Payments
    - April 2020: **$250-$1,500** to 20,000 employees
    - July 2020: **$200** to all hourly employees in stores and distribution centers
    - October 2020: **$200** to 350,000 employees
    - January 2021: **$500-$2,000** to 375,000 employees
  - Free virtual healthcare visits
  - 30-day paid leave for vulnerable team members susceptible to the coronavirus
  - Paid leave options for team members who are symptomatic, have a confirmed case of coronavirus, or have been quarantined due to exposure.
  - Mental health resources
- Amazon ($2.5 billion on special bonuses and incentives in 2020)
  - Bonus Payments
    - June: **$150-$500** for warehouse, Whole Foods, and delivery workers
    - December 2020: **$150 or $300** for operations employees
  - An employee diagnosed with COVID-19 receives up to two weeks of pay
  - Established a $25 million relief fund for employees facing financial hardship or quarantine
- Walmart
  - Bonus Payments
    - March 2020: **$150 or $300**
    - June 2020: **$150 or $300**
    - November 2020: **$150 or $300**
    - December 2020: **$150 or $300**
  - Employees required to quarantine will receive up to two weeks of pay
- Albertsons
  - Bonus Payments
    - June 2020: equal to **$4 per hour** for the average hours worked between March 15 and June 13
    - December 2020: equal to **$5 per hour** for weekly average hours worked during the recent 12-week period
- Costco
  - Bonus Payments
    - None
- Kroger (over $1 billion in new benefits in 2020)
  - Bonus Payments
    - March 2020: **$150** or **$300**
    - May 2020: **$200 or $400**
    - June 2020: **$200 or $400**
    - February 2021: **$100** for employees who get vaccinated
  - Store credits and fuel points

---

[2] The source of all employer COVID-19 investments is their respected websites.

18

- ○ Two weeks paid time off for employees diagnosed with COVID-19, placed under quarantine, or practicing self-isolation
  - ○ $15 million available to provide financial assistance to employees who face hardship due to COVID-19
  - ○ Mental health resources
- Walgreens
  - ○ Bonus Payment
    - March 2020: **$150 or $300**
- CVS
  - ○ Bonus Payments
    - March 2020: **$150-$500**
  - ○ 14-day paid leave for any employee who tests positive for COVID-19 or needs to be quarantined as a result of potential exposure
  - ○ Employee Relief Fund

19

Exhibit I, Page 270

Attachment C

**Projected Companies That Will Be Required to Include Hazard Pay Under the Draft Ordinance**

| Mid-Size Grocery Stores | Number of Locations | Employees (estimated)* |
|---|---|---|
| Super King | 8 | 640 |
| Mitsuwa | 11 | 880 |
| Nijiya | 12 | 960 |
| Lassens | 11 | 880 |
| Zion | 7 | 560 |
| Han Kook | 4 | 320 |
| Erewhon | 6 | 480 |
| Big Saver | 10 | 800 |
| Eataly | 8 | 640 |
| Island Pacific Market | 16 | 1,280 |
| Marukai | 4 | 320 |
| Numero Uno | 24 | 1,920 |
| Super A Foods | 8 | 640 |

*The number of store locations is multiplied by 80 to determine total employees

**Large Grocery Stores**

Northgate
Sprouts
Kroger (Ralphs/Food 4 Less)
Albertsons (Vons/Pavilions)
Aldi/Trader Joe's
Grocery Outlet
Gelsons
Vallarta
Superior
Smart and Final
Jons Market
El Super
Whole Foods
99 Ranch
Costco
Seafood City

Bristol Farms
H Mart
Mother's

**Large Retail Stores**

Walmart/Sam's Club
Target

**Large Drug Stores**

Walgreens
CVS (including Longs Drugs)
Rite Aid

20

Exhibit I, Page 271

21

ORDINANCE NO. **186940**

    An ordinance adding Article 9 to Chapter XX of the Los Angeles Municipal Code to provide additional pay to grocery and drug retail workers on the frontlines of COVID-19.

### THE PEOPLE OF THE CITY OF LOS ANGELES
### DO ORDAIN AS FOLLOWS:

    Section. 1.  Article 9 is added to Chapter XX of the Los Angeles Municipal Code to read as follows:

### ARTICLE 9

### PREMIUM HAZARD PAY FOR ON-SITE GROCERY AND DRUG RETAIL WORKERS

**SEC. 200.100.  PURPOSE.**

    On March 4, 2020, as a result of the threat of the novel coronavirus (COVID-19), Governor Gavin Newsom proclaimed a State of Emergency in California and Mayor Eric Garcetti declared the existence of a local emergency in the City of Los Angeles.  On March 11, 2020, the Word Health Organization officially declared the outbreak a pandemic.  Since that time, grocery and drug retail workers in the City of Los Angeles continue to report to work and serve their communities, despite the ongoing hazards and danger of being exposed to COVID-19.  While many employees can choose to work from home, essential grocery and drug retail workers are on the frontlines of the pandemic—they must report to work to perform their jobs, which includes substantial interaction with the public and significant exposure to an infectious disease.  The Center for Disease Control (CDC) reports that the virus spreads more readily indoors, and essential grocery and drug retail workers must perform their jobs inside, with large crowds.  These workers live with daily fear of not only contracting COVID-19, but bringing it home to their families—often for low wages and minimal benefits.

    Because of the sacrifice of these essential workers, families throughout the City continue to have access to the food and supplies they need during the pandemic.  Grocery and drug retail workers ensure a strong supply chain by continuously restocking food and critical household items, including toilet paper, cleaning supplies, medicine, and other products necessary to maintain the safety, sanitation, and essential operation of residences.  As a result of the pandemic, grocery and drug retail workers are tasked with responsibilities they did not have previously, including wearing masks, practicing social distancing, and constantly wiping down high touch areas, including cash registers, conveyer belts, and shopping carts for the public.

    This year, the CDC reports that multiple COVID-19 variants are circulating globally that appear to spread more quickly and easily than other variants.  As

coronavirus cases continue to spread throughout the City, the health threats grocery
and drug retail workers face are as significant now as when the pandemic began. The
risks are especially pronounced among employees who are Black, Indigenous, and
People of Color because they are overrepresented among the retail frontline workforce
and are disproportionately impacted by the pandemic, which has exposed and
deepened social and economic inequalities.

        According to a Brookings Institution analysis from November 2020, the top retail
companies in the United States have earned record-breaking profits during the
pandemic. In total, top retail companies earned on average an extra $16.7 billion in
profit in 2020, while stock prices were up an average of 33 percent. But this increase in
profits has not transferred to the low-wage frontline workers who risk their lives to
support the business operations. To the extent workers have received any hazard pay
at all for performing life threatening work, such pay has been limited or inconsistent.

        The importance of fair compensation for the risks the City's essential grocery and
drug retail workers endure cannot be overstated, particularly at a time when many
families are struggling financially, and workers face increased childcare costs as a result
of remote learning and expensive healthcare bills if they become sick with COVID-19.
Providing additional compensation to essential grocery and drug retail workers
encourages them to continue their work to keep the food and supply chain operating.

        Through this ordinance, the City seeks to justly compensate essential grocery
and drug retail workers for their daily sacrifices and the ongoing danger they and their
families face while providing vital services to the City's residents during the pandemic.
By requiring premium hazard pay for their work during the COVID-19 pandemic, the City
aims to protect the health and welfare of its essential grocery and drug retail workers,
their families, and the community.

### SEC. 200.101. DEFINITIONS.

        The following definitions shall apply to this article:

        A.      **"City"** means the City of Los Angeles.

        B.      **"Employee"** means any individual who:

        1.      In a particular week performs at least two hours of work
within the geographic boundaries of the City for an Employer; and

        2.      Qualifies as an Employee entitled to payment of a minimum
wage from any Employer under the California minimum wage law, as
provided under Section 1197 of the California Labor Code and wage
orders published by the California Industrial Welfare Commission.

        Employee does not include an exempt manager.

2

Exhibit I, Page 274

C.     **"Employer"** means a person, as defined in section 18 of the California Labor Code, including a corporate officer or executive, that operates::

1.     A grocery retail store with more than 300 employees nationwide, and more than ten Employees on-site in the City, that sells primarily food or household goods, including the sale of produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, baked foods, and/or prepared foods; or

2.     A drug retail store with more than 300 employees nationwide, and more than ten Employees on-site in the City, that sells a variety of prescription and nonprescription medicines and miscellaneous items, including, but not limited to, drugs, pharmaceuticals, sundries, produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, prepared foods, and other merchandise; or

3.     Any site of a retail store with more than 300 employees nationwide, and more than ten Employees on-site in the City, where:

a.     The retail store has at least one site in the City over 85,000 square feet that:

i.     Dedicates 10 percent or more of its sales floor to groceries, including, but not limited to, produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, baked foods, and/or prepared foods; or

ii.     Dedicates 10 percent or more of its sales floor to drug retail, including, but not limited to, drugs, pharmaceuticals, sundries, produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, prepared foods, and other merchandise; and

b.     The site:

i.     Dedicates 10 percent or more of its sales floor to groceries, including, but not limited to, produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, baked foods, and/or prepared foods; or

ii.     Dedicates 10 percent or more of its sales floor to drug retail, including, but not limited to, drugs, pharmaceuticals, sundries, produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, prepared foods, and other merchandise.

3

Exhibit I, Page 275

D.  **"Premium Hazard Pay"** means additional compensation owed to an Employee in addition to the Employee's other compensation, including, but not limited to, salaries, wages, tips, overtime, commissions, piece rate, bonuses, rest breaks, paid leave, and reimbursement for expenses.

## SEC. 200.102. PREMIUM HAZARD PAY FOR ON-SITE GROCERY AND DRUG RETAIL EMPLOYEES.

An Employee shall be entitled to no less than five dollars per hour in Premium Hazard Pay for each hour worked on-site for an Employer in the City. If an Employer already provides hourly Premium Hazard Pay as of the effective date of this ordinance, such compensation may be credited against the additional five dollars per hour required by this section. In no event shall any Premium Hazard Pay provided prior to the effective date of this ordinance be credited as part of the compensation due under this section.

## SEC. 200.103. RETALIATORY ACTION PROHIBITED.

No Employer shall discharge, reduce in compensation, or otherwise discriminate against any Employee for opposing any practice proscribed by this article, for requesting additional compensation owed under this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

## SEC. 200.104. ENFORCEMENT.

Any Employee aggrieved by a violation of this article may bring a civil action in a court of competent jurisdiction against the Employer violating this article. An Employee, upon prevailing, shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation, including, without limitation, the payment of any wages unlawfully withheld and/or injunctive relief, and shall be awarded attorney's fees and costs.

## SEC. 200.105. NO WAIVER OF RIGHTS.

Any waiver by an Employee of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable.

## SEC. 200.106. COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

The provisions of this article are in addition to or independent of any other rights, remedies, or procedures available under any other law and do not diminish, alter, or negate any other legal rights, remedies, or procedures available to an Employee.

### SEC. 200.107. CONFLICTS.

Nothing in this article shall be interpreted or applied to create any power or duty in conflict with any federal or state law.

### SEC. 200.108. SEVERABILITY.

If any subsection, sentence, clause or phrase of this article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this article. The City Council hereby declares that it would have adopted this article and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the article would be subsequently declared invalid or unconstitutional.

### SEC. 200.109. RULES AND REGULATIONS.

The Office of Wage Standards of the Bureau of Contract Administration shall promulgate Rules and Regulations that will be updated when necessary consistent with the article for further clarification of the provisions of this article. The Rules and Regulations shall be posted on WagesLA.lacity.org.

### SEC. 200.110. SUNSET.

This article shall sunset 120 days after the effective date of this article.

Sec. 2. Urgency Clause. The City Council finds and declares that this ordinance is required for the immediate protection of the public peace, health, and safety for the following reasons: Establishing a labor standard that requires Premium Hazard Pay for grocery and drug retail Employees is a subject of imminent concern in light of the current and continuing hazards of the COVID-19 pandemic. Grocery and drug retail workers have been working in hazardous environments for months, and continue to face significant risks in light of the rate of community transmission, the more contagious variants circulating globally, and the unavoidable working conditions they endure, including significant public contact every day. To promote the health and safety of the residents of the City of Los Angeles, this ordinance must become effective as soon as possible. For all these reasons, the ordinance shall become effective upon publication pursuant to Los Angeles Charter Section 253.

5

Sec. 3. The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

Approved as to Form and Legality

MICHAEL N. FEUER, City Attorney

By _____
       DAVID MICHAELSON
       Chief Assistant City Attorney

Date ____3/34/2021____

File No. ____20-1609____

M:\GENERAL COUNSEL DIVISION\ORDINANCES AND REPORTS\ORDINANCES - FINAL YELLOW\Revised LAMC Art. 9, Chapter XX  Hero Pay.docx

The Clerk of the City of Los Angeles hereby certifies that the foregoing ordinance was passed by the Council of the City of Los Angeles, **by a vote of not less than three-fourths** of all its members.

CITY CLERK                                  MAYOR

Ordinance Passed 03/03/2021            Approved _03/03/2021_

Published Date: 03/08/2021
Ordinance Effective Date: 03/08/2021
Council File No.: 20-1609

Exhibit I, Page 278

# EXHIBIT "J"

# EXHIBIT "J"





**Mayor Alex Fisch**
**Vice Mayor Daniel Lee**
**Member Göran Eriksson**
**Member Yasmine-Imani McMorrin**
**Member Albert Vera**

## City Council Meeting Agenda

Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board, Culver City**
**Parking Authority Board, and Culver City**
**Housing Authority Board**

| **7:00 PM** | **Monday, May 10, 2021** |

**MEETING INFORMATION AND ACCOMMODATION:**

To combat the spread of the coronavirus respiratory disease (COVID-19), the City proclaimed a local emergency on March 14, 2020 and issued subsequent public orders beginning March 16, 2020.  In accordance with such orders City Hall has been closed to the public and in-person meetings have been discontinued until further notice.

City Council meetings can be viewed live in Culver City on Channel 35 by Time Warner subscribers, on Channel 37 by Frontier FIOS subscribers and, for AT&T Uverse subscribers, by going to Channel 99. Additionally, you may access    http://www22.verizon.com/residential/fiostv/channels.htm    and enter your zip code to see the channel listing.

Meetings can also be viewed live online at 1) http://www.culvercity.org/meetings and clicking on the "In Progress" meeting, 2) the Culver City youtube channel:   www.CulverCity.org/youtube or 3) Via the Webex App, which requires registration at culvercity.org/agendas.

Any person needing reasonable accommodation related to disabilities, including assisted listening devices, is welcome to contact the City Clerk's Office at 310-253-5851 or via email at city.clerk@culvercity.org.

*For complete information on how to attend and participate in a City Council meeting and provide public comment, please visit www.culvercity.org/agendas.

**PUBLIC COMMENT:**

For those who wish to speak and provide oral public comment during a meeting, please register to attend the meeting via Webex at

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

culvercity.org/agendas and indicate the agenda item(s) for which you wish to make a comment. This will serve as a virtual speaker card. Speakers will be called in chronological order, based on when they registered to attend.  A tutorial on Webex Registration is available at Culver City's YouTube page (https://youtube.com/watch?v=q3NX-9lhSoU.)

Members of the public may submit written comments in advance on the City's website via eComment. To submit, go to www.culvercity.org/meetings, locate the appropriate meeting and click on the highlighted eComment link. As a new user you may need to register once. There is a new user tutorial at the City of Culver City's YouTube page (https://youtu.be/ckjtduK9B9s). Written comments may also be sent via public.comment@culvercity.org, or mail. Written comments, received by 3:00 PM on the day of the City Council meeting, will be compiled and provided to Council Members to ensure sufficient time for Council Member review. These comments will become part of the official record through a motion to receive and file correspondence.  Please be advised, written comments WILL NOT be read aloud during the City Council Meeting.

The City Council will receive comments from the public on any item of interest to the public (not listed on the agenda) that is within the subject matter jurisdiction of the City Council. The City Council cannot legally take action on any item not appearing on the agenda.  Such items may be referred for administrative action or scheduled on a future agenda.

Each speaker may address the City Council for up to three minutes.  Public comments on items on the agenda are taken at the time that particular agenda item is considered by the City Council.

**AUTHORITY OF PRESIDING OFFICER:**

Section 611 of the City Charter provides that during any public meeting, all persons shall have the right to address the City Council, and any City commission, board or committee, subject to reasonable rules of decorum and time limits established by ordinance or the presiding officer.  Therefore, the presiding officer may, from time to time, establish different time limits than those listed in this Agenda in order to effectively conduct City business.  The presiding officer may also, from time to time, re-order the items on the agenda

| | | |
|---|---|---|
| **City Council Meeting Agenda**<br>**Regular Session - 3:00 PM** | **Regular Meeting of the City Council,**<br>**Successor Agency to the Culver City**<br>**Redevelopment Agency Board,**<br>**Culver City Parking Authority Board,**<br>**and Culver City Housing Authority**<br>**Board** | **May 10, 2021** |

in order to effectively conduct the City Council meeting.

**AVAILABILITY OF AGENDA PACKETS AND CONSERVATION OF RESOURCES:**

The Agenda, staff reports and attachments are available online at www.culvercity.org/agendas. Members of the public may inspect (at no cost) and/or obtain copies (upon payment of the City's current copying fee) of any regular session item by contacting the City Clerk's Office at City Hall via phone at (310) 253-58591 or email at city.clerk@culvercity.org.

**NOTE:   AT OR ABOUT 11:00 P.M., MEMBERS MAY DETERMINE WHETHER TO CONTINUE WITH DISCUSSION OF REMAINING ITEMS ON THE AGENDA OR TO CARRY SOME/ALL OF THE ITEMS OVER TO A FUTURE MEETING DATE.**

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

**May 10, 2021**

---

## CALL TO ORDER & ROLL CALL:

## CLOSED SESSION - 5:00 PM

Public requests to discuss Closed Session Items must be filed with the Clerk before Closed Session convenes.

The City Council shall convene in closed session to consider the following matters:

**CS-1.**   21-972   **CC - PUBLIC EMPLOYEE APPOINTMENT**
**TITLE: POLICE CHIEF**
**PURSUANT TO GOVERNMENT CODE SECTION § 54957 (B) (1)**

**CS-2.**   21-942   **CC- CONFERENCE WITH REAL PROPERTY NEGOTIATORS**
**RE: 9240 CULVER BOULEVARD**
**CITY NEGOTIATORS: JOHN NACHBAR, CITY MANAGER; SOL BLUMENFELD, COMMUNITY DEVELOPMENT DIRECTOR; TODD TIPTON, ECONOMIC DEVELOPMENT MANAGER**
**OTHER PARTIES NEGOTIATORS: K-ZO RESTAURANT**
**UNDER NEGOTIATION: PRICE, TERMS OF PAYMENT OR BOTH, INCLUDING USE RESTRICTIONS, DEVELOPMENT OBLIGATIONS AND OTHER MONETARY RELATED CONSIDERATIONS.**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.8**

---

Exhibit J, Page 283

**City Council Meeting Agenda**
**Regular Session - 3:00 PM**

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

---

**CS-3.**   [21-970](21-970)   CC   -   CONFERENCE   WITH   REAL   PROPERTY
NEGOTIATORS
RE: 9500 CULVER BOULEVARD
CITY   NEGOTIATORS:   JOHN   NACHBAR,   CITY
MANAGER;   SOL   BLUMENFELD,   COMMUNITY
DEVELOPMENT   DIRECTOR;   TODD   TIPTON,   ECONOMIC
DEVELOPMENT   MANAGER;   TODD   MOONEY,   CITY
SPECIAL COUNSEL
OTHER   PARTIES   NEGOTIATORS:   OMCC   THEATER
OWNER, LLC
UNDER   NEGOTIATION:   PRICE,   TERMS   OF   PAYMENT
OR   BOTH,   INCLUDING   USE   RESTRICTIONS,
DEVELOPMENT   OBLIGATIONS   AND   OTHER
MONETARY RELATED CONSIDERATIONS.
PURSUANT TO GOVERNMENT CODE SECTION 54956.8

**RECOGNITION PRESENTATIONS - 6:30 PM**

**R-1.**   [21-969](21-969)   CC   -   PRESENTATION   OF   A   PROCLAMATION
DESIGNATING   MAY   AS   OLDER   AMERICANS
RECOGNITION MONTH

**R-2.**   [21-979](21-979)   CC   -   PRESENTATION   OF   A   PROCLAMATION
DESIGNATING   MAY   AS   ASIAN   AMERICAN   AND   PACIFIC
ISLANDER HERITAGE MONTH 2021

**R-3.**   [21-968](21-968)   CC   -   PRESENTATION   OF   A   PROCLAMATION
DESIGNATING   MAY   AS   HISTORIC   PRESERVATION
MONTH

**REGULAR SESSION - 7:00 PM**

**PLEDGE OF ALLEGIANCE**

**REPORT ON ACTION TAKEN IN CLOSED SESSION**

---

Exhibit J, Page 284

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

---

**COMMUNITY ANNOUNCEMENTS BY MEMBERS/INFORMATION ITEMS FROM STAFF**

Note: Council Members will have up to two minutes each to provide announcements (not including requests to "adjourn in memory".) Any additional announcements and/or requests to place items on a future agenda may be held to the end of the City Council Meeting, after all other business appearing on the agenda has been completed.

**I-1.**     21-973       **CC - COVID-19 UPDATE**

**JOINT PUBLIC COMMENT - Items NOT on the Agenda (Limit 20 Minutes)**

Note: All requests to address the City Council (and all other bodies in session) on items of interest to the public that are within the subject matter jurisdiction of the City Council (and all other bodies in session) and NOT on the agenda must be submitted to the City Clerk prior to the calling of this item by the presiding officer.  This public comment period shall have an aggregate duration of up to 20 minutes for all bodies in session.  Each comment may be up to three minutes in length.

**RECEIPT AND FILING OF CORRESPONDENCE**

Note: The City Council shall consider a motion to receive and file all written correspondence related to agenda items appearing on this evening's agenda and for all other written documents (including e-mails sent to city.clerk@culvercity.org) on subjects not appearing on the agenda that were received by the City Clerk's Office. Comments received in writing by 3:00 PM on the meeting date will be distributed to the City Council Members and become part of the official record of the meeting.

**ORDER OF THE AGENDA**

Note: The presiding officer or City Council may consider reordering the sequence in which items appearing on this evening's agenda will be considered by the City Council.

**CONSENT CALENDAR**

Note: Joint Consent and Consent Calendar items are considered to be routine in nature and may be approved by one motion.  All requests to address the City

---

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

Council under these items must be filed with the City Clerk before the Consent Calendar and Joint Consent Calendar are called by the presiding officer. Any Consent Calendar item that is pulled for discussion by a Council Member (not including brief questions, points of clarification and the like, which can be handled quickly), or because a public comment card(s) has been filed with the City Clerk, may be pulled from the Consent Calendar and considered later in the agenda, at the discretion of the presiding officer or City Council.

**C-1.**   21-974   **CC:HA:SA - APPROVAL OF CASH DISBURSEMENTS FOR APRIL 17, 2021 TO APRIL 30, 2021**

   *Attachments:*   Final Cash Disbursements for City Council - 210510.pdf

**C-2.**   21-975   **CC:HA:SA - APPROVAL OF MINUTES FOR THE SPECIAL CITY COUNCIL MEETING OF APRIL 19, 2021, THE JOINT CITY COUNCIL/COMMITTEE ON HOMELESSNESS MEETING ON PPRIL 19, 2021, AND THE REGULAR CONSOLIDATED CITY COUNCIL MEETING OF APRIL 26, 2021**

   *Attachments:*   CCCCSP 04192021 Draft Minutes.pdf
   CCCOH 04192021 Joint Draft Minutes.pdf
   CCCC 04262021 Draft Minutes.pdf

**C-3.**   21-909   **CC - ADOPTION OF A RESOLUTION AUTHORIZING OTHER NON-RESIDENTIAL GROUND-FLOOR USES, INCLUDING OFFICE USE, AT THE LUCKY DEVELOPMENT AS PERMITTED IN THE CITY'S MIXED-USE DEVELOPMENT STANDARDS.**

   *Attachments:*   2021-05-10_ATT 1_Resolution Authorizing Other Non-Residential Ground Floor Uses_12821 Washington.pdf
   2021-05-10_ATT 2_March 4, 2021 Applicant Request 12821 Wash BL.pdf

Exhibit J, Page 286

| | | |
|---|---|---|
| **City Council Meeting Agenda**<br>Regular Session - 3:00 PM | Regular Meeting of the City Council,<br>Successor Agency to the Culver City<br>Redevelopment Agency Board,<br>Culver City Parking Authority Board,<br>and Culver City Housing Authority<br>Board | **May 10, 2021** |

**C-4.**  21-910  CC - (1) ADOPTION OF THE CULVER CITY MASS DEBRIS MANAGEMENT PLAN; AND (2) INCORPORATE THE MASS DEBRIS MANAGEMENT PLAN INTO THE EXISTING CITY COUNCIL APPROVED EMERGENCY OPERATIONS PLAN.

*Attachments:*  Culver City Mass Debris Management Plan

**C-5.**  21-935  CC- APPROVAL OF A THIRD AMENDMENT TO THE EXISTING PROFESSIONAL SERVICES AGREEMENT WITH TETRA TECH, INC. FOR ADDITIONAL TECHNICAL SUPPORT SERVICES FOR THE CULVER BOULEVARD STORMWATER FILTRATION/RETENTION PROJECT, PR-002 (THE "STORMWATER CAPTURE PROJECT") IN AN AMOUNT NOT-TO-EXCEED $8,405.

**C-6.**  21-937  CC - APPROVAL OF AN AMENDMENT TO THE EXISTING AGREEMENT WITH CONCEPT CONSULTANT, INC. FOR THE REMOVAL OF EXISTING BUS STOP FURNITURE AND THE INSTALLATION OF NEW BUS STOP FURNITURE AT ADDITIONAL LOCATIONS IN THE CITY IN AN AMOUNT NOT-TO-EXCEED $82,725.

**C-7.**  21-943  CC-(1) APPROVAL OF FINAL PLANS AND SPECIFICATIONS FOR THE MOVE CULVER CITY - DOWNTOWN CORRIDOR PROJECT PS017 (PROJECT); (2) APPROVAL OF A PROFESSIONAL SERVICES AGREEMENT WITH LNI CUSTOM MANUFACTURING INC. TO DESIGN, FABRICATE, AND INSTALL BUS/BIKE PLATFORMS IN AN AMOUNT NOT-TO-EXCEED $327,314.52; (3) AUTHORIZATION TO THE CITY MANAGER TO NEGOTIATE AND APPROVE THE FINAL TERMS OF THE AGREEMENT; AND (4) AUTHORIZATION TO THE CITY MANAGER TO APPROVE AMENDMENTS TO THE AGREEMENT FOR CONTINGENCY COSTS OF 16% NOT-TO-EXCEED $52,685.

Exhibit J, Page 287

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

---

C-8.  21-944  CC - ADOPTION OF A RESOLUTION (1) DECLARING THE CITY COUNCIL'S INTENTION TO GRANT A FRANCHISE TO TORRANCE VALLEY PIPELINE COMPANY LLC FOR THE OPERATION OF AN EXISTING PIPELINE, LOCATED IN THE PUBLIC RIGHTS-OF-WAY, FOR THE TRANSPORTATION OF OIL; AND (2) SETTING THE DATE, TIME, AND PLACE FOR A PUBLIC HEARING TO BE JUNE 14, 2021 AT 7:00 PM VIA TELECONFERENCE, AT WHICH ANY PERSON HAVING ANY OBJECTION TO THE GRANTING OF THIS PROPOSED FRANCHISE MAY BE HEARD.

_Attachments:_  2021-05-10 ATT Pipeline Route Description.pdf
2021-05-10 ATT Pipeline Map.pdf
2021-05-10 ATT TVP Pipeline Franchise Ordinance
2021-05-10 ATT TVP Franchise Key Terms.pdf
2021-05-10 ATT Resolution Notice of Intent

C-9.  21-945  CC - (1) APPROVAL OF A PURCHASE ORDER WITH NEW FLYER OF AMERICA, INC. IN AN AMOUNT NOT-TO-EXCEED $5,752,070 ($5,153,882 BBASE, PPLUS $598,188 CCONTINGENCY) TO SUPPLY SIX BATTERY ELECTRIC BUSES; AND (2) APPROVAL OF A PURCHASE ORDER WITH A-Z BUS SALES IN THE AN AMOUNT OF NOT-TO-EXCEED $242,978 ($202,481 BBASE, PPLUS $40,496 CCONTINGENCY) TO SUPPLY ONE SHUTTLE BUS.

C-10.  21-946  CC - ADOPTION OF A RESOLUTION TO SUPPORT STATE LEGISLATION TO END CHILD MARRIAGE

_Attachments:_  2021-05-10 ATT Resolution Supporting Legislation to End Child Marriage.pdf

---

Exhibit J, Page 288

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

**C-11.**   21-947   **CC - ADOPTION OF A RESOLUTION REQUESTING A STATE AUDIT OF ALLEGED SEXUAL HARASSMENT, DISCRIMINATION, BULLYING AND RETALIATION AT THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA.**

*Attachments:*   2021-05-10_ATT_Resolution Requesting State Audit of MWD.pdf

**C-12.**   21-954   **CC - ADOPTION OF AN ORDINANCE ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE GROCERY AND DRUG RETAIL WORKERS**

*Attachments:*   2021-05-10_ATT_ Proposed Ordinance Premium Hazard Pay.pdf

**C-13.**   21-967   **CC:SA:HA:PA - (1) RECEIPT OF THE CITY MANAGER'S/EXECUTIVE DIRECTOR'S PROPOSED BUDGET FOR FY 2021/2022; AND (2) SETTING THE DATE AND TIME OF THE PUBLIC HEARING ON THE PROPOSED BUDGET FOR JUNE 28, 2021 AT 7:00 P.M.**

**PUBLIC HEARINGS AND ACTION ITEMS**

Note: The Public Hearing or Action Item with the most public comment cards on file with the City Clerk may be considered by the City Council as the first item, at the discretion of the presiding officer or City Council. The remaining Public Hearing and Action items shall be considered in the order they appear on the agenda, unless re-ordered by the presiding officer or City Council.

**ACTION ITEMS**

**A-1.**   21-952   **CC - INTRODUCTION OF AN ORDINANCE ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE HOSPITAL WORKERS AT COVERED HOSPITALS.**

*Attachments:*   2021-05-10_ATT_ Proposed Ordinance Premium Hazard Pay Hospital Workers.pdf

Exhibit J, Page 289

**City Council Meeting Agenda**
Regular Session - 3:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 10, 2021

---

**A-2.**   21-940   **CC - DISCUSSION OF REFUSE FUND RATE INCREASES; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE**

**A-3.**   21-849   **CC - (1) INTRODUCTION OF AN ORDINANCE AMENDING, TITLE 5, PUBLIC WORKS, OF THE CULVER CITY MUNICIPAL CODE (CCMC) TO ADD A NEW CHAPTER 5.07 ENTITLED "WASTE REDUCTION REGULATIONS" AND REPEALING CCMC CHAPTER 11.18, POLYSTYRENE REGULATIONS,; AND (2) ADOPTION OF A CATEGORICAL EXEMPTION RELATING THERETO, PURSUANT TO THE CALIFORNIA ENVIRONMENTAL QUALITY ACT (CEQA).**

   _Attachments:_   Proposed Ordinance Amending Polystyrene Regulations.pdf
   Polystyrene Ban Implementation Timeline

**A-4.**   21-971   **CC - (1) ADOPTION OF A RESOLUTION AMENDING CITY COUNCIL POLICY 3002, CITY COMMISSIONS, BOARDS AND COMMITTEES; APPOINTED REPRESENTATIVES TO OUTSIDE AGENCIES AND BOARDS TO CLARIFY NON-RESIDENCY REQUIREMENTS MAY BE ESTABLISHED BY CBC BYLAWS, INCLUDE LANGUAGE ENCOURAGING DIVERSITY IN APPOINTMENTS, AND MAKE AN ADDITIONAL CLEAN-UP REVISION; AND (2) DIRECTION REGARDING REMOVAL OF THE RESIDENCY REQUIREMENT FOR MEMBERS OF THE EQUITY AND HUMAN RELATIONS ADVISORY COMMITTEE.**

   _Attachments:_   2021-05-10_ATT 1_Council Policy 3002_CBC Policy.pdf
   2020-05-10_ATT 2_Resolution Amending CBC Policy.pdf

**PUBLIC COMMENT - ITEMS NOT ON THE AGENDA (CONTINUED)**

**ITEMS FROM MEMBERS (CONTINUED)**

---

Exhibit J, Page 290

| **City Council Meeting Agenda** | **Regular Meeting of the City Council,** | **May 10, 2021** |
|---|---|---|
| Regular Session - 3:00 PM | **Successor Agency to the Culver City** | |
| | **Redevelopment Agency Board,** | |
| | **Culver City Parking Authority Board,** | |
| | **and Culver City Housing Authority** | |
| | **Board** | |

**MEMBER REQUESTS TO AGENDIZE FUTURE ITEMS**

**ADJOURN (INCLUDING ADJOURNMENT IN MEMORY)**

# EXHIBIT "K"

# EXHIBIT "K"



# City of Culver City

## Staff Report Details (With Text)

| File #: | 21-952 | **Version:** 1 | **Name:** | Premium Hazard Pay for Southern California Hospital Workers |
|---|---|---|---|---|
| **Type:** | Ordinance | | **Status:** | Action Item |
| **File created:** | 4/29/2021 | | **In control:** | City Council Meeting Agenda |
| **On agenda:** | 5/10/2021 | | **Final action:** | |
| **Title:** | CC - Introduction of an Ordinance Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals. | | | |
| **Sponsors:** | | | | |
| **Indexes:** | | | | |
| **Code sections:** | | | | |
| **Attachments:** | 1. 2021-05-10_ATT_ Proposed Ordinance Premium Hazard Pay Hospital Workers.pdf | | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| | | | | |

**CC - Introduction of an Ordinance Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals.**

**Meeting Date:** May 10, 2021

**Contact Person/Dept:**   Shelly Wolfberg/City Manager's Office
**Phone Number:**   (310) 253-6000

**Fiscal Impact**: Yes []   No [X]          **General Fund:** Yes []    No [X]

**Public Hearing:** []     **Action Item:**   [X]    **Attachments:** [X]

**Commission Action Required:**    Yes []    No [X]   **Date:**

**Public Notification:**    (E-Mail) Michael Klepin, Southern California Hospital; Maky Peters, SEIU - United Healthcare Workers West; and Meetings and Agendas - City Council (05/05/2021).

**Department Approval:**  John M. Nachbar (05/05/2021)

_____

## RECOMMENDATION

Staff recommends the City Council consider introduction of an Ordinance establishing premium hazard pay for on-site hospital workers at covered hospitals (Attachment 1).

## BACKGROUND

On March 4, 2020, the State of California declared a State of Emergency due to the worldwide novel coronavirus pandemic (COVID-19) affecting residents of California, and the County of Los Angeles declared a public health emergency on that same date.  Subsequently, the City of Culver City issued a Proclamation of Local Emergency on March 14, 2020.  Shortly after the emergency was declared, the State and County began issuing public health orders requiring the closure or modified operations of numerous business sectors, in an attempt to mitigate the spread of COVID-19.

Hospital operations were determined to be part of the essential infrastructure, and hospital workers were identified as essential workers. Thus, hospitals remained open and hospital employees continued to report to work, treating an increasing number of patients extremely ill from COVID-19 complications.  Additionally, as more and more persons became ill with COVID-19 and were admitted to  hospitals, it was reported that many hospitals initially experienced a shortage of personal protective equipment such as gowns, gloves, and face masks.

Throughout the pandemic, many hospital workers have worked long hours; and thousands of hospital workers were infected with COVID-19.  As of April 30, 2021, as reported by the Los Angeles County Department of Public Health, over 10,000 Los Angeles County hospital workers have tested positive with COVID-19.   Due to the nature of the virus, it is not always possible to determine where an individual contracted the virus; thus, the Los Angeles County Public Health website does not state where the hospital workers contracted COVID-19.

Overall, as reported by Los Angeles County Public Health officials, as of May 4, 2021, over 23,900 COVID-19 deaths have been reported in Los Angeles County, and over 1,233,000 positive COVID-19 cases. The Centers for Disease Control and Prevention (CDC) reported that multiple COVID-19 variants are circulating globally, including in California and Los Angeles County. Under these circumstances, COVID-19 remains a risk in the community.

At the April 12, 2021 City Council Meeting, after discussion, the City Council voted 3-2 in favor of agendizing the introduction of an Ordinance establishing premium hazard pay for on-site hospital workers at covered hospitals. On that same date, the City Council voted to also agendize introducing an ordinance establishing premium hazard pay for grocery and drug retail workers, which was introduced at the April 26, 2021 City Council meeting.


## DISCUSSION

As directed by City Council, the Proposed Ordinance for hospital workers is similar to the Premium Hazard Pay Ordinance adopted by the City of Los Angeles for grocery and retail drug store workers.

The Proposed Ordinance includes the following provisions:

- Covered Hospital: A covered hospital is one included in California Health and Safety Code section 1250(a), i.e., "a general acute care hospital having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services."
- Eligible Employees: The Ordinance uses the term "Hospital Workers", defined as individuals providing direct patient care and support services at a Covered Hospital including but not limited to, clinicians, nurses, aides, technicians, janitorial and housekeeping staff, security

Exhibit K, Page 294

guards, food services workers, laundry workers, pharmacists, and nonmanagerial administrative staff, but does not include any exempt manager or an individual performing exclusively managerial or supervisory functions, or any physician or surgeon licensed by the State of California

- Employer: As used in the Ordinance, an Employer is obligated to pay Premium Hazard Pay to Hospital Workers. An Employer includes any person, who directly or indirectly or through an agent or any other person, including through the services of a temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Hospital Worker.
- Premium Hazard Pay: A Hospital Worker is entitled to no less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer.
- A Covered Hospital shall reimburse any contracted Employer for Premium Hazard Pay paid to Hospital Workers under the Ordinance.
- Private Right of Action: Any Hospital Worker may bring a civil action against the Employer for violating the Ordinance.
- No Covered Hospital or Employer shall discharge, reduce in compensation or otherwise discriminate against a Hospital Worker for seeking to enforce their rights under the Ordinance.
- Ordinance Sunset Date - 120 days after the effective date of the Ordinance.

The Proposed Ordinance is presented for City Council's consideration for introduction (Attachment 1).

## FISCAL ANALYSIS

There is no fiscal impact relative to introducing the premium hazard pay for this on-site hospital workers at covered hospitals ordinance.

## ATTACHMENTS

1. 2021-05-10__ ATT__ Ordinance - Premium Hazard Pay for on-site hospital workers at covered hospitals.

## MOTION

That the City Council:

1. Introduce an Ordinance Establishing Premium Hazard Pay for on-site hospital workers at covered hospitals; or

2. Provide alternate direction to the City Manager as deemed appropriate.

# EXHIBIT "L"

# EXHIBIT "L"

**ORDINANCE NO. 2021-_____**

**AN ORDINANCE OF THE CITY OF CULVER CITY, STATE OF CALIFORNIA, ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE HOSPITAL WORKERS AT COVERED HOSPITALS**

**WHEREAS,** the novel coronavirus 19 ("COVID-19") disease is caused by a virus that spreads easily from person to person and may result in serious illness or death, and is classified by the World Health Organization (WHO) as a worldwide pandemic; and

**WHEREAS**, on March 14, 2020, the City Manager, as the Director of Emergency Services, issued a Proclamation of Local Emergency due to the COVID-19 pandemic, which was ratified by the City Council on March 18, 2020 by Resolution No. 2020-R015.  Such action followed the Los Angeles County Department of Public Health's and the Chair of the Board of Supervisor's declarations of a local health emergency, the State of California's declaration of a State of Emergency on March 4, 2020, and the declaration of a National Emergency on March 13, 2020; and

**WHEREAS**, after issuing local health emergency declarations, the County of Los Angeles, with guidance from the State of California, issued public health orders requiring the closure or modified operations of numerous business sectors, and ordered the general public to stay safer at home, except to provide essential services and to engage in essential activities, to mitigate the spread and the effects of COVID-19; and

**WHEREAS**, hospital operations were determined to be part of the essential infrastructure, and  hospital workers were identified to be essential workers who continued to report to work throughout the pandemic and work long hours to serve their communities, despite the ongoing health hazard of being exposed to COVID-19; and

**WHEREAS**, according to the Los Angeles County Department of Public Health, as of April 30, 2021 over 10,000 Hospital Workers have been infected with COVID-19; and

Exhibit L, Page 297

**WHEREAS,** Hospital Workers in Culver City put themselves and their families at increased risk every day to care for patients with COVID-19; and

**WHEREAS**, caring for COVID-19 patients may also take an emotional toll on Hospital Workers, who often serve as family surrogates for very ill or dying patients and must bear the stress of record hospitalizations, declining caregiver to patient ratios, longer work shifts and deferred time off; and

**WHEREAS**, in 2021 the CDC has reported that multiple COVID-19 variants are circulating globally that appear to spread more quickly and easily than other variants, and as coronavirus cases continue to spread throughout the City and the region, the health threats Hospital Workers face continue to be significant, including the threat from the potentially more contagious variants of the coronavirus that have been detected in California; and

**WHEREAS**, through this Ordinance, the City seeks to compensate essential Hospital Workers for their daily sacrifices and the ongoing risks they and their families face while providing vital services to the City's residents during the pandemic; and

**WHEREAS**, by requiring premium hazard pay for their work during the COVID-19 pandemic, the City aims to protect the health and welfare of its essential Hospital Workers, their families, and the community.

**NOW THEREFORE**, the City Council of the City of Culver City, California, **DOES HEREBY ORDAIN** as follows:

**SECTION 1: DEFINITIONS.**

The following  definitions shall apply to this Ordinance:

A.    "**City**" means the City of Culver City.

B.    "**Covered Hospital**" means any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the geographical borders of the City.

Exhibit L, Page 298

C.      "**Employer**" means any person, as defined in Section 18 of the California Labor Code, including any person, who directly or indirectly or through an agent or any other person, including through the services of a temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Hospital Worker.

D.      "**Hospital Worker**" means any individual  providing direct patient care and services supporting patient care at a Covered Hospital, including, but not limited to, clinicians, nurses, aides, technicians, janitorial and housekeeping staff, security guards, food services workers, laundry workers, pharmacists, and nonmanagerial administrative staff, but does not include any exempt manager or an individual performing exclusively managerial or supervisory functions, or any physician or surgeon licensed by the State of California pursuant to Chapter 5 of Division 2 of the Business and Professions Code.

E.      "**Premium Hazard Pay**" means additional compensation owed to an Employee in addition to the Employee's other compensation, including, but not limited to, salaries, wages, tips, overtime, commissions, piece rate, bonuses rest breaks, paid leave, and reimbursement for expenses.

**SECTION 2.  PREMIUM HAZARD PAY FOR HOSPITAL WORKERS.**

A.      Hospital Workers shall be entitled to no less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer.  If an Employer already provides hourly Premium Hazard Pay as of the effective date of this Ordinance, such compensation may be credited as part of the additional five dollars per hour required by this section.  In no event shall any Premium Hazard Pay provided

prior to the effective date of this Ordinance be credited as part of the compensation due under this section.

B.      Hospital Workers entitled to Premium Hazard Pay include Hospital Workers employed directly by a Covered Hospital and Hospital Workers who are contracted to work at the Covered Hospital through another Employer.

C.      A Covered Hospital shall reimburse any contracted Employer for Premium Hazard Pay pursuant to this Ordinance.

**SECTION 3:  RETALIATORY ACTION PROHIBITED.**

No Covered Hospital or Employer shall discharge, reduce in compensation, or otherwise discriminate against any Hospital Worker for opposing any practice proscribed by this Ordinance, for requesting the additional compensation owed under this Ordinance, for participating in proceedings  related to this Ordinance, for seeking to enforce his or her rights under this Ordinance by any lawful means, or for otherwise asserting rights under this Ordinance.

**SECTION 4:  ENFORCEMENT.**

Any Hospital Worker aggrieved by a violation of this Ordinance may bring a civil action in a court of competent jurisdiction against the Employer violating this Ordinance. An Employee, upon prevailing, shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation, including, without limitation, the payment  of any wages unlawfully withheld and/or injunctive relief, and shall be awarded  attorney's fees and costs.

**SECTION 5:  NO WAIVER OF RIGHTS.**

Any waiver by an Employee of any or all of the provisions of this Ordinance shall be deemed contrary to public policy and shall be void and unenforceable.

**SECTION 6:  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR DEPRIVATIONS OF PROTECTED RIGHTS.**

The provisions of this Ordinance are in addition to or independent of any other rights remedies, or procedures  available under any other law and do not diminish, alter, or negate any other legal rights, remedies, or procedures  available to an Employee.

**SECTION 7:  CONFLICTS**

Nothing in this Ordinance shall be interpreted or applied to create any power or duty in conflict with any federal or state law.

**SECTION 8:  RULES AND REGULATIONS.**

The City Manager or their designee shall promulgate Rules and Regulations that will be updated when necessary consistent with this Ordinance for further clarification of the provisions of this Ordinance if warranted.  The Rules and Regulations shall be posted on the City's website.

**SECTION 9:  SUNSET**

This Ordinance shall expire 120 days after the effective date of this Ordinance.

**SECTION 10.   ENVIRONMENTAL DETERMINATION.**   The City Council finds that this Ordinance is not subject to the California Environmental Quality Act ("CEQA") pursuant to CEQA guidelines, California Code of Regulations, Title 14, Chapter 3, §15060(c)(2) [the activity will not result in a direct or reasonably foreseeable indirect physical change in the environment] and §15060(c)(3) [the activity is not a project as defined in §15378] because it has no potential for resulting in physical change to the environment, directly or indirectly.

Exhibit L, Page 301

1         **SECTION 11.   EFFECTIVE DATE.** Pursuant to Section 619 of the City

2   Charter, this Ordinance shall take effect thirty (30) days after its adoption.

3

4         **SECTION 12.   SEVERABILITY.**  The City Council hereby declares that, if any

5   provision, section, subsection, paragraph, sentence, phrase or word of this Ordinance is

6   rendered or declared invalid or unconstitutional by any final action in a court of competent

7   jurisdiction or by reason of any preemptive legislation, then the City Council would have

8   independently adopted the remaining provisions, sections, subsections, paragraphs,

9   sentences, phrases or words of this Ordinance and as such they shall remain in full force

10  and effect.

11

12        **SECTION 13.   PUBLICATION.**  Pursuant to Sections 616 and 621 of the City

13  Charter, prior to the expiration of fifteen (15) days after the adoption, the City Clerk shall

14  cause this Ordinance, or a summary thereof, to be published in the Culver City News and

15  shall post this Ordinance or a summary thereof in at least three places within the City.

16

17  APPROVED and ADOPTED this _____day of _____ 2021.

18

19                                                         ALEX FISCH, MAYOR

20                                                         City of Culver City, California

21

22

23  ATTEST:                                    APPROVED AS TO FORM:

24

25

26  JEREMY GREEN        ,       CAROL A. SCHWAB

     City Clerk                             City Attorney

27

28

# EXHIBIT "M"

# EXHIBIT "M"





Mayor Alex Fisch
Vice Mayor Daniel Lee
Member Göran Eriksson
Member Yasmine-Imani McMorrin
Member Albert Vera

## City Council Meeting Agenda



Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, Culver City Parking Authority Board, and Culver City Housing Authority Board**

| 7:00 PM | Monday, May 24, 2021 |
|---------|----------------------|

**MEETING INFORMATION AND ACCOMMODATION:**

To combat the spread of the coronavirus respiratory disease (COVID-19), the City proclaimed a local emergency on March 14, 2020 and issued subsequent public orders beginning March 16, 2020. In accordance with such orders City Hall has been closed to the public and in-person meetings have been discontinued until further notice.

City Council meetings can be viewed live in Culver City on Channel 35 by Time Warner subscribers, on Channel 37 by Frontier FIOS subscribers and, for AT&T Uverse subscribers, by going to Channel 99. Additionally, you may access http://www22.verizon.com/residential/fiostv/channels.htm and enter your zip code to see the channel listing.

Meetings can also be viewed live online at 1) http://www.culvercity.org/meetings and clicking on the "In Progress" meeting, 2) the Culver City youtube channel: www.CulverCity.org/youtube or 3) Via the Webex App, which requires registration at culvercity.org/agendas.

Any person needing reasonable accommodation related to disabilities, including assisted listening devices, is welcome to contact the City Clerk's Office at 310-253-5851 or via email at city.clerk@culvercity.org.

*For complete information on how to attend and participate in a City Council meeting and provide public comment, please visit www.culvercity.org/agendas.

**PUBLIC COMMENT:**

For those who wish to speak and provide oral public comment during a meeting, please register to attend the meeting via Webex at

---

Exhibit M, Page 304

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, Culver City Parking Authority Board, and Culver City Housing Authority Board**

May 24, 2021

culvercity.org/agendas and indicate the agenda item(s) for which you wish to make a comment. This will serve as a virtual speaker card. Speakers will be called in chronological order, based on when they registered to attend.   A tutorial on Webex Registration is available at Culver City's YouTube page (https://youtube.com/watch?v=q3NX-9lhSoU.)

Members of the public may submit written comments in advance on the City's website via eComment. To submit, go to www.culvercity.org/meetings, locate the appropriate meeting and click on the highlighted eComment link. As a new user you may need to register once. There is a new user tutorial at the City of Culver City's YouTube page (https://youtu.be/ckjtduK9B9s). Written comments may also be sent via public.comment@culvercity.org, or mail. Written comments, received by 3:00 PM on the day of the City Council meeting, will be compiled and provided to Council Members to ensure sufficient time for Council Member review. These comments will become part of the official record through a motion to receive and file correspondence.   Please be advised, written comments WILL NOT be read aloud during the City Council Meeting.

The City Council will receive comments from the public on any item of interest to the public (not listed on the agenda) that is within the subject matter jurisdiction of the City Council. The City Council cannot legally take action on any item not appearing on the agenda.   Such items may be referred for administrative action or scheduled on a future agenda.

Each speaker may address the City Council for up to three minutes.   Public comments on items on the agenda are taken at the time that particular agenda item is considered by the City Council.

**AUTHORITY OF PRESIDING OFFICER:**

Section 611 of the City Charter provides that during any public meeting, all persons shall have the right to address the City Council, and any City commission, board or committee, subject to reasonable rules of decorum and time limits established by ordinance or the presiding officer.   Therefore, the presiding officer may, from time to time, establish different time limits than those listed in this Agenda in order to effectively conduct City business.   The presiding officer may also, from time to time, re-order the items on the agenda

**City Council Meeting Agenda**  |  **Regular Meeting of the City Council,**  |  **May 24, 2021**
Closed Session - 5:30 PM  |  **Successor Agency to the Culver City**
Regular Session - 7:00 PM  |  **Redevelopment Agency Board,**
|  **Culver City Parking Authority Board,**
|  **and Culver City Housing Authority**
|  **Board**

in order to effectively conduct the City Council meeting.

## AVAILABILITY OF AGENDA PACKETS AND CONSERVATION OF RESOURCES:

The Agenda, staff reports and attachments are available online at www.culvercity.org/agendas. Members of the public may inspect (at no cost) and/or obtain copies (upon payment of the City's current copying fee) of any regular session item by contacting the City Clerk's Office at City Hall via phone at (310) 253-58591 or email at city.clerk@culvercity.org.

**NOTE:   AT OR ABOUT 11:00 P.M., MEMBERS MAY DETERMINE WHETHER TO CONTINUE WITH DISCUSSION OF REMAINING ITEMS ON THE AGENDA OR TO CARRY SOME/ALL OF THE ITEMS OVER TO A FUTURE MEETING DATE.**

Exhibit M, Page 306

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

**Regular Meeting of the City Council,**
**Successor Agency to the Culver City**
**Redevelopment Agency Board,**
**Culver City Parking Authority Board,**
**and Culver City Housing Authority**
**Board**

May 24, 2021

---

## CALL TO ORDER & ROLL CALL:

## CLOSED SESSION - 5:30 PM

Public requests to discuss Closed Session Items must be filed with the Clerk before Closed Session convenes.

The City Council shall convene in closed session to consider the following matters:

**CS-1**    21-986    **CC - CONFERENCE WITH LEGAL COUNSEL – ANTICIPATED LITIGATION**
**RE: SIGNIFICANT EXPOSURE TO LITIGATION – 2 ITEMS**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(2)**

**CS-2**    21-1016    **CC - CONFERENCE WITH LABOR NEGOTIATORS**
**CITY DESIGNATED REPRESENTATIVES: CITY MANAGER JOHN NACHBAR; ASSISTANT CITY MANAGER SERENA WRIGHT**
**EMPLOYEE ORGANIZATION: CULVER CITY EMPLOYEES ASSOCIATION; CULVER CITY MANAGEMENT GROUP; CULVER CITY POLICE OFFICERS ASSOCIATION;**
**CULVER CITY FIRE FIGHTERS ASSOCIATION; CULVER CITY POLICE MANAGEMENT GROUP; CULVER CITY FIRE MANAGEMENT ASSOCIATION; EXECUTIVE MANAGEMENT EMPLOYEES**
**PURSUANT TO GOVERNMENT CODE SECTION 54957.6**

## REGULAR SESSION - 7:00 PM

## PLEDGE OF ALLEGIANCE

## REPORT ON ACTION TAKEN IN CLOSED SESSION

---

Exhibit M, Page 307

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, Culver City Parking Authority Board, and Culver City Housing Authority Board**

May 24, 2021

---

**COMMUNITY ANNOUNCEMENTS BY MEMBERS/INFORMATION ITEMS FROM STAFF**

Note: Council Members will have up to two minutes each to provide announcements (not including requests to "adjourn in memory".) Any additional announcements and/or requests to place items on a future agenda may be held to the end of the City Council Meeting, after all other business appearing on the agenda has been completed.

**I-1.**   21-1013   **CC - COVID-19 UPDATE**

**JOINT PUBLIC COMMENT - Items NOT on the Agenda (Limit 20 Minutes)**

Note: All requests to address the City Council (and all other bodies in session) on items of interest to the public that are within the subject matter jurisdiction of the City Council (and all other bodies in session) and NOT on the agenda must be submitted to the City Clerk prior to the calling of this item by the presiding officer.  This public comment period shall have an aggregate duration of up to 20 minutes for all bodies in session.   Each comment may be up to three minutes in length.

**RECEIPT AND FILING OF CORRESPONDENCE**

Note: The City Council shall consider a motion to receive and file all written correspondence related to agenda items appearing on this evening's agenda and for all other written documents (including e-mails sent to city.clerk@culvercity.org) on subjects not appearing on the agenda that were received by the City Clerk's Office. Comments received in writing by 3:00 PM on the meeting date will be distributed to the City Council Members and become part of the official record of the meeting.

**ORDER OF THE AGENDA**

Note: The presiding officer or City Council may consider reordering the sequence in which items appearing on this evening's agenda will be considered by the City Council.

**CONSENT CALENDAR**

Note: Joint Consent and Consent Calendar items are considered to be routine in nature and may be approved by one motion.  All requests to address the City

---

Exhibit M, Page 308

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, Culver City Parking Authority Board, and Culver City Housing Authority Board**

May 24, 2021

---

Council under these items must be filed with the City Clerk before the Consent Calendar and Joint Consent Calendar are called by the presiding officer. Any Consent Calendar item that is pulled for discussion by a Council Member (not including brief questions, points of clarification and the like, which can be handled quickly), or because a public comment card(s) has been filed with the City Clerk, may be pulled from the Consent Calendar and considered later in the agenda, at the discretion of the presiding officer or City Council.

**C-1**   21-984   **CC:HA:SA - APPROVAL OF CASH DISBURSEMENTS FOR MAY 1, 2021 TO MAY 14, 2021**

*Attachments:*   Final Cash Disbursements for City Council - 210524.pdf

**C-2**   21-1014   **CC:HA:SA:PA - APPROVAL OF MINUTES FOR THE REGULAR CONSOLIDATED CITY COUNCIL MEETING OF MAY 10, 2021**

*Attachments:*   CC 051021 Minutes for Approval.pdf

**C-3**   21-769   **CC-ADOPTION OF A RESOLUTION INITIATING PROCEEDINGS FOR THE LEVY AND COLLECTION OF ANNUAL ASSESSMENTS FOR THE LANDSCAPE MAINTENANCE DISTRICT NUMBER 1 AND ORDERING THE PREPARATION OF THE ENGINEER'S REPORT THEREON FOR FISCAL YEAR 2021/2022**

*Attachments:*   Resolution of Initiation - LMD1.pdf

**C-4**   21-771   **CC- ADOPTION OF A RESOLUTION (1) APPROVING THE ENGINEER'S REPORT FOR HIGUERA STREET LANDSCAPING AND LIGHTING MAINTENANCE DISTRICT; (2) DECLARING THE INTENTION TO ORDER THE LEVY OF ANNUAL ASSESSMENTS FOR FISCAL YEAR 2021/2022; AND (3) SETTING THE DATE, TIME AND PLACE OF THE PUBLIC HEARING**

*Attachments:*   2021-05_24_Higuera_LMD_Engineers_Report.doc
                  Resolution of Intention - Higuera.pdf

---

Exhibit M, Page 309

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 24, 2021

---

**C-5**   21-953   **CC-(1) APPROVAL OF A FIFTH AMENDMENT TO THE EXISTING PROFESSIONAL SERVICES AGREEMENT WITH NBS GOVERNMENT FINANCE GROUP FOR ENHANCED TAX ROLL BILLING SERVICES FOR THE SAFE/CLEAN WATER PROTECTION MEASURE (MEASURE CW) AND ENHANCED TAX ROLL BILLING FOR REFUSE COLLECTION SERVICES IN AN AMOUNT NOT-TO-EXCEED $31,020.**

**C-6**   21-963   **CC - (1) APPROVAL OF AN AMENDMENT TO THE EXISTING AGREEMENT WITH HP COMMUNICATIONS TO SUPPORT FIBER MAINTENANCE AND CONTINUED LATERAL BUILD-OUT (ENGINEERING AND CONSTRUCTION SERVICES) FOR CULVER CONNECT (MUNICIPAL FIBER NETWORK); AND (2) AUTHORIZATION TO THE CITY MANAGER TO AMEND THE CONTRACT EXPENDITURE AMOUNT NOT-TO-EXCEED THE APPROVED BUDGET FOR THE NETWORK (FUND 205).**

**C-7**   21-976   **CC - ADOPTION OF A RESOLUTION (1) APPROVING THE ENGINEER'S REPORT, (2) DECLARING THE CITY COUNCIL'S INTENTION TO ORDER THE LEVY OF ANNUAL ASSESSMENTS FOR FISCAL YEAR 2021/2022, AND (3) SETTING THE DATE, TIME, AND PLACE FOR A PUBLIC HEARING FOR THE WEST WASHINGTON BOULEVARD BENEFIT ASSESSMENT DISTRICT NO. 1.**

*Attachments:*   FY 2021-22 W. Washington No. 1 Engineer's Report.pdf
AIP - Washington Boulevard No. 1 - Intention Reso.pdf

---

Exhibit M, Page 310

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 24, 2021

---

**C-8** [21-977](#) CC - ADOPTION OF A RESOLUTION (1) APPROVING THE ENGINEER'S REPORT, (2) DECLARING THE CITY COUNCIL'S INTENTION TO ORDER THE LEVY OF ANNUAL ASSESSMENTS FOR FISCAL YEAR 2021/2022, AND (3) SETTING THE DATE, TIME, AND PLACE FOR A PUBLIC HEARING FOR THE WEST WASHINGTON BOULEVARD BENEFIT ASSESSMENT DISTRICT NO. 2.

_**Attachments**:_ FY 2021-22 W. Washington No. 2 Engineer's Report.pdf
AIP - Washington Boulevard No. 2 - Intention Reso.pdf

**C-9** [21-945](#) CC - (1) APPROVAL OF A PURCHASE ORDER WITH NEW FLYER OF AMERICA, INC. IN AN AMOUNT NOT-TO-EXCEED $5,752,070 ($5,153,882 BASE, PLUS $598,188 CONTINGENCY) TO SUPPLY SIX BATTERY ELECTRIC BUSES; AND (2) APPROVAL OF A PURCHASE ORDER WITH A-Z BUS SALES IN AN AMOUNT NOT-TO-EXCEED $242,978 ($202,481 BASE, PLUS $40,496 CONTINGENCY) TO SUPPLY ONE SHUTTLE BUS.

**C-10** [21-978](#) CC - ADOPTION OF A RESOLUTION (1) APPROVING THE ENGINEER'S REPORT, (2) DECLARING THE CITY COUNCIL'S INTENTION TO ORDER THE LEVY OF ANNUAL ASSESSMENTS FOR FISCAL YEAR 2021/2022, AND (3) SETTING THE DATE, TIME, AND PLACE FOR A PUBLIC HEARING FOR THE WEST WASHINGTON BOULEVARD BENEFIT ASSESSMENT DISTRICT NO. 3.

_**Attachments**:_ FY 2021-22 W. Washington No. 3 Engineer's Report.pdf
AIP - Washington Boulevard No. 3 - Intention Reso.pdf

**C-11** [21-996](#) CC - APPROVAL OF AN APPLICATION FOR $18,768.42 IN GRANT FUNDS THROUGH THE FISCAL YEAR 2021 DEPARTMENT OF JUSTICE BUREAU OF JUSTICE ASSISTANCE PATRICK LEAHY BULLETPROOF VEST PARTNERSHIP.

---

Exhibit M, Page 311

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, Culver City Parking Authority Board, and Culver City Housing Authority Board**

**May 24, 2021**

---

**C-12**   21-1004   **CC - ADOPTION OF A RESOLUTION (1) APPROVING THE REFUSE FUND'S ENGINEER'S REPORT; (2) DECLARING THE INTENTION TO LEVY AND COLLECT THE REFUSE, RECYCLING AND ORGANICS COLLECTION FEES FOR FY 2021/2022 - FY 2030/2031; AND (3) SETTING THE DATE, TIME AND PLACE FOR THE PUBLIC HEARING.**

*Attachments:*   2021-05-24_Resolution of Intention_Refuse Collection Fees.pdf
Public Notification.pdf
Engineer's Report.pdf

**C-13**   21-1005   **CC - (1) UPDATE FROM THE CITY COUNCIL AD HOC LAX SUBCOMMITTEE; (2) CONSIDERATION OF RENAMING THE SUBCOMMITTEE; AND (3) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.**

**C-14**   21-1006   **CC - (1) EXTENSION OF ALEXEY STEELE'S TERM AS ARTIST LAUREATE TO A THIRD YEAR THROUGH DECEMBER 31, 2022; (2) AUTHORIZATION TO INCREASE ARTIST LAUREATE STIPEND FOR 2022; AND (3) DIRECTION TO CITY MANAGER AS DEEMED APPROPRIATE**

*Attachments:*   21-05-24_CC_ATT_Alexey Steele Artist Laureate Update for 2020

**C-15**   21-1009   **CC - ADOPTION OF A RESOLUTION APPROVING AND CONFIRMING THE FINDINGS OF THE 2020 ANNUAL HOUSING ELEMENT PROGRESS REPORT.**

*Attachments:*   2021-05-24-ATT NO 1_Resolution Confirming Housing Element Annual Progress Report 2020.pdf

**PUBLIC HEARINGS AND ACTION ITEMS**

Note: The Public Hearing or Action Item with the most public comment cards on file with the City Clerk may be considered by the City Council as the first item, at the discretion of the presiding officer or City Council. The remaining Public

---

Exhibit M, Page 312

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

**Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, Culver City Parking Authority Board, and Culver City Housing Authority Board**

May 24, 2021

---

Hearing and Action items shall be considered in the order they appear on the agenda, unless re-ordered by the presiding officer or City Council.

## ACTION ITEMS

A-1    21-1012    CC - INTRODUCTION OF AN ORDINANCE ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE HOSPITAL WORKERS AT COVERED HOSPITALS.

_Attachments:_   2021-05-24_ATT_Proposed Ordinance Premium Hazard Pay Hospital Workers.pdf

A-2    21-985    CC - (1) DISCUSSION OF EXTENDING EMERGENCY TEMPORARY USE PERMITS RELATED TO THE COVID-19 PANDEMIC; AND (2) DISCUSSION OF EXTENDING OUTDOOR DINING AND VALET FEE WAIVERS RELATED TO THE COVID-19 PANDEMIC; (3) DISCUSSION AND APPROVAL OF STAFF'S RECOMMENDATION ON THE IMPLEMENTATION OF THE MOVE CULVER CITY PROJECT DESIGN ON WESTBOUND CULVER BOULEVARD RELATIVE TO EXPANDED OUTDOOR DINING AND DIRECTION ON THE TIMING OF IMPLEMENTATION; AND (4) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.

_Attachments:_   State of California Blueprint for a Safer Economy.pdf
Downtown Planning Quick-Build Design Options.pdf

A-3    21-965    CC - ADOPTION OF A RESOLUTION ESTABLISHING VARIOUS FEES RELATED TO THE CITY'S RENT CONTROL AND TENANT PROTECTIONS PROGRAM

_Attachments:_   2021-05-24_ATT_Resolution_Residential Unit Registration Fees.pdf
2021-05-24 ATT Comparable Rent Control Fees in Other Jurisdictions.pdf

---

Exhibit M, Page 313

**City Council Meeting Agenda**
Closed Session - 5:30 PM
Regular Session - 7:00 PM

Regular Meeting of the City Council,
Successor Agency to the Culver City
Redevelopment Agency Board,
Culver City Parking Authority Board,
and Culver City Housing Authority
Board

May 24, 2021

---

A-4    21-1000    CC - ADOPTION OF AN ORDINANCE AMENDING, TITLE 5, PUBLIC WORKS, OF THE CULVER CITY MUNICIPAL CODE (CCMC) TO ADD A NEW CHAPTER 5.07 ENTITLED "WASTE REDUCTION REGULATIONS" AND REPEALING CCMC CHAPTER 11.18, POLYSTYRENE REGULATIONS.

     *Attachments:*    Waste Reduction Regulations Ordinance

A-5    21-1023    CC - 1) APPOINTMENT OF MANUEL CID AS POLICE CHIEF; AND 2) APPROVAL OF AN EXECUTIVE EMPLOYMENT AGREEMENT CONFIRMING SUCH APPOINTMENT

     *Attachments:*    2021-05-24_ATT 1_MANUEL CID_Employment Agreement and Exh A.pdf

A-6    21-1003    CC - (1) DISCUSSION AND CONSIDERATION OF A SUPPORT POSITION FOR AB 1401 (FRIEDMAN) - RESIDENTIAL AND COMMERCIAL DEVELOPMENT: PARKING REQUIREMENTS; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.

     *Attachments:*    2021-05-24__ATT__AB 1401 (Friedman) Legislation.pdf
                   2021-05-24__ATT__AB 1401 (Friedman) Fact Sheet.pdf
                   2021-05-24__Public Resources Code_21155.pdf
                   2021-05-24__Public Resources Code_21064.3.pdf

**PUBLIC COMMENT - ITEMS NOT ON THE AGENDA (CONTINUED)**

**ITEMS FROM MEMBERS (CONTINUED)**

**MEMBER REQUESTS TO AGENDIZE FUTURE ITEMS**

**ADJOURN (INCLUDING ADJOURNMENT IN MEMORY)**

---

Exhibit M, Page 314

# EXHIBIT "N"

# EXHIBIT "N"



# City of Culver City

Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

## Staff Report Details (With Text)

| File #: | 21-1012 | **Version:** 1 | **Name:** | Premium Hazard Pay for Southern California Hospital Workers |
|---|---|---|---|---|
| **Type:** | Ordinance | | **Status:** | Action Item |
| **File created:** | 5/17/2021 | | **In control:** | City Council Meeting Agenda |
| **On agenda:** | 5/24/2021 | | **Final action:** | |
| **Title:** | CC - Introduction of an Ordinance Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals. | | | |
| **Sponsors:** | | | | |
| **Indexes:** | | | | |
| **Code sections:** | | | | |
| **Attachments:** | 1. 2021-05-24_ATT_Proposed Ordinance Premium Hazard Pay Hospital Workers.pdf | | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 5/24/2021 | 1 | City Council Meeting Agenda | | |

**CC - Introduction of an Ordinance Establishing Premium Hazard Pay for On-Site Hospital Workers at Covered Hospitals.**

**Meeting Date:** May 24, 2021

**Contact Person/Dept:**   Shelly Wolfberg/City Manager's Office
**Phone Number:**      (310) 253-6000

**Fiscal Impact**: Yes []   No [X]        **General Fund:** Yes []    No [X]

**Public Hearing:** []     **Action Item:** [X]     **Attachments:** [X]

**Commission Action Required:**    Yes []    No [X]   **Date:**

**Public Notification:**   (E-Mail) Michael Klepin, Southern California Hospital; Maky Peters, SEIU - United Healthcare Workers West; and Meetings and Agendas - City Council (05/20/2021).

**Department Approval:**  John M. Nachbar (05/20/2021)

_____

## RECOMMENDATION

Staff recommends the City Council consider introduction of an Ordinance establishing premium hazard pay for on-site hospital workers at covered hospitals (Attachment 1).

## BACKGROUND

Exhibit N, Page 316

File #: 21-1012, **Version:** 1

On March 4, 2020, the State of California declared a State of Emergency due to the worldwide novel coronavirus pandemic (COVID-19) affecting residents of California, and the County of Los Angeles Department of Public Health (LAC DPH) declared a public health emergency on that same date. Subsequently, the City of Culver City issued a Proclamation of Local Emergency on March 14, 2020. Shortly after the emergency was declared, the State and County began issuing public health orders requiring the closure or modified operations of numerous business sectors, in an attempt to mitigate the spread of COVID-19.

Hospital operations were determined to be part of the essential infrastructure, and hospital workers were identified as essential workers. Thus, hospitals remained open and hospital employees continued to report to work, treating an increasing number of patients extremely ill from COVID-19 complications.   Additionally, as more and more persons became ill with COVID-19 and were admitted to hospitals, it was reported that many hospitals initially experienced a shortage of personal protective equipment such as gowns, gloves, and face masks.

Throughout the pandemic, many hospital workers have worked long hours; and thousands of hospital workers were infected with COVID-19.  As of May 6, 2021, as reported by the LAC DPH, over 10,000 Los Angeles County hospital workers have tested positive with COVID-19. Hospitals continue to report the highest proportion of overall employee infection among all healthcare worker and first responder settings, and nurses continue to face the highest risk of infection among all healthcare workers and first responders, totally approximately five times as many reported cases as the next occupation with the highest number of reported cases (law enforcement).  Due to the nature of the virus, it is not always possible to determine where an individual contracted the virus; however, the LAC DPH states the majority of known exposures to COVID-19 among positive healthcare workers and first responders occurred in a healthcare setting.

According to the U.S. Occupational Safety and Health Administration (OSHA), worker classifications which have a "Very High Exposure Risk" to COVID-19 includes jobs with a very high potential for exposure to known or suspected sources of COVID-19 during specific medical, postmortem, or laboratory procedures. Examples of workers in the Very High Exposure Risk category include healthcare workers such as nurses and emergency medical technicians performing aerosol-generating procedures (e.g., intubation, cough induction procedures, bronchoscopies, or invasive specimen collection) on known or suspected COVID-19 patients; and healthcare or laboratory personnel collecting or handling specimens from known or suspected COVID-19 patients (e.g., manipulating cultures from known or suspected COVID-19 patients).

OSHA further identifies "High Exposure Risk" worker classifications as those with jobs with a high potential for exposure to known or suspected sources of COVID-19; this classification includes healthcare delivery and support staff (hospital staff who must enter patients' rooms) exposed to known or suspected COVID-19 patients, and those persons who have frequent or sustained contact with coworkers, including under close working conditions indoors or in poorly ventilated spaces.

On May 14, 2021, the LAC DPH issued an amended Public Order with modified restrictions as the County moves through the "Yellow Tier" of the state's tiered system. DPH stated, among other things, that there is evidence of continued community transmission of COVID-19 in the County, that asymptomatic transmission has been documented, and that a significant portion of the County population continues to be at risk for infection with serious health complications, due to pre-existing conditions.

File #: 21-1012, **Version:** 1

Further, only 43% of Los Angeles County residents 16 and older are fully vaccinated while the majority of residents remain susceptible to infection. Despite the availability of vaccines, factors including vaccine hesitancy, vaccine refusal and age and health conditions that prevent vaccination mean that hospital workers will still be required to interface with and treat individuals in the coming months who have not been vaccinated.  According to the LAC DPH, there remains a strong likelihood that increased interactions among members of the public who are not fully vaccinated against COVID-19 may result in an increased number of cases of community transmission.  Making community transmission even more problematic, some individuals who contract the virus causing COVID-19 have no symptoms or only mild symptoms, and are unaware they carry the virus and are transmitting it to others.

Additionally, the Centers for Disease Control and Prevention (CDC) has recognized that some individuals with COVID-19 experience symptoms and require healthcare services for an extended period, a phenomenon termed "Long Haul Covid".  The lingering effects of COVID-19 on these individuals may continue to place a strain on the healthcare system and on hospital workers for a period of time going forward.  There is also limited data on vaccine protection in people who are immunocompromised.  Hospital workers' employment requires them to continue to treat and interface with people with immunocompromising conditions.

Overall, as reported by LAC DPH, as of May 17, 2021 over 24,000 COVID-19 deaths have been reported in Los Angeles County, and over 1,237,500 positive COVID-19 cases. The CDC reported that multiple COVID-19 variants are circulating globally, including in California and Los Angeles County. Other nearby states, including Oregon, Nevada, Utah and Arizona, are experiencing a recent increase in cases and hospitalization rates. Under these circumstances, COVID-19 remains a risk in the community and to hospital workers. The CDC in fact still calls for wearing masks in hospitals, while relaxing mask wearing guidelines overall, which recognizes the COVID-19 risks still facing hospital workers.

At the April 12, 2021 City Council Meeting, after discussion, the City Council voted 3-2 in favor of agendizing the introduction of an Ordinance establishing premium hazard pay for on-site hospital workers at covered hospitals. On that same date, the City Council voted to also agendize introducing an ordinance establishing premium hazard pay for grocery and drug retail workers, which was introduced at the April 26, 2021 City Council meeting and adopted on May 10, 2021.

This Staff Report was postponed from the May 10, 2021 City Council meeting and agendized for discussion this evening.

## DISCUSSION

As directed by City Council, the Proposed Ordinance for hospital workers is similar to the Premium Hazard Pay Ordinance adopted by the City of Los Angeles for grocery and retail drug store workers.

The Proposed Ordinance includes the following provisions:

- Covered Hospital: A covered hospital is one included in California Health and Safety Code section 1250(a), i.e., "a general acute care hospital having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care, including the following basic services: medical, nursing,

Exhibit N, Page 318

surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services."

- Eligible Employees: The Ordinance uses the term "Hospital Workers", defined as individuals providing direct patient care and support services at a Covered Hospital including but not limited to, clinicians, nurses, aides, technicians, janitorial and housekeeping staff, security guards, food services workers, laundry workers, pharmacists, and nonmanagerial administrative staff, but does not include any exempt manager or an individual performing exclusively managerial or supervisory functions, or any physician or surgeon licensed by the State of California
- Employer: As used in the Ordinance, an Employer is obligated to pay Premium Hazard Pay to Hospital Workers.  An Employer includes any person, who directly or indirectly or through an agent or any other person, including through the services of a temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Hospital Worker.
- Premium Hazard Pay: A Hospital Worker is entitled to no less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer.
- A Covered Hospital shall reimburse any contracted Employer for Premium Hazard Pay paid to Hospital Workers under the Ordinance.
- Private Right of Action:  Any Hospital Worker may bring a civil action against the Employer for violating the Ordinance.
- No Covered Hospital or Employer shall discharge, reduce in compensation or otherwise discriminate against a Hospital Worker for seeking to enforce their rights under the Ordinance.
- An exemption to the provision stating that no provision of the Ordinance may be waived by an employee, except if expressly waived in writing in a collective bargaining agreement.
- Ordinance Sunset Date - 120 days after the effective date of the Ordinance; however, the Ordinance states that City Council may rescind the Ordinance sooner if conditions render it advisable to do so.

*Potential Legal Challenges*

At this time, staff has not found another municipality that has adopted an ordinance relative to providing healthcare worker or hospital worker hazard pay.  The ordinance, if adopted, may be subject to legal challenges similar to the challenges brought by opponents to the grocery store hazard pay ordinances against the City of Long Beach, West Hollywood, Montebello, San Jose, and other California cities.  For instance, in litigation against the City of Long Beach, the California Grocers Association (CGA) alleged that the grocery store worker hazard pay ordinance violated the National Labor Relations Act (NLRA) by regulating activity that Congress intended to be left to economic forces; that it violates the Equal Protection Clause of the U.S. and California constitutions by singling out certain workers but ignoring others similarly situated; that it interferes with collective bargaining and violates the Contract Clause of the constitution.

The Proposed Ordinance is presented for City Council's consideration for introduction (Attachment 1).

**FISCAL ANALYSIS**

**File #:** 21-1012, **Version:** 1

There is no fiscal impact relative to introducing the premium hazard pay for this on-site hospital workers at covered hospitals ordinance. There would be costs associated with defending any litigation that may be filed against the City if the ordinance is adopted.

## ATTACHMENTS

1. 2021-05-24__ ATT__ Ordinance - Premium Hazard Pay for on-site hospital workers at covered hospitals.

## MOTION

That the City Council:

1. Introduce an Ordinance Establishing Premium Hazard Pay for on-site hospital workers at covered hospitals; or

2. Provide alternate direction to the City Manager as deemed appropriate.

Exhibit N, Page 320

# EXHIBIT "O"

# EXHIBIT "O"

**ORDINANCE NO. 2021-_____**

**AN ORDINANCE OF THE CITY OF CULVER CITY, STATE OF CALIFORNIA, ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE HOSPITAL WORKERS AT COVERED HOSPITALS**

   **WHEREAS,** the novel coronavirus ("COVID-19") disease is caused by a virus that spreads easily from person to person and may result in serious illness or death, and is classified by the World Health Organization (WHO) as a worldwide pandemic; and

   **WHEREAS**, on March 14, 2020, the City Manager, as the Director of Emergency Services, issued a Proclamation of Local Emergency due to the COVID-19 pandemic, which was ratified by the City Council on March 18, 2020 by Resolution No. 2020-R015.  Such action followed the Los Angeles County Department of Public Health's (LACDPH) and the Chair of the Board of Supervisor's declarations of a local health emergency, the State of California's declaration of a State of Emergency on March 4, 2020, and the declaration of a National Emergency on March 13, 2020; and

   **WHEREAS**, after issuing local health emergency declarations, the County of Los Angeles, with guidance from the State of California, issued public health orders requiring the closure or modified operations of numerous business sectors, and ordered the general public to stay 'safer at home', except to provide essential services and to engage in essential activities, to mitigate the spread and the effects of COVID-19; and

   **WHEREAS**, hospital operations were determined to be part of the essential infrastructure, and hospital workers were identified to be essential workers who continued to report to work throughout the pandemic and work long hours to serve their communities, despite the ongoing health hazard of being exposed to COVID-19; and

**WHEREAS**, on May 14, 2021, the LACDPH issued an amended order with modified restrictions, based on, among other things, the following determinations: evidence of continued community transmission of COVID-19 within the County; asymptomatic transmission has been documented; evidence that a significant portion of the County population continues to be at risk for infection with serious health complications, including hospitalizations and death from COVID-19, due to age or pre-existing health conditions; and further evidence that other County residents, including younger and otherwise healthy people, are also at risk for serious negative health outcomes and for transmitting the virus to others. The City Council acknowledges that these conditions exist; and

**WHEREAS**, according to the LACDPH, as of May 6, 2021 over 10,000 Hospital Workers have been infected with COVID-19. As of May 6, 2021 hospitals continue to report the highest proportion of overall employee infection among all healthcare worker and first responder settings, and nurses continue to face the highest risk of infection among all healthcare workers and first responders in Los Angeles County, totaling approximately five times as many reported cases as the next occupation with the highest number of reported cases; and

**WHEREAS,** according to the LACDPH, the vast majority of known exposures among COVID-19 positive healthcare workers and first responders occurred in a healthcare setting, reflecting the continued dangers and risks faced by Hospital Workers; and

**WHEREAS,** while existing community transmission of COVID-19 is at a lower level, it continues to present a substantial and significant risk of harm to the health of County residents and workforce. Only 43.5% of people over the age of 16 in Los

Angeles County are fully vaccinated against COVID-19, leaving the majority of the population susceptible to infections. Further, according to the LACDPH, as of May 14, 2021 there remains a strong likelihood that increased interactions among members of the public who are not fully vaccinated against COVID-19 may result in an increased number of cases of community transmission. Making the community transmission problem worse, some individuals who contract the virus causing COVID-19 have no symptoms or only mild symptoms, and so are unaware that they carry the virus and are transmitting it to others. As the LACDPH concluded, as of May 14, 2021, the public health emergency and attendant risks to public health associated with COVID-19 still predominate despite the availability of the vaccine; and

**WHEREAS,** Hospital Workers in Culver City put themselves and their families at increased risk every day to care for patients with COVID-19 and are facing now and will face substantial risk and burden over the coming weeks and months; and

**WHEREAS**, caring for COVID-19 patients may also take an emotional toll on Hospital Workers, who often serve as family surrogates for very ill or dying patients and must bear the stress of record hospitalizations, declining caregiver-to-patient ratios, longer work shifts and deferred time off; and

**WHEREAS**, in 2021 the Centers for Disease Control and Infection (CDC) has reported that multiple COVID-19 variants are circulating globally that appear to spread more quickly and easily than other variants. Variants are present in Los Angeles County, and the efficacy of vaccines against these new variants remains under investigation. While the impact of these variants is not fully known, other nearby states including Oregon, Nevada, Utah, and Arizona are experiencing a recent increase in case and hospitalization rates. As COVID-19 cases continue to spread throughout the region,

Hospital Workers continue to face health threats, including the threat from the potentially more contagious variants of the coronavirus that have been detected in California; and

**WHEREAS,** despite the availability of vaccines, the existence of vaccine hesitancy individuals, vaccine refusal, and age and health conditions that prevent vaccination mean that Hospital Workers will still be required to interface with and treat individuals who have not been vaccinated over the coming weeks and months; and

**WHEREAS,** according to a study by the Urban Institute, a nonprofit health policy center, more than one-third of adults between the ages of 18 and 64 have forgone or delayed medical care because of COVID-19. Even as community transmission of COVID-19 declines, this pent-up demand for healthcare will place a substantial burden on Hospital Workers; and

**WHEREAS,** even with growing percentages of the public becoming vaccinated against COVID-19, Hospitals Workers still face increased risks and burdens due to the fact that their employment requires them to work directly and over longer periods of time with those with symptomatic COVID-19, as well as asymptomatic carriers and those at higher risk of being asymptomatic carriers, including individuals who have not or cannot take the vaccine; and

**WHEREAS,** as the CDC has recognized, some individuals with COVID-19 experience symptoms and require healthcare services for an extended period of time, a phenomenon termed "Long Haul COVID;" "Long Haul COVID" may continue to place a strain on the healthcare system and Hospital Workers for a substantial period of time; and

**WHEREAS,** as the CDC has recognized, there is limited data on vaccine protection in people who are immunocompromised. Hospital Workers'

employment requires them to treat and interface with people with immunocompromising conditions; and

   **WHEREAS,** in recognition of the heightened risks facing Hospital Workers and those they treat, the recently relaxed masking guidelines released by the CDC still call for wearing masks in, among other places, hospitals; and

   **WHEREAS,** according to the U.S. Occupational Safety and Health Administration (OSHA), worker classifications which have a "Very High Exposure Risk" to COVID-19 includes jobs with a very high potential for exposure to known or suspected sources of COVID-19 during specific medical, postmortem, or laboratory procedures; and

   **WHEREAS,** examples of workers in the Very High Exposure Risk category include healthcare workers such as nurses and emergency medical technicians performing aerosol-generating procedures (e.g., intubation, cough induction procedures, bronchoscopies, or invasive specimen collection) on known or suspected COVID-19 patients; and healthcare or laboratory personnel collecting or handling specimens from known or suspected COVID-19 patients (e.g., manipulating cultures from known or suspected COVID-19 patients); and

   **WHEREAS,** OSHA further identifies "High Exposure Risk" worker classifications as those with jobs with a high potential for exposure to known or suspected sources of COVID-19, and this classification includes healthcare delivery and support staff (including hospital staff who must enter patients' rooms) exposed to known or suspected COVID-19 patients, and those persons who have frequent or sustained contact with coworkers, including under close working conditions indoors or in poorly ventilated spaces; and

**WHEREAS**, through this Ordinance, the City seeks to compensate essential Hospital Workers for their daily sacrifices and the ongoing risks and burdens they and their families face while providing vital services to the community during the pandemic and in the coming weeks and months; and

**WHEREAS**, by requiring premium hazard pay for their work during the COVID-19 pandemic, the City aims (1) to protect the health and welfare of its essential Hospital Workers, their families, and the community; (2) to recognize and compensate Hospital Workers for the risks and burdens they face every day and will continue to face in the coming months; (3) support stable incomes among Hospital Workers; and (4) promote job retention by ensuring Hospital Workers are adequately compensated for the substantial risks, efforts, and expenses they are undertaking to provide essential services in a safe and reliable manner.

**NOW THEREFORE**, the City Council of the City of Culver City, California, **DOES HEREBY ORDAIN** as follows:

**SECTION 1: DEFINITIONS.**

The following  definitions shall apply to this Ordinance:

A.      "**City**" means the City of Culver City.

B.      "**Covered Hospital**" means any and all hospitals as defined in California Health and Safety Code section 1250(a) that operate within the geographical borders of the City.

C.      "**Employer**" means any person, as defined in Section 18 of the California Labor Code, including any person, who directly or indirectly or through an agent or any other person, including through the services of a

temporary service or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of any Hospital Worker.

D.      "**Hospital Worker**" means any individual  providing direct patient care and services supporting patient care at a Covered Hospital, including, but not limited to, clinicians, nurses, aides, technicians, janitorial and housekeeping staff, security guards, food services workers, laundry workers, pharmacists, and nonmanagerial administrative staff, but does not include any exempt manager or an individual performing exclusively managerial or supervisory functions, or any physician or surgeon licensed by the State of California pursuant to Chapter 5 of Division 2 of the Business and Professions Code.

E.      "**Premium Hazard Pay**" means additional compensation owed to an Employee in addition to the Employee's other compensation, including, but not limited to, salaries, wages, tips, overtime, commissions, piece rate, bonuses rest breaks, paid leave, and reimbursement for expenses.


**SECTION 2.  PREMIUM HAZARD PAY FOR HOSPITAL WORKERS.**

A.      Hospital Workers shall be entitled to no less than five dollars ($5.00) per hour in Premium Hazard Pay for each hour worked on-site at a Covered Hospital in the City for an Employer.  If an Employer already provides hourly Premium Hazard Pay as of the effective date of this Ordinance, such compensation may be credited as part of the additional five dollars per hour required by this section.

In no event shall any Premium Hazard Pay provided prior to the effective date of this Ordinance be credited as part of the compensation due under this section.

B.      Hospital Workers entitled to Premium Hazard Pay include Hospital Workers employed directly by a Covered Hospital and Hospital Workers who are contracted to work at the Covered Hospital through another Employer.

C.      A Covered Hospital shall reimburse any contracted Employer for Premium Hazard Pay pursuant to this Ordinance.

**SECTION 3:  RETALIATORY ACTION PROHIBITED.**

No Covered Hospital or Employer shall discharge, reduce in compensation, or otherwise discriminate against any Hospital Worker for opposing any practice proscribed by this Ordinance, for requesting the additional compensation owed under this Ordinance, for participating in proceedings  related to this Ordinance, for seeking to enforce his or her rights under this Ordinance by any lawful means, or for otherwise asserting rights under this Ordinance.

**SECTION 4:  ENFORCEMENT.**

Any Hospital Worker aggrieved by a violation of this Ordinance may bring a civil action in a court of competent jurisdiction against the Employer violating this Ordinance. An Employee, upon prevailing, shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation, including, without limitation, the payment  of any wages unlawfully withheld and/or injunctive relief, and shall be awarded  attorney's fees and costs.

**SECTION 5: EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT**

All of the provisions of this Ordinance, or any part thereof, may be expressly waived in a collective bargaining agreement, but only if the waiver is explicitly set forth in the agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute a waiver of all or any of the provision of this Ordinance.

**SECTION 6**:  **NO WAIVER OF RIGHTS.**

Except for a collective bargaining agreement provision made pursuant to Section 5, any waiver by an Employee of any or all of the provisions of this Ordinance shall be deemed contrary to public policy and shall be void and unenforceable.

**SECTION 7:  COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR DEPRIVATIONS OF PROTECTED RIGHTS.**

The provisions of this Ordinance are in addition to or independent of any other rights remedies, or procedures  available under any other law and do not diminish, alter, or negate any other legal rights, remedies, or procedures  available to an Employee.

**SECTION 8:  CONFLICTS**

Nothing in this Ordinance shall be interpreted or applied to create any power or duty in conflict with any federal or state law.

*///*

**SECTION 9:  RULES AND REGULATIONS.**

The City Manager or their designee shall promulgate Rules and Regulations that will be updated when necessary consistent with this Ordinance for further clarification of the provisions of this Ordinance if warranted.   The Rules and Regulations shall be posted on the City's website.

**SECTION 10:  SUNSET**

This Ordinance shall expire 120 days after the effective date of this Ordinance. The City will continue to monitor COVID-19 indicators to assess the impact of the disease and may rescind this Ordinance before the full 120 days elapses if evolving conditions render it advisable to do so.

**SECTION 11.   ENVIRONMENTAL DETERMINATION.**   The City Council finds that this Ordinance is not subject to the California Environmental Quality Act ("CEQA") pursuant to CEQA guidelines, California Code of Regulations, Title 14, Chapter 3, §15060(c)(2) [the activity will not result in a direct or reasonably foreseeable indirect physical change in the environment] and §15060(c)(3) [the activity is not a project as defined in §15378] because it has no potential for resulting in physical change to the environment, directly or indirectly.

**SECTION 12.   EFFECTIVE DATE.** Pursuant to Section 619 of the City Charter, this Ordinance shall take effect thirty (30) days after its adoption.

**SECTION 13.   SEVERABILITY.**   The provisions of this Ordinance are declared to be separate and severable. The City Council hereby declares that, if any provision, section, subsection, paragraph, sentence, phrase, or word of this Ordinance, or the application thereof to any covered hospital, employer, hospital worker, person, or circumstance, is rendered or declared invalid or unconstitutional by any final action in a court of competent jurisdiction or by reason of any preemptive legislation, then the City Council would have independently adopted the remaining provisions, sections, subsections, paragraphs, sentences, phrases, words or applications of this Ordinance and as such they shall remain in full force and effect.

**SECTION 14. PUBLICATION.**  Pursuant to Sections 616 and 621 of the City Charter, prior to the expiration of fifteen (15) days after the adoption, the City Clerk shall cause this Ordinance, or a summary thereof, to be published in the Culver City News and shall post this Ordinance or a summary thereof in at least three places within the City.

APPROVED and ADOPTED this _____day of _____ 2021.

_____
ALEX FISCH, MAYOR
City of Culver City, California

ATTEST:                                        APPROVED AS TO FORM:

_____          _____
JEREMY GREEN              ,              CAROL A. SCHWAB
City Clerk                                   City Attorney

-11-

# EXHIBIT "P"

# EXHIBIT "P"



**Mayor Alex Fisch**
**Vice Mayor Daniel Lee**
**Member Göran Eriksson**
**Member Yasmine-Imani McMorrin**
**Member Albert Vera**

## City Council Meeting Agenda

Mike Balkman
Council Chambers
9770 Culver Blvd.
Culver City, CA 90232
(310) 253-5851

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

| 7:00 PM | Monday, June 14, 2021 |
|---|---|

**MEETING INFORMATION AND ACCOMMODATION:**

To combat the spread of the coronavirus respiratory disease (COVID-19), the City proclaimed a local emergency on March 14, 2020 and issued subsequent public orders beginning March 16, 2020.  In accordance with such orders City Hall has been closed to the public and in-person meetings have been discontinued until further notice.

City Council meetings can be viewed live in Culver City on Channel 35 by Time Warner subscribers, on Channel 37 by Frontier FIOS subscribers and, for AT&T Uverse subscribers, by going to Channel 99. Additionally, you may access http://www22.verizon.com/residential/fiostv/channels.htm and enter your zip code to see the channel listing.

Meetings can also be viewed live online at 1) http://www.culvercity.org/meetings and clicking on the "In Progress" meeting, 2) the Culver City youtube channel:  www.CulverCity.org/youtube or 3) Via the Webex App, which requires registration at culvercity.org/agendas.

Any person needing reasonable accommodation related to disabilities, including assisted listening devices, is welcome to contact the City Clerk's Office at 310-253-5851 or via email at city.clerk@culvercity.org.

*For complete information on how to attend and participate in a City Council meeting and provide public comment, please visit www.culvercity.org/agendas.

**PUBLIC COMMENT:**

For those who wish to speak and provide oral public comment during a meeting, please register to attend the meeting via Webex at culvercity.org/agendas and indicate the agenda item(s) for which you wish to

Exhibit P, Page 334

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the
City Council, Successor Agency to
the Culver City Redevelopment
Agency Board, and Culver City
Housing Authority Board**

June 14, 2021

make a comment. This will serve as a virtual speaker card. Speakers will be called in chronological order, based on when they registered to attend. A tutorial on Webex Registration is available at Culver City's YouTube page (https://youtube.com/watch?v=q3NX-9lhSoU.)

Members of the public may submit written comments in advance on the City's website via eComment. To submit, go to www.culvercity.org/meetings, locate the appropriate meeting and click on the highlighted eComment link. As a new user you may need to register once. There is a new user tutorial at the City of Culver City's YouTube page (https://youtu.be/ckjtduK9B9s). Written comments may also be sent via public.comment@culvercity.org, or mail. Written comments, received by 3:00 PM on the day of the City Council meeting, will be compiled and provided to Council Members to ensure sufficient time for Council Member review. These comments will become part of the official record through a motion to receive and file correspondence. Please be advised, written comments WILL NOT be read aloud during the City Council Meeting.

The City Council will receive comments from the public on any item of interest to the public (not listed on the agenda) that is within the subject matter jurisdiction of the City Council. The City Council cannot legally take action on any item not appearing on the agenda. Such items may be referred for administrative action or scheduled on a future agenda.

Each speaker may address the City Council for up to three minutes. Public comments on items on the agenda are taken at the time that particular agenda item is considered by the City Council.

**AUTHORITY OF PRESIDING OFFICER:**

Section 611 of the City Charter provides that during any public meeting, all persons shall have the right to address the City Council, and any City commission, board or committee, subject to reasonable rules of decorum and time limits established by ordinance or the presiding officer. Therefore, the presiding officer may, from time to time, establish different time limits than those listed in this Agenda in order to effectively conduct City business. The presiding officer may also, from time to time, re-order the items on the agenda in order to effectively conduct the City Council meeting.

**City Council Meeting Agenda**
**Closed Session - 5:00 PM**
**Recognitions - 6:30 PM**
**Regular Session - 7:00PM**

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

**June 14, 2021**

**AVAILABILITY OF AGENDA PACKETS AND CONSERVATION OF RESOURCES:**

The Agenda, staff reports and attachments are available online at www.culvercity.org/agendas. Members of the public may inspect (at no cost) and/or obtain copies (upon payment of the City's current copying fee) of any regular session item by contacting the City Clerk's Office at City Hall via phone at (310) 253-58591 or email at city.clerk@culvercity.org.

**NOTE: AT OR ABOUT 11:00 P.M., MEMBERS MAY DETERMINE WHETHER TO CONTINUE WITH DISCUSSION OF REMAINING ITEMS ON THE AGENDA OR TO CARRY SOME/ALL OF THE ITEMS OVER TO A FUTURE MEETING DATE.**

Exhibit P, Page 336

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

---

**CALL TO ORDER & ROLL CALL:**

**CLOSED SESSION - 5:00 PM**

Public requests to discuss Closed Session Items must be filed with the Clerk before Closed Session convenes.

The City Council shall convene in closed session to consider the following matters:

CS-1.  21-1011   **CONFERENCE WITH REAL PROPERTY NEGOTIATORS**
**RE:   9070 VENICE BOULEVARD (THE IVY SUBSTATION) (PROPERTY)**
**CITY   NEGOTIATORS:   JOHN   NACHBAR,   CITY MANAGER/EXECUTIVE   DIRECTOR;   SOL   BLUMENFELD, COMMUNITY   DEVELOPMENT   DIRECTOR/ASSISTANT EXECUTIVE   DIRECTOR,   AND   TODD   TIPTON, ECONOMIC DEVELOPMENT MANAGER**
**OTHER PARTIES NEGOTIATORS:  THE ACTORS' GANG**
**UNDER   NEGOTIATION:   PRICE,   TERMS   OF   PAYMENT OR   BOTH,   INCLUDING   USE   RESTRICTIONS, DEVELOPMENT   OBLIGATIONS   AND   OTHER MONETARY RELATED CONSIDERATIONS.**
**PURSUANT TO GOVERNMENT CODE SECTION 54956.8**

CS-2.  21-1095   **CC - CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION**
**RE: REYES, DOUG V. CITY OF CULVER CITY**
**LASC CASE NO. BC709625**
**PURSUANT   TO   GOVERNMENT   CODE   SECTION 54956.9(D)(10**

---

Exhibit P, Page 337

| | |
|---|---|
| **City Council Meeting Agenda** | **REVISION #1 Regular Meeting of the** |
| Closed Session - 5:00 PM | **City Council, Successor Agency to** |
| Recognitions - 6:30 PM | **the Culver City Redevelopment** |
| Regular Session - 7:00PM | **Agency Board, and Culver City** |
| | **Housing Authority Board** |

**June 14, 2021**

---

**CS-3.**   21-1041   **CC - CONFERENCE WITH LABOR NEGOTIATORS**

**CITY DESIGNATED REPRESENTATIVES: CITY MANAGER JOHN NACHBAR; ASSISTANT CITY MANAGER SERENA WRIGHT**

**EMPLOYEE ORGANIZATION: CULVER CITY EMPLOYEES ASSOCIATION; CULVER CITY MANAGEMENT GROUP; CULVER CITY POLICE OFFICERS ASSOCIATION;**

**CULVER CITY FIRE FIGHTERS ASSOCIATION; CULVER CITY POLICE MANAGEMENT GROUP; CULVER CITY FIRE MANAGEMENT ASSOCIATION; EXECUTIVE MANAGEMENT EMPLOYEES**

**PURSUANT TO GOVERNMENT CODE SECTION 54957.6**

**CS-4.**   21-1111   **CC - CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION**

**RE: SIGNIFICANT EXPOSURE TO LITIGATION—ONE (1) ITEM**

**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(2)**

**ATT: JUNE 10, 2021 THREAT OF LITIGATION**

*Attachments:*   2021-06-10 SCHCC Letter to Culver City.pdf

**CS-5.**   21-1112   **CC - CONFERENCE WITH LEGAL COUNSEL—ANTICIPATED LITIGATION**

**RE: SIGNIFICANT EXPOSURE TO LITIGATION—ONE (1) ITEM**

**PURSUANT TO GOVERNMENT CODE SECTION 54956.9(D)(2)**

**RECOGNITION PRESENTATIONS - 6:30 PM**

**R-1.**   21-1101   **CC - PRESENTATION OF A PROCLAMATION DESIGNATING JUNE AS MEN'S HEALTH MONTH 2021**

**R-2.**   21-1102   **CC - PRESENTATION OF A PROCLAMATION IN CELEBRATION OF JUNETEENTH 2021**

---

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

---

**R-3.**   21-1103   **CC - PRESENTATION OF A PROCLAMATION DESIGNATING JUNE AS PRIDE MONTH 2021**

**REGULAR SESSION - 7:00 PM**

**PLEDGE OF ALLEGIANCE**

**REPORT ON ACTION TAKEN IN CLOSED SESSION**

**COMMUNITY ANNOUNCEMENTS BY MEMBERS/INFORMATION ITEMS FROM STAFF**

Note: Council Members will have up to two minutes each to provide announcements (not including requests to "adjourn in memory".) Any additional announcements and/or requests to place items on a future agenda may be held to the end of the City Council Meeting, after all other business appearing on the agenda has been completed.

**I-1.**   21-1100   **CC - COVID-19 UPDATE**

**JOINT PUBLIC COMMENT - Items NOT on the Agenda (Limit 20 Minutes)**

Note: All requests to address the City Council (and all other bodies in session) on items of interest to the public that are within the subject matter jurisdiction of the City Council (and all other bodies in session) and NOT on the agenda must be submitted to the City Clerk prior to the calling of this item by the presiding officer.  This public comment period shall have an aggregate duration of up to 20 minutes for all bodies in session.  Each comment may be up to three minutes in length.

**RECEIPT AND FILING OF CORRESPONDENCE**

Note: The City Council shall consider a motion to receive and file all written correspondence related to agenda items appearing on this evening's agenda and for all other written documents (including e-mails sent to city.clerk@culvercity.org) on subjects not appearing on the agenda that were received by the City Clerk's Office. Comments received in writing by 3:00 PM on the meeting date will be distributed to the City Council Members and become part of the official record of the meeting.

---

Exhibit P, Page 339

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

---

**ORDER OF THE AGENDA**

Note: The presiding officer or City Council may consider reordering the sequence in which items appearing on this evening's agenda will be considered by the City Council.

**CONSENT CALENDAR**

Note: Joint Consent and Consent Calendar items are considered to be routine in nature and may be approved by one motion.  All requests to address the City Council under these items must be filed with the City Clerk before the Consent Calendar and Joint Consent Calendar are called by the presiding officer. Any Consent Calendar item that is pulled for discussion by a Council Member (not including brief questions, points of clarification and the like, which can be handled quickly), or because a public comment card(s) has been filed with the City Clerk, may be pulled from the Consent Calendar and considered later in the agenda, at the discretion of the presiding officer or City Council.

C-1.    [21-1092]    **CC:HA:SA - APPROVAL OF CASH DISBURSEMENTS FOR MAY 15, 2021 TO JUNE 4, 2021**

  _**Attachments:**_    Final Cash Disbursements for City Council - 210614 Rev1.pdf

C-2.    [21-1093]    **CC:HA:SA:PA - APPROVAL OF MINUTES FOR THE SPECIAL CONSOLIDATED CITY COUNCIL MEETINGS OF MAY 17, 2021 AND MAY 18, 2021 AND THE REGULAR CONSOLIDATED CITY COUNCIL MEETING OF MAY 24, 2021**

  _**Attachments:**_    CCCC 05172021 Minutes for Approval.pdf
                        CCCC 05182021 Minutes for Approval.pdf
                        CCCC 05242021 Minutes for Approval.docx.pdf

---

| City Council Meeting Agenda<br>**Closed Session - 5:00 PM**<br>**Recognitions - 6:30 PM**<br>**Regular Session - 7:00PM** | REVISION #1 Regular Meeting of the<br>City Council, Successor Agency to<br>the Culver City Redevelopment<br>Agency Board, and Culver City<br>Housing Authority Board | June 14, 2021 |

---

**C-3.**  21-435   CC - (1) AUTHORIZATION FOR THE CITY'S MUNICIPAL FIBER NETWORK TO BE USED TO SERVE RESIDENTIAL CUSTOMERS; (2) AUTHORIZATION TO THE CITY MANAGER TO MODIFY THE CITY'S AGREEMENT WITH INYO NETWORKS, INC. TO PROVIDE RESIDENTIAL INTERNET SERVICES; AND (3) DIRECTION TO THE CITY MANAGER TO UPDATE THE CULVER CONNECT PROJECT GOALS TO INCLUDE DELIVERY HIGH SPEED INTERNET ACCESS TO RESIDENTS

*Attachments:*   ATT 2020-11-09_Culver_Connect_Network_Map

**C-4.**  21-772   CC - ADOPTION OF A RESOLUTION (1) APPROVING THE ENGINEER'S REPORT FOR LANDSCAPE MAINTENANCE DISTRICT NUMBER 1, (2) DECLARING THE INTENTION TO ORDER THE LEVY OF ANNUAL ASSESSMENTS FOR FISCAL YEAR 2021/22 THEREIN, AND (3) SETTING THE DATE, TIME AND PLACE FOR THE PUBLIC HEARING.

*Attachments:*   2021 Landscape District 1 - engineer's report.pdf
Resolution of Intention - LMD1.pdf

---

Exhibit P, Page 341

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

C-5.   21-837   **CC - (1) AWARD OF A CONSTRUCTION CONTRACT TO ORTIZ ENTERPRISES, INC. IN THE AMOUNT OF $7,608,634.20 FOR THE HIGUERA STREET BRIDGE REPLACEMENT PROJECT, PZ553, BHLS 5240(026) AND THE BALLONA BICYCLE PATH CONNECTIVITY PROJECT AT HIGUERA STREET, PZ964, F7507 AS THE LOWEST RESPONSIVE AND RESPONSIBLE BIDDER; (2) AUTHORIZE THE PUBLIC/CITY WORKS DIRECTOR/CITY ENGINEER TO APPROVE CHANGE ORDERS IN AN AMOUNT NOT-TO-EXCEED $760,863; (3) APPROVAL OF AN AMENDMENT TO THE EXISTING PROFESSIONAL SERVICES AGREEMENT WITH IDC CONSULTING, INC. IN AN ADDITIONAL AMOUNT NOT-TO-EXCEED $426,901 FOR CONSTRUCTION SUPPORT AND ENVIRONMENTAL MONITORING; AND (4) APPROVAL OF AN AMENDMENT TO THE EXISTING PROFESSIONAL SERVICES AGREEMENT WITH BIGGS CARDOSA ASSOCIATES IN AN ADDITIONAL AMOUNT NOT-TO-EXCEED $338,035 FOR CONSTRUCTION MANAGEMENT AND INSPECTION SERVICES**

C-6.   21-994   **CC - (1) AUTHORIZATION TO TERMINATE THE EXISTING AGREEMENT WITH CR&R, INC. FOR TRANSPORT SERVICES AND ON-CALL ROLL OFF COLLECTION; AND (2) APPROVAL OF AN AGREEMENT WITH RCS TRUCKING FOR TRANSPORT SERVICES AND ON-CALL ROLL-OFF COLLECTION SERVICES.**

Exhibit P, Page 342

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

| | | |
|---|---|---|
| C-7. | 21-1032 | CC - (1) ADOPTION OF A RESOLUTION AUTHORIZING THE EXECUTION OF A COOPERATIVE IMPLEMENTATION AGREEMENT (CIA) WITH CALTRANS TO RECEIVE GRANT FUNDS IN AN AMOUNT NOT-TO-EXCEED $522,916 TO CONSTRUCT THE CULVER BOULEVARD STORMWATER FILTRATION/RETENTION REGIONAL PROJECT; AND (2) FOUR-FIFTHS VOTE REQUIREMENT: APPROVAL OF A RELATED BUDGET AMENDMENT. |

_**Attachments:**_  Resolution Caltrans Cooperative Implementation Agreement.pdf
Cooperative Implementation Agreement

| | | |
|---|---|---|
| C-8. | 21-1039 | CC - ADOPTION OF RESOLUTION ADOPTING A LABOR COMPLIANCE PROGRAM (LCP) FOR THE CULVER BOULEVARD STORMWATER FILTRATION/RETENTION PROJECT, PR-002 IN ACCORDANCE WITH STATE OF CALIFORNIA PROPOSITION 84 GRANT REQUIREMENTS, AUTHORIZING THE CITY MANAGER, OR HIS DESIGNEE, TO SUBMIT THE LCP TO THE DEPARTMENT OF INDUSTRIAL RELATIONS FOR APPROVAL, AND RESCINDING RESOLUTION NO. 2020-R102. |

_**Attachments:**_  2021-06-14_ATT 1_Resolution Adopting Updated LCP_FINAL.pdf

| | | |
|---|---|---|
| C-9. | 21-1040 | CC - 1) UPDATE ON THE GENERAL PLAN UPDATE (GPU) PROJECT; 2) DIRECTION ON GENERAL PLAN ADVISORY COMMITTEE (GPAC) VACANCIES; AND 3) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE. |

_**Attachments:**_  2021-06-14_ATT_GPU Work Plan
2021-06-14_ATT_GPU Deliverables and Engagement Summary

Exhibit P, Page 343

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

C-10.   21-1058   CC - APPROVAL OF A PURCHASE ORDER WITH SUNSET VANS IN AN AMOUNT NOT-TO-EXCEED $707,491 ($589,576 BASE PLUS $117,915 CONTINGENCY) TO SUPPLY THREE LOW FLOOR ELECTRIC MINIBUSES.

C-11.   21-1059   CC - APPROVAL OF AN AMENDMENT TO THE EXISTING PROFESSIONAL SERVICES AGREEMENT WITH THE NICKERSON COMPANY FOR PUBLIC WORKS INSPECTION SERVICES, UTILITY LOCATION, AND ARBORIST INSPECTION SUPPORT FOR THE PUBLIC WORKS DEPARTMENT/ENGINEERING DIVISION FOR THE CITY-WIDE TING HIGH SPEED FIBER PROJECT

C-12.   21-1085   CC-(1) REJECTION OF A BID SUBMITTED BY ELECNOR BELCO ELECTRIC INC. (BELCO) FOR THE MOVE CULVER CITY DOWNTOWN CORRIDOR PROJECT LABOR AND MATERIALS FOR BUS AND BIKE LANES AND SIGNAL INSTALLATION (BID 2124); (2) AUTHORIZATION TO THE CITY MANAGER TO NEGOTIATE A CONTRACT WITH BELCO AND OTHER CONTRACTORS ON BEHALF OF THE CITY; (3) WAIVER OF THE BIDDING REQUIREMENTS ON MATERIAL PROCUREMENTS; AND (4) AUTHORIZATION TO THE PURCHASING OFFICER/CITY MANAGER TO NEGOTIATE AND ISSUE VARIOUS PURCHASE ORDERS ON MATERIALS FOR THE PROJECT, WITH TOTAL PROCUREMENT AMOUNT NOT-TO-EXCEED $400,000.

Exhibit P, Page 344

| | |
|---|---|
| **City Council Meeting Agenda** | **REVISION #1 Regular Meeting of the** |
| Closed Session - 5:00 PM | **City Council, Successor Agency to** |
| Recognitions - 6:30 PM | **the Culver City Redevelopment** |
| Regular Session - 7:00PM | **Agency Board, and Culver City** |
| | **Housing Authority Board** |

June 14, 2021

---

**C-13.**   21-1087   **CC- (1) APPROVAL OF AN UPDATE TO THE EXISTING STANDARD OPERATING AGREEMENT (OA) FOR SCOOTER SHARE SERVICES, INCLUDING NEW FEES AND TERMS; (2) AUTHORIZATION TO STAFF TO RELEASE A REQUEST FOR QUALIFICATIONS TO SEEK UP TO TWO QUALIFIED OPERATORS TO LAUNCH SERVICE IN FISCAL YEAR 2022; (3) AUTHORIZATION TO THE CITY MANAGER TO SELECT THE OPERATOR(S) AND NEGOTIATE AND EXECUTE THE FINAL TERMS OF THE OA WITH THE SELECTED OPERATOR(S).**

**PUBLIC HEARINGS AND ACTION ITEMS**

Note: The Public Hearing or Action Item with the most public comment cards on file with the City Clerk may be considered by the City Council as the first item, at the discretion of the presiding officer or City Council. The remaining Public Hearing and Action items shall be considered in the order they appear on the agenda, unless re-ordered by the presiding officer or City Council.

**PUBLIC HEARINGS**

**PH-1.**   21-1053   **CC - PUBLIC HEARING:   ADOPTION OF A RESOLUTION APPROVING THE ANNUAL ASSESSMENT LEVY FOR BENEFIT ASSESSMENT DISTRICT WEST WASHINGTON BOULEVARD NO. 1 FOR FISCAL YEAR 2021/2022.**

*Attachments:*   FY 2021-22 W. Washington No. 1 Engineer's Report.pdf
AIP - Washington Boulevard No. 1 - Levy Reso.pdf

**PH-2.**   21-1054   **CC - PUBLIC HEARING:   ADOPTION OF A RESOLUTION APPROVING THE ANNUAL ASSESSMENT LEVY FOR BENEFIT ASSESSMENT DISTRICT WEST WASHINGTON BOULEVARD NO. 2 FOR FISCAL YEAR 2021/2022.**

*Attachments:*   FY 2021-22 W. Washington No. 2 Engineer's Report.pdf
AIP - Washington Boulevard No. 2 - Levy Reso.pdf

---

Exhibit P, Page 345

| City Council Meeting Agenda | REVISION #1 Regular Meeting of the | June 14, 2021 |
|---|---|---|
| **Closed Session - 5:00 PM**<br>**Recognitions - 6:30 PM**<br>**Regular Session - 7:00PM** | City Council, Successor Agency to<br>the Culver City Redevelopment<br>Agency Board, and Culver City<br>Housing Authority Board | |

**PH-3.** 21-1055 **CC - PUBLIC HEARING: ADOPTION OF A RESOLUTION APPROVING THE ANNUAL ASSESSMENT LEVY FOR BENEFIT ASSESSMENT DISTRICT WEST WASHINGTON BOULEVARD NO. 3 FOR FISCAL YEAR 2021/2022.**

*Attachments:* FY 2021-22 W. Washington No. 3 Engineer's Report.pdf

AIP - Washington Boulevard No. 3 - Levy Reso.pdf

**PH-4.** 21-1044 **CC - PUBLIC HEARING: (1) INTRODUCTION OF AN ORDINANCE ADDING SUBCHAPTER 15.06.500, MOBILITY IMPROVEMENT FEES, TO CHAPTER 15.06, NEW DEVELOPMENT FEES, OF THE CULVER CITY MUNICIPAL CODE; (2) DETERMINATION THE ORDINANCE IS EXEMPT FROM THE CALIFORNIA ENVIRONMENTAL QUALITY ACT PURSUANT TO TITLE 14 OF THE CALIFORNIA CODE OF REGULATIONS SECTIONS 15061(B)(3), 15060(C)(3) AND 15378(B)(4); (3) ADOPTION OF A RESOLUTION ESTABLISHING MOBILITY IMPROVEMENT FEES; (4) ADOPTION OF A RESOLUTION ADOPTING AN INTERIM MOBILITY IMPROVEMENT PROJECT LIST; (5) ADOPTION OF A RESOLUTION ADOPTING INTERIM 2045 GROWTH FORECASTS; AND (7) DIRECTION ON PROCEEDING WITH OPTIONAL CHANGES TO SCREENING CRITERIA AND PROJECT-LEVEL TOOL.**

Exhibit P, Page 346

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

| | |
|---|---|
| _**Attachments:**_ | 2021-06-14_ATT_Transportation Study Information Webpage |
| | 2021-06-14_ATT_5/13/20 City Council/Planning Commission Agenda Item A-1 |
| | 2021-06-14_ATT_7/13/20 City Council Agenda Item C-3 |
| | 2021-06-14_ATT_Proposed Mobility Fee Ordinance.pdf |
| | 2021-06-14_ATT_Nexus Study |
| | 2021-06-14_ATT_Economic Analysis |
| | 2021-06-14_ATT_Resolution Establishing Mobility Improvement Fees.pdf |
| | 2021-06-14_ATT_Resolution Adopting Interim Project List.pdf |
| | 2021-06-14_ATT_Resolution Adopting Interim 2045 Growth Forecasts.pdf |
| | 2021-06-14_ATT_TPA Maps |
| | 2021-06-14_ATT_Optional VMT Screening Criteria Updates |
| | 2021-06-14_ATT_Optional TDM Updates |

**PH-5.**  21-1065  **CC - PUBLIC HEARING: INTRODUCTION OF AN ORDINANCE GRANTING A FRANCHISE TO TORRANCE VALLEY PIPELINE COMPANY LLC FOR THE OPERATION OF AN EXISTING PIPELINE, LOCATED IN THE PUBLIC RIGHTS-OF-WAY, FOR THE TRANSPORTATION OF OIL.**

| | |
|---|---|
| _**Attachments:**_ | 2021-06-14 ATT Pipeline Route Description.pdf |
| | 2021-06-14 ATT Pipeline Map.pdf |
| | 2021-06-14 ATT Franchise Ordinance.pdf |
| | 2021-06-14 ATT TVP Franchise Key Terms.pdf |

**ACTION ITEMS**

**A-1.**  21-1090  **CC - RECOMMENDATION FROM THE CITY COUNCIL AD HOC EQUITY SUBCOMMITTEE TO (1) DISCUSS AND CONSIDER THE ADOPTION OF A RESOLUTION ACKNOWLEDGING CULVER CITY'S RACIAL HISTORY; AND (2) PROVIDE DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.**

| | |
|---|---|
| _**Attachments:**_ | 2021-06-14_ATT_Proposed Resolution Apology.pdf |

**City Council Meeting Agenda**        REVISION #1 Regular Meeting of the        June 14, 2021
Closed Session - 5:00 PM                        City Council, Successor Agency to
Recognitions - 6:30 PM                             the Culver City Redevelopment
Regular Session - 7:00PM                          Agency Board, and Culver City
                                                            Housing Authority Board

---

**A-2.**   21-1098   **CC - (1) APPOINTMENTS TO THE (1) CIVIL SERVICE COMMISSION; CULTURAL AFFAIRS COMMISSION; PARKS, RECREATION, AND COMMUNITY SERVICES COMMISSION; PLANNING COMMISSION; BOARD OF TRUSTEES OF THE LOS ANGELES COUNTY WEST VECTOR AND VECTOR-BORNE DISEASE CONTROL DISTRICT; LANDLORD-TENANT MEDIATION BOARD; LAX AREA ADVISORY COMMITTEE; ADVISORY COMMITTEE ON HOUSING AND HOMELESSNESS; BICYCLE AND PEDESTRIAN ADVISORY COMMITTEE; EQUITY AND HUMAN RELATIONS ADVISORY COMMITTEE; FIESTA LA BALLONA COMMITTEE; AND FINANCE ADVISORY COMMITTEE; AND (2) DIRECTION TO THE CITY CLERK REGARDING ANY VACANCIES NOT FILLED.**

_Attachments:_   CC Policy 3002_Commisssions, Boards and Committees_01-27-2020.pdf

**A-3.**   21-1086   **CC-(1) PRESENTATION AND DISCUSSION OF THE DESIGN ON THE ASPHALT ART COMPONENT OF THE MOVE CULVER CITY DOWNTOWN CORRIDOR PROJECT; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.**

**A-4.**   21-1078   **CC - ADOPTION AN ORDINANCE ESTABLISHING PREMIUM HAZARD PAY FOR ON-SITE HOSPITAL WORKERS AT COVERED HOSPITALS.**

_Attachments:_   2021-06-14_ATT_ Proposed Ordinance Hazard Pay Hospital Workers.pdf

---

**City Council Meeting Agenda**
Closed Session - 5:00 PM
Recognitions - 6:30 PM
Regular Session - 7:00PM

**REVISION #1 Regular Meeting of the City Council, Successor Agency to the Culver City Redevelopment Agency Board, and Culver City Housing Authority Board**

June 14, 2021

A-5.   21-938   CC - (1) INTRODUCTION OF AN ORDINANCE AMENDING CULVER CITY MUNICIPAL CODE SECTION 9.08.035, USE OF SIDEWALKS FOR OUTDOOR DINING, TO ADD THE USE OF PARKLETS AND OTHER USES IN THE PUBLIC RIGHT-OF-WAY AND MODIFY THE CURRENT OUTDOOR DINING AGREEMENT PROCESS; (2) ADOPTION OF A RESOLUTION ESTABLISHING FEES FOR THE PARKLET PROGRAM; AND (3) ADOPTION OF A RESOLUTION ESTABLISHING DESIGN GUIDELINES FOR PARKLETS; AND (4) ADOPTION OF A CATEGORICAL EXEMPTION RELATING THERETO, PURSUANT TO THE CALIFORNIA ENVIRONMENTAL QUALITY ACT.

_Attachments:_   2021-06-14_ATT 1_Proposed Ordinance Amending CCMC Section 9.08.035.pdf
2021-06-14_ATT 2_Resolution_Adopting Parlet Design Guidelines.pdf
2021-06-14_ATT 3_Resolution_Establishing PROW Use Fees for Outdoor Dining.pdf

A-6.   21-1094   CC - (1) CONSIDERATION TO SUPPORT A PRIDE DAY EVENT IN CULVER CITY; (2) IF DESIRED, DESIGNATE THE EVENT AS CITY-SPONSORED; AND (3) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.

A-7.   21-1096   CC - (1) CONSIDERATION OF A SUPPORT POSITION FOR AB 369 (KAMLAGER) - MEDI-CAL SERVICES: PERSONS EXPERIENCING HOMELESSNESS; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.

_Attachments:_   2021-06-14_ATT_AB 369 Medi-Cal services-persons experiencing homelessness.pdf

A-8.   21-1099   CC - (1) CONSIDERATION OF A SUPPORT POSITION FOR SB 679 (KAMLAGER) - LOS ANGELES COUNTY: AFFORDABLE HOUSING; AND (2) DIRECTION TO THE CITY MANAGER AS DEEMED APPROPRIATE.

Exhibit P, Page 349

**City Council Meeting Agenda**

**Closed Session - 5:00 PM**
**Recognitions - 6:30 PM**
**Regular Session - 7:00PM**

REVISION #1 Regular Meeting of the
City Council, Successor Agency to
the Culver City Redevelopment
Agency Board, and Culver City
Housing Authority Board

June 14, 2021

---

**_Attachments:_** 2021-06-14    ATT    SB 679 Los Angeles County - affordable housing.pdf

**PUBLIC COMMENT - ITEMS NOT ON THE AGENDA (CONTINUED)**

**ITEMS FROM MEMBERS (CONTINUED)**

**MEMBER REQUESTS TO AGENDIZE FUTURE ITEMS**

**ADJOURN (INCLUDING ADJOURNMENT IN MEMORY)**

---

Exhibit P, Page 350

# EXHIBIT "Q"

# EXHIBIT "Q"

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
310.228.3700 main
310.228.3701 fax
www.sheppardmullin.com

David A. Schwarz
310.228.3705 direct
dschwarz@sheppardmullin.com

File Number: 29HJ-334829

June 10, 2021

**Via Email**
The Honorable Alex Fisch, Mayor
The Honorable Daniel Lee, Vice Mayor
The Honorable Göran Eriksson, Council Member
The Honorable Yasmine-Imani McMorrin, Council Member
The Honorable Albert Vera, Council Member
City of Culver City – City Hall
9770 Culver Blvd.
Culver City, CA 90232

Re:     *Proposed Ordinance Establishing Premium Hazard Pay for On-site Hospital Workers at Covered Hospitals – Proposed Amendment to the Effective Date.*

To the Members of the Culver City Council and Senior Deputy City Attorney Vidra:

On behalf of Southern California Hospital at Culver City ("SCHCC"), we respectfully request that the City consider revising the effective date of the above-referenced Proposed Ordinance by an additional 60 days. Should the Proposed Ordinance be adopted, this modest extension of time would enable SCHCC to obtain meaningful and timely judicial review. The alternative would almost certainly force SCHCC to choose between two harmful options: to risk substantial legal exposure as a result of the Proposed Ordinance's "Enforcement" provisions or to comply with a potentially unconstitutional law without any practical or adequate remedy at law.

There is no assurance, given continuing and significant court delays and backlogs due to COVID-19, that SCHCC will be able to obtain a ruling on a preliminary injunction and, if needed, to obtain immediate review of the denial of that motion in an appellate court. The alternative would be to file a request for a TRO, and thereby risk a denial of a request for expedited relief because the Ordinance was not yet in effect. Over the last several months, a number of plaintiffs challenging other "Hero Pay" ordinances faced this exact dilemma. In some instances, the 120 day period for bonus payments substantially ran its course before effective judicial review was possible. From SCHCC's point of view, the practical consequences of delay are no different from a denial of a request for relief.

There is, on the other hand, no prejudice whatsoever by delaying the effective date for an additional 60 days. First, it is never "in the public's interest to allow the state to violate the requirements of federal law." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). This is particularly true with respect to constitutional rights. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal citation omitted). Second, to the extent that a 60 day

**Sheppard**Mullin

Culver City Council
June 10, 2021
Page 2

extension before payment obligations go into effect constitutes any hardship to SCHCC's employees, SCHCC is prepared to provide an undertaking or bond for the aggregate amount of Premium Hazard Pay, plus statutory interest.  Third, there is nothing out of the ordinary in deferring the effective date of a law, at least for enforcement purposes, in order to permit parties sufficient time to comply with the law without having to risk sacrificing constitutional rights.

Therefore, we would propose the following amendment to Section 12 (Effective Date) of the Proposed Ordinance:

SECTION 12. EFFECTIVE DATE.  Pursuant to Section 619 of the City Charter, this Ordinance shall take effect **on the later of:**

**A.**    **~~t~~T**hirty (30) days after its adoption**~~.~~; or**

**B.      Ninety (90) days after its adoption, provided that within thirty (30) days after adoption of the Ordinance, a Covered Hospital (1) commences a legal action in any court of competent jurisdiction to challenge the Ordinance; and (2) provides an undertaking or bond for the aggregate amount of the Premium Hazard Pay estimated to be incurred, plus interest at the statutory rate accruing from the thirty-first (31st) day after adoption of the Ordinance.**

We look forward to your response.

Respectfully submitted,

*David A. Schwarz*

David A. Schwarz
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


SMRH:4848-9367-0894.2

cc:    Michael Klepin
City Attorney, city.attorney@culvercity.org
City Manager, john.nachbar@culvercity.org
Senior Deputy City Attorney, lisa.vidra@culvercity.org

# EXHIBIT "R"

# EXHIBIT "R"

June 15, 2021

***Via Email Only* [DSchwarz@sheppardmullin.com](mailto:DSchwarz@sheppardmullin.com)**

David A. Schwarz, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA  90067-6055

Re:  Response to June 10, 2021 Letter re Public Records Request of May 26, 2021

Dear Mr. Schwarz:

Your June 10, 2021 letter to the City Clerk in regard to the City's response to your public records request has been referred to me for response.  In your letter, you make a number of allegations against the City's elected officials, which I will briefly address before responding to the issues related to the City's public records request response and any records that may be outstanding.

**Campaign Finance Allegations**:
Without getting into whether or not your factual allegations are correct, an offer to assist the City with its legal defense, which is made to an elected official *in their official capacity*, confers no personal benefit on the elected official.  If there were to be litigation over the ordinance, it would be against the City; and if elected officials were included, it would be in their official capacity.  There would be no quid pro quo because the elected official would be fully indemnified by the City and would not be personally responsible for any of those litigation costs, and thus would derive no personal benefit from the offer.  Nor is there anything extraordinary about the offer of support, as it is common for unions and other organizations to become involved in litigation challenging an ordinance they support.  (*See, e.g., Cal. Hotels & Lodging Ass'n v. City of Oakland* (N.D. Cal. 2019) 393 F. Supp. 3d 817 [union representing hotel workers intervened to support City in defending city ordinance against preemption challenge]). Notwithstanding the foregoing, the City has not accepted assistance with legal costs or legal support from the union.

Further, there has not been a "behested contribution."  A campaign contribution is a payment made for the purpose of influencing the voters for or against the nomination or election of a candidate or measure.  FPPC Reg. 18215(a).  The offer to help the City with its legal costs has nothing to do with any candidate election and thus is not a campaign contribution to an individual city official under FPPC Reg. 18215(c).  Nor is the offer a gift because, as noted above, it confers no personal benefit on an individual official.  Gov. Code 82028 (defining gift as a "payment that confers a personal benefit").  Further, a behested payment is made only if an elected official expressly solicits the payment for the City.  Should that be the case, then under the Political Reform Act, Gov. Code 84224, a behested payment made at the behest of an elected official principally for a legislative, governmental, or charitable purpose is neither a contribution nor a gift to the individual official.

The same analysis above applies to the issues you have raised regarding an Op-Ed being drafted by the SEIU, or a letter to the hospital.  Drafting assistance is not a campaign contribution because the intent is to influence the passage of an ordinance, or influence the hospital's actions toward its employees, and not the outcome of an election.  When there is no personal benefit there is not a gift and not a quid pro quo for official action.  In sum, the SEIU efforts to persuade elected officials to support the ordinance appear to be protected activity under the U.S. and California Constitutions' right to petition the government.

**Allegation of Arbitrary June 1, 2021 Cutoff Date**.
The original public records request was received by the City on May 26, 2021. On May 28th, you sent a letter questioning the use of the City Clerk's standard COVID-19 response.  I responded to your letters on Wednesday June 2, 2021, at which time the terms of the request were clear to all parties. Since the Public Records Act applies to records in existence at the time of the request and not to records that may have been created in the future (*Simon Rosenthal v. Sigmund Hansen, et al. (1973)* 34 Cal.App.3d 754, 758), it was reasonable that the timeframe of the request would end at or around the time I responded to you on June 2nd.

**Additional Documents to Produce**. In your June 10th correspondence, you asked that any additional documents (notes, text messages, phone messages, calendar entries) be produced.  Out of an abundance of caution, we have done a supplemental search for records to confirm that we have conducted the requisite reasonable search for responsive records. (*Community Youth Athletic Center v. City of National City* (2013) 220 Cal.App.4th 1385, 1417–1418; *Cal. First Amend. Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 166.) Please be advised that there are no phone messages to provide; however, there are additional records (calendar entries and text messages) that will be produced, with any applicable exemptions, on a rolling basis beginning June 16, 2021. Additionally, you did not previously identify "notes" in your original request for

communications between the City Council and the SEIU. Therefore, I will address the notes below with the other items newly requested in your June 10th correspondence.

**New Requests as of June 10, 2021.**

In your June 10th correspondence, on page 3, you make two new requests that were not included in the original May 26th request.  These new requests include the following:

> (1) "documents related to the outcome of these discussions, notes of the call;" and
>
> (2) "any communications between council members and City personnel, prior to any action taken with respect to the Proposed Ordinance at the June 14, 2021 meeting."

As to communications between City Council and City personnel, the request contains no start date; please clarify so we can perform a specific search for records. (Gov. Code, § 6253(b); *Rogers v. Superior Court* (1993) 19 Cal.App.4th 469, 481.) Further, as this is a new request, your requested production date of June 16, 2021 is not applicable. Once we receive your specific time frame and search for responsive records, we will transmit an official determination to you regarding these new requests within the ten-day statutory response period. (Gov. Code § 6253(c).)

**Request for Log of Withheld Records.**

The Public Records Act does not require the City to produce a privilege log or exemption log of withheld records. (Gov. Code § 6252(e); *Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1075.)

Thank you for your cooperation.  Please feel free to contact me with any questions.

Sincerely,

CAROL A. SCHWAB, CITY ATTORNEY

*Lisa A. Vidra*

By:    Lisa A. Vidra
Senior Deputy City Attorney

cc:    City Clerk

# EXHIBIT "S"

# EXHIBIT "S"

**Union Proposal of 3/25/21**

**Hero Severance**

In recognition of service shown by hospital employees during the pandemic, all employees who are terminated as result of the reduction in force announced to the Union on March 19th 2021 shall receive two weeks of severance pay per year of service in lieu of the severance benefits in Article 13, Subsection G.

**Hero Health Benefits**

The employer shall continue to pay for the effected employee's health insurance benefits through the end of calendar year 2021.

# EXHIBIT "T"

# EXHIBIT "T"







# EXHIBIT "U"

# EXHIBIT "U"

# [Logo]

# United Healthcare Workers — West

## Service Employees International Union
## CTW, CLC

560 Thomas L Berkley Wy.
Oakland, CA 94612

5480 Ferguson Drive
Los Angeles, CA 90022

510-251-1250 ❏ 800-585-4250

323-734-8399 ❏ 877-734-8399

www.seiu-uhw.org
Quality Healthcare for All

Collective Bargaining Agreement with

SOUTHERN CALIFORNIA HOSPITAL

at

CULVER CITY

February 23, 2018 - February 22, 2021

TABLE OF CONTENTS

Page

**ARTICLE 1.** RECOGNITION ...............................................................................1

    A.     Combined Service. Maintenance. Technical, and Business Office Clerical Unit............................................................................................1
    B.     Professional Employees. ....................................................................2

**ARTICLE 2.** UNION REPRESENTATION ...........................................................2

    A.     Union Steward.....................................................................................2
    B.     Union Representatives. .......................................................................2
    C.     Bulletin Board, .....................................................................................3
    D.     Employee Representatives to Union Negotiating Committees...........3
    E.     Orientation...........................................................................................3

**ARTICLE 3.** EMPLOYEE STATUS .......................................................................4

    A.     Full-time Employee.............................................................................4
    B.     Part-time Employee.............................................................................4
    C.     Per diem Employee. ............................................................................4
    D.     Temporary Employee..........................................................................4
    E.     Conversion to Regular Full-time or Regular Part-time  Employee Status..................................................................................................4

**ARTICLE 4.** SENIORITY .......................................................................................5

    A.     Seniority Defined. ...............................................................................6
    B.     Seniority and Credited Service for All Benefit Purposes...................6
    C.     Reduction In Force...............................................................................7
    D.     Severance Pay. ....................................................................................9

**ARTICLE 5.** FILLING OF VACANCIES................................................................9

    A.     Posting of Vacancies...........................................................................9
    B.     Bidding on Posted Vacancies..............................................................9
    C.     Restrictions in Bidding........................................................................9
    D.     Preference Order. ..............................................................................10
    E.     Notification of Selection. ..................................................................10
    F.     External Selection. ............................................................................10
    G.     Seniority Application. ........................................................................11
    H.     Limitation...........................................................................................11
    I.     Potential Vacancies. ..........................................................................11
    J.     Evaluation Period after Promotion or Transfer.................................11

**ARTICLE 6.** NONDISCRIMINATION ..................................................................11

**ARTICLE 7.** HARASSMENT ............................................................................12

**ARTICLE 8.** JOINT LABOR-MANAGEMENT COMMITTEE FOR QUALITY CARE AND WORKING ENVIRONMENT........................................................12

    A.    Adequate Staffing Levels....................................................12
    B.    Purpose of the Committee..................................................12
    C.    Composition of Committee.................................................12
    D.    Meetings.......................................................................13
    E.    Dispute Resolution...........................................................13

**ARTICLE 9.** GRIEVANCE PROCEDURE ..............................................................13

    A.    Definition......................................................................13
    B.    Procedure,.....................................................................13

**ARTICLE 10.** DISCIPLINE ..............................................................................15

    A.    Just Cause......................................................................15
    B.    Progressive Discipline.......................................................15
    C.    Investigatory Suspension....................................................15
    D.    Written Disciplinary Action................................................15
    E.    Disciplinary Notices. Rebuttal, and Inspection of Personnel Files,.....................16
    F.    Additional Representation Rights..........................................16
    G.    Probationary Employees....................................................16
    H.    Time Limits for Discipline and Discharge.............................16

**ARTICLE 11.** HOURS OF WORK, OVERTIME AND SCHEDULING ...............................17

    A.    State and Federal Wage and Hour Laws..................................17
    B.    Workday and Workweek....................................................17
    C.    Payroll Period.................................................................18
    D.    Meal and Rest Periods.......................................................18
    E.    Overtime.......................................................................18
    F.    Work Schedules and Posting................................................20
    G.    Weekend Scheduling.........................................................20
    H.    Holiday Scheduling..........................................................21
    I.    Vacation Scheduling.........................................................21
    J.    Additional Hours.............................................................22
    K.    Call-In Procedure.............................................................23
    L.    Call Off/Flexing..............................................................23
    M.    No Guarantee..................................................................25
    N.    No Pyramiding.................................................................25

**ARTICLE 12.** FLOATING ...............................................................................................25

    A.    Definition: ..............................................................................................25
    B.    Floating Order: Employees shall float in the following order: ............25
    C.    Floating Rotation: .................................................................................26
    D.    Floating Conditions: .............................................................................26
    E.    Voluntary Floating: ..............................................................................26
    F.    Floating Records: ..................................................................................26
    G.    Floating Clusters: .................................................................................27
    H.    Transfers of Staff Assigned to Non-Patient Care Unit........................28

**ARTICLE 13.** COMPENSATION ....................................................................................28

    A.    Wages. ...................................................................................................28
    B.    Payday and Paycheck. ...........................................................................29
    C.    Bonuses. ................................................................................................29
    D.    Shift Differentials. ................................................................................29
    E.    Report Pay. ............................................................................................34
    F.    Uniforms. ..............................................................................................34
    G.    Severance Pay. ......................................................................................34
    H.    Working Out Of Job Classification.......................................................34
    I.    New Classifications And Job Descriptions. ..........................................35
    J.    Bilingual Services. ................................................................................35
    K.    Miscellaneous. ......................................................................................35
    L.    Nursing Department In-House Registry Program (IHR). ......................36
    M.    Modification Of Practices. ....................................................................36

**ARTICLE 14.** MINIMUM RATES ...................................................................................36

**ARTICLE 15.** STANDARD BENEFIT PLANS ..............................................................37

**ARTICLE 16.** HOLIDAYS...............................................................................................37

    A.    Holiday Pay and Working on Holidays. ...............................................37
    B.    Definition of Premium Pay Holiday Hours...........................................37
    C.    Scheduled Off on Holidays. ..................................................................38
    D.    Credit for Working Holidays. ...............................................................38
    E.    Miscellaneous. ......................................................................................38

**ARTICLE 17.** HEALTH AND SAFETY ..........................................................................38

    A.    General. .................................................................................................38
    B.    Joint Health and Safety Committee......................................................39
    C.    Personal Protective Equipment. ...........................................................39
    D.    Communicable Diseases. ......................................................................40
    E.    Workplace Violence, ............................................................................40
    F.    Counseling. ...........................................................................................40
    G.    Physical Exams. ....................................................................................40

| | | | |
|---|---|---|---|
| | H. | Parking and Security. | 40 |

**ARTICLE 18.** EDUCATION BENEFITS ................................................................40

| | | |
|---|---|---|
| A. | Tuition Assistance Benefits | 40 |
| B. | Mandatory In-Service and Educational Classes | 42 |
| C. | Joint Training and Education Trust Fund | 42 |

**ARTICLE 19.** LEAVES OF ABSENCE .................................................................42

| | | |
|---|---|---|
| A. | Federal and State Laws Regarding Leaves of Absence. | 42 |
| B. | Union Leave. | 43 |
| C. | Personal Leave of Absence. | 43 |
| D. | Return to Work From a Leave. | 44 |
| E. | Medical Disability Leave. | 44 |
| F. | Length of Leaves. | 45 |
| G. | Use of Paid Time Off During Leaves | 45 |
| H. | Modified Duty Programs. | 45 |
| I. | Bereavement Leave. | 45 |
| J. | Jury Duty Leave. | 46 |
| K. | Witness Leave. | 47 |
| L. | Pay and Benefits. | 47 |
| M. | Reduction in Force. | 47 |
| N. | Termination During Leave of Absence. | 47 |
| O. | Physical Examinations. | 48 |

**ARTICLE 20.** JOB SECURITY .............................................................................48

**ARTICLE 21.** MANAGEMENT RIGHTS ............................................................48

**ARTICLE 22.** SUBCONTRACTING .....................................................................49

**ARTICLE 23.** UNION SECURITY .......................................................................49

| | | |
|---|---|---|
| A. | Union Membership as a Condition of Employment. | 49 |
| B. | Failure to Make Required Payments. | 49 |
| C. | Deduction and Remittance of Union Initiation Fees and Dues. | 50 |

**ARTICLE 24.** WORK STOPPAGE .................................................................................50

**ARTICLE 25.** NOTICES ............................................................................................51

**ARTICLE 26.** SAVINGS CLAUSE .............................................................................51

**ARTICLE 27.** ENTIRE AGREEMENT .........................................................................51

**ARTICLE 28.** EMPLOYMENT AND INCOME SECURITY ...............................................51

      A.     Acknowledgement.................................................................................51
      B.     Joint Consideration..............................................................................52

**ARTICLE 29.** BARGAINING UNIT WORK ....................................................................52

      A.     Supervisory Employees........................................................................52
      B.     Exception for Charge RNs. ...................................................................53
      C.     Special Programs.................................................................................53

**ARTICLE 30.** TERM ...............................................................................................53

SOUTHERN CALIFORNIA HOSPITAL AT CULVER CITY
HEALTH CARE EMPLOYEES CONTRACT

This Health Care Employees Contract ("Contract" or "Agreement") is made by and between Southern California Hospital at Culver City ("Facility" or "Employer"), its successor or assign, and Service Employees International Union — United Healthcare Workers-West, SEIU-UHW West ("Union"), its successor or assign.

## PREAMBLE

In order to provide employment stability during these economic times and in light of the ever-changing health care industry, and to form a basis for future agreement over matters of mutual concern to the hospital and the employees who work there, the Facility and the Union shall execute this Contract. Among other important goals, this contract is designed to:

- Promote a way for employees, the Union and the Facility to work together to improve the quality of healthcare and the working environment and maintain contract standards;

- Assure employees of stable employment conditions during resolution of additional collective bargaining talks;

- Identify key issues of concern to the employees which shall be addressed in supplemental local negotiations;

- Enhance job security through negotiated safeguards in the event of a possible sale or transfer of operations to another employer; and

- Provide a fair and reliable process for resolving contract issues without the disruption of a strike or lockout.

## ARTICLE 1. RECOGNITION

A.     Combined Service. Maintenance. Technical, and Business Office Clerical Unit.

Pursuant to an election, the Facility recognizes the Union as the exclusive collective bargaining representative of the employees employed at its Facility in the following bargaining unit:

**Included**:     All full-time, regular part-time, and per diem service, maintenance, technical, and clerical employees at Southern California Hospital at Culver City with the job titles and classifications identified in Appendix D.

**Excluded**:     All other employees, managers, administrators, supervisors, confidential employees, guards, physicians, residents, and central business office employees (whether facility based or not) who are solely engaged in qualifying or collection activities, employees of outside registries and other agencies supplying labor to the Employer and already represented employees.

B.   Professional Employees.

Pursuant to an election, the Facility recognizes the Union as the exclusive collective bargaining representative of the employees employed at its Facility in the following bargaining unit:

Included: All full-time, regular part-time, and per diem professional employees at Southern California Hospital at Culver City with the job titles and classifications identified in Appendix D (except for Registered Nurses and Physicians).

Excluded: All other employees, managers, administrators, supervisors, office clerical employees, confidential employees, guards, engineers, plant operations, IT, HR, payroll, finance department, accounting, registered nurses, all other professional employees including, without limitation, physicians and residents, central business office employees (whether facility based or not) who are solely engaged in qualifying or collection activities, employees of outside registries and other agencies supplying labor to the Employer, and already represented employees.

## ARTICLE 2. UNION REPRESENTATION

A.   Union Steward.

The Union shall provide the Facility with a written list of Union stewards after their designation, and shall notify the Facility of changes as they occur. The Union shall designate one steward as Chief Steward. Prior to the Facility's receipt of such Union designation, the Facility is not obligated to recognize a Union steward under this Article.

The functions of the Union steward include the authority (l) to settle or assist in settling problems arising in connection with the application or interpretation of the agreement, (2) to resolve grievances at Step 1 or 2 of the grievance procedure and (3) to serve as a Union representative for Weingarten meetings.

Union Stewards shall perform their functions or Union related activities on their own time. However, if a meeting is mutually agreed to with the Union steward during the steward's work shift, that time will be paid for by the Facility. If the Union Steward wishes to schedule a meeting with employees during the union steward's work shift, unpaid leave time shall not be unreasonably denied. Four (4) hours of paid time per month may be used for Union related business (including, but not limited to, attendance at monthly steward meetings) for each shop steward  up to a maximum of eight (8) shop stewards. Five (5) business days advance notice must be provided to the Chief Human Resources Officer of the Employer by either the Chief Union Steward or Union Staff Representative for such release time. Should a steward not utilize the full four (4) hours per month, the steward will not be permitted to "carry over" unused hours into the following month.

Union Stewards shall not direct any employees as to how to perform or not perform his/her work, shall not countermand the order of any supervisor, and shall not interfere with the normal operations of the Facility or any employee.

B.   Union Representatives.

A duly authorized Field Representative of the Union shall be permitted to enter the Facility at reasonable times for the purpose of observing whether this Agreement is being observed or to check upon complaints of bargaining unit employees. The Field Representative shall advise the Director of Human Resources or his/her designee of each visit upon entering the Facility. If the Director of Human Resources or his/her designee is not on site and/or on duty, the Field Representative will call and/or page the Director of Human Resources or his/her designee. The Field Representative will abide by patient confidentiality, infection control, and other Facility policies applicable to such areas. When at the Facility, the Field Representative will wear his/her Union Representative badge issued by the Facility.

The Union Representative shall not interfere with the work of any employee. This shall not prevent the Union Representative from conferring with an employee and his/her supervisor or a Facility representative on Facility time in connection with the complaint or problem concerning the employee.

C.   Bulletin Board,

The Facility shall provide six (6) glass enclosed locking bulletin boards in the following locations:

    (1)   Existing location on first floor

    (2)   Basement near time clock

    (3)   P5 — common area behind the nursing stations

    (4)   Tower building, first floor by time clock in north corridor

    (5)   Tower building, first floor by time clock in south corridor

    (6)   P2 — by the Med Room

These bulletin boards shall only be used for posting of notices and announcements regarding Union business, such as meetings, internal Union election results, education, and social events. No materials which are derogatory of the hospital or management shall be posted. Both the Union and Facility shall have a key to the bulletin board. The Facility shall not access the bulletin board until a request has been made to the Union, in writing, and a reasonable time given for discussion.

D.   Employee Representatives to Union Negotiating Committees.

The Employer agrees to pay a maximum of forty (40) hours total for bargaining. However, union members who serve on the bargaining committee shall only be compensated if they are required to miss a regularly scheduled day (night before or night after for night shift employees) to attend bargaining, and shall not be compensated above their regularly scheduled hours.

E.   Orientation.

The Employer shall provide the Union up to 30 minutes a month for union orientation with newly hired bargaining unit employees. Attendance at such meetings is voluntary, but every effort will be made to hold the meetings in times consistent with employee meal

breaks thus allowing those who wish to attend to do so during their meal period. A Shop steward will be released to attend on paid time. The scheduling of such meetings must be agreed upon with the Employer and every effort will be made by the parties to do a consistent monthly schedule.

## ARTICLE 3. EMPLOYEE STATUS

A. <u>Full-time Employee.</u>

A regular full-time Employee is an Employee who is not in a temporary status and is regularly scheduled to work thirty-two (32) hours or more per work week. Regular full-time Employees are benefits eligible.

B. <u>Part-time Employee.</u>

A regular part-time Employee is an Employee who is not in a temporary status and is regularly scheduled to work twenty-four (24) or more hours per workweek. Regular part-time Employees are benefits eligible.

C. <u>Per diem Employee.</u>

A per diem Employee is an Employee who has executed the Facility's per diem Agreement and who is not a regular full-time or regular part-time  Employee. Per diem Employees do not receive any insurance, retirement or other fringe benefits under this Agreement, including without limitation Paid Time Off benefits or other benefits, provided that such Employees may participate in any retirement savings plan, assuming they meet the requirements of the plan.

D. <u>Temporary Employee.</u>

A temporary Employee is one who is hired to work either part-time or full-time for a specified limited period of time and for a specific and temporary purpose, to replace a specific Employee on leave of absence or for a short term project when bargaining unit Employees have been solicited and the need cannot be filled. The specified period of employment for a temporary Employee shall not extend beyond ninety (90) calendar days. However, in those instances where a temporary Employee is hired to substitute for a regular Employee who is on authorized leave of absence which continues beyond ninety (90) calendar days, the temporary Employee shall remain on temporary status until the end of the authorized leave of absence. The ninety (90) calendar days may be extended in non-leave of absence cases by mutual agreement of the Employer and the Union, and the Union's agreement to such extension will not be unreasonably denied. This period may not be extended by the use of temporary assignments beyond a twelve (12) month period. Temporary Employment lasting for more than the period provided above, or any extension agreed upon, shall be classified as a regular hours position and shall be posted as a job vacancy in accordance with Article 5 —Filling of Vacancies.

E. <u>Conversion to Regular Full-time or Regular Part-time  Employee Status.</u>

1. Regular Part-time  Employees working a regular schedule of at least sixty-four (64) hours per pay period for seven consecutive pay periods may claim additional

4

regular hours to increase their predetermined (budgeted) schedule thereafter or to change their employment status and be reclassified as a Regular Full-time Employee, subject to seniority.

2.     Regular bargaining unit positions (i.e. non-per diem positions) shall be established when regular hours are worked outside of a defined status, above, or hours worked beyond an Employee's predetermined schedule.

3.     Per diem Employees who are working a regular schedule of at least sixty-four (64) hours per pay period for seven consecutive pay periods in the same job title, classification and department shall cause a reclassification of the additional hours to regular hours. The additional regular hours will be posted as a vacancy in accordance with Article 5— Filling of Vacancies.

4.     A per diem Employee working regular hours and receiving higher pay in lieu of benefits may continue to work in such a position, at their request, subject to approval by the Union that such job or hours will not be posted.

5.     A regular part-time  or per diem Employee shall not be reduced in hours solely to prevent his or her advancement to full-time or part-time  status when the hours continue to be available or for the sole purpose of keeping a regular job constantly staffed by a part-time  or per diem Employee.

6.     Per diem Employees changing from no benefit to benefit status shall have past service recognized for benefit accrual purposes based on the seniority calculation set forth in Article 4, Section A(3). Employees changing from benefit to no benefit status shall have all accrued but unused PTO benefits paid off.

## <u>ARTICLE 4. SENIORITY</u>

**<u>GENERAL DEFINITIONS</u>**: For purposes of this CBA, the following definitions shall apply:

a.     Status: The term "status" refers to whether an employee is part-time, full-time or per diem.

b.     Job Title: The term "job title" refers to an employee's job title.

c.     Classification: The term "classification" applies to levels within the job title, to the extent levels exist for that job title (e.g., the job title X-Ray Tech has a classification of Tech 1, 2 or 3). For job titles that do not have levels (e.g., Case Manager), the job title and classification will be the same.

d.     Department: The term "department" refers to the department within which the particular employee is assigned.

e.     Covered Position: The term "covered position" shall mean a bargaining unit position as listed in Appendix D.

A.   <u>Seniority Defined.</u>

    1.    Seniority for full-time and regular part-time employees shall be defined as the employee's length of continuous service with the Facility since his or her most recent date of hire.

    2.    Per diem employees shall accrue seniority by hours worked calculated quarterly, from their most recent date of employment in a covered position only for use within the per diem employee pool. Per diem employees shall be credited with previous seniority accumulated in other statuses of continuous covered employment in a covered position(s).

    3.    To convert hours worked to establish or adjust a seniority date, for the purposes of this Article, seventeen hundred (1,700) hours shall be equal to one (1) year.

    4.    Reclassification: A per diem employee reclassified as a full-time or part-time employee shall receive a seniority date based on hours worked, as of the Employee's most recent date of employment in a covered position, including previous seniority accumulated in other covered positions, and thereafter shall accumulate seniority the same as full-time and part-time employees, as outlined in this Article.

    5.    Return to Unit. Any bargaining unit employee who accepts a non-bargaining unit position with the Employer may return to the bargaining unit without a break in seniority provided that there exists a vacancy to return to and that such return occurs within ninety (90) days of the acceptance of the non-bargaining unit position.

    6.    Seniority List. The Employer shall maintain seniority lists, which will be provided to the Union upon request.

    7.    Loss of Seniority: Employees shall lose their seniority when they:

        a.    Are terminated for just cause;

        b.    Voluntarily resign, without rehire in excess of six (6) months;

        c.    Fail to return from a leave of absence or after the waiting period for vacancy, in accordance with the terms outlined in Article 19 Section O Leaves of Absence, of this Agreement;

        d.    Are laid off without recall in excess of twelve (12) months; and

        e.    Fail to respond within three (3) business days of receipt of a notification to return to work from a layoff or fail to return to work within ten (10) business days of receipt of such notice. Notice shall be sent to the employee's last known address by registered mail, FedEx or a similar delivery service.

B.   <u>Seniority and Credited Service for All Benefit Purposes.</u>

Seniority and credited service for Benefit placement in this Agreement shall be credited to each Employee based on his/her seniority date as established in Article 4 — Seniority, Section A.1, above,

C.   <u>Reduction In Force.</u>

    1.       In a reduction in force and subsequent recall, the principle of seniority, as defined in this Article, shall govern, provided the employee meets the minimum job requirements.

    2.       Reduction in force shall be defined as the elimination of an Employee's position in a department, or a reduction in headcount in a department.  A reduction in hours of a full-time or part-time employee(s) shall also be deemed to be a reduction in force.

    3.       Reduction in force language outlined in this Article will only apply to full-time and part-time employees, except as otherwise specifically referenced.

    4.       In the event of a reduction in force, the following steps will be followed in order to determine placement of the affected employee(s).

        a.    <u>Step One.</u> The affected employee(s) will be granted the opportunity to elect a layoff at any step of the reduction in force process and may elect to receive full severance benefits.

        b.    <u>Step Two.</u> The affected employee(s) will be offered vacant position(s) for which they are qualified and meet position requirements within the bargaining unit.  Vacant positions will be offered to affected employees in seniority order. Affected employees shall have preference over non-affected employees applying through the bidding process.  An affected employee who accepts a vacant position at this step will retain recall rights to the position from which he/she was reduced for twelve (12) months from the date of the reassignment.  An employee who declines a position at this step will be required to accept a layoff.

            An affected full-time employee, at his/her option, may accept any vacant part-time position, provided he/she meets the position requirements.  A full-time employee who chooses to accept a part-time position shall remain on the recall list to return to a full-time position for twelve (12) months.

        c.    <u>Step Three.</u> Employee(s) who are not qualified or who do not meet the position requirements for any vacant position in Step Two may exercise their seniority rights to bump the least senior employee in his/her current job title, with the same or lower classification, or may bump the least senior employee in other job titles/classifications in the Hospital for which the affected employee is qualified and meets the minimum position requirements. No recall rights will be given to any employee who exercises their bumping rights in this Step.

      d.     Step Four. Any affected employee who cannot exercise bumping rights in Step Three shall be given the option of being placed into a per diem position, with recall rights to the position from which he/she was reduced for twelve (12) months from the date of the reassignment.  Affected employees who accept a per diem position shall receive severance benefits.

5.     Recall.

      a.     Recall rights shall be limited to employees on layoff status who have not elected to receive severance and employees who are moved into a new position under Steps Two or Three above.  Such rights shall remain effective for twelve (12) months from the date the employee was laid off or had his/her position changed.  Recall will be by seniority, as defined in this Article.

      b.     An employee on layoff status or whose status was changed as a result of reduction in hours, shall have rights in accordance with this provision for twelve (12) months from the date the employee was laid off or had his/her status reduced. Recall will be by seniority, as defined in this Article.

      c.     An employee placed into a position on a different shift, status or classification as part of the reduction-in-force shall have rights to return to his/her shift, status and classification, under the recall rights provisions for the defined "recall" period. If an employee rejects the open comparable position, then the employee will be taken off the recall list.

      d.     A laid off employee may refuse a job offer and retain full recall rights if the job is not comparable in status, shift, classification, location and pay to his/her former position at the time of layoff. Additionally, a laid off employee who accepts a job that is not comparable shall retain recall rights for the remaining term back to a comparable status, shift and classification, location and pay at the time of layoff.

      e.     In order to be eligible for recall, the employee must keep the Hospital informed as to his/her current address and current telephone numbers (including pagers, and cell phones). Recall notice to employees on layoff shall be sent by certified mail, return receipt requested, or similar carrier, to the employee's last known address, with a copy sent to the Union. The employee must return from lay-off within ten (10) business days after receipt of notice to return to work, unless there are mitigating circumstances or by mutual agreement with the employee or the Union, or lose all recall privileges.

6.     <u>Per Diem Reduction in Force</u>.

In the event of a reduction in force, per diem positions shall be reduced before any full-time or part-time  positions. Per diem positions shall be reduced by seniority (only in relation to other per diem employees) according to hours worked applied

among such employees. The number of per diem employees in the job titles and classification(s) in which reductions are needed will be laid off in inverse order using per diem seniority.

7.   <u>Reduction in Force Notice</u>.

The Employer agrees to give the Union thirty (30) days' notice of a reduction in force. Affected employees shall be given fourteen (14) days' notice of a reduction in force. The 30 days' notice to the Union is inclusive of the 14 days' notice to the affected employees.

8.   <u>Application of Reduction in Force Procedure</u>.

The parties recognize that reductions in force are extremely serious matters and that even well intentioned procedures may result in unintended applications. Therefore, the parties agree to communicate and meet during any application of the procedures to ensure its correct application to employee. Nothing contained herein shall prevent the parties from mutually agreeing to modify the procedure in a specific reduction in force application should the need arise.

D.   <u>Severance Pay</u>.

Severance Pay shall be provided according to provisions in Article 13, Section G Compensation, of this Agreement.

# ARTICLE 5. FILLING OF VACANCIES

A.   <u>Posting of Vacancies</u>.

When a vacancy subject to this Agreement occurs in any department, a notice of that vacancy shall be posted in a location or locations accessible to all Employees for a minimum period of seven (7) calendar days before the Employer fills the vacancy on a permanent basis. Qualifications for vacant positions shall appear on position postings. Postings shall include the hours, shift, wage rate or range, days off (if fixed), and whether the days off are fixed or variable and primary assignment and work duties (where applicable). This does not prevent the Employer from filling the vacancy on a temporary basis until such position is filled.

Discussion and review of turn-over and vacancies shall be a standing agenda item of the monthly labor management meetings.

B.   <u>Bidding on Posted Vacancies</u>.

Any current Employee who has completed his/her probationary period of employment may apply for a posted vacancy by submitting a written bidding request utilizing the Facility-required form. Regardless of length of service, Employees may apply for posted vacancies within the same department.

C.   <u>Restrictions in Bidding</u>.

9

Employees who apply for and are awarded a posted position may not be awarded another posted vacancy within the next six (6) months. This rule shall not apply:

1.      If the posted vacancy arises in the same department (for Nursing, only within the Unit) which would result in a lateral transfer and not a promotion. For purposes of this provision, a "promotion" shall not include a change in the number of pre-scheduled hours of the bidding Employee, the scheduled start and end times,  the days of work and days off,  the Employee's shift or the Employees' classification; or

2.      If the bidding Employee is in his/her current position as a direct result of a job change or layoff.

D.      <u>Preference Order.</u>

Preference among those bidding shall be given in the following order among bidding Employees from the same preference level. Among bidding Employees from the same preference level, seniority shall govern. The prior sentence is subject to the provision that (1) the bidding Employees must meet all reasonable qualifications of the job established by the Employer (the Union has the burden of establishing that the Employer's qualifications are unreasonable), and (2) ability and performance must meet minimum qualifications in the Employer's reasonable judgment, and if the Employer's judgment is disputed, the Employer has the burden of establishing that its judgment was reasonable.

Bidding preference levels shall be as follows:

1.      Full-time and part-time Employees from the same department, including full-time and Part-time Employees on layoff.

2.      Full-time and part-time Employees from other departments, including such Employees on layoff.

3.      Per diem Employees from the same department.

4.      Per diem Employees from other departments.

5.      Applicants who are former Employees of the bargaining unit who left in good standing with not more than one (1) year's absence from the Employer.

E.      <u>Notification of Selection.</u>

Employees submitting a written bid for a posted vacancy under this subsection shall be timely informed by the Employer whether or not they are awarded the position.

F.      <u>External Selection.</u>

For vacancies that cannot be filled internally (i.e. according to the preference order set forth above), the Employer may employ the person who, in its judgment, will make the best Employee. The Employer shall be the sole judge of the fitness of any applicant.

G.    Seniority Application.

The seniority of bidding Employees shall be determined by the Employee's seniority as defined in Article 4.

H.    Limitation.

It is understood that this Section applies only to vacancies in bargaining unit positions that the Employer desires to fill, and not day to day assignments arising from rotation of personnel, paid time off, or sickness relief.

I.    Potential Vacancies.

Employees expected to be on vacation for a period of more than seven (7) days may submit an Application for Promotion and Transfer Form for a potentially available position. Such request must be submitted in writing to the Human Resources Department. Such written request shall constitute an automatic bid for thirty (30) days or for the period of vacation, whichever is less. It is understood that any written request under this Section is limited to vacancies or potential vacancies in permanent positions subject to this Agreement.

When completing the Facility-required form, the Employee shall be responsible for providing contact information. Should they qualify for the position, the Employer shall contact them and the Employee must be available for an interview in person or by telephone, if appropriate within seven (7) business days of notification.

J.    Evaluation Period after Promotion or Transfer.

Employees who are promoted to a new position or who transfer to another position through the bidding process shall have orientation as necessary, and such Employees shall have up to two (2) weeks of evaluation of their performance. The Employees may have the option to return to their former position within two (2) weeks of starting the new position with no loss. If, at any time within the two (2) week period, the Employee fails to perform satisfactorily, such Employee shall be returned to his/her former position including shift, assignment, and scheduled hours without loss of seniority.

## ARTICLE 6. NONDISCRIMINATION

A.    The Facility and the Union agree that there shall be no discrimination by either Party against any Employee or applicant because of race, color, religion, national origin, sex, sexual orientation, age, disability, marital status, union status or any other characteristic protected by law.

B.    There shall be no discrimination by the Facility or the Union against any Employee because of membership in or activity on behalf of the Union, or because of an Employee's decision not to join the Union or to refrain from activities on the Union's behalf. Union Representatives shall not be transferred or reassigned to another area of work as a result of Union activities.

## ARTICLE 7. HARASSMENT

A.   The Facility and the Union are committed to providing a work environment *free* from discrimination and unlawful harassment. Actions, words, jokes or comments based on an individual's sex, race, ethnicity, age, religion, sexual orientation or any other legally protected characteristic will not be tolerated. Any employee, supervisor, or bargaining unit member engaging in sexual or other unlawful harassment will be subject to appropriate corrective action, up to and including termination of employment.

B.   The Facility and the Union will take all reasonable steps to protect an employee who reports harassment from continuing harassment and from retaliation for reporting the harassment. The Facility and the Union will also take all reasonable steps to protect witnesses who cooperate in any investigation of alleged harassment from retaliation, including by keeping their identities confidential to the extent practicable. If the investigation reveals that the complaint is valid, prompt attention and disciplinary action will be taken to stop the harassment immediately and to prevent its reoccurrence.

## ARTICLE 8. JOINT LABOR-MANAGEMENT COMMITTEE FOR QUALITY CARE AND WORKING ENVIRONMENT

A.   <u>Adequate Staffing Levels.</u>

The Facility reaffirms its practice to maintain adequate staffing levels based on patient census and patient acuity, as required by law. Should an employee believe staffing levels are insufficient to permit the delivery of adequate patient care, he/she shall undertake work assignments but may do so under oral or written protest. In an emergency situation where there is a potential danger to patient, the employee shall immediately notify the supervisor/manager/designee who will physically visit the unit to assess the situation. Corrective action will be implemented if necessary. The Facility shall not require an employee in any case to perform a work assignment outside the lawful scope of his/her license.

B.   <u>Purpose of the Committee</u>

The Joint Labor Management Committee for Quality Care and Working Environment shall be tasked with working collaboratively to improve working conditions of employees and ensuring the highest level of quality care is given to patients. Either party, however, may decline to discuss grievable issues during Committee meetings, and to require such issues to be addressed instead through the grievance process. The discussion of grievable issues during Committee meetings furthermore will not delay any applicable time limits, unless the parties agree otherwise in writing.

C.   <u>Composition of Committee</u>

The Committee shall be comprised of six (6) members of the bargaining unit selected by the Union and six (6) management representatives selected by the Facility. Either party may invite additional representatives with mutual agreement.

D.    Meetings

Meetings shall be held monthly for up to four (4) hours for the first twelve (12) months of this Agreement and for up to two (2) hours thereafter.  The parties may meet more frequently by mutual agreement.  Participation in these meetings by bargaining unit members shall be paid when meetings occur during their regularly scheduled shift.

E.    Dispute Resolution

In the event the parties are unable to resolve a dispute before the Committee or agree upon a recommendation to advance a specific agenda item before the Committee, the following procedures shall be followed:

1.    For items not covered by a provision of this Agreement the parties shall attempt to find a resolution through the assistance of a mediator provided by the Federal Mediation and Conciliatory Services.

2.    For disputes covered by a provision of this Agreement, the dispute shall be resolved through the arbitration provisions of Article 9, Grievance Procedure.

## ARTICLE 9. GRIEVANCE PROCEDURE

A.    Definition.

A grievance is defined as a dispute as to the interpretation, meaning or application of a specific provision of this Agreement.

B.    Procedure,

Grievances shall be processed in accordance with the procedure set forth below:

STEP 1
An Employee should make a reasonable effort to resolve the possible grievance informally in a discussion with her/his immediate supervisor. If an Employee is unable to resolve the possible grievance, the Union Steward (if requested by the Employee) and Employee will have a discussion with the immediate supervisor. This requirement must be satisfied before a written grievance is submitted at Step 2.

STEP 2
If the grievance cannot be resolved informally, it shall be reduced to writing and submitted to the Facility's designated representative within fifteen (15) calendar days after the Employee had or should have had knowledge of the event which caused the grievance. in any event, irrespective of the Employee's knowledge, the grievance must be presented in writing to the Facility's designated representative within thirty (30) calendar days after the event on which it is based. The written grievance must (1) allege the violation of a specific provision or provisions of this Agreement, and (2) set forth all factual grounds upon which the allegation is based. Within ten (10) calendar days after receipt of the written grievance,

a meeting shall be held with the Facility's designated representative(s) to discuss the grievance. The grievant, the Union Steward and the Union Representative may be present at the meeting. Within ten (10) calendar days after the meeting, the Facility's designated representative shall respond to the grievance in writing.

STEP 3
If the Facility's response in Step 2 is not satisfactory, the Union may submit the grievance to arbitration by notifying the Facility in writing of its intent to do so. In order to be timely, the Union's notice must be received by the Facility within fourteen (14) calendar days after the Union's receipt of the Facility's Step 2 response.

1.      Arbitration.

        The following procedure shall apply if a grievance is submitted to arbitration:

        An impartial arbitrator shall be selected by mutual agreement from the following panel of arbitrators:

                Fred Horowitz
                Michael Rappaport
                Doug Collins
                Edna Francis
                Ken Perea
                Charles Askin
                Mark Burstein

        If the parties cannot reach agreement, the parties will select an arbitrator by alternately striking names from the list until one arbitrator remains. The selection of the arbitrator must be completed no later than thirty (30) calendar days from receipt by the Facility of the appeal to arbitration.

        A hearing on the grievance shall be held at a time and place designated by the arbitrator, at which the Facility and the Union shall present their respective positions, evidence and arguments. The sole parties to the arbitration proceeding shall be the Facility and the Union. The arbitrator's decision shall be rendered in writing and shall be final and binding on the parties and on all affected bargaining unit Employees. It shall be issued not more than thirty (30) calendar days after the close of the hearing or the filing of briefs, whichever is later.

        Any information requests from one party to the other concerning an issue relating to a grievance must be made at least sixty (60) calendar days prior to any scheduled hearing.

        The arbitrator's authority is derived from this Agreement and his/her jurisdiction is limited to the interpretation and application thereof. He/She shall not have authority to (a) amend or modify any provision of this Agreement; or (b) render an award on any grievance arising before the effective date, or after the termination date.

The fee and expenses of the arbitrator, the court reporter's appearance fee, and the cost of mutual facilities shall be borne equally by the Facility and the Union.

2.   Time Limits.

The time limits and other procedural requirements set forth in this Article must be strictly adhered to unless mutually extended by the express agreement of the Union and the Facility. Such agreement need not be in writing. If the Facility fails to respond to a grievance within the time limits set forth in this Article, the grievance may be appealed immediately to the next step. In the event of a failure by the grievant or the Union to adhere to any of such requirements, the grievance shall be resolved on the basis of the Facility's last response. In the event of a dispute over whether the grievant or the Union has failed to adhere to any of such requirements, the arbitrator shall make that determination.

## ARTICLE 10. DISCIPLINE

A.   Just Cause.

The Employer may only discipline or terminate an employee for just cause. Any discipline or discharge may be subject to the grievance procedure in Article 9.

B.   Progressive Discipline.

Unless circumstances warrant more severe actions, the Facility will attempt to utilize a system of progressive discipline. Progressive steps shall include verbal counseling, written counseling and/or warnings, disciplinary suspensions without pay, and termination of employment.

Notwithstanding the above paragraph, the discipline imposed in any particular case will depend upon the facts and circumstances, including, but not limited to, the seriousness of the infraction, prior infractions of a similar nature, and the provisions of any applicable laws or regulations.

C.   Investigatory Suspension.

No employee shall be held in unpaid investigatory suspension for more than fourteen (14) calendar days. Investigatory suspensions may be extended as set forth in Section H of this Article.

D.   Written Disciplinary Action.

A written warning is a document designated as such by the Facility. An employee who receives a written warning shall be given a copy of the warning and shall sign a receipt to acknowledge having received the document. Acknowledging receipt of the warning shall not constitute an admission of the employee's agreement with the substance of the warning. A Union grievance contesting a written warning shall be subject to the requirements of the grievance procedure in Article 9.

E.   Disciplinary Notices. Rebuttal, and Inspection of Personnel Files.

   1.   There shall be one official personnel file for all bargaining unit employees and they shall have the right to inspect and to be provided, on request, with one copy of any document in the employee's file.

   2.   Employees will receive copies of all disciplinary notice(s) placed in their personnel files and shall have the right to rebut in writing any disciplinary notice. Such rebuttals, other than grievances, shall be attached to the disciplinary notice and placed in the personnel file.

   3.   In any case where the Facility and the Union agree to revise personnel record material, the Facility shall, upon request, provide evidence of the revision. This requirement may be satisfied by permitting a Union representative to review the file's content in the presence of an Employer representative.

   4.    Except in the case of serious offenses, no disciplinary document shall be utilized for progressive discipline beyond eighteen (18) months of its issuance.

F.   Additional Representation Rights.

   The following holding of the U.S. Supreme Court in NLRB v. Weingarten. Inc., shall apply to investigatory interviews conducted by the employer that an employee, upon his/her request, is entitled to have Union representation during an investigatory interview in which the employee is required to participate where the employee reasonably believes that such investigation will result in disciplinary action. The right to Union representation (Field Representative or Union Steward) is conditioned upon a requirement that the Union representative be available for participation in such investigatory interview within twenty-four hours, excluding Saturday, Sunday, and Holidays, of the employee's request for his/her presence.

G.   Probationary Employees.

   An Employee will be on probation for the first ninety (90) calendar days and may be discharged or disciplined in the Facility's discretion without establishing just cause. Such probationary period may be extended for an additional ninety (90) calendar days upon written notice to the Employee and the Union.

H.   Time Limits for Discipline and Discharge

   It is the intent of the Hospital to impose corrective discipline, including discharge, as promptly as possible after it has knowledge of the incident and commensurate with its obligation to conduct a good faith and reasonable investigation.  The Hospital will strive to impose such discipline, including discharge, within two (2) weeks of the time it has knowledge of the incident.  Any delay due to the unavailability of a Union representative for an investigatory interview shall not be counted.

The Union acknowledges that depending on the nature or complexity of the offense, the number of people involved, the number of witnesses to the incident, the availability of witnesses, the availability of the appropriate investigator, the availability of a senior manager necessary to review the intended discipline and other reasonable circumstances, the time to impose discipline, including discharge, may extend beyond the two weeks. If the investigation requires more than two (2) weeks, notice will be given by electronic mail or otherwise in writing to the Union Steward or the Union Representative. Management shall have the right to extend the fourteen (14) day period by up to thirty (30) additional days by giving notice to the Union of its intent to do so. After thirty (30) additional days, the Employer may obtain additional extensions by providing a non-arbitrary explanation to the Union of the cause for the delay.

## ARTICLE 11. HOURS OF WORK, OVERTIME AND SCHEDULING

A.   <u>State and Federal Wage and Hour Laws.</u>

The Facility will comply with all applicable local, State, and Federal wage and hour requirements.

B.   <u>Workday and Workweek.</u>

1.   A workday is defined as the consecutive twenty-four (24) hour period beginning at 12:00 midnight each day.

2.   A workweek is defined as the seven (7) calendar day period that starts at 12:01 a.m. on Sunday and ends at 11:59 p.m. (midnight) the following Saturday.

3.   For purposes of computing overtime obligations under an "Eight-80" or "back-to-back" workweek, the "back-to-back" workweek starts at 12:01 a.m, on Sunday and ends on 11:59 p.m. on the Saturday, fourteen days later.

4.   It is understood and agreed that the workday, workweek, and "back-to-back" workweek are defined above for the purposes of complying with the overtime requirements under state and federal wage and hour laws and that the workday and workweek may be changed by the Facility to comply with such laws so long as such changes are not designed to evade the overtime requirements.

5.   Nothing herein shall be deemed or construed to change the Facility's current practice as to the aggregation of consecutive hours into a single workday in which a shift commences for overtime compensation.

Each employee shall receive two (2) consecutive days off each week, provided that the days off may be split or rotated at the employee's written request, or for 8-hour shift employees, in order to achieve every other weekend off scheduling. Past practices of consecutive or non-consecutive day scheduling may be continued at the employee's discretion. Twelve Hour Shift Employees will not normally work more than the schedule they were hired into with three (3) consecutive shifts of twelve (12) or more hours per week (or a 3 and 4 shift schedule per pay period), except by mutual agreement with the employee.

C.   Payroll Period.

The payroll period will consist of a fourteen (14) day period that begins on Sunday at 12:01 a.m. and ends on Saturday of the following week at 11:59 p.m.  The Employer may change the pay period following fourteen (14) days' notice to the Union.  In the event of a change in the payroll period, no employee shall be required to go longer than two (2) weeks without receiving a paycheck.  The parties agree to work collaboratively during the transition to identify any paycheck shortages or overages so that they can be corrected in the next paycheck.

D.   Meal and Rest Periods.

1.   The Facility will comply with the applicable Industrial Welfare Commission Wage Order regarding meal periods, meal period waivers, missed meal period penalties, and on duty meal period agreements.

2.   Unpaid, unworked meal periods will not be counted as hours worked in calculating overtime to be paid under any provision of this Agreement.

3.   The Facility will comply with the applicable Industrial Welfare Commission Wage Order regarding 10 minute rest periods. Where 15 minute rest periods exist as department/unit past practice, it shall continue.

4.   An Employee will make every effort to notify his/her supervisor in advance of his/her inability to leave the workstation for a meal period. Anytime an Employee misses a meal period, he/she must provide his/her supervisor with a written explanation as to why the meal period was missed.

5.   Adequate Coverage: The Department supervisor/charge nurse shall make every effort to provide adequate coverage and relief for Employee's meal.

6.   On Duty Meal Periods: Unless the Employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked.

An on duty meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and, when by written agreement between the Employee and Employer, an on the job paid meal period is agreed to. Such agreement shall state that the employee may revoke the agreement at any time.

E.   Overtime.

1.   Mandatory Overtime.

The Facility and the Union recognize that mandatory overtime is not desirable and represents a burden on the employee. Acceptance of overtime and shifts beyond the employee's schedule shall be voluntary and in accordance with state law or regulations, except where patient care would be endangered by an internal or

external emergency declared by state, local or federal government or declared by the administrator on duty. An external or internal emergency, for the purposes of this section, is defined as an unexpected situation of sudden occurrence of a serious and urgent nature that demands immediate attention, such as an unpredictable or unavoidable occurrence at unscheduled or unpredictable intervals relating to healthcare delivery requiring immediate interventions and care such as natural disasters, situations of mass casualties or an internal emergency endangering patient care such as fire, structural collapse, bomb threats, hazardous material spills or any other unanticipated event that would result in the closure of beds required for patient care.

2.   An Employee must make every effort to obtain supervisory approval prior to working any hours that would require the payment of overtime.

a.   <u>Eight-Hour Shifts</u>.

Work on eight (8)-hour shifts will be paid at the rate of one and one-half (1 1/2) times the Employee's regular rate of pay for all hours worked after the first eight (8) hours in a workday or over eighty (80) in a two week pay period and two (2) times his/her regular rate of pay for all hours worked after the first twelve (12) hours in a workday.

b.   <u>Ten-Hour Shifts</u>.

An Employee who is assigned to work ten (10)-hour shifts will be paid at the rate of one and one-half (1 1/2) times his/her regular rate of pay for all hours worked after the first ten (10) hours in a workday or over forty (40) in a workweek and two (2) times her/his regular rate of pay for all hours worked after the first twelve (12) hours in a workday.

c.   <u>Twelve-Hour Shifts</u>.

An Employee who is assigned to work twelve (12)-hour shifts will be paid two (2) times his/her regular hourly rate of pay for all hours worked after the first twelve (12) hours in a workday and will be paid one and one-half (1 1/2) times his/her regular rate of pay for all hours worked after the first eight (8) hours in a workday or over eighty (80) in a two week period.

d.   <u>Alternative Twelve-Hour Shifts</u>.

If the Union and the Employer mutually agree to implement alternative straight-time twelve (12) hour shifts, the employees' base rates will be adjusted so that no employee shall experience any reduction of compensation or benefits as a result of the conversion.

e.   <u>Regular Rate</u>.

For the purpose of computing overtime pay, the regular rate of pay shall be calculated in accordance with the Fair Labor Standards Act, as amended.

F.   <u>Work Schedules and Posting.</u>

1.   The Facility will post work schedules at least ten (10) days in advance of their commencement dates and such schedules will cover a minimum period of four (4) weeks.

2.   As an exception to a. above, a department/unit that permits self-scheduling in accordance with c., below will attempt to post work schedules at least ten (10) days in advance of their commencement dates and such schedules will cover a minimum period of four (4) weeks.

3.   Wherever applicable, the Facility shall continue its existing practice(s) of permitting Employees to self-schedule on a department/unit-bydepartment/unit basis. The respective department Director or his/her designee will consider and make a reasonable effort to grant Employees' self-scheduling requests, provided such requests are submitted in a timely way and that they are consistent with departmental/unit needs and the operating requirements of the Facility.

4.   After the schedule has been posted, an employee's schedule will not be changed without the employee's consent, except in case of unforeseeable and unavoidable operational needs or emergency.

5.   Requests by Employees for changes to a posted schedule must be approved in writing by the department Director or his/her designee.

6.   A regularly scheduled Employee may trade a shift or workday with another regularly scheduled Employee provided they have substantially equal competencies. Shift trades are subject to the written approval of the department Director or his/her designee and, except in emergency situations, should be submitted at least forty-eight (48) hours in advance. A shift trade will not be approved if it would increase overtime or extra shift premium costs for the Facility.

G.   <u>Weekend Scheduling.</u>

A weekend shift means any shift that is scheduled to begin on or after 6:00 p.m. Friday evening through Sunday evening, ending no later than 7:30 a.m. on Monday. The Employer reserves the right to designate shifts commencing earlier than 6:00 p.m. on Friday evening as weekend shifts provided that the scheduled hours for such shift extend into Saturday.

1.   Nothing herein shall preclude an Employee from volunteering to be scheduled for additional weekend shifts.

2.   An Employee may request to share his/her weekend shift requirement with another Employee with substantially equal competencies. Approval of such requests will be at the discretion of the Facility and will not be unreasonably withheld, except

that an Employee's request will not be approved if it would increase overtime or extra shift premium costs for the Facility.

3.    An Employee working in a department/unit with weekend scheduling may be scheduled to work every other weekend, up to a maximum of two (2) weekend shifts per scheduled weekend. However, Employees will be scheduled with at least every other weekend off. If one shift is scheduled and worked on a weekend it shall constitute the weekend worked.

4.    Notwithstanding the above, per diem Employees will be scheduled to work weekends in accordance with their per diem agreements and Employees hired specifically to work weekends will continue to be scheduled to work weekends.

5.    Employees shall not be required to "make up" missed weekend days, however this shall not be interpreted as diminishing an employee's overall attendance obligation.

H.    <u>Holiday Scheduling.</u>

1.    Employees shall be solicited in September for the November through April holidays and the hospital shall post the holiday assignments by October 15. Employees shall be solicited in March for the May through October holiday assignments and the employer shall post the holiday assignments by May I. The final right to reasonably allot the number of employees off on holidays and the right to change such allotments are reserved to the Employer in order to ensure the adequate operation of the Facility.

2.    Requests to work on a holiday or be off on a holiday shall be awarded on the basis of seniority by rotation, except that every employee shall be required to work one of the following three holidays (New Year's, Thanksgiving and Christmas) unless an employee requests to be allowed to work more than one or all of them except that, in units where employees are currently required to work two (2) of such holidays, this practice shall continue. Subject to the foregoing, should all employees exercise seniority for non-assignment, the Employer shall assign employees by inverse seniority (beginning with the least senior employee) to work the designated holiday.

3.    All designated holidays will be observed on the actual calendar day, and all conditions and benefits applying to such holiday will be in effect on that day. However, in the event the Holiday falls on a weekend day and the department does not operate and/or in the event the employer closes any of its facilities/departments on the Friday preceding a Saturday holiday or on a Monday following a Sunday holiday, the Friday or Monday will be designated as a holiday for those employees who do not work either the actual holiday or the designated holiday.

4.    Per diem Employees: per diem employees are required to work one (1) major holiday and one (1) other designated holiday per year.

I.    <u>Vacation Scheduling.</u>

1. Employees shall be solicited during the month of January of each year in order to determine their preferences for vacation. Prior to March first (1st), the Employer shall advise all employees as to when their vacation is scheduled and shall post the full twelve (12) month vacation schedule in a location in each department accessible to all employees.

2. Vacation will be granted, subject to patient care and operational necessity, at times most desired by employees, employees being given preference as to choice based on seniority. Vacation allotment schedules for each year shall be provided to the Union in January, for each department, with updates provided timely throughout the year. For those employees choosing to split their vacation into two (2) or more increments, seniority will apply only to the first (1st) choice of vacation in each year. The highest senior employee will then go to the bottom of the list and shall be considered for their second choice after a full rotation by seniority, then to the bottom of the list again for a third choice, etc. All vacation request forms shall allow the employee to indicate which requested vacation period is his or her first (1st) choice, which is his/her second (2nd) choice, and which is third (3rd) choice. Vacation requests in any department will be considered at any time of the year. Requests received after the annual vacation scheduling period above shall be granted, subject to patient care and operational necessity, on a first come, first serve basis, except that in the case of competing requests submitted on the same calendar day, the request shall be granted by seniority.

3. The Employer shall notify an employee in writing of approval or denial as soon as possible of vacation requests submitted after the annual vacation scheduling period above, but no later than two (2) weeks after receipt of said request.

4. Transferring employees will be required to select vacation from open dates, at their new department/location, not previously filled by scheduled vacations or approved leaves.

5. The employee may request vacation be attached to the employee's scheduled day(s) off and such request shall be granted, when possible.

6. Employees granted vacation time must use accrued Paid Time Off. An employee who does not have Paid Time Off will be granted non-paid vacation time, not to exceed three (3) weeks, subject to patient care and operational necessity, and under the same procedures in this Article.

7. When requesting vacations, employee may request less than five (5) work days at a time or that the vacation start on any day of the week. The total amount of vacation earned, may be taken in one consecutive period or vacation periods may be split at the request of the employee.

J. <u>Additional Hours.</u>

In any department/unit without an In-House Registry program, the department/unit will maintain an availability list and will attempt to cover any additional hours from such list in

an equitable manner, subject to competency, in accordance with the steps below. Regular full-time and part-time Employees will be placed on the availability list in seniority order. Using their dates of hire, per diem Employees will be placed on the availability list after all regular full- time and part-time Employees.

1.      Straight Time.

Additional hours shall first be offered to a volunteer from the availability list who has the necessary competency and whose acceptance of such additional hours will not result in overtime. Straight time hours will be distributed starting with the senior-most volunteer and rotating through the availability list in seniority order so that each employee on the availability list had the opportunity to work additional straight time hours, before the offer returns to the most senior employee. If the employee is not available to work the offered hours, the Facility will proceed down the seniority list until the additional straight time hours are covered.

2.      Overtime.

If the Facility is unable to cover the additional hours without incurring overtime, then such additional overtime hours will be offered to the most senior volunteer and rotating through the availability list in seniority order so that each employee on the availability list had the opportunity to work additional overtime hours, before the offer returns to the most senior employee. If the employee is not available to work the offered hours, the Facility will proceed down the seniority list until the additional overtime time hours are covered.

3.      In the event there are no volunteers on the availability list, the Facility will be free to offer the additional hours to any other qualified Employee volunteer.

K.      Call-In Procedure.

An Employee reporting absent for a shift, or portion thereof, will call in the absence and will describe the reason for such absence to his/her department Director or his/her designee as soon as he/she knows the absence will occur. An Employee calling in less than two (2) hours prior to the commencement of an absence may be required on request to provide reasonable substantiation to explain why such absence could not have been called in earlier by the Employee or another person acting on his/her behalf. Compliance with this call-in requirement is necessary for staffing reliability and will not operate to excuse unscheduled or unauthorized absences.

L.      Call Off/Flexing.

1.      Every Effort To Avoid Call Off/Flexing.

Insofar as is practicable, if after exercising every effort to avoid daily cancellations in accordance with Side Letter - Employment and Income Security, it may be necessary to require an employee to take time off without pay during temporary periods of low census or on other occasions when staffing needs to be adjusted on

a temporary basis (Call Off/Flexing). Call Off/Flexing must be approved by a supervisor or department manager or designee. Eligible employees who are cancelled may take the day off without pay or use Paid Time Off (where applicable), at the employee's discretion.

2.    <u>Call Off/Flexing as Time Worked</u>.

If an employee is cancelled or volunteers to take time off, the hours that an employee was scheduled to work shall count as time worked for Paid Time Off accruals.

3.    <u>Order of Call Off/Flexing</u>.

Subject to patient care staffing needs, including adequate qualifications of employees, when it is necessary and unavoidable to call off an employee, the Employer shall Call Off/Flex employees in the following order:

a.    Registry

b.    Employees receiving double time

c.    Employees receiving overtime or extra shift premium, i.e. IHR.

d.    Volunteers

e.    Travelers

f.    Temporary employees

g.    Per diem, on-call, and casual

h.    Part-time employees working shifts over and above their regular schedule

i.    Per diem on minimum required shift

j.    Full-time and part-time employees working their regular schedule. Within each category above, Call Off/Flexing shall be by rotation beginning in reverse order of seniority provided the remaining employee(s) are able to perform the work.

Call off/flexing, should the need to implement arise, and in accordance with L.1 and L.3 above, shall be implemented within job classifications among all Employees who hold that job classification in the Facility, provided the same or similar job skills and competencies exist. In addition, as a result of call off/flexing, should remaining employees be required to work in departments or units other than their "home unit/department" such floating shall be done consistent with Article 12 — Floating.

Call off/flexing list (s) shall be maintained in each individual department. In the nursing department, the list shall be in the nursing staffing office for nursing personnel. Such list(s) shall be made available to bargaining unit members, shop stewards and union representatives upon request.

4.  The Employer will accept volunteers for Call Off/Flexing before any other employees provided that such voluntary Call Off/Flexing do not result in retaining an employee at premium pay who would have been Called Off/Flexed if the Employer had followed the list above, unless the Employer permits.

5.  <u>Call Off/Flexing Notice</u>.

    For employees called off before the shift commences, the Employer will attempt to Call Off/Flex employees at least two (2) hours prior to the commencement of their scheduled shift. Nothing herein shall be construed as preventing a call off/flex during the shift, when necessary.

6.  <u>Call Off/Flexed Employees Off the Schedule</u>.

    Once called-off, an employee is considered off the schedule and shall not be required to maintain contact or be available to work, unless the employee has agreed to accept Stand-by status and is compensated accordingly, for the shift or portion thereof.

M.  <u>No Guarantee</u>.

Nothing in this Article shall be construed to constitute a guarantee of hours of work per day or per week or of days of work per week.

N.  <u>No Pyramiding</u>.

There will be no pyramiding of overtime and premium payments for the same hours worked. To the extent that hours are compensable as overtime under provisions of this Agreement and where two or more overtime provisions apply, the greater will prevail.

## **ARTICLE 12. FLOATING**

**Floating General Provisions**

A.  <u>Definition:</u>

1.  Floating is defined as the temporary reassignment of a staff member to a clinical area outside of their assigned patient care unit.

2.  Employees may be assigned to float to another patient care unit other than their own, subject to the limitations provided in this Article.

B.  <u>Floating Order: Employees shall float in the following order:</u>

1.      Volunteers

2.      Registry

3.      Travelers

4.      Employees working extra shifts

5.      Temporary

6.      Per diem

7.      Part-time

8.      Full-time

C.      <u>Floating Rotation:</u>

The order of float for Employees within a unit or cluster will be on a rotational basis within each of the categories of Employees described above. Volunteers for floating will be allowed, within B.2 to B.9 above. Floating decisions shall be based on the Employer's assessment of operational and patient care needs in the sending and receiving units, including staff and skill mix, and the conditions and provisions in this Article.

D.      <u>Floating Conditions:</u>

Floating shall be subject to the following conditions and limitations:

1.      Fully qualified Employees may be floated to a different department or unit provided the Employee has received orientation in that department or unit and has demonstrated current competence in providing care to patients in that department or unit. In the event an Employee with limited qualifications is floated to another department or unit to assist other qualified Employees, they will be oriented and limited to performing only those tasks they are qualified and competent to perform.

2.      Compliance with Law: Floating of Employees shall be in compliance with all federal and state laws and regulations, including Title XXII of the California Administrative Code.

E.      <u>Voluntary Floating:</u>

Nothing herein shall prohibit an Employee from volunteering to float to other areas, provided that the conditions in this Article are satisfied.

F.      <u>Floating Records:</u>

The Employer will maintain competency validation, float orientation, and other such relevant float documentation. Float rotation lists will be maintained and will be available

for inspection by affected Employees in the Unit and job classification. Information in this paragraph shall be made available and provided to the Union upon request.

G.    Floating Clusters:

The Employer will float Employees according to the agreed upon clusters, and floating inconsistent with such clusters shall be voluntary, except in the event of an emergency.

Any changes in the clusters shall be made only by mutual agreement with the Union. The floating clusters are as follows:

i.      **Licensed Vocational Nurses (LVNs)**

   ▪ Med/Surg and Telemetry LVNs
     Float to Psych, Acute Rehab Unit (ARU), Telemetry, Med/Surg, and Chem. Depend.

   ▪ Psych LVNs
     Float to Chem. Depend.

   ▪ Chem. Depend. LVNs
     Float to Psych, Med/Surg, and ARU

ii.     **Nursing Assistants and Certified Nursing Assistants (NM and CNAs)**

   Nursing Assistants/Aides and Certified Nursing Assistants float to all nursing units subject to certification limits, orientation requirements, and other conditions set forth in this Article.

iii.    **Mental Health Workers/Techs**
        Psych MHT/MHW
        All nursing units for "patient sitting"

iv.     **Unit Secretaries and Monitor Techs**
        Unit Secretaries and Monitor Techs
        Float to other Patient Care Units, provided they are qualified

v.      **Radiology/Cath Lab**
        Special Procedures Technologists and Cath Lab Technologists may float within this cluster.

vi.     **Other Patient Care Positions**
        Employees in other patient care positions who float to other departments/units shall continue to do so, subject to Sections A to F, above.

H.  Transfers of Staff Assigned to Non-Patient Care Unit.

Employees assigned to non-patient care units may be temporarily reassigned on their shift to the same position in an area outside of their regular unit. To the extent practical, such reassignment shall be done on a rotating basis among those qualified to do the work.

## ARTICLE 13. COMPENSATION

A.  Wages.

1.  The parties have agreed to the hiring grid set forth in Exhibit E, to be implemented over the term of this Agreement in accordance with this Article.  The relevant range for employees in classifications for which no license or certification is required will be identified based upon years of service at the Hospital in the employee's current position.  The relevant range for employees in classifications for which a license or certification is required will be identified based upon the employee's years of licensure or certification.

2.  Increases to base hourly wage rates shall be implemented beginning on each of the effective dates described below, for all full-time and regular part-time bargaining unit employees:

    a.  Effective on the first day of the second full pay period following the date on which this Agreement is ratified, all full-time and part-time employees shall receive a 2% across the board wage increase.

    In addition to the across-the-board increases, employees who are below the minimum of the relevant range on the hiring grid in Appendix E for their respective classifications and years of service/licensure will receive the lower of the minimum for the relevant range on the hiring grid or an additional 2% increase.

    b.  Effective on the first day of the first full pay period after March 1, 2019, all full-time and part-time employees shall receive a 2% across the board wage increase.

    In addition to the across-the-board increases, employees who are below the minimum of the relevant range on the hiring grid in Appendix E for their respective classifications and years of service/licensure will receive the lower of the minimum for the relevant range on the hiring grid or an additional 2% increase.

    c.  Effective on the first day of the first full pay period after March 1, 2020, all full-time and part-time employees shall receive a 2% across the board wage increase.

3.    During the term of this Agreement, the Employer will not pay a new hire an hourly rate greater than the maximum of her/his applicable quartile on the hiring grid set forth in Appendix E.

4.    Notwithstanding any other provision of this Agreement, the Employer shall not be required to increase the rate of any employee after this Agreement's expiration, except to the extent required under the language of a successor agreement.

B.    <u>Payday and Paycheck.</u>

1.    Wages will be paid every two (2) weeks. Paychecks will be distributed on payday. Payday is the Friday after the end of a pay period, except that where such Friday is a bank holiday, payday for employees on direct deposit will be the Thursday after the end of a pay period.

2.    The Facility will continue its current practice regarding the direct deposit of paychecks.

3.    Where an error by the Facility results in paycheck underpayment, upon Employee request, such error will be corrected by the close of business on the next business day. However, where the underpayment results from an Employee error, it will be corrected on the next paycheck.

4.    The Facility will comply with its obligations under state law regarding paycheck stubs.

C.    <u>Bonuses.</u>

1.    <u>Referral Bonus:</u> The Facility will continue its current past practice of paying all Referral bonuses on an as-needed basis. In the event a referral bonus is to be instituted, modified or discontinued, notice will be given to the Union.

2.    <u>Admitting; Bonus Plan:</u> Admitting staff are eligible for a monthly individual cash bonus pursuant to past practice providing they meet the established goals and the eligibility criteria.

D.    <u>Shift Differentials.</u>

An Employee assigned to the evening or night shift will be paid a shift differential according to the following:

1.    Shift Differential Rates: An employee assigned to the Evening Shift or Night Shift will be paid a shift differential, in accordance with past practice, based on the following hourly Shift Differential rates, effective on the first date of this Agreement.

Service/Maintenance/Technical & Business Office Clerical Position

|      |                              | 2nd Shift | 3rd Shift |
|------|------------------------------|-----------|-----------|
| (1)  | Operator-Telecom             | $0.75     | $1.12     |
| (2)  | Insurance Verifier           | $0.90     | $1.35     |
| (3)  | Rep — Admit                  | $0.90     | $1.35     |
| (4)  | Rep — Admit PD               | $1.07     | $1.61     |
| (5)  | Admit — Fin Counselor        | $1.07     | $1.61     |
| (6)  | Clerk — Accounts Payable     | $1.07     | $1.60     |
| (7)  | Rep-Admit QC                 | $1.07     | $1.61     |
| (8)  | Secretary .- Dept            | $0.95     | $1.43     |
| (9)  | Coord - ER Charge            | $0.78     | $1.17     |
| (10) | Coord-Accounts Payable       | $1.07     | $1.60     |
| (11) | Lead Admitting Rep           | $1.21     | $1.81     |
| (12) | Admit Bed Control Coord      | $1.07     | $1.61     |
| (13) | Admit Fin Mgr/UR Coord       | $1.07     | $1.61     |
| (14) | Coord - Admit/Intake         | $1.21     | $1.82     |
| (15) | Clerk - Clinical Support     | $0.78     | $1.17     |
| (16) | Transport/Courier            | $0.67     | $1.00     |
| (17) | Aide - Physical Therapy      | $0.69     | $1.04     |
| (18) | Driver                       | $0.75     | $1.12     |
| (19) | Pharmacy Messenger           | $0.78     | $1.17     |
| (20) | Pulmonary Support Tech       | $0.75     | $1.12     |
| (21) | Transport/Courier/Senior     | $0.78     | $1.17     |
| (22) | Asst - Nursing               | $0.78     | $1.17     |
| (23) | Asst -Nursing Nursing Surgical | $0.78   | $1.17     |
| (24) | C.D. Aide 1                  | $0.78     | $1.17     |
| (25) | Clerk - General Radiog       | $0.63     | $0.94     |
| (26) | Clerk - Health Info          | $0.75     | $1.12     |
| (27) | Mental Health Tech           | $0.78     | $1.17     |
| (28) | Tech - Central Svcs          | $0.84     | $1.27     |
| (29) | Biller - Pharmacy            | NA        | NA        |
| (30) | Clerk - Data Entry Opera     | $0.90     | $1.35     |
| (31) | Lab Technician               | $1.05     | $1.57     |
| (32) | Secretary-Unit               | $0.91     | $1.37     |
| (33) | Staffing Asst - Nursing      | $0.78     | $1.16     |
| (34) | Tech - CHF Tech Central      | $0.95     | $1.43     |
| (35) | Health Info                  | $0.87     | $1.31     |
| (36) | U.R. Specialist              | $0.90     | $1.35     |
| (37) | Aide - Imaging               | $1.07     | $1.60     |
| (38) | Asst - Laboratory            | $0.91     | $1.37     |
| (39) | al. Lab Tech                 | $1.30     | $1.96     |
| (40) | Secretary - Radiology        | $0.95     | $1.43     |
| (41) | Tech - EKG                   | $0.75     | $1.12     |
| (42) | Tech - Monitor               | $0.87     | $1.31     |
| (43) | EMT                          | $0.91     | $1.37     |

|      |                           | 2nd Shift | 3rd Shift |
|------|---------------------------|-----------|-----------|
| (44) | Pharmacy Buyer            | $1.16     | $1.74     |
| (45) | Pharmacy Tech             | $1.07     | $1.60     |
| (46) | Tech - Anesthesia         | $0.87     | $1.31     |
| (47) | Buyer                     | $1.16     | $1.74     |
| (48) | Coord - Scheduling        | $1.21     | $1.81     |
| (49) | LPT                       | $1.00     | $1.60     |
| (50) | LVN                       | $1.00     | $1.60     |
| (51) | Medical Transcript        | $1.07     | $1.60     |
| (52) | Asst - Occupational Ther  | $1.41     | $2.12     |
| (53) | Pulmonary Tech            | $1.40     | $2.00     |
| (54) | Tech-Surgical             | $1.21     | $1.81     |
| (55) | Asst - Physical Therapy   | $1.41     | $2.12     |
| (56) | Tech - Cardiac Cath       | $1.65     | $2.48     |
| (57) | Vascular Tech             | $1.07     | $1.61     |
| (58) | Coder I                   | $1.41     | $2.12     |
| (59) | Therapist - Resp 11       | $1.40     | $2.00     |
| (60) | Therapist - Respiratory   | $1.40     | $2.00     |
| (61) | Coder II                  | $1.41     | $2.12     |
| (62) | Lead Coder                | $1.41     | $2.12     |
| (63) | Rad Tech 11               | $1.53     | $2.29     |
| (64) | Lead Tech, Rad Therapy    | $2.20     | $3.30     |
| (65) | Nuclear Med Tech          | $1.65     | $2.48     |
| (66) | Rad Tech In               | $1.65     | $2.48     |
| (67) | Special Procedures Tech   | $1.47     | $2.20     |
| (68) | Ultrasound Tech           | $1.47     | $2.20     |
| (69) | Lead Rad Tech             | $1.47     | $2.20     |
| (70) | Radiology Tech            | $1.30     | $1.96     |
| (71) | Tech - Echo               | $1.36     | $2.04     |
| (72) | Therapist - Resp, Sr      | $1.40     | $2.00     |
| (73) | Coder III                 | $1.40     | $2.12     |

|      | Professional Unit Position   | 2nd Shift | 3rd Shift |
|------|------------------------------|-----------|-----------|
| (1)  | Coord of Dual Diagnosis      | $1.21     | $1.82     |
| (2)  | Counselor - Behavioral (II N)| $1.21     | $1.82     |
| (3)  | Accountant Ill               | NA        | NA        |
| (4)  | Counselor - Behavioral (1 3N)| $1.76     | $2.63     |
| (5)  | Therapist - Drama            | $1.46     | $2.20     |
| (6)  | Tech - Med                   | $1.91     | $2.87     |
| (7)  | Therapist - Occupational     | $1.91     | $2.87     |
| (8)  | Therapist - PT               | $2.00     | $3.00     |
| (9)  | Therapist- Speech            | $1.91     | $2.87     |
| (10) | Pharmacist - Clinical        | $2.45     | $3.68     |
| (11) | Pharmacist - Senior Clin     | $2.68     | $4.01     |
| (12) | Social Worker                | $1.82     | $2.73     |

|      |                    | 2nd Shift | 3rd Shift |
|------|--------------------|-----------|-----------|
| (13) | Audiologist        | $1.36     | $2.03     |
| (14) | Discharge Planner  | NA        | NA        |
| (15) | Social Worker - LCSW | NA      | NA        |

2.    <u>Shift Differential Payment Eligibility:</u>

Shift differential will be paid when fifty percent (50%) or more of the hours worked fall within the following shift times:

a.    Shift 2 (Evening Shift) Period: 3:00 p.m. to 11:30 p.m.

b.    Shift 3 (Night Shift Period): 11:00 p.m. to 7:30 a.m.

c.    Payment

    i.    Employees who work 50% or more of their shift hours during the Shift 2 (Evening Shift) period shall be paid the Shift 2 Differential for all hours worked; and

    ii.    Employees who work 50% or more of their shift hours during the Shift 3 (Night Shift) period shall be paid the Shift 3 (Night Shift) Differential for all hours worked.

d.    Relief Charge/Lead Differential

Employees who are assigned as "relief Charge or Lead" shall be paid an additional hourly differential of $1.00 per hour for all hours worked during the designated charge or lead shift.

3.    <u>Stand-By/On-call and Call-back Pay.</u>

a.    Stand-By/On-Call Pay

An Employee assigned to stand-by/on-call status by the department Director or his/her designee will be paid as follows:

| Hourly Rates | Position |
|--------------|----------|
| $3.00        | Central Services Tech |
|              | Certified Nursing Assist |
|              | Monitor Tech |
|              | Storekeeper |
|              | Surg Nursing Assist |
| $3.75        | Clinical Pharmacist |
|              | Clinical Lab Scientists |
|              | Pharmacy Buyer |
|              | Pharmacy Tech |

| Hourly Rates | Position |
|---|---|
| | Surgery Scheduling Coord |
| $4.50 | Anesthesia Tech |
| | LVN |
| | Mental Health Tech |
| | Surgery Materials Coord |
| | LPT |
| $5.00 | Surgical Tech |
| $5.50 | Special Procedures Tech (Special Cardiac Cath-Lab Techs, if any, will also receive this rate) |
| | Vascular Tech |
| | Echo Tech |
| | Radiation Oncology Tech |
| | Nuclear Medicine Tech |
| | Radiology Technologist |
| | Ultrasound Tech |
| $6.00 | Cardiac Cath Lab Tech |

No other compensation will be paid for such stand-by/on-call status. Hours of stand-by/on-call will not be considered hours worked for purposes of paying differentials, overtime or any other form of premium pay under this Agreement.

b.  Call-Back From Stand-by Pay. An Employee who is assigned to stand-by/on-call status will be guaranteed a minimum of two (2) hours of work each time he/she is called in by the department Director or his/her designee. When called back an Employee will be required to work until released by his/her Department Director or his/her designee. An Employee will receive one and one-half (1 1/2) times his/her base rate of pay, rather than stand-by/on-call pay, for all hours actually worked when he/she is called back to work from stand-by status. The work time of an Employee who is called in from stand-by/on-call status shall commence when he/she arrives at the work site and clocks in and will end when he/she clocks out.

c.  Stand-by/on-call and call-back hours are not subject to the call-off provisions of this Agreement.

d.  Call Back -- Not on Stand-by. An employee on stand-by status, who is called back, completes that assignment and is no longer on stand-by status but agrees to return that same day, will be paid in accordance with paragraph 2 above, for this additional assignment.

E.   <u>Report Pay.</u>

1.   Each workday an Employee is required to report to work and does report to work, he/she will be provided with at least half of their scheduled shift up to a maximum of four (4) hours work or any combination of work and pay totaling four (4) hours. If the Employee agrees to report to work a second time in any one workday and does report, he/she will be provided with a minimum of two (2) hours work or any combination of work and pay totaling two (2) hours. If the Facility offers an Employee an assignment other than the regular assignment and the Employee refuses the alternate work no report pay will be paid.

2.   The Employee will not be paid report pay if the Facility makes a reasonable effort to notify the Employee at least two (2) hours prior to the start time that the Employee should not report to work. It shall be the Employee's responsibility to keep his/her current phone number on file with the Facility.

3.   Report pay will not be paid to an Employee who is called back to work from stand-by/on-call status.

4.   The Facility shall not be required to pay report pay if no work is available due to acts of God such as fires, floods, earthquakes, power failure or other causes not within the Facility's control.

F.   <u>Uniforms.</u>

When the Employer requires an Employee to wear a uniform as a condition of employment, such uniform will be provided and maintained by the Employer.

The term "uniform" herein means apparel of distinctive design and/or color (i.e., not white).

G.   <u>Severance Pay.</u>

Severance pay will be provided to a regular full-time and regular part-time Employee whose employment is terminated as a result of a reduction in force provided he/she executes the Facility standard release. The amount of severance pay will be one (1) week of pay per year of service, up to twelve (12) weeks, with a minimum of two (2) weeks pay. Payment will be at the Employee's current base rate and partial years will not be prorated.

H.   <u>Working Out Of Job Classification.</u>

Any employee directed to relieve another employee in a higher paid classification shall receive a 5% increase for all hours worked in the higher classification, except when the employee works one-half (1/2) or more of the shift in the higher classification and then the employee shall receive the 5% increase for the entire shift. Overtime rates shall be calculated on the higher rate for all hours of overtime worked in the higher pay

classification. An employee assigned to relieve another employee in a lower paid classification shall continue to receive their own wage rate, and shall not be reduced to the lower wage rate.

I.    New Classifications And Job Descriptions.

1.    In the event that the Employer wishes to establish a new job classification in the bargaining unit, the Employer and the Union will meet and negotiate over rate of pay and job duties, prior to the Employer implementing the job. The parties will make a good faith effort to reach a settlement. If the parties are unable to reach agreement, the Employer may implement and the Union, within fifteen days, may submit the dispute to expedited arbitration for final and binding resolution. Any monetary remedy resulting in a higher rate of pay for employees shall be paid retroactively to the start of the job or the start date of each individual employee in the new position.

2.    The Employer shall maintain and review job descriptions for all classifications which will be timely remitted to the Union.

3.    Upon request to the Human Resources Director, or designee, the Employer shall provide the Union (including either a Union representative or a shop steward) with any existing job description and/or individual position descriptions, for covered employees. These shall be mailed and made available to the Union within five (5) calendar days of any such request.

J.    Bilingual Services.

To the extent the Employer requires bargaining unit employees to provide medical translation to those who are not proficient in English, only employees who have been certified as medical translators will be required to provide such service. Medical translation, for purposes of this provision, is defined as: (1) obtaining informed consent; (2) obtaining medical history; (3) obtaining or providing information related to diagnosis; (4) providing discharge instructions; and (5) translating written patient educational and instructional materials of a medical nature. Nothing herein shall prohibit the Employer from requiring an employee to provide non-medical translation. An employee who provides translation services shall be held harmless for any legal or other adverse action arising from an unintentional misrepresentation as a result of such services.

K.    Miscellaneous

1.    Per diem wage rates shall beas provided on the hiring grid set forth in Appendix E.

2.    In the event per diem employees are utilized by the Employer, and are not covered by an established "per diem" wage rate in Appendix E, the parties shall meet to determine the wage rate.

L.    <u>Nursing Department In-House Registry Program (IHR).</u>

1.    A benefited full-time, part-time, or per diem Employee, completing his/her probationary period who is eligible for IHR as detailed in the IHR policy may participate in the Southern California Hospital at Culver City IHR. IHR direct patient care hours worked will be paid one and one-half (1 1/2) times of the base rate for the first eight (8) hours of the shift and double time for the last four (4) hours of the shift when the Employee has met the following criteria:

a.    A total of seventy-two (72) productive hours of work or six (6) productive shifts must be completed in a pay period to be eligible for IHR pay for any additional shift.

b.    If any unscheduled absence at any time during the pay period occurs, IHR will not be paid for any shifts in that pay period.

c.    If the IHR shift falls on one of the observed holidays listed in Article 16, then no holiday differential will be paid.

d.    Qualifications, competency and certifications to work in the designated unit without additional orientation.

2.    Productive hours/shifts are understood to be only those hours/shifts spent in direct patient care.

3.    IHR pay will not convert back to regular pay if absence is due to pre-granted vacation days or cancellation made by the staffing office of regular scheduled work days.

4.    Cancellation by the Employee of a confirmed IHR shift less than two (2) hours prior to the start of the shift will be considered as an unexcused absence.

5.    Any and all incentives offered for IHR will be forfeited if the employee calls off during a regularly scheduled shift in the same pay period.

M.    <u>Modification Of Practices.</u>

There shall be no individual bargaining with employees over wages, hours and working conditions. Where the Agreement explicitly allows employee agreement, it shall not be coercive. If requested, by either party, the parties agree to discuss modifications or improvements to terms and conditions of current practices.

## **ARTICLE 14. MINIMUM RATES**

All wage rates, benefits and other economic provisions of this Agreement establish minimums, and nothing herein shall be deemed or construed to limit the Facility's right to increase wage rates, benefits, premiums and differentials, and to pay other extra compensation at the Facility's discretion in excess of those provided by this Agreement. Accordingly, it is also

understood that any such increases shall be over and above the economic package negotiated under Article 13. Before taking any action, the Facility shall notify the Union and meet and confer over the proposed change,

## ARTICLE 15. STANDARD BENEFIT PLANS

Employees shall be eligible to participate in the Employer's Standard Benefit Plans, as amended from time to time, on the same terms, conditions and basis as other Facility employees. The Employer shall continue to offer the following core benefit plans during the term of this Agreement: Paid Time Off, medical plan, dental plan, long-term disability plans, life insurance, and 401(k) Plan. The Employer shall continue to maintain a medical insurance option for full-time and part-time employees and their families which will not require any employee payroll contribution. (Note: Cash Plus in its previous format no longer exists, however, the Employer shall continue to maintain the employee dollar pool and prior funded commitments until fully utilized or paid out to the employees.)

In no event shall an employee's contribution toward premiums for elected coverage under the EPO Plan exceed 30% of the total premium cost for such coverage, and such percentage of the premium contribution shall not exceed the percentage paid by other Facility employees for the same coverage.

Employees shall adhere to the appeals process set forth in the applicable plan documents to resolve any dispute regarding insurance coverage and/or benefits.  Such matters shall not be subject to the grievance/arbitration procedure in this Agreement.

The Employer shall offer informational sessions to bargaining unit members regarding their healthcare coverage options at the outset of the open enrollment process. These sessions shall include the following information: a description and comparison of the plans and how to utilize the plans.

## ARTICLE 16. HOLIDAYS

A.      Holiday Pay and Working on Holidays.

Employees working the following holidays will be paid a premium rate of one and one-half (1 1/2) times the regular rate of pay:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

B.      Definition of Premium Pay Holiday Hours.

Employees working a shift on which 50% or more of hours fall on an actual holiday listed in Section A shall be paid time and one-half (1 1/2) of their base rate for all hours worked

on that shift, Premium pay only shall apply to the actual holiday and shall not apply to any other day on which a holiday is "observed" by closure of an administrative department.

C.     Scheduled Off on Holidays.

Each Department Director, in conjunction with Administration, will determine the appropriateness of closing the department(s), or if volume allows, operate on a reduced schedule. Employees who are scheduled off for the holiday due to pre-approved time off, low volume, or department closure may choose to use accrued Paid Time Off.

D.     Credit for Working Holidays.

1.     Once the assigned holidays are posted, Employees are free to individually trade or find a replacement. The Employee who works on the holiday will be credited as having worked the holiday.

2.     If an Employee is called-off/flexed-off by the Facility on the holiday, she/he will be credited as having worked the holiday.

3.     If an Employee calls in sick on an assigned holiday, she/he will not be credited as having worked the holiday.

E.     Miscellaneous.

In addition to these six (6) Holidays, there may be other days during the year (such as, but not limited to, the day after Thanksgiving) when it may be determined by the Department Director and Administration to close a department or operate with a minimal staff. Those who work these other days are not eligible for premium pay. Employees who are scheduled off due to pre-approved time off, low volume, or department closure may choose to use accrued Paid Time Off.

## ARTICLE 17. HEALTH AND SAFETY

A.     General.

The Facility has the obligation to provide a safe and healthy environment for Employees and patients. The Facility shall comply with all applicable federal and California laws and regulations pertaining to occupational and general safety and health standards.

1.     Reporting of Health and Safety Hazards by Employees.

It is the duty of all Employees and Management to comply with health and safety regulations, and if any safety or health hazard is detected by an Employee, the Employee shall promptly report it to the Facility and the Facility shall take prompt positive measures to remedy the situation. The Union shall promptly notify the Facility of any potential health and safety hazards, violations or problems of which it is aware and the Facility shall take prompt positive measures to remedy the situation.

2.    <u>In-Service</u>.

The Facility shall provide regular in-service or other training and information to Employees concerning health and safety.

3.    <u>Hepatitis B Vaccine</u>.

Hepatitis B vaccine shall be make available free of charge and at a covered Employee's request, if the Employee's normal functions include exposure to blood, blood products, bodily fluids, or needle sticks or cuts by other sharp objects that may have patient blood, blood products, or body fluids on them. Such vaccine also will be provided to other Employees, at their request, if their normal functions do not include such exposure, but the Employee has had an on-the-job needle stick or cut, as described.

B.    <u>Joint Health and Safety Committee.</u>

There shall be a Joint Health and Safety Committee of no more than four (4) representatives appointed by the Facility and four (4) representatives appointed by the Union. The Joint Health and Safety Committee will be formed for the purpose of reviewing, discussing and resolving issues related to Health and Safety of concern to the parties.

1.    <u>Compensation:</u> If an Employee committee member is regularly scheduled to work during the time in which the committee meeting is held, the Employee representatives on the Committee shall be compensated at straight-time pay for attendance at Committee meetings up to a maximum of two (2) hours per Employee per meeting. Attendance at committee meetings will be considered "time worked" for all purposes.

2.    <u>Frequency of meetings:</u> Meetings of the Committee shall not be more than once every other month except by mutual agreement.

3.    <u>Dispute Resolution:</u> The Union and the Facility acknowledge that unless mutually agreed, neither shall use this committee for the purpose of collective bargaining. Disputes within the Joint Committee shall not be subject to the Grievance and Arbitration provisions of this Agreement (Article 9). However, nothing in this Agreement shall prevent an Employee, the Union or the Facility from subsequently pursuing an otherwise grievable issue through the Grievance/Arbitration Procedure.

4.    <u>Size of Committee: Chair:</u> There will be a maximum of four (4) bargaining unit employees selected by the Union and four (4) management representatives selected by the Facility irrespective of the number of separate bargaining units represented by the Union. This committee will be chaired by the Facility's director of quality risk management or his/her designee.

C.    <u>Personal Protective Equipment.</u>

Personal protective equipment, as appropriate, will be provided to all Employees.

D.    <u>Communicable Diseases.</u>

The Facility will work to eliminate or minimize Employee exposure to communicable diseases and shall provide information and training to Employees on communicable diseases to which they may have routine workplace exposure. To the extent required by law, the Facility shall make appropriate vaccinations available to employees who are at risk of exposure to infectious agents.

E.    <u>Workplace Violence,</u>

The Facility will maintain a workplace violence prevention policy.

F.    <u>Counseling.</u>

The Facility will make Critical Incident Stress Debriefing (CISD) available to Employees on an as needed basis. CISD is to be used for incidents such as serious physical and/or emotional work injury, work-related death of co-workers, or the suicide of a co-worker.

G.    <u>Physical Exams.</u>

1.    All physical examinations required of an employee in connection with her/his employment, according to the practice of the Employer, shall be given without charge, provided such examination(s) is conducted by a Facility-designated physician or RN. Physical examinations shall include all laboratory and other clinical tests as required by the Facility or the Department of Health Services. All time spent by an employee in such physical examination(s) will be considered as hours worked regardless of whether it occurs during the employee's normal working hours or nonworking hours; however, time spent in a pre-employment physical examination and/or test and time spent in follow-up workers' compensation examinations or treatment will not be compensable.

2.    An examination conducted by any other physician or RN may be acceptable at the Facility's option for purposes of compliance with state law, but in these cases the Facility shall have no financial obligation for such examination(s).

H.    <u>Parking and Security.</u>

The Facility will provide free Employee parking within a reasonable distance of the workplace; the employer will continue its existing parking security deposit policy. The Facility will provide reasonable security for Employees at all times in and around the Facility's premises. After dark and subject to operational needs of the Facility, a security escort to the parking area will be made available at the request of an Employee.

## ARTICLE 18. EDUCATION BENEFITS

A.    <u>Tuition Assistance Benefits.</u>

Tuition assistance shall be available to eligible regular full-time and part-time Employees upon satisfactory completion of pre-approved qualified college or university coursework.

1.   <u>Employees Eligibility</u>.

To be eligible to receive tuition assistance, Employees must satisfy the following requirements:

a.   The Employees must be on the payroll and classified as a regular full-time or part-time Employee at the time of course registration through and including the course completion date.

b.   The Employees must have completed at least six (6) months of continuous service at the Facility at the time of registration.

2.   <u>Qualified Courses</u>.

To be eligible for reimbursement, courses must meet the following requirements:

a.   Courses must be offered by a recognized, accredited educational institution. Satisfactory course completion must result in the award of college credits, certification, or other completion documentation.

b.   Courses must be job-related or part of a degree program that is job-related. Courses taken in preparation for other career opportunities within the Facility may be submitted for consideration.

3.   <u>Participation Requirements</u>.

To receive tuition assistance, an eligible Employee must satisfy the following requirements:

a.   Complete the required tuition reimbursement request form(s) and secure approval from the Department Mead/Director and the Human Resources Representative prior to registering for the requested course.

b.   Submit to Human Resources documentation of successful course completion (a minimum grade of "C" or equivalent) and the associated tuition receipts within three (3) months of course completion. Such documentation shall include an official grade report and actual receipts.

4.   <u>Reimbursement Levels</u>.

a.   Regular full-time and part-time Employees will be reimbursed for the cost of tuition (including class fees, textbooks, enrollment fees, test fees, and laboratory fees) up to six hundred dollars ($600) per year per Employee and up to three hundred dollars ($300) for part-time employees. Unused reimbursement balances shall not accumulate from year to year.

b.      Where the reimbursement provided by the Facility and the amount paid through other sources such as government agencies (e.g., G. I. Bill, etc.) or other educational benefits (i.e., scholarships or grants) exceeds the total cost of tuition, reimbursement will be reduced by the amount in excess of the cost of tuition. If outside financial assistance is obtained, documentation of the outside financial assistance is required before reimbursement by the Facility.

B.    <u>Mandatory In-Service and Educational Classes.</u>

1.      Employees will be compensated as time worked for all in-service meetings designated by the Facility as mandatory.

2.      Except where required for licensure, certification, registration or renewal, the Facility will pay Employees at their base rate of pay (or overtime, if applicable) for all hours spent attending Employer-provided courses required by the Facility in order to retain their current positions. In order to be eligible for payment, eligible Employees must obtain prior written approval from their Director to attend any such course offered at the Facility. If no such course is reasonably available at the Facility, the Employees may with prior written approval attend the course at a nearby facility. No tuition fee will be charged to Employees for such courses.

3.      The Facility will pay Employees at their base rate of pay (or overtime, if applicable) for all hours spent attending courses and will reimburse the Employees for the tuition fee provided such courses are attended by the Employees at the request of their Director and the Employees have obtained prior written approval from their Director to attend such courses.

4.      With respect to Paragraphs 2 and 3, "travel time" to and from such course will be paid in accordance with the requirements of federal and state wage and hour laws.

C.    <u>Joint Training and Education Trust Fund.</u>

The Employer hereby agrees to contribute .22% (twenty two hundredths of one percent) of the collective bargaining unit's annual gross payroll to the SEIU United Healthcare Workers West and Joint Employer Education Fund. Said contribution payments for each year shall be payable no later than February 28th of each year and shall be based on the W-2s for the prior year. In the event of partial years, the Employer shall contribute based on a pro rata basis. The Employer further agrees to be bound by the terms of the Trust Agreement, the Plan Document, and the rules and regulations adopted by the Trustees of the Fund.

## ARTICLE 19. LEAVES OF ABSENCE

The Facility will continue its current leave of absence policies, unless otherwise mutually agreed.

A.    <u>Federal and State Laws Regarding Leaves of Absence.</u>

The Facility will comply with its obligations under federal and state law regarding leaves of absence, including leaves of absence under the Pregnancy Leave Act, California Family Rights Act, the federal Family and Medical Leave Act of 1993, California Workers' Compensation laws, and the federal Uniform Services Employment and Reemployment Act (29 U.S.C. §§ 84301 et seq.).

B.   <u>Union Leave.</u>

Notwithstanding the above, Employee who have been in the employ of the Facility for at least one (1) year may request a Union leave of absence (without pay) in writing at least (30) days prior to the leave commencing. Such leave of absence without pay will not exceed six (6) months. No more than one Employee may take such a leave at any one time, however, such leave will not be unreasonably denied. Should the Facility grant such leave, permission shall be in writing setting forth the date of such leave.

1.   <u>Health Insurance.</u>

Benefits may be continued under the provision of COBRA.

2.   <u>Use of Paid Time Off</u>.

Use of Paid Time Off is not allowed. Union leaves of absence are unpaid.

3.   <u>Accrual of Benefits</u>.

A Union leave of absence will not affect previously accumulated benefits. However, employees taking this type of leave will not accrue benefits while on unpaid leave.

4.   <u>Return to Work</u>.

When an Employee returns to duty in compliance with the authorized leave of absence, such Employee shall be reinstated in the same classification, positions, shift, unit and scheduled hours in which such Employee was employed before his/her absence. If conditions in the Facility have so changed that it would not be feasible to reinstate him/her in such manner, then the Facility will reinstate the Employee to as nearly comparable a position and shift as is reasonable under the circumstances.

If an Employee wishes to return from leave early he/she must give the Facility at least four (4) weeks' notice prior to reinstatement.

C.   <u>Personal Leave of Absence.</u>

An Employee may request a personal leave of absence. Such leave may be granted for reasons other than an employee's own serious health condition or disability or the employee's need to fulfill family obligations relating directly to childbirth, adoption, or placement of a foster child; or to care for a child, spouse, or parent with a serious health

condition. An employee requiring a leave for those reasons should apply for leave under the Family Medical Leave Act or the California Family Rights Act. A personal leave of absence may be granted for up to thirty (30) days, however, such leave may not be used to extend a vacation, or other paid time off. The leave may be extended beyond the initial thirty (30) days at the discretion of the Facility's Department Head/Director and Human Resource Director.

1. <u>Benefit Accrual.</u>

A benefit-eligible Employee on a personal leave of absence will continue to accrue all benefits such as Paid Time Off in accordance with the plan until the Paid Time Off account has been exhausted.

2. <u>Continuation of Health Benefits.</u>

Subject to the terms, conditions and limitations of the applicable benefits plans, health insurance benefits will not be subsidized by the Facility after the end of the month in which the Employee enters a personal leave status. An Employee will become responsible for the full leave of absence cost of these benefits if he/she wishes coverage to continue during such leave.

3. <u>Requests in Writing.</u>

A request for a personal leave of absence must be submitted in writing and must be approved in writing by the Employee's Department Head/Director and Facility Human Resources Department before the leave begins.

D. <u>Return to Work From a Leave.</u>

When an Employee returns to duty in compliance with any authorized leave of absence, such Employee shall be reinstated in the same classification, position, shift, unit and scheduled hours in which such Employee was employed before his/her absence. If conditions in the Facility have so changed and there are circumstances that render an assignment impossible or substantially impracticable, that it would not be feasible to reinstate him/her in such manner, then the Facility will reinstate the Employee to as nearly comparable a position and shift as is reasonable under the circumstances. If an Employee wishes to return from leave early, the Facility may require at least two (2) weeks' notice prior to reinstatement.

E. <u>Medical Disability Leave.</u>

An Employee shall be granted a leave of absence when the Employee is unable to work because of disability or illness, The Employer will grant such leaves according to state and federal law, and this Agreement.

1. The Employee shall be granted leaves of absence for physical or mental disabilities to the extent such leaves are mandated by state and federal law.

2.    Additionally, an Employee shall be granted leaves of absence for physical or mental disabilities for a period of up to six (6) months, where the necessity for such absence has been certified by the Employee's attending physician; such leaves shall be subject to the Return From Leave provisions of Section D., above.

3.    Continuation of Benefits: Subject to the terms, conditions, and limitation of the applicable benefit plans, health insurance benefits will be subsidized by the Facility (as if the Employee were working) up to twelve (12) weeks. An Employee will become responsible for the full leave of absence cost of these benefits if he/she wishes coverage to continue beyond the twelve (12) weeks.

F.    <u>Length of Leaves.</u>

Leaves (whether paid, unpaid, or a combination of paid and unpaid) shall not exceed one year unless:

1.    otherwise required by law;

2.    otherwise provided in this article;

3.    except in the case of Workers' Compensation leaves which will be handled on a case-by-case basis, but in no event shall be less than required by law and no less than that provided for other Medical leaves; and

4.    except in the case of pregnancy disability leave.

G.    <u>Use of Paid Time Off During Leaves</u>

Except as provided in Paragraph 13 of this Article, Employee may use any accumulated Paid Time Off and extended illness benefits, in accordance with Paid Time Off policy, in connection with leaves of absence granted pursuant to this Article. If the Employee elects to utilize paid time off and/or reserve sick benefits during a leave covered by state Workers Compensation or State Disability benefits, such paid time off or accrued reserve sick benefits shall be integrated with the state benefits in order to fully replace the Employee's regular wages, until such benefits are exhausted.

H.    <u>Modified Duty Programs.</u>

1.    In the case of worker compensation injuries, the Employer will provide an Employee with temporary restrictions, a temporary job they can perform with comparable wages, shift and hours in accordance with the Transitional Duty (Modified Duty) Program

2.    Prior to participating in the Transitional Duty (Modified Duty) Program an Employee shall be provided the Transitional Duty (Modified Duty) Program Information.

I.    <u>Bereavement Leave.</u>

In the event of a death in the immediate family, an Employee will be allowed three (3) scheduled days off with pay (to a maximum of twenty-four (24) hours), immediately following the death, to arrange or attend the funeral. Bereavement Leave must be taken within the seven (7) day period following the death.

1.   Immediate Family.

     "Immediate family" is defined as: spouses, parents, children, brothers, sisters, current brothers-and sisters-in-law, fathers- and mothers-in-law, stepparents, stepbrothers, stepsisters, stepchildren, stepgrandchildren, grandparents, spouse's grandparents, grandchildren and registered domestic partners.

2.   Pay.

     The Employee will be paid his/her base hourly rate for each of the scheduled day(s) missed (up to twenty-four 24 hours) and may be required to furnish satisfactory evidence to support the leave.

3.   Use of Paid Time Off.

     At the Facility's discretion, an additional bereavement day(s) may be granted beyond three (3) and may be used from the Employee's accrued Paid Time Off.

4.   Eligibility.

     An eligible Employee may request bereavement leave only after having completed at least ninety (90) calendar days of service.

J.   Jury Duty Leave.

1.   Eligibility.

     Regular full-time Employees and part-time Employees called to jury duty after completing ninety (90) days of employment may be eligible to receive a portion of their hourly base pay for a limited time while serving on jury duty. In the event that a regular full-time Employee cannot be excused or cannot rearrange his/her working schedule to avoid a conflict, the Employee will be paid his/her base daily rate for each full working day missed due to jury duty for a maximum of eighty (80) hours pay within a thirty-six (36) month period, except where otherwise required by law. A part-time Employee may receive up to a maximum of forty (40) hours pay within a thirty-six (36) month period, except as otherwise required by law. Any additional time served on jury duty by the Employee during this period shall be without pay.

2.   Jury Duty Attendance and Work Requirement.

     Evidence of jury duty attendance must be presented to the Facility. The Employee should continue to report for work on those days or parts of days when excused

from jury duty or whenever time spent on jury duty does not match the time regularly scheduled for work.

3. <u>Return to Work</u>.

It is the Employee's responsibility to report for employment at the end of an approved leave (not daily) for jury duty. Failure to do so may result in disciplinary action up to and including termination of employment.

4. <u>Continuation of Benefits</u>.

All Employee benefit accruals and other benefits in which the Employee is enrolled will continue while the Employee is on jury duty leave. The Employee will be required to continue payment of any required contributions for Employee benefits during the jury duty leave.

K. <u>Witness Leave.</u>

An Employee who is required by law to appear in court as witness may take time off without pay for such purpose provided he/she gives the Facility reasonable advance notice, An Employee who appears as a witness at the request of the Facility will receive pay at his/her base rate during such time.

L. <u>Pay and Benefits.</u>

Unless otherwise required by law or otherwise required by this Agreement, leaves of absence under this Article and Agreement shall be unpaid. Employees on leaves of absence other than Union leaves of absence shall be eligible to continue to participate in the Facility's insurance and benefits plans in accordance with the terms and conditions of those plans.

M. <u>Reduction in Force.</u>

If business conditions require a reduction in force, Employees on approved leaves of absence will be considered for layoff under the same terms and conditions as other Employees actively at work.

N. <u>Termination During Leave of Absence.</u>

Unless otherwise required by law, an Employee may be subject to termination during a leave of absence for reasons including but not limited to the following:

1. Failure to keep the Facility informed of changes in medical status if on a medical disability leave, including maternity/pregnancy-related leave.

2. Misrepresentations regarding the reasons for applying for the leave of absence, or any facts related hereto.

O.    Physical Examinations.

The Facility reserves the right to require any Employee on any medical or disability leave, including maternity/pregnancy related leave, to be examined at the Facility's expense by a Facility selected physician prior to his/her return to work.

## ARTICLE 20. JOB SECURITY

**Successorship Protection**

In the event of sale or transfer of control of the Facility, the Employer, Southern California Hospital at Culver City shall, within a reasonable period of time but not less than twenty-one (21) days of the effective date of the sale or transfer, provide the Union with the new employer's or entity's name, address and designated representative. Prior to the sale or transfer, the Employer shall inform the new owner and/or employer or entity of the existence of this Agreement and of its terms and conditions; shall require the new owner, employer or entity to retain all or substantially all of the bargaining unit employees, recognize the Union as the collective bargaining representative and to assume any existing collective bargaining agreement. The parties agree that compliance with this Article shall constitute full satisfaction of any and all obligations to bargain regarding such sale or transfer, and the Employer and the Facility shall have no further obligation to the Union with respect to a sale or transfer of control of the Facility.

## ARTICLE 21. MANAGEMENT RIGHTS

Subject to the laws and regulations governing the healthcare industry, the Facility retains, solely and exclusively, all the rights, powers and authority exercised or possessed by it prior to the execution of this Agreement, except as expressly limited, delegated or deleted by a specific provision of this Agreement. Without limiting the generality of the foregoing, the rights, powers and authority retained solely and exclusively by the Facility and not abridged by this Agreement include, but are not limited to, the following: (i) to manage, direct and maintain the efficiency of its business and personnel; (ii) to manage and control its departments, buildings, facilities, equipment and operations; (iii) to create, change, combine or abolish jobs, departments and facilities in whole or in part; (iv) to discontinue work for business, economic, medical or operational reasons; (v) to utilize personnel from nursing registries or other temporary help agencies; (vi) to direct the work force; (vii) to increase or decrease the work force; (viii) to determine staffing patterns, deployment and levels and the number of Employees needed, provided that the Facility adheres to the regulations set forth in Title XXII; (ix) to lay off Employees; (x) to hire, transfer and promote Employees; (xi) to demote, suspend, discipline and discharge Employees; (xii) to maintain the discipline and efficiency of its Employees; (xiii) to establish work standards and schedules of operations; (xiv) to specify or assign work requirements and overtime; (xv) to assign work and decide which Employees are qualified to perform such work; (xvi) to determine working hours, shift assignments, and days off; (xvii) to adopt rules of conduct, appearance and safety, and penalties for violations thereof; (xviii) to determine the type and scope of work to be performed and for the services to be provided to patients; (xix) to determine whether work will be assigned to bargaining unit Employees or other Employees; (xx) to determine the methods, processes, means and places of providing service to patients; (xxi) to determine the quality of patient services and require Employees to comply with all such quality standards;; (xxii)

to acquire and dispose of equipment and facilities; (xxiii) to determine the places where work will be performed; (xxiv) to hire temporary Employees for designated periods of time; (xxv) to pay wages and benefits in excess of those required by this Agreement; (xxvi) to effect technological changes in its equipment and operations; and (xxvii) to sell, close, or dispose of all or part of the Facility. The Facility's failure to exercise any right, prerogative, or function hereby reserved to it or the Facility's exercise of any such right, prerogative, or function in a particular way, shall not be considered a waiver of the Facility's right to exercise such right, prerogative, or function, or preclude it from exercising the same in some other way not in conflict with the express provisions of this Agreement.

## ARTICLE 22. SUBCONTRACTING

The Employer has no current intention to subcontract bargaining unit work during the term of this Agreement. It is understood that the Employer is in a turnaround situation. The Employer is looking for ways to improve the financial condition of the Facility. The Employer agrees that it will not subcontract bargaining unit work during the term of this contract except by mutual agreement between the Employer and the Union and the and the Union agrees it will reasonably consider any request to sub-contract bargaining unit work.

The Employer will, upon request, discuss the possibility of bringing currently subcontracted work into the bargaining unit.

## ARTICLE 23. UNION SECURITY

A.   Union Membership as a Condition of Employment.

All employees of the Facility covered by this Agreement as of the date of the execution shall, as a condition of continued employment with the Facility, become and remain members in good standing of the Union not later than the thirty-first (31st) day following the date of the execution of this Agreement by tendering payment of the initiation fee to the Union and continuing their payment of periodic union dues uniformly required.

As a condition of employment all employees hired on or after the effective date of this Agreement shall, on the thirty-first (31st) day following the beginning of such employment, become and remain members in good standing of the Union and tender to the Union the initiation fees and periodic dues that are the obligations of members.

The Employer will provide all new hire employees who are hired into the bargaining unit with the Union Membership Application/Payroll Deduction Form in the same manner that the Employer provides all other documents to new hire employees for processing of employment.

B.   Failure to Make Required Payments.

The Union shall notify the Facility and the affected employee in writing of an Employee's failure to comply with the provisions of this Article and shall afford each such employee fifteen (15) work days, after the Employee has been mailed such notice at his/her last known address, in which to comply.

If said Employee does not comply with the provisions of this Article within the ten (10) day period following actual notice, the employee shall be promptly terminated upon written notice of such fact from the Union to the Facility.

C.     Deduction and Remittance of Union Initiation Fees and Dues.

Upon receipt of an individual, voluntary, written, and un-revoked check-off authorization form which has been signed by an employee in the bargaining unit covered by this Agreement, the Facility shall deduct from the pay of such Employee during the first pay period of each calendar month a sum equal to the employee's union initiation fees or monthly membership dues, uniformly required, and only so long as such employee was employed by the Facility at the time such obligation became due.

The Facility shall promptly remit to the Union the sums which are deducted under this Section, together with a list on hard copy and a disk or electronically (on Excel, ASCII delimited text, or another compatible format) showing the following information for Union members: their names, Social Security number, home address and phone number (as provided by the employee), classification, regular wage rate, regular hours worked during the period, regular earnings during the period, department, status (e.g. regular full-time, regular part-time, limited part-time, on call, casual, per diem, or temporary), and date of hire.

The Union shall indemnify the Facility and hold it harmless against any and all suits, claims, demands and liabilities that arise out of, or by reason of, any action that shall be taken by the Facility for the purpose of complying with the foregoing provisions of this Article.

The Facility will honor written assignment of wages to the Union's Committee on Political Education (C.O.P.E.) fund, where such assignments are submitted in a form agreed to by the Facility and the Union, and will remit such contributions to the Union.

## ARTICLE 24. WORK STOPPAGE

During the term of this Agreement, neither the Union nor its agents or representatives, shall participate in any strike, sympathy strike, work stoppage, sitdown, boycott, sick out or slow down, or any interference of goods to or from the Facility's premises.

The Facility agrees that there shall be no lockout during the term of this Agreement. As used herein, the term "lockout" shall not include the closing down or curtailment of operations or layoffs due to economic conditions, business or operational reasons, natural disaster, or reasons beyond the Facility's control.

If a violation of this Article should occur, the Union shall immediately do everything in its power to terminate the violation of the contract.

## ARTICLE 25. NOTICES

Notices by the Union to the Facility shall be mailed, by certified mail, return receipt requested, or delivered to the following address:

Chief Executive Officer
Southern California Hospital at Culver City
3828 Delmas Terrace
Culver City, CA 90231

Copies shall also be mailed, by certified mail, return receipt requested, or delivered to the Chief Operating Officer and Human Resources Director at the address listed above. Notices by the Facility to the Union shall be mailed, by certified mail, return receipt requested, or delivered to the following address:

President
SEIU-United Healthcare Workers-West
5480 Ferguson Drive
Los Angeles, CA 90022

## ARTICLE 26. SAVINGS CLAUSE

If any provision of this Agreement is held to be in conflict with any State or Federal law, or if compliance with or enforcement of any provision is restrained, the remainder of this Agreement shall remain in full force and effect.

## ARTICLE 27. ENTIRE AGREEMENT

The parties agree that this Agreement constitutes the entire contract between them governing wages, hours and conditions of employment of bargaining unit Employees covered during the term hereof, and settles all demands and issues on all matters subject to the Collective Bargaining Agreement.

Accordingly, except for statutory rights to bargain over the impact or effects of events that arise during the term of the Agreement, and except for the bargaining process for a successor agreement, the Union and the Facility will not demand to re-negotiate any subject matter contained in this Agreement or to negotiate whether new subject matter should be included in this Agreement during its term.

Additionally, nothing in this Article prevents the parties from mutually agreeing to meet and discuss issues, and to enter into mutual agreements on significant matters.

## ARTICLE 28. EMPLOYMENT AND INCOME SECURITY

A.      Acknowledgement.

The parties acknowledge the common goal of providing employment and income security to employees. As such, it is the intent of the parties to avoid displacement of employees, but recognize there are circumstances where avoiding displacement cannot be achieved.

The parties acknowledge a mutual intention to make use of attrition, business growth, job matching, retraining and/or other mutually agreed upon mechanisms to accomplish this goal. The Employer will make every effort to maintain employment and income security and to avoid displacing employees, i.e., reductions in force, reduction in hours, daily cancellations and job elimination on a temporary, indefinite, or permanent basis.

B.    Joint Consideration.

Issues regarding job security, retention and recruitment shall be jointly considered by the parties, and the Employer will implement mutually agreeable programs to address these issues, when necessary and feasible, including the following:

1.    Identifying current and anticipated vacancies;

2.    Projecting changes in the delivery of healthcare at each Hospital;

3.    Identifying voluntary retraining opportunities for employees at the Hospital;

4.    Identifying creative retention programs such as one that contemplates the identification of transferable skills of employees to voluntarily work in classifications other than their own to avoid daily cancellations;

5.    Identifying voluntary cross-training opportunities to minimize involuntary daily cancellations;

6.    Identify systems to support effective reassignment processes such as float pools, cross-training programs, employee lists by competencies;

7.    Identifying new and creative recruitment sources;

8.    Other opportunities to enhance recruitment, retention and retraining;

9.    Impact on the workforce as a result of business changes that would result in closures, consolidations or shared service entities.

## ARTICLE 29. BARGAINING UNIT WORK

A.    Supervisory Employees.

The Employer recognizes the fact that bona fide supervisory employees (pursuant to NLRB definition) are only those who have the authority to hire, promote, discipline, discharge, or otherwise effect changes in the status of employees or effectively recommend such action. The Employer shall not establish jobs or job titles for the purpose of excluding work or employees from the bargaining unit as established in this Article of the Agreement and

shall not hire or utilize existing supervisors to perform bargaining unit work. Supervisory employees will not perform duties normally performed by employees falling within the scope of this Agreement except for emergencies requiring immediate action, or under circumstances that are beyond the control of the Employer, or for training situations where the performance of bargaining unit work may be required, but is limited and minimal, or where necessity to maintain competencies may be required, but is limited and minimal, or in an emergency and/or a situation where the delivery of health care services or important operations could be compromised and it would be necessary for a supervisor to assist until an appropriate bargaining unit employee is available.

B.   <u>Exception for Charge RNs.</u>

Notwithstanding Paragraph 1, above, the parties have agreed that Charge RNs shall be allowed to continue performing bargaining unit work, as they have in the past and pursuant to past practice.

C.   <u>Special Programs.</u>

1.   The Employer agrees that programs such as JTPA, Developmentally Disabled Programs, volunteers, students, student interns or other student programs and summer youth programs shall not be utilized to displace bargaining unit employees, or to till positions previously occupied by bargaining unit employees, nor shall they be used to reduce or limit hours of work for bargaining unit employees.

2.   The Employer shall notify the Union upon commencement of JTPA, Developmentally Disabled Programs, volunteers, student interns or other student programs and summer youth programs including the number of participants, their classification, duties, work location, hours per week, and the duration of the program. Information including the number of participants, their classification, duties, work locations, hours per week, and the duration of the program shall be furnished to the Union at any time, upon request.

## <u>ARTICLE 30. TERM</u>

The Agreement is effective as of February 23, 2018 and shall continue in full force and effect for a 3-year period following the effective date, expiring at 11:59 pm on February 22, 2021. This Agreement shall be automatically renewed and extended from year to year and thereafter without addition, change or amendment, unless either party serves notice in writing to the other party not less than ninety (90) days before the end of the term of its desire to terminate, change, amend or add to this Agreement.

The elections, described herein, were certified on the following dates:

| Bargaining Unit | Date Certified |
| --- | --- |
| Service, Maintenance and Tech | 5/16/03 |
| BOC: | 8/25/03 |
| Professional | 8/18/03 |

The service, maintenance, technical and Business Office Clerical employees, as set forth in Article one (1), are combined into a single unit by agreement of the parties. However, the Professional unit, although covered by the same contract as this combined unit, remains a separate bargaining unit, and in the future either party has the option to bargain separately regarding such unit.

This Agreement has been executed as of effective February ___, 2018.

**For the Employer:**

**SOUTHERN CALIFORNIA HOSPITAL AT CULVER CITY**

By:_____
    [TBD]

**For the Union:**

**SEIU UNITED HEALTHCARE WORKERS-WEST**

By:_____
    Dave Regan
    President

By:_____
    Stan Lyles
    Vice President

By:_____
    Jason Capell, Chief Negotiator
    Hospital Division

By:_____
    Chokri Bensaid
    Hospital Division Director

By:_____
    Floyd Jones
    Bargaining Committee Member

By:_____
    Ja Narain
    Bargaining Committee Member

By:_____
    Jamila Holmes
    Bargaining Committee Member

By:_____
    Chris Bronson
    Bargaining Committee Member

By:_____
    Jerry Kringen
    Bargaining Committee Member

By:_____
    Ana Alvarenga
    Bargaining Committee Member

By:_____
    Anton Abilevich
    Bargaining Committee Member

## APPENDIX A          JOB & WAGE PLACEMENT ISSUES WAGE RATES OF PAY

A.    <u>Pay Rate Upon Promotion.</u>

     1.    A promotion is defined as a change in classification or classification level to a higher rated position in which the minimum of the rate range of the new classification exceeds the minimum of the employee's current classification. A promotion must always result in an increase of pay of at least 5% or to the classification minimum whichever is greater. Incumbent employees, similarly situated within the job classification will not be brought up automatically to the promoted employees wage rate based on the 5% promotion increase.

     2.    Pay raises to promoted employees referenced in this Appendix shall be effective on the date the promoted employee assumes the duties of the new classification.

B.    <u>Non-Contractual Wage Increases.</u>

     1.    Pay rate adjustments provided for in this Agreement are intended by the Employer and the Union to replace traditional annual employee merit based increases. Therefore the practice of paying such increases will cease upon the initial effective date of contractual wage across the board (and longevity, if applicable) increases in this Agreement.

     2.    Additionally, employee evaluations shall not have any effect or cause a change to the compensation rates of employees.

C.    <u>Job Classifications and Reclassifications.</u>

     The right to determine job content and to make necessary changes to jobs and job descriptions remains with the Employer. The Employer shall timely notify the Union of all meaningful changes to job content and responsibilities. In the event an Employee believes his or her job is inaccurately described or that it has changed and, as a result of that change, should be upgraded, the employee may appeal such rating and seek an upgrade by bringing such claim to the attention of his/her supervisor. If a satisfactory resolution is not forthcoming at that level, the matter may be appealed by the union through the grievance procedure and, if necessary, to arbitration. In the event it is determined that a wage increase is in order, the adjustment shall be retroactive to the implementation date of the subject job changes.

## <u>APPENDIX B</u>      <u>DEPARTMENT DEFINITIONS</u>

A.   <u>For the purpose of Article 4 - Seniority, Regarding Bidding for Job Vacancies, Force Reduction and Bumping: The following Departments will be considered:</u>

     a.   Nursing: Emergency Room, SICU, CCU, SDU, Medical-Surgical/Telemetry, BHU, Detox, Acute Rehab, Transitional Care Unit, Sub-Acute Unit, OB-Maternal/Child Health.

     b.   Perioperative: OR, PACU, ACU, G.I. Lab, X-Ray Holding.

     c.   Imaging Services: Radiology, Nuclear Medicine, Ultrasound, CT, MRI, EKG, ECHO, Vascular and Cath Lab.

     d.   Laboratory: Clinical Laboratory, Pathology.

     e.   Materials Management and Central Supply.

     f.   Cardio-Pulmonary: Respiratory, EEG, PFT.

     g.   Admitting Patient Registration, PBX.

     h.   Health Information Management: (formerly known as Medical Records).

     i.   Pharmacy.

     j.   Rehab Services: Occupational Therapy, Physical Therapy, Speech Therapy, Audiology.

     k.   Social Services.

     I.   Utilization Management.

     m.   Spine Clinic.

     l.   Grounds Keeping.

     m.   Mail Room.

     n.   Transportation.

Other Department groupings or proposed or future changes to be determined or agreed to by the parties.

## APPENDIX C        LETTER OF AGREEMENT

The parties agree as follows:

A.     On a monthly basis, no later than the tenth (10th) of the month, the Employer will provide the Union with a list of deletions and additions to the bargaining unit in the previous month and the effective dates thereof. The list will be provided on hard copy and a disk or electronically (on Excel, ASCII delimited text, or another compatible format) showing the following information for such Employees: name, social security number, classification, department, status, telephone numbers (including cell phone and paper), and date of hire. Addresses will be provided for new hires and transfers into the bargaining unit.

B.     The Union shall indemnify the Employer and hold it harmless against any and all suits, claims, demands and liabilities that arise out of, or by reason of, any action taken by Employer in providing the Union with the information set forth in Paragraph B above or otherwise complying with said paragraph.

C.     In connection with new Employee orientation sessions, the Employer agrees as follows:

   1.     The Employer will allow a Union steward up to thirty (30) minutes during the general part of the Employer's orientation program for new Employees to discuss the Union and the terms of the collective bargaining agreement. Such time will normally be scheduled immediately prior to the lunch break, or as the final item on the orientation program agenda.

   2.     In connection with Paragraph C.1. above, the Union steward shall be released from work without loss of pay to participate provided that patient care permits. Where such orientation program is regularly scheduled such release should normally occur.

   3.     The Employer will distribute the items described below along with other orientation materials provided to new Employee in the bargaining units represented by the Union subject to timely prior receipt of such materials from the Union:

      a.     Copy of the applicable collective bargaining agreement.

      b.     Copy of a Union membership application and dues authorization card.

      c.     List of Union stewards, prepared by the Union, showing their departments and/or work areas and telephone numbers.

## <u>APPENDIX D   BARGAINING UNIT JOB TITLES AND CLASSIFICATIONS</u>

The following job titles and classifications are part of the bargaining unit:

Aide — Anesthesia
Aide — Physical Therapy
Assistant — Nursing
Assistant -- Surgical Nursing
Asst Laboratory
Asst Nurse Staffing
Asst — Occupational Therapy
Asst — Pathology
Asst Physical Therapy
Buyer
Case Manager — BHU
Case Manager LVN
Case Manager — O.T.
Clerk- Discharge Planning
Clerk — File
Clerk — Mailroom
Clerk — Warehouse
Coder I, Coder II, Coder III, Coder ER
Coord — Activity
Coord Admitting/Intake
Coord — Clinical
Coord — Discharge
Coord — ER Charges
Coord — Intake
Coord — Surgical Materials
Counselor — Behavioral Health
Discharge Planner
EMT
Financial Counselor / Insurance Verifier
Grounds-Keeper
Lead — CT Tech
Lead — Patient Access Rep
Lead — Pharmacy Tech
Lead Radiology Tech
LPT
LVN
Mental Health Tech
Operator PBX
Patient Access Rep (formerly known as Admitting Rep)
Patient Access Rep (Per Diem)
Pharmacist — Clinical
Phlebotomist (CPT)

Program Assistant
Scheduler — Surgery
Secretary — Department
Secretary — Radiology
Secretary — Unit
Secretary Lead -- Radiology
Social Worker
Social Worker - LCSW
Spine & Neurodiag Clin Coord
Supervisor Resident Assess
Tech — Cardiac Cath
Tech — Central Service
Tech — CT
Tech — Echo
Tech — EKG
Tech — Health Information
Tech — Laboratory
Tech — Med (C LS)
Tech - Monitor
Tech — MRI
Tech — Nuclear Medicine
Tech — Pharmacy
Tech — Radiology I
Tech — Radiology II
Tech — Surgical
Tech — Ultrasound
Tech — Vascular
Therapist — Art
Therapist — Drama
Therapist — Occupational
Therapist -• Outpatient Program
Therapist — Physical
Therapist — Recreational
Therapist — Respiratory
Therapist — Respiratory Sr.
Therapist — Speech
Transport/Courier
Transport/Courier — Senior
Transport/Dispatcher
Utilization Review — Specialist/Coordinator

## IN HOUSE REGISTRY POLICY - RESPIRATORY THERAPY DEPARTMENT

PURPOSE:

To provide incentive pay for additional hours worked by eligible Respiratory Therapists (RT) on their regularly scheduled days off,

POLICY:

Eligible employees will receive a pay differential for working extra shifts on their regularly scheduled days off (hereinafter referred to as "registry hours").

ELIGIBILITY:

Employees (full-time, part-time, and per diem) must meet at least the following minimum conditions in order to be eligible for the In-House Registry (IHR) program:

1.     Participants must fulfill their scheduled staffing requirements in the pay period to be eligible for IHR pay for additional shifts. For example, a full-time RT who normally works six shifts would need to work six (6) shifts during the pay period to receive IHR pay for any additional shifts worked in the same pay period.

2.     If an Employee has an unscheduled absence during the pay period, but then completes his/her regularly scheduled number of shifts and works additional shifts, the additional shifts would be eligible for IHR pay as long as the employee is in compliance with Southern California Hospital at Culver City's attendance policy.

3.     Full-time, part-time, and per diem RTs who work in excess of 72 hours in the pay period would be eligible for IHR pay.

4.     Employees must have completed their 3 month introductory period at Southern California Hospital at Culver City to participate in the In House Registry Program.

5.     The Employee must have a current BLS and required Certifications, as well as have completed the required competencies for Units worked.

6.     The Employee must maintain qualifications and competency to work in designated unit without additional orientation.

7.     The Employee must maintain an overall "Meets Standard" or above rating on his/her Annual Performance Appraisal.

8.     If the Employee is called/flexed off, the day will be considered as a "regular day worked" for IHR eligibility purposes.

GENERAL:

1.      The benefits package is not a feature of the IHR program, and hours worked in the in-house registry program will not affect the Employee's status for benefits except as required by law.

2.      An Employee's participation in the in-house registry program does not affect the work week and/or pay period applicable to that Employee.

3.      Cancellation of a confirmed registry shift less than two (2) hours prior to the start of the shift will be considered as an unscheduled absence for attendance tracking purposes.

PAY DIFFERENTIAL APPLICABLE TO REGISTRY HOURS:

1.      Participants will be paid pay IHR incentive pay for registry hours worked as follows:

2.      Time and one half (I 1/2) for the first eight (8) hours of the shift and double time for the last four (4) hours of the additional shifts worked.

3.      Shift differential may also be paid for registry hours worked in accordance with the Facility's policies regarding such shift differentials.

4.      If the 1HR shift falls on one of the Facility-observed holidays, then no holiday differential pay will be paid.

5.      Any participant who is required to work in excess of 12 hours must obtain prior authorization from his/her Director.

6.      Seniority and competencies shall be considered in making decisions regarding eligibility for IHR hours.

7.      Nothing in this policy, the accompanying procedures or in any oral or written communication regarding the in-house registry program is a contract of employment.

8.      Nothing in this or any other policy, guideline or procedure entitles any Employee to a regular or any other schedule of hours.

PROCEDURES:

1.      Participants must notify the Department Director of their availability for IHR shifts.

2.      Confirmation of a registry shift will take place as much in advance as possible but final confirmation may occur up to two (2) hours before the beginning of the shift to be worked,

      a.      In-house registry staff will be "confirmed" if needed to work.

3.      HR shifts will be coded as such in the computer system.

Exhibit U, Page 432

## ATTACHMENT 1 SIDE LETTER RE EMPLOYEE RETENTION COMMITTEE

The parties agree that the retention of skilled, experienced employees is crucial to providing the highest quality patient care. Toward that end, the parties agree on the advisability of developing mechanisms to accomplish that goal. Employees may form an Employee Retention Committee for the purpose of constructively recommending proactive programs to retain skilled employees, including compensation programs designed to eliminate wage inequities and ensure a proper relationship between experience, seniority, and wage levels. The SEW field representatives will also participate in the Committee. Upon SEIU-UHW's request, the Facility shall schedule mutually convenient meetings (not to exceed one per month) between the Employee Retention Committee and appropriate local management. Employees shall be paid their base wage rate for attending such meetings, for at least three (3) but no more than one (1) employee for each one hundred (100) full and part-time employees in each bargaining unit in the Facility, provided that that the meetings shall not exceed two (2) hours per month except by mutual agreement. Proposals advanced by this committee may be adopted by mutual agreement between SEIU-UHW and Southern California Hospital at Culver City Facility management.

**ATTACHMENT 2 SIDE LETTER RE FACILITY MEALS**

1. The Employer shall continue to provide, free of charge, annual holiday and event meals including beverages to employees working at midnight the night before Thanksgiving Day and Christmas Day, and for those working during the regular lunch and dinner meal service on Thanksgiving Day and Christmas Day, and for any other holiday, celebration, recognition event, or individual reward meals previously provided to employees.

2. Provided continuation of current meal costs, the Employer shall continue its current practice of providing all employees with the same meal discount as provided at the time the Agreement is effective.

# EXHIBIT "V"

# EXHIBIT "V"

Employer Package Proposal – 3/4/2021

## Employer withdraws the following and agrees to maintain current contract language:

Reduction in Force (4.C.6. and 4.C.7)
(New Language) Block Staffing Schedule
Weekend Scheduling (11.G.)
Holiday Scheduling (11.H.)
Call-In Procedure (11.K.) and (11.L.3.)
In House Registry (13.L.1.A.)

> Nursing Department In-House Registry Program (IHR).
>
> a.  A total of **seventy-two** (72) productive hours of work or six (6) productive shifts must be completed in a pay period to be eligible for IHR pay for any additional shift.

## Employer accepts the following union proposals of 2/19/2021:

Union withdraws the following:

### New Language: No Variable Shifts

> There shall be no variable shift schedules permitted under this agreement.

Union to accept employer proposal:

### Posting of Vacancies (5.A.)

A.  Posting of Vacancies.

When a vacancy subject to this Agreement occurs in any department, a notice of that vacancy shall be posted electronically on the employer's career website for a minimum period of five (5) calendar days before the Employer fills the vacancy on a permanent basis. Qualifications for vacant positions shall appear on position postings. Postings shall include the hours, shift, wage rate or range, days off (if fixed), and whether the days off are fixed or variable and primary assignment and work duties (where applicable). This does not prevent the Employer from filling the vacancy on a temporary basis until such position is filled.

### Article 11

B.  Work Schedules and Posting

1.  The Facility will post work schedules at least ten (10) calendar days in advance of their commencement dates and such schedules will cover a minimum period of four (4) weeks.

2.  As an exception to a. above, a department/unit that permits self-scheduling in accordance with c., below will attempt to post work schedules at least ten (10) calendar

Page 1 of 4

days in advance of their commencement dates and such schedules will cover a minimum period of four (4) weeks.

## Article 12 (Floating as follows with all other language remaining the same):

A.  Floating Conditions: Floating shall be subject to the following conditions and limitations:

 1.  Fully qualified Employees may be floated to a different department or unit provided the Employee has received orientation in that department or unit by completing the departmental and classification specific orientation checklist and has demonstrated current competence in providing care to patients in that department or unit. In the event an Employee with limited qualifications is floated to another department or unit to assist other qualified Employees, they will be oriented and limited to performing only those tasks they are qualified and competent to perform.

 2.  Within 90 days of the ratification of this agreement the parties shall meet to discuss departmental and classification specific orientation checklists for all departments and classifications.

B.  Floating Records:

The Employer will maintain competency validation, float orientation checklist, and other such relevant float documentation. Float rotation lists will be maintained and will be available for inspection by affected Employees in the Unit and job classification. Information in this paragraph shall be made available and provided to the Union upon request.

G.  Floating Clusters:

The Employer will float Employees according to the agreed upon clusters, and floating inconsistent with such clusters shall be voluntary, except in the event of an emergency.

Any changes in the clusters shall be made only by mutual agreement with the Union. The floating clusters are as follows:

 i.  **Licensed Vocational Nurses (LVNs)**

 ▪ Med/Surg and Telemetry LVNs
 Float to Psych, Acute Rehab Unit (ARU), Telemetry, Med/Surg, and Chem. Depend.

 ▪ Psych LVNs
 Float to Med/Surg and Chem. Depend.

 ▪ Chem. Depend. LVNs
 Float to Psych, Med/Surg, and ARU

**Union to withdraw:**

**Work Schedules and Posting (11.F.3.) \***

3.    Wherever applicable, the Facility shall continue its existing practice(s) of permitting Employees to self-schedule on a department/unit-by department/unit basis. The respective department Director or his/her designee will consider and make a reasonable effort to grant Employees' self-scheduling requests, provided such requests are submitted in a timely way and that they are consistent with departmental/unit needs and the operating requirements of the Facility. Upon ratification of this agreement the employer shall permit self-scheduling in the Pharmacy department.

TA 3/4/21
For the union!

TA 4/30/21

## 4/29/21 Employer Response @ 8:39pm to #2 Union Proposal @ 6:15pm

### Union Proposal, Article 2 (Union Representation)

The Union shall provide the Facility with a written list of Union stewards after their designation, and shall notify the Facility of changes as they occur. The Union shall designate one steward as Chief Steward. Prior to the Facility's receipt of such Union designation, the Facility is not obligated to recognize a Union steward under this Article.

The functions of the Union steward include the authority (l) to settle or assist in settling problems arising in connection with the application or interpretation of the agreement, (2) to resolve grievances at Step 1 or 2 of the grievance procedure and (3) to serve as a Union representative for Weingarten meetings.

Union Stewards shall perform their functions or Union related activities on their own time. However, if a meeting is mutually agreed to with the Union steward during the steward's work shift, that time will be paid for by the Facility. If the Union Steward wishes to schedule a meeting with employees during the union steward's work shift, unpaid leave time shall not be unreasonably denied. **Four (4) hours** of paid time per month may be used for Union related business (including, but not limited to, attendance at monthly steward meetings) for each shop steward up to a maximum of **twelve (12)** shop stewards. Five (5) business days advance notice must be provided to the Chief Human Resources Officer of the Employer by either the Chief Union Steward or Union Staff Representative for such release time. Should a steward not utilize the full four (4) hours per month, the steward will not be permitted to "carry over" unused hours into the following month.

Union Stewards shall not direct any employees as to how to perform or not perform his/her work, shall not countermand the order of any supervisor, and shall not interfere with the normal operations of the Facility or any employee.

### Union Proposal Article 13: Compensation

**Amend as follows with all other language remaining the same:**

#### a.    Wages

1.    The parties have agreed to the **wage scale in Exhibit E**, to be implemented over the term of this Agreement in accordance with this Article. The relevant range for employees in classifications for which no license or certification is required will be identified based upon years of service at the Hospital in the employee's current position. The relevant range for employees in classifications for which a license or certification is required will be identified based upon the employee's years of licensure or certification.

2.  **Grid for all positions increase 3% year over year for the life of the contract. 1.5% spread between steps for full-time and part-time employees. Per Diem rates remain flat for the contract year.**

3.  Increases to base hourly wage rates shall be implemented beginning on each of the effective dates described below, for all bargaining unit employees:

    b.  Effective on the first day of the second full pay period following the date on which this Agreement is ratified, all full-time and part-time employees shall move **receive a wage increase based on being moved to the appropriate step on the wage scale. Employees above the appropriate step on the wage scale shall receive a 1.5% increase to their base rate of pay.** These increases shall be retroactive to the expiration of the CBA. 2% across the board wage increase.

        In addition to the across-the-board increases, employees who are below the minimum of the relevant range on the hiring grid in Appendix E for their respective classifications and years of service/licensure will receive the lower of the minimum for the relevant range on the hiring grid or an additional 2% increase.

    c.  Effective on the first day of the first full pay period **after the one year anniversary of the ratification of this agreement, the wage scale shall be increased by 3%. All employees shall receive a wage increase based on movement to the appropriate step on the wage scale. Employees above the appropriate step on the wage scale shall receive a 1.5% increase to their base rate of pay.** March 1, 2019, all full-time and part-time employees shall receive a 2% across the board wage increase.

        In addition to the across-the-board increases, employees who are below the minimum of the relevant range on the hiring grid in Appendix E for their respective classifications and years of service/licensure will receive the lower of the minimum for the relevant range on the hiring grid or an additional 2% increase.

    d.  Effective on the first day of the first full pay period **after the two year anniversary of the ratification of this agreement, the wage scale shall be increased by 3%. All employees shall receive a wage increase based on movement to the appropriate step on the wage scale. Employees above the appropriate step on the wage scale shall receive a 1.5% increase to their base rate of pay.** after March 1, 2020, all full-time and part-time employees shall receive a 2% across the board wage increase.

Employer Response to Union Proposal - 4/29/21

1. **New Hire with Experience:** During the term of this Agreement new hires may be hired up to the mid-point of the applicable wage scale. The Employer may consider a new hire's experience in determining the appropriate wage on the grid set forth in Exhibit E.

   1. During the term of this Agreement, the Employer will not pay a new hire an hourly rate greater than the maximum of her/his applicable quartile on the hiring grid set forth in Appendix E.

   2. ~~In addition to the above hospital wide increases in subsection #2, employees shall receive an increase to their base pay as they advance through the steps of the wage scale based on their anniversary date.~~

   3. Notwithstanding any other provision of this Agreement, the Employer shall not be required to increase the rate of any employee after this Agreement's expiration, except to the extent required under the language of a successor agreement.

Subsection D, Shift Differentials:

Union Accepts employer proposal on shift differentials of 4/29/21.
Employer agrees to move Physical Therapist into group 3.

~~Weekend Differential:~~

~~Weekend Shift Differential: For all hours worked between 7:00 p.m. Friday and 6:59 a.m. Monday, the Employee shall receive a differential of $1.00 $2.00 per hour.~~

Standby/On-Call:

Union accepts management proposal of 4/29/21

G. **Severance Pay.**

   Severance pay will be provided to a regular full-time and regular part-time Employee whose employment is terminated as a result of a reduction in force provided he/she executes the Facility standard release. The amount of severance pay will be one (1) week of pay per year of service up **to fifteen weeks (15)**, with a minimum of two (2) weeks pay. Payment will be at the Employee's current base rate and partial years will not be prorated.

B.    ~~Nursing Department~~ In-House Registry Program (IHR).

    1.    A benefited full-time, part-time, or per diem Employee, completing his/her probationary period who is eligible for IHR in **the following job classifications: RT (includes removal of IHR – Respiratory Therapy Department side letter), CNA, LVN and Mental Health Workers, Monitor Techs and EMT's** ~~detailed in the IHR policy may participate in the Southern California Hospital at Culver City IHR.~~ IHR direct patient care hours worked will be paid one and one-half (1 1/2) times of the base rate for the first eight (8) hours of the shift and double time for the last four (4) hours of the shift when the Employee has met the following criteria:

        a.    A total of seventy-two (72) productive hours of work or six (6) productive shifts must be completed in a pay period to be eligible for IHR pay for any additional shift.

        b.    If any unscheduled absence at any time during the pay period occurs, IHR will not be paid for any shifts in that pay period.

        c.    If the IHR shift falls on one of the observed holidays listed in Article 16, then no holiday differential will be paid.

        d.    Qualifications, competency and certifications to work in the designated unit without additional orientation.

    2.    Productive hours/shifts are understood to be only those hours/shifts spent in direct patient care.

    3.    IHR pay will not convert back to regular pay if absence is due to pre-granted vacation days or cancellation made by the staffing office of regular scheduled work days.

    4.    Cancellation by the Employee of a confirmed IHR shift less than two (2) hours prior to the start of the shift will be considered as an unexcused absence.

    5.    Any and all incentives offered for IHR will be forfeited if the employee calls off during a regularly scheduled shift in the same pay period.

## ARTICLE 15. STANDARD BENEFIT PLANS

**A. Standard Benefits**

Employees shall be eligible to participate in the Employer's Standard Benefit Plans, as amended from time to time, on the same terms, conditions and basis as other Facility employees. The Employer shall continue to offer the following core benefit plans during the term of this Agreement: Paid Time Off, medical plan, dental plan, long-term disability plans, life insurance, and 401(k) Plan. The Employer shall continue to maintain a medical insurance option for full-time and part-time employees and their families which will not require any employee payroll contribution. (Note: Cash Plus in its previous format no longer exists, however, the Employer shall continue to maintain the employee dollar pool and prior funded commitments until fully utilized or paid out to the employees.)

### B. Medical Plan

Upon ratification of this agreement the employer shall pay 100% of the cost for medical plan coverage for all plans. In addition, the employer shall pay 100% of the cost for the dental plan.

There will be no change(s) to the overall plan design, network or benefits, including but not limited to co-pays, deductibles, out-of-pocket maximums or pharmacopoeias without the parties' mutual agreement.

The out-of-pocket maximum shall be embedded for future plan years, and the deductibles shall remain the same as in plan year 2020.

In no event shall an employee's contribution toward premiums for elected coverage under the EPO Plan exceed 30% of the total premium cost for such coverage, and such percentage of the premium contribution shall not exceed the percentage paid by other Facility employees for the same coverage. **During the term of this Agreement, the employee contribution and premiums shall not exceed the same percentage share of total premium for the elected coverage as applied in 2020.**

Employees shall adhere to the appeals process set forth in the applicable plan documents to resolve any dispute regarding insurance coverage and/or benefits. Such matters shall not be subject to the grievance/arbitration procedure in this Agreement.

The Employer shall offer informational sessions to bargaining unit members regarding their healthcare coverage options at the outset of the open enrollment process. These sessions shall include the following information: a description and comparison of the plans and how to utilize the plans.

### C. 401k Match

**The employer, at its sole discretion, will make 401(k) reimbursement available to bargaining unit employees to the same extent and on the same terms that such benefit is available to non-represented employees in the California Region.**

## ARTICLE 30. TERM

Employer Response to Union Proposal - 4/29/21

The Agreement is effective as of February 23, 2018 **contract ratification** and shall continue in full force and effect for a 3-year period following the effective date, expiring at 11:59 pm on February 22, 2021.

This Agreement shall be automatically renewed and extended from year to year and thereafter without addition, change or amendment, unless either party serves notice in writing to the other party not less than ninety (90) days before the end of the term of its desire to terminate, change, amend or add to this Agreement.

## ARTICLE 8. JOINT LABOR-MANAGEMENT COMMITTEE FOR QUALITY CARE AND WORKING ENVIRONMENT

### A. Adequate Staffing Levels.

The Facility reaffirms its practice to maintain adequate staffing levels based on patient census and patient acuity, as required by law. Should an employee believe staffing levels are insufficient to permit the delivery of adequate patient care, he/she shall undertake work assignments but may do so under oral or written protest. In an emergency situation where there is a potential danger to patient, the employee shall immediately notify the supervisor/manager/designee who will physically visit the unit to assess the situation. Corrective action will be implemented if necessary. The Facility shall not require an employee in any case to perform a work assignment outside the lawful scope of his/her license.

### B. Working Environment

The hospital will meet to discuss capital projects and preventative maintenance repairs. Such discussions shall include a written status report, provided during the first meeting and on a quarterly basis thereafter on each of the following: roof repair, elevator repair, plumbing and any other deficiencies that are identified by the committee in the future.

### C. Purpose of the Committee

The Joint Labor Management Committee for Quality Care and Working Environment shall be tasked with working collaboratively to improve working conditions of employees and ensuring the highest level of quality care is given to patients. Either party, however, may decline to discuss grievable issues during Committee meetings, and to require such issues to be addressed instead through the grievance process. The discussion of grievable issues during Committee meetings furthermore will not delay any applicable time limits, unless the parties agree otherwise in writing.

**Union withdraws the following proposals:**

Hero Severance and Hero Health Benefits – 3/25/21

CNA Ratios

Community Benefits and Charity Care

All other provisions and side letters contained in the 2018-21 contract not modified during these negotiations shall remain the same.

TA  For the union
4/29/21 :

TA  4/30/21

Exhibit V, Page 444

# EXHIBIT "W"

# EXHIBIT "W"

# COLLECTIVE BARGAINING AGREEMENT

## BETWEEN



## CALIFORNIA NURSES ASSOCIATION

## And

## SOUTHERN CALIFORNIA HOSPITAL

## AT

## CULVER CITY

## March 24, 2020 through March 31, 2023

# TABLE OF CONTENTS

ARTICLE   1 – RECOGNITION ......................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE   2 – ASSOCIATION REPRESENTATION ......... ERROR! BOOKMARK NOT DEFINED.

ARTICLE   3 – REGISTERED NURSE STATUS ................. ERROR! BOOKMARK NOT DEFINED.

ARTICLE   4 – SENIORITY ................................ ERROR! BOOKMARK NOT DEFINED.

ARTICLE   5 – FILLING OF JOB VACANCIES ................. ERROR! BOOKMARK NOT DEFINED.

ARTICLE   6 – NONDISCRIMINATION ........... ERROR! BOOKMARK NOT DEFINED.

ARTICLE   7 – HARASSMENT ........................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE   8 – SAFE STAFFING AND PATIENT ADVOCACY . ERROR! BOOKMARK NOT DEFINED.

ARTICLE   9 – GRIEVANCE PROCEDURE ..... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 10 – DISCIPLINE ................................ ERROR! BOOKMARK NOT DEFINED.

ARTICLE 11 – HOURS OF WORK, OVERTIME AND SCHEDULING .............. ERROR! BOOKMARK NOT DEFINED.

ARTICLE 12 – FLOATING .................................. ERROR! BOOKMARK NOT DEFINED.

ARTICLE 13 – COMPENSATION ...................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 14 – MINIMUM RATES ..................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 15 – STANDARD BENEFIT PLANS  ERROR! BOOKMARK NOT DEFINED.

ARTICLE 16 – HOLIDAYS ................................. ERROR! BOOKMARK NOT DEFINED.

ARTICLE 17 – HEALTH AND SAFETY ........... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 18 – EDUCATION BENEFITS ......... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 19 – LEAVES OF ABSENCE ............ ERROR! BOOKMARK NOT DEFINED.

ARTICLE 20 – JOB SECURITY .......................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 21 – MANAGEMENT RIGHTS ........ ERROR! BOOKMARK NOT DEFINED.

ARTICLE 22 – SUBCONTRACTING ................. ERROR! BOOKMARK NOT DEFINED.

ARTICLE 23 – ASSOCIATION SECURITY ...... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 24 – WORK STOPPAGE .................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 25 – NOTICES ................................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 26 – SAVINGS CLAUSE .................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 27 – ENTIRE AGREEMENT ............ ERROR! BOOKMARK NOT DEFINED.

ARTICLE 28 – TECHNOLOGY .......................... ERROR! BOOKMARK NOT DEFINED.

ARTICLE 29 – OUTSIDE AGENCY REGISTERED NURSES ..... ERROR! BOOKMARK NOT DEFINED.

**ARTICLE 30 – REGISTERED NURSE RESPONSE NETWORK ERROR! BOOKMARK NOT DEFINED.**

**ARTICLE 31 – TERM** ........................................... **ERROR! BOOKMARK NOT DEFINED.**

**SIDE LETTER RE: PATIENT CARE ADVOCACY FORUM** ........ **ERROR! BOOKMARK NOT DEFINED.**

**SIDE LETTER RE: BARGAINING UNIT INFORMATION ERROR! BOOKMARK NOT DEFINED.**8

**APPENDIX A – AB 394** ......................................... **ERROR! BOOKMARK NOT DEFINED.**

**APPENDIX B – STAFFING REGULATIONS ADOPTED BY DHS** ....................... **ERROR! BOOKMARK NOT DEFINED.**

**APPENDIX C – BENEFIT PLAN PREMIUM CONTRIBUTIONS AND PLAN** .... **ERROR! BOOKMARK NOT DEFINED.**

Southern California Hospital at Culver City ("Facility" or "Employer"), its successor or assign, and California Nurses Association ("CNA" or "Association"), its successor or assign hereby agree to become parties to this agreement.

## ARTICLE 1 – RECOGNITION

Pursuant to an election conducted on February 18, 2004, the Facility recognizes the Association as the exclusive collective bargaining representative of the Registered Nurses employed at its facility located at 3828 Delmas Terrace, Culver City, California in the following bargaining unit:

Included:    All full-time, part-time, and per diem Registered Nurses, including those who serve as relief charge nurses;

Excluded:    All other Registered Nurses, including confidential Registered Nurses, office clerical Registered Nurses, Registered Nurses of outside registries and other agencies supplying labor to the Employer, traveling nurses, regularly assigned charge nurses, guards, managers, supervisors, as defined in the Act.

Nothing in this Agreement shall be deemed or construed to preclude regularly assigned charge nurses from performing those Registered Nurse duties currently performed by such charge nurses. It is not the intention of the Employer to have a loss of hours or benefits as a result of charge RNs performing bargaining unit work.

The parties agree that competent performance of the essential functions of bargaining unit direct care registered nurses and nurse practitioners as determined by registered nursing and hospital licensing law and regulation requires the application of scientific knowledge and technical skill in the physical, social and biological sciences and the exercise of independent, discretionary judgment by the direct care registered nurse/nurse practitioner in the exclusive interest of the assigned patient.

Therefore, the Employer agrees it will not take any action to eliminate or transfer out of the bargaining unit, the direct care registered nurse/nurse practitioner job functions and responsibilities described above including without limitation, challenges to the composition or appropriateness of the existing bargaining unit, or the bargaining unit status of any individual or classification currently within the unit, or withdrawal or threatening withdrawal of recognition based on claims or questions regarding the "employee" status of unit employees or classifications under applicable labor laws. Disputes concerning this provision are not subject to Article 24, Work Stoppages, except as the parties may otherwise agree in writing with respect to any specific dispute.

## ARTICLE 2 – ASSOCIATION REPRESENTATION

A.     **CNA Nurse Representatives**

The Association shall provide the Facility with a written list of CNA Nurse Representatives after their designation, and shall notify the Facility of changes as they occur.   The Association shall designate one Nurse Representative as Chief Nurse Representative.  Prior to the Facility's receipt of such Association designation, the Facility is not obligated to recognize a CNA Nurse Representative under this Article.

The functions of the Association Nurse Representative include the authority 1) to settle or assist in settling problems arising in connection with the application or interpretation of the agreement, 2) to resolve grievances at Step 1 or 2 of the grievance procedure and 3) to serve as a Association representative for Weingarten meetings and, 4) to ascertain that the terms and conditions of the contract are observed; and 5) to educate RNs about their rights and obligations under this agreement. With advance notice and approval of Human Resources, one (1) additional nurse representative may sit in on and observe any grievance or investigatory meeting for training purposes, but shall not be an active participant in such meeting.  Attendance of a preapproved nurse may be later denied if it impacts patient care.

CNA Nurse Representatives shall perform their functions or Association related activities on their own time.  However, if a meeting is mutually agreed to with the Nurse Representative during the Nurse Representative's work shift, that time will be paid for by the Facility.  If the Nurse Representative wishes to schedule a meeting with Registered Nurses during the Nurse Representative's work shift, unpaid leave time shall not be unreasonably denied.

While Registered Nurses have the duty to be patient advocates, CNA Nurse Representatives shall not direct any Registered Nurses as to how to perform or not perform his/her work, shall not countermand the order of any supervisor, and shall not interfere with the normal operations of the Facility or any Registered Nurse.

A CNA Nurse Representative will be given 30 minutes at each new RN orientation to educate RNs about CNA.

The Employer shall provide the Nurse Representatives reasonable access to conference rooms upon written or email request, based on availability.

B.     **Association Labor Representative**

A duly authorized Labor Representative of the Association shall be permitted to enter the Facility at reasonable times for the purpose of observing whether this Agreement is being observed or to check upon complaints of bargaining unit Registered Nurses.  The Labor Representative shall advise the Director of Human Resources or his/her designee of each visit upon entering the Facility.  If the Director of Human Resources or his/her designee is not on site and/or on duty, the Labor Representative will call and/or page the Director of Human Resources or his/her designee.  The Labor Representative will abide by

patient confidentiality, infection control, and other Facility policies applicable to such areas. When at the Facility, the Labor Representative will wear his/her Association Representative badge issued by the Facility. Further, the Association Labor Representative shall have access to the break room of the Psych unit of the hospital on the day and night shift at times which must be agreed upon in advance with the Employer. It is understood that Nurse Representatives must be escorted to the Psych Unit by Security.

The Association Representative shall not interfere with the work of any Registered Nurse. This shall not prevent the Association Representative from conferring with a Registered Nurse and his/her supervisor or a Facility representative on Facility time in connection with the complaint or problem concerning the Registered Nurse.

C.    **Bulletin Board**

The Facility shall provide one (1) glass enclosed locking bulletin board in a mutually agreed location and space on existing bulletin boards in each nursing lounge for posting of notices and announcement regarding Association business, such as meetings, internal Association election results, education, and social events. No materials, which are derogatory of the hospital or management, shall be posted. Both the Association and Facility shall have a key to the bulletin board. The Facility shall not access the bulletin board until a request has been made to the Association, in writing, and a reasonable time given for discussion.


## ARTICLE 3 – REGISTERED NURSE STATUS


A.    **Full-Time Registered Nurse**

A Regular full-time Registered Nurse is a Registered Nurse who is not in a temporary status and is regularly scheduled to work thirty-two (32) hours or more per work week. Regular full-time Registered Nurses are benefits eligible.

B.    **Part-Time Registered Nurse**

A Regular part-time  Registered Nurse is a Registered Nurse who is not in a temporary status and is regularly scheduled to work twenty-four (24) or more hours per workweek. Regular part-time  Registered Nurses are benefits eligible.

C.    **Per Diem Registered Nurse**

A Per Diem Registered Nurse is a Registered Nurse who has executed the Facility's Per Diem Agreement and who is not a Regular full-time or Regular part-time Registered Nurse. Per Diem Registered Nurses do not receive any insurance, retirement or other fringe benefits under this Agreement, including without limitation other benefits as defined in Article 15A, except that Per Diem nurses shall be eligible for participation in the company 401(k) Retirement Savings Plan as allowed under the Plan.

D. **Temporary Registered Nurse**

A temporary Registered Nurse is one who is hired for a special project or assignment not to exceed one hundred and twenty (120) calendar days, with the understanding that his/her employment will end when such project or assignment is completed. Such one hundred and twenty (120) calendar day limitations may be extended when a temporary Registered Nurse is covering for a Registered Nurse who is on leave of absence. Unless a temporary Registered Nurse is already a member of the bargaining unit, a temporary Registered Nurse will not be subject to the provisions of this Agreement.

E. **Consultants and Contractors**

Consultants and contractors are defined as individuals who perform services for the Facility pursuant to a contractual agreement, including registry Nurses and travelers. Unless otherwise stated herein, consultants and contractors will not be subject to the provisions of this Agreement. The use of consultants and contractors is not intended to displace bargaining unit positions.

## ARTICLE 4 – SENIORITY

A. **Seniority Defined**

**1.** For a Full-time or Part-time Registered Nurse, seniority will be based on his/her most recent uninterrupted date of hire as a Registered Nurse at Southern California Hospital at Culver City, or its predecessor(s). Upon a change of ownership, seniority will be based on a Registered Nurse's date of hire as above or at Southern California Hospital at Culver City's successor, whichever is earlier.

**2.** For a Per Diem Registered Nurse, seniority will be based on his/her most recent uninterrupted date of hire as a Registered Nurse at Southern California Hospital at Culver City, or its predecessor(s). Upon a change of ownership, seniority will accrue from a Per Diem Registered Nurse's date of hire as above or at Southern California Hospital at Culver City's successor, whichever is earlier. On a going-forward basis, a Per Diem Registered Nurse will accrue one (1) month of seniority for every ninety-six (96) hours worked, not to exceed one (1) month of seniority in one (1) month's time. Such seniority adjustments will be made on a quarterly basis.

**3.** A master seniority list of Registered Nurses' names and seniority dates, updated quarterly, will be available in the Nursing Office for Registered Nurses' review and will be sent to the Association in a mutually agreeable database format.

**4.** Seniority dates will only be adjusted for:

    **a.** A break in service from Southern California Hospital at Culver City associated with a termination of less than twelve (12) months.

    **b.** An unpaid leave of absence (except for military leave, union leave, workers compensation and state or federally mandated family or medical care leaves).

**5.** After a probationary period in accordance with this Agreement, seniority will only be broken by:

>**a.** A break in service from Southern California Hospital at Culver City associated with a termination of more than twelve (12) months.

>**b.** A reduction in force lasting more than twelve (12) months without recall to a permanent position.

**6.** Seniority will be lost if a Registered Nurse is terminated, resigns, retires or fails to return within the terms of an approved leave.  In case of a reduction in force, a Registered Nurse who is recalled within one (1) year will retain his/her original seniority date as if he/she had never terminated service.

B.   **Reduction in Force and Recall**

**1.** Reduction in Force (RIF) will be defined as:

>**a.** The elimination of a full-time or part-time Registered Nurse's position; or

>**b.** A reduction from full-time to part-time status.

**2.** Any full-time or part-time Registered Nurse who is subject to a RIF may elect to be placed in per diem status in lieu of the RIF.  Such Registered Nurse will retain his/her recall rights in accordance with this Section.

**3.** RIFs will occur by department/unit.  The RIF steps outlined below will only apply to full-time and part-time  Registered Nurses.

**4.** In the event of a RIF of fourteen (14) calendar days or more, and recall from such RIF, seniority shall prevail.  For a RIF of fourteen (14) days or less, Call-Off Procedures will apply.

**5.** If a position (i.e., Full Time Equivalent (FTE)) is eliminated, the least senior Registered Nurse in the department or unit where the reduction occurs will be the first to be displaced.  The displaced Registered Nurse will be permitted to fill any regular full-time or part-time  permanent vacancy within the bargaining unit for which he/she is fully qualified and competent, without additional training, to perform the work to the Facility's job standards.  A list of such bargaining unit vacancies, including the unit, shift, status and required qualifications, shall be provided to the displaced Registered Nurse.

**6.** If the displaced Registered Nurse is unable to fill such a bargaining unit vacancy, he/she will be permitted to displace the least senior Registered Nurse in the bargaining unit, provided (i) he/she is fully qualified and competent, without additional training, to perform the work to the Facility's job standards and (ii) his/her skill, training, experience, ability and work performance (as evidenced by performance evaluations) is substantially equal to that of the least senior Registered Nurse.

**7.** If the displaced Registered Nurse is unable to displace the least senior Registered Nurse in the bargaining unit, he/she may continue up the seniority list until he/she is able to displace a more junior Registered Nurse, subject to the requirements of paragraph 3 above.

**8.**     Any Registered Nurse displaced in the foregoing bumping process may exercise the same bumping rights described above.  If such a Registered Nurse is unable to displace another Registered Nurse as a result of the bumping process, he/she will be placed on RIF status.

**9.**     Any Registered Nurse on RIF status or who elected per diem status in lieu of a RIF, will be recalled in reverse order from the RIF, to fill a permanent vacancy that arises in the bargaining unit, provided he/she is fully qualified and competent, without additional training.  Basic orientation to the unit will not be considered as additional training.

**10.**     It will be a RIF Registered Nurse's responsibility to keep the Facility informed as to his/her current address and telephone.

**11.**     A Registered Nurse will be deemed terminated from employment when, after a RIF, such Registered Nurse fails to return to work within ten (10) working days from certified mail delivery of a return-to-work notice or such other date mutually agreed to between the Facility and the Registered Nurse.

**12.**     A Registered Nurse who returns to employment as a result of recall from RIF within one (1) year from the date of separation will be restored to his/her former status with respect to salary and all fringe benefits outlined in this Agreement that are in force at the time of return to work.  There will, however, be no accumulation of earnings or benefits during the period of separation.

**13.**     RIF Notice.

The Facility will provide the Association and each affected Registered Nurse with as much notice of a RIF as possible, and will provide such notice immediately upon the Facility's knowledge and/or realization of the need to implement RIFs, which will affect bargaining unit Registered Nurses.  In no event will notice be given to the Association and each affected Registered Nurse less than two (2) weeks before any implementation of a RIF.

**14.**     Application of RIF Procedure.

The parties recognize that RIFs are extremely serious matters and that even well intentioned procedures may result in unintended applications.  Therefore, the parties agree to communicate and meet during any application of the procedures to ensure its correct application to Registered Nurses.  Nothing contained herein will prevent the parties from mutually agreeing to modify the procedure in a specific RIF should the need arise.

## ARTICLE 5 – FILLING OF JOB VACANCIES

A.     **Posting of Vacancies**

When a vacancy subject to this Agreement occurs in any department, a notice of that vacancy shall be posted on the employer's website and in a location(s) accessible to all Registered Nurses for a minimum period of five (5) calendar days before the Facility

fills the vacancy on a permanent basis.  Qualifications for vacant positions shall appear on position postings.  This does not prevent the Facility from filling the vacancy on a temporary basis until such position is filled.

B.    **Applying for Vacancies**

Any current Registered Nurse who has completed his/her probationary period may apply for a posted vacancy by submitting an Application for Promotion or Transfer Form to Human Resources via online application.

C.    **Restrictions in Applying for Vacancies**

A Registered Nurse who applies for and is selected to fill a posted vacancy may not apply for another posted vacancy within the next six (6) months, except as follows:

**1.**    If the posted vacancy arises in the same unit which would result in a lateral transfer and not a promotion, including a change in a Registered Nurse's pre-scheduled hours, or his/her scheduled start and end times, or his/her days of work and days off, or his/her shift.

**2.**    If the Registered Nurse is in his/her current position as a direct result of a reduction in force.

**3.**    If an exception is agreed to by the Employer and the Association.

D.    **Preference Order**

Preference among those applying for posted vacancies shall be given in the following order among applicants from the same preference level and seniority as defined in Article 4 shall govern, provided that 1) the applicant must meet all reasonable qualifications of the job established by the Facility (the Association has the burden of establishing that the Facility's qualifications are unreasonable), and 2) the applicant's skills, abilities, training, experience, competencies and job performance (as evidenced by periodic evaluations) must meet minimum standards in the Facility's reasonable judgment and, if such judgment is disputed, the Facility has the burden of establishing that its judgment was reasonable.

**1.**    Qualified Full-time, and Part-time Registered Nurses from within the facility.

**2.**    Qualified Per Diem Registered Nurses from within the Facility.

**3.**    Qualified RNs on RIF.

**4.**    Other applicants from outside the bargaining unit.

E.    **Potential Vacancies**

A Registered Nurse who will be on vacation for a period of more than seven (7) calendar days is free to submit a written Application for Promotion and Transfer Form to Human Resources for a potential job vacancy that may be posted in accordance with this Article.  Such application will remain active for up to thirty (30) days or for the period of

the vacation, whichever is less.  When completing the Application for Promotion and Transfer Form, the RN shall be responsible for providing contact information.  Should they qualify for the position, the RN must be available to return within seven (7) calendar days of notification.

F.      **Evaluation Period**

A Registered Nurse who is selected to fill a vacancy in accordance with this Article will be oriented as necessary, and the Facility will have up to thirty (30) days to evaluate his/her performance.  If, at any time during the thirty (30) day period, the Registered Nurse fails to perform satisfactorily, he/she will be returned to his/her former position, including shift, assignment, and scheduled hours, provided his/her former position remains vacant. At the Registered Nurse's option, he/she may return to his/her former position or a comparable position within ten (10) calendar days of starting in the new position.

G.      **Change in Specialty**

A probationary period of ninety (90) calendar days will be served immediately following a change in specialty, and such probationary period may be extended for an additional ninety (90) calendar days upon written notice to the Registered Nurse and the Association.   If a Nurse does not qualify for the new position after his/her probationary period, the RN may be returned to their former position, shift and status, or as close to former position, as available.

## ARTICLE 6 – NONDISCRIMINATION

The Facility and the Association agree that there shall be no discrimination against any Registered Nurse or applicant because of race, color, religion, national origin, sex, sexual orientation, age, disability, marital status, Association status or any other characteristic protected by law.  There shall be no discrimination by the Facility or the Association against any Registered Nurse because of membership in or activity on behalf of the Association.  Association Representatives shall not be transferred or reassigned to another area of work as a result of Association activities.

## ARTICLE 7 – HARASSMENT

The Facility is committed to providing a work environment free from discrimination and unlawful harassment.  The Facility will not tolerate actions, words, jokes or comments based on an individual's sex, race, ethnicity, age, religion, sexual orientation or any other legally protected characteristic.  Any Registered Nurse, supervisor, or bargaining unit member engaging in sexual or other unlawful harassment will be subject to appropriate corrective action, up to and including termination of employment.

The Facility will take all reasonable steps to protect a Registered Nurse who reports harassment from continuing harassment and from retaliation because of having reported

the harassment.  The Facility will also take all reasonable steps to protect witnesses who cooperate in any investigation of alleged harassment from retaliation.  If the investigation reveals that the complaint is valid, prompt attention and disciplinary action will be taken to stop the harassment immediately and to prevent its reoccurrence.

## ARTICLE 8 – SAFE STAFFING AND PATIENT ADVOCACY

A.    **Adequate Staffing Levels**

The Employer will comply with state mandated staffing ratios.  The provisions of said law will be included in this agreement as Appendix "A".  The facility reaffirms its practice to maintain adequate staffing levels based on patient acuity, and as required by law.  Should a Registered Nurse believe staffing levels are insufficient to permit the delivery of adequate patient care, he/she shall undertake work assignments but may do so under oral or written protest.  In an emergency situation where there is a potential danger to patient, the Registered Nurse shall immediately notify his/her supervisor/manager/designee who will physically visit the unit to assess the situation.  Corrective action will be implemented if necessary.  The Facility shall not require a Registered Nurse in any case to perform a work assignment outside the lawful scope of his/her license.

The parties agree there shall be total compliance with Title 22, Section 70217, "Nursing Service Staff" in California to the extent they are applicable to bargaining unit employees.

Southern California Hospital at Culver City and the Union agree that quality patient care and an appropriate working environment require adequate staffing and that staffing levels within all departments vary with census, acuity, shift, the specialization of various areas, changes in the specialization of the units, and structural changes in delivery of patient services.

Resource Nurse

The employer may provide one resource nurse per unit, per shift. The Resource Nurse shall be in addition to dedicated Break Relief nurses and Charge Nurses.

Transport Nurse

The employer will provide one (1) dedicated transport nurse six days per week, 7am-7pm.

B.    **Professional Practice Committee**

**1.**    A CNA Professional Performance Committee (PPC) comprised exclusively of bargaining unit Nurses shall be established at the Hospital.

**2.**     The PPC shall schedule a regular monthly meeting.  Unless already scheduled to work during the meeting, each Nurse Committee member who attends the meeting shall be compensated at his/her base rate of pay for the actual time spent at the meeting, not to exceed two (2) hours.

**3.**     The Committee shall keep minutes of all meetings, a copy of which shall be provided to the Chief Nursing Officer (CNO).

**4.**     The function of the Committee is to constructively discuss such aspects of nursing as patient care plans, procedures, quality control, effective utilization of personnel, in-service, performance evaluation and issues relevant to professional practice, patient care and safety.

**5.**     Upon the request of the PPC, the CNO (or her/his designee), agrees to meet with the PPC at a mutually agreeable time to discuss recommendations and any agreed upon implementation.  The CNO or his/her designee will provide a written or oral progress report to the PPC within two (2) weeks on any pending issues.

**6.**     It is further agreed that the Committee may make recommendations to the Hospital where, in the opinion of the Committee, frequent staffing shortages exist.

**7.**     The Association may appoint to serve on the Committee the greater of one Nurse representative for every one hundred full and part-time nurses employed by the Hospital or four (4) Nurses.  The Association shall use its best efforts to recruit Nurse Committee members from diverse units in the Hospital.

**8.**     If requested by the PPC, the Facility shall provide documentation of actual staffing and acuity by unit and shift for the prior month for review by the Committee and to assist in discussion of specific incidents that may have occurred.  Daily Nursing assignment forms by unit along with Patient Classification Level Summary Forms shall satisfy the documentation requirement.  The parties understand and agree that the Hospital shall comply with relevant HIPAA requirements when providing the requested documentation.

C.     **Special Review Panel**

Issues addressed by the PPC that the PPC does not believe are resolved to its satisfaction may be referred to a Special Review Panel provided such referral is made within thirty (30) days of the unsatisfactory management response.  The Special Review Panel shall be comprised of four (4) members; two (2) of whom shall be selected by the Association and two (2) of whom shall be selected by the Facility.  The Panel may resolve issues referred to it informally or by majority vote of the four members.  Except as set forth in subparagraph (D) below, the issues addressed by the PPC and/or the Special Review Panel are not subject to the grievance and arbitration provisions of this or any other Agreement.

D.     **Enforcement of Legally Mandated Nurse Staffing**

Any dispute concerning any alleged non-compliance with any state or federal law or regulation mandating minimum nurse staffing, any staffing provision of this article, or any dispute not resolved by the Special Review Panel as described above may be submitted

by the Association to an Enforcement Panel for final resolution, provided that the issue has first been addressed with the CNO (or his/her designee) through the above-described PPC process and such submission is presented in writing within fifteen (15) days of the unsatisfactory management response.  The jurisdiction of the EP, including any third party neutral ("The Neutral"), shall be limited to enforcing the provisions of the applicable state or federal law or regulation mandating minimum nurse staffing.

     **1.**     The Panel shall consist of three members, one (1) selected by CNA, one (1) selected by the Facility and a third selected by the other two (2) panel members to serve as The Neutral.  The parties will make a good faith effort to select a Neutral who is experienced in the healthcare industry and has expertise with the nurse staffing law at issue. If they are unable to agree on such a person, the parties shall select The Neutral by alternatively striking names from a panel of seven (7) arbitrators (with expertise in healthcare) obtained from the American Arbitration Association until one name remains. That person shall serve as The Neutral.

     **2.**     If the Panel is unable to agree on a resolution, The Neutral shall resolve the difference and such decision shall be final and binding on the parties.

     **3.**     The jurisdiction of The Neutral shall be limited to enforcing the provisions of the applicable state or federal law or regulation, or contract provision mandating minimum nurse staffing.

     **4.**     CNA and the Facility shall share the costs associated with the EP including but not limited to costs of The Neutral and any court reporter obtained for the proceedings. Any party, however, that wishes to obtain a transcript from the court reporter shall solely bear the cost of such transcript.

     **5.**     Except for any complaint that the Association may file with any state or federal regulatory agency, the Enforcement Panel (EP) shall be the Association's sole and exclusive remedy for any dispute regarding alleged non-compliance with minimum nurse staffing laws.  Prior to filing any complaint with a state or federal regulatory agency, the Association agrees to attempt to resolve the issue with the Facility.  To the extent that any state or federal regulatory agency issues a binding decision or ruling regarding any alleged noncompliance with minimum nurse staffing laws, such decision or ruling shall prevail over any decision rendered by The Neutral on any same or similar alleged noncompliance.

E.     **Standards of Competent Performance**

     A Registered Nurse shall be considered competent when the Nurse consistently demonstrates the ability to transfer scientific knowledge from social, biological and physical sciences in applying the nursing process as follows:

     **1.**     Formulates a nursing diagnosis through observation of the patient's physical condition and behavior, and through interpretation of information obtained from the patient and others, including the health team.

     **2.**     Formulates a care plan, in collaboration with the patient, which ensures that direct and indirect nursing care services provide for the patient's safety, comfort, hygiene, and protection, and for disease prevention and restorative measures.

**3.** Performs skills essential to the kind of nursing action to be taken, explains the health treatment to the patient and family, and teaches the patient and family how to care for the patient health needs.

**4.** Assigns or delegates tasks to other care givers based on the legal scope of practice of those care givers and on the preparation and capacity needed in the tasks to be assigned or delegated, and provides clinical supervision of those care givers.

**5.** Evaluates the effectiveness of the care plan through observation of the patient's physical condition and behavior, signs and symptoms of illness, and reactions to treatment through communication with the patient and health team members, and modifies the plan as needed.

**6.** Acts as the patient's advocate, as circumstances require, by initiating action to improve health care or to change decisions or activities which are against the interests or wishes of the patient, and by giving the patient the opportunity to make informed decisions about health care before it is provided.

## ARTICLE 9 – GRIEVANCE PROCEDURE

A.   **Definition**

A grievance is defined as a dispute as to the interpretation, meaning or application of a specific provision of this Agreement.

B.   **Procedure**

Grievances shall be processed in accordance with the procedure set forth below:

STEP 1

A Registered Nurse should make a reasonable effort to resolve the possible grievance informally in a discussion with her/his immediate supervisor.  If a Registered Nurse is unable to resolve the possible grievance, the Association Nurse Representative (if requested by the Registered Nurse) and the Registered Nurse will have a discussion with the immediate supervisor.  This requirement must be satisfied before a written grievance is submitted at Step 2.

STEP 2

If the grievance cannot be resolved informally, it shall be reduced to writing and submitted to the Facility's designated representative within thirty (30) calendar days after the Registered Nurse had or should have had knowledge of the event which caused the grievance.  The written grievance must (1) allege the violation of a specific provision or provisions of this Agreement, and (2) set forth all factual grounds upon which the allegation is based.  Within ten (10) calendar days after receipt of the written grievance, a meeting shall be held with the Facility's designated representative(s) to discuss the grievance.  The grievant, the Association Nurse Representative and the Association Labor Representative

may be present at the meeting.  Within ten (10) calendar days after the meeting, the Facility's designated representative shall respond to the grievance in writing.

STEP 3

If the Facility's response in Step 2 is not satisfactory, the Association may submit the grievance to arbitration by notifying the Facility in writing of its intent to do so.  In order to be timely, the Association's notice must be received by the Facility within fourteen (14) calendar days after the Association's receipt of the Facility's Step 2 response.

C.    **Arbitration**

The following procedure shall apply if a grievance is submitted to arbitration:

**1.**    An impartial arbitrator shall be selected by mutual agreement from the following panel of arbitrators:

The facility will pick two (2) arbitrators at its discretion to put on the list.

The Association will pick two (2) arbitrators at its discretion to put on the list.

Each Part's two picks shall be shared with the other party within two weeks of the appeal to arbitration.

The four picks above shall be combined with the list for a panel of nine arbitrators.

> Kenneth Perea
>
> Michael Rappaport
>
> Barry Winograd
>
> Fred Horowitz
>
> Lou Zigman

The parties will select an arbitrator by alternately striking names from the list until one arbitrator remains.  The party that will exercise the first strike shall be chosen by coin flip.  The selection of the arbitrator must be completed no later than thirty (30) calendar days from receipt by the facility of the appeal to arbitration.

**2.**    A hearing on the grievance shall be held at a time and place designated by the arbitrator, at which the Facility and the Association shall present their respective positions, evidence and arguments.  The sole parties to the arbitration proceeding shall be the Facility and the Association.  The arbitrator's decision shall be rendered in writing and shall be final and binding on the parties and on all affected bargaining unit Registered Nurses.  It shall be issued not more than thirty (30) calendar days after the close of the hearing or the filing of briefs, whichever is later.

**3.**    The arbitrator's authority is derived from this Agreement and his/her jurisdiction is limited to the interpretation and application thereof.  He/She shall not have authority to (a) amend or modify any provision of this Agreement; or (b) render an award on any grievance arising before the effective date, or after the termination date.  No dispute regarding Article 8 shall be subject to arbitration under this Contract, except as expressly set forth in Article 8.

**4.**     The fee and expenses of the arbitrator, the court reporter's appearance fee, and the cost of mutual facilities shall be borne equally by the Facility and the Association.

D.     **Time Limits**

The time limits and other procedural requirements set forth in this Article must be strictly adhered to unless mutually extended by the express agreement of the Association and the Facility.  Such agreement need not be in writing.  If the Facility fails to respond to a grievance within the time limits set forth in this Article, the grievance may be appealed immediately to the next step.  In the event of a failure by the grievant or the Association to adhere to any of such requirements, the grievance shall be resolved on the basis of the Facility's last response.   In the event of a dispute over whether the grievant or the Association has failed to adhere to any of such requirements, the arbitrator shall make the determination.

## ARTICLE 10 – DISCIPLINE

A.     **Just Cause**

The Employer may only discipline or terminate a Registered Nurse for just cause. Any discipline may be subject to the grievance procedure in Article 9.

B.     **Progressive Discipline**

Unless circumstances warrant more severe actions, the Facility will attempt to utilize a system of progressive discipline.   Progressive steps shall include verbal counseling, written counseling and/or warnings, disciplinary suspensions without pay, and termination of employment.

C.     **Investigation Suspension**

No Registered Nurse shall be held in unpaid investigatory suspension for more than seven (7) calendar days. Investigatory suspensions will be paid unless the investigation results in termination or suspension.  If RN is suspended, RN will be paid for missed scheduled days in excess of initial seven (7) calendar day suspension period.

The hospital may continue to keep a nurse on investigatory leave with pay beyond the 7 days in order to further review or investigate allegations that in the hospital's view would warrant continuation of relieving the nurse from work duties.  If the employee or the union representative are not available within twenty-four (24) hours upon request, the employee shall not be paid by the employer.  If the employee has a pre-approved vacation during the investigation, the employee may be able to take his/her vacation, but shall use his/her PTO to pay for the time.

D.     **Written Disciplinary Action**

A written warning is a document designed as such by the Facility.  A Registered Nurse who receives a written warning shall be given a copy of the warning and shall sign

a receipt to acknowledge having received the document.  Acknowledging receipt of the warning shall not constitute an admission of the Registered Nurse's agreement with the substance of the warning.  An Association grievance contesting a written warning shall be subject to the requirements of the grievance procedure in Article 9.

E.      **Disciplinary Notices, Rebuttal, and Inspection of Personnel Files**

**1.**      There shall be one official personnel file for all bargaining unit Registered Nurses and they shall have the right to inspect and to be provided, on request, with one copy of any document in the Registered Nurse's file.

**2.**      Registered Nurses will receive copies of all disciplinary notice(s) placed in their personnel files and shall have the right to rebut in writing any disciplinary notice. Such rebuttals, other than grievances, shall be attached to the disciplinary notice and placed in the personnel file.

**3.**      In any case where the Facility and the Association agree to revise personnel record material, the Facility shall, upon request, provide evidence of the revision.

**4.**      No disciplinary document shall be utilized for progressive discipline beyond twelve (12) months of its issuance.

F.      **Additional Representation Rights**

The following holding of the U.S. Supreme Court in NLRB v Weingarten, Inc., shall apply to investigatory interviews conducted by the Employer that an Registered Nurse, upon his/her request, is entitled to have an Association representative present during an investigatory interview in which the Registered Nurse is required to participate where the Registered Nurse reasonably believes that such investigation will result in disciplinary action.  The right to the presence of an Association representative (Labor Representative or Nurse Representative) is conditioned upon a requirement that the Association representative be available for participation in such investigatory interview within twenty-four hours, excluding Saturday, Sunday, and Holiday, of the Registered Nurse's request for his/her presence.

G.      **Probationary Registered Nurses**

A Registered Nurse will be on probation for the first ninety (90) calendar days and may be discharged or disciplined in the Facility's discretion without establishing just cause, and such probationary period may be extended for an additional ninety (90) calendar days upon written notice to the Registered Nurse and the Association.


**ARTICLE 11 – HOURS OF WORK, OVERTIME AND SCHEDULING**


A.      **State and Federal Wage and Hour Laws**

The Employer will comply with all applicable local, State, and Federal wage and hour requirements.

B.     **Workday and Workweek**

    **1.**     A workday is defined as the consecutive twenty-four (24) hour period beginning at 12:00 midnight each day.

    **2.**     A workweek is defined as the seven (7) calendar day period that starts at 12:01 a.m. on Sunday and ends at 11:59 p.m. (midnight) the following Saturday.

    **3.**     It is understood and that the workday and workweek are defined above for the purposes of complying with the overtime requirements under state and federal wage and hour laws and that the workday and workweek may be changed by the Employer to comply with such laws so long as such changes are not designed to evade the overtime requirements.

    **4.**     Nothing herein shall be deemed or construed to change the Employer's current practice as to the aggregation of consecutive hours into a single workday in which a shift commences for overtime compensation.

    **5.**     Except where otherwise stipulated, each Registered Nurse will receive two (2) consecutive days off each week, provided that the days off may be split or rotated at the Registered Nurse's written request, or for eight (8) hour shift Registered Nurses, in order to achieve every other weekend off scheduling.  Twelve (12) hour shift Registered Nurses will not normally work more than the schedule they were hired into with three (3) consecutive shifts of twelve (12) or more hours per week (or a three (3) and four (4) shift schedule per pay period), except by mutual agreement with the Registered Nurse.

    **6.**     As an exception to paragraph 5 above, in a department/unit that relies on regularly scheduled on-call duty, the Employer will continue its practice of scheduling such on-call days in addition to regularly scheduled shifts.  Such on-call duty will be assigned in an equitable manner among Registered Nurses within the department/unit and, for full-time Registered Nurses, may result in fewer than two (2) consecutive days off in a week with scheduled on-call duty.

C.     **Payroll Period**

    The payroll period will consist of a fourteen (14) day period that begins on Sunday at 12:00 a.m. and ends on Saturday of the following week at 11:59 p.m. fourteen (14) days later.

D.    **Meal and Rest Periods**

1.  Registered Nurses who work a scheduled shift of five (5) hours or more are entitled to a duty-free unpaid meal period of thirty (30) minutes during any shift where no more than twelve (12) hours are worked.  An RN shall have the opportunity to take this meal period before the end of the fifth (5th) hour of work.

2.   Each Nurse shall be granted a rest period of ten (10) minutes during each four (4) hours of work (or major fraction thereof) without deduction in pay.  Rest periods must not be combined with meal periods or taken at the beginning or end of a shift.  The Employer shall endeavor to make rest periods available after approximately two (2), six (6) and ten (10) hours of work.

3.   In compliance with State Wage and Hours regulations, an RN who is unable to take a meal period will be paid one (1) hour penalty pay, at her/his regular base rate of pay. An RN who is unable to take one or more rest periods during a shift will be paid one (1) hour of penalty pay at her/his regular base rate of pay.  Penalty pay described in this section does not qualify as hours worked in the calculation of overtime. In the event an RN's meal period is interrupted, the full meal period will be paid and shall be deemed time worked for the purpose of computing overtime.

4.  The Hospital shall have an appropriate RN staffing plan in place, for each unit and shift, to ensure adequate relief staffing for uninterrupted patient care during meals and breaks, including adequate time for patient handoff, so that Registered Nurses on break may be relieved from all duties during meals and rest break time, in accordance with this Article and to ensure safe, uninterrupted patient care.

E.    **Work Schedules**

**1.**    The Employer will post work schedules at least ten (10) days in advance of their commencement dates and such schedules will cover a minimum period of four (4) weeks.

**2.**    As an exception to paragraph 1 above, a department/unit that permits self-scheduling in accordance with paragraph 3, below will attempt to post work schedules at least ten (10) days in advance of their commencement dates and such schedules will cover a minimum period of four (4) weeks.

**3.**    Wherever applicable, the Employer shall continue its existing practice(s) of permitting Registered Nurses to self-schedule on a department/unit-by-department/unit basis.  The respective department Director or his/her designee will consider and make a reasonable effort to grant Registered Nurses' self-scheduling requests, provided such requests are submitted in a timely way and that they are consistent with departmental/unit needs and the operating requirements of the Employer.  If a Registered Nurse has submitted an Absence Request Form and the requested time off cannot be accommodated, the Employer will make a documented attempt to notify him/her before the schedule is finalized.

**4.**       After the schedule has been posted, a Registered Nurse's schedule will not be changed without his/her consent, except in case of internal (such as a fire, flood, explosion), or external disaster.

**5.**       Requests by Registered Nurses for changes to a posted schedule must be approved in writing by the department Director or his/her designee. Such reasonable requests shall not be unreasonably denied.

**6.**       A regularly scheduled Registered Nurse may trade a shift or workday with another regularly scheduled Registered Nurse provided they have equal competencies. Shift trades require the written approval of the department Director or his/her designee and, except in emergency situations, should be submitted in writing. Trades should not result in overtime or other premium pay, unless those premiums also would apply to the nurse originally scheduled for the shift.

**Weekend Scheduling**

**1.**       A regular full-time and part-time Registered Nurse working in a department/unit with weekend scheduling may be scheduled to work every other weekend. However, such Registered Nurse will be scheduled with at least every other weekend off.

**2.**       A weekend shift means any shift that is scheduled to begin on or after 6:45 pm Friday evening through Sunday evening; ending no later than 7:30 a.m. on Monday.

**3.**       Nothing herein shall preclude a Registered Nurse from volunteering to be scheduled for additional weekend shifts.  In addition, in those departments/units with self-scheduling, nothing herein shall preclude a Registered Nurse from requesting to be scheduled to work on two (2) consecutive weekends.

**4.**       A Registered Nurse may request to share his/her weekend shift requirement with another Registered Nurse with equal competencies.  Approval of such requests will be at the discretion of the Employer and will not be unreasonably withheld, except that a Registered Nurse's request will not be approved if it would increase overtime or extra shift premium costs for the Employer.

**5.**       Notwithstanding the above, Per Diem Registered Nurses will be scheduled to work weekends in accordance with their per diem agreements and Registered Nurses who were hired specifically to work weekends will continue to be scheduled to work weekends.

F.       **Vacation Scheduling**

**1.**       Vacation scheduling will be granted in accordance with current practice, by department/unit; taking into account the wishes of the Registered Nurse, the needs of the department/unit and assuring patient care/operational needs of the Employer are met.

**2.**       In the event of a conflict over vacation or holiday scheduling and among requests submitted and not yet acted upon, seniority shall be the controlling factor.

**3.**       A vacation requested in accordance with the above paragraph may be taken in increments of less than one (1) week and up to four (4) weeks.  Longer vacation requests may be approved on a case-by-case basis.

**4.** Requests will not be unreasonably denied.

**5.** Absent unusual circumstances, any request for a change in vacation must be submitted at least two (2) weeks prior to the first day of the desired vacation.

**6.** Once a vacation request has been granted, it may only be canceled by the Employer with the approval of the Registered Nurse.  However, if a Registered Nurse transfers out of a department/unit, there is no guarantee that the Registered Nurse will receive vacation time approved in the former department/unit.

**7.** There shall be no "blackout dates" for scheduling vacations.  Vacations requested spanning holidays will be considered on the same basis as provided above, except where the Registered Nurse is scheduled on a rotational basis to work that particular holiday.

**H.**   **Overtime**

**1.** Mandatory Overtime.

The Employer and the Association recognize that mandatory overtime is not desirable and represents a burden on the Registered Nurse. Acceptance of overtime and shifts beyond the Registered Nurse's schedule shall be voluntary and in accordance with state law or regulations, except where patient care would be endangered by an internal or external emergency declared by state, local or federal government or declared by the administrator on duty. An external or internal emergency, for the purposes of this section, is defined as an unexpected situation of sudden occurrence of a serious and urgent nature that demands immediate attention, such as an unpredictable or unavoidable occurrence at unscheduled intervals relating to healthcare delivery requiring immediate interventions and care such as natural disasters, situations of mass casualties or an internal emergency endangering patient care such as fire, structural collapse, bomb threats, hazardous material spills or any other unanticipated event that would result in the closure of beds required for patient care.

**2.** Authorization of Overtime.

A Registered Nurse must make every effort to obtain supervisory approval prior to working any hours that would require the payment of overtime.

The Employer will not unreasonably deny payment of overtime.  If it is not possible on the day overtime is worked to secure authorization in advance, the Registered Nurse will record the overtime on the day overtime is worked and the reasons therefore, which must be adequate, with a record made available to the Employer and given to the supervisor at the earliest convenience.

**3.** "8 And 80" Work Schedule.

A Registered Nurse who is assigned to an "8 and 80" work schedule will be paid one and one-half (1½) times his/her regular rate of pay for all hours worked after the eight (8) hours in a workday or over eighty (80) hours in a fourteen (14)-day work period and two (2) times his/her regular rate of pay for all hours worked after the first twelve (12) hours in a workday.

4. Base Rate.

The base rate as used in this Agreement is the Registered Nurse's hourly rate of pay.

5. Regular Rate.

For the purpose of computing overtime pay, the regular rate of pay shall be calculated in accordance with the Fair Labor Standards Act, as amended, and will include any applicable relief charge and/or shift differentials.

**I.** **Call-In Procedure**

A Registered Nurse reporting absent for a shift, or portion thereof, will call in the absence and will describe the reason for such absence to his/her department Director or his/her designee as soon as he/she knows the absence will occur. A Registered Nurse calling in less than two (2) hours prior to the commencement of an absence may be required on request to provide reasonable substantiation to explain why such absence could not have been called in earlier by the Registered Nurse or another person acting on his/her behalf. Compliance with this call-in requirement is necessary for staffing reliability and will not operate to excuse unscheduled or unauthorized absences.

**J.** **Call-Off/Flex-Off**

1. Subject to patient care staffing needs, including competency of Registered Nurse, when a call-off/flex-off becomes necessary due to temporary census fluctuations or other operational needs, Registered Nurses will be called-off/flexed-off in the following order:

   **a.** Outside Registry

   **b.** Volunteers

   **c.** Registered Nurses receiving In-House Registry pay

   **d.** Per Diem by rotation

   **e.** Travelers

   **f.** Part Time  by rotation

   **g.** Full-time Registered Nurses by rotation

2. However, no RNs will be called off unless the hospital meets staffing ratios under AB 394 for patient care. Benefited Registered Nurses may request call-off/flex-off and their requests will be granted, if possible. If no such volunteers, then call-off/flex-off will be rotated through the Registered Nurses in each targeted department/unit, using a goal of equal hour distribution. The Department Director or his/her designee will track all call-off/flex-off hours in the current calendar year and such cumulative hours will be the basis for determining which Registered Nurse, will be called-off/flexed-off. The Registered Nurse with the fewest "lost" hours on the shift will be called-off/flexed-off first. Records of called-off hours will be kept in the Nursing Office and will be available for review by Registered Nurses and Association staff upon request.

3.      The following will not qualify as "lost" hours:

    **a.**      Sick time

    **b.**      Vacation

    **c.**      Floating

    **d.**      Paid education time off

    **e.**      Jury duty

    **f.**      Witness duty

    **g.**      Bereavement

**4.**      If low census occurs in any particular department/unit for a prolonged period of time, the Department Director or his/her designee may meet with the Association to negotiate a more equitable distribution of call-off/flex-off hours.

**5.**      Call-Off/Flex-Off as Time Worked.

If a Registered Nurse is called-off/flexed-off or volunteers to take time off, the hours that he/she was scheduled to work shall count as time worked for the following, including but not limited to:

    **a.**      Vesting and service credit under the retirement (401-k) plan;

    **b.**      Waiting periods under health insurance and other fringe benefit plans;

    **c.**      PTO accruals.

**6.**      Call-Off/Flex-Off Notice.

For Registered Nurses called off before the shift commences, the Employer will call-off/flex-off at least two (2) hours prior to the commencement of their scheduled shift. Nothing herein shall be construed as preventing a call-off/flex-off during the shift, when necessary. The Registered Nurse will not be paid report pay if the Employer makes a reasonable effort to notify him/her at least two (2) hours prior to the start time that he/she should not report to work. It is the RNs responsibility to keep the Employer informed of their current phone number. The Employer will maintain a call off log in the staffing office, available for CNA staff and RN inspection.

**7.**      Called-Off/Flexed-Off Registered Nurses Off the Schedule.

Once called-off/flexed-off, a Registered Nurse is considered off the schedule and shall not be required to maintain contact or be available to work, unless he/she has to accept Standby status and is compensated accordingly, for the shift or portion thereof.

**K.**    <u>**No Guarantee**</u>

Nothing in this Article will be construed to constitute a guarantee of hours of work per day or per week or of days of work per week.

Exhibit W, Page 469

**L.**   **No Pyramiding**

There will be no pyramiding of overtime and premium payments for the same hours worked.  To the extent that hours are compensable as overtime under the provisions of this Agreement and where two (2) or more overtimes or premiums apply, the greater will prevail.  Shift differentials and other differentials are not included within the meaning of the term "premium payments."

## ARTICLE 12 – FLOATING

A.   **Definition**

Floating is defined as the temporary reassignment of a Registered Nurse to a clinical area outside of his/her assigned patient care unit.  A Registered Nurse may be assigned to float to a patient care unit other than his/her own, subject to the limitations within this Article. Registered nurses who are floated to a different department or unit should have received orientation in that department or unit and validated competencies in providing care to patients in that unit, in accordance with current California law. Southern California Hospital at Culver City will provide documentation upon request regarding nurse orientation and competency validation.

B.   **Floating Order**

Registered Nurses will float in the following order:

**1.**   Volunteers

**2.**   Travelers

**3.**   Registry

**4.**   In-House Registry

**5.**   Temporary

**6.**   Per Diem

**7.**   Part-time

**8.**   Full-time Registered Nurses

C.   **Floating Rotation**

The order of float for Registered Nurses within a unit or cluster will be on a rotational basis within each of the categories of Registered Nurses listed above.  Floating decisions will be based on the needs of the patients on the sending and receiving units and the floating conditions and provisions in this Article.

D.   **Floating Conditions**

Floating will be subject to the following conditions and limitations:

1.      A fully qualified Registered Nurse may be floated to a different department or unit provided he/she has received orientation in that department or unit and has demonstrated current competence in providing care to patients in that department or unit.  In the event a Registered Nurse with limited qualifications is floated to another department or unit to assist other qualified Registered Nurses, he/she will be oriented and limited to performing only those tasks he/she is qualified and competent to perform.

2.      Compliance with Law:  Floating of Registered Nurses will be in compliance with all federal and state laws and regulations, including Title XXII of the California Administrative Code.

3.      Voluntary Floating.

Nothing herein shall prohibit a Registered Nurse from volunteering to float to another area, provided that the Conditions in this Article are satisfied.

4.      Floating Records:

The Facility will maintain competency validation, float orientation, and other such relevant float documentation. Float rotation lists will be maintained for each department or unit and will be available for inspection by affected Registered Nurses in the Nursing Office.

E.   **Floating Clusters**

The Facility will float Registered Nurses according to the clusters below.  RNs may volunteer to float to units not in their cluster as long as the RN has current competency validation for the unit.  Any changes in the clusters will only be made by mutual agreement with the Association.

1.   SICU/CCU floats to Step Down, PACU.

2.   Step Down floats to Telemetry, SICU/CCU.

3.   GI Lab floats to PACU, Cath Lab. (pre & post procedures only)

4.   Telemetry floats to Step Down, ACU.  Telemetry/Step Down may float voluntarily to Med/Surg.

5.   Med/Surg floats to Rehab ACU, Skilled Nursing, and Behavioral Health open wing and D team only and if RNs have Workplace Violence and De-escalation Training.  May float to Telemetry if ACLS certified to care for non-monitored patients. Reason able efforts will be made to provide for voluntary participation.

6.   Behavioral Health floats to Chemical Dependency & to ER for Psych patients awaiting admission.

7.   Chemical Dependency floats to Behavioral Health open wing and D team only.

8.   Rehab floats to Med/Surg.  May go to Telemetry for non-monitored patients.

9.   Cath Lab floats to PACU, GI Lab (for moderate sedation or recovery only).

10.   PACU floats to GI Lab, ACU, Cath Lab (pre & post procedures only).

11.   ACU & ER are exempt from floating.

## ARTICLE 13 – COMPENSATION

A.   **Wages**

Registered Nurses will receive increases during the term of this Agreement as follows:

a.   Effective March 24, 2020, each registered nurse will receive a minimum increase of 4.5% as follows:  2.5% effective the first pay period of April 2020, and an additional 2% effective October 4, 2020  to her/his base rate of pay or receive an increase to their appropriate step based on the RN's years of nursing experience, whichever is greater.

b. Effective April 2021, each Registered Nurse will receive a minimum increase of three percent (3%) as follows:  1.5% effective April 4, 2021, and an additional 1.5% effective October 3, 2021 to her/his base rate of pay or receive an increase to their appropriate step based on the RN's years of nursing experience, whichever is greater.

c. Effective April 2022, each Registered Nurse will receive a minimum increase of three percent (3%) as follows:  1.5% effective April 3, 2022 and an additional 1.5% effective October 2, 2022 to her/his base rate of pay or receive an increase to their appropriate step based on the RN's years of nursing experience, whichever is greater.

Except as mutually agreed to by the parties, no other increases shall be required except to the extent provided for in a subsequent agreement.

2.   Wage Scales

| Wage Scale Date | Year 1 Part 1 4/5/20 | Year 1 Part 2 10/4/20 | Year 2 Part 1 4/4/21 | Year 2 Part 2 10/3/21 | Year 3 Part 1 4/3/22 | Year 3 Part 2 10/2/22 |
|---|---|---|---|---|---|---|
| **Steps:** | | | | | | |
| New Grad | $35.37 | $36.08 | $36.62 | $37.17 | $37.73 | $38.29 |
| 1 | $36.55 | $37.28 | $37.84 | $38.41 | $38.98 | $39.57 |
| 2 | $38.25 | $39.02 | $39.60 | $40.19 | $40.80 | $41.41 |
| 3 | $39.65 | $40.44 | $41.05 | $41.67 | $42.29 | $42.92 |
| 4 | $40.83 | $41.65 | $42.27 | $42.91 | $43.55 | $44.20 |
| 5 | $42.00 | $42.84 | $43.48 | $44.13 | $44.80 | $45.47 |
| 6 | $42.55 | $43.40 | $44.05 | $44.71 | $45.38 | $46.06 |
| 7 | $43.89 | $44.77 | $45.44 | $46.12 | $46.81 | $47.51 |
| 8 | $44.36 | $45.25 | $45.93 | $46.61 | $47.31 | $48.02 |
| 9 | $45.79 | $46.71 | $47.41 | $48.12 | $48.84 | $49.57 |
| 10 | $46.21 | $47.13 | $47.84 | $48.56 | $49.29 | $50.03 |
| 11 | $46.21 | $47.13 | $47.84 | $48.56 | $49.29 | $50.03 |
| 12 | $47.72 | $48.67 | $49.40 | $50.15 | $50.90 | $51.66 |
| 13 | $47.72 | $48.67 | $49.40 | $50.15 | $50.90 | $51.66 |
| 14 | $47.72 | $48.67 | $49.40 | $50.15 | $50.90 | $51.66 |
| 15 | $49.29 | $50.28 | $51.03 | $51.80 | $52.57 | $53.36 |
| 16 | $49.29 | $50.28 | $51.03 | $51.80 | $52.57 | $53.36 |
| 17 | $49.29 | $50.28 | $51.03 | $51.80 | $52.57 | $53.36 |
| 18 | $49.29 | $50.28 | $51.03 | $51.80 | $52.57 | $53.36 |
| 19 | $49.29 | $50.28 | $51.03 | $51.80 | $52.57 | $53.36 |
| 20 | $50.92 | $51.94 | $52.72 | $53.51 | $54.31 | $55.13 |
| 21 | $50.92 | $51.94 | $52.72 | $53.51 | $54.31 | $55.13 |
| 22 | $50.92 | $51.94 | $52.72 | $53.51 | $54.31 | $55.13 |
| 23 | $50.92 | $51.94 | $52.72 | $53.51 | $54.31 | $55.13 |
| 24 | $50.92 | $51.94 | $52.72 | $53.51 | $54.31 | $55.13 |
| 25 | $52.60 | $53.65 | $54.46 | $55.27 | $56.10 | $56.94 |
| PD | $47.82 | $48.78 | $49.51 | $50.25 | $51.00 | $51.77 |

1.  Credit for Past Experience.

    a.  <u>Credit for Experience as an RN</u>:  Each full year of experience as a Registered Nurse in the United States shall count one for one as a year of experience.  Each full two (2) years of experience as a Registered Nurse outside the United States shall count as one year of experience.  No partial years credit will be given.

    b.  <u>Credit for Experience as an LVN</u>:  Each 3 years of experience as an LVN shall count as one year of experience for placement on the wage scale up to a maximum of 2 years credit.

    c.  Nurses shall not be hired at a rate that exceeds their years of qualifying experience.

    d.  At least ninety (90) days prior to the first step increase provided by this Agreement, the Employer will furnish to each RN the nurse's current credited years of experience, a copy of paragraphs a) and b) above, and instructions for submitting corrections to ensure appropriate placement on the steps.  Nurses shall submit such correction no later than thirty (30) days following receipt for such notification.  Failure to submit such proposed correction within such time frame shall be deemed a waiver of any objection to the Employer's placement of such RN on the wage scale.

B.  **Payday and Paycheck**

1.  Wages will be paid every two (2) weeks.  Paychecks will be distributed on payday.  Payday is the Friday after the end of a pay period, except where such Friday is a bank holiday, in which case the payday will be Thursday.

2.  The Facility will continue its current practice regarding the direct deposit of paychecks.

3.  Where an error by the Facility results in paycheck underpayment, upon Employee request, such error will be corrected by the close of business on the next business day.  However, where the underpayment results from an Employee error, it will be corrected on the next paycheck.

4.  The Facility will comply with its obligations under state law regarding paycheck stubs.

C.  **Shift Differentials**

Shift differentials will be paid when fifty percent (50%) or more of the hours worked fall within the following shift times:

Shift 2 (evening shift):    3:00 p.m. to 11:30 p.m.

Shift 3 (night shift):    11:00 p.m. to 7:30 a.m.

Registered Nurses who work 50% or more of their shift hours during the shift 2 (evening shift) shall be paid the shift 2 differential of three dollars ($3.00) per hour for all hours worked.  Registered Nurses who work 50% or more of their shift hours during the shift 3 (night shift) shall be paid the shift 3 differential of five dollars ($5.00) per hour for all hours worked.

D.    **In-House Registry Program (IHR)**

    **1.**    A benefited full-time, part-time 1, part-time 2 or per diem Registered Nurse, completing their probationary period is eligible for IHR as detailed in the IHR policy.  IHR direct patient care hours worked will be paid one and one-half (1½) times of the base rate for the first eight (8) hours of the shift and double time for the last four (4) hours of the shift when the Registered Nurse has met the following criteria:

        **a.**    A total of seventy-two (72) productive hours of work or six (6) productive shifts must be completed in a pay period to be eligible for IHR pay for any additional shift.

        **b.**    If any unscheduled absence at any time during the pay period occurs, IHR will not be paid for any shifts in that pay period.

        **c.**    If the IHR shift falls on one of the observed holidays listed in Article 16, then no holiday differential will be paid.

        **d.**    Qualifications, competency and certifications to work in the designated unit without additional orientation.

    **2.**    Productive hours/shifts are understood to be only those hours/shifts spent in direct patient care.

    **3.**    IHR pay will not convert back to regular pay if absence is due to pre-granted vacation days or cancellation made by the staffing office of regular scheduled work days.

    **4.**    Cancellation by the Registered Nurse of a confirmed IHR shift less than two (2) hours prior to the start of the shift will be considered as an unexcused absence.

    **5.**    Any and all incentives offered for IHR will be forfeited if the Registered Nurse calls off during a regularly scheduled shift in the same pay period.

E.    **Stand-by/On-Call and Call-Back Pay**

    **1.**    Stand-By/On-Call Pay.

A Registered Nurse assigned to stand-by/on-call status by the department Director or his/her designee will be paid per hour for each hour he/she is assigned to such status. No other compensation will be paid for such stand-by/on-call status.  Hours of stand-by/on-call will not be considered hours worked for purposes of paying differentials, overtime or any other form of premium pay under this Agreement except that RNs who are called off by the hospital and are placed on standby/on call, will have their hours on standby treated as time worked for benefit accrual and for overtime eligibility.

**2.** Stand-by Pay Rates.

| Department | Rate Effective Upon Execution | Rate Effective 1/1/2021 | Rate Effective 1/1/2022 |
|---|---|---|---|
| | | N/A | N/A |
| Radiology R.N. | $10.00 | $10.75 | $11.50 |
| Critical Care R.N., | $10.00 | $10.75 | $11.50 |
| OR, Cath Lab, PACU | $10.00 | $10.75 | $11.50 |

**3.** Call-Back From Standby Pay.

A Registered Nurse who is assigned to stand-by/on-call status will be guaranteed a minimum of two (2) hours work each time he/she is called in by the department Director or his/her designee. When called back a Registered Nurse will be required to work until released by his/her Department Director or his/her designee. A Registered Nurse will receive one and one-half (1½) times his/her base rate of pay, rather than stand-by/on-call pay, for all hours actually worked when he/she is called back to work from stand-by status. The work time of a Registered Nurse who is called in from stand-by/on-call status shall commence when he/she arrives at the work site and clocks in and will end when he/she clocks out.

**4.** Stand-by/on-call and call-back hours are not subject to the weekend scheduling or call-off provisions of this Agreement.

F. **Relief Charge Pay**

Effective January 1, 2020, a Registered Nurse who is assigned to be in charge or who is performing the duties of a Charge Nurse shall receive additional compensation of three dollars ($3.00) per hour above his/her regular rate of pay. Registered Nurses will have the option of accepting or declining relief charge duties.

G. **Weekend differential-**

A weekend differential of one dollar an hour ($1.00) to be effective in year two of the agreement.

**Severance Pay**

Severance pay will be provided to a regular full-time and part-time Registered Nurse whose employment is terminated as a result of a reduction in force provided he/she executes the Facility standard release. The amount of severance pay will be one (1) week of pay per year of service, up to twelve (12) weeks, with a minimum of two (2) weeks' pay. Payment will be at the Registered Nurse's current base rate and partial years will not be prorated.

H.   **Reporting Pay**

    **1.**    Each workday a Registered Nurse is required to report to work and does report to work, he/she will be provided with at least half of his/her scheduled shift up to a maximum of four (4) hours work or any combination of work and pay totaling four (4) hours.  If the Registered Nurse agrees to report to work a second (2nd) time in any one (1) workday and does report, he/she will be provided with a minimum of two (2) hours' work or any combination of work and pay totaling two (2) hours.

    **2.**    Reporting pay will not apply in the event that:

    **a.**    The Facility offers a Registered Nurse an assignment other than his/her regular assignment and he/she refuses the alternate work.

    **b.**    The Facility makes a reasonable effort to notify the Registered Nurse at least two (2) hours prior to the start time. (Note: It shall be the Registered Nurse's responsibility to keep his/her current phone number on file with the Facility.)  A call-off log will be kept in the staffing office and will be available for review by Registered Nurses and Association staff.

    **c.**    A Registered Nurse is called back to work from stand-by/on-call status.

    **d.**    No work is available due to acts of God such as fires, floods, earthquakes, power failure or other causes not within the Facility's control.

I.   **Bonuses**

    1.    Referral Bonus.

    a.    The Facility will continue its practice of paying all referral/sign-on bonuses on an as needed basis.  In the event a referral is to be instituted, modified or discontinued, notice will be given to the Association.  Following such notice, the Association may request to meet and confer with the Facility prior to implementation of the change.

    2.    The Facility may offer retention incentives (including, but not limited to, retention bonuses) to Registered Nurses.  Notice will be given to the Association in the event that the Facility elects to offer such incentives.  Following such notice, the Association may request to meet and confer with the Facility prior to implementation.

    3.    The Facility will not be required to delay implementation of bonuses or other incentives in accordance with the above two paragraphs for more than thirty (30) days following notification to the Association.

J.   **Clinical Certificate Recognition**

    A Registered Nurse who obtains advanced certification in his/her unit specialty is eligible to receive an additional $1.00 per hour provided certification documentation is

provided and he/she can show educational proof for each year the certification is maintained. All required job certifications are excluded (i.e. ACLS, BCLS, etc.)

K.  **Full-time Non-Benefitted Registered Nurse – Opt Out Program**

Registered Nurses who have currently opted out of certain benefits will be "grandfathered" in these positions, unless they move to a non-benefit eligible position, choose to participate in opted out benefit plans or terminate employment at Southern California Hospital at Culver City.  No new participants will be added.

L.  **Waiving Medical Benefits**

Full-time and Part-time  Registered Nurses may choose, at time of initial benefit eligibility or annually at open enrollment, to "waive" Medical Benefits participation and receive $35.00 per pay period in lieu of Medical Benefits.

M.  **Facility Meals**

The Employer shall continue its current practice of providing all employees with the same meal discount as provided at the time the Agreement is effective.

N.  **Individual Bargaining**

There shall be no individual bargaining between the Facility and a Registered Nurse over wages, hours and working conditions.  Where the Agreement explicitly allows employee agreement, it shall not be coercive.

O.  **Differentials**

Preceptor differential will be $3.00per hour

ICU/CCU Step Down /ED Registered Nurses will receive a wage add on of $2.75 per hour

Surgery/Surgery Outpatient ACU/Recovery/Cardiac Cath Lab/GI Lab/Wound Care Registered Nurses  will receive a wage add on of $4.00 per hour

Case Management Registered Nurses will receive a wage add on of $9.00 per hour.

Registered Nurses not assigned to the above units will receive the applicable wage add-on for any hours during which the float to the above units.

## ARTICLE 14 – MINIMUM RATES

All wage ranges, benefits and other economic provisions of this Agreement establish minimums, and nothing herein shall be deemed or construed to limit the Facility's right to increase wage rates, benefits, premiums and differentials, and to pay other extra compensation in excess of those provided by this Agreement with the mutual agreement of the Association.  Accordingly, it is also understood that any such increases shall be over

and above the economic package negotiated under Article 13.  No employee shall suffer any reduction in base hourly rate of pay as a result of the execution of this Agreement.

## ARTICLE 15 – STANDARD BENEFIT PLANS

**1.**    Registered Nurses shall be eligible to participate in the Employer's Standard Benefit Plans, as amended from time to time, on the same terms, conditions and basis as other Facility employees.  The Employer shall continue to offer the following core benefit plans during the term of this Agreement:  Paid Time Off, medical plan, dental plan, long-term disability plan, life insurance and 401(k) Plan.  The Employer shall continue to maintain a medical insurance option for full-time and part-time 1 Registered Nurses and their families which will not require any employee payroll contribution.  (Note: CashPlus in its previous format no longer exists, however, the Employer shall continue to maintain the previously accrued dollar pool and prior funded commitments until further utilized or paid out to the employees.)

**2.**    Premium contribution and plan design changes, effective January 2019, shall be as set forth in attached Appendix C. Plan design for 2020, 2021 and 2022 will be subject to paragraph 1 above. Registered Nurse premium contributions for 2020, 2021 and 2022 shall not exceed the same percentage share of total premium for the elected coverage as applied in 2013. There will be no increases to employee contributions and premiums for the life of the agreement.

## ARTICLE 16 – HOLIDAYS AND PAID TIME OFF

Holiday Pay and Working on Holidays

Registered Nurses working the following holidays will be paid a premium rate of one and one-half (1½) times the base rate of pay

| New Year's Day | Labor Day |
|---|---|
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

A.    **Definition of Premium Pay Holiday Hours**

**1.**    Registered Nurses working day/evening shifts will be paid the premium rate for hours worked on a shift commencing between 7:00a.m. and 5:00p.m. of the actual holiday.

**2.**    Registered Nurses working a 12-hour shift commencing at or after 7:00p.m. on the eve of the above actual  holidays, shall be paid time and one-half (1 ½) their base rate for all holiday hours worked.

B.    **Scheduled Off on Holidays**

Each Department Director, in conjunction with Administration, will determine the appropriateness of closing the department(s), or if volume allows, operate on a reduced schedule. Registered Nurses who are scheduled off for the holiday due to pre-approved time off, low volume, or department closure may choose to use accrued Paid Time Off.

C.    **Holiday Obligation**

    **1.**    Regular Full-Time and Part-Time Registered Nurses.

Regular full-time and part-time Registered Nurses are required to work two (2) major holidays per year.  The major holidays are Thanksgiving, Christmas Eve (for twelve (12) hour night shifts only), Christmas Day, New Years Eve (for twelve (12) hour night shifts only), and New Years Day.

    **2.**    Per Diem Registered Nurses.

Per Diem Registered Nurses are required to work one (1) major holiday and one (1) other designated holiday per year.

D.    **Credit for Working Holidays**

    **1.**    Once the assigned holidays are posted, Registered Nurses are free to individually trade or find a replacement.  The Registered Nurse who works on the holiday will be credited as having worked the holiday.

    **2.**    If a Registered Nurse is called-off/flexed-off on the holiday, she/he will be credited as having worked the holiday.

    **3.**    If a Registered Nurse calls in sick on an assigned holiday, she/he will not be credited as having worked the holiday.

E.    **Holiday Scheduling**

    **1.**    At the time the holiday schedule is posted, a sign-up list will be posted to request call-off/flex-off.  The order of call-off/flex-off will be in accordance with Article 11.

    **2.**    Prior to the Holiday Schedule posting, a sign up list will be made available to Registered Nurses on each unit to indicate their holiday preference.

    **3.**    Holiday scheduling will be granted in accordance with current practice, by department/unit; taking into account the wishes of the Registered Nurse, the needs of the department/unit and assuring operational needs of the Employer are met.

**Paid Time Off**

1. Purpose/Procedure.  Paid Time Off is a paid time off program, which provides income replacement to eligible employees to enable them to take approved time off from scheduled work.  Each eligible employee is given a Paid Time Off account into which dollars (hours) are placed for the employee's use.  The employee may then use these dollars to replace income when taking approved time away from scheduled work.  The replacement income should not exceed their regularly scheduled hours up to 80 hours in a pay period.

2. Eligibility.  Full-time and part-time 1 employees in time off eligible positions who have been with the medical center for at least 30 days are eligible for the Paid Time Off program.  Once eligible, Paid Time Off accruals begin on the first day of the pay period in which the 31st day falls.  Part-time 2 employees and per diem employees are not eligible for Paid Time Off.

   All changes in status that affect Paid Time Off eligibility will be effective as of the first day of the pay period in which the status change becomes effective.  If an employee is changed to a non-eligible status, Paid Time Off accruals will cease and 100% of the employee's Paid Time Off account balance will be paid to the employee at 100% of its value in the pay period in which the status change occurs.  If the employee returns to a benefit-eligible status, Paid Time Off accruals will begin on the first day of the pay period in which the employee again becomes eligible, with the accrual percentage based on the employee's hire date.  If any employee is hired into a non-eligible status and later becomes benefit eligible, Paid Time Off accruals will begin on the first day of the pay period in which the employee becomes eligible, with the accrual percentage based on the employee's hire date (subject to the initially-required employment for 30 days).

3. Paid Time Off Accrual.  The standard accrual rates for Paid Time Off are based on length of service as follows:

| Length of Service | FT (80 hrs) Accrual Rate | Max | PT (40 hrs) Accrual Rate | Max |
|---|---|---|---|---|
| 31 days to 4 years | 7.2 Hrs/Pay Period | 280.80 | 3.6 Hrs/Pay Period | 140.40 |
| 4+ years to 8 years | 8.8 Hrs/Pay Period | 343.20 | 4.40 Hrs/Pay Period | 171.60 |
| 8+ years | 10.4 Hrs/Pay Period | 405.60 | 5.2 Hrs/Pay Period | 202.80 |

Paid Time Off will not accrue in any pay period in which the employee's account balance, as of the beginning of the pay period, is at the maximum limit.

Exhibit W, Page 481

4. Hours Eligible for PTO Accrual.  PTO hours will accrue in regard to the following categories of hours:

| 01 | Regular | 52 | In House Registry ** |
|----|---------|----|----------------------|
| 09 | Callback* | 61 | Retro (paid in dollars only) |
| 17 | Bereavement | 64 | Leave Without Pay |
| 19 | Jury Duty | 74 | Worker's Compensation – Light Duty |
| 20 | Education | 77 | Paid Time Off Hours |
| 24 | Orientation | 78 | Old Tenet Reserve Sick |
| 26 | Special Overtime | 79 | Medical Center Reserve Sick |

The Earning Codes listed above are for clarification purposes only.  The referencing of the Earnings Codes is not intended, and shall not be interpreted, to incorporate such items into this Agreement.

*Accruals on Callback hours (currently Earning Code 09) are always based on the employee's base hourly rate.  Paid time Off accruals are limited to base hourly rate only for callback paid at 1 ½ times the hourly rate.

** Accruals on In House Registry Hours (currently Earning Code 42) are only accumulated if coded to Earnings 52 at base hourly rate.  In House Registry coded in Earnings 53 as 1.5 or Earnings 54 as 2.0 times base pay are not eligible earnings for Paid Time Off.

5. Paid Time Off is considered non-productive time and does not count towards overtime.

6. Except as provided above, all matters concerning paid time off (including, but not limited to, requests, approval and usage) will be governed by the Facility's PTO policy.

### ARTICLE 17 – HEALTH AND SAFETY

A. **General**

The Facility agrees to provide a safe and healthy work environment for all Registered Nurses and further agrees to comply with all applicable local, state and federal health and safety laws and regulations.  In the event that local, state or federal safety laws and regulations mandate a higher standard than the language of this article, the higher standard shall be in effect.

1. Reporting of Health and Safety Hazards by Registered Nurses.

It is the duty of all Registered Nurses and Management to comply with health and safety regulations, and if any safety or health hazard is detected by a Registered Nurse, the Registered Nurse shall promptly report it to the Facility and the Facility shall take prompt positive measures to remedy the situation. The Association shall promptly notify the Facility of any potential health and safety hazards, violations or problems of which it is aware and the Facility shall take prompt positive measures to remedy the situation.

**2.**     In-Service.

The Facility shall provide regular in-service or other training and information to Registered Nurses concerning health and safety.

**3.**     Hepatitis B Vaccine.

Hepatitis B vaccine shall be made available free of charge and at a covered Registered Nurse's request, if the Registered Nurse's normal functions include exposure to blood, blood products, bodily fluids, or needlesticks or cuts by other sharp objects that may have patient blood, blood products, or body fluids on them.  Such vaccine also will be provided to other Registered Nurses, at their request, if their normal functions do not include such exposure, but the Registered Nurse has had an on-the-job needlestick or cut, as described.

**4.**     Other Testing and or Treatment for On-the-Job Exposure.

The Facility will continue all other existing practices with regard to testing and/or treatment for on-the-job exposure to health and safety hazards at no cost to the Registered Nurse.

**5.**     Personal Protective Equipment.

Personal protective equipment, as appropriate, will be provided to all Registered Nurses.

B.     **Joint Health and Safety Committee**

**1.**     Makeup of Committee.

The Facility shall establish a Joint Health and Safety committee for Registered Nurses which will meet quarterly to consider matters of workplace safety.  The chairperson of the committee shall be appointed by the Facility.  The remainder of the committee shall be comprised of three (3) additional management and four (4) bargaining unit Registered Nurses selected by the respective parties.

**2.**     Meeting Agenda.

The committee's agenda will be confirmed to all members at least one (1) week in advance of each meeting and the committee's written recommendations shall be submitted to management of the Facility.

**3.**     Compensation.

If a Registered Nurse committee member is regularly scheduled to work during the time in which the committee meeting is held, she/he will be compensated at straight-time

pay for attendance up to a maximum of two (2) hours per Registered Nurse per meeting. Attendance at committee meetings will be considered "time worked" for all purposes.

**4.** Dispute Resolution.

The Union and the Facility acknowledge that unless mutually agreed neither shall use this committee for the purposes of collective bargaining. Disputes within the Joint Committee shall not be subject to the Grievance and Arbitration provisions of this Agreement (Article 9). However, nothing in this Agreement shall prevent an Employee, the Union or the Facility from subsequently pursuing an otherwise grievable issue through the Grievance/Arbitration Procedure.

C.   **Communicable Diseases**

**1. General**

**a.** The Facility will work to eliminate or minimize Registered Nurse exposure to communicable diseases.

**b.** The Facility shall provide information and training, at least annually, to Registered Nurses on communicable diseases to which he/she may have routine workplace exposure. Information and training shall include the symptoms of diseases, modes of transmission, and methods of self-protection, workplace infection control procedures, special precautions and recommendations for immunizations where applicable. In addition, the training shall include interactive hands-on training in donning and doffing of personnel protective equipment, facility exposure control plans, and other programs related to infectious diseases. There will be additional training and education as needed based on new conditions relating to infectious diseases. The Facility shall make the Hepatitis B and/or other appropriate vaccinations available to Registered Nurses who are at risk of exposure to infectious agents.

**c.** The Employer shall provide accepted protocols and personal protective equipment based on the type and nature of the disease.

**d.** This article shall be interpreted and implemented based on the precautionary principle which holds that lacking scientific consensus that a proposed action, policy, or act is not harmful – particularly if that harm has the potential to be catastrophic – such action, policy, or act should not be implemented and the maximum safeguards should be pursued.

**2.    Infection Disease Task Force**

a.    The Employer and the Union shall create an Infectious Diseases Taskforce (IDTF) for Registered Nurses (RNs) per the provisions of the Joint Health and Safety Committee under Article 17.B.

b.    In the event of an infectious disease outbreak, epidemic, or pandemic that impacts the facility, the IDTF shall meet within twenty-four (24) hours. Thereafter, the IDTF shall meet as needed.

c.      The IDTF is hereby charged with monitoring system-wide preparedness and response to an infectious disease outbreak, epidemic, or pandemic.

D.      **Workplace Violence**

1.  General

The Facility will maintain a comprehensive workplace violence prevention program.

2.  **Registered Nurse Workplace Violence Prevention**

**a.**  Workplace violence includes, but is not limited to, any of the following against a Registered Nurse (RN) by a patient or patient visitor:

i.  The use of physical force that results in, or has a high likelihood of resulting in, injury, psychological trauma, or stress, regardless of whether the RN sustains an injury.

ii.  An incident involving the use of a firearm or other dangerous weapon, regardless of whether the RN sustains an injury.

iii.  Sexual assault or harassment, threats of violence or harm, and verbal or non-verbal intimidation.

**b.**  The Hospital shall establish a Joint Workplace Violence Taskforce for Registered Nurses (RNs) per the provisions of the Joint Health and Safety Committee under Article 17.B.  The RN Workplace Violence Prevention Taskforce will be responsible for identifying and recommending workplace violence prevention programs as well as other safety and prevention measures for the Employer's consideration.  The committee will meet at mutually agreed upon times but no lesser than bi-annually, with the initial meeting scheduled within ninety (90) days of the execution of this Agreement.  Whenever the bargaining unit Registered Nurses of the Committee make a written recommendation to the Chairperson of the Committee, s/he shall respond in writing within thirty (30) calendar days unless the Association and the Hospital mutually agree that the time may be extended.

**c.**  The workplace violence prevention plan under the provisions of this section shall be in effect at all times in all patient care units and hospital grounds.

**d.**  Education and training shall be offered periodically in accordance with the workplace violence prevention plan.

**e.**  The parties acknowledge that this section does not displace the Hospital's general Workplace Violence Policy insofar as it is not in direct and irreconcilable conflict with the provisions of this Agreement.  The parties also agree that all Registered Nurses remain protected by, and subject to, the general Workplace Violence Policy.

E.    **Counseling**

The Facility will make Critical Incident Stress Debriefing (CISD) available to Registered Nurses on an as needed basis. CISD is to be used for incidents such as serious physical and/or emotional work injury, work-related death of co-workers, or the suicide of a co-worker.

F.    **Physical Examinations**

**1.**    All physical examinations required of a Registered Nurse in connection with her/his employment, according to the practice of the Employer, shall be given without charge, provided such examination(s) is conducted by a Facility-designated physician or Registered Nurse.  Physical examinations shall include all laboratory and other clinical tests as required by the Facility, Title XXII or the Department of Health Services.  All time spent by a Registered Nurse in such physical examination(s) will be considered as hours worked regardless of whether it occurs during the Registered Nurse's normal working hours or nonworking hours; however, time spent in a pre-employment physical examination and/or test will not be compensable.

**2.**    An examination conducted by any other physician or RN may be acceptable at the Facility's option for purposes of compliance with state law, but in these cases the Facility shall have no financial obligation for such examination(s).  The amount of time that would have been spent in having the Facility-designated physician or Registered Nurse perform the examination(s) shall be considered as hours worked.

G.    **Safe Patient Handling & Lift Policy**

1.    To protect patients and nurses from back and musculoskeletal injury, the Employer shall maintain a safe patient handling program for all patient care units at all times.  The Employer shall generally replace manual lifting and transferring of patients with powered patient transfer devices, lifting devices, and lift teams, as appropriate for the specific patient and consistent with the Employer's safety policies, accepted standards of professional judgment, and the clinical assessment of the registered nurse.

2.    Consistent with the California Code of Regulations regarding Health Care Worker Back and Musculoskeletal Injury Prevention, the Employer shall provide education and training in safe patient handling to nurses that includes, but is not limited to, the following:

    a.    The areas of the body exposure and types of injuries associated with manual patient handling activities including risk associated with the vertical and lateral movement, bariatric patients, repositioning and ambulation, and the importance of early recognition and management.

    b.    How risk factors, such as the patient's ability and willingness to cooperate, bariatric condition, clinical condition, etc. are assessed and controlled during patient handling tasks including the following: vertical lifts, lateral transfer, repositioning and ambulation.

    c.    How to communicate with patients regarding the use of patient handling procedures and equipment.

d. The appropriate use of powered and non-powered equipment to reduce injuries to patients and employees. This shall include practice using the types and models of equipment that lift team members and other designated healthcare workers will be expected to use.

e. Procedures to be followed in order to safely perform manual patient handling when necessary.

f. The importance and process for reporting concerns regarding equipment availability, condition, storage and maintenance, and concerns regarding availability of sufficient staff to perform patient handling activities.

g. The elements of the Employer's Safe Patient Handling Plan and policy and how the Plan will be made available to employees.

h. The right to refuse to lift, reposition, mobilize, or transfer a patient due to concerns about patient or worker safety or the lack of trained personnel or equipment, and how a health care worker can communicate concerns regarding the designated activity to an appropriate supervisor.

i. The role of the designated registered nurse (RN) as the coordinator of care, and how the RN will be responsible for the observation and direction of patient lifts and mobilization.

j. The role of the supervisor to be familiar with the Safe Patient Handling Plan, the safe patient handling policy, and the patient handling hazards in their units.

k. How an RN can request additional training and an opportunity for interactive questions and answers with a person knowledgeable about the Plan and safe patient handling equipment and procedures.

3. As the coordinator of care, the registered nurse shall be responsible for the observation and direction of patient lifts and mobilization, and shall participate as needed in patient handling in accordance with the nurse's job description and accepted standards of professional judgment.

4. The lift team shall be specifically trained to handle patient lifts, repositioning, and transfers using patient transfer, repositioning, or lifting devices as appropriate for the specific patient. The provision of lift resources will not compromise direct patient care assignments.

5. At an RN's request, the Employer shall provide an ergonomic evaluation of the work environment, including the RN's work space and equipment. At an RN's request, the Employer shall provide additional training consistent with the provisions of this section.

6. An RN who refuses to lift, reposition, or transfer a patient due to reasonable concerns about patient or worker safety or the lack of trained lift team personnel or equipment shall not, based upon the refusal, be the subject of disciplinary action by the hospital or any of its managers or employees.

## ARTICLE 18 – EDUCATION BENEFITS

A.    **Tuition Assistance Benefits**

Tuition assistance shall be available to eligible Regular Full Time and Part Time Registered Nurses upon satisfactory completion of pre-approved qualified college or university coursework.

**1.**    Registered Nurse Eligibility.

To be eligible to receive tuition assistance, a Registered Nurse must satisfy the following requirements:

**a.**    The Registered Nurse must be on the payroll and classified as a Regular Full Time or Part Time Registered Nurse at the time of course registration through and including the course completion date.

**b.**    The Registered Nurse must have completed at least six (6) months of continuous service at the Facility at the time of registration.

**2.**    Qualified Courses.

To be eligible for reimbursement, courses must meet the following requirements:

**a.**    Courses must be offered by a recognized, accredited educational institution.  Satisfactory course completion must result in the award of college credits.

**b.**    Courses must be job-related or part of a degree program that is job-related.  Courses taken in preparation for other career opportunities within the facility may be submitted for consideration.

**3.**    Participation Requirements.

To receive tuition assistance, an eligible Registered Nurse must satisfy the following requirements:

**a.**    Complete the required tuition reimbursement request form(s) and secure approval from the Department Head/Director and the Director of Human Resources or her/his designee prior to registering for the requested course.

**b.**    Submit to Human Resources documentation of successful course completion (a minimum grade of "C" or equivalent) and the associated tuition receipts within three (3) months of course completion.  Such documentation shall include an official grade report and actual receipts.

**4.**    Reimbursement Levels.

    **a.**    Regular Full Time and Part Time I Registered Nurses will be reimbursed for the cost of tuition (including class fees, textbooks, enrollment fees, test fees, and laboratory fees) $1,400 annually.

    **b.**    Facility reimbursement and reimbursement from other sources such as government agencies (e.g., G.I. Bill, etc.) or other educational benefits (i.e., scholarships or grants) cannot exceed the cost of tuition. If the cost of tuition exceeds the Facility's maximum reimbursement level, the Facility's reimbursement will be reduced by any amounts received through such other sources. Documentation of outside financial assistance is required before reimbursement by the Facility.

    **c.**    The employer, at its sole discretion, may make additional tuition reimbursement available to bargaining unit employees to the same extent and on the same terms that such benefit is available to non-represented employees in the California Region.

**B.**    <u>**Paid Education Time**</u>

    **A.**    Mandatory In-Service.

        a.    Registered Nurses will receive their base rate of pay for all in-service meetings designated by the Facility as mandatory and such time shall be counted as time worked.

    **B.**    Other Educational Classes.

        a.    Except where required for licensure or renewal, all Registered Nurses will be paid at their base rate of pay for all hours spent attending courses required by the Facility in order to retain their current positions. In order to be eligible for payment, all Registered Nurses must obtain prior written approval from their Director to attend any such course offered at the Facility. If no such course is reasonably available at the Facility, the Registered Nurse may with prior written approval attend the course at a nearby facility-contracted vendor. Such approvals will not be unreasonably withheld. No tuition fee will be charged to Registered Nurses for such courses.

        b.    The Facility will pay Registered Nurses at their base rate of pay for all hours spent attending courses and will reimburse the Registered Nurses for the tuition fee provided.

        c.    The courses, workshops, or seminars relate to the Nursing Profession;

        d.    There will be a direct or indirect benefit to the maintenance of or improvement in the RN's skills;

        e.    Application in writing is received by the Employer no less than 14 days prior to the requested date of leave if the RN is scheduled to work on the day of the class.

**C.**   Education leave may be used by nurses for home study programs.

**D.**   Approval of requests for education leave shall not be unreasonably withheld.

**E.**   With respect to Paragraphs a and b, "travel time" to and from such course will be paid in accordance with the requirements of federal and state wage and hour laws.

**F.**   In addition to the above, a Full-Time or Part-Time Registered Nurse, having successfully completed their 90 day new hire probationary period, may utilize up to sixteen (16) paid educational leave hours annually to attend any Course approved by the Board of Registered Nursing for Continuing Education credit, including Home Study.

**G.**   The nurse must give management a minimum of 14 days' notice of any such training or education and approval of leave shall be in the sole discretion of management.

## C.   <u>Nurse Preceptors</u>

**A.**   Performance of preceptor duties shall not be mandatory unless necessary for patient care or operational needs.

**B.**   Nurses that are precepting will have a modified assignment as determined at a departmental level by hospital management.

**C.**   Employees who are designated as preceptors will be paid at their regular hourly rate for attending employer provided preceptor training.

**D.**   To be considered for assignment as a preceptor, the employee must have demonstrated current competency in the department /unit to which the employee is assigned.

**E.**   When an employee is assigned to perform preceptor duties, the employer will comply with all applicable state and federal laws.

**F.**   A registered nurse who serves as a preceptor, pursuant to Article 18, Education, will not be floated or flexed while precepting and will receive a differential of $3.00 per hour for hours serving as preceptor.

**G.**   The preceptor will orient the new graduate /registered nurse in specialty training to their roles and responsibilities on their unit and introduce them to the formal and informal rules, customs, culture and norms of their coworkers and workplace.

**H.**   Opportunities to participate both as a preceptor and in preceptor training will be posted and will not be unreasonably denied.

## ARTICLE 19 – LEAVES OF ABSENCE

A.    **Statutory Leaves of Absence**

The Facility will comply with its obligation under federal and state law regarding leaves of absence, including leaves of absence under the Pregnancy Leave Act, California Family Rights Act, California Paid Family Leave Law, the federal Family and Medical Leave Act of 1993, California Workers' Compensation laws, and the federal Uniform Services Employment and Reemployment Act (29U.S.C.SS84301 et seq.).

B.    **Association Leave**

Notwithstanding the above, Registered Nurses who have been in the employ of the Facility for at least one (1) year may request an Association leave of absence (without pay) in writing at least (30) days prior to the leave commencing.  Such leave of absence without pay will not exceed six (6) months.  No more than one Registered Nurse may take such a leave at any one time, however, such leave will not be unreasonably denied.  Should the Facility grant such leave, permission, shall be in writing setting forth the date of such leave.

1.    Health Insurance.

Benefits may be continued under the provision of COBRA.

Association leaves of absence are unpaid.

2.    Accrual of Benefits.

An Association leave of absence will not affect previously accumulated benefits. However, Registered Nurses taking this type of leave will not accrue benefits while on unpaid leave.

3.    Return to work.

When a Registered Nurse returns to duty in compliance with the authorized leave of absence, such Registered Nurse shall be reinstated in the same classification, positions, shift, unit and scheduled hours in which such Registered Nurse was employed before his/her absence.  If conditions in the Facility have so changed that it would not be feasible to reinstate him/her in such manner, then the Facility will reinstate the Registered Nurse to as nearly comparable a position and shift as is reasonable under the circumstances.

If a Registered Nurse wishes to return from leave early he/she must give the Facility at least four (4) weeks notice prior to reinstatement.

C.    **Personal Leave of Absence**

A Registered Nurse may request a Personal Leave of Absence. Such leave may be granted for reasons other than a Registered Nurse's own serious health condition or disability or the Registered Nurses need to fulfill family obligations relating directly to childbirth, adoption, or placement of a foster child: or to care for a child, spouse, or parent with a serious health condition. A Registered Nurse requiring a leave for those reasons

should apply for Family Leave or Medical Leave. A Personal Leave of Absence may be granted for up to thirty (30) days; however such leave may not be used to extend a vacation, or other paid time off. The leave may be extended beyond the initial thirty (30) days at the discretion of the facility's Department Head/Director, and Human Resources Director.

**1.**      Benefit Accrual

A benefit – eligible Registered Nurse on a General Leaves of Absence will continue to accrue all benefits or other paid time off.

**2.**      Continuation of Health Benefits.

Subject to terms, conditions, and limitations of the applicable benefits plan, health insurance benefits will not be subsidized by the facility. A Registered Nurse will become responsible for the full leave of absence cost of these benefits if he/she wishes coverage to continue during such leave.

**3**.      Request in Writing.

A request for a ~~General~~ Personal Leave of Absence must be submitted in writing and must be approved in writing by the Registered Nurse's Department Head/Director and facility Human Resources Department before the leave begins.

**4.**      Return to Work.

When A Registered Nurse returns to duty after an authorized Personal Leave of Absence, such Registered Nurse will be reinstated in the same classification, position, shift, unit and scheduled hours in which such Registered Nurse was employed before his/her absence. If conditions in the Facility have so changed and there are circumstances that render an assignment impossible or substantially impracticable, that it would not be feasible to reinstate him/her in such manner, then the facility will reinstate the Registered Nurse to as nearly comparable a position and shift as is reasonable under the circumstances. If neither option is available, the affected Registered Nurse will be given preferential consideration for another position and shift for which he/she is qualified over external applicants.

D.      **<u>Medical Disability Leave</u>**

A Registered Nurse shall be granted a leave of absence when a Registered Nurse is unable to work because of disability or illness. The Facility will grant such leaves according to state and federal law and this Agreement.

**1.**      A Registered Nurse shall be granted a leave of absence for physical or mental disabilities to the extent such leaves are mandated by state and federal law.

**2.**      Additionally, a Registered Nurse shall be a granted leave of absence for physical or mental disabilities for a period up to six (6) months, where the necessity for such absence has been certified by the Registered Nurses' attending physician; such leaves shall be subject to the Return To Work provisions of Section C.4., above.

E.      **Length of Leaves**

Leaves (whether paid, unpaid, or a combination of paid and unpaid) shall not exceed one (1) year unless:

     **1.**      Otherwise required by law;

     **2.**      Otherwise provided in this Article;

     **3.**      Except in the case of Workers' Compensation leaves which will be handled on a case-by-case basis, but in no event shall be less than required by law and no less than that provided for other Medical leaves; and

     **4.**      Except in the case of pregnancy disability leave.

F.      **Use of Paid Time Off During Leaves**

Except as otherwise agreed, Registered Nurses may use any extended illness benefits, in connection with leaves of absence granted pursuant to this Article. If the Registered Nurse elects to utilize paid time off and/or reserve sick benefits during a leave covered by state Workers Compensation or State Disability benefits, such paid time off or accrued reserve sick benefits shall be integrated with the state benefits in order to fully replace the Registered Nurse's regular wages, until such benefits are exhausted.

G.      **Modified Duty Program**

     **1.**      In the case of a worker compensation injury, the Facility will provide a Registered Nurse with temporary restrictions in a temporary job they can perform in accordance with the Transitional Duty (Modified Duty) Program.

     **2.**      Prior to participating in the Transitional Duty (Modified Duty) Program a Registered Nurse shall be provided the Transitional Duty (Modified Duty) Program Information (Addendum D) and Contract (Addendum C) for his/her review and signature.

H.      **Bereavement Leave**

In the event of a death in the immediate family, a Registered Nurse will be allowed twenty-four (24) hours immediately following the death, to arrange or attend the funeral. Bereavement Leave must be taken within the seven (7) day period following the death.

     **1.**      Immediate Family.

"Immediate family" is defined as: spouse, domestic partner, parents, children, brothers, sisters, current brothers-and sisters-in-law, fathers- and mothers-in-law, stepparents, stepbrothers, stepsisters, stepchildren, step grandchildren, grandparents, grandchildren and individuals who are not legally related but who reside with the Registered Nurse.

     **2.**      Pay.

The Registered Nurse will be paid his/her base hourly rate for each of the scheduled day(s) missed up twenty-four (24) hours and may be required to furnish satisfactory evidence to support the leave.

3.      Eligibility.

An eligible Registered Nurse may request bereavement leave only after having completed at least ninety (90) calendar days of service.

I.      **Jury Duty Leave**

1.      Eligibility.

Regular Full-Time Registered Nurses and Part-Time 1 Registered Nurses called to jury duty after completing ninety (90) days of employment may be eligible to receive a portion of their hourly base pay for a limited time while serving on jury duty. In the event that a regular Full-Time Registered Nurse cannot be excused or cannot rearrange his/her working schedule to avoid a conflict, the Registered Nurse will be paid his/her base daily rate for each full working day missed due to jury duty for a maximum of eighty (80) hours pay within a thirty-six (36) month period, except where otherwise required by law. A Part-Time 1 Registered Nurse may receive up to a maximum of forty (40) hours pay within a thirty-six (36) month period, except as otherwise required by law. Any additional time served on jury duty by the Registered Nurse during this period shall be without pay.

2.      Jury Duty Attendance and Work Requirement.

Evidence of jury duty attendance must be presented to the facility.  The Registered Nurse should continue to report for work on those days or       parts  of  days when excused from jury duty or whenever time spent on jury duty does not match the time regularly scheduled for work.

3.      Return to Work.

It is the Registered Nurse's responsibility to report for employment at the end of an approved leave for jury duty.  Failure to do so may result in disciplinary action up to and including termination of employment.

4.      Continuation of Benefits.

All Registered Nurse benefit accruals and other benefits in which the Registered Nurse is enrolled will continue while the Registered Nurse  is  on  jury  duty  leave.  The Registered Nurse will be required to continue payment of any required contributions for Registered Nurse benefits during the jury duty leave.

J.      **Witness Leave**

A Registered Nurse who is required by law to appear in court as witness may take time off without pay for such purpose provided he/she gives the facility reasonable advance notice. A Registered Nurse who appears as a witness at the request of the facility will receive pay at his/her base rate during such time.

K.      **Pay and Benefits**

Unless otherwise required by law or otherwise required by this Agreement, leaves of absence under this Article and Agreement shall be unpaid.  Registered Nurses on leaves of absence other than Union leaves of absence shall be eligible to continue to participate in

the Facility's insurance and benefits plans in accordance with the terms and conditions of those plans.

L.    **Reduction in Force**

If business conditions require a reduction in force, Registered Nurses on an approved leaves of absence will be considered for layoff under the same terms and conditions as other Registered Nurses actively at work.

M.    **Termination During Leave of Absence**

**1.**    Unless otherwise required by law, a Registered Nurse may be subject to termination during a leave of absence for reasons including but not limited to the following:

**a.**    Failure to keep the Facility informed of changes in medical status if on a medical disability leave, including maternity/pregnancy-related leave.

**b.**    Misrepresentations regarding the reasons for applying for the leave of absence, or any facts related hereto.

**2.**    The Facility must provide a Registered Nurse on any leave with reasonable advanced written notice of pending termination, stating the reasons therefore, and further stating what, if anything, the Registered Nurse needs to do to avoid termination.

N.    **Physical Examinations**

The facility reserves the right to require any Registered Nurse on any medical of disability leave, including maternity/pregnancy related leave, to be examined at the Facility's expense by a Facility selected physician prior to his/her return to work.

## ARTICLE 20 – JOB SECURITY

A.    **Successorship Protection**

In the event of sale or transfer of control of the Facility by Southern California Hospital at Culver City, Southern California Hospital at Culver City shall, within a reasonable period of time but not less than twenty-one (21) days of the effective date of the sale or transfer, provide the Association with the new Employer's or entity's name, address and designated representative.  Prior to the sale or transfer, Southern California Hospital at Culver City shall inform the new owner and/or Employer or entity of the existence of this agreement and of its terms and conditions; shall require the new owner, Employer or entity to retain all or substantially all of the bargaining unit Registered Nurses, recognize the Association as the collective bargaining representative and to assume any existing collective bargaining agreement.  The parties agree that compliance with this Article shall constitute full satisfaction of any and all obligations to bargain regarding such sale or transfer, and Southern California Hospital at Culver City and the Facility shall have no further obligation to the Association with respect to a sale or transfer of control of the

facility.  Nothing in this article shall constitute a waiver by CNA of any successorship
rights they may enjoy under applicable law.

## ARTICLE 21  –  MANAGEMENT RIGHTS

It is the right of Administration to manage the Hospital and to direct its employees,
including the right to establish lawful policies and procedures, to establish reasonable work
standards and rules, and the right to hire, discipline or discharge for just cause, assign,
layoff and promote employees subject to the Association's rights which are set forth and
preserved in this Agreement.

## ARTICLE 22  –  SUBCONTRACTING

There shall be no subcontracting of work currently performed by Registered Nurses
covered by this agreement if there are RNs currently working in these positions or there
are qualified applicants for such positions.

## ARTICLE 23  –  ASSOCIATION SECURITY

A.    **Association Membership as a Condition of Employment**

**1.**    All Registered Nurses of the Facility covered by this Agreement as of the
date of the execution shall, as a condition of continued employment with the Facility,
become and remain members in good standing of the Association not later than the thirty-
first (31st) day following the date of the execution of this Agreement by tendering payment
to the Association of periodic Association dues uniformly required.

**2.**    As a condition of employment all Registered Nurses hired on or after the
effective date of this Agreement shall, on the thirty-first (31st) day following the beginning
of such employment, become and remain members in good standing of the Association and
tender to the Association the periodic dues that are the obligations of members.

B.    **Failure to Make Required Payments**

**1.**    The Association shall notify the Facility and the affected Registered Nurse
in writing of an Registered Nurse's failure to comply with the provisions of this Article
and shall afford each such Registered Nurse fifteen (15) work days, after the Registered
Nurse has been mailed such notice at his/her last known address, in which to comply.

**2.**    If said Registered Nurse does not comply with the provisions of this Article
within the ten (10) day period following actual notice, the Registered Nurse shall be
promptly terminated upon written notice of such fact from the Association to the Facility.

C.    **Deduction and Remittance of Association Initiation Fees and Dues**

    **1.**    Upon receipt of an individual, voluntary, written and un-revoked check-off authorization form which has been signed by an Registered Nurse in the bargaining unit covered by this Agreement, the Facility shall deduct from the pay of such Registered Nurse during the first pay period of each calendar month a sum equal to the Registered Nurse's Association monthly membership dues, uniformly required, and only so long as such Registered Nurse was employed by the Facility at the time such obligation became due.

    **2.**    The Facility shall promptly remit to the Association the sums which are deducted under the Section, together with a list on hard copy and a disk or electronically (on Excel, ASCII delimited text, or another compatible format) showing the following information for the Association members: their names, Social Security number, home address and phone number (as provided by the Registered Nurse), classification, regular wage rate, regular hours worked during the period, regular earnings during the period, Department, status, (e.g. Regular full-time, Regular part-time, Limited part-time, On Call, Casual, Per Diem, or Temporary), and date of hire.

    **3.**    The Association shall indemnify the Facility and hold it harmless against any and all suits, claims, demands and liabilities that arise out of, or by reason of, any action that shall be taken by the Facility for the purpose of complying with the foregoing provisions of this Article.

    **4.**    The Facility will honor written assignment of wages to the Association's Federal Political Action Committee fund, where such assignments are submitted in a form agreed to by the Facility and the Association, and will remit such contributions to the Association.

## ARTICLE 24 – WORK STOPPAGE

A.    **Prohibited Activity**

    During the term of this Agreement, neither the Association nor its agents or representatives, nor any Registered Nurses, individually or collectively, shall call, sanction or participate in any strike, work stoppage, boycott, sit-down, sickout or slow-down, or any refusal to cross a picket line at or enter the Facility's premises, or any other interference with any of the Facility's services or operations, or with the movement or transportation of goods to or from the Facility's premises.

B.    **Waiver By Association**

    The prohibitions of this Article are intended to apply regardless of the motivation for the strike or other conduct.  By way of illustration only, this Article expressly prohibits (1) sympathy strikes (individual or concerted failure to cross a picket line established by another labor organization or by members of another bargaining unit); (2) strikes over disputes that are not subject to arbitration; and (3) strikes in protest of alleged violations of state or federal law.  Any statutory right under the NLRA which a Registered Nurse may otherwise have to engage in such conduct is hereby expressly waived by the Association.

C.      **Association Obligation**

If a violation of this Article should occur, the Association shall immediately do everything within its power to terminate the violation.

D.      **Penalty**

Any Registered Nurse who participates in any activities prohibited by this Article shall be subject to discharge or such lesser discipline as the Facility in its discretion shall determine, provided however, that such Registered Nurse shall have recourse to the grievance and arbitration procedure as to the sole questions of whether she/he in fact participated in such prohibited activity and whether the discipline is discriminatory.

E.      **Association Officials**

The Association's Labor Representatives and Nurse Representatives shall attempt to end any violation of this article by personally complying with the article, and by urging others to do so.  Should they fail to do so, they may be selectively disciplined, including discharge, provided they shall have recourse to the grievance and arbitration procedure as to the question of whether they complied with this section.

F.      **No Lockouts**

The Facility agreed that there shall be no lockout during the term of this Agreement.  As used herein, the term "lockout" shall not include the closing down or curtailment of operations or layoffs due to economic conditions, business or operational reasons, natural disaster, or reasons beyond the Facility's control.

G.      **Expedited Arbitration**

Without resort to the grievance procedure, any dispute regarding an alleged violation or threatened violation of this Article may be submitted to expedited arbitration by either party upon written notice to the other party.  Within twenty-four hours of any request to arbitrate an alleged violation of this Article or as soon thereafter as any arbitrator is available, a hearing shall be held, telephonically or otherwise, before any one of the arbitrators identified in Article 9, Section C(1) of this Agreement.  The first available arbitrator in sequential order from the list shall be selected.  The arbitrator shall determine and advise the parties of the time and place of such hearing.  The failure of either party or witness to attend the hearing as scheduled and noticed by the arbitrator shall not delay the hearing, and the arbitrator shall proceed to take evidence and issue an award and order as though such party or witness was present.  The sole issue before the arbitrator shall be whether this Article has been violated of this Article and what relief, if any, for such violation is appropriate.  In the event the arbitrator finds any violation of this Article, the arbitrator may order such interim relief as he/she deems appropriate.  The arbitrator may issue his award at any time, but in no event later than 24 hours after the hearing.  Any decision supporting such award shall be issued within seven (7) days of the close of the hearing.  The arbitrator's decision and award shall be final and binding on the parties. Nothing herein shall be deemed or construed to limit or preclude any party's right to any judicial remedy, including but not limited to injunctive relief and damages.  The fees and

expenses of the arbitrator, the court reporter's appearance fee, and the cost of mutual facilities shall be borne equally by the Facility and the Association.

## ARTICLE 25 – NOTICES

Notices by the Association to the Facility shall be mailed, by certified mail, return receipt requested, or delivered to the following address:

Southern California Hospital at Culver City
3828 Delmas Terrace
Culver City, California 90232

Copies shall also be mailed, by certified mail, return receipt requested, or delivered to the Chief Operating Officer and Human Resources Director at the address listed above. Notices by the Facility to the Association shall be mailed, by certified mail, return receipt requested, or delivered to the following address:

California Nurses Association
155 Grand Ave
Oakland, California 94612

## ARTICLE 26 – SAVINGS CLAUSE

If any provision of this Agreement is held to be in conflict with any State or Federal law, or if compliance with or enforcement of any provision is restrained, the remainder of this Agreement shall remain in full force and effect.

## ARTICLE 27 – ENTIRE AGREEMENT

The parties agree that this Agreement (including the results of any local bargaining as provided herein constitutes the entire contract between them governing wages, hours and conditions of employment of bargaining unit Registered Nurses covered during the term hereof, and settles all demands and issues on all matters subject to collective bargaining. Accordingly, except as the Agreement expressly provides for a local bargaining process, the Association and the Facility expressly waive their rights during the term of the Agreement to demand negotiations upon any subject matter, whether or not such subject matter is specifically contained in this Agreement or whether such subject matter has or has not been raised or discussed by either party during the negotiations leading up to the execution of this Agreement.

## ARTICLE 28 – TECHNOLOGY

**A.**     Utilization of technology should be consistent with the provision of safe, therapeutic, effective care that promotes patient safety through the ability of a Registered Nurse to follow the Nursing Process, including the exercise of clinical judgment in assessing, evaluation, planning, implementing, and diagnosing and acting as a patient advocate.

**B.**     Technology should be utilized to safeguard patient confidentiality.

**C.**     The Hospital intends to maintain a work environment in which technology provides skill enhancement, and furthers the implementation of the nursing process defined in the Nursing Practice Act Title 22, and the Standards of Competent Performance as defined in Title 16, including, but not limited to, the responsibility of patient advocacy.  It is not the intention of the employer to replace nurses through the implementation of technology.

**D.**     Technology is intended to provide information and options for clinical decision making.  Clinicians will maintain accountability for actual clinical decision making, including incorporating individualized patient needs, complications, and co-morbidities, as appropriate.

**E.**     Prior to the implementation of new technology, the hospital shall notify the PPC of the proposed new technology being considered.  Nursing management shall meet with the PPC upon request to assure that the new and existing technology conforms with the provisions of this Article, and provides opportunities for the nurses to have input regarding the new technologies.  Input from the nurses and the PPC will be considered prior to the implementation of new technology.

## ARTICLE 29 – OUTSIDE AGENCY REGISTERED NURSES

A traveler will only be retained on a contract basis if the Employer has not been able to fill the position as posted.  This shall not be construed to require termination of a traveler's services prior to expiration of the traveler's contract.  Vacant positions temporarily filled by travelers shall remain posted until filled on a permanent basis.  No traveler shall be retained without the required competencies to provide care for assigned patients.

## ARTICLE 30 – REGISTERED NURSE RESPONSE NETWORK

The Registered Nurse Response Network (RNRN) is the national network of direct-care RNs that coordinates education, training, and deployment of volunteer RNs to provide humanitarian and/or disaster relief when and where they are needed.  Upon request from the Union, the Employer will grant unpaid leave for education, training, and deployment

through the RNRN program of up to one (1) RN at a time.  The Union will request in writing up to three (3) nurses to participate in the RNRN program per year, with the understanding that no more than one (1) RN may be away from work due to the RNRN program at any given time.  Requests made by the Union to exceed three (3) nurses in a year may be mutually agreed upon by both parties.  All nurses participating in the RNRN program shall not be on leave for more than thirty (30) days from the first day of release of this program.

The Registered Nurse will be entitled to reinstatement of his/her position, provided s/he returns on the next scheduled shift after the RNRN leave period expires. CNA will provide all training and will be responsible for all the logistics, coordination with local authorities, transportation, meals and lodging. Registered Nurses may use accrued PTO during participation in the RNRN program.  Requests for such leave time must be accompanied by documentation supporting the purpose of such leave, including evidence as to the bona fide humanitarian emergency or disaster.  Registered Nurse will remain covered under the Employer's health insurance plans provided the nurse continues to make his/her normal contributions (if applicable) to such plans.

Additionally, the Employer may sponsor Nurses to participate in education, training, and/or deployment through the RNRN program.  As a sponsor, the Employer shall provide each nurse that participated in an RNRN program full compensation including wages, benefits, PTO accrual, and seniority in the same manner as if the nurse were working in the hospital or other Employer facility.

## ARTICLE 31 – TERM

This Agreement shall become effective March 24, 2020 and shall continue in full force and effect through March 31, 2023.  Either party may serve written notice to the other party of its intent to amend the Agreement at least ninety (90) days prior to the expiration date.

This Agreement has been executed as of  _____.

For the California Nurses Association    Southern California Hospital at Culver City


_____    _____

Sam Cook

Lead Labor Representative

## SIDE LETTER RE: PATIENT CARE ADVOCACY FORUM

The parties agree that Southern California Hospital at Culver City Registered Nurses are the frontline providers of patient care, and the repository of a wealth of experience and expertise regarding excellence in the delivery of medical care. Therefore, upon request by the Association, Southern California Hospital at Culver City and CNA agree to conduct semi-annual meetings (not to exceed one every six (6) months unless otherwise agreed by CNA and Southern California Hospital at Culver City) between Southern California Hospital at Culver City RNs and Southern California Hospital at Culver City CNO or his/her designee, to discuss mechanisms for accomplishing the following goals:

1. Constructively advance the safe and therapeutic delivery of healthcare in Southern California Hospital at Culver City.

2. Overcoming obstacles confronting Registered Nurses in providing patient care;

3. Enhancing retention and recruitment of skilled Registered Nurses; and

4. Developing and strengthening professional education initiatives.

5. To positively impact and continuously improve the HCAHPS Communication with Nurses Domain Performance scores, consistent with the role of a professional nurse

6. Continuous review of a professional practice model and recommendations for continual improvement.

7. Create collaborative relationships among members of the health team

8. Create a practice environment in which nurses can practice in a professional manner and will be treated professionally by their health team

## <u>SIDE LETTER RE: BARGAINING UNIT INFORMATION</u>

No later than thirty-one (31) days after the ratification of this agreement, the Employer will provide the Association with a database list by email and on diskette.  The list will reflect all Registered Nurses covered by the Agreement by name, address, telephone number, social security number, wage rate, seniority date, employment status, FTE equivalent, job title, department/unit and shift and years of nursing experience.

Thereafter, on a monthly basis, the Employer will provide the above information for Registered Nurses who were hired into, transferred into or terminated from the bargaining unit since issuance of the previous month's list.

## SIDE LETTER RE: MEAL AND REST PERIODS

During the term of the Agreement effective from August 3, 2016, through March 31, 2019, the parties (California Nurses Association and Southern California Hospital at Culver City) are agreed that no arbitrator or other adjudicatory body will have jurisdiction to award relief of any kind under Article 11, Section D of the Agreement, other than to require penalty pay in accordance with Section D, Paragraph 3 of Article 11 for missed meal and/or break periods.

**SIDE LETTER RE: SAFE PATIENT HANDLING AND LIFT POLICY**

In regards to Article 17, Section G of the collective bargaining agreement, the parties agree as follows:

1.  The facility will offer training to current RN's on the topics listed in Article 17, Section G, Paragraph 2, and may require current RN's to complete such training within ninety (90) days from the contract effective date.

2.  Grievances over matters concerning safe patient handling and lifting may be processed to the third step of the grievance process, but will not be subject to arbitration.

## <u>SIDE LETTER REGARDING ESTABISHMENT OF A FLOAT POOL AT SOUTHERN CALIFORNIA HOSPITAL AT CULVER CITY</u>

Date:  March 19, 2020

This Agreement is by and between the Southern California Hospital – Culver City and California Nurses Association. This agreement shall remain in effect March 24, 2020 and shall continue in full force and effect until March 31, 2023,  unless either party shall give the other written notice of a desire to terminate, modify or amend this prior to March 31, 2023 of any subsequent year.

**Background/Purpose:**

Southern California Hospital – Culver City to establish a "Float Pool as no such position(s) exists in the current CBA.

The Hospital will, consistent with Article 21 of the collective bargaining agreement provide for the establishment of a "float pool," and create a job description for float pool positions, sufficient to establish appropriate competency levels of those hired.

The employer intends to commence a float pool providing for two nurses for day shifts and two nurses for night shifts, creating an internal float pool.  Float pool nurses are expected to possess an ICU background.

The float pool should be able to work all areas i.e. Stepdown, Tele, Med-Surg, Sub-acute.

In the event any portion of this side letter should be held invalid and unenforceable by any court of competent jurisdiction, such decision shall apply only to the specific portion thereof specified in the court's decision; and upon issuance of such a decision, the hospital and the union agree to meet and confer on the invalidated portion.

Exhibit W, Page 507

## IMPLEMENTATION OF MEMORANDUM OF UNDERSTANDING

Date:  March 24, 2020

Terms of Memorandum of Understanding

This Agreement is by and between the Southern California Hospital – Culver City and California Nurses Association. This Agreement will remain in effect and run concurrent with the parties collective bargaining agreement unless extended by mutual agreement.

This Memorandum of Understanding shall become effective (date of contract ratification) and shall continue in full force and effect until (expiration of contract).

This Memorandum of Understanding shall automatically renew itself as of March 31, 2023 and for yearly periods thereafter unless either party shall give the other written notice of a desire to terminate, modify or amend this Memorandum of Understanding prior to March 21, 2023 or March 31 of any subsequent year.

**Background/Purpose:**

Southern California Hospital – Culver City to implement a Break RN (BRN) for the Medical Surgical, Telemetry and Critical Care units as no such position exists in the current CBA.

The Hospital will convert five vacant positions from RN to Break RN and the addition of one FT AM position in the Telemetry unit.  Two (2) full-time AM and two (2) full-time PM employees per unit as listed in this MOU shall operate as BRN's.

The BRN shall be responsible for providing meal and rest breaks to the RN's on the unit. The BRN shall have the same qualifications and credentials as required for the RN on the unit.  The BRN shall be paid in accordance with the wage scale as listed in the current CBA and shall be compensated in the same manner as the RN in the unit.

The BRN shall not be subject to the floating language under Article 12 – FLOATING.

The BRN shall not be counted in staffing ratios while in the capacity of the BRN.  The BRN shall be allowed to sign up for/pick up additional shifts as an RN in the units for which they meet the minimum qualifications and competencies.

The BRN shall be allowed to sign up for/pick up additional shifts to provide break relief.

This action will reclassify five (5) RN positions to Break RN positions and add one position to the bargaining unit.

Rates are agreeable as proposed.

Employer and union agree to forgo impact bargaining and to implement Break RNs for the Medical Surgical, Telemetry and Critical Care units to become effective within two pay periods of the execution of this agreement.

In the event any portion of this Memorandum of Understanding should be held invalid and unenforceable by any court of competent jurisdiction, such decision shall apply only to the specific portion thereof specified in the court's decision; and upon issuance of such a decision, the hospital and the union agree to meet and confer on the invalidated portion.


_____

Union Rep Signature          Date


_____

Culver Hospital              Date

**APPENDIX A – AB 394**

FEBRUARY 11, 1999

An act to add Section 2725.3 to the Business and Professions Code, and to add Section 1276.4 to the Health and Safety Code, relating to health care.

LEGISLATIVE COUNSEL'S DIGEST

AB 394, Kuehl.  Health facilities:  nursing staff.

Existing law provides for the licensing, registration, and regulation of nurses, and sets forth the scope of practice.

This bill would prohibit a general acute care hospital, an acute psychiatric hospital, and a special hospital, as defined, from assigning an unlicensed person to perform nursing functions in lieu of a registered nurse, or from allowing unlicensed personnel under the direct clinical supervision of a registered nurse to perform certain functions.

Existing law prohibits operation of a health facility, as defined, without a license issued by the State Department of Health Services and provides for the issuance of licenses and for the regulation of health facilities and sets forth the services to be provided therein.

Willful or repeated violation of these provisions is a crime.

This bill would require the department, with regard to general acute care hospitals, acute psychiatric hospitals, and special hospitals, to adopt regulations that establish certain minimum nurse-to-patient ratios, and would require these health facilities to adopt written policies and procedures for training and orientation of nursing staff.  This bill would authorize the department to take into consideration the unique nature of the University of California teaching hospitals as educational institutions when establishing the ratios, in accordance with certain requirements.  This bill would also require a county hospital in Los Angeles County to be subject to a phase-in process developed in conjunction with the department.

By changing the definition of an existing crime this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state.  Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

<u>Section 1.</u>  The Legislature finds and declares all of the following:

(a)     Health care services are becoming complex and it is increasingly difficult for patients to access integrated services.

(b)     Quality of patient care is jeopardized because of staffing changes implemented in response to managed care.

(c)     To ensure the adequate protection of patients in acute care settings, it is essential that qualified registered nurses and other licensed nurses be accessible and available to meet the needs of patients.

(d)     The basic principles of staffing in the acute care setting should be based on the patient's care needs, the severity of condition, services needed, and the complexity surrounding those services.

Section 2.  Section 2725.3 is added to the Business and Professions Code, to read:

**2725.3.**

(a)     A health facility licensed pursuant to subdivision (a), (b), or (f), of Section 1250 of the Health and Safety Code shall not assign unlicensed personnel to perform nursing functions in lieu of a registered nurse and may not allow unlicensed personnel to perform functions under the direct clinical supervision of a registered nurse that require a substantial amount of scientific knowledge and technical skills, including, but not limited to, any of the following:

    (1)     Administration of medication.

    (2)     Venipuncture or intravenous therapy.

    (3)     Parenteral or tube feedings.

    (4)     Invasive procedures including inserting nasogastric tubes, inserting catheters, or tracheal suctioning.

    (5)     Assessment of patient condition.

    (6)     Educating patients and their families concerning the patient's health care problems, including post discharge care.

    (7)     Moderate complexity laboratory tests.

(b)     This section shall not preclude any person from performing any act or function that he or she is authorized to perform pursuant to Division 2 (commencing with Section 500) or pursuant to existing statute or regulation as of July 1, 1999.

Section 3.  Section 1276.4 is added to the Health and Safety Code, to read:

**1276.4.**

 (a) By January 1, 2001, the State Department of Health Services shall adopt regulations that establish minimum, specific, and numerical licensed nurse-to-patient ratios by licensed nurse classification and by hospital unit for all health facilities licensed pursuant to subdivision (a), (b), or (f) of Section 1250.  The department shall adopt these regulations in accordance with the department's licensing and certification regulations as stated in Sections 70053.2, 70215, and 70217 of Title 22 of the California Code of Regulations, and the professional and vocational regulations in Section 1443.5 of Title 16 of the California Code of Regulations.  The department shall review these regulations five years after adoption and shall report to the Legislature regarding any proposed changes.  Flexibility shall be considered by the department for rural general acute care hospitals in response to their special needs.  As used in this subdivision, "hospital unit" means a critical care unit, burn unit, labor and delivery room, post anesthesia service area, emergency department, operating room, pediatric unit, step-down/intermediate care unit, specialty care unit, telemetry unit, general medical care unit, subacute care unit, and transitional inpatient care unit.  The regulation addressing the emergency department shall distinguish between regularly scheduled core staff licensed nurses and additional licensed nurses required to care for critical care patients in the emergency department.

 (b) These ratios shall constitute the minimum number of registered and licensed nurses that shall be allocated.  Additional staff shall be assigned in accordance with a documented patient classification system for determining nursing care requirements, including the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan and the ability for self-care, and the licensure of the personnel required for care.

 (c) "Critical care unit" as used in this section means a unit that is established to safeguard and protect patients whose severity of medical conditions requires continuous monitoring, and complex intervention by licensed nurses.

 (d) All health facilities licensed under subdivision (a), (b), or (f) of Section 1250 shall adopt written policies and procedures for training and orientation of nursing staff.

 (e) No registered nurse shall be assigned to a nursing unit or clinical area unless that nurse has first received orientation in that clinical area sufficient to provide competent care to patients in that area, and has demonstrated current competence in providing care in that area.

(f)     The written policies and procedures for orientation of nursing staff shall require that all temporary personnel shall receive orientation and be subject to competency validation consistent with Sections 70016.1 and 70214 of Title 22 of the California Code of Regulations.

(g)     Requests for waivers to this section that do not jeopardize the health, safety, and well-being of patients affected and that are needed for increased operational efficiency may be granted by the state department to rural general acute care hospitals meeting the criteria set forth in Section 70059.1 of Title 22 of the California Code of Regulations.

(h)     In case of conflict between this section and any provision or regulation defining the scope of nursing practice, the scope of practice provisions shall control.

(i)     The regulations adopted by the department shall augment and not replace existing nurse-to-patient ratios that exist in regulation or law for the intensive care units, the neonatal intensive care units, or the operating room.

(j)     The regulations adopted by the department shall not replace existing licensed staff-to-patient ratios for hospitals operated by the State Department of Mental Health.

(k)     The regulations adopted by the department for health facilities licensed under subdivision (b) of Section 1250 that are not operated by the State Department of Mental Health shall take into account the special needs of the patients served in the psychiatric units.

(l)     The department may take into consideration the unique nature of the University of California teaching hospitals as educational institutions when establishing licensed nurse-to-patient ratios. The department shall coordinate with the Board of Registered Nursing to ensure that staffing ratios are consistent with the Board of Registered Nursing approved nursing education requirements. This includes nursing clinical experience incidental to a work-study program rendered in a University of California clinical facility approved by the Board of Registered Nursing provided there will be sufficient direct care registered nurse preceptors available to ensure safe patient care.

(m)     A county hospital in a county of the first class, as defined in Section 28022 of the Government Code, shall be subject to a phase-in process developed in conjunction with the department. This phase-in process shall be completed within one year of the adoption of the regulations that implement this section.

<u>Section 4</u>.  No reimbursement is required by this act pursuant to Section 6 of Article XIIIB of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIIIB of the California Constitution.

**APPENDIX B – STAFFING REGULATIONS ADOPTED BY DHS EFFECTIVE 1/1/04**

70217.  Nursing Service Staff.

(a)     Hospitals shall provide staffing by licensed nurses, within the scope of their licensure in accordance with the following nurse-to-patient ratios.  Licensed nurse means a registered nurse, licensed vocational nurse and, in psychiatric units only, a licensed psychiatric technician.  Staffing for care not requiring a licensed nurse is not included within these ratios and shall be determined pursuant to the patient classification system.

No hospital shall assign a licensed nurse to a nursing unit or clinical area unless that hospital determines that the licensed nurse has demonstrated current competence in providing care in that area, and has also received orientation to that hospital's clinical area sufficient to provide competent care to patients in that area.  The policies and procedures of the hospital shall contain the hospital's criteria for making this determination.

Licensed nurse-to-patient ratios represent the maximum number of patients that shall be assigned to one licensed nurse at any one time. "Assigned" means the licensed nurse has responsibility for the provision of care to a particular patient within his/her scope of practice.  There shall be no averaging of the number of patients and the total number of licensed nurses on the unit during any one shift nor over any period of time. Only licensed nurses providing direct patient care shall be included in the ratios.

Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses, and other licensed nurses shall be included in the calculation of the licensed nurse-to-patient ratio only when those licensed nurses are engaged in providing direct patient care.  When a Nurse Administrator, Nurse Supervisor, Nurse Manager, Charge Nurse or other licensed nurse is engaged in activities other than direct patient care, that nurse shall not be included in the ratio. Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses who have demonstrated current competence to the hospital in providing care on a particular unit may relieve licensed nurses during breaks, meals, and other routine, expected absences from the unit.

Licensed vocational nurses may constitute up to 50 percent of the licensed nurses assigned to patient care on any unit, except where registered nurses are required pursuant to the patient classification system or this section.  Only registered nurses shall be assigned to

Intensive Care Newborn Nursery Service Units, which specifically require one registered nurse to two or fewer infants. In the Emergency Department, only registered nurses shall be assigned to triage patients and only registered nurses shall be assigned to critical trauma patients.

Nothing in this section shall prohibit a licensed nurse from assisting with specific tasks within the scope of his or her practice for a patient assigned to another nurse. "Assist" means that licensed nurses may provide patient care beyond their patient assignments if the tasks performed are specific and time-limited.

(1)    The licensed nurse-to-patient ratio in a critical care unit shall be 1:2 or fewer at all times. "Critical care unit" means a nursing unit of a general acute care hospital which provides one of the following services: an intensive care service, a burn center, a coronary care service, an acute respiratory service, or an intensive care newborn nursery service. In the intensive care newborn nursery service, the ratio shall be 1 registered nurse: 2 or fewer patients at all times.

(2)    The surgical service operating room shall have at least one registered nurse assigned to the duties of the circulating nurse and a minimum of one additional person serving as scrub assistant for each patient-occupied operating room. The scrub assistant may be a licensed nurse, an operating room technician, or other person who has demonstrated current competence to the hospital as a scrub assistant, but shall not be a physician or other licensed health professional who is assisting in the performance of surgery.

(3)    The licensed nurse-to-patient ratio in a labor and delivery suite of the perinatal service shall be 1:2 or fewer active labor patients at all times. When a licensed nurse is caring for antepartum patients who are not in active labor, the licensed nurse-to-patient ratio shall be 1:4 or fewer at all times.

(4)    The licensed nurse-to-patient ratio in a postpartum area of the perinatal service shall be 1:4 mother-baby couplets or fewer at all times. In the event of multiple births, the total number of mothers plus infants assigned to a single licensed nurse shall never exceed eight. For postpartum areas in which the licensed nurse's assignment consists of mothers only, the licensed nurse-to-patient ratio shall be 1:6 or fewer at all times.

(5)    The licensed nurse-to-patient ratio in a combined Labor/Delivery/Postpartum area of the perinatal service

shall be 1:3 or fewer at all times the licensed nurse is caring for a patient combination of one woman in active labor and a postpartum mother and infant  The licensed nurse-to-patient ratio for nurses caring for women in active labor only, antepartum patients who are not in active labor only, postpartum women only, or mother-baby couplets only, shall be the same ratios as stated in subsections (3) and (4) above for those categories of patients.

(6)     The licensed nurse-to-patient ratio in a pediatric service unit shall be 1:4 or fewer at all times.

(7)     The licensed nurse-to-patient ratio in a post-anesthesia recovery unit of the anesthesia service shall be 1:2 or fewer at all times, regardless of the type of anesthesia the patient received.

(8)     In a hospital providing basic emergency medical services or comprehensive emergency medical services, the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer at all times that patients are receiving treatment. There shall be no fewer than two licensed nurses physically present in the emergency department when a patient is present.

At least one of the licensed nurses shall be a registered nurse assigned to triage patients.  The registered nurse assigned to triage patients shall be immediately available at all times to triage patients when they arrive in the emergency department.  When there are no patients needing triage, the registered nurse may assist by performing other nursing tasks.  The registered nurse assigned to triage patients shall not be counted in the licensed nurse-to-patient ratio.

Hospitals designated by the Local Emergency Medical Services (LEMS) Agency as a "base hospital", as defined in section 1797.58 of the Health and Safety Code, shall have either a licensed physician or a registered nurse on duty to respond to the base radio 24 hours each day.  When the duty of base radio responder is assigned to a registered nurse, that registered nurse may assist by performing other nursing tasks when not responding to radio calls, but shall be immediately available to respond to requests for medical direction on the base radio. The registered nurse assigned as base radio responder shall not be counted in the licensed nurse-to-patient ratios.

When licensed nursing staff are attending critical care patients in the emergency department, the licensed nurse-to-patient ratio shall be 1:2 or fewer critical care patients at all times. A patient in the emergency department shall be considered a critical care patient when the patient meets the criteria for admission to a critical care service area within the hospital.

Only registered nurses shall be assigned to critical trauma patients in the emergency department, and a minimum registered nurse-to-critical trauma patient ratio of 1:1 shall be maintained at all times. A critical trauma patient is a patient who has injuries to an anatomic area that: (1) require life saving interventions, or (2) in conjunction with unstable vital signs, pose an immediate threat to life or limb.

(9)     The licensed nurse-to-patient ratio in a step-down unit shall be 1:4 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a step-down unit shall be 1:3 or fewer at all times. A "step down unit" is defined as a unit which is organized, operated, and maintained to provide for the monitoring and care of patients with moderate or potentially severe physiologic instability requiring technical support but not necessarily artificial life support. Step-down patients are those patients who require less care than intensive care, but more than that which is available from medical/surgical care. "Artificial life support" is defined as a system that uses medical technology to aid, support, or replace a vital function of the body that has been seriously damaged. "Technical support" is defined as specialized equipment and/or personnel providing for invasive monitoring, telemetry, or mechanical ventilation, for the immediate amelioration or remediation of severe pathology.

(10)    The licensed nurse-to-patient ratio in a telemetry unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a telemetry unit shall be 1:4 or fewer at all times. "Telemetry unit" is defined as a unit organized, operated, and maintained to provide care for and continuous cardiac monitoring of patients in a stable condition, having or suspected of having a cardiac condition or a disease requiring the electronic monitoring, recording, retrieval, and display of cardiac electrical signals. "Telemetry unit" as defined in these regulations does not include fetal monitoring nor fetal surveillance.

(11)     The licensed nurse-to-patient ratio in medical/surgical care units shall be 1:6 or fewer at all times. Commencing January 1, 2005, the licensed nurse-to-patient ratio in medical/surgical care units shall be 1:5 or fewer at all times. A medical/surgical unit is a unit with beds classified as medical/surgical in which patients, who require less care than that which is available in intensive care units, step-down units, or specialty care units receive 24 hour inpatient general medical services, post-surgical services, or both general medical and post-surgical services. These units may include mixed patient populations of diverse diagnoses and diverse age groups who require care appropriate to a medical/surgical unit.

(12)     The licensed nurse-to-patient ratio in a specialty care unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a specialty care unit shall be 1:4 or fewer at all times. A specialty care unit is defined as a unit which is organized, operated, and maintained to provide care for a specific medical condition or a specific patient population. Services provided in these units are more specialized to meet the needs of patients with the specific condition or disease process than that which is required on medical/surgical units, and is not otherwise covered by subdivision (a).

(13)     The licensed nurse-to-patient ratio in a psychiatric unit shall be 1:6 or fewer at all times. For purposes of psychiatric units only, "licensed nurses" also includes licensed psychiatric technicians in addition to licensed vocational nurses and registered nurses. Licensed vocational nurses, licensed psychiatric technicians, or a combination of both, shall not exceed 50 percent of the licensed nurses on the unit.

(14)     Identifying a unit by a name or term other than those used in this subsection does not affect the requirement to staff at the ratios identified for the level or type of care described in this subsection.

(b)     In addition to the requirements of subsection (a), the hospital shall implement a patient classification system as defined in section 70053.2 above for determining nursing care needs of individual patients that reflects the assessment, made by a registered nurse as specified at subsection 70215(a)(1), of patient requirements and provides for shift-by-shift staffing based on those requirements. The ratios specified in subsection (a) shall constitute the minimum number of registered nurses, licensed vocational nurses, and in the case of psychiatric units, licensed psychiatric technicians, who shall

be assigned to direct patient care.  Additional staff in excess of these prescribed ratios, including non-licensed staff, shall be assigned in accordance with the hospital's documented patient classification system for determining nursing care requirements, considering factors that include the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan, the ability for self-care, and the licensure of the personnel required for care. The system developed by the hospital shall include, but not be limited to, the following elements:

(1)     Individual patient care requirements.

(2)     The patient care delivery system.

(3)     Generally accepted standards of nursing practice, as well as elements reflective of the unique nature of the hospital's patient population.

(c)     A written staffing plan shall be developed by the administrator of nursing service or a designee, based on patient care needs determined by the patient classification system.  The staffing plan shall be developed and implemented for each patient care unit and shall specify patient care requirements and the staffing levels for registered nurses and other licensed and unlicensed personnel.  In no case shall the staffing level for licensed nurses fall below the requirements of subsection (a).    The plan shall include the following:

(1)     Staffing requirements as determined by the patient classification system for each unit, documented on a day-to-day, shift-by-shift basis.

(2)     The actual staff and staff mix provided, documented on a day-to-day, shift-by-shift basis.

(3)     The variance between required and actual staffing patterns, documented on a day-to-day, shift-by-shift basis.

(d)     In addition to the documentation required in subsections (c)(1) through (3) above, the hospital shall keep a  record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments to individual patients by licensure category, documented on a day-to-day, shift-by-shift basis.  The hospital shall retain:

(1)     The staffing plan required in subsections (c)(1) through (3) for the time period between licensing surveys, which

Exhibit W, Page 520

includes the Consolidated Accreditation and Licensing Survey process, and

(2) The record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments by licensure category for a minimum of one year.

(e) The reliability of the patient classification system for validating staffing requirements shall be reviewed at least annually by a committee appointed by the nursing administrator to determine whether or not the system accurately measures patient care needs.

(f) At least half of the members of the review committee shall be registered nurses who provide direct patient care.

(g) If the review reveals that adjustments are necessary in the patient classification system in order to assure accuracy in measuring patient care needs, such adjustments must be implemented within thirty (30) days of that determination.

(h) Hospitals shall develop and document a process by which all interested staff may provide input about the patient classification system, the system's required revisions, and the overall staffing plan.

(i) The administrator of nursing services shall not be designated to serve as a charge nurse or to have direct patient care responsibility, except as described in subsection (a) above.

(j) Registered nursing personnel shall:

(1) Assist the administrator of nursing service so that supervision of nursing care occurs on a 24-hour basis.

(2) Provide direct patient care.

(3) Provide clinical supervision and coordination of the care given by licensed vocational nurses and unlicensed nursing personnel.

(k) Each patient care unit shall have a registered nurse assigned, present and responsible for the patient care in the unit on each shift.

(l) A rural General Acute Care Hospital as defined in Health and Safety Code Section 1250(a), may apply for and be granted program flexibility for the requirements of subsection 70217(i) and for the personnel requirements of subsection (j)(1) above.

(m) Unlicensed personnel may be utilized as needed to assist with simple nursing procedures, subject to the requirements of competency

validation.  Hospital policies and procedures shall describe the responsibility of unlicensed personnel and limit their duties to tasks that do not require licensure as a registered or vocational nurse.

(n)     Nursing personnel from temporary nursing agencies shall not be responsible for a patient care unit without having demonstrated clinical and supervisory competence as defined by the hospital's standards of staff performance pursuant to the requirements of subsection 70213(c) above.

(o)     Hospitals which utilize temporary nursing agencies shall have and adhere to a written procedure to orient and evaluate personnel from these sources.  Such procedures shall require that personnel from temporary nursing agencies be evaluated as often, or more often, than staff employed directly by the hospital.

(p)     All registered and licensed vocational nurses utilized in the hospital shall have current licenses.  A method to document current licensure shall be established.

(q)     The hospital shall plan for routine fluctuations in patient census.  If a healthcare emergency causes a change in the number of patients on a unit, the hospital must demonstrate that prompt efforts were made to maintain required staffing levels.  A healthcare emergency is defined for this purpose as an unpredictable or unavoidable occurrence at unscheduled or unpredictable intervals relating to healthcare delivery requiring immediate medical interventions and care.

70225.  Surgical Service Staff.

(a)     A physician shall have overall responsibility for the surgical service. This physician shall be certified or eligible for certification in surgery by the American Board of Surgery.  If such a surgeon is not available, a physician, with additional training and experience in surgery shall be responsible for the service.

(b)     One or more surgical teams consisting of physicians, registered nurses and other personnel shall be available at all times.

(c)     A registered nurse with training and experience in operating room techniques shall be responsible for the nursing care and nursing management of operating room service.

(d)     There shall be sufficient nursing personnel so that one person is not serving as a circulating assistant for more than one operating room.

(e)     There shall be evidence of continuing education and training programs for the nursing staff.

70455.  Comprehensive Emergency Medical Service Staff.

  (a)   A full-time physician trained and experienced in emergency medical service shall have overall responsibility for the service.  The physician or her or his designee shall be responsible for:

    (1)   Implementation of established policies and procedures.

    (2)   Providing continuous staffing with physicians trained and experienced in emergency medical service.  Such physicians shall be assigned to and be located in the emergency service area 24 hours a day.

    (3)   Providing experienced physicians in specialty categories to be available in-house 24 hours a day.  Such specialties include but are not limited to medicine, surgery, anesthesiology, orthopedics, neurosurgery, pediatrics, and obstetrics-gynecology.

    (4)   The most senior resident in any of the specialties may be considered an experienced physician.

    (5)   Maintenance of a roster of specialty physicians immediately available for consultation and/or assistance.

    (6)   Assurance of continuing education for all emergency service staff including physicians, nurses, and other personnel.

  (b)   All physicians, dentists, and podiatrists providing services in the emergency room shall be members of the organized medical staff.

  (c)   A registered nurse qualified by education and/or training shall be responsible for nursing care within the service.

  (d)   All registered nurses shall have training and experience in emergency lifesaving and life support procedures.

  (e)   A registered nurse trained and experienced in emergency nursing care shall be on duty at all times.

  (f)   There shall be sufficient licensed nurses and other skilled personnel on duty as required to support the services.

## APPENDIX C – BENEFIT PLAN PREMIUM CONTRIBUTIONS EFFECTIVE JANUARY 1, 2013

| | EE Monthly Contribution | EE % cost sharing |
|---|---|---|
| EPO Full Time | | |
| EE Only | $ 80.37 | 17% |
| EE + Spouse | $177.62 | 17% |
| EE + Child | $129.39 | 17% |
| EE + Children | $152.70 | 17% |
| EE +Family | $313.56 | 21% |

| EPO Part-Time | | |
|---|---|---|
| EE Only | $122.92 | 26% |
| EE + Spouse | $208.96 | 20% |
| EE + Child | $152.23 | 20% |
| EE + Children | $179.65 | 20% |
| EE +Family | $354.01 | 24% |

| PPO1 Full-Time | | |
|---|---|---|
| EE Only | $165.94 | 27% |
| EE + Spouse | $380.32 | 28% |
| EE + Child | $277.06 | 28% |
| EE + Children | $326.97 | 28% |
| EE +Family | $536.91 | 28% |

| PP01 Part-Time | | |
|---|---|---|
| EE Only | $233.55 | 38% |
| EE + Spouse | $516.14 | 38% |

| EE + Child | $376.01 | 38% |
| EE + Children | $443.74 | 38% |
| EE +Family | $728.67 | 38% |

| PPO2 Full-Time | | |
| --- | --- | --- |
| EE Only | $204.24 | 27% |
| EE + Spouse | $468.07 | 28% |
| EE + Child | $341.00 | 28% |
| EE + Children | $402.42 | 28% |
| EE +Family | $660.82 | 28% |

| PPO2 Part-Time | | |
| --- | --- | --- |
| BE Only | $287.44 | 38% |
| EE + Spouse | $614.73 | 38% |
| EE + Child | $462.79 | 38% |
| EE + Children | $546.14 | 38% |
| EE +Family | $896.83 | 38% |

| PPO 7500/FREE | | |
| --- | --- | --- |
| EE Only | $ 0.00 | 0% |
| EE + Spouse | $ 0.00 | 0% |
| EE + Child | $ 0.00 | 0% |
| EE + Children | $ 0.00 | 0% |
| EE +Family | $ 0.00 | 0% |

| PPO Dental | | |
|---|---|---|
| EE Only | $15.30 | 52% |
| EE + Spouse | $32.72 | 46% |
| EE + Child(ren) | $44.81 | 52% |
| EE +Family | $49.66 | 52% |

| DHMO Dental | | |
|---|---|---|
| EE Only | $ 6.86 | 57% |
| EE + Spouse | $14.43 | 63% |
| EE + Child(ren) | $20.48 | 85% |
| EE +Family | $20.61 | 60% |

# Medical: EPO

Medical EPO

Similar to an HMO plan, the Medical Exclusive Provider Organization (EPO) requires that you receive your healthcare from providers in the Preferred EPO Network You can obtain a list of Preferred EPO Network providers from SmartBen or Human Resources. The EPO is designed to be a cost effective means of obtaining your healthcare services to protect you and your family in the event of an illness or injury. The EPO plan offers a full range of coverage with low out of pocket costs.

All services must be received from providers in the Preferred EPO Network unless it is an emergency, otherwise the service will not be covered.


Primary Care

When enrolling in the EPO, you must select a Primary Care Physician (PCP) from the Preferred EPO Network

Specialty Care

When you see specialists, they mint be part of the Preferred EPO Network Before you see a specialist, you need to contact Keenan TPA Customer Service at 855.626.6195. They can help you make sure your specialist is part of the Preferred EPO Network

Hospital Care

If you live within 25 talks of Brotmon Medical Center or any of the Alta Hospital (Los Angeles Community Hospital, Norwalk Community Hospital, Hollywood Community Hospital, and Hollywood Community Hospital of Van Nuys), you must receive your hospital care from one of these entities.

If you live more than 25 miles from Hollywood ˙Community Hospital at Brotmon Medical Center or any of the Alta Hospitals (Los Angeles Community Hospital, Norwalk Community Hospital, Hollywood Community Hospital, and Hollywood Community Hospital of Van Nuys), or if the services you require are not available at any of these entities, *then* you must select an alternative hospital that is in the Preferred EPO Network.

## Medical: EPO (continued)

| Benefit Categories | EPO |
|---|---|
| **Lifetime Plan Maximum** *(per Individual)* | |
| • Essential Health Benefits | Unlimited |
| • Non-Essential Health Benefits | $2,000,000 |
| **Calendar Year Deductible** *(Individual / Family)* | $0 / $0 |
| **Annual Out-of-Pocket Maximum** *(Individual / Family)* | $1,500 / $4,500 |
| **Physician Office Visit** | |
| • Primary Care Physician | $20 copay |
| • Specialist Office Visit | $30 copay |
| **Preventive Services** | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge |
| • Immunizations | No charge |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge |
| **Inpatient Hospital Facility** | |
| • Semi-Private Room and Board | $500/admit, then 10% |
| • Inpatient Professional Services | No charge |
| **Outpatient Services** | |
| • Outpatient Surgery | $250/service, then 10% |
| • Outpatient Professional Services | No charge |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | $30 copay (60 combined visits max/plan year) |
| **Lab and X-Ray** | |
| • Physician's Office, Independent Lab and X-Ray | No charge |
| • Outpatient Advanced Imaging | $100 copay |
| **Emergency Services** | |
| • Hospital Emergency Room *(copay waived if admitted)* | $150 copay |
| • Ambulance | $100 copay |

...ment is intended to highlight and/or summarize certain aspects of the employer's benefit program. It is not a contract or official plan document. All ...in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

# Medical: Limited PPO

The Limited PPO provides the same provider network and benefits as the EPO plan except you do not need to select a Primary Care Physician and you are not limited to the Preferred EPO network. You have flexibility to use the Preferred EPO Network (Tier 1) or the Blue Shield Network (Tier 2). Your cost sharing will depend on whether you use Tier 1 or Tier 2 networks. There is no out-of-network coverage unless it is an emergency.

| Benefit Categories | LIMITED PPO | |
|---|---|---|
| | Preferred EPO Network | Blue Shield Preferred Network |
| **Lifetime Plan Maximum** *(per Individual)* | | |
| • Essential Health Benefits | Unlimited | |
| • Non-Essential Health Benefits | $2,000,000 | |
| **Calendar Year Deductible** *(Individual / Family)* | $0 / $0 | $1,500 / $4,500 |
| **Annual Out-of-Pocket Maximum** *(Individual / Family)* | $1,500 / $4,500 | $6,000 / $18,000 |
| **Physician Office Visit** | | |
| • Primary Care Physician | $20 copay | 20% after deductible |
| • Specialist Office Visit | $30 copay | 20% after deductible |
| **Preventive Services** | | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge | No charge |
| • Immunizations | No charge | No charge |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge | No charge |
| **Inpatient Hospital Facility** | | |
| • Semi-Private Room and Board | $500/admit, then 10% | 20% after deductible |
| • Inpatient Professional Services | No charge | 20% after deductible |
| **Outpatient Services** | | |
| • Outpatient Surgery | $250/service, then 10% | 20% after deductible |
| • Outpatient Professional Services | No charge | 20% after deductible |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | $30 copay (60 combined visits max./plan year) | 20% (60 combined visits max./plan year) |
| **Lab and X-Ray** | | |
| • Physician's Office, Independent Lab and X-Ray | No charge | 20% after deductible |
| • Outpatient Advanced Imaging | $100 copay | 20% after deductible |
| **Emergency Services** | | |
| • Hospital Emergency Room *(copay waived if admitted)* | $150 copay | 10% after deductible |
| • Ambulance | $100 copay | 10% after deductible |

This document is intended to highlight and/or summarize certain aspects of the employer's benefit program. It is not a contract or official plan document. All statements in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

# Medical: Standard PPO

The Standard PPO plan offers freedom of choice and allows you the ability to go out-of-network. You may obtain services from any provider you choose, but your costs will be lower when utilizing the Preferred EPO Network (Tier 1) or Blue Shield PPO Network (Tier 2) Provider. Your out-of-pocket costs will be lowest when care is received within the Preferred EPO Network. For services received Out-of-Network, you will be responsible for any difference between the covered expense and actual charges.

| Benefit Categories | STANDARD PPO | | |
|---|---|---|---|
| | Preferred EPO Network | Blue Shield Network | Out-of-Network |
| **Lifetime Plan Maximum** *(per Individual)* | | | |
| • Essential Health Benefits | Unlimited | | |
| • Non-Essential Health Benefits | $2,000,000 | | |
| **Calendar Year Deductible** *(Individual / Family)* | $0 / $0 | $1,500 / $4,500 | $5,000 / $15,000 |
| **Annual Out-of-Pocket Maximum** *(Individual / Family)* | $1,500 / $4,500 | $6,000 / $18,000 | $8,000 / $24,000 |
| **Physician Office Visit** | | | |
| • Primary Care Physician | $20 copay | 20% after deductible | 40% after deductible |
| • Specialist Office Visit | $30 copay | 20% after deductible | 40% after deductible |
| **Preventive Services** | | | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge | No charge | 40% after deductible |
| • Immunizations | No charge | No charge | 40% after deductible |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge | No charge | 40% after deductible |
| **Inpatient Hospital Facility** | | | |
| • Semi-Private Room and Board | $500/admit, then 10% | 20% after deductible | 40% after deductible |
| • Inpatient Professional Services | No charge | 20% after deductible | 40% after deductible |
| **Outpatient Services** | | | |
| • Outpatient Surgery | $250/service, then 10% | 20% after deductible | 40% after deductible |
| • Outpatient Professional Services | No charge | 20% after deductible | 40% after deductible |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | $30 copay (60 combined visits Max/plan year) | 20% (60 combined visits Max/plan year) | 40% (60 combined visits Max/plan year) |
| **Lab and X-Ray** | | | |
| • Physician's Office, Independent Lab and X-Ray | No charge | 20% after deductible | 40% after deductible |
| • Outpatient Advanced Imaging | $100 copay | 20% after deductible | 40% after deductible |
| **Emergency Services** | | | |
| • Hospital Emergency Room *(copay waived if admitted)* | $150 copay | 10% after deductible | |
| • Ambulance | $100 copay | 10% after deductible | |

This document is intended to highlight and/or summarize certain aspects of the employee's benefit program. It is not a contract or official plan document. All statements in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

# Medical: Free PPO

The Free PPO plan offers freedom of choice and allows you the ability to go out-of-network. You may obtain services from any provider you choose, but your costs will be lower when utilizing the Preferred EPO Network (Tier 1) or Blue Shield PPO Network (Tier 2) Provider. This PPO has high deductibles and cost sharing but your annual preventive exams are always covered at 100% within the Tier 1 or Tier 2 networks. For services received Out-of-Network, you will be responsible for any difference between the covered expense and actual charges.

| Benefit Categories | FREE PPO | | |
|---|---|---|---|
| | Preferred EPO Network | Blue Shield Network | Out-of-Network |
| **Lifetime Plan Maximum** *(per Individual)* | | | |
| • Essential Health Benefits | Unlimited | | |
| • Non-Essential Health Benefits | $2,000,000 | | |
| **Calendar Year Deductible** *(Individual / Family)* | $7,500 / $15,000 | $7,500 / $15,000 | $10,000 / $20,000 |
| **Annual Out-of-Pocket Maximum** *(Individual / Family)* | $15,000 / $30,000 | $15,000 / $30,000 | $30,000 / $60,000 |
| **Physician Office Visit** | | | |
| • Primary Care Physician | 20% after deductible | 20% after deductible | 50% after deductible |
| • Specialist Office Visit | 20% after deductible | 20% after deductible | 50% after deductible |
| **Preventive Services** | | | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge | No charge | 50% after deductible |
| • Immunizations | No charge | No charge | 50% after deductible |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge | No charge | 50% after deductible |
| **Inpatient Hospital Facility** | | | |
| • Semi-Private Room and Board | 20% after deductible | 20% after deductible | 50% after deductible |
| • Inpatient Professional Services | 20% after deductible | 20% after deductible | 50% after deductible |
| **Outpatient Services** | | | |
| • Outpatient Surgery | 20% after deductible | 20% after deductible | 50% after deductible |
| • Outpatient Professional Services | 20% after deductible | 20% after deductible | 50% after deductible |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | 20% after deductible | 20% after deductible | 50% after deductible |
| **Lab and X-Ray** | | | |
| • Physician's Office, Independent Lab and X-Ray | 20% after deductible | 20% after deductible | 50% after deductible |
| • Outpatient Advanced Imaging | 20% after deductible | 20% after deductible | 50% after deductible |
| **Emergency Services** | | | |
| • Hospital Emergency Room *(copay waived if admitted)* | 10% after deductible | | |
| • Ambulance | 10% after deductible | | |

This document is intended to highlight and/or summarize certain aspects of the employee's benefit program. It is not a contract or official plan document. All statements in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

| INDEX |
|---|

Additional Representation Rights, 17
Adequate Staffing Levels, 12
Appendix A – AB 394, 49
Applying for Vacancies, 10
Arbitration, 15
Association Labor Representative, 5
Association Leave, 37
Association Membership as a Condition of Employment, 42
Association Obligation, 44
Association Officials, 44
Association Representation, 5
Association Security, 42
Bargaining Unit Information, 49
Bereavement Leave, 40
Benefit Plan Premium Contributions, 75
Bonuses, 30
Bulletin Board, 6
Call-In Procedure, 21
Call-Off/Flex-Off, 22
Change in Specialty, 11
Clinical Certificate Recognition, 30
CNA Nurse Representatives, 5
Communicable Diseases, 34
Compensation, 25
Consultants and Contractors, 7
Counseling, 34
Credit for Working Holidays, 32
Deduction and Remittance of Association Initiation Fees and Dues, 43
Definition, 15, 23
Definition of Premium Pay Holiday Hours, 31
Disciplinary Notices, Rebuttal, and Inspection of Personnel Files, 17
Discipline, 16
Education Benefits, 35
Enforcement of Legally Mandated Nurse Staffing, 13
Entire Agreement, 46
Evaluation Period, 11
Expedited Arbitration, 45
Facility Meals, 30

Failure to Make Required Payments, 43
Filling Of Job Vacancies, 9
Floating, 23
Floating Clusters, 25
Floating Conditions, 24
Floating Order, 24
Floating Rotation, 24
Full-time Non-Benefitted Registered Nurse – Opt Out Program, 30
Full-Time Registered Nurse, 6
General, 32
General Leave of Absence, 38
Grievance Procedure, 15
Harassment, 11
Health and Safety, 32
Holiday Obligation, 32
Holiday Scheduling, 32
Holidays, 31
Hours of Work, Overtime and Scheduling, 18
Individual Bargaining, 30
In-House Registry Program (IHR), 27
Investigation Suspension, 17
Job Security, 42
Joint Health and Safety Committee, 33
Jury Duty Leave, 40
Just Cause, 16
Leaves Of Absence, 37
Length of Leaves, 39
Lift Policy, 35
Management Rights, 42
Meal and Rest Periods, 19
Medical Disability Leave, 39
Minimum Rates, 30
Modified Duty Program, 39
No Guarantee, 23
No Lockouts, 44
No Pyramiding, 23
Nondiscrimination, 11
Notices, 45
Outside Agency Registered Nurses, 47
Overtime, 20
Paid Education Time, 36
Part-Time 1 Registered Nurse, 6

Part-Time 2 Registered Nurse, 6
Patient Care Advocacy Forum, 49
Pay and Benefits, 41
Payday and Paycheck, 27
Payroll Period, 18
Penalty, 44
Per Diem Registered Nurse, 6
Physical Examinations, 34, 41
Posting of Vacancies, 9
Potential Vacancies, 10
Preference Order, 10
Probationary Registered Nurses, 18
Procedure, 15
Professional Practice Committee, 12
Progressive Discipline, 16
Prohibited Activity, 44
Recognition, 4
Reduction in Force, 41
Reduction in Force and Recall, 8
Registered Nurse Response Network, 47
Registered Nurse Status, 6
Relief Charge Pay, 29
Reporting Pay, 29
Restrictions in Applying for Vacancies, 10
Safe Staffing and Patient Advocacy, 12
Savings Clause, 46
Scheduled Off on Holidays, 31
Seniority, 7
Seniority Defined, 7
Severance Pay, 29
Shift Differentials, 27
Special Review Panel, 13
Staffing Regulations adopted by DHS, 53
Standard Benefit Plans, 31
Standards of Competent Performance, 14
Stand-by/On-Call and Call-Back Pay, 28
State and Federal Wage and Hour Laws, 18
Statutory Leaves of Absence, 37
Subcontracting, 42
Successorship Protection, 42
Technology, 46
Temporary Registered Nurse, 7
Term, 48
Termination During Leave of Absence, 41
Time Limits, 16

Tuition Assistance Benefits, 35
Use of Paid Time Off During Leaves, 39
Vacation Scheduling, 20
Wages, 25
Waiver By Association, 44
Waiving Medical Benefits, 30
Weekend Scheduling, 19
Witness Leave, 41
Work Schedules, 19
Work Stoppage, 44
Workday and Workweek, 18
Workplace Violence, 34
Written Disciplinary Action, 17

**APPENDIX A – AB 394**

FEBRUARY 11, 1999

An act to add Section 2725.3 to the Business and Professions Code, and to add Section 1276.4 to the Health and Safety Code, relating to health care.

LEGISLATIVE COUNSEL'S DIGEST

AB 394, Kuehl.  Health facilities:  nursing staff.

Existing law provides for the licensing, registration, and regulation of nurses, and sets forth the scope of practice.

This bill would prohibit a general acute care hospital, an acute psychiatric hospital, and a special hospital, as defined, from assigning an unlicensed person to perform nursing functions in lieu of a registered nurse, or from allowing unlicensed personnel under the direct clinical supervision of a registered nurse to perform certain functions.

Existing law prohibits operation of a health facility, as defined, without a license issued by the State Department of Health Services and provides for the issuance of licenses and for the regulation of health facilities and sets forth the services to be provided therein.

Willful or repeated violation of these provisions is a crime.

This bill would require the department, with regard to general acute care hospitals, acute psychiatric hospitals, and special hospitals, to adopt regulations that establish certain minimum nurse-to-patient ratios, and would require these health facilities to adopt written policies and procedures for training and orientation of nursing staff.  This bill would authorize the department to take into consideration the unique nature of the University of California teaching hospitals as educational institutions when establishing the ratios, in accordance with certain requirements.  This bill would also require a county hospital in Los Angeles County to be subject to a phase-in process developed in conjunction with the department.

By changing the definition of an existing crime this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state.  Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

Section 1.  The Legislature finds and declares all of the following:

(a)     Health care services are becoming complex and it is increasingly difficult for patients to access integrated services.

(b)     Quality of patient care is jeopardized because of staffing changes implemented in response to managed care.

(c)     To ensure the adequate protection of patients in acute care settings, it is essential that qualified registered nurses and other licensed nurses be accessible and available to meet the needs of patients.

(d)     The basic principles of staffing in the acute care setting should be based on the patient's care needs, the severity of condition, services needed, and the complexity surrounding those services.

Section 2.  Section 2725.3 is added to the Business and Professions Code, to read:

**2725.3.**

(a)     A health facility licensed pursuant to subdivision (a), (b), or (f), of Section 1250 of the Health and Safety Code shall not assign unlicensed personnel to perform nursing functions in lieu of a registered nurse and may not allow unlicensed personnel to perform functions under the direct clinical supervision of a registered nurse that require a substantial amount of scientific knowledge and technical skills, including, but not limited to, any of the following:

(1)     Administration of medication.

(2)     Venipuncture or intravenous therapy.

(3)     Parenteral or tube feedings.

(4)     Invasive procedures including inserting nasogastric tubes, inserting catheters, or tracheal suctioning.

(5)     Assessment of patient condition.

(6)     Educating patients and their families concerning the patient's health care problems, including post discharge care.

(7)     Moderate complexity laboratory tests.

(b)     This section shall not preclude any person from performing any act or function that he or she is authorized to perform pursuant to Division 2 (commencing with Section 500) or pursuant to existing statute or regulation as of July 1, 1999.

Section 3.  Section 1276.4 is added to the Health and Safety Code, to read:

**1276.4.**

(a)  By January 1, 2001, the State Department of Health Services shall adopt regulations that establish minimum, specific, and numerical licensed nurse-to-patient ratios by licensed nurse classification and by hospital unit for all health facilities licensed pursuant to subdivision (a), (b), or (f) of Section 1250. The department shall adopt these regulations in accordance with the department's licensing and certification regulations as stated in Sections 70053.2, 70215, and 70217 of Title 22 of the California Code of Regulations, and the professional and vocational regulations in Section 1443.5 of Title 16 of the California Code of Regulations. The department shall review these regulations five years after adoption and shall report to the Legislature regarding any proposed changes. Flexibility shall be considered by the department for rural general acute care hospitals in response to their special needs. As used in this subdivision, "hospital unit" means a critical care unit, burn unit, labor and delivery room, post anesthesia service area, emergency department, operating room, pediatric unit, step-down/intermediate care unit, specialty care unit, telemetry unit, general medical care unit, subacute care unit, and transitional inpatient care unit. The regulation addressing the emergency department shall distinguish between regularly scheduled core staff licensed nurses and additional licensed nurses required to care for critical care patients in the emergency department.

(b)  These ratios shall constitute the minimum number of registered and licensed nurses that shall be allocated. Additional staff shall be assigned in accordance with a documented patient classification system for determining nursing care requirements, including the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan and the ability for self-care, and the licensure of the personnel required for care.

(c)  "Critical care unit" as used in this section means a unit that is established to safeguard and protect patients whose severity of medical conditions requires continuous monitoring, and complex intervention by licensed nurses.

(d)  All health facilities licensed under subdivision (a), (b), or (f) of Section 1250 shall adopt written policies and procedures for training and orientation of nursing staff.

(e)  No registered nurse shall be assigned to a nursing unit or clinical area unless that nurse has first received orientation in that clinical area sufficient to provide competent care to patients in that area, and has demonstrated current competence in providing care in that area.

(f)      The written policies and procedures for orientation of nursing staff shall require that all temporary personnel shall receive orientation and be subject to competency validation consistent with Sections 70016.1 and 70214 of Title 22 of the California Code of Regulations.

(g)      Requests for waivers to this section that do not jeopardize the health, safety, and well-being of patients affected and that are needed for increased operational efficiency may be granted by the state department to rural general acute care hospitals meeting the criteria set forth in Section 70059.1 of Title 22 of the California Code of Regulations.

(h)      In case of conflict between this section and any provision or regulation defining the scope of nursing practice, the scope of practice provisions shall control.

(i)      The regulations adopted by the department shall augment and not replace existing nurse-to-patient ratios that exist in regulation or law for the intensive care units, the neonatal intensive care units, or the operating room.

(j)      The regulations adopted by the department shall not replace existing licensed staff-to-patient ratios for hospitals operated by the State Department of Mental Health.

(k)      The regulations adopted by the department for health facilities licensed under subdivision (b) of Section 1250 that are not operated by the State Department of Mental Health shall take into account the special needs of the patients served in the psychiatric units.

(l)      The department may take into consideration the unique nature of the University of California teaching hospitals as educational institutions when establishing licensed nurse-to-patient ratios. The department shall coordinate with the Board of Registered Nursing to ensure that staffing ratios are consistent with the Board of Registered Nursing approved nursing education requirements. This includes nursing clinical experience incidental to a work-study program rendered in a University of California clinical facility approved by the Board of Registered Nursing provided there will be sufficient direct care registered nurse preceptors available to ensure safe patient care.

(m)      A county hospital in a county of the first class, as defined in Section 28022 of the Government Code, shall be subject to a phase-in process developed in conjunction with the department. This phase-in process shall be completed within one year of the adoption of the regulations that implement this section.

Section 4.  No reimbursement is required by this act pursuant to Section 6 of Article XIIIB of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIIIB of the California Constitution.

## APPENDIX B – STAFFING REGULATIONS ADOPTED BY DHS EFFECTIVE 1/1/04

70217.  Nursing Service Staff.

(a) Hospitals shall provide staffing by licensed nurses, within the scope of their licensure in accordance with the following nurse-to-patient ratios.  Licensed nurse means a registered nurse, licensed vocational nurse and, in psychiatric units only, a licensed psychiatric technician.  Staffing for care not requiring a licensed nurse is not included within these ratios and shall be determined pursuant to the patient classification system.

No hospital shall assign a licensed nurse to a nursing unit or clinical area unless that hospital determines that the licensed nurse has demonstrated current competence in providing care in that area, and has also received orientation to that hospital's clinical area sufficient to provide competent care to patients in that area.  The policies and procedures of the hospital shall contain the hospital's criteria for making this determination.

Licensed nurse-to-patient ratios represent the maximum number of patients that shall be assigned to one licensed nurse at any one time. "Assigned" means the licensed nurse has responsibility for the provision of care to a particular patient within his/her scope of practice.  There shall be no averaging of the number of patients and the total number of licensed nurses on the unit during any one shift nor over any period of time. Only licensed nurses providing direct patient care shall be included in the ratios.

Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses, and other licensed nurses shall be included in the calculation of the licensed nurse-to-patient ratio only when those licensed nurses are engaged in providing direct patient care.  When a Nurse Administrator, Nurse Supervisor, Nurse Manager, Charge Nurse or other licensed nurse is engaged in activities other than direct patient care, that nurse shall not be included in the ratio. Nurse Administrators, Nurse Supervisors, Nurse Managers, and Charge Nurses who have demonstrated current competence to the hospital in providing care on a particular unit may relieve licensed nurses during breaks, meals, and other routine, expected absences from the unit.

Licensed vocational nurses may constitute up to 50 percent of the licensed nurses assigned to patient care on any unit, except where registered nurses are required pursuant to the patient classification system or this section.  Only registered nurses shall be assigned to

Intensive Care Newborn Nursery Service Units, which specifically require one registered nurse to two or fewer infants. In the Emergency Department, only registered nurses shall be assigned to triage patients and only registered nurses shall be assigned to critical trauma patients.

Nothing in this section shall prohibit a licensed nurse from assisting with specific tasks within the scope of his or her practice for a patient assigned to another nurse. "Assist" means that licensed nurses may provide patient care beyond their patient assignments if the tasks performed are specific and time-limited.

(1)   The licensed nurse-to-patient ratio in a critical care unit shall be 1:2 or fewer at all times. "Critical care unit" means a nursing unit of a general acute care hospital which provides one of the following services: an intensive care service, a burn center, a coronary care service, an acute respiratory service, or an intensive care newborn nursery service. In the intensive care newborn nursery service, the ratio shall be 1 registered nurse: 2 or fewer patients at all times.

(2)   The surgical service operating room shall have at least one registered nurse assigned to the duties of the circulating nurse and a minimum of one additional person serving as scrub assistant for each patient-occupied operating room. The scrub assistant may be a licensed nurse, an operating room technician, or other person who has demonstrated current competence to the hospital as a scrub assistant, but shall not be a physician or other licensed health professional who is assisting in the performance of surgery.

(3)   The licensed nurse-to-patient ratio in a labor and delivery suite of the perinatal service shall be 1:2 or fewer active labor patients at all times. When a licensed nurse is caring for antepartum patients who are not in active labor, the licensed nurse-to-patient ratio shall be 1:4 or fewer at all times.

(4)   The licensed nurse-to-patient ratio in a postpartum area of the perinatal service shall be 1:4 mother-baby couplets or fewer at all times. In the event of multiple births, the total number of mothers plus infants assigned to a single licensed nurse shall never exceed eight. For postpartum areas in which the licensed nurse's assignment consists of mothers only, the licensed nurse-to-patient ratio shall be 1:6 or fewer at all times.

(5)   The licensed nurse-to-patient ratio in a combined Labor/Delivery/Postpartum area of the perinatal service

shall be 1:3 or fewer at all times the licensed nurse is caring for a patient combination of one woman in active labor and a postpartum mother and infant   The licensed nurse-to-patient ratio for nurses caring for women in active labor only, antepartum patients who are not in active labor only, postpartum women only, or mother-baby couplets only, shall be the same ratios as stated in subsections (3) and (4) above for those categories of patients.

(6)     The licensed nurse-to-patient ratio in a pediatric service unit shall be 1:4 or fewer at all times.

(7)     The licensed nurse-to-patient ratio in a post-anesthesia recovery unit of the anesthesia service shall be 1:2 or fewer at all times, regardless of the type of anesthesia the patient received.

(8)     In a hospital providing basic emergency medical services or comprehensive emergency medical services, the licensed nurse-to-patient ratio in an emergency department shall be 1:4 or fewer at all times that patients are receiving treatment. There shall be no fewer than two licensed nurses physically present in the emergency department when a patient is present.

At least one of the licensed nurses shall be a registered nurse assigned to triage patients.  The registered nurse assigned to triage patients shall be immediately available at all times to triage patients when they arrive in the emergency department.  When there are no patients needing triage, the registered nurse may assist by performing other nursing tasks.  The registered nurse assigned to triage patients shall not be counted in the licensed nurse-to-patient ratio.

Hospitals designated by the Local Emergency Medical Services (LEMS) Agency as a "base hospital", as defined in section 1797.58 of the Health and Safety Code, shall have either a licensed physician or a registered nurse on duty to respond to the base radio 24 hours each day.  When the duty of base radio responder is assigned to a registered nurse, that registered nurse may assist by performing other nursing tasks when not responding to radio calls, but shall be immediately available to respond to requests for medical direction on the base radio. The registered nurse assigned as base radio responder shall not be counted in the licensed nurse-to-patient ratios.

When licensed nursing staff are attending critical care patients in the emergency department, the licensed nurse-to-patient ratio shall be 1:2 or fewer critical care patients at all times. A patient in the emergency department shall be considered a critical care patient when the patient meets the criteria for admission to a critical care service area within the hospital.

Only registered nurses shall be assigned to critical trauma patients in the emergency department, and a minimum registered nurse-to-critical trauma patient ratio of 1:1 shall be maintained at all times. A critical trauma patient is a patient who has injuries to an anatomic area that: (1) require life saving interventions, or (2) in conjunction with unstable vital signs, pose an immediate threat to life or limb.

(9)     The licensed nurse-to-patient ratio in a step-down unit shall be 1:4 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a step-down unit shall be 1:3 or fewer at all times. A "step down unit" is defined as a unit which is organized, operated, and maintained to provide for the monitoring and care of patients with moderate or potentially severe physiologic instability requiring technical support but not necessarily artificial life support. Step-down patients are those patients who require less care than intensive care, but more than that which is available from medical/surgical care. "Artificial life support" is defined as a system that uses medical technology to aid, support, or replace a vital function of the body that has been seriously damaged. "Technical support" is defined as specialized equipment and/or personnel providing for invasive monitoring, telemetry, or mechanical ventilation, for the immediate amelioration or remediation of severe pathology.

(10)    The licensed nurse-to-patient ratio in a telemetry unit shall be 1:5 or fewer at all times. Commencing January 1, 2008, the licensed nurse-to-patient ratio in a telemetry unit shall be 1:4 or fewer at all times. "Telemetry unit" is defined as a unit organized, operated, and maintained to provide care for and continuous cardiac monitoring of patients in a stable condition, having or suspected of having a cardiac condition or a disease requiring the electronic monitoring, recording, retrieval, and display of cardiac electrical signals. "Telemetry unit" as defined in these regulations does not include fetal monitoring nor fetal surveillance.

(11)     The licensed nurse-to-patient ratio in medical/surgical care units shall be 1:6 or fewer at all times.  Commencing January 1, 2005, the licensed nurse-to-patient ratio in medical/surgical care units shall be 1:5 or fewer at all times. A medical/surgical unit is a unit with beds classified as medical/surgical in which patients, who require less care than that which is available in intensive care units, step-down units, or specialty care units receive 24 hour inpatient general medical services, post-surgical services, or both general medical and post-surgical services.  These units may include mixed patient populations of diverse diagnoses and diverse age groups who require care appropriate to a medical/surgical unit.

(12)     The licensed nurse-to-patient ratio in a specialty care unit shall be 1:5 or fewer at all times.  Commencing January 1, 2008, the licensed nurse-to-patient ratio in a specialty care unit shall be 1:4 or fewer at all times.  A specialty care unit is defined as a unit which is organized, operated, and maintained to provide care for a specific medical condition or a specific patient population.  Services provided in these units are more specialized to meet the needs of patients with the specific condition or disease process than that which is required on medical/surgical units,and is not otherwise covered by subdivision (a).

(13)     The licensed nurse-to-patient ratio in a psychiatric unit shall be 1:6 or fewer at all times.  For purposes of psychiatric units only, "licensed nurses" also includes licensed psychiatric technicians in addition to licensed vocational nurses and registered nurses.  Licensed vocational nurses, licensed psychiatric technicians, or a combination of both, shall not exceed 50 percent of the licensed nurses on the unit.

(14)     Identifying a unit by a name or term other than those used in this subsection does not affect the requirement to staff at the ratios identified for the level or type of care described in this subsection.

(b)     In addition to the requirements of subsection (a), the hospital shall implement a patient classification system as defined in section 70053.2 above for determining nursing care needs of individual patients that reflects the assessment, made by a registered nurse as specified at subsection 70215(a)(1), of patient requirements and provides for shift-by-shift staffing based on those requirements. The ratios specified in subsection (a) shall constitute the minimum number of registered nurses, licensed vocational nurses, and in the case of psychiatric units, licensed psychiatric technicians, who shall

be assigned to direct patient care.  Additional staff in excess of these prescribed ratios, including non-licensed staff, shall be assigned in accordance with the hospital's documented patient classification system for determining nursing care requirements, considering factors that include the severity of the illness, the need for specialized equipment and technology, the complexity of clinical judgment needed to design, implement, and evaluate the patient care plan, the ability for self-care, and the licensure of the personnel required for care. The system developed by the hospital shall include, but not be limited to, the following elements:

(1)   Individual patient care requirements.

(2)   The patient care delivery system.

(3)   Generally accepted standards of nursing practice, as well as elements reflective of the unique nature of the hospital's patient population.

(c)   A written staffing plan shall be developed by the administrator of nursing service or a designee, based on patient care needs determined by the patient classification system.  The staffing plan shall be developed and implemented for each patient care unit and shall specify patient care requirements and the staffing levels for registered nurses and other licensed and unlicensed personnel.  In no case shall the staffing level for licensed nurses fall below the requirements of subsection (a).   The plan shall include the following:

(1)   Staffing requirements as determined by the patient classification system for each unit, documented on a day-to-day, shift-by-shift basis.

(2)   The actual staff and staff mix provided, documented on a day-to-day, shift-by-shift basis.

(3)   The variance between required and actual staffing patterns, documented on a day-to-day, shift-by-shift basis.

(d)   In addition to the documentation required in subsections (c)(1) through (3) above, the hospital shall keep a  record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments to individual patients by licensure category, documented on a day-to-day, shift-by-shift basis.  The hospital shall retain:

(1)   The staffing plan required in subsections (c)(1) through (3) for the time period between licensing surveys, which

includes the Consolidated Accreditation and Licensing Survey process, and

(2)    The record of the actual registered nurse, licensed vocational nurse and licensed psychiatric technician assignments by licensure category for a minimum of one year.

(e)    The reliability of the patient classification system for validating staffing requirements shall be reviewed at least annually by a committee appointed by the nursing administrator to determine whether or not the system accurately measures patient care needs.

(f)    At least half of the members of the review committee shall be registered nurses who provide direct patient care.

(g)    If the review reveals that adjustments are necessary in the patient classification system in order to assure accuracy in measuring patient care needs, such adjustments must be implemented within thirty (30) days of that determination.

(h)    Hospitals shall develop and document a process by which all interested staff may provide input about the patient classification system, the system's required revisions, and the overall staffing plan.

(i)    The administrator of nursing services shall not be designated to serve as a charge nurse or to have direct patient care responsibility, except as described in subsection (a) above.

(j)    Registered nursing personnel shall:

(1)    Assist the administrator of nursing service so that supervision of nursing care occurs on a 24-hour basis.

(2)    Provide direct patient care.

(3)    Provide clinical supervision and coordination of the care given by licensed vocational nurses and unlicensed nursing personnel.

(k)    Each patient care unit shall have a registered nurse assigned, present and responsible for the patient care in the unit on each shift.

(l)    A rural General Acute Care Hospital as defined in Health and Safety Code Section 1250(a), may apply for and be granted program flexibility for the requirements of subsection 70217(i) and for the personnel requirements of subsection (j)(1) above.

(m)    Unlicensed personnel may be utilized as needed to assist with simple nursing procedures, subject to the requirements of competency

validation.  Hospital policies and procedures shall describe the responsibility of unlicensed personnel and limit their duties to tasks that do not require licensure as a registered or vocational nurse.

(n)    Nursing personnel from temporary nursing agencies shall not be responsible for a patient care unit without having demonstrated clinical and supervisory competence as defined by the hospital's standards of staff performance pursuant to the requirements of subsection 70213(c) above.

(o)    Hospitals which utilize temporary nursing agencies shall have and adhere to a written procedure to orient and evaluate personnel from these sources.  Such procedures shall require that personnel from temporary nursing agencies be evaluated as often, or more often, than staff employed directly by the hospital.

(p)    All registered and licensed vocational nurses utilized in the hospital shall have current licenses.  A method to document current licensure shall be established.

(q)    The hospital shall plan for routine fluctuations in patient census.  If a healthcare emergency causes a change in the number of patients on a unit, the hospital must demonstrate that prompt efforts were made to maintain required staffing levels.  A healthcare emergency is defined for this purpose as an unpredictable or unavoidable occurrence at unscheduled or unpredictable intervals relating to healthcare delivery requiring immediate medical interventions and care.

70225.  Surgical Service Staff.

(a)    A physician shall have overall responsibility for the surgical service. This physician shall be certified or eligible for certification in surgery by the American Board of Surgery.  If such a surgeon is not available, a physician, with additional training and experience in surgery shall be responsible for the service.

(b)    One or more surgical teams consisting of physicians, registered nurses and other personnel shall be available at all times.

(c)    A registered nurse with training and experience in operating room techniques shall be responsible for the nursing care and nursing management of operating room service.

(d)    There shall be sufficient nursing personnel so that one person is not serving as a circulating assistant for more than one operating room.

(e)    There shall be evidence of continuing education and training programs for the nursing staff.

70455.  Comprehensive Emergency Medical Service Staff.

   (a)   A full-time physician trained and experienced in emergency medical service shall have overall responsibility for the service.  The physician or her or his designee shall be responsible for:

      (1)   Implementation of established policies and procedures.

      (2)   Providing continuous staffing with physicians trained and experienced in emergency medical service.  Such physicians shall be assigned to and be located in the emergency service area 24 hours a day.

      (3)   Providing experienced physicians in specialty categories to be available in-house 24 hours a day.  Such specialties include but are not limited to medicine, surgery, anesthesiology, orthopedics, neurosurgery, pediatrics, and obstetrics-gynecology.

      (4)   The most senior resident in any of the specialties may be considered an experienced physician.

      (5)   Maintenance of a roster of specialty physicians immediately available for consultation and/or assistance.

      (6)   Assurance of continuing education for all emergency service staff including physicians, nurses, and other personnel.

   (b)   All physicians, dentists, and podiatrists providing services in the emergency room shall be members of the organized medical staff.

   (c)   A registered nurse qualified by education and/or training shall be responsible for nursing care within the service.

   (d)   All registered nurses shall have training and experience in emergency lifesaving and life support procedures.

   (e)   A registered nurse trained and experienced in emergency nursing care shall be on duty at all times.

   (f)   There shall be sufficient licensed nurses and other skilled personnel on duty as required to support the services.

**APPENDIX C – BENEFIT PLAN PREMIUM CONTRIBUTIONS EFFECTIVE
JANUARY 1, 2013**

|  | EE Monthly Contribution | EE % cost sharing |
|---|---|---|
| EPO Full Time | | |
| EE Only | $ 80.37 | 17% |
| EE + Spouse | $177.62 | 17% |
| EE + Child | $129.39 | 17% |
| EE + Children | $152.70 | 17% |
| EE +Family | $313.56 | 21% |

| EPO Part-Time | | |
|---|---|---|
| EE Only | $122.92 | 26% |
| EE + Spouse | $208.96 | 20% |
| EE + Child | $152.23 | 20% |
| EE + Children | $179.65 | 20% |
| EE +Family | $354.01 | 24% |

| PPO1 Full-Time | | |
|---|---|---|
| EE Only | $165.94 | 27% |
| EE + Spouse | $380.32 | 28% |
| EE + Child | $277.06 | 28% |
| EE + Children | $326.97 | 28% |
| EE +Family | $536.91 | 28% |

| PP01 Part-Time | | |
|---|---|---|
| EE Only | $233.55 | 38% |
| EE + Spouse | $516.14 | 38% |

| | | |
|---|---|---|
| EE + Child | $376.01 | 38% |
| EE + Children | $443.74 | 38% |
| EE +Family | $728.67 | 38% |

| PPO2 Full-Time | | |
|---|---|---|
| EE Only | $204.24 | 27% |
| EE + Spouse | $468.07 | 28% |
| EE + Child | $341.00 | 28% |
| EE + Children | $402.42 | 28% |
| EE +Family | $660.82 | 28% |

| PPO2 Part-Time | | |
|---|---|---|
| BE Only | $287.44 | 38% |
| EE + Spouse | $614.73 | 38% |
| EE + Child | $462.79 | 38% |
| EE + Children | $546.14 | 38% |
| EE +Family | $896.83 | 38% |

| PPO 7500/FREE | | |
|---|---|---|
| EE Only | $ 0.00 | 0% |
| EE + Spouse | $ 0.00 | 0% |
| EE + Child | $ 0.00 | 0% |
| EE + Children | $ 0.00 | 0% |
| EE +Family | $ 0.00 | 0% |

| PPO Dental | | |
|---|---|---|
| EE Only | $15.30 | 52% |
| EE + Spouse | $32.72 | 46% |
| EE + Child(ren) | $44.81 | 52% |
| EE +Family | $49.66 | 52% |

| DHMO Dental | | |
|---|---|---|
| EE Only | $ 6.86 | 57% |
| EE + Spouse | $14.43 | 63% |
| EE + Child(ren) | $20.48 | 85% |
| EE +Family | $20.61 | 60% |

# Medical: EPO

Medical EPO

Similar to an HMO plan, the Medical Exclusive Provider Organization (EPO) requires that you receive your healthcare from providers in the Preferred EPO Network You can obtain a list of Preferred EPO Network providers from SmartBen or Human Resources. The EPO is designed to be a cost effective means of obtaining your healthcare services to protect you and your family in the event of an illness or injury. The EPO plan offers a full range of coverage with low out of pocket costs.

All services must be received from providers in the Preferred EPO Network unless it is an emergency, otherwise the service will not be covered.

Primary Care

When enrolling in the EPO, you must select a Primary Care Physician (PCP) from the Preferred EPO Network

Specialty Care

When you see specialists, they mint be part of the Preferred EPO Network Before you see a specialist, you need to contact Keenan TPA Customer Service at 855.626.6195. They can help you make sure your specialist is part of the Preferred EPO Network

Hospital Care

If you live within 25 talks of Brotman Medical Center or any of the Alta Hospital (Los Angeles Community Hospital, Norwalk Community Hospital, Hollywood Community Hospital, and Hollywood Community Hospital of Van Nuys), you must receive your hospital care from one of these entities.

If you live more than 25 miles from Hollywood Community Hospital at Brotman Medical Center or any of the Alta Hospitals (Los Angeles Community Hospital, Norwalk Community Hospital, Hollywood Community Hospital, and Hollywood Community Hospital of Van Nuys), or if the services you require are not available at any of these entities, *then* you must select an alternative hospital that is in the Preferred EPO Network.

# Medical: EPO (continued)

| Benefit Categories | EPO |
|---|---|
| **Lifetime Plan Maximum** *(per Individual)* | |
| • Essential Health Benefits | Unlimited |
| • Non-Essential Health Benefits | $2,000,000 |
| **Calendar Year Deductible** *(Individual / Family)* | $0 / $0 |
| **Annual Out-of-Pocket Maximum** *(Individual / Family)* | $1,500 / $4,500 |
| **Physician Office Visit** | |
| • Primary Care Physician | $20 copay |
| • Specialist Office Visit | $30 copay |
| **Preventive Services** | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge |
| • Immunizations | No charge |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge |
| **Inpatient Hospital Facility** | |
| • Semi-Private Room and Board | $500/admit, then 10% |
| • Inpatient Professional Services | No charge |
| **Outpatient Services** | |
| • Outpatient Surgery | $250/service, then 10% |
| • Outpatient Professional Services | No charge |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | $30 copay (60 combined visits max/plan year) |
| **Lab and X-Ray** | |
| • Physician's Office, Independent Lab and X-Ray | No charge |
| • Outpatient Advanced Imaging | $100 copay |
| **Emergency Services** | |
| • Hospital Emergency Room *(copay waived if admitted)* | $150 copay |
| • Ambulance | $100 copay |

ment is intended to highlight and/or summarize certain aspects of the employer's benefit program. It is not a contract or official plan document. All in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

# Medical: Limited PPO

The Limited PPO provides the same provider network and benefits as the EPO plan except you do not need to select a Primary Care Physician and you are not limited to the Preferred EPO network. You have flexibility to use the Preferred EPO Network (Tier 1) or the Blue Shield Network (Tier 2). Your cost sharing will depend on whether you use Tier 1 or Tier 2 networks. There is no out-of-network coverage unless it is an emergency.

| Benefit Categories | LIMITED PPO | |
|---|---|---|
| | Preferred EPO Network | Blue Shield Preferred Network |
| **Lifetime Plan Maximum** (per Individual) | | |
| • Essential Health Benefits | Unlimited | |
| • Non-Essential Health Benefits | $2,000,000 | |
| **Calendar Year Deductible** (Individual / Family) | $0 / $0 | $1,500 / $4,500 |
| **Annual Out-of-Pocket Maximum** (Individual / Family) | $1,500 / $4,500 | $6,000 / $18,000 |
| **Physician Office Visit** | | |
| • Primary Care Physician | $20 copay | 20% after deductible |
| • Specialist Office Visit | $30 copay | 20% after deductible |
| **Preventive Services** | | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge | No charge |
| • Immunizations | No charge | No charge |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge | No charge |
| **Inpatient Hospital Facility** | | |
| • Semi-Private Room and Board | $500/admit, then 10% | 20% after deductible |
| • Inpatient Professional Services | No charge | 20% after deductible |
| **Outpatient Services** | | |
| • Outpatient Surgery | $250/service, then 10% | 20% after deductible |
| • Outpatient Professional Services | No charge | 20% after deductible |
| • Rehabilitation Benefits (Physical, Occupational and Speech Therapy) | $30 copay (60 combined visits max./plan year) | 20% (60 combined visits max./plan year) |
| **Lab and X-Ray** | | |
| • Physician's Office, Independent Lab and X-Ray | No charge | 20% after deductible |
| • Outpatient Advanced Imaging | $100 copay | 20% after deductible |
| **Emergency Services** | | |
| • Hospital Emergency Room (copay waived if admitted) | $150 copay | 10% after deductible |
| • Ambulance | $100 copay | 10% after deductible |

This document is intended to highlight and/or summarize certain aspects of the employer's benefit program. It is not a contract or official plan document. All statements in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

# Medical: Standard PPO

The Standard PPO plan offers freedom of choice and allows you the ability to go out-of-network. You may obtain services from any provider you choose, but your costs will be lower when utilizing the Preferred EPO Network (Tier 1) or Blue Shield PPO Network (Tier 2) Provider. Your out-of-pocket costs will be lowest when care is received within the Preferred EPO Network. For services received Out-of-Network, you will be responsible for any difference between the covered expense and actual charges.

| Benefit Categories | STANDARD PPO | | |
|---|---|---|---|
| | Preferred EPO Network | Blue Shield Network | Out-of-Network |
| Lifetime Plan Maximum *(per Individual)* | | | |
| • Essential Health Benefits | Unlimited | | |
| • Non-Essential Health Benefits | $2,000,000 | | |
| Calendar Year Deductible *(Individual / Family)* | $0 / $0 | $1,500 / $4,500 | $5,000 / $15,000 |
| Annual Out-of-Pocket Maximum *(Individual / Family)* | $1,500 / $4,500 | $6,000 / $18,000 | $8,000 / $24,000 |
| Physician Office Visit | | | |
| • Primary Care Physician | $20 copay | 20% after deductible | 40% after deductible |
| • Specialist Office Visit | $30 copay | 20% after deductible | 40% after deductible |
| Preventive Services | | | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge | No charge | 40% after deductible |
| • Immunizations | No charge | No charge | 40% after deductible |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge | No charge | 40% after deductible |
| Inpatient Hospital Facility | | | |
| • Semi-Private Room and Board | $500/admit, then 10% | 20% after deductible | 40% after deductible |
| • Inpatient Professional Services | No charge | 20% after deductible | 40% after deductible |
| Outpatient Services | | | |
| • Outpatient Surgery | $250/service, then 10% | 20% after deductible | 40% after deductible |
| • Outpatient Professional Services | No charge | 20% after deductible | 40% after deductible |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | $30 copay (60 combined visits Max/plan year) | 20% (60 combined visits Max/plan year) | 40% (60 combined visits Max/plan year) |
| Lab and X-Ray | | | |
| • Physician's Office, Independent Lab and X-Ray | No charge | 20% after deductible | 40% after deductible |
| • Outpatient Advanced Imaging | $100 copay | 20% after deductible | 40% after deductible |
| Emergency Services | | | |
| • Hospital Emergency Room *(copay waived if admitted)* | $150 copay | 10% after deductible | |
| • Ambulance | $100 copay | 10% after deductible | |

This document is intended to highlight and/or summarize certain aspects of the employee's benefit program. It is not a contract or official plan document. All statements in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

# Medical: Free PPO

The Free PPO plan offers freedom of choice and allows you the ability to go out-of-network. You may obtain services from any provider you choose, but your costs will be lower when utilizing the Preferred EPO Network (Tier 1) or Blue Shield PPO Network (Tier 2) Provider. This PPO has high deductibles and cost sharing but your annual preventive exams are always covered at 100% within the Tier 1 or Tier 2 networks. For services received Out-of-Network, you will be responsible for any difference between the covered expense and actual charges.

| Benefit Categories | FREE PPO | | |
|---|---|---|---|
| | Preferred EPO Network | Blue Shield Network | Out-of-Network |
| **Lifetime Plan Maximum** *(per Individual)* | | | |
| • Essential Health Benefits | | Unlimited | |
| • Non-Essential Health Benefits | | $2,000,000 | |
| **Calendar Year Deductible** *(Individual / Family)* | $7,500 / $15,000 | $7,500 / $15,000 | $10,000 / $20,000 |
| **Annual Out-of-Pocket Maximum** *(Individual / Family)* | $15,000 / $30,000 | $15,000 / $30,000 | $30,000 / $60,000 |
| **Physician Office Visit** | | | |
| • Primary Care Physician | 20% after deductible | 20% after deductible | 50% after deductible |
| • Specialist Office Visit | 20% after deductible | 20% after deductible | 50% after deductible |
| **Preventive Services** | | | |
| • Well-Baby, Well-Child, Well-Woman and Adult Preventive Care | No charge | No charge | 50% after deductible |
| • Immunizations | No charge | No charge | 50% after deductible |
| • Mammogram, PSA, Pap Smear and Maternity Screening | No charge | No charge | 50% after deductible |
| **Inpatient Hospital Facility** | | | |
| • Semi-Private Room and Board | 20% after deductible | 20% after deductible | 50% after deductible |
| • Inpatient Professional Services | 20% after deductible | 20% after deductible | 50% after deductible |
| **Outpatient Services** | | | |
| • Outpatient Surgery | 20% after deductible | 20% after deductible | 50% after deductible |
| • Outpatient Professional Services | 20% after deductible | 20% after deductible | 50% after deductible |
| • Rehabilitation Benefits *(Physical, Occupational and Speech Therapy)* | 20% after deductible | 20% after deductible | 50% after deductible |
| **Lab and X-Ray** | | | |
| • Physician's Office, Independent Lab and X-Ray | 20% after deductible | 20% after deductible | 50% after deductible |
| • Outpatient Advanced Imaging | 20% after deductible | 20% after deductible | 50% after deductible |
| **Emergency Services** | | | |
| • Hospital Emergency Room *(copay waved if admitted)* | | 10% after deductible | |
| • Ambulance | | 10% after deductible | |

This document is intended to highlight and/or summarize certain aspects of the employee's benefit program. It is not a contract or official plan document. All statements in this summary are subject to the terms and conditions of the official plan document/contract, as interpreted by the appropriate plan fiduciary.

| INDEX |
|---|

Additional Representation Rights, 17
Adequate Staffing Levels, 12
Appendix A – AB 394, 49
Applying for Vacancies, 10
Arbitration, 15
Association Labor Representative, 5
Association Leave, 37
Association Membership as a Condition of Employment, 42
Association Obligation, 44
Association Officials, 44
Association Representation, 5
Association Security, 42
Bargaining Unit Information, 49
Bereavement Leave, 40
Benefit Plan Premium Contributions, 75
Bonuses, 30
Bulletin Board, 6
Call-In Procedure, 21
Call-Off/Flex-Off, 22
Change in Specialty, 11
Clinical Certificate Recognition, 30
CNA Nurse Representatives, 5
Communicable Diseases, 34
Compensation, 25
Consultants and Contractors, 7
Counseling, 34
Credit for Working Holidays, 32
Deduction and Remittance of Association Initiation Fees and Dues, 43
Definition, 15, 23
Definition of Premium Pay Holiday Hours, 31
Disciplinary Notices, Rebuttal, and Inspection of Personnel Files, 17
Discipline, 16
Education Benefits, 35
Enforcement of Legally Mandated Nurse Staffing, 13
Entire Agreement, 46
Evaluation Period, 11
Expedited Arbitration, 45
Facility Meals, 30

Failure to Make Required Payments, 43
Filling Of Job Vacancies, 9
Floating, 23
Floating Clusters, 25
Floating Conditions, 24
Floating Order, 24
Floating Rotation, 24
Full-time Non-Benefitted Registered Nurse – Opt Out Program, 30
Full-Time Registered Nurse, 6
General, 32
General Leave of Absence, 38
Grievance Procedure, 15
Harassment, 11
Health and Safety, 32
Holiday Obligation, 32
Holiday Scheduling, 32
Holidays, 31
Hours of Work, Overtime and Scheduling, 18
Individual Bargaining, 30
In-House Registry Program (IHR), 27
Investigation Suspension, 17
Job Security, 42
Joint Health and Safety Committee, 33
Jury Duty Leave, 40
Just Cause, 16
Leaves Of Absence, 37
Length of Leaves, 39
Lift Policy, 35
Management Rights, 42
Meal and Rest Periods, 19
Medical Disability Leave, 39
Minimum Rates, 30
Modified Duty Program, 39
No Guarantee, 23
No Lockouts, 44
No Pyramiding, 23
Nondiscrimination, 11
Notices, 45
Outside Agency Registered Nurses, 47
Overtime, 20
Paid Education Time, 36
Part-Time 1 Registered Nurse, 6

Part-Time 2 Registered Nurse, 6
Patient Care Advocacy Forum, 49
Pay and Benefits, 41
Payday and Paycheck, 27
Payroll Period, 18
Penalty, 44
Per Diem Registered Nurse, 6
Physical Examinations, 34, 41
Posting of Vacancies, 9
Potential Vacancies, 10
Preference Order, 10
Probationary Registered Nurses, 18
Procedure, 15
Professional Practice Committee, 12
Progressive Discipline, 16
Prohibited Activity, 44
Recognition, 4
Reduction in Force, 41
Reduction in Force and Recall, 8
Registered Nurse Response Network, 47
Registered Nurse Status, 6
Relief Charge Pay, 29
Reporting Pay, 29
Restrictions in Applying for Vacancies, 10
Safe Staffing and Patient Advocacy, 12
Savings Clause, 46
Scheduled Off on Holidays, 31
Seniority, 7
Seniority Defined, 7
Severance Pay, 29
Shift Differentials, 27
Special Review Panel, 13
Staffing Regulations adopted by DHS, 53
Standard Benefit Plans, 31
Standards of Competent Performance, 14
Stand-by/On-Call and Call-Back Pay, 28
State and Federal Wage and Hour Laws, 18
Statutory Leaves of Absence, 37
Subcontracting, 42
Successorship Protection, 42
Technology, 46
Temporary Registered Nurse, 7
Term, 48
Termination During Leave of Absence, 41
Time Limits, 16

Tuition Assistance Benefits, 35
Use of Paid Time Off During Leaves, 39
Vacation Scheduling, 20
Wages, 25
Waiver By Association, 44
Waiving Medical Benefits, 30
Weekend Scheduling, 19
Witness Leave, 41
Work Schedules, 19
Work Stoppage, 44
Workday and Workweek, 18
Workplace Violence, 34
Written Disciplinary Action, 17

# EXHIBIT "X"

# EXHIBIT "X"

# Master Service Agreement
### Between
### ALTA HOSPITALS SYSTEM, LLC
### and
### COMPASS GROUP USA, INC.



**W I T N E S S E T H :**

1.   **Locations.**

2.   **Compass's Responsibilities.**

      a.     **Compass's Qualifications.**

      b.     **Client's Rules.**

      c.     **Background Checks for Compass Personnel.**

      d.     **Physicals and Testing for Compass Personnel.**

      e.     **Compass Personnel.**

      f.     **Removal of Compass Personnel.**

      g.     **Wages, Salaries and Fringe Rates.**

2

██████████████████████████████████████████████

      h.     **Management and Training of Non-Supervisory Personnel.** ████

████████████████████████████████████████████████

   3.   **Facility Access and Client Responsibilities.**

      a.     **Access to Client Facilities and Equipment.** ██

██████████████████████████████████████████████

      b.     **Provision of Office and Storage Space.** ██

████████████████████████████

      c.     **Environmental Hazards.** ██

██████████████████████████████████████████████

      d.     **Client and Location Personnel.** ██

██████████████████████████████████████████████

   4.   **Financial Terms.**

      a.     **Compass's Rates.** ██

      b.     **Payment Terms.** ██

████████████████████████████████████████████████

3

c.      **Previous Investments**.



d.      **Adjustments to Compass's Rates.**

i.      **Scope of Service Changes.**

ii.      **Labor Changes.** Compass's Rates will be subject to change in the event of (i) a change to existing or new federal, state or local payroll taxes (including changes to any payroll based taxes or withholdings such as FICA, SUI and FUI); (ii) a change related to unionization of employees performing Services (whether an initial collective bargaining agreement, amendments to an existing collective bargaining agreement, or the negotiation of a subsequent, successor collective bargaining agreement); (iii) an increase in the minimum wage rate or the enactment of any "living wage" laws by any

4

governmental entity; and/or (iv) new or additional fees, taxes, assessments or other charges or costs incurred by Compass arising out of changes to existing or new federal, state or local legislation or legal requirements related to Compass's employees. Compass's Rates for the affected Service(s) will be increased as mutually agreed upon by the Parties in writing to account for the change in such costs effective from the date such changes impose additional costs on Compass.

          iii.    **Annual CPI Adjustment.**



          iv.    **Changes Impacting Operations.**



5.    **Term of Agreement.** The term of this Agreement shall commence on August 1, 2017 and shall continue until July 31, 2024 (the "Initial Term"). This Agreement shall then renew for additional one (1) year terms ("Renewal Terms") unless a Party provides written notice at least ninety (90) days prior to the expiration date of the Initial Term or any Renewal Term, as the case may be, to the other Party of its election not to renew the Agreement.

6.    **Quarterly Business Review.**

7.    **Termination of Agreement.**

         a.    **Termination for Cause.**



         b.    **Termination for Non-Payment.**

         c.    **Termination without Cause.**

5



d. **Termination Cooperation.** ████████████████

8. **Insurance Coverage.**

a. **Types of Insurance.** ███████████████████████

b. **Certificate of Insurance.** ████████████████

9. **Indemnity.**

a. **Mutual Indemnification.** ████████████

b. **Workers' Compensation and Property Damage Waiver of Subrogation.**

c. **Limitation of Liability.** ██████████████████

6



d.      **Indemnification for Withdrawal Liability.**

10.   **Dispute Resolution.**

a.      **Initiation of Dispute Resolution.**

b.      **Referral to Senior Executives.**

11.   **Auditing.**

7

12. **Taxes**.

    a.    **Compass Responsibility for Taxes.**

    b.    **Compass Charges for Taxes.**

    c.    **Client Responsibility for Taxes.**

13. **Force Majeure Events**.

    a.    **Force Majeure Defined.**

    b.    **Operating During a Force Majeure Event.**

14. **Employment Commitment**.

8

15. <u>**Compliance with Applicable Law**</u>.

    a.    <u>**Applicable Laws.**</u>

    b.    <u>**Compliance with Laws and Regulatory Standards.**</u>

    c.    <u>**Unlawful Discrimination.**</u>

    d.    <u>**Licenses.**</u>

16. <u>**Confidential Information and Proprietary Materials**</u>.

    a.    <u>**Proprietary Information.**</u>

9



b.  **Precautions.**

c.  **Protection of Proprietary Information.**

d.  **Limitation on Confidentiality Obligation.**

e.  **Use of Client Data.**

17. **HIPAA.**

18. **Miscellaneous.**

a.  **Independent Contractor.**

10



b.    **Assignment.**

c.    **Modification.**

d.    **Execution.**

e.    **Entire Agreement; Conflict in Terms.**

f.    **Survival.**

g.    **Waiver.**

h.    **Severability.**

i.    **Attorneys' Fees.**

j.    **Written Notices.**

Exhibit X, Page 571



k.   **Governing Law.**

l.   **Limitation of Claims.**

m.   **Third Party Patient Satisfaction Providers.**

n.   **Compass Vendors.**

o.   **Information Technology Systems.**

12



p.  **Compass Code of Conduct.**

q.  **Representations.**

r.  **Title.**

s.  **GPO Fees.**

[Signature Page Follows]

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their officers thereunto duly authorized, as of the day and year first above written.

**ALTA HOSPITALS SYSTEM, LLC**

By: *Don Kreitz*
Name:   Donald Kreitz
Title:   SVP California Hospitals

By: *Bill Gorenstein*
Name:   William Gorenstein
Title:   CFO California Hospitals

**COMPASS GROUP USA, INC.**
**By and through its subsidiary**
**MORRISON MANAGEMENT SPECIALISTS, INC.**

By: _____
Name:   Ed Clark
Title:   Regional Vice President

14

Exhibit X, Page 574

# EXHIBIT "Y"

# EXHIBIT "Y"

# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Summary:** As of 6/10/21, a total of 40,835 healthcare workers and first responders have been confirmed with COVID-19 in Los Angeles County—this is an additional 38 newly reported cases, as well as 4 older cases not previously included in this report. This report includes all healthcare workers and first responders who live and/or work in Los Angeles County. Cases have reported symptom onset dates starting in February 2020, with a decline from mid-April through early June, and again as of mid-July until mid-September (Figure 1). Based on symptom onset, it appears there was a small decline in mid-December before our latest peak in early January; however, weekly reported cases remained high until late January, signifying possible delays in testing (Figure 2) and/or reporting. Asymptomatic cases currently account for 11.4% of all positive healthcare workers/first responders. Demographics show two-thirds of cases were women (69%), nearly half were between 30 and 49 years old (48%), and over half were of Hispanic, Latino, or Spanish origin (54%) (Table 1). Cases have been identified among 30 different occupational settings (Table 2). Hospitals continue to report the highest proportion of overall cases (26%), but Skilled Nursing Facilities reported the highest number of weekly cases (21%). Nurses (including RN, LVN, and CNA) also continue to account for the majority of overall (29%) and weekly cases (23%) (Table 3). Nearly one-third (32%) reported being exposed to a known case within their facility, either a patient and/or co-worker, and 13% had a known exposure outside of their facility, such as a family member or social gathering (Table 4). Matching with hospital data, rate of hospitalization is approximately 6% for healthcare workers/first responders. (Table 5). There has been a total of 269 COVID-19 related deaths in healthcare workers/first responders. The majority were men (56%), between 50 and 64 years old (50%), Hispanic, Latino, or Spanish (47%), and had a known co-morbidity (81%) (Table 6). Skilled Nursing Facility staff (42%) and nurses (29%) continue to account for the most deaths (Tables 7 and 8). All data in this report was obtained from case interviews, death report forms, and/or emailed reports directly from facilities or from outside jurisdictions if the worker resides outside but works in LA County.

**Figure 1. Date of Symptom Onset by Week for COVID-19 Positive Healthcare Worker Cases and First Responders, May 31, 2020 through June 5, 2021 [1,2]**

[1]  Data provisional and subject to change; cumulative until 6/10/21.

[2]  Due to delays in testing and interviewing, late May cases are likely still to be added.



# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Table 1. Demographics of COVID-19 Positive Healthcare Workers and First Responders[1]**

| Gender | Count | Percent |
|---|---|---|
| Female | 28120 | 68.9% |
| Male | 11661 | 28.6% |
| Other (Genderqueer, Transgender) | 25 | 0.1% |
| Prefer Not to State | 2 | <0.1% |
| Not specified/Unknown[2] | 38 | 0.1% |
| Blank[3] | 989 | 2.4% |
| **Age** | | |
| Under 18 | 14 | <0.1% |
| 18 to 29 | 10472 | 25.6% |
| 30 to 49 | 19459 | 47.7% |
| 50 to 64 | 9174 | 22.5% |
| 65 to 79 | 1472 | 3.6% |
| 80 and Over | 19 | <0.1% |
| Missing DOB | 225 | 0.6% |
| **Race/Ethnicity** | | |
| Hispanic, Latino, or Spanish | 22176 | 54.3% |
| Asian | 6033 | 14.8% |
| White | 4843 | 11.9% |
| Black or African-American | 3136 | 7.7% |
| Native Hawaiian or Other Pacific Islander | 508 | 1.2% |
| American Indian or Alaska Native | 83 | 0.2% |
| Other | 419 | 1.0% |
| Two or More Races | 591 | 1.4% |
| Not specified/Unknown/Refused[2] | 1777 | 4.4% |
| Blank[3] | 1269 | 3.1% |

[1]  Data provisional and subject to change; cumulative until 6/10/21.

[2]  "Not specified" defined as interviewed cases who did not specify their gender or race/ethnicity.

[3]  "Blank" includes cases that were not interviewed and/or instances where information was not included in the report from the facility or outside jurisdiction.

Los Angeles County Department of Public Health
publichealth.lacounty.gov/acd/ncorona2019/
6/9/2021

Page **2** of 10

Exhibit Y, Page 577

County of Los Angeles
Public Health

# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Table 2. Occupational Setting of COVID-19 Positive Healthcare Workers and First Responders[1]**

| Setting | Newly Reported | | Overall | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Skilled Nursing/Assisted Living/Senior Living Facility | 8 | 21.1% | 10357 | 25.4% |
| Hospital | 5 | 13.2% | 10762 | 26.4% |
| Corrections/Detention | 5 | 13.2% | 1944 | 4.8% |
| Home Health | 3 | 7.9% | 2293 | 5.6% |
| Other (Insurance Companies, Non-Profit Organizations, etc) | 3 | 7.9% | 551 | 1.3% |
| Outpatient | 2 | 5.3% | 4479 | 11.0% |
| EMS/First Responder | 2 | 5.3% | 1963 | 4.8% |
| Dental | 1 | 2.6% | 1296 | 3.2% |
| Mental Health | 1 | 2.6% | 1170 | 2.9% |
| Other Congregate | 1 | 2.6% | 1137 | 2.8% |
| Urgent Care | 1 | 2.6% | 264 | 0.6% |
| Laboratory | 1 | 2.6% | 252 | 0.6% |
| Pharmacy | 0 | - | 366 | 0.9% |
| Dialysis | 0 | - | 297 | 0.7% |
| Optometry/Ophthalmology Office | 0 | - | 284 | 0.7% |
| Substance Abuse | 0 | - | 270 | 0.7% |
| DPH/DHS/DMH Services | 0 | - | 251 | 0.6% |
| Hospice | 0 | - | 234 | 0.6% |
| School | 0 | - | 184 | 0.5% |
| Surgery Center | 0 | - | 176 | 0.4% |
| Shelter | 0 | - | 140 | 0.3% |
| Testing Site | 0 | - | 112 | 0.3% |
| Chiropractor | 0 | - | 105 | 0.3% |
| Medical Equipment | 0 | - | 95 | 0.2% |
| Community Center | 0 | - | 72 | 0.2% |
| Research | 0 | - | 51 | 0.1% |
| Airport | 0 | - | 44 | 0.1% |
| Call Center | 0 | - | 29 | 0.1% |
| Consultant | 0 | - | 18 | <0.1% |
| Postmortem Care | 0 | - | 14 | <0.1% |
| Not specified[2] | 0 | - | 1213 | 3.0% |
| Blank[3] | 5 | 13.2% | 412 | 1.0% |

[1]  Data provisional and subject to change; cumulative until 6/10/21.

[2]  "Not specified" defined as interviewed cases who did not specify their occupational setting.

[3]  "Blank" includes cases that were not interviewed and/or instances where information was not included in the report from the facility or outside jurisdiction.



# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Figure 2. Weekly Test Count by Setting for COVID-19 Positive Healthcare Worker Cases and First Responders, May 31, 2020 through June 5, 2021** [1,2,3,4,5]

1   Data provisional and subject to change; cumulative until 6/10/21.

2   Report date used if test date not available.

3   Due to delays in reporting and interviewing, January cases are likely still to be added.

4   Settings included in "outpatient" include general outpatient, dental, surgery centers, dialysis, urgent care, chiropractor, and optometry/ophthalmology office.

5   "Other Settings" includes all other settings not specified in the key.

Los Angeles County Department of Public Health
publichealth.lacounty.gov/acd/ncorona2019/
6/9/2021



Exhibit Y, Page 579

# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Table 3. Occupational Role of COVID-19 Positive Healthcare Workers and First Responders[1]**

| Role | Newly Reported Count | Newly Reported Percent | Overall Count | Overall Percent |
|---|---|---|---|---|
| Nurse | 9 | 23.7% | 11695 | 28.6% |
| Administration | 4 | 10.5% | 2775 | 6.8% |
| Law Enforcement | 4 | 10.5% | 2373 | 5.8% |
| Caregiver | 3 | 7.9% | 3632 | 8.9% |
| Radiology | 2 | 5.3% | 386 | 0.9% |
| Patient Services | 1 | 2.6% | 1715 | 4.2% |
| Reception/Check In | 1 | 2.6% | 987 | 2.4% |
| Psychiatrist/Therapist | 1 | 2.6% | 912 | 2.2% |
| Surgical or Other Technician | 1 | 2.6% | 839 | 2.1% |
| EMT/Paramedic/Firefighter | 1 | 2.6% | 735 | 1.8% |
| Physician | 1 | 2.6% | 660 | 1.6% |
| Physical/Occupational/Speech Therapist | 1 | 2.6% | 650 | 1.6% |
| Pharmacist or Pharmacy Technician | 1 | 2.6% | 621 | 1.5% |
| Security | 1 | 2.6% | 237 | 0.6% |
| Medical Assistant | 0 | - | 2095 | 5.1% |
| Non-patient Facing Services | 0 | - | 1605 | 3.9% |
| Environmental Services | 0 | - | 1288 | 3.2% |
| Food Services | 0 | - | 1052 | 2.6% |
| Dentist/Orthodontist/Dental Assistant | 0 | - | 902 | 2.2% |
| Laboratory | 0 | - | 381 | 0.9% |
| Maintenance | 0 | - | 358 | 0.9% |
| Social Worker | 0 | - | 318 | 0.8% |
| Phlebotomist | 0 | - | 289 | 0.7% |
| Respiratory Therapist | 0 | - | 278 | 0.7% |
| Mid-level Practitioner | 0 | - | 260 | 0.6% |
| Specialty Medicine | 0 | - | 242 | 0.6% |
| Activity Coordinator | 0 | - | 226 | 0.6% |
| Student/Volunteer | 0 | - | 216 | 0.5% |
| Transporter | 0 | - | 178 | 0.4% |
| MD Resident | 0 | - | 111 | 0.3% |
| Infection Preventionist | 0 | - | 46 | 0.1% |
| Not specified[2] | 2 | 5.3% | 1560 | 3.8% |
| Blank[3] | 5 | 13.2% | 1213 | 3.0% |

[1] Data provisional and subject to change; cumulative until 6/10/21.

[2] "Not specified" defined as interviewed cases who did not specify their occupational setting.

[3] "Blank" includes cases that were not interviewed and/or instances where information was not included in the report from the facility or outside jurisdiction.



# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

### Table 4. Known Exposure of COVID-19 Positive Healthcare Workers and First Responders[1,2]

| Healthcare Exposure | Count | Percent |
|---|---|---|
| Positive Patient | 1331 | 3.3% |
| Positive Healthcare Worker | 863 | 2.1% |
| Both: Positive Healthcare Worker and Positive Patient | 244 | 0.6% |
| Healthcare Not Specified | 10495 | 25.7% |
| **Non-Healthcare Exposure[3]** | | |
| Family/Household Contact | 2516 | 6.2% |
| Social/Community Contact | 614 | 1.5% |
| Travel | 374 | 0.9% |
| Non-Healthcare Not Specified | 1967 | 4.8% |
| **Unknown Exposure** | | |
| Reported No Known Exposure | 13229 | 32.4% |
| Did Not Answer Question/Not Interviewed | 9979 | 24.4% |

[1] Data provisional and subject to change; cumulative until 6/10/21.

[2] Data represents frequencies and not unique individuals, as some may have reported multiple exposures.

[3] Non-healthcare exposures are only known if noted in the remarks/comments section and are likely underrepresented.

### Table 5. Hospitalizations among COVID-19 Positive Healthcare Workers and First Responders[1,2,3]

| Hospitalized | Count | Percent |
|---|---|---|
| Yes | 2478 | 6.1% |
| No | 29333 | 71.8% |
| No Record of Hospitalization | 9024 | 22.1% |

[1] Data provisional and subject to change; cumulative until 6/10/21.

[2] Hospitalization reported via case interview and/or matched with hospitalization records reported from LA County Hospitals.

[3] Many hospitalized patients are unable to be interviewed; therefore, these numbers may be misrepresented if hospitalized outside of LA County.



# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Figure 3. Date of Death by Week for All COVID-19 Positive Healthcare Worker Cases and First Responders, April 5, 2020 to present [1,2]**



[1]  Data provisional and subject to change; cumulative until 6/10/21.

[2]  Includes 11 who reside outside of LAC DPH jurisdiction.

Los Angeles County Department of Public Health
publichealth.lacounty.gov/acd/ncorona2019/
6/9/2021

Page **7** of **10**

County of Los Angeles
Public Health

Exhibit Y, Page 582

# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Table 6. Demographics and Exposure of COVID-19-Related Healthcare Worker and First Responder Deaths[1,2]**

| Gender | Count | Percent |
|---|---|---|
| Male | 150 | 55.8% |
| Female | 119 | 44.2% |
| **Age** | | |
| 18 to 29 | 2 | 0.7% |
| 30 to 49 | 48 | 17.8% |
| 50 to 64 | 136 | 50.6% |
| 65 to 79 | 78 | 29.0% |
| 80 and over | 3 | 1.1% |
| Unknown/Under Investigation | 2 | 0.7% |
| **Race/Ethnicity** | | |
| Hispanic, Latino, or Spanish | 127 | 47.2% |
| Asian | 80 | 29.7% |
| White | 24 | 8.9% |
| Black or African-American | 19 | 7.1% |
| Native Hawaiian or Other Pacific Islander | 5 | 1.9% |
| Two or More Races | 3 | 1.1% |
| American Indian or Alaska Native | 1 | 0.4% |
| Other | 4 | 1.5% |
| Unknown/Under Investigation | 6 | 2.2% |
| **Co-Morbidities** | | |
| Yes | 217 | 80.7% |
| None Reported | 40 | 14.9% |
| Unknown/Under Investigation | 12 | 4.5% |
| **Exposure** | | |
| Healthcare | 67 | 24.9% |
| Family or Community | 12 | 4.5% |
| Unknown[3] | 190 | 70.6% |

[1] Data provisional and subject to change; cumulative until 6/10/21.

[2] Includes 11 who reside outside of LAC DPH jurisdiction.

[3] Exposure information is most often obtained during case interview; therefore, exposure is unknown if not interviewed or specified in hospital notes.

Los Angeles County Department of Public Health
publichealth.lacounty.gov/acd/ncorona2019/
6/9/2021

Page **8** of 10

Exhibit Y, Page 583

COUNTY OF LOS ANGELES
Public Health

# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Table 7.  Occupational Setting of COVID-19-Related Healthcare Worker and First Responder Deaths[1,2]**

| Occupational Setting | Count | Percent |
|---|---|---|
| Skilled Nursing/Long-term Care Facility | 113 | 42.0% |
| Hospital | 42 | 15.6% |
| EMS/First Responder | 16 | 5.9% |
| Outpatient | 17 | 6.3% |
| Home Health | 13 | 4.8% |
| Other Congregate | 7 | 2.6% |
| Corrections/Detention | 6 | 2.2% |
| Dental | 6 | 2.2% |
| Laboratory | 4 | 1.5% |
| Dialysis | 3 | 1.1% |
| Mental Health | 3 | 1.1% |
| Substance Abuse | 3 | 1.1% |
| Health Insurance | 2 | 0.7% |
| Medical Equipment | 2 | 0.7% |
| Surgery Center | 2 | 0.7% |
| DPH/DHS/DMH Services | 1 | 0.4% |
| Hospice | 1 | 0.4% |
| Pharmacy | 1 | 0.4% |
| Unknown/Under Investigation | 27 | 10.0% |

[1]  Data provisional and subject to change; cumulative until 6/10/21.

[2]  Includes 11 who reside outside of LAC DPH jurisdiction.

Los Angeles County Department of Public Health
publichealth.lacounty.gov/acd/ncorona2019/
6/9/2021

Page **9** of 10

Exhibit Y, Page 584

County of Los Angeles
Public Health

# Coronavirus Disease 2019 (COVID-19)

## COVID-19 Positive Healthcare Workers and First Responders Data, Los Angeles County

**Table 8. Occupational Role of COVID-19-Related Healthcare Worker and First Responder Deaths[1,2]**

| Occupational Role | Count | Percent |
|---|---|---|
| Nurse | 77 | 28.6% |
| Administration | 28 | 10.4% |
| Caregiver | 26 | 9.7% |
| Law Enforcement | 15 | 5.6% |
| Environmental Services | 14 | 5.2% |
| Food Services | 13 | 4.8% |
| Physician | 8 | 3.0% |
| Dentist/Dental Assistant | 6 | 2.2% |
| Non-patient Facing Services | 6 | 2.2% |
| Maintenance | 4 | 1.5% |
| Security | 4 | 1.5% |
| Social Worker | 4 | 1.5% |
| Lab Technician | 3 | 1.1% |
| Medical Assistant | 3 | 1.1% |
| Psychiatrist/Therapist | 3 | 1.1% |
| Activity Coordinator | 2 | 0.7% |
| Firefighter/Paramedic | 2 | 0.7% |
| Radiology | 2 | 0.7% |
| Medical Equipment | 2 | 0.7% |
| Nurse Practitioner | 1 | 0.4% |
| Optician | 1 | 0.4% |
| Patient Services | 1 | 0.4% |
| Pharmacist | 2 | 0.7% |
| Phlebotomist | 1 | 0.4% |
| Physical Therapist | 1 | 0.4% |
| Physician Assistant | 1 | 0.4% |
| Respiratory Therapist | 1 | 0.4% |
| Speech Therapist | 1 | 0.4% |
| Unknown/Under Investigation | 37 | 13.8% |

[1]  Data provisional and subject to change; cumulative until 6/10/21.

[2]  Includes 11 who reside outside of LAC DPH jurisdiction.

